**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In the Matter of the Arbitration between<br><br>TEMBEC INC., TEMBEC INVESTMENTS INC., TEMBEC INDUSTRIES INC.<br><br>Petitioners,<br><br>and<br><br>THE UNITED STATES OF AMERICA,<br><br>Respondent. | Case No. 05-2345 (RMC) |

**MOTION TO VACATE ARBITRATION AWARD**

Petitioners Tembec Inc., Tembec Investments Inc., and Tembec Industries Inc. ("Tembec"), pursuant to the Convention on the Recognition and Enforcement of Arbitral Awards ("New York Convention"), 9 U.S.C. §201, and Section 10 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §10, move this court to vacate the September 7, 2005 Order of the Consolidation Tribunal rendered by the arbitration tribunal constituted under Article 1126 of the North American Free Trade Agreement ("NAFTA") *In the Matter of Canfor Corp. v. United States, Tembec et al v. United States, Terminal Forest Products Inc. v. United States*, which terminated Tembec's arbitration proceedings under NAFTA Article 1120.

This motion is supported by the accompanying memorandum and exhibits.

Respectfully submitted,

/s/

Elliot J. Feldman (D.C. Bar No. 418501)
Mark A. Cymrot (D.C. Bar No. 164673)
Michael S. Snarr (D.C. Bar No. 474719)
BAKER & HOSTETLER LLP
1050 Connecticut Ave. N.W.
Suite 1100
Washington D.C. 20036-5304
Tel: (202) 861-1679
Fax: (202) 861-1783
Counsel for Petitioners Tembec Inc., Tembec Investments Inc., and Tembec Industries Inc.

Dated: February 17, 2006

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| In the Matter of the Arbitration between<br><br>TEMBEC INC., TEMBEC INVESTMENTS INC., TEMBEC INDUSTRIES INC.<br><br>Petitioners,<br><br>and<br><br>THE UNITED STATES OF AMERICA,<br><br>Respondent. | ) | Case No. 05-2345 (RMC) |

**ORDER**

Upon consideration of Tembec's Motion to Vacate Arbitration Award, and other papers and proceedings herein, it is hereby

ORDERED, that the Motion to Vacate Arbitration Award is granted, and the September 7, 2005 Order of the Consolidation Tribunal *In the Matter of Canfor Corp. v. United States, Tembec et al v. United States, Terminal Forest Products Inc. v. United States* is hereby vacated.

__________________________________
ROSEMARY M. COLLYER
United States District Judge

Dated: _________________, 2006

Washington, District of Columbia

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In the Matter of the Arbitration between<br><br>TEMBEC INC., TEMBEC INVESTMENTS INC., TEMBEC INDUSTRIES INC.<br><br>Petitioners,<br><br>and<br><br>THE UNITED STATES OF AMERICA,<br><br>Respondent. | Case No. 05-2345 (RMC) |

**PETITIONERS' MEMORANDUM IN SUPPORT OF**
**MOTION TO VACATE ARBITRATION AWARD**

**INTRODUCTION**

Petitioners Tembec Inc., Tembec Investments Inc., and Tembec Industries Inc. (collectively "Tembec") move this Court, pursuant to the Convention on the Recognition and Enforcement of Arbitral Awards ("New York Convention"), 9 U.S.C. §201, and Section 10 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10, to vacate the September 7, 2005 Order of the Consolidation Tribunal ("Award") rendered by a tribunal constituted under Article 1126 of the North American Free Trade Agreement ("NAFTA").

Tembec is a Canadian lumber, pulp and paper producing company, organized under the laws of Québec, Canada, with significant investments in the United States. On December 3, 2003, Tembec instituted an arbitration seeking damages from the United States under NAFTA Article 1120, which provides protections for foreign investors in the United States. The arbitration seeks more than $200 million in

damages for the continued imposition of antidumping and countervailing duties on softwood lumber that on appeal has been held unlawful.

By March 7, 2005, an Article 1120 tribunal had been formed expressly to arbitrate Tembec's claims; a hearing on organizational matters and discovery had been held; jurisdictional objections raised by the United States had been pleaded and briefed; a jurisdictional hearing had been scheduled. After almost a year and a half of delaying the proceedings, the United States on March 7 sought new arbitrators, petitioning the International Centre for the Settlement of Investment Disputes ("ICSID") to appoint a new tribunal under NAFTA Article 1126 ("Consolidation Tribunal") to consolidate Tembec's NAFTA Chapter 11 claims with claims submitted by Canfor Corporation ("Canfor") in November 2001, and by Terminal Forest Products Limited ("Terminal") (collectively "Claimants") in March 2004.[1] The United States' petition, which could have been filed fifteen months earlier (with Canfor's suit long outstanding before Tembec filed), effectively postponed jurisdictional decisions on motions of the United States from two consensually formed tribunals, in favor of a new tribunal chosen in part from a U.S. government list with no comparable input from Claimants.

On May 6, 2005, the ICSID Secretary-General appointed three arbitrators to the new Consolidation Tribunal sought by the United States.[2] One of the arbitrators was an American who had been appointed by the United States to the ICSID Panel of Arbitrators--a group of arbitrators chosen by governments (who are only and always respondents) to hear state-investor disputes. The chairman was Dutch, named to the

[1] Letter from Mark A. Clodfelter to Roberto Dañino (Mar. 7, 2005) attached at Appendix Tab.A.

[2] Letter from Gonzalo Flores to the United States, Tembec, Canfor, and Terminal (hereinafter "the Parties") (May 6, 2005), attached at Appendix Tab B.

ICSID Panel of Arbitrators by the Government of The Netherlands. The third arbitrator was a Canadian appointed at the discretion of the Secretary-General.[3] Tembec was not asked to provide a proposed list of arbitrators from which members of the Consolidation Tribunal could be selected.

None of the arbitrators disclosed information of "any circumstances likely to give rise to justifiable doubts as to his impartiality or independence," as required by UNCITRAL Rules of Arbitration ("UNCITRAL"), Article 9, the governing procedural rules under NAFTA Article 1126.[4] Through due diligence, Tembec learned that the American arbitrator, Davis R. Robinson, was a family relation of the President of the United States. The President has been involved personally in the *Softwood Lumber* dispute with Canada that led to Tembec's claims. Mr. Robinson was also former Legal Adviser to the Department of State, the very office that defends investment disputes generally and is defending the United States in this case in particular.

Quickly after these disclosures, and before the expiration of the fifteen days for challenging the appointment of arbitrators provided by Article 11 of the UNCITRAL Rules, the Consolidation Tribunal issued an order suspending the ongoing Article 1120 arbitration proceedings, which effectively canceled Tembec's jurisdictional hearing.[5] The hearing was to have completed a protracted process instigated by the United States that had delayed getting to the merits of Tembec's claims. Tembec promptly objected to Mr. Robinson's appointment, to the premature suspension of its

[3] Canada is not a member of ICSID and therefore does not make appointments to the ICSID Panel.

[4] A copy of the UNCITRAL Rules of Arbitration is attached at Appendix Tab C.

[5] Letter from Gonzalo Flores to the Parties (May 19, 2005), attached at Appendix Tab D.

Article 1120 proceedings, and to the untimely petition for consolidation. ICSID and the Tribunal overruled all of Tembec's objections.

On September 7, 2005, the Consolidation Tribunal granted the United States' request to consolidate Tembec's NAFTA Chapter 11 claims with the other Claimants, and definitively terminated Tembec's suspended arbitration proceedings before the Article 1120 Tribunal ("Award").[6] Tembec timely filed a petition to vacate the Consolidation Tribunal's Award, and notified the United States of its intent to file this Motion to Vacate.

Tembec now requests that this Court vacate the Award on the grounds that: (1) Mr. Robinson's appointment to the Consolidation Tribunal presented conflicts of interest, creating "evident partiality" on the tribunal against Tembec; (2) the composition of the Consolidation Tribunal violated NAFTA Article 1126 and U.S. public policy, as the United States and respondent governments had undue influence over the choice of the tribunal; and (3) the Consolidation Tribunal exceeded its powers because it exercised authority without being properly constituted and beyond the authority granted by NAFTA Article 1126. As a result, the Award should be void.

## STATEMENT OF FACTS

The NAFTA Parties – the Governments of Canada, Mexico, and the United States – promulgated Chapter 11 of NAFTA to "ensure a predictable commercial framework for business planning and investment"[7] and to "increase substantially

[6] *In the Matter of Canfor Corp. v. United States, Tembec et al v. United States, Terminal Forest Products Inc. v. United States*, Order of the Consolidation Tribunal (September 7, 2005), attached at Appendix Tab E.

[7] NAFTA Preamble.

investment opportunities in the territories of the Parties."[8] They codified international legal standards to protect foreign investments from discriminatory and arbitrary government measures. For example, the NAFTA Parties are required to provide "national treatment" and "most-favored-nation treatment" to NAFTA investors and their foreign investments.[9] They also must provide "the minimum standard of treatment in accordance with international law" to foreign investments, and refrain from expropriating foreign investments without providing fair compensation.[10]

The NAFTA Parties gave investors the means to protect their foreign investments from violations of these and other standards by waiving sovereign immunity and consenting to foreign investors' submission of arbitration claims for damages.[11] In the case of Article 1126 proceedings, NAFTA Chapter 11 and the UNCITRAL Rules of Arbitration serve as the "arbitration agreement." *See* NAFTA Article 1126(1).

The United States Department of Commerce and the United States International Trade Commission, acting upon petitions filed by U.S. lumber manufacturers, initiated antidumping and countervailing duty investigations of softwood lumber imported from Canada on April 2, 2001. The two agencies both made affirmative determinations to impose duties, and on May 22, 2002, the Department of Commerce issued antidumping and countervailing duty orders requiring Tembec to pay 29% *ad valorem* duties, in the form of cash deposits, on lumber destined for the U.S.

---

[8] NAFTA, art. 102(1)(c).

[9] *See* NAFTA art. 1102 ("National Treatment") and art. 1103 ("Most-Favored-Nation Treatment"). A copy of the provisions in Chapter 11 of NAFTA can be found attached at Appendix Tab F.

[10] *See* NAFTA art. 1105 ("Minimum Standard of Treatment") and art. 1110 ("Expropriation and Compensation.")

[11] *See* NAFTA, art. 1122.

market. The United States has collected an estimated US$4 billion in softwood lumber cash deposits from Canadian exporters.[12] Tembec has paid already over US$200 million to the United States under these orders. Duty deposits continue to be collected on a daily basis.

Tembec and other Canadian parties appealed the administrative determinations authorizing the imposition of antidumping and countervailing duties. NAFTA Chapter 19 permits binational panels of U.S. and Canadian international trade experts to "stand in the shoes" of the United States Court of International Trade and the United States Court of Appeals for the Federal Circuit, and review the administrative determinations to determine whether they comply with U.S. law. A NAFTA Chapter 19 binational panel reviewing the International Trade Commission's affirmative threat of injury determination found the determination to be unlawful and required the Commission to reverse it.

The legal result of the binational panel decision and consequent negative determination of the International Trade Commission should have been the revocation of the duty orders and refund of the cash deposits paid pursuant to them.[13] Another NAFTA Chapter 19 panel independently found that the original 19% *ad valorem* countervailing duties calculated by the Department of Commerce in fact should have been *de minimis*, meaning less than 1%, which also should require revocation and

[12] *Notice of Amended Final Affirmative Countervailing Duty Determination and Notice of Countervailing Duty Order: Certain Softwood Lumber Products from Canada*, Case No. C-122-839, 67 Fed. Reg. 36,070 (May 22, 2002); *Notice of Amended Final Determination of Sales at Less Than Fair Value: Certain Softwood Lumber Products from Canada*, Case No. C-122-838, 67 Fed. Reg. 36,068 (May 22, 2002).

[13] *Antidumping and Countervailing Duty Investigations of Certain Softwood Lumber Products From Canada: NAFTA Panel Decision*, 69 Fed. Reg. 69,584 (Nov. 30, 2004).

refund as to the countervailing duty order.[14] The United States, however, has refused to comply with these decisions.

The *Softwood Lumber* dispute has engaged the leaders of both countries. In late November 2004, President Bush personally told Canada's then Prime Minister, Paul Martin, that the problem in the *Softwood Lumber* dispute was Canada's despite the many contrary rulings. Senator Michael Crapo of Idaho explained on the Senate floor:

> The Bush Administration has concluded that duty deposits amounting to approximately $3 billion and growing daily cannot and will not be returned absent a negotiated settlement between the Canadian and U.S. Governments. … There is zero likelihood that the countervailing duty antisubsidy order will disappear absent settlement of the lumber subsidy and dumping issues, no matter how often a NAFTA panel tries to achieve this outcome.[15]

At least three cabinet officials have been involved framing, defending, or explaining U.S. policy, all as rebuttal to the judicial decisions of NAFTA panels. The Commerce Secretary and the U.S. Trade Representative (who is in the Executive Office of the President) personally have spent considerable time on the issue.[16] At a joint press conference in Ottawa with Canada's Foreign Affairs Minister, Pierre Pettigrew, Secretary of State Condoleezza Rice urged

---

[14] *In the Matter of Certain Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination*, Decision of the Panel on the Fourth Remand Determination, File USA-CDA-2002-1904-03 (Oct. 5, 2005).

[15] 151 Cong. Rec. S136-7 (daily ed. Jan. 24, 2005) (statement of Sen. Crapo) attached at Appendix Tab G. Through a "colloquy" on the Senate floor, Senators Crapo (R-ID), Larry Craig (R-ID) and Max Baucus (D-MT) stated that the United States Government would not live up to its legal obligations under NAFTA.

[16] *See e.g. Trade: Hearing of the Senate Finance Committee*, 107th Cong. (2002) (Statement of Robert Zoellick, U.S. Trade Representative) attached at Appendix Tab H (Ambassador Zoellick boasted that he was personally involved in the softwood lumber dispute, stating "[I]n general on softwood lumber, you and I are actually in very close agreement in that, as you know, we backed the cases that were filed by the coalition, including – I personally, while it was a commerce decision, suggested the critical circumstances finding which was important along the way, was the one that was appropriate. And so we now do have the preliminary countervailing duty and anti-dumping duties.") Ambassador Zoellick thus adopted and pursued a position contrary to Tembec's interests without the results of agency investigations.

Canadians "not to speak in apocalyptic language about this issue" and that "[t]he word of the United States has been good as gold in international dealings and agreements."[17] Yet, litigation to enforce the panel decisions continues, the United States has not revoked the antidumping and countervailing duty orders, no refunds have been given, and Tembec continues to pay duty deposits.

Tembec submitted claims for arbitration against the United States on December 3, 2003 for violations of its NAFTA Chapter 11 obligations with respect to Tembec and Tembec's U.S. investments. Tembec alleges that the United States has manipulated its antidumping and countervailing duty laws so they were applied to Tembec and its investments in an arbitrary, unfair, and discriminatory manner in violation of Articles 1102, 1103, 1105, and 1110 of NAFTA.[18]

Tembec appointed to its original Article 1120 tribunal Professor James Crawford of Australia. The United States appointed Professor Kenneth Dam of the United States of America, and ICSID appointed Judge Florentino Feliciano of the Philippines, with the consent of both the United States and Tembec. Neither Tembec nor the United States had any objections as to any of the Article 1120 tribunal members nor to the formation of the tribunal. The first meeting with the Article 1120 tribunal was convened by telephone on November 30, 2004, and the parties began submitting briefs addressing U.S. challenges to jurisdiction in February 2005.

---

[17] *See* Peter Menyasz, "Canada Exaggerating Difficulties in Resolving Softwood Lumber, Says Secretary of State Rice," BNA International Trade Daily (Oct. 26, 2005) attached at Appendix Tab I.

[18] *In the Matter of Tembec et al v. United States*, Notice of Arbitration and Statement of Arbitration Claim (Dec. 3, 2003) (hereinafter "Tembec's Statement of Claim"), attached at Appendix Tab J.

On March 7, 2005, as briefing was almost complete, the United States requested ICSID to appoint a new tribunal under NAFTA Article 1126 to consolidate the NAFTA Chapter 11 claims of Tembec, Canfor, and Terminal.[19] Canfor had filed its statement of claim in November 2001 and Terminal filed a notice of arbitration in March 2004.[20] Canfor had already completed a jurisdictional hearing and was awaiting a decision; Terminal had shown no interest in pursuing its claim.[21] The United States, thus, knew by December 2003 that it was facing more than one investor claim from Canadian lumber producers.

Tembec, Canfor, and the Canfor tribunal all questioned the United States about consolidation, Tembec inquiring as early as January 2004. Counsel for the United States told the Canfor tribunal, "I can assure you that we have given [consolidation] considerable thought, that we have no intention of invoking Article 1126 in this proceeding."[22] The United States participated in the separate tribunals until both were nearly finished addressing jurisdictional challenges raised by the United States. Only then, after developing a substantial acquaintance with both tribunals, did the United States move to dispose of both of them.[23]

---

[19] Letter from Mark A. Clodfelter to Roberto Dañino (Mar. 7, 2005).

[20] See *In the Matter of Canfor Corp. v. United States*, Notice of Arbitration and Statement of Claim (July 9, 2002) attached at Appendix Tab K; *In the Matter of Terminal Forest Products Ltd. v. United States*, Notice of Arbitration (March 30, 2004) attached at Appendix Tab L.

[21] Terminal did not take further action to pursue its claim after filing its Notice of Arbitration in March 2004.

[22] *In the Matter of Canfor Corp. v. United States*, Hearing Transcript, vol. 3 (Dec. 9, 2004) at p. 112 (Ms. Menaker, representing the United States) attached at Appendix Tab M.

[23] The United States' appointee to the Canfor tribunal, Conrad Harper, resigned on March 2, 2005 after being questioned by Canfor about an undisclosed conflict. The United States refused to make a timely appointment to replace Mr. Harper. The United States used his recusal as pretext to dispose of the two tribunals.

Without addressing such obvious issues as timing, forum shopping, and due process, ICSID named Dr. Albert Jan van den Berg of The Netherlands, Mr. Davis R. Robinson of the United States, and Mr. L. Yves Fortier of Canada as arbitrators to decide whether, on the United States' motion, the other tribunals should be abolished in favor of themselves.[24] The United States objected to the appointment of Mr. Fortier on the basis that his law firm had been involved with representing Canadian parties in the United States' antidumping or countervailing duty proceedings against softwood lumber from Canada. Mr. Fortier immediately withdrew.[25] ICSID then appointed Professor Armand de Mestral of Canada in place of Mr. Fortier.[26] Neither Mr. Fortier nor Professor de Mestral came from a list of arbitrators submitted by the Government of Canada or a list submitted by any of the Canadian parties, unlike the selection of Mr. Robinson, whose name was chosen by ICSID from a list of four arbitrators appointed by the President of the United States.[27]

Upon being named, Mr. Robinson did not disclose any relationship to President George W. Bush. During its due diligence, Tembec found a family tree on the Internet that indicated a person bearing the name "Davis Robinson" was a member of the Bush family. Tembec wrote to ICSID on May 2, 2005 to inquire whether Mr. Robinson was related to President Bush, and the nature of any relationship, so Tembec could determine whether to challenge Mr. Robinson's appointment as giving rise to

[24] Letter from Gonzalo Flores to the Parties (May 6, 2005).

[25] *See* Letter from Gonzalo Flores to the Parties (May 4, 2005), attached at Appendix Tab N.

[26] *Id*.

[27] The United States, as a party to the ICSID Convention, appoints four arbitrators to the ICSID list of arbitrators for a term of six years. Canada, who has not signed the ICSID Convention, is not entitled to appoint any arbitrators to the standing list maintained by ICSID. *See* Convention on the Settlement of Investment Disputes Between States and Nationals of Other States (the "ICSID Convention"), art. 3.

"justifiable doubts as to the arbitrator's impartiality or independence" under Article 10 of the UNCITRAL Rules.[28]

ICSID responded in a letter on Friday, May 6, 2005, stating:

> I am pleased to confirm that Dr. Albert Jan van den Berg, Professor Armand de Mestral and Mr. Davis R. Robinson have accepted their appointments as presiding arbitrator and co arbitrators, respectively, in the Consolidation Tribunal that will decide the United States' Request for Consolidation under NAFTA Article 1126 of March 7, 2005.
>
> Attached please find a copy of a statement that we have received today from Mr. Robinson with his acceptance.
>
> The Consolidation Tribunal is accordingly deemed to be established on this date.[29]

Submitted contemporaneously with that letter was Mr. Robinson's response to the inquiry about his family relations. He revealed for the first time that he is married to Suzanne Walker, a first cousin (once removed) of the President of the United States, George Walker Bush.[30]

Immediately after the intervening weekend, on Monday, May 9, 2005, the United States requested that the Consolidation Tribunal issue an order to stay Tembec's Article 1120 arbitration proceedings in light of the immediate need, in its view, to prevent a June 2-3, 2005 hearing on jurisdiction scheduled by Tembec's Article 1120 Tribunal.[31] Tembec opposed the United States' request on that same day, pointing out that a stay would be premature because Tembec had not been allowed the 15 days

---

[28] *See* Letter from Elliot J. Feldman to Jose Antonio Rivas (May 2, 2005) attached at Appendix Tab O.

[29] *See* Letter from Gonzalo Flores to the Parties (May 6, 2005).

[30] Letter from Davis R. Robinson to Gonzalo Flores (May 6, 2005) attached at Appendix Tab P.

[31] *See* Letter from Andrea J. Menaker to Prof. Albert Jan van den Berg *et al* (May 9, 2005) at 1 attached at Appendix Tab Q.

allotted under the UNCITRAL Rules to evaluate the information provided in Mr. Robinson's May 6 letter.[32] The United States responded by urging the Consolidation Tribunal to nonetheless stay Tembec's Article 1120 arbitration proceedings before a challenge to the tribunal's proper formation and authority could be heard.[33] The United States indicated none of the concern about familial relations manifested when questioning one of the Canfor arbitrators.[34]

Counsel to Canfor provided a letter to the parties on May 10, 2005 to disclose another potential, undisclosed conflict of interest.[35] Canfor advised that Professor Armand de Mestral was of counsel to a law firm pursuing another NAFTA Chapter 11 claim against the United States, and that one of the co-counsel in Canfor also was acting as co-counsel with Professor de Mestral's firm in the other case.

On May 19, 2005, fewer than fifteen days after information had been disclosed regarding potential conflicts of interest for two of the three named arbitrators—Mr. Davis R. Robinson and Prof. Armand de Mestral—the Consolidation Tribunal ordered a stay of Tembec's Article 1120 proceedings pending the decision to

---

[32] *See* Letter from Elliot J. Feldman to Gonzalo Flores and Jose Antonio Rivas (May 9, 2005) attached at Appendix Tab R.

[33] *See* Letter from Andrea J. Menaker to Prof. Albert Jan van den Berg *et al* (May 10, 2005) attached at Appendix Tab S.

[34] The last name of Canfor's consultant and Canfor's arbitrator is the same. Mr. Clodfelter presumed a distant family relationship and questioned the arbitrator. He said he presumed that any relationship would have been disclosed, but accepted the reply that there was no relationship of any kind. *In the Matter of Canfor Corp. v. United States*, Hearing Transcript, vol. 3 (Dec. 9, 2004) at p. 112 (Mr. Clodfelter, representing the United States) at 118, attached at Appendix Tab T. By contrast, here, with a known, close family relationship, Mr. Clodfelter moved to empower the President's cousin before he could be challenged under the UNCITRAL Rules.

[35] Letter from P. John Landry to Albert Jan van den Berg *et al* (May 10, 2005) attached at Appendix Tab U.

assume jurisdiction over those claims, and fixed an expedited schedule for determining the issue of consolidation without consulting any of the parties.[36]

Tembec submitted a timely objection to Mr. Robinson's participation on May 20, 2005, and requested the Tribunal to stay its own proceedings pending the outcome of Tembec's challenge.[37] The other Claimants joined Tembec's objection, while the United States alone opposed.[38] On June 1, the Tribunal decided "[o]n the basis of the Tribunal's discretionary powers under the UNCITRAL Arbitration Rules, the consolidations [*sic*] proceedings are not suspended pending the challenge of Mr. Davis R. Robinson."[39] The United States opposed the objection by Tembec and the other Claimants, and Mr. Robinson responded that he "respectfully refuse[s] to withdraw as an arbitrator in this matter."[40]

Tembec's Article 1120 Tribunal stayed its proceedings as instructed by the Consolidation Tribunal's decision and cancelled the Article 1120 Tribunal's hearing on

---

[36] Letter from Gonzalo Flores to the Parties (May 19, 2005); *See* Letter from Professor Armand de Mestral to Gonzalo Flores (May 20, 2005) attached at Appendix Tab V. Professor de Mestral disclosed his affiliation with the law firm mentioned in the Canfor letter only after the Article 1120 proceedings were stayed, and explained that he terminated his relationship with that law firm in order to continue his participation in the Consolidation Tribunal even before any decision could be taken whether the Consolidation Tribunal would have any long-term business to conduct.

[37] Letter from Elliot J. Feldman to Gonzalo Flores (May 20, 2005), attached at Appendix Tab W, and Letter from Elliot J. Feldman to Albert Jan van den Berg *et al* (May 20, 2005) attached at Appendix Tab X. *See* Letter from Elliot J. Feldman to Roberto Dañino (May 12, 2005) attached at Appendix Tab Y (indicating that the time for challenging Mr. Robinson's appointment would run until May 21, 2005, in accordance with Article 11 of the UNCITRAL Rules, permitting the parties fifteen days to challenge an appointment).

[38] *See* Letter from P. John Landry to Roberto Dañino. (May 24, 2005) attached at Appendix Tab Z; Letter from Andrea J. Menaker to Roberto Dañino (May 24, 2005) attached at Appendix Tab AA. The standard implied in the questioning of Professor Weiler was nowhere to be found as to Mr. Robinson.

[39] Letter from Gonzalo Flores to the Parties (June 1, 2005) attached at Appendix Tab BB.

[40] Letter from Davis R. Robinson to Antonio R. Parra (June 3, 2005) attached at Appendix Tab CC.

jurisdiction in *Tembec Inc. et al. v. United States* scheduled for June 2-3, 2005.[41] Meanwhile, Tembec continued its challenge of Mr. Robinson to the Secretary-General of ICSID on June 9, 2005, pursuant to UNCITRAL Article 11(3).[42] The Consolidation Tribunal proceeded as though it had obtained full consent and authorization from the parties, requiring written submissions regarding consolidation, and ordering the parties to appear at a hearing on consolidation on June 16, 2005.[43] ICSID's decision not to compel Mr. Robinson's withdrawal came on the morning of the first hearing with the Consolidation Tribunal, just thirty minutes before the hearing was scheduled to begin.[44]

## ARGUMENT

The Consolidation Tribunal's decision to terminate Tembec's Article 1120 tribunal should be vacated on three well-established grounds for setting aside arbitration awards: "evident partiality;" violation of the arbitration agreement and U.S. public policy; and the tribunal having exceeded its powers.

### I. STANDARD OF REVIEW

NAFTA Chapter 11 arbitration has a short history consisting of relatively few arbitrations. It is, however, a form of international commercial arbitration derived from well-known principles developed in U.S. federal courts. The Supreme Court has established that "arbitration is a matter of contract and a party cannot be required to

[41] *See* Letter from Jose Antonio Rivas to Tembec and the United States (May 23, 2005) attached at Appendix Tab DD.

[42] Letter from Elliot J. Feldman to Antonio R. Parra (June 9, 2005) attached at Appendix Tab EE.

[43] Letter from Gonzalo Flores to the Parties (June 1, 2005).

[44] *See* Letter from Roberto Dañino to the Parties (June 15, 2005) attached at Appendix Tab FF(The facsimile notifying the Parties that ICSID would not sustain the challenge to Mr. Robinson's appointment was not sent until 9:04 p.m. on June 15, 2005, directed to a main office well after the close of business. Tembec and its counsel effectively did not receive notice of ICSID's decision until the morning of June 16, 2005, just before the Consolidation hearing was scheduled to begin at 10:00 a.m.).

submit to arbitration any dispute which he has not agreed so to submit." *AT&T Technologies Inc. v. Communications Workers of America,* 475 U.S. 643, 648 (1986). "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *Id.* at 649. The arbitration agreement at issue here is NAFTA Chapter 11 and the UNCITRAL Rules of Arbitration which, according to Article 1126(1), govern the establishment and conduct of the Consolidation Tribunal.

Arbitration awards from NAFTA Chapter 11 tribunals are "not considered a domestic award" and are, therefore, subject to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. *See* New York Convention Article I(1) and NAFTA Article 1136(7)("A claim that is submitted to arbitration under this Section shall be considered to arise out of a commercial relationship or transaction for purposes of Article I of the New York Convention….").

The situs of the Consolidation Tribunal's proceedings was ICSID headquarters in Washington D.C., but the arbitration was governed by international law. *See* NAFTA Article 1131(1). Because the Award was made in the United States, this Court must apply domestic law, under Chapter 1 of the FAA, to vacate the award. *See Jacada (Europe) Ltd. v. Int'l Marketing Strategies*, 401 F.3d 701, 709 (6th Cir. 2005).[45]

Chapter 1 of the Federal Arbitration Act, 9 U.S.C. 1 et seq. sets forth three relevant grounds for setting aside an arbitration award. Section 10, 9 U.S.C. §10, provides:

---

[45] The Court has jurisdiction over this matter pursuant to 9 U.S.C. §203 and 28 U.S.C. §1331, because Chapter 11 of NAFTA is the arbitration agreement at issue.

> (a) In any of the following cases, the United States court in and for the district wherein the award[46] was made may make an order vacating the award upon application of any party to the arbitration-
>
> …
>
> (2) Where there was evident partiality or corruption in the arbitrators, or either of them.
>
> (3) Where the arbitrators were guilty of misconduct … or any other behavior by which the rights of the party have been prejudiced.
>
> (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

The courts also have established non-statutory grounds to vacate an award. Relevant to this case, courts will vacate an award that is contrary to public policy or where the arbitral tribunal lacked jurisdiction over the dispute because it was not within the agreement to arbitrate.

[46] Courts have construed "award" in the FAA to mean a decision by an arbitrator or tribunal that is final and definite. *Am. Fed'n of Gov't Employees. v. Fed. Labor Relations Auth.*, 777 F.2d 751, 755 (D.C. Cir. 1985). An arbitral decision need not, however, resolve every issue between the parties to be considered a final award for review under the FAA. *Publicis Commc'n v. True N. Commc'ns Inc*., 206 F.3d 725 (7th Cir. 2000); *Metallgesellschaft A.G. v. M/V Capitan Constante*, 790 F.2d 280 (2d Cir. 1986); *Hart Surgical Inc. v. Ultracision, Inc.*, 244 F.3d 231, 234 (1st Cir. 2001). Courts will review a decision that is independent of and unrelated to the merits of a continuing arbitration, particularly where the relief sought through judicial review under the FAA would be rendered meaningless by delaying until the issuance of a final arbitral award on the merits. *Nat'l R.R. Passenger Corp. v. Expresstrak, L.L.C*., 2003 U.S. Dist. LEXIS 24486 at *7-8 (D.D.C. May 1, 2003) (preliminary order preventing Amtrak from ceasing to perform under a contract); *Publicis Commc'n*, 206 F.3d at 729 (interim order to produce tax records); *Yasuda Fire & Marine Ins. Co. of Europe, Ltd. v. Cont'l Cas. Co.*, 37 F.3d 345, 348 (7th Cir. 1994)( order directing a letter of credit be posted as security); *Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019 (9th Cir. 1991)( "interim final order" requiring a party to set aside funds in an escrow account); *Hart Surgical, Inc.,* 244 F.3d at 233 (liability award). The September 7, 2005 decision meets these criteria.

## II. THE COMPOSITION OF THE CONSOLIDATION TRIBUNAL UNFAIRLY FAVORED THE UNITED STATES

### A. Mr. Robinson Has A Relationship To The United States That Demonstrates "Evident Partiality" Sufficient To Vacate The Award

#### 1. The Court May Vacate For Evident Partiality Demonstrated By An Arbitrator's Partial Relationship With A Party To The Arbitration

The arbitration agreement required the tribunal to consist of "independent and impartial" arbitrators. *See* NAFTA Article 1126(1), incorporating UNCITRAL Rules of Arbitration, Arts. 6(4). The appointment of Davis R. Robinson gave rise to "evident partiality" on the tribunal, violating FAA §10(a)(2) and the arbitration agreement.[47]

The federal courts have interpreted the Supreme Court's decision, in *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145 (1968), to require more than an appearance but less than actual proof of bias to satisfy the "evident partiality" standard in Section 10(a)(2) of the FAA.[48] The Court should find evident partiality where "a 'reasonable person would have to conclude that an arbitrator was partial' to the other party to the arbitration."[49] The party seeking vacatur must offer specific facts "that demonstrate objectively a degree of partiality such that a reasonable person could assume an arbitrator had improper motives."[50]

---

[47] 9 U.S.C. §10(a)(2).

[48] *See, e.g., Overseas Private Investment Corp. v. Anaconda Co.,* 418 F.Supp. 107, 110-11 (D.C. Cir. 1976) (concluding that *Commonwealth Coatings* created an "irrebuttable presumption" of bias where arbitrator knows of conflicting relationship and fails to disclose); *Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 84 (2d Cir. 1984). In *Commonwealth Coatings Corp.*, 393 U.S. 145, Justice Black declared for a plurality of the Supreme Court that arbitrators "not only must be unbiased but must avoid even the appearance of bias." 393 U.S. at 150. Justices White and Marshall concurred in the result.

[49] *Al-Harbi v. Citibank*, 1995 U.S. Dist. Lexis 22158, at 6 (D.D.C. July 18, 1995) (citing *People's Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 991 F.2d 141, 146 (4th Cir. 1993)) *aff'd by Al-Harbi v. Citibank*, 85 F.3d 680 (DC Cir. 1996). *See also Morelite Constr. Corp.*, 748 F.2d at 84; *Montez v. Prudential Securities Inc.*, 260 F.3d 980, 983 (8th Cir. 2001).

[50] *Al-Harbi*, 85 F.3d at 683.

A petitioner need not demonstrate actual bias in the proceedings or the merits of an award where there is evidence of a partial relationship between the arbitrator and one of the parties. In *Commonwealth Coatings*, the Supreme Court vacated an arbitration award for "evident partiality" based on one arbitrator's undisclosed business relationships with one of the arbitration parties, even though the petitioner "does not charge before us that the third arbitrator was actually guilty of fraud or bias in deciding this case, and we have no reason, apart from the undisclosed business relationship, to suspect him of any improper motives." 393 U.S. at 147.

Similarly, the Second Circuit, in *Morelite Constr. Corp.*, 748 F.2d 79, vacated an arbitration award where the arbitrator and an officer of the union participating in the arbitration had a father-son relationship. The Second Circuit did not know any other facts about the relationship between the two men, but based its decision on the "strong feeling that sons are more often than not loyal to their fathers, partial to their fathers, and biased on behalf of their fathers." *Id.*

An arbitrator's failure to disclose information about his relationship to one of the arbitration parties may also be considered as evidence of partiality. *See Commonwealth Coatings*, 393 U.S. at 148; *see also Gianelli Money Purchase Plan and Trust v. ADM Investor Services, Inc.*, 146 F.3d 1309, 1312-13 (11th Cir. 1998) ("[A]n arbitration award may be vacated due to the 'evident partiality' of an arbitrator … when … the arbitrator knows of, but fails to disclose, information which would lead a reasonable person to believe that a potential conflict exists." (citations omitted)); *See Delta Mine Holding Co. v. AFC Coal Props., Inc*., 280 F.3d 815, 821-22 (8th Cir. 2002) ("When a neutral arbitrator fails to disclose a relationship with one party that casts

significant doubt on the arbitrator's impartiality, as in *Commonwealth Coatings*, it is appropriate to assume that the concealed partiality prejudicially tainted the award."); *Schmitz v. Zilveti*, 20 F.3d 1043, 1049 (9th Cir. 1994).

In *Olson v. Merrill Lynch*, 51 F.3d 157 (8th Cir. 1995), the Eighth Circuit vacated an award because one of the arbitrators failed to disclose his high ranking position in his company and the fact that his company conducted a significant amount of business with Merrill Lynch. There was no direct relationship between the arbitrator and Merrill Lynch. The court vacated the award, without any finding of actual bias in the conduct of the proceedings or on the merits of the award, because the arbitrator's failure to disclose denied the parties an opportunity to accept or reject the arbitrator with full knowledge of the arbitrator's connections.

A finding of evident partiality of just one member of a tribunal explicitly merits vacatur of the award under Section 10, which specifies the partiality of the arbitrators "or either of them." *See Commonwealth Coatings* 393 U.S. at 150-51 (1968) (setting aside a unanimous arbitral award because one arbitrator failed to disclose prior business relationships with a party to the dispute); *Amos Treat & Co. v. SEC*, 306 F.2d 260, 264 (D.C. Cir. 1962) (*quoting Berkshire Employees Ass'n, Etc. v. National Labor R. Bd.,* 121 F.2d 235, 238-239 (3d Cir. 1941)("Litigants are entitled to an impartial tribunal whether it consists of one man or twenty and there is no way which we know of whereby the influence of one upon the others can be quantitatively measured.").[51]

[51] S*ee also Schmitz*, 20 F.3d at 1049 (vacating a unanimous arbitration award by a National Association of Securities Dealers panel due to evident partiality of one arbitrator); *University Commons-Urbana, Ltd. v. Universal Constructors Inc.*, 304 F.3d 1331, 1339-43 (11th Cir. 2002) (remanding for evidentiary hearing to determine whether one arbitrator was evidently partial and providing a basis to set aside a unanimous arbitration award).

2. Mr. Robinson's Relationships To The United States Demonstrate Evident Partiality

Mr. Robinson's familial relationship to the President of the United States (undisclosed until questioned); his political and financial support for the President (not disclosed at all); his former position as the Legal Adviser to the U.S. State Department (the office defending the claim); and his appointment to the ICSID Panel of Arbitrators by the President (also undisclosed); all demonstrate a relationship that compromises Mr. Robinson's impartiality in Tembec's suit against the United States.

Mr. Robinson's familial relationship to the President arises from his wife, Suzanne Walker, who is the first cousin of former President George Herbert Walker Bush, and the first cousin once removed of the current President George Walker Bush. Mr. Robinson did not disclose the relationship upon his appointment. When asked about the relationship, Mr. Robinson deemphasized its significance by observing that the Bush family is notably large.[52]

The indisputable facts are that Mr. Robinson is a close enough member of the Bush family to have received two Presidential appointments and to have provided financial support for the very person whose decisions are at issue in the arbitration. Mr. Robinson was appointed as the Legal Adviser in the U.S. State Department while George Herbert Walker Bush held the office of Vice President of the United States. Mr. Robinson was appointed by President George Walker Bush as one of four U.S.

[52] *See* Letter from Davis R. Robinson to Gonzalo Flores (May 6, 2005) at n. 1 (After stating that his wife was "a first cousin, once removed, of the President," Mr. Robinson added, "As you may know, the President's larger family is sizeable, and she is one of twenty or more who fit this designation.")

representatives on the ICSID Panel of Arbitrators.[53] Mr. Robinson and his wife also have been active contributors to the political campaigns of the two Bush Presidents.[54]

As Legal Adviser, Mr. Robinson was the principal legal counsel to the United States on foreign policy matters and represented the United States in international legal disputes.[55] The Office of the Legal Adviser represents the United States in investor-state arbitrations and has conducted the United States' defense against Tembec's claims before the NAFTA Article 1120 and Consolidation Tribunals. Thus, Mr. Robinson was also chief lawyer for the opposition; Tembec is suing Mr. Robinson's principal former client.

Mr. Robinson could not have doubted the relevance of his relationship to President Bush from reading Tembec's NAFTA Chapter 11 Statement of Claims and the briefing on the issue of his potential conflict.[56] Tembec is suing the United States

[53] *See* Public Papers of the Presidents, Digest of Other White House Announcements (May 27, 2002) attached at Appendix Tab GG. Mr. Robinson denied in his May 6, 2005 letter having received appointments in two different Republic administrations. The appointment he did not acknowledge or disclose was the Presidential assignment as an ICSID arbitrator.

[54] According to www.politicalmoneyline.com, a nationally-acclaimed Internet website that monitors Federal Election Commission data, Mr. Robinson made the following contributions to federal political campaigns: the maximum allowed $1000 for the 1988 election to "George Bush for President Inc.; the maximum allowed $1000 for the 1992 election to "Bush-Quayle 92 Primary Committee Inc."; the maximum allowed $1000 for the 2000 election to "Bush for President Inc."; $1000 for the 2000 election to "DC Republican Committee Federal Campaign Committee"; $2000 for the 2000 election to National Republican Senatorial Committee; $1200 for the 2000 election to Republican National Committee; $1575 for the 2000 election to Leboeuf Lamb Green & Macrae Political Action Committee; and $2000 for the 2004 election to "Bush-Cheney '04 (Primary) Inc." Mrs. Robinson matched many of these contributions with the maximum allowed: $1000 for the 1988 election to "George Bush for President Inc."; $1000 for the 1992 election to "Bush-Quayle 92 Primary Committee Inc."; $1000 for the 2000 election to "Bush for President Inc." The records do not indicate any campaign contributions for the 1996 Republican Presidential Campaign of Senator Robert Dole. *See* documents attached at Appendix Tab HH.

[55] *See* U.S. Department of State: Office of the Legal Adviser website, *available at* http://www.state.gov/s/l/.

[56] *See Morelite Construction Corp.*, 748 F.2d 79 (court recognized that meaning of evident partiality must correspond with circumstances, stating, "[i]n assessing a given relationship, courts must remain cognizant of peculiar commercial practices and factual variances."); *Overseas Private Investment Corp.*, 418 F.Supp. at 110 (indicating that evident partiality inquiry must be done on a case-by-case basis: "[r]ather
(continue)

Government for over US$200 million in damages for measures taken by Executive Branch agencies under the direction of President George Walker Bush. At least three cabinet officials have been involved in the dispute. Mr. Bush has been personally involved in establishing or ratifying United States policy in this dispute, as shown by his personal conversations with the Canadian Prime Minister. Measures undertaken by the United States Department of Commerce ("Commerce") and the United States International Trade Commission ("ITC") include "employ[ing] methodologies that had never before been used and that Commerce itself had rejected on prior occasions as arbitrary and capricious."[57] Tembec detailed in its Statement of Claims various improper acts undertaken by Commerce, the ITC, and the Office of the United States Trade Representative ("USTR") (which is in the Executive Office of the President), including unreported *ex parte* communications between Commerce, which is required by international law to be a neutral investigating body, and Petitioners, destroying e-mails and thereby covering up *ex parte* meetings, and the U.S. Trade Representative, Robert Zoellick, personally involving himself in the critical circumstances finding of the investigation.[58] Although the measures have been rejected as unlawful on appeal by multiple international tribunals, the openly-stated policy of the Bush Administration has been to ignore these decisions and to delay resolution to Tembec's detriment.[59]

---

(continued)
the court held that each case must be reviewed on its own facts and that an award should be set aside where the panel 'might reasonably be thought biased…'.") (citing *Commonwealth Coatings*, 393 U.S. at 150).

[57] *See* Tembec's Statement of Claim (Dec. 3, 2003).

[58] *Id.* at 17, 22, 27.

[59] *See, e.g.*, Tembec's Statement of Claim at 29-33.

These allegations obviously are very serious and damning of President Bush's policies. They must be heard by "impartial and independent" arbitrators, according to the FAA and the arbitration agreement. Mr. Robinson has loyally supported his wife's cousins in their Presidential campaigns over three decades, and has benefited from the relationship with Presidential appointments and other opportunities, including foreign travel with his wife as personal delegates of the President.[60] The facts that Mr. Robinson failed to disclose his family relationship until asked by Tembec; failed then to disclose the full extent of the relationship; and attempted to diminish its proximity and importance, raise further questions about partiality.[61]

Mr. Robinson's conduct also must be viewed in context. Arbitration is a consensual process which derives its legitimacy, in part, from the fact that the arbitrators should be acceptable to all parties.[62] ICSID routinely vets potential candidates with the parties and usually will not appoint an arbitrator when any party objects. Arbitrators routinely withdraw when they are challenged, as seen, for example, in Mr. Harper's withdrawal from the Canfor tribunal and Mr. Fortier's from the

[60] For example, President George Herbert.Walker Bush sent Mr. and Mrs. Robinson on travel overseas as part of a United States delegation. *See* Christopher Connell, *Bush Makes Global Relations a Family Affair: Having a Relative in the White House has its Privileges*, Associated Press, Dec. 1, 1991) attached at Appendix Tab II ("Suzanne Robinson, a Bush cousin, and her husband Davis Robinson, a former State Department lawyer, were in the official U.S. party that attended the dedication of a new wing of the Polish-American Children's Hospital in Krakow, Poland. Pope John Paul II also attended the ceremony in his hometown, along with Polish President Lech Walesa.").

[61] Mr. Robinson's conflict of interest is at least as salient as the conflict of interest the United States saw when it forced Mr. Fortier to withdraw his candidacy from the Consolidation Tribunal. The law partners who had represented Canadian interests in the *Softwood Lumber* dispute were known to have left Mr. Fortier's firm, taking that portfolio with them; Mr. Fortier was himself not involved, and the Canadian parties' defense of the *Softwood Lumber* dispute was not material to the arbitration. Mr. Robinson's loyalties to President Bush, who was personally involved in the dispute and whose administration's actions are at the heart of Tembec's claim, presented a more immediate and manifest conflict.

[62] *See* Exhibit 1, Declaration of The Hon. Ronald A. Cass (Feb. 14, 2006) ("Cass Decl.") at ¶ 9.

Consolidation Tribunal. "[E]ven the most experienced arbitrators whose reputations for fairness are strong routinely withdraw" where a party's challenge to the appointment "is at most colorable.".[63] Mr. Robinson's refusal to withdraw "where the arbitrator is related to an officer of one of the parties, and where the same arbitrator was the former head of the legal office responsible for defending that party in international arbitrations" was contrary to a practice legitimizing international arbitration.[64]

Tembec does not have to prove actual bias. Mr. Robinson's relationship to the President, his failure to disclose the relationship, and his conduct when it was disclosed, would lead a "reasonable person … to conclude that [he] was partial."[65] He cannot be viewed as an independent and impartial arbitrator. In this situation, the Award should be vacated for "evident partiality."

B. The Consolidation Tribunal As Constituted Unfairly Favored Respondents In The Arbitration

The appointment of Mr. Robinson and the other arbitrators raises a second issue requiring vacation of the award. ICSID chose two arbitrators from the ICSID Panel of Arbitrators, which is composed of persons chosen by member governments. Mr. Robinson came from the United States' pre-approved list of arbitrator candidates on the ICSID Panel of Arbitrators. Tembec did not appoint, nor was it asked to recommend, any of the candidates for the Consolidation Tribunal.

These appointments create the extraordinary situation of a tribunal with a single party-appointed arbitrator and another arbitrator appointed by a government with

[63] *Id*. at ¶ 7.

[64] *See id*. at ¶¶ 8-9 ("I would expect that the challenged arbitrator in such a situation would withdraw from the arbitral tribunal.").

[65] *Al Harbi*, 1995 U.S. Dist. LEXIS 22158 at 6.

a common interest with the United States. The appointment process gives the United States unfair power in the arbitration. U.S. courts have recognized that awards should be set aside when they are contrary to the arbitration agreement or public policy. In this case, the constitution of the tribunal violated both. A well recognized public policy is that arbitration tribunals should not unfairly represent one party in disputes.[66] NAFTA Article 1126 cannot be interpreted to violate U.S. public policy.

1. Arbitration Awards From Tribunals That Unfairly Represent One Party Contravene Public Policy

Under NAFTA Article 1126(5), the ICSID Secretary-General is required to choose a consolidation panel from the following sources in their order of availability: the roster, to which Article 1124(4) refers; the ICSID Panel of Arbitrators; or, in the discretion of the Secretary-General. The chairman is not to be a national of any of the "Parties," that is the three NAFTA countries. The remaining arbitrators should be one national from the disputing Party, the United States in this case, and one of a Party of the disputing investors, in this case Canada.

ICSID has never created the Article 1124(4) roster of expert international arbitrators. The ICSID Panel of Arbitrators is created from nominations from each member government.[67] Mr. Robinson was appointed to the ICSID Panel by President

---

[66] A challenge to the arbitrator-selection process is a separate and independent ground to not enforce an arbitration award. *See McMullen v. Meijer, Inc.*, 355 F.3d 485, 494 n.7 (6th Cir. 2004) ("When the process used to select the arbitrator is fundamentally unfair … the arbitral forum is not an effective substitute for a judicial forum, and there is no need to present separate evidence of bias or corruption in the particular arbitrator selected."). *See also Hooters of America v. Phillips*, 173 F.3d 933, 941 (4th Cir. 1999) ("The material breach of this duty warranting rescission is an issue of substantive arbitrability and thus is reviewable [apart from grounds for vacatur] before arbitration.").

[67] *See* ICSID Convention, art. 3 ("The Centre shall have an Administrative Council and a Secretariat and shall maintain a Panel of Conciliators and a Panel of Arbitrators."); *Id.* at art. 13(1) ("Each Contracting State may designate to each Panel four persons who may but need not be its nationals.").

Bush.[68] Because Canada is not an ICSID member, it does not make appointments to the ICSID Panel.[69] Professor de Mestral, a Canadian, was appointed at the discretion of the Secretary-General.[70] Professor van den Berg, the Tribunal chairman, was appointed to the ICSID Panel by the Government of The Netherlands.[71]

Courts have found as a nonstatutory basis for vacatur that arbitration awards should not be enforced when they are contrary to public policy.[72] The public policy must be "well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'"[73]

U.S. courts have recognized a public policy that arbitration tribunals should not unfairly represent one party, and have declined to enforce awards from unbalanced tribunals even when the arbitration agreement so requires. *See Hooters of America*, 173 F.3d at 940 (award rescinded when all members of the arbitration tribunal were required to be selected from a pool nominated by the employer, and not the employee); *Murray v. United Food and Commercial Workers In'tl Union*, 289 F.3d 297 (4th Cir. 2002) *Texas E. Transmission Corp. v. Barnard*, 285 F.2d 536 (6th Cir. 1960). *See also, Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 995 F.Supp. 190,

---

[68] *See Public Papers of the Presidents*, Digest of Other White House Announcements (May 27, 2005).

[69] *See* ICSID Convention, art. 13(1); *List of Contracting States and Other Signatories of the Convention*, available at http://www.worldbank.org/icsid/constate/c-states-en.htm.

[70] Professor de Mestral was not on ICSID's list of panels of Conciliators or Arbitrators.

[71] *See Members of the Panels of Conciliators and of Arbitrators: Part II, Designations by Contracting States*, available at http://www.worldbank.org/icsid/pubs/icsid-10/icsid-10ii-3.htm.

[72] *W.R. Grace & Co. v. Local Union 759, Int'l Union Of The United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757 (1983); *Office & Prof'l Employees Int'l Union, Local 2 v. Washington Metro. Area Transit Auth.*, 724 F.2d 133, 140 (D.C. Cir. 1983).

[73] *W.R. Grace*, 461 U.S. at 766 (citing *Muschany v. United States*, 324 U.S. 49, 66 (1945)).

208 (D. Mass. 1998) ("both parties to a dispute should have equal right to control the appointment of the arbitral panel, and neither side should play a disproportionate role in the decision-making."); *Harold Allen's Mobile Home Factory Outlet, Inc. v. Butler*, 825 So.2d 779, 784 (Ala. 2002) ("Our research has not disclosed a single case upholding a provision in an arbitration agreement in which appointment of the arbitrator was within the exclusive control of one of the parties."); *Graham v. Scissor-Tail, Inc.*, 623 P.2d 165, 175 (Cal. 1981) ("[A] contractual party may not act in the capacity of arbitrator …. [F]or the same reasons, one whose interests are so allied with those of the party … is subject to the same disabilities…. [A] contractual provision designating such an entity as arbitrator must be denied enforcement …."); *Bd. of Educ. of Berkeley v. W. Harley Miller, Inc.*, 236 S.E.2d 439, 444 (W. Va. 1977) ( "[T]his Court would not countenance an arbitration provision by which the parties agree that all disputes will be arbitrated by a panel chosen exclusively by one of the parties."); *Sehulster Tunnels/Pre-Con v. Traylor Bros.*, 4 Cal. Rptr.3d 655,667 (Cal. Ct. App. 2003) ("An ADR clause … that excludes one of the parties … from any voice in the selection of 'neutrals' cannot be enforced; that provision conflicts with our fundamental notions of fairness …."); *Ditto v. RE/MAX Preferred Props., Inc.*, 861 P.2d 1000, 1003-04 (Okla. Civ. App. 1993) (Excluding one party from any voice in arbitrator selection "conflicts with our fundamental notions of fairness and tends to defeat arbitration's ostensible goals of expeditious and equitable dispute resolution."); *Bennish v. N. Carolina Dance Theater*, 422 S.E.2d 335, 337 (N.C. Ct. App. 1992) ("To allow defendant to have two representatives … would make the proceedings inherently unfair and would tip the balance decidedly in favor of defendant."); *Smith v. Rubloff, Inc.*, 370 S.E.2d 159, 160

(Ga. Ct. App. 1988) ("[T]he panel of arbitrators designated … [by] defendant's associates' manual (an employee and two associates … of defendant) would render the arbitration provision invalid as to a controversy between plaintiff and defendant."); *Chimes v. Oritani Motor Hotel, Inc.*, 480 A.2d 218, 222 (N.J. Super. Ct. App. Div. 1984) ("[W]e conclude that the so-called arbitration provision, giving … [one party] power to decide disputes between its members and defendant, is contrary to public policy.").

Several appellate courts have relied on "an Aesopian metaphor" to articulate the public policy:

> Let us assume for a minute that for some reason all the rabbits and all the foxes decided to enter into a contract for mutual security, one provision of which [was] that any disputes arising out of the contract would be arbitrated by a panel of foxes. Somehow that shocks our consciences, and it doesn't help the rabbits very much either.[74]

This principle is consistent with the UNCITRAL Rules of Arbitration applicable to the NAFTA Consolidation Tribunal. *See* UNCITRAL Rules of Arbitration, Arts. 6(4) and 15 ("[T]he appointing authority shall have regard to such considerations as are likely to secure the appointment of an independent and impartial arbitrator…" "[T]he arbitral tribunal may conduct the arbitration in such a manner as it considers appropriate, provided that the parties are treated with equality…").

2. <u>The NAFTA Consolidation Tribunal Unfairly Represented Respondents To The Exclusion Of Claimants</u>

The Consolidation Tribunal has the same deficiency found fatal in *Hooters of America*, 173 F.3d at 940. Mr. Robinson and Professor van den Berg were named from lists chosen by governments who have an interest, as respondents in investment

[74] *See Ditto*, 861 P.2d at 1003-04 (*quoting Bd. of Educ. of Berkeley v. W. Harley Miller, Inc.*, 236 S.E.2d 439, 443 (W. Va. 1977)).

disputes (and never claimants), to decide against the investor. Mr. Robinson was chosen from a list pre-approved by President Bush, whose decisions were at issue in the dispute. Tembec, by contrast, had no input into the selection of any of the arbitrators. In *Hooters*, the Fourth Circuit held "that the promulgation of so many biased rules--especially the scheme whereby one party to the proceeding so controls the arbitral panel--breaches the contract entered into by the parties." 173 F.3d at 937.

The Sixth Circuit vacated an arbitration award in *Texas E. Transmission Corp.*, 285 F.2d 536, where the decision had involved only one party-appointed arbitrator on the tribunal. The second party-appointed arbitrator had been prevented from hearing the claim because he was appointed three days late. The court stated that "the predominant purpose of the parties to this agreement, as in every arbitration, was to have their dispute determined by a board free from partiality. …With all the arbitrators representing one party only, the party unrepresented would in some cases b[e] at the mercy of his opponent and the result a foregone conclusion." *Id.* at 540).

Even assuming that the appointment of tribunal members drawn from the ICSID Panel of Arbitrators was not inherently biased toward respondent governments, ICSID could have appointed a balanced tribunal consistent with the terms of NAFTA Article 1126. The ICSID Panel contains names of American arbitrators appointed by other governments who are members of the ICSID Convention. ICSID could have named an American arbitrator from the ICSID Panel who was not appointed to that list by the President of the United States. Uzbekistan, for example, named an American lawyer to the ICSID Panel of Arbitrators. Alternatively, ICSID could have solicited names of Canadian arbitrators from Tembec, so that an arbitrator pre-approved by

Tembec could counterbalance Mr. Robinson, the pre-approved U.S. appointment. Nothing in Article 1126 envisioned a single-party appointed arbitrator.

The Government of Mexico apparently recognized this public policy in the only other known attempt to consolidate NAFTA Chapter 11 claims. In that instance, the respondent Government of Mexico and the two claimants contracted to avoid the inequitable results of a tribunal deciding issues on the merits of the Claimants' NAFTA Chapter 11 claims when the tribunal did not fairly represent respondents and claimants. *See Corn Products International, Inc. v. United Mexican States* and *Archer Daniels Midland Co., et. al. v. United Mexican States*, ICSID case No. ARB(AF)04/5 (May 20, 2005) at ¶ 2 (describing the arbitration parties' agreement that, in the event of consolidation, a tribunal other than the consolidation tribunal would be chosen by consent of the arbitration parties and this new tribunal would proceed to address the consolidated claims on the merits). Once ICSID had named Messrs. Robinson, de Mestral and van den Berg to the Consolidation Tribunal, the United States showed no interest in making a similar agreement with the Claimants, and pressed for a decision from the biased Consolidation Tribunal that would prevent any of the Claimants from ever having heard the merits of their claims.

### C. The Consolidation Tribunal Had No Power To Act While Constituted In A Manner Inconsistent With NAFTA Article 1126

NAFTA Article 1126 is the source of authority for the Consolidation Tribunal to be formed and to resolve certain disputes. An arbitration tribunal that has not been formed in a manner consistent with its source of authority—the agreement—has no power to act. *See, e.g., Cargill Rice, Inc. v. Empresa Nicaraguense De Alimentos Basicos*, 25 F.3d 223, 225 (4th Cir. 1994).

The appointment procedures in NAFTA Article 1126 did not require the Consolidation Tribunal to be appointed in a way that unfairly favored the United States, with a *de facto* party-appointment to the tribunal while Tembec had none. NAFTA Article 1126(5) sets forth the procedure for appointment and composition of the Consolidation Tribunal, including, "One member shall be a national of the disputing Party and one member shall be a nation of the Party of the disputing investor." This provision is modified by NAFTA Article 1126(1): "A Tribunal established under this Article shall be established under the UNCITRAL Arbitration Rules . …" UNCITRAL Rule 6(4) and U.S. public policy require the tribunal to be "fair and impartial."[75]

ICSID named Mr. Robinson, an arbitrator pre-chosen by the United States; Mr. van den Berg, chosen by another government (always a respondent); and a third arbitrator at the Secretary-General's discretion. No arbitrators were proposed or chosen by Tembec. This method of appointment was not required, and is not designed to obtain a fair and impartial tribunal. It therefore violates NAFTA Article 1126.

The three Consolidation Tribunal arbitrators could have been appointed at the discretion of the ICSID Secretary-General, as NAFTA Article 1126 allows, while still complying with the nationality distribution contained within the article. The Secretary-General could have appointed without using pre-approved government lists.

### D. Nothing About The Consolidation Tribunal's Consolidation Order Contradicts The Indications Of Bias In Mr. Robinson's Relationship To The United States Or The Unbalanced Constitution Of The Tribunal

The Consolidation Tribunal accepted virtually all of the United States' arguments in favor of consolidation, even when those arguments contradicted the only

[75] *See* Section II. B.1.

other consolidation award by a Consolidation Tribunal. In a strikingly similar situation, the *High Fructose Corn Syrup* consolidation tribunal ("*HFCS* Tribunal") decided not to consolidate two NAFTA Chapter 11 claims brought against Mexico for its policies protecting domestic corn syrup producers. The Consolidation Tribunal's 180-degree turn from the *HFCS* Tribunal's reasoning and decision was based not on a materially different set of facts, but on a different conclusion that apparently it wanted to reach, based on its own interpretation of the criteria for consolidation. This dramatically different decision on consolidation, reasoning common issues to opposite conclusions unequivocally in the United States' favor, is further evidence of the Consolidation Tribunal's partiality toward the United States.

## III. THE CONSOLIDATION TRIBUNAL EXCEEDED ITS POWERS

While potential challenges to two arbitrators, Mr. Robinson and Prof. de Mestral, were pending, the Consolidation Tribunal assumed jurisdiction over all of the dispute, stayed the Article 1120 Tribunals, and scheduled briefing and a hearing. These acts cancelled Tembec's jurisdictional hearing before its Article 1120 Tribunal and prevented the Canfor Article 1120 Tribunal, which had already completed a jurisdictional hearing, from ruling. These acts were improper, premature and voided all subsequent acts, including the rulings that the United States had not waived consolidation by waiting for more than a year and a half to file the motion, and the decision itself to consolidate.

Section 10 of the FAA requires this Court to vacate the arbitration award granted by the Consolidation Tribunal where "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award on the subject

matter submitted was not made."[76] Arbitration is contractual; the arbitrator's power is defined by the contours of the arbitration agreement. *See United Steelworkers of Am. V. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960).[77] "[A]n arbitral award regarding a matter not within the scope of the governing arbitration clause is one made in excess of authority, and a court is precluded from giving effect to such an award." *Davis v. Chevy Chase Financial Ltd.*, 667 F.2d 160, 165 (DC Cir. 1981). Arbitrators "do not bind principals or contracting parties when they go beyond the authority delegated to them. When they exceed that authority their decision in the area of that departure is not binding ….". *Marceron v. Chevy Chase Services, Inc.*, 258 F.2d 155, 158 (D.C. Cir. 1958).

A. An Arbitration Tribunal Taking Actions Without Proper Authority Exceeds Its Powers Under 9 U.S.C. § 10(a)(4)

Courts vacate arbitration awards made by arbitrators who are not appointed in accordance with the procedure provided in the parties' agreement*. See Cargill Rice*, 25 F.3d at 225 (*citing Szuts v. Dean Witter Reynolds, Inc*., 931 F.3d 830, 832 (11th Cir. 1991); *Avis Rent A Car System, Inc. v. Garage Employees Union*, 791 F.2d 22, 26 (2d Cir. 1986); *Bear Stearns & Co. v. N.H. Karol & Assocs., Ltd.*, 728 F. Supp. 499, 501-02 (N.D. Ill. 1989).). *See also* 9 U.S.C. § 5 ("If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed…."). The Fourth Circuit in *Cargill Rice* vacated an arbitration award where the institution administering the arbitration did not allow the

[76] 9 U.S.C. §10(a)(4).

[77] *See also Matteson v. Ryder System Inc.*, 99 F.3d 108, 112 (3d Cir. 1996) ("[A]n arbitrator may not venture beyond the bounds of his or her authority.").

parties to select the arbitrators by mutual consent as was required by the dispute resolution clause in the parties' agreement.

The Second Circuit similarly denied enforcement of a foreign award issued by an arbitrator who was not appointed in accordance with agreed-upon procedures. In *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85 (2d Cir. 2005), the arbitration clause between the arbitrating parties "required the two party-appointed arbitrators to disagree on a third arbitrator before asking the Tribunal to appoint one." One of the party-appointed arbitrators instead requested of his own volition the appointment of the third arbitrator to establish the tribunal. The Second Circuit applied Article V of the New York Convention and found the appointment of the third arbitrator to have been premature and inconsistent with the parties' agreement.[78]

The Second Circuit also held that the premature appointment of the third arbitrator could not be cured by a suspension of the proceedings to allow the party-appointed arbitrators to first disagree on a third arbitrator: "We agree, for the reasons expressed by the District Court, that 'the … premature appointment of [the third arbitrator] irremediably spoiled the arbitration process.'" 403 F.3d at 91.[79]

---

[78] Article V(1)(d) of the New York Convention provides as a defense to enforcement of a foreign arbitral award, ""[t]he composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties."

[79] The Second Circuit said that it would not deny enforcement of the award under 9 U.S.C. § 10(a)(4) (the arbitrators "exceeded their powers") because the action before the court strictly was one of enforcement of an award under the New York Convention, instead of an action to vacate an award under § 10 of the FAA. However, the Second Circuit acknowledged that "[u]nder the FAA, an award issued by arbitrators who are not appointed in accordance with agreed-upon procedures may be vacated because the arbitrators 'exceeded their powers.'" 403 F.3d at 92.

B. The Consolidation Tribunal Exceeded Its Powers By Prematurely Exercising Authority While Subject To Challenge

The Consolidation Tribunal exceeded its authority when it stayed Tembec's Article 1120 tribunal proceedings even while the Consolidation Tribunal's authority still was subject to an unresolved arbitrator challenge. The UNCITRAL Rules required the Consolidation Tribunal to allow Tembec the opportunity to challenge the appointment of Mr. Robinson before the tribunal exercised Article 1126 powers, suspending Tembec's Article 1120 proceedings (Article 1126(9)), and ordering briefs and a hearing on consolidation (Article 1126(2)).

Articles 9 through 12 of the UNCITRAL Rules address the challenge of arbitrators. Article 9 sets out a duty for arbitrators governed by the Rules to disclose "any circumstances likely to give rise to justifiable doubts as to his impartiality or independence." Article 10(1) permits the parties to an arbitration to challenge the appointment of an arbitrator where "circumstances exist that give rise to justifiable doubts as to the arbitrator's impartiality or independence."

Articles 11 and 12 establish the procedures for an arbitrator challenge. Article 11(1) provides for a party to challenge the appointment of an arbitrator within fifteen days of appointment, or fifteen days after the disclosure of circumstances raising doubts about the arbitrator's impartiality. When a party challenges an arbitrator, it first asks the other party to agree that the arbitrator be dismissed, or asks the arbitrator to withdraw. *See* Article 11(2). Should there be no agreement for withdrawal, the challenging party may turn next to an appointing authority (in Tembec's case, ICSID) to make a decision on the challenge. *See* Article 12. In making its determination, the appointing authority "shall have regard to such considerations as are likely to secure the

appointment of an independent and impartial arbitrator, and shall take into account as well the advisability of appointing an arbitrator of a nationality other than the nationalities of the parties." Article 6(4).[80]

The drafters of the UNCITRAL Rules understood and intended that a tribunal subject to a timely arbitrator challenge under the Rules would not take any action in the arbitration with respect to the challenging party. The *travaux preparatoires* to the UNCITRAL Rules of Arbitration explain what happens when a party challenges an arbitrator's appointment under Article 10:

> Challenge of an arbitrator results in an interruption of the course of arbitral proceedings and a successful challenge will result in a serious interruption arising from the need to appoint a substitute arbitrator and the possible need to repeat hearings held prior to such challenge (para 3. of article 12). It is therefore desirable that challenges, if any, should be made at the earliest possible stage in the arbitral proceedings. The time-limit of 30 days imposed by this paragraph seeks to achieve this objective.[81]

The placement in the UNCITRAL Rules of the provisions regarding the tribunal's composition promotes the drafters' understanding. Articles 9 through 12 are part of Section II of the Rules, "Composition of the Arbitral Tribunal," and precede Section III, "Arbitral Proceedings," which provides for the presentation of arguments and evidence, as well as Section IV, "The Award," concerning decisions by the tribunal.

The International Bar Association's "Guidelines on Conflicts of Interest in International Arbitration" reinforces the principle that arbitration tribunals do not have

---

[80] Article 12 refers back to Article 6 regarding the administering authority's appointment procedures.

[81] *Report of the Secretary-General: preliminary draft set of arbitration rules for optimal use in* ad hoc *arbitration relating to international trade*, [1976] 7 UNCITRAL Y.B. 170, U.N. Doc. A/CN.9/112/Add. 1/1976, attached at Appendix Tab JJ. The 30-day period referenced in the *travaux* ultimately was amended to 15 days.

power to take action against a party while there is a pending challenge brought by that party as to the tribunal's authority:

> The purpose of the [potential conflict] disclosure is to inform the parties of a situation that they may wish to explore further in order to determine whether objectively—i.e., from a reasonable third person's point of view having knowledge of the relevant facts—there is a justifiable doubt as to the arbitrator's impartiality or independence. If the conclusion is that there is no justifiable doubt, the arbitrator can act. … Of course, if a party challenges the appointment of the arbitrator, he or she can nevertheless act *if* the authority that has to rule on the challenge decides that the challenge does not meet the objective test for disqualification.[82]

The right to challenge an arbitrator for bias under Article 10 would have little meaning were the tribunal permitted to make decisions impacting the challenging party before the time to challenge the initial appointment had concluded or any challenge had been decided: "[I]t is simple common sense that arbitrators should allow the parties the fifteen-day period for challenge and should not take actions affecting the case during that time."[83] A challenging party could preserve its objection to allow for a motion to vacate in domestic courts, but Articles 11(3) and 12, which provide for the arbitrator's replacement, demonstrate that arbitrator challenges meant more to the drafters than merely the opportunity for a challenging party to proffer an objection for the record. A contrary reading of the UNCITRAL Rules would allow a biased arbitrator to be appointed, subsequently disclose his bias, and act to the detriment of one party before that party could challenge the arbitrator's appointment, or have that challenge decided by the appointing authority.

---

[82] IBA Guidelines on Conflicts of Interest in International Arbitration (International Bar Association 2004) at 18 (emphasis added), attached at Appendix Tab KK.

[83] Cass Decl. at ¶ 10.

ICSID declared the Consolidation Tribunal established on May 6, 2005, the same day upon which Mr. Robinson disclosed, only after being asked and not fully, his relationship to the President of the United States. Article 10 provided Tembec fifteen days to challenge Mr. Robinson's appointment following the disclosure. On May 19, 2005, two days before Tembec's allotted fifteen days had expired, the Consolidation Tribunal decided to suspend Tembec's Article 1120 proceedings, and thus canceled the Article 1120 tribunal's jurisdictional hearing scheduled six months prior for June 2 and 3. Tembec filed a timely and detailed challenge to Mr. Robinson's appointment on May 20.

Tembec's Article 1120 Tribunal had declined to enter a stay of the proceedings when requested by the United States, after it filed its consolidation petition. The arbitrator challenge was not resolved until June 16, 2005, but the Consolidation Tribunal, including Mr. Robinson, nevertheless continued to act in the interim by scheduling a hearing on consolidation and ordering the submission of pre-hearing briefs from Tembec and other parties. Tembec only learned the results of its challenge thirty minutes before the hearing on consolidation was to begin.

The Consolidation Tribunal's premature actions could not be justified by ICSID's subsequent denial of the arbitrator challenge. The tribunal's premature exercise of its authority "irremediably spoiled the arbitration process." *See Encyclopaedia Universalis*, 403 F.3d at 92.

Tembec was entitled to fifteen days to evaluate the arbitrators named to the Consolidation Tribunal, and was entitled to submit its challenge to their appointment in accordance with the UNCITRAL Rules. The Consolidation Tribunal did not respect those rights and exceeded its powers under the Rules by acting before the time for

Tembec's challenge had expired and before Tembec's challenge had been resolved.[84] Arbitration tribunals do not have the prerogative to ignore rules under which the parties have consented to arbitration: "The value of arbitration depends…in large measure on the fidelity paid by arbitrators to the contracts from which their powers derive."[85]

The Consolidation Tribunal's actions "contravene[d] the evident intent of the UNCITRAL Rules" and had detrimental consequences for Tembec.[86] Had the Consolidation Tribunal waited for Tembec's challenge to be resolved before deciding to suspend Tembec's Article 1120 proceedings, Tembec likely would have been able to complete a hearing on jurisdiction before a consensually-formed Article 1120 tribunal, or alternatively received a decision from the Article 1120 tribunal on the United States' objections to jurisdiction of Tembec's NAFTA Chapter 11 claims.[87] Despite having brought its NAFTA Chapter 11 claim against the United States in December 2003, Tembec has yet to obtain a decision on any aspect of its claims—jurisdiction, merits, or damages—due to interruptions by the United States and by the Consolidation Tribunal. Tembec has withdrawn from the Consolidation Tribunal's proceedings and brought this action before the Court rather than permit a decision on jurisdiction from a tribunal that

---

[84] *See* Cass Decl. at ¶ 11 ("When a challenge to the impartiality of a nominee to arbitrate has been asserted, the arbitrators should not act while the challenge is pending. They should stay their hand unless and until the challenge is resolved.").

[85] *Davis*, 667 F.2d at 172.

[86] *See* Cass Decl. at ¶ 12.

[87] Tembec asked the Article 1120 tribunal to decide the jurisdictional challenge from the United States on papers submitted, *see* Letter from Elliot J. Feldman to Florentino P. Feliciano et al (May 9, 2005), attached at Appendix Tab LL, but the United States demanded that there be a hearing, which it then persisted in delaying. *See* Letter from Andrea J. Menaker to Florentino P. Feliciano et al (May 9, 2005), attached at Appendix Tab MM; Letter from Andrea J. Menaker to Albert Jan van den Berg et al (May 9, 2005); Letter from Andrea J. Menaker to Albert Jan van den Berg et al (May 10, 2005); Letter from Andrea J. Menaker to Florentino P. Feliciano et al (May 10, attached at Appendix Tab. NN; Letter from Andrea J. Menaker to Albert Jan van den Berg et al (May 11, 2005) attached at Appendix Tab OO.

does not have the proper authority to decide that question, and is unfairly partial toward the United States.

C. The Consolidation Tribunal Exceeded Its Powers By Deciding To Consolidate Claims Before The Article 1120 Tribunals Decided Whether There Existed Claims Subject To Consolidation

The Consolidation Tribunal's authority under Article 1126 is to consolidate "claims" where the prerequisites for consolidation have been established. The Tribunal "may … assume jurisdiction over, and hear and determine together, all or part of the claims [or] one or more of the claims…." NAFTA Article 1126(2). The Consolidation Tribunal exercised authority beyond that permitted under NAFTA Article 1126 because it assumed authority over the validity of claims before addressing the claims themselves. Article 1126 confers authority only over claims, not over jurisdictional objections, which are not claims. The United States is not a claimant, and the objections raised by the United States that the Consolidation Tribunal elected to arbitrate were not claims.

The Consolidation Tribunal here stripped the Article 1120 tribunals of authority to determine the validity of the claims, and moved swiftly to assert its own authority to decide validity (by consolidating the jurisdictional objections raised by the United States) before reaching the claims themselves. The United States contended there were no valid claims. Were the United States correct, there would have been no claims to consolidate, but this issue was precluded when the Consolidation Tribunal asserted its authority to address the United States' objections before turning to the claims at all – the claims it was consolidating. This assertion of authority violated the

plain language of Article 1126, which limited the tribunal to jurisdiction over the "claims," not to questions of whether the claims could be heard at all.

Chapter 11 of NAFTA allows for a very limited range of jurisdictional questions, making all jurisdictional challenges inevitably similar. The Consolidation Tribunal used the similarity of the jurisdictional challenges as a basis for consolidation.[88] The tribunal had no authority over objections to jurisdiction, and certainly could not decide similarity of claims on the basis of similar jurisdictional objections.

The predicate for the Consolidation Tribunal's existence is that "claims" exist for which there may be common questions of law or fact warranting consolidation.[89] What must be determined to be in common are laws and facts about the claims, not the jurisdictional objections to them. The Consolidation Tribunal might decide whether claims should be consolidated, but that decision could be made only after it had been determined that there were any cognizable Chapter 11 claims at all. Thus, the Consolidation Tribunal had no authority under NAFTA to consolidate Tembec's Article 1120 proceedings and assume jurisdiction over them, because the Article 1120 tribunal had not decided whether Tembec had a valid arbitration claim in light of the United States' jurisdictional objections. *See AT&T Technologies,* 475 U.S. at 651 ("arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration.")

---

[88] *See In the Matter of Canfor Corp. v. United States, Tembec et al v. United States, Terminal Forest Products Inc. v. United States*, Order of the Consolidation Tribunal at ¶¶ 174-183.

[89] *See* NAFTA Article 1126(2) ("Where a Tribunal established under this Article is satisfied that claims have been submitted to arbitration under Article 1120 that have a question of law or fact in common, the Tribunal may, in the interests of fair and efficient resolution of the claims, and after hearing the disputing parties, by order: (a) assume jurisdiction over, and hear and determine together, all or part of the claims; or (b) assume jurisdiction over, and hear and determine one or more of the claims, the determination of which it believes would assist in the resolution of the others.")

## CONCLUSION

For the foregoing reasons, Tembec moves this Court to vacate the Order of the Consolidation Tribunal on September 7, 2005, terminating Tembec's arbitration proceedings under NAFTA Article 1120.

Respectfully submitted,

/s/

Elliot J. Feldman (D.C. Bar No. 418501)
Mark A. Cymrot (D.C. Bar No. 164673)
Michael S. Snarr (D.C. Bar No. 474719)
BAKER & HOSTETLER LLP
1050 Connecticut Ave. N.W.
Suite 1100
Washington D.C. 20036-5304
Tel: (202) 861-1679
Fax: (202) 861-1783
Counsel for Petitioners Tembec Inc., Tembec Investments Inc., and Tembec Industries Inc.

Dated: February 17, 2006