UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

)
TEMBEC INC., TEMBEC INVESTMENTS    )
INC., TEMBEC INDUSTRIES INC.,       )
                                    )
            Petitioners,            )
                                    )
      v.                            )        No. 05-CV-2345 (RMC)
                                    )
UNITED STATES OF AMERICA,           )
                                    )
            Respondent.             )
_____)

**RESPONDENT'S MEMORANDUM OF LAW IN
OPPOSITION TO PETITIONERS' MOTION TO VACATE**

Dated: March 28, 2006                    Respectfully submitted,


                                         PETER D. KEISLER
OF COUNSEL:                              Assistant Attorney General


MARK A. CLODFELTER                       KENNETH WAINSTEIN
*Assistant Legal Adviser*                United States Attorney


ANDREA J. MENAKER                        VINCENT M. GARVEY
*Chief, NAFTA Arbitration Division*      Deputy Branch Director
MARK S. MCNEILL
JENNIFER THORNTON                        ALEXANDER K. HAAS (CA 220932)
*Attorney-Advisers*                      Trial Attorney
*Office of International Claims and*     U.S. Department of Justice, Civil Division
   *Investment Disputes*                 Federal Programs Branch
                                         Post Office Box 883, Room 1030
United States Department of State        Washington, D.C.  20044
Washington, D.C. 20520                   Tel: (202) 307-3937  Fax:  (202) 616-8460
Office of the Legal Adviser              *Attorneys for the United States*
2201 C Street, N.W.
Suite 5519

## TABLE OF CONTENTS

PAGE

INTRODUCTION ...................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND ............................................. 2

FACTUAL AND PROCEDURAL BACKGROUND ................................................. 4

    A.    The NAFTA Chapter Eleven Arbitrations ............................................. 5

    B.    Establishment of the Consolidation Tribunal and Appointment
          of Arbitrators ........................................................................................ 7

    C.    The Consolidation Tribunal's Stay of the Article 1120 Arbitrations .................... 9

    D.    Tembec's Unsuccessful Challenge to Mr. Robinson Prior to the
          Consolidation Hearing ........................................................................ 10

    E.    The Consolidation Tribunal's Proceedings Subsequent to the Stay .................... 12

    F.    Post Consolidation Events ................................................................... 13

ARGUMENT .......................................................................................................... 15

THIS COURT LACKS JURISDICTION TO VACATE THE PROCEDURAL
CONSOLIDATION ORDER AND NO BASIS EXISTS TO VACATE THE
CONSOLIDATION ORDER IN ANY EVENT ....................................................... 15

I.     THIS COURT LACKS JURISDICTION UNDER THE FAA TO VACATE A
      PROCEDURAL RULING SUCH AS THE CONSOLIDATION ORDER ................... 15

    A.    The Consolidation Order is Not an Arbitration Award, So the Court
          Lacks Jurisdiction Under the FAA to Vacate the Order ...................... 15

    B.    The Consolidation Order is a Procedural Decision Left Solely to the
          Arbitral Tribunal Under Both Case Law And Text of NAFTA ........................... 19

II.    NEITHER MR. ROBINSON'S DISTANT FAMILIAL RELATIONSHIP
      WITH THE PRESIDENT NOR HIS FORMER EMPLOYMENT WITH
      THE DEPARTMENT OF STATE DEMONSTRATES EVIDENT PARTIALITY ...... 22

III.   THE CONSOLIDATION TRIBUNAL WAS CONSTITUTED IN A
       MANNER CONSISTENT WITH THE NAFTA AND PUBLIC POLICY ................... 27

       A.   The Tribunal Was Constituted In Accordance with NAFTA Article 1126 ......... 28

       B.   Tembec's Facial Challenge to Article 1126 Fails ................................................ 30

IV.    THE CONSOLIDATION TRIBUNAL DID NOT EXCEED ITS AUTHORITY
       UNDER THE NAFTA OR THE GOVERNING ARBITRATION RULES ................... 37

       A.   The Consolidation Tribunal Did Not Exceed Its Authority By Staying
            the Article 1120 Arbitrations or Issuing Procedural Orders ............................... 37

       B.   The Consolidation Tribunal Did Not Exceed Its Authority By
            Consolidating the Softwood Lumber Claims ...................................................... 41

CONCLUSION ....................................................................................................................... 43

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

Al-Harbi v. Citibank, N.A., 85 F.3d 680 (D.C. Cir. 1996) ........................................ 22

American Fed'n of Gov't Employees v. Fed. Labor Relations Auth.,
    777 F.2d 751 (D.C. Cir. 1985) ................................................. 16

American Postal Workers Union, AFL-CIO v. USPS, 789 F.2d 1
    (D.C. Cir. 1986) .................................................................. 31

American Postal Workers Union v. United States Postal Service,
    362 F.Supp.2d 284 (D.D.C. 2005) ................................... 19

Avis Rent-A-Car System, Inc. v. Garage Employees Union, Local 272,
    791 F.2d 22 (2d Cir. 1986) ................................................. 38

Banco de Seguros del Estado v. Mutual Marine Office, Inc.,
    344 F.3d 255 (2d Cir. 2003) ............................................... 37

Bear Stearns & Co. v. N.H. Karol & Assoc., Ltd., 728 F.Supp. 499
    (N.D. Ill. 1989) ................................................................. 38

Blimpie Int'l v. Blimpie of the Keys, 371 F.Supp.2d 469 (S.D.N.Y. 2005) ............... 20

Buckeye Check Cashing, Inc. v. Cardegna, 126 S.Ct. 1204 (2005) ........................... 31

Cargill Rice, Inc. v. Empresa Nicaraguense Dealimentos Basicos,
    25 F.3d 223 (4th Cir. 1994) ............................................... 38

Commonwealth Coatings Corp. v. Continental Cas. Co.,
    393 U.S. 145 (1968) .......................................................... 23

Consolidation Coal Co. v. Local 1643, United Mine Workers of Am.,
    48 F.3d 125 (4th Cir. 1995) ......................................... 23, 25

Davis v. Chevy Chase Fin. Ltd., 667 F.2d 160 (D.C. Cir. 1981) ............................... 37

Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213 (1985) ........................................ 31

Ditto v. RE/MAX Preferred Properties, 861 P.2d 1000
    (Okl. Civ. App. 1993) ....................................................... 33

Eastern Assoc. Coal Corp. v. United Mine Worker of Am., Dist. 17,
    531 U.S. 57 (2000) ..................................................... 32

Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.,
    403 F.3d 85 (2d Cir. 2005) .......................................... 38, 40

Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20 (1991) .................... 31

Graham v. Scissor-Tail, Inc., 623 P.2d 165 (Cal. 1990) ......................... 32

Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444 (2003) ........................ 20-21

Gulf Guar. Life Ins. Co. v. Connecticut Gen. Life Ins. Co., 304 F.3d 476
    (5th Cir. 2002) ....................................................... 16

Harold Allen's Mobile Home Factory Outlet v. Butler, 825 So.2d 779
    (Ala. 2002) ........................................................... 32

Hart Surgical, Inc. v. Ultracision, Inc., 244 F.3d 231 (1st Cir. 2001) ......... 18

Hooters of America, Inc. v. Phillips, 173 F.3d 933 (4th Cir. 1999) ............ 33

Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002) ..................... 20

John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543 (1964) ................... 19

Kanuth v. Prescott, Ball & Turben, Inc., 949 F.2d 1175 (D.C. Cir. 1991) ...... 37

Levine v. Am. Export Indus., Inc., 473 F.2d 1008 (2d Cir. 1973) .............. 19

Metallgesellschaft A.G. v. M/V Capitan Constante, 790 F.2d 280 (2d Cir. 1986) .... 18

Michaels v. Mariforum Shipping, S.A., 624 F.2d 411 (2d Cir. 1980) ........... 16, 17

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 (1985) .... 31

Morelite Construction Corp. v. New York City District Council Carpenters
    Benefit Funds, 748 F2d 79 (2d Cir. 1984) ......................... 22, 23, 24

Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1 (1983) ........... 30

Nat'l R.R. Passenger Corp. v. Expresstrak, LLC., 02-CV-1773 (RBW),
    rev'd on other grounds 330 F.3d 523 (D.C. Cir. 2003) ................ 18

Nolfi v. Chrysler Corp., 324 F.2d 373 (3d Cir. 1963) ........................ 19

Northwest Airlines, Inc. v. Air Line Pilots Assoc. Int'l, 808 F.2d 76
  (D.C. Cir. 1987) ................................................................ 31

Pacific Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp., 935 F.2d 1019
  (9th Cir. 1991) ................................................................. 17

Payne v. Giant Food, Inc., 346 F.Supp.2d 15 (D.D.C. 2004) .................... 31

Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co., 991 F.2d 141 (4th Cir. 1993) ............. 22

Publicis Comm. v. True North Comms. Inc., 206 F.3d 725 (7th Cir. 2000) ............ 18

Revere Copper and Brass Inc. v. OPIC, 628 F.2d 81 (D.C. Cir. 1980) .................. 32

Rosenberg v. Merrill Lynch, 995 F.Supp. 190 (D. Mass. 1998) ................... 33

Sehulster Tunnels/Pre-Con v. Taylor Brothers, Inc., 4 Cal.Rpt.3d 655
  (Cal. Ct. App. 2003) ......................................................... 33

Shaw's Supermarkets, Inc. v. United Food and Commercial Workers Union,
  321 F.3d 251 (1st Cir. 2003) ................................................. 20

Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220 (1987) ................... 31

Stroh Container Co. v. Delphi Indus., Inc., 783 F.2d 743 (8th Cir. 1986) ................ 19

Texas Eastern Transmission Corp. v. R.L. Barnard, 285 F.2d 536
  (6th Cir. 1960) .............................................................. 32

Yasuda Fire & Marine Ins. Co. Of Europe, Ltd. v. Cont'l Cas. Co.,
  37 F.3d 345 (7th Cir. 1994) ............................................... 17-18

## STATUTES AND RULES

The Federal Arbitration Act ("FAA"),
  9 U.S.C. § 1, et seq .................................................... passim

NAFTA, Pub. L. No. 103-182, 107 Stat. 2057 (1993) .............................. 3

Federal Rule of Civil Procedure 42 ........................................... 18

NAFTA, Article 1126 .......................................................passim

UNCITRAL RULE 11(1) .................................................................................................25

UNCITRAL RULE 15(1) .................................................................................................39

UNCITRAL RULE 21(1) .................................................................................................42

IBA Guidelines on Conflicts of Interests in International Arbitration............................ 24, 25, 40

<u>INTRODUCTION</u>

It is a cardinal principle of arbitration law that the Court only has jurisdiction to vacate an "award" of an arbitrator and not every ruling in an arbitration. At issue in this case is just such a non-award: a Consolidation Order issued by an arbitral tribunal constituted under the North American Free Trade Agreement ("NAFTA"). There is no jurisdiction, and absolutely no basis in law or fact, to vacate the procedural order.

Respondent, the United States of America, therefore submits this memorandum in opposition to the Motion to Vacate filed by Petitioners, Tembec Inc., Tembec Investments Inc., and Tembec Industries Inc. (collectively "Tembec"). <u>See</u> Pet. Mem. (Feb. 17, 2006). Tembec asks this Court for unprecedented relief: vacatur of a procedural order of a NAFTA arbitration tribunal that consolidated before one tribunal nearly identical legal and factual claims then pending before separate arbitration tribunals. Indeed, by arguing for vacatur on public policy grounds, Tembec essentially makes a facial challenge to a treaty of the United States. But the consolidation tribunal was established, and exercised its authority, according to the NAFTA's express terms. Moreover, Tembec, by submitting their claim to arbitration under Chapter 11 of the NAFTA, was required to – and did – expressly consent to the very procedures they now challenge. <u>See</u> NAFTA, Art. 1121(1), (3). For a myriad of reasons, the Court should enter judgment for the United States denying Tembec's meritless motion.

First, the Court lacks jurisdiction in this case as the procedural Consolidation Order is not a final award it does not relate in any way to the substance of the claims. Moreover, even if jurisdiction existed, courts have overwhelmingly rejected requests by parties to an arbitration for judicial intervention into procedural decisions by arbitrators in general and consolidation decisions in particular. In such circumstances, courts have accorded great deference to the

1

arbitral tribunal. The Court should therefore defer to the NAFTA tribunal's decision because the NAFTA procedures were followed to the letter and Tembec has utterly failed to demonstrate otherwise.

Second, there was absolutely no unfairness in the appointment process, or in any other aspect of the arbitral proceedings. Tembec's arguments that the order should be vacated on the grounds of evident partiality of an arbitrator, violation of public policy, or the panel acting in excess of authority, are therefore without merit. Neither Mr. Davis Robinson's attenuated familial relationship by marriage to the President, nor his service as Legal Adviser to the Department of State over twenty years ago demonstrates evident partiality. Moreover, the selection of arbitrators and the rulings of the tribunal were wholly consistent with public policy and follow the NAFTA's express terms, and, therefore were within its authority.

Finally, Tembec seeks to set aside an arbitral ruling in a proceeding in which it is no longer a party. Even setting the consolidation order aside, however, would not revive the preexisting tribunal because it ceased to exist when the claims were consolidated. See NAFTA, Art. 1126(8). This is now the third forum – after pursuing claims before NAFTA's Chapter 19 binational panels and a Chapter 11 arbitration – where Tembec has raised its claims against the United States. The Court should deny Tembec's Motion to Vacate for all of these reasons. A proposed order is attached.

<u>STATUTORY AND REGULATORY BACKGROUND</u>

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, <u>et seq.</u>, provides limited grounds for a District Court to vacate an arbitration award. Section 10 of the FAA provides that such an "award" may be vacated:

(1)    where the award was procured by corruption, fraud, or undue means;

2

(2)    where there was evident partiality or corruption in the arbitrators, or either of them;

(3)    where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4)    where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4).

The Consolidation Order was rendered by a tribunal constituted pursuant to the NAFTA. Section B of Chapter Eleven of the NAFTA governs the "Settlement of Disputes between a Party and an Investor of Another Party."  See NAFTA, Sept. 14, 1993, Part V, Ch. 11, § B, Pub. L. No. 103-182, 107 Stat. 2057 (1993), available at http://www.mac.doc.gov/nafta/ chapter11.html (last visited Mar. 22, 2006); a copy of Chapter Eleven is attached as Exhibit ("Exh.") A.  It establishes a mechanism for a private investor of a NAFTA country to institute arbitral proceedings directly against another NAFTA country with respect to that country's treatment of the investor and its investments.  Section A of Chapter Eleven of the NAFTA sets forth certain substantive obligations, including the obligation to treat foreign investors and investments in a non-discriminatory manner, see NAFTA, Arts. 1102 & 1103, and in accordance with the minimum standard of treatment under customary international law, see NAFTA, Art. 1105, and sets forth certain obligations with respect to the expropriation or nationalization of investments.  See NAFTA, Art. 1110.  Article 1120 provides investors with the choice of submitting an arbitration claim under the United Nations Commission on International Trade Law ("UNCITRAL") Arbitration Rules, the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States (the "ICSID Convention"), International Centre for Settlement of Investment Disputes ("ICSID") Additional Facility Rules.

3

NAFTA Article 1126 governs the consolidation of parallel claims submitted to arbitration under NAFTA Chapter Eleven.  <u>See</u> NAFTA, Art. 1126.  Paragraph 3 of Article 1126 allows a disputing party to request consolidation of claims pending before Article 1120 arbitral tribunals. Paragraph 5 of Article 1126 requires the Secretary-General of the ICSID to constitute a tribunal to decide whether to consolidate some or all of the claims within 60 days of a request.  Article 1126, paragraph 2 empowers the tribunal appointed by ICSID to consolidate some or all of the claims so long as the claims "have a question of law or fact in common" and consolidation would be in the interests of fairness and efficiency.  The consolidation tribunal therefore "assume[s] jurisdiction" over claims that have been consolidated.  <u>See</u> NAFTA, Art. 1126(2).  NAFTA Article 1126(9) provides that "pending its decision under paragraph 2" – whether to assume jurisdiction over claims before Article 1120 tribunals – upon a request of a party an Article 1126 Tribunal "may order that the proceedings of a Tribunal established under Article 1120 be stayed, unless the latter Tribunal has already adjourned its proceedings."  NAFTA, Art. 1126(9).  If the tribunal assumes jurisdiction over all or part of the claims, the Article 1120 tribunals, "shall not have jurisdiction to decide a claim, or a part of a claim, over which a Tribunal established under [Article 1126] has assumed jurisdiction."  NAFTA, Art. 1126(8).  Finally, the consolidation tribunal is established under the UNCITRAL Arbitration Rules and conducts its proceedings in accordance with those Rules, "except as modified by [Article 1126]."  NAFTA, Art. 1126(1). <u>See</u> <u>also</u> UNCITRAL Arbitration Rules, attached as Exh. B.

FACTUAL AND PROCEDURAL BACKGROUND

This case ultimately relates to the longstanding softwood lumber dispute between Canada and the United States, and to an arbitration commenced under the investment chapter of the NAFTA with respect to that dispute.  The dispute centers on the subsidies received by softwood

4

lumber producers that harvest timber on public Canadian land.  In 2002, the United States

Department of Commerce and the International Trade Commission made final antidumping and

countervailing duty, and threat of injury, determinations, respectively, that resulted in the

imposition of duties on softwood lumber imports from Canada.  Tembec and other Canadian

softwood lumber producers, including Canfor Corporation ("Canfor"), challenged the

determinations before binational panels constituted pursuant to the antidumping and

countervailing duty provisions in Chapter Nineteen of the NAFTA.  Those proceedings involving

the Department of Commerce remain pending.

A.    The NAFTA Chapter Eleven Arbitrations

In July 2002, Canfor challenged the same duty determinations under the investment

chapter of the NAFTA, Chapter Eleven, making essentially the same allegations and seeking the

same relief as in the Chapter Nineteen proceedings.  See Canfor Notice of Arbitration &

Statement of Claim (July 9, 2002), available at http://www.state.gov/documents/organization

/13203.pdf (last visited Mar. 22, 2006).  In March 2004, another Canadian softwood lumber

producer, Terminal Forest Products Ltd. ("Terminal"), submitted claims to arbitration under

Chapter Eleven.  See Terminal Notice of Arbitration (Mar. 31, 2004), available at

http://www.state.gov/documents/organization/31360.pdf (last visited Mar. 22, 2006).  Tembec

likewise filed an Article 1120 arbitration in 2003, which was submitted to arbitration in April

2005.  See Tembec Notice of Arbitration (Dec. 3, 2003), available at http://www.state.gov/

documents/organization/27805.pdf (last visited Mar. 22, 2006).

The Chapter Eleven claims of Canfor, Terminal and Tembec were nearly identical.  All

three claims were submitted against the same respondent, challenged the same measures of the

Department of Commerce and the International Trade Commission, and alleged violations of the

5

same provisions of Section A of Chapter Eleven.  They also made nearly identical legal and

factual allegations, and were submitted under the same UNCITRAL Arbitration Rules.  <u>See</u>

Exhibit A to Post-Hearing Submission of Respondent United States of America in Support of

Request for Consolidation in <u>Canfor Corp., Tembec Inc., Tembec Investments Inc. and Tembec</u>

<u>Industries Inc. and Terminal Forest Products Ltd. v. United States of America</u>, (July 22, 2005),

attached as Exh. C (setting forth chart comparing claims of three softwood lumber claimants).

In October 2003, the United States submitted an objection to jurisdiction to the <u>Canfor</u>

Chapter Eleven tribunal.  <u>See</u> United States' Objection to Jurisdiction (Oct. 16, 2003), <u>available</u>

<u>at</u> http://www.state.gov/documents/organization/25567.pdf (last visited Mar. 22, 2006).  The

United States objected that NAFTA Article 1901(3) expressly deprived the tribunal of

jurisdiction over the claims.  The United States argued that the NAFTA limits a party's challenge

to antidumping or countervailing duty determinations to the specialized mechanism established

for that purpose in NAFTA Chapter Nineteen.[1]

A hearing on the United States' jurisdictional objection was held in December 2004.

Following the hearing, while the <u>Canfor</u> tribunal was deliberating on the United States'

objection, one of the arbitrators disclosed that, in his capacity as a board member of a university,

he was indirectly subject to an unrelated lawsuit by the Office of the United States Attorney.

Although the lawsuit presented a potential conflict adverse only to the United States, Canfor

demanded, over the United States' objection, that the arbitrator withdraw.  <u>See</u> Letter from

Andrea J. Menaker, Chief, NAFTA Arbitration Division, U.S. Department of State, to Members

---

[1]  NAFTA Article 1901(3) provides:  "Except for Article 2203 [Entry into Force], no
provision of any other Chapter of this Agreement shall be construed as imposing obligations on a
Party with respect to the Party's antidumping law or countervailing duty law."

of the Canfor Tribunal (Feb. 28, 2005), attached as Exh. D, at 2 (urging tribunal to continue

deliberating).  The arbitrator consequently withdrew from the <u>Canfor</u> tribunal on March 2, 2005.

       B.      <u>Establishment of the Consolidation Tribunal and Appointment of Arbitrators</u>

As a result of the arbitrator's withdrawal from the <u>Canfor</u> tribunal, the <u>Canfor</u> and

<u>Tembec</u> Chapter Eleven proceedings became aligned procedurally.  Accordingly, on March 7,

2005, the United States requested that ICSID's Secretary-General establish a consolidation

tribunal under NAFTA Article 1126 (hereinafter "Consolidation Tribunal").  The United States

requested that the Secretary-General consolidate the Chapter Eleven claims of Canfor and

Tembec, as well as the claims of Terminal, which had not pursued its claim after submitting the

claim to arbitration.  <u>See</u> Letter from Mark A. Clodfelter to ICSID (March 7, 2005), attached as

Exh. E.

On March 7, 2005, the Secretary-General proposed appointing Professor Christopher J.

Greenwood of the United Kingdom as the presiding arbitrator, and Mr. William Rowley, a

national of Canada, and Mr. O. Thomas Johnson Jr., a United States' national, as co-arbitrators

of the Consolidation Tribunal.  Canfor, Tembec, and Terminal objected to the appointment of all

three proposed arbitrators.  <u>See</u> Letter from Elliot J. Feldman, Baker & Hostetler LLP, to José

Antonio Rivas, Counsel, ICSID (Apr. 1, 2005), attached as Exh. F; Letter from Keith E.W.

Mitchell, Harris & Co., to Gonzalo Flores, Secretary of the Consolidation Tribunal, ICSID (Apr.

1, 2005), attached as Exh. G.  They objected to Professor Greenwood on the basis that he had

been an expert witness in a prior Chapter Eleven dispute and to Mssrs. Rowley and Johnson on

the basis that their law firms were involved in the softwood lumber dispute.  <u>Id.</u>  The United

States also objected to the appointments of Mssrs. Johnson and Rowley on the same basis, but

opposed the objections to Professor Greenwood.  <u>See</u> Letters from Andrea J. Menaker to

7

Gonzalo Flores, Secretary of the Consolidation Tribunal, ICSID (Apr. 1, 2005 and Apr. 7, 2005), attached as Exh. H and Exh. I, respectively.

On April 19, 2005, ICSID informed the parties that it had appointed Dr. Albert Jan van den Berg of the Netherlands as the presiding arbitrator, and Mr. Davis Robinson, a United States' national, and Mr. Yves Fortier, a national of Canada, as co-arbitrators to the Consolidation Tribunal. See Letter from Gonzalo Flores to the parties (Apr. 19, 2005), attached as Exh. J. The appointment letter attached, among other things, a copy of Mr. Robinson's curriculum vitae, which disclosed that in 1981 he "was appointed Legal Adviser to the U.S. Department of State . . . ." Id. at 8. The United States objected to the appointment of Mr. Fortier on the basis that his firm was involved in the softwood lumber dispute. See Letter from Andrea J. Menaker, to Gonzalo Flores (Apr. 22, 2005), attached as Exh. K. Mr. Fortier subsequently informed the parties that he was unavailable to serve as an arbitrator, and the Secretary-General appointed Professor Armand de Mestral, a Canadian national, in his place. See Letter from Gonzalo Flores to the parties (May 4, 2005), attached as Exh. L.

On May 2, 2005, Tembec informed ICSID that it had uncovered evidence of a "familial relationship" between Mr. Robinson and the President of the United States, George W. Bush. See Letter from Elliot J. Feldman to José Antonio Rivas (May 2, 2005) at 2, attached as Exh. M. Tembec also expressed concern that Mr. Robinson was "a political appointee in two Republican Administrations." Id. at 1. Tembec, however, did not challenge Mr. Robinson at that time. See id. Instead, it invited Mr. Robinson to provide further information concerning his relationship to the President. Id. at 2-3.

Mr. Robinson responded to Tembec's letter by writing to ICSID on May 6, 2005, explaining that he had "no personal familial blood relationship with the President whatsoever,"

that his wife was a "first cousin, once removed, of the President," and that his wife was "one of twenty or more" who fit that description due to the large size of the President's extended family. See Letter from Davis R. Robinson to Gonzalo Flores (May 6, 2005), attached as Exh. N, at 2. He also confirmed that he had no personal relationship with the President and that his sole contact with the President since Mr. Bush took office was having briefly shaken hands on two occasions, once at a reception attended by approximately 500 people, and once at a luncheon attended by approximately 250 people. Id. Mr. Robinson also stated that he had no substantive conversations with the President on any subject during that period. Id. Finally, he confirmed that this attenuated connection did not in any way affect his ability to judge the merits of the dispute with the requisite impartiality and independence. Id. (noting that he had served on a binational panel under the Canada-U.S. Free Trade Agreement that issued a unanimous decision generally in favor of Canada and against the United States). ICSID transmitted Mr. Robinson's response to the parties on May 6, 2005 and in the same letter deemed the Consolidation Tribunal "established" as of that date. See Letter from Gonzalo Flores to the parties (May 6, 2005), attached as Exh. O, at 1-2.

       C.     The Consolidation Tribunal's Stay of the Article 1120 Arbitrations

Pursuant to NAFTA Article 1126(9), the United States requested on May 9, 2005, that the Consolidation Tribunal issue a temporary stay of the Tembec and Canfor arbitrations pending its decision on consolidation. See Letter from Andrea J. Menaker to the Consolidation Tribunal (May 9, 2005), attached as Exh. P (explaining that the a jurisdictional hearing in the Tembec arbitration was less than a month away, and in the absence of an immediate stay, the United States would need to begin preparing for that hearing). Later that same day, Tembec sent a letter to ICSID asserting that the Consolidation Tribunal was not yet "fully operative" because fifteen

9

days had not elapsed from the date on which Tembec disclosed its discovery of information

supposedly linking Mr. Robinson to President Bush.  See Letter from Elliot J. Feldman to

Gonzalo Flores (May 9, 2005), attached as Exh. Q, at 1.  Tembec requested more time "to

complete its evaluation of Mr. Robinson's role as a tribunal member."  Id.; see also Letter from

Andrea J. Menaker to the Consolidation Tribunal (May 10, 2005), attached as Exh. R.  Tembec

continued to contest the establishment of the Consolidation Tribunal in a letter addressed directly

to ICSID's Secretary-General.  See Letter from Elliot J. Feldman to Roberto Dañino, Secretary-

General, ICSID (May 12, 2005), attached as Exh. S.  The Deputy Secretary-General of ICSID

responded to Tembec on May 13, 2005, noting that Mr. Robinson had already provided the

requested explanatory information in his May 6 Letter, and confirming that "the appointments are

entirely without the prejudice to the right of the parties to avail themselves of the challenge

provisions of the UNCITRAL Arbitration Rules."  See Letter from Antonio R. Parra, Deputy

Secretary-General, ICSID to Elliot J. Feldman (May 13, 2005), attached as Exh. T.

On May 19, 2005, the Consolidation Tribunal stayed the Canfor and Tembec arbitrations

pursuant to its authority under Article 1126(9), thereby preserving the status quo.  See Letter

from Gonzalo Flores to the parties (May 19, 2005), attached as Exh. U.  Cognizant of the

claimants' objections that consolidation would unduly delay resolution of their claims, the

Consolidation Tribunal set an expedited schedule for the consolidation proceeding, directing the

parties to file their submissions on whether the claims should be consolidated by June 2, 2005,

and setting a hearing on that issue for June 16, 2005.  Id.

     D.    Tembec's Unsuccessful Challenge to Mr. Robinson Prior to the Consolidation
           Hearing

Tembec challenged Mr. Robinson's appointment to the Consolidation Tribunal on May

10

20, 2005, citing his familial relationship to President Bush and his former position as Legal Adviser to the United States Department of State.  See Letter from Elliot J. Feldman to Gonzalo Flores (May 20, 2005), attached as Exh. V at 1-7 (on the same date, Tembec also sent letters to Secretary-General Dañino and the Consolidation Tribunal also attached at V).  The United States responded to Tembec's challenge on May 24, 2005.  See Letter from Andrea J. Menaker to Roberto Dañino, Secretary-General, ICSID (May 24, 2005), attached as Exh. W.  Tembec replied to the United States' letter on May 26, 2005, and commented on Mr. Robinson's decision not to step down from the Consolidation Tribunal on June 9, 2005.  See Letter from Elliot J. Feldman to Roberto Dañino, Secretary-General, ICSID (May 26, 2005); Letter from Davis R. Robinson to Antonio R. Parra, Deputy Secretary-General, ICSID (June 3, 2005); Letter from Elliot J. Feldman to Antonio R. Parra, Deputy Secretary-General, ICSID (June 9, 2005), attached collectively as Exh. X.

On June 15, 2005, ICSID's Secretary-General, Roberto Dañino, rendered a decision rejecting the challenge to Mr. Robinson's appointment.  See Letter from Roberto Dañino to the parties (June 15, 2005), attached as Exh. Y.  The Secretary-General explained, in pertinent part, as follows:

> The somewhat distant familial relationship referred to in the challenge does not, in my judgment, raise justifiable doubts as to the impartiality or independence of Mr. Robinson.  Nor, in my view, does the service of Mr. Robinson in the Department of State of the United States justify his exclusion from the Consolidation Tribunal. In the context of the NAFTA, with its special provisions allowing the appointment of co-nationals as arbitrators, there is a clear, consistent acceptance in the cases that prior governmental service, even at a higher level, does not in and of itself disqualify a person from service as an arbitrator.  This conclusion is reinforced in this case by the fact that the governmental service concerned concluded some 20 years ago.  It does not, in my view, especially having regard to the NAFTA context, raise justifiable doubts as to the impartiality or independence of Mr. Robinson.

Id. at 2.

E.    The Consolidation Tribunal's Proceedings Subsequent to the Stay

Meanwhile, on May 27, 2005, Tembec informed the Consolidation Tribunal that it would

not comply with the order that it file its submission by June 2, 2005, and requested an additional

three weeks to file its submission.  See Letter from Elliot J. Feldman to Gonzalo Flores (May 27,

2005), attached as Exh. Z.  Tembec also proposed that the question of consolidation be

bifurcated, separating the question of whether to consolidate issues of jurisdiction from the

question of whether to consolidate the claims on the merits, and that the Tribunal address only

the issue of jurisdiction.  Id.  On June 1, 2005, the Consolidation Tribunal partially extended the

briefing schedule in response to Tembec's request.  See Letter from Gonzalo Flores to the parties

(June 1, 2005), attached as Exh. AA.

The hearing on consolidation was held on June 16, 2005.  See Transcript of June 16, 2005

Hearing, available at http://www.state.gov/documents/organization/48508.pdf (last visited Mar.

22, 2006).  In addition to the pre-hearing briefing on June 10, 2005, the parties submitted two

rounds of post-hearing submissions.[2]  On June 27, 2005, Tembec filed a "Motion to Dismiss," a

document not contemplated by the scheduling order or NAFTA arbitration practice, arguing,

among other things, that the Article 1126 appointment process was inherently flawed because it

allegedly deprived Tembec of its right to appoint a member of the Consolidation Tribunal.  See

Tembec Motion to Dismiss (June 27, 2005) at 18, available at http://www.state.gov/documents/

organization/51406.pdf (last visited Mar. 22, 2006).

The Consolidation Tribunal rendered its decision on September 7, 2005, consolidating the

claims of Canfor, Terminal and Tembec in their entirety.  See Canfor Corp., Tembec et al. and

_____

[2]    All documents relating to the Consolidation Tribunal's decision to consolidate and
cited herein are available at http://www.state.gov/s/l/c14432.htm (last visited Mar. 28, 2006).

Terminal Forest Products Ltd. v. United States of America, Order of the Consolidation Tribunal

("Consolidation Order") (Sept. 7, 2005), attached as Exh. BB.  The Consolidation Tribunal noted

that the Article 1126 "consolidation provision is intended to relieve a State Party from the

hardship of having to defend multiple claims arising from the same measure . . . ."  Id. at 27

(citing Henri C. Alvarez, Arbitration Under the North American Free Trade Agreement, 16

ARB'N INT'L. 393, 414 (2000)).  In its 84-page decision, the Consolidation Tribunal ruled that

consolidation was appropriate because the three claims contained numerous questions of fact and

law in common, and that consolidation would serve the interests of a fair and efficient resolution

of those claims.  Id. at 65 & 77.  The Consolidation Tribunal distinguished the only other

decision rendered under Article 1126, which had denied consolidation, id. at 81-82, and denied

Tembec's Motion to Dismiss, id. at 84.

      F.      Post Consolidation Events

The Consolidation Tribunal subsequently made several attempts to confer with the parties

on the conduct and sequence of the consolidation proceeding.  Tembec repeatedly objected to the

Tribunal's efforts, insisting on its right to consult with the other parties, while refusing to engage

in any such consultations.[3]  As of December 1, 2005, Tembec was still advising the

---

[3]  The correspondence, which is attached collectively as Exh. CC, from September 21, 2005 through December 5, 2005, speaks for itself.  See Letter from Gonzalo Flores to the parties (Sept. 21, 2005) (noting inability to convene hearing); Letter from Elliot J. Feldman to the Consolidation Tribunal (Sept. 23, 2005) (objecting to procedures proposed by Tribunal); Letter from Andrea J. Menaker to the Consolidation Tribunal (Sept. 30, 2005) (noting inability to confer with Tembec, which did not return the United States' telephone calls); Letter from Gonzalo Flores to the parties (Oct. 14, 2005) (informing the parties that the Tribunal intended to hold a procedural hearing on November 7 or 14, 2005); Draft Procedural Order No. 1 (Nov. 9, 2005) (noting "The impossibility, notwithstanding proposals by the Tribunal, to determine a date for a procedural hearing within a reasonable period of time."); Letter from Andrea Menaker to the Consolidation Tribunal (Nov. 16, 2005) (noting that Tembec did not provide observations on the draft Procedural Order No. 1 by the Tribunal-ordered deadline.); Letter from Elliot J.

Consolidation Tribunal that it intended to consult with the other parties, but had been unable to do so because of scheduling conflicts.  See Letter from Elliot J. Feldman to the Consolidation Tribunal (Dec. 1, 2005), attached as Exh. DD.

On December 7, 2005, Tembec filed its petition to vacate the consolidation order with this Court.  The same day, Tembec informed the Consolidation Tribunal that it "does not recognize that this Tribunal has lawfully assumed jurisdiction over Tembec's Statement of Claim," and declared that it "removes its Statement of Claim" from the consolidation proceedings.  See Letter from Elliot J. Feldman to the Consolidation Tribunal (Dec. 7, 2005), attached as Exh. EE.  The United States objected to Tembec's attempt to remove its claim from the arbitration.  See Letter from Andrea J. Menaker to the Consolidation Tribunal (Dec. 13, 2005); Letter from Andrea J. Menaker to the Consolidation Tribunal (Dec. 22, 2005), attached collectively at Exh. FF.  Over the United States' objections, the Consolidation Tribunal issued an order terminating the proceedings with respect to Tembec, but retained jurisdiction over Tembec's claim for purposes awarding costs in the arbitration.  See Order for the Termination of the Arbitral Proceedings with respect to Tembec et al. of the Tribunal (Jan. 10, 2006), attached as

---

Feldman to the Consolidation Tribunal (Nov. 16, 2005) (objecting to the draft Procedural Order and insisting that "the parties should have the opportunity to resolve these issues through consultation"); Letter from Gonzalo Flores to the parties (Nov. 22, 2005) (noting that the Tribunal "had already invited the Parties to agree on the conduct and sequence of the proceedings in its letter of September 21, 2005," proposing again a hearing with the parties, and encouraging the parties once again to engage in consultations); Letter from Elliot J. Feldman to the Consolidation Tribunal (Dec. 1, 2005) (noting that Tembec would not make itself available for the hearing date proposed by ICSID and that "we have been in no position to consult with the other parties regarding procedural issues."); Letter from Andrea J. Menaker to the Consolidation Tribunal (Dec. 2, 2005) (noting that Tembec still had refused to consult with the United States, despite many Tribunal orders to do so, and despite Tembec's insistence in its November 16 letter on its right to resolve outstanding issues by consultation); Letter from Gonzalo Flores to the parties (Dec. 5, 2005) (conveying the Tribunal's order that "Tembec et al. shall consult with the other parties . . . by Thursday, December 8, 2005").

Exh. GG.  A consolidated jurisdictional hearing was held in Tembec's absence on January 11-12,

2006.  See Transcript of Hearing, <u>available at</u> http://www.state.gov/documents/

organization/60209.pdf & http://www.state.gov/documents /organization/60210.pdf (last visited

Mar. 22, 2006).  The United States' jurisdictional objection remains pending.

ARGUMENT

THIS COURT LACKS JURISDICTION TO VACATE<br>THE PROCEDURAL CONSOLIDATION ORDER AND<br><u>NO BASIS EXISTS TO VACATE THE CONSOLIDATION ORDER IN ANY EVENT</u>

Tembec asks this Court to vacate a procedural ruling of the Consolidation Tribunal – the

Consolidation Order – that consolidated the claims in three Article 1120 arbitrations:  a ruling

that did not address any substantive claim submitted by the parties for arbitration.  This Court

should deny Tembec's motion for several independent reasons.  Initially, the Court lacks

jurisdiction under the FAA to vacate the Consolidation Tribunal's Order because it is not an

"award."  The Consolidation Order does not fall within that narrow exception to the rule

preventing judicial litigation over non-final arbitral decisions.  Moreover, even if jurisdiction

existed, case law rejects ancillary judicial litigation over arbitral procedural orders in general and

orders of consolidation in particular.  In any event, Tembec has utterly failed to establish that the

Consolidation Order should be vacated on the grounds of evident partiality, violation of public

policy, or that the Consolidation Tribunal acted in excess of authority.

I.    THIS COURT LACKS JURISDICTION UNDER THE FAA TO VACATE A<br>      <u>PROCEDURAL RULING SUCH AS THE CONSOLIDATION ORDER</u>

    A.    The Consolidation Order is Not an Arbitration Award, So the Court Lacks<br>          <u>Jurisdiction Under the FAA to Vacate the Order</u>

The FAA only provides courts with jurisdiction to vacate an "award" of an arbitration

panel, 9 U.S.C. § 10, not every arbitral decision.  Thus, the D.C. Circuit has noted the "cardinal

15

principle of arbitration" that "awards are reviewable and enforceable only if they are 'final' – that is, if they purport to resolve all aspects of the dispute being arbitrated."  See American Fed'n of Gov't Employees v. Fed. Labor Relations Auth., 777 F.2d 751, 755 (D.C. Cir. 1985).  Indeed, "[t]he language of the [FAA] is unambiguous:  it is only after an award has been made by the arbitrators that a party can seek to attack any of the arbitrators' determinations in court, by moving either to vacate the award, or to modify or correct it."  Michaels v. Mariforum Shipping, S.A., 624 F.2d 411, 414 (2d Cir. 1980) (citations omitted) (noting that courts do not have "the power to review an interlocutory ruling by an arbitration panel.").  "The FAA does not provide therefore for any court intervention prior to issuance of an arbitral award beyond the determination as to whether an agreement to arbitrate exists and enforcement of that agreement by compelled arbitration of claims that fall within the scope of the agreement even after the court determines some default has occurred."  Gulf Guar. Life Ins. Co. v. Connecticut Gen. Life Ins. Co., 304 F.3d 476, 486-87 (5th Cir. 2002).  Thus, non-final or interim decisions of arbitral panels generally cannot be challenged under the FAA, because they are not awards.

In Michaels, for example, the Second Circuit considered a district court's decision to review an interim award in arbitration.  Id. at 412.  That interim award held one of the parties liable on several of the claims, the other party liable on a counterclaim, deferred a decision on another counterclaim, and made no ruling on damages.  Id. at 413.  Thus, the Court held that the decision did "'not purport to be final but is merely a first step in deciding all claims submitted to arbitration.'"  Id. (quoting underlying district court opinion).  The Second Circuit held that because the decision was non-final – in that the decision was not "intended by the arbitrators to be their complete determination of all claims submitted to them" – "the interlocutory nature of the interim award rendered [a challenge] premature . . . ."  Id. at 413-14.  For this reason, the

Second Circuit ruled that the district court should not have addressed the merits of the challenge and should have simply dismissed the challenge as premature.  <u>Id.</u> at 415.

This principle – that a district court may only vacate a final award and has no authority under the FAA to rule on other issues – applies here.  Because the Consolidation Order here is much further removed from a decision on all issues submitted to NAFTA arbitration, the non-finality of the Consolidation Order is even more apparent than the ruling in <u>Michaels</u>.  Indeed, in <u>Michaels</u>, the ruling had decided liability on most claims.  By contrast, Tembec challenges a Consolidation Order that decides only whether three separate arbitrations dealing with identical issues should be consolidated.  While the nomenclature used by the Tribunal is not conclusive in determining whether a ruling is an "award" under the FAA, the Consolidation Order does not decide jurisdictional issues, liability, or damages.  It therefore does not resolve with finality <u>any</u> of the claims submitted to Chapter Eleven by Tembec.  Thus, just like the interim award in <u>Michaels</u>, the Consolidation Order does "'not purport to be final but is merely a first step in deciding all the claims submitted to arbitration.'"  <u>Id.</u> at 413.  Under these circumstances, the Court lacks jurisdiction to vacate the Consolidation Order, and the Court should therefore dismiss this case.

None of the cases mentioned by Tembec, <u>see</u> Pet. Mem. at 16, n.46, casts any doubt on whether the Consolidation Order is an "award" under the FAA.  The cases fall generally into two camps.  First, Tembec cites cases setting forth the limited exception allowing "temporary equitable orders calculated to preserve assets or performance needed to make a potential final award meaningful" to be reviewed as final orders, much akin to the reviewability of preliminary injunctions issued by district courts.  <u>See</u> <u>Pacific Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.</u>, 935 F.2d 1019, 1022-23 (9th Cir. 1991).  <u>See also</u> <u>Yasuda Fire & Marine Ins. Co. Of</u>

Europe, Ltd. v. Cont'l Cas. Co., 37 F.3d 345, 347-48 (7th Cir. 1994); Nat'l R.R. Passenger Corp. v. Expresstrak, LLC., 02-CV-1773 (RBW), Dkt. Entry 83, at 6 (D.D.C. May 1, 2003), rev'd on other grounds 330 F.3d 523 (D.C. Cir. 2003) ("[T]here are compelling reasons why equitable relief is necessary in order to preserve ExpressTrak's assets and viability so that the arbitration proceeding will not be a meaningless process."). The Consolidation Order is not a temporary equitable order, akin to a preliminary injunction, and does not compel the preservation of any party's assets, and thus the rationale behind that limited exception does not apply here.

Second, Tembec cites cases involving an arbitral decision that conclusively resolved a discrete issue on the merits. Thus, in Metallgesellschaft A.G. v. M/V Capitan Constante, 790 F.2d 280 (2d Cir. 1986), the Second Circuit considered an arbitration where the defendant had made a counterclaim for unpaid freight charges after the plaintiff sought damages for short delivery and contamination of an oil shipment. The arbitration panel issued a ruling on the counterclaim, but not on the original claim, and the Second Circuit permitted the district court to review the partial award because it "finally and definitely dispose[d] of a separate independent claim" even though other distinct claims remained. Id. at 283. Similarly, in Publicis Comm. v. True North Comms. Inc., 206 F.3d 725 (7th Cir. 2000), the Seventh Circuit concluded that an arbitration ruling requiring the disclosure of tax records was a final award. But the Seventh Circuit held that "whether or not Publicis had to turn over the tax records is the whole ball of wax . . . [p]roducing the documents wasn't just some procedural matter – it was the very issue True North wanted arbitrated." Id. at 729 (emphasis added). Finally, in Hart Surgical, Inc. v. Ultracision, Inc., 244 F.3d 231 (1st Cir. 2001), the First Circuit vacated the denial of a motion to vacate an arbitration ruling on liability where "both parties" urged the Court to vacate the ruling, id. at 232 (emphasis in original), and where the parties had agreed that liability would be

18

bifurcated from damages, such that review of the arbitral award on liability furthered the parties'

agreement. Id. at 232-34. By contrast, the Consolidation Order did not resolve any merits

issues.[4]

      B.      The Consolidation Order is a Procedural Decision Left Solely to the Arbitral
                Tribunal Under Both Case Law and the Text of NAFTA

The non-final nature of the Consolidation Order is a sufficient reason to dismiss this case

for lack of jurisdiction. The procedural nature of the Consolidation Order, however, also

provides a related but independent reason to dismiss Tembec's motion. While courts accord all

arbitral decisions a high degree of deference, "it is equally well-established that courts are even

more deferential regarding procedural decisions." American Postal Workers Union v. United

States Postal Service, 362 F.Supp.2d 284, 288-89 (D.D.C. 2005) (Lamberth, J.) (arbitration

award reviewed under the Postal Reorganization Act). See also Stroh Container Co. v. Delphi

Indus., Inc., 783 F.2d 743, 749 (8th Cir. 1986) (FAA challenge to an arbitrator award).

Indeed, case law demonstrates that such procedural matters, and specifically the issue of

consolidation, are left to arbitrators without judicial involvement. Over forty years ago, the

Supreme Court opined that "[o]nce it is determined . . . that the parties are obligated to submit

the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the

dispute and bear on its final disposition should be left to the arbitrator." John Wiley & Sons, Inc.

---

     [4] The consolidation of claims before separate arbitration tribunals is akin to the District
Court's power to consolidate cases under Federal Rule of Civil Procedure 42, which furthers the
Court's inherent power to control its docket. Such consolidation orders are generally not
appealable absent certification to the Circuit. See Levine v. Am. Export Indus., Inc., 473 F.2d
1008, 1008-09 (2d Cir. 1973) (rejecting an appeal from an "interlocutory order" consolidating
three derivative suits for pretrial purposes); Nolfi v. Chrysler Corp., 324 F.2d 373, 374 (3d Cir.
1963).

v. Livingston, 376 U.S. 543, 557 (1964). And the Supreme Court recently confirmed that

procedural questions growing out of an arbitration "are presumptively not for the judge, but for

an arbitrator, to decide." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83-84 (2002)

(six-year statute of limitations was a question for the arbitrator not the courts).

The few cases addressing consolidation of arbitration proceedings have held that

consolidation is a purely procedural question that is presumptively for an arbitrator to the

exclusion of ancillary judicial proceedings. The First Circuit thus squarely held that whether to

consolidate separate arbitrations under the Labor Management Relations Act is a procedural

matter for an arbitrator to decide. Shaw's Supermarkets, Inc. v. United Food and Commercial

Workers Union, 321 F.3d 251 (1st Cir. 2003). Shaw's Supermarkets involved three grievances

filed by a union under three separate collective bargaining agreements against the same employer

that the union sought to consolidate "because they challenged the same policy." Id. at 252.

Applying Howsam, the First Circuit noted that consolidation does not involve a question of

arbitrability, because each of the underlying arbitrations were undeniably arbitrable. Id. at 254.

Thus, "[l]eaving the decision whether to consolidate the three proceedings in the hands of the

arbitrator comports with long-standing precedent resolving ambiguities regarding the scope of

arbitration in favor of arbitrability." Id. Similarly, the United States District Court for the

Southern District of New York agreed that consolidation is purely a procedural issue for an

arbitrator to decide, not a matter for the Court to resolve at the outset of an arbitration. See

Blimpie Int'l v. Blimpie of the Keys, 371 F.Supp.2d 469, 473-74 (S.D.N.Y. 2005) (dismissing an

action because "consolidation is a procedural issue, 'which grow[s] out of the [parties'] dispute,'

and therefore, presumptively falls to the arbitrator."). Finally, in Green Tree Fin. Corp. v.

Bazzle, a plurality of the Supreme Court, in reviewing a final award, held that the decision of

20

whether class arbitration was prohibited by an arbitration agreement, which it reviewed after the award was final, did not fall within the narrow subset of decisions that are questions of arbitrability subject to judicial involvement. 539 U.S. 444, 452-53 (2003) (plurality opinion). Thus, the plurality stated that where the question is the "kind of arbitration proceeding the parties agreed to," including arbitration procedures, the "[a]rbitrators are well situated to answer that question." Id.

Even if the Court were to conclude that it has jurisdiction, the question of consolidation under the NAFTA is a procedural question that is for the arbitrator and not for this Court to decide. The Consolidation Order is clearly procedural and "gives a decision of an administrative nature." Consolidation Order, Exh. BB, at 32, n.35. Here, the text of the NAFTA expressly grants a Consolidation Tribunal the power to consolidate claims from Article 1120 tribunals, "assume jurisdiction" over those claims, and stay existing Article 1120 tribunals while it considers consolidation. NAFTA, Art. 1126(2), (9). Moreover, the parties made competing arguments about whether the consolidation of claims presented to three different Article 1120 tribunals was appropriate under the circumstances. The Consolidation Tribunal issued a well-reasoned 84-page decision carefully considering the parties' arguments and the applicable law. The Consolidation Tribunal unanimously concluded that: (i) "it is common ground that the claims in question have been submitted to arbitration under Article 1120;" (ii) "many questions of law and fact are common in the three Article 1120 arbitrations;" (iii) "the interests of fair and efficient resolution of the claims merit the assumption of jurisdiction over all of the claims;" and (iv) "the parties to the present proceedings have been heard." Consolidation Order, Exh. BB at 82. This record is more than sufficient to uphold that decision. Second-guessing the Consolidation Tribunal on a purely procedural ruling is simply not warranted.

21

II.    NEITHER MR. ROBINSON'S DISTANT FAMILIAL RELATIONSHIP WITH THE
       PRESIDENT NOR HIS FORMER EMPLOYMENT WITH THE DEPARTMENT OF
       STATE DEMONSTRATES EVIDENT PARTIALITY

       Even if the Consolidation Order were a final award that is subject to judicial review –

which it is not – Tembec fails to demonstrate that there was "evident partiality" on the part of the

arbitrators within the meaning of the Section 10 of the FAA, such that the Order should be

vacated.  See Pet. Mem. at 17-24.

       As the party asserting evident partiality, Tembec bears the burden of proof.  Al-Harbi v.

Citibank, N.A., 85 F.3d 680, 683 (D.C. Cir. 1996).  The D.C. Circuit has held that "'the burden

on a claimant for vacation of an arbitration award due to 'evident partiality' is heavy, and the

claimant must establish specific facts that indicate improper motives on the part of an

arbitrator.'"  Id. (quoting Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co., 991 F.2d 141,

146 (4th Cir. 1993)).  The "alleged partiality must be direct, definite, and capable of

demonstration rather than remote, uncertain, or speculative."  Id. (citation and internal marks

omitted).  Furthermore, the evidence must meet a "reasonable person standard," such that "a

reasonable person would have to conclude that an arbitrator was partial to the other party to the

arbitration."  Consolidation Coal Co. v. Local 1643, United Mine Workers of Am., 48 F.3d 125,

129 (4th Cir. 1995) (applying FAA evident partiality standards to a collective bargaining

situation).

       While some familial relationships are so close to warrant per se vacation of arbitration

awards, "such a list would most likely be very short."  Morelite Construction Corp. v. New York

City District Council Carpenters Benefit Funds, 748 F2d 79, 85 (2d Cir. 1984).  In Morelite, for

example, the Second Circuit concluded that a father-son relationship between an arbitrator and an

officer of one party to the arbitration rose to the level of per se partiality under the FAA.  Id. at

22

84-85.  But the Second Circuit also noted that the ruling was not intended to allow parties to challenge awards "by seeking out and finding tenuous relationships between the arbitrator and the successful party."  Id. at 85.  Indeed, the Fourth Circuit in Consolidation Coal rejected extending the per se rule from Morelite to vacate an arbitration award rendered by an arbitrator in favor of a union that his brother worked for in another state.  48 F.3d at 129-30.  The Fourth Circuit adopted the following factors to aid the evident partiality analysis: "(1) any personal interest pecuniary or otherwise, the arbitrator has in the proceeding; (2) the directness of the relationship between the arbitrator and the party he is alleged to favor; (3) the connection of the relationship to the arbitration; and (4) the proximity in time between the relationship and the arbitration proceeding."  Id. at 130.  Indeed, examining the particular claims of partiality is critical.  See Commonwealth Coatings Corp. v. Continental Cas. Co., 393 U.S. 145, 150 (1968) (White, J., concurring).

Here, Tembec alleges that evident partiality is demonstrated by:  (i) Mr. Robinson's familial relationship with the President, and (ii) Mr. Robinson's former position as Legal Adviser to the State Department.  See Pet. Mem. at 20-24.  Tembec fails to meet its burden of proof with respect to either of these allegations.  Given the facts surrounding these relationships, no reasonable person would conclude that Mr. Robinson was partial or lacked independence.

Mr. Robinson's familial relationship with the President is too attenuated to lead a reasonable person to conclude that Mr. Robinson is unfairly biased in favor of the United States.  The President is Mr. Robinson's wife's parent's sibling's offspring's offspring.  See Letter from Andrea J. Menaker to Roberto Dañino, Secretary-General, ICSID (May 24, 2005), Exh. W at 2, n.5.  Mr. Robinson is thus separated from the President by five degrees, and by law and not blood.  Id.  Moreover, Mr. Robinson's wife is a "first cousin, once removed, of the President,"

23

that his wife is "one of twenty or more" persons who fit that description due to the large size of the President's extended family.  See Letter from Davis R. Robinson to Gonzalo Flores (May 6, 2005), Exh. N, at 2.  Mr. Robinson also confirmed that he had no personal relationship with the President and that his sole contact with the President since Mr. Bush took office was having briefly shaken hands at two large functions.  Id.  Mr. Robinson also stated that he had no substantive conversations with the President.  Id.  Mr. Robinson's attenuated connection with the President is thus hardly the type of relationship, such as the father-son relationship in Morelite, that gives rise to justifiable doubts as to Mr. Robinson's ability to serve as an arbitrator with the requisite impartiality.  As a matter of fact, the IBA Guidelines on Conflicts of Interests in International Arbitration, a source relied on by Tembec, see Pet. Mem. at 36, defines "close family member" as "a spouse, sibling, child, parent or life partner."  IBA Guidelines at 25 n.4, available at http://www.ibanet.org/images/downloads/guidelines%20text.pdf (last visited Mar. 24, 2006).  As then-Secretary-General Dañino correctly held in his decision on Tembec's challenge to Mr. Robinson, the "somewhat distant familial relationship" at issue "does not . . . raise justifiable doubts as to the impartiality or independence of Mr. Robinson."  Letter from Roberto Dañino to the parties (June 15, 2005), Exh. Y at 2.

        In any event, the relevant relationship for purposes of conflicts of interest is between the arbitrator and a party.  President Bush is not a party in the Chapter Eleven arbitration.  The United States is the party.  Likewise, Tembec's suggestion that President Bush was directly involved in making the antidumping and countervailing duty determinations, see, e.g., Pet. Mem. at 29 (contending that "President Bush['s] . . . decisions were at issue in the dispute."), strains credulity.  Tembec's sole evidence is a purported conversation that the President had with the Canadian Prime Minister.  See id. at 7.  Nor would the modest campaign contributions

24

allegedly made by Mr. Robinson and his wife lead a reasonable person to conclude that Mr.

Robinson lacked impartiality.  See id. at 21, n.54.

     In sum, the "tenuous" and "remote" connection between Mr. Robinson does not give rise

to justifiable doubts as to Mr. Robinson's impartiality or independence, and cannot serve as a

basis for setting aside the unanimous Consolidation Order in which Mr. Robinson participated

with two other arbitrators.  Morelite, 748 F2d at 85; Consolidation Coal, 48 F.3d at 130.

     Nor would Mr. Robinson's former employment as the Legal Adviser to the Department of

State lead any reasonable person to believe that he was partial to the United States.  First, Mr.

Robinson's curriculum vitae, which was circulated upon his selection in April 2005, see Letter

from Gonzalo Flores to the parties (Apr. 19, 2005), Exh. J at 8-9, prominently listed his former

position.  Indeed, Tembec's challenge to Mr. Robinson based on his former position was not

timely in any event because it was made well beyond the fifteen-day period under the

UNCITRAL Rules for making such challenges.  See UNCITRAL Rule 11(1).  See also Letter

from Gonzalo Flores to the parties (Apr. 19, 2005), Exh. J, (appointing the panel), Letter from

Elliot J. Feldman to Gonzalo Flores (May 20, 2005), Exh. V at 1-7 (challenging Mr. Robinson)

and Letter from Andrea J. Menaker to Roberto Dañino, Secretary-General, ICSID (May 24,

2005), Exh. W at 1 & n.2.  Second, Mr. Robinson's service as Legal Adviser ended in 1985,

eight years before the NAFTA even entered into force and twenty years before his appointment to

the Consolidation Tribunal.  And he was appointed to the ICSID roster in 2002, well before

Tembec filed its claim under Article 1120 and he was selected as an arbitrator for the

Consolidation Tribunal.  Notably, the IBA Guidelines provide that "previous services for one of

the parties" more than three year prior to an arbitration gives rise to no appearance of, and no

actual, conflict of interest.  See IBA Guidelines at 18-19, 21 (noting that remoteness in time

reduces potential conflicts).

The Secretary-General of ICSID rejected the notion that Mr. Robinson's former government service that ended over twenty years before his appointment could raise doubts to his independence. See Letter from Roberto Dañino to the parties (June 15, 2005), Exh. Y at 2. The Secretary-General emphasized that "[i]n the context of the NAFTA, with its special provisions allowing the appointment of co-nationals as arbitrators, there is a clear, consistent acceptance in the cases that prior governmental service, even at a higher level, does not in and of itself disqualify a person from service as an arbitrator." Id. Indeed, other high-level Department of State officials have served as arbitrators in Article 1120 arbitrations, including former Legal Adviser Conrad Harper in the Canfor arbitration. See Letter from Andrea J. Menaker to Roberto Dañino, Secretary-General, ICSID (May 24, 2005), Exh. W at 2 & n.4 (noting four former high-level Department of State officials that have acted in that capacity). And other high-ranking United States officials, such as Abner Mikva, a former White House Counsel, have served as arbitrators as well. See Award, Loewen Group, Inc. and Raymond L. Loewen v. United States of America, June 26, 2003, available at http://www.state.gov/documents/organization/22094.pdf (last visited Mar. 28, 2006), at 1 (listing Judge Mikva as a Member of the Tribunal). Mr. Robinson's former position, from twenty years ago, as Legal Adviser to the Department of State would in no way lead a reasonable person to conclude that he was partial.

Furthermore, many of the cases Tembec cites are non-disclosure cases, see Pet. Mem. at 17-19 (citing cases), which are not applicable here. As to Mr. Robinson's former position, the record is uncontroverted that his position was fully disclosed upon his initial selection on April 19, 2005, through his curriculum vitae. See Letter from Gonzalo Flores to the parties (Apr. 19, 2005), Exh. J at 8 (listing Legal Adviser to the Department of State beginning in 1981).

26

Moreover, on May 6, 2005, Mr. Robinson explained the facts of his highly attenuated connection to the President upon an inquiry by Tembec on May 2, 2005.  See Letter from Davis R. Robinson to Gonzalo Flores (May 6, 2005), Exh. N, at 1-2. This is therefore not a situation where the parties engaged in lengthy arbitration proceedings and one party discovered a fact either during the hearing stage or after an award was issued.  Rather, Tembec raised its concern shortly after Mr. Robinson's selection and Mr. Robinson fully disclosed the nature of his relationships and this all occurred in advance of (i) the stay the Consolidation Tribunal issued, (ii) the hearing on consolidation, and (iii) the Consolidation Order now at issue.  Indeed, that there was no conflict warranting disclosure was confirmed by ICSID's decision denying Tembec's challenge to Mr. Robinson.  In its May 20, 2005 letter, Tembec challenged Mr. Robinson's appointment to the Consolidation Tribunal and cited his familial relationship to President Bush and his former position as Legal Adviser to the Department of State.  See Letter from Elliot J. Feldman to Gonzalo Flores (May 20, 2005), Exh. V at 1-7.  ICSID's Secretary-General, Roberto Dañino, squarely rejected Tembec's challenge on June 15, 2005, allowing the hearing to proceed the next day.  See Letter from Roberto Dañino to the parties (June 15, 2005), Exh. Y at 2.

Tembec has utterly failed to meet its burden of establishing evident partiality.  No basis in fact or law exists to conclude that the Consolidation Order should be vacated because of evident partiality.

III.    THE CONSOLIDATION TRIBUNAL WAS CONSTITUTED IN A MANNER
        CONSISTENT WITH THE NAFTA AND PUBLIC POLICY

By submitting its claim to arbitration under Chapter Eleven of the NAFTA, Tembec consented to all of the provisions in that chapter, including the consolidation provision in Article 1126.  See NAFTA, Art. 1121 ("A disputing investor may submit a claim under Article 1116 to

arbitration only if . . . the investor consents to arbitration in accordance with the procedures set

out in this Agreement."). See also Tembec's Notice of Arbitration at ¶ 11 (Dec. 3, 2003),

available at http://www.state.gov/documents/organization/27805.pdf (last visited Mar. 22, 2006)

(Tembec "consented to the submission of this claim to arbitration before a three arbitrator

Tribunal appointed in accordance with the procedures set forth in NAFTA Chapter 11");

Consolidation Order, Exh. BB at 34 ("[M]embers of an Article 1126 Tribunal are appointed by a

neutral person, i.e., the Secretary-General of ICSID, a method to which all parties have consented

as a result of Articles 1121 and 1123 of the NAFTA."). Tembec's attempt to attack judicially the

appointment process to which it expressly consented cannot be countenanced.

　　　　Although Tembec appears to argue that the Consolidation Tribunal was not appointed in

accordance with the arbitration agreement, see Pet. Mem. at 25-26, it cannot point to any actual

provision from which the appointing authority supposedly deviated. To the contrary, the

Secretary-General of ICSID appointed the Consolidation Tribunal precisely in accordance with

the terms of NAFTA Article 1126.

　　　　Tembec also advances the remarkable assertion that Article 1126 – a treaty provision that

was negotiated by the executive branch and approved by the Congress – on its face violates

public policy, and is thus invalid. See id. at 25-28. Even if the procedural Consolidation Order

were subject to judicial vacatur – which it is not – Tembec cannot demonstrate any supposed

unfairness that resulted from the Article 1126 appointment process, let alone meet the burden it

has set out for itself in seeking to strike down a United States treaty provision as contrary to

public policy.

　　　　A.　　The Tribunal Was Constituted In Accordance with NAFTA Article 1126

　　　　The ICSID Secretary-General constituted the Consolidation Tribunal precisely in

accordance with the terms of NAFTA Article 1126.  Article 1126(5) mandates that the Secretary-General establish a tribunal within 60 days of receiving a request for such a tribunal by a party to an Article 1120 proceeding.  The Secretary-General must appoint the arbitrators from the roster referred to in Article 1124(4), and if no such arbitrators are available, from the ICSID Panel of Arbitrators (the "ICSID Roster").  <u>See</u> NAFTA, Art. 1126(5).  If the ICSID Roster does not contain a suitable individual to serve as a co-arbitrator, the Secretary-General may make such appointment in his discretion.  <u>Id.</u>  Article 1126(5) requires that the presiding arbitrator not be a national of any of the NAFTA Parties, but that one of the co-arbitrators be a national of the State of the investor and the other co-arbitrator be a national of the respondent Party.

The Secretary-General appointed the Consolidation Tribunal precisely in accordance with its mandate under NAFTA Article 1126.  In accordance with Article 1126(5), the Secretary-General appointed the Consolidation Tribunal on April 19, 2005 and established it on May 6, 2005, within sixty-days of receiving the United States' March 7, 2005, request for consolidation. <u>See</u> Letter from Gonzalo Flores to the parties (Apr. 19, 2005), Exh. J; Letter from Gonzalo Flores to the parties (May 6, 2005), Exh. O, at 2.  The Secretary-General appointed a national of the Netherlands as the presiding arbitrator, and nationals of Canada and the United States as co-arbitrators.  Because no Article 1124(4) list was ever created, the Secretary-General sought to appoint all of the arbitrators from the ICSID Roster, as contemplated by Article 1126(5).  The lone Canadian national on the ICSID Roster, however, Mr. Yves Fortier, was unable to serve. Letter from Gonzalo Flores to the parties (May 4, 2005), Exh. L at 1.  The Secretary-General thus appointed a Canadian national, <u>see id.</u>, from outside the ICSID panel, as contemplated by Article 1126(5).  Mr. Robinson was thus appointed in a manner consistent with the NAFTA and pursuant to its express terms.

Tembec cannot establish any deviation in the appointment process from the NAFTA's express terms.  Instead, Tembec contends that the UNCITRAL Arbitration Rules modify the NAFTA, see Pet. Mem. at 28, 31, and that the appointment process violated UNCITRAL Rule 6(4), which requires the appointing authority to "have regard to such considerations as are likely to secure the appointment of an independent and impartial" tribunal.  Id. at 35 (quoting Rule 6(4)).  As an initial matter, Tembec's legal analysis is flawed:  it is the NAFTA that modifies the UNCITRAL Arbitration Rules, not the other way around.  Article 1126(1) expressly provides that "[a] Tribunal established under this Article shall be established under the UNCITRAL Arbitration Rules and shall conduct its proceedings in accordance with those Rules, except as modified by this Section."  NAFTA, Art. 1126(1).  In any event, Tembec cannot demonstrate how the Secretary-General, which merely followed his mandate under the NAFTA and the UNCITRAL Arbitration Rules in constituting the Consolidation Tribunal, somehow failed to give regard to considerations likely to result in an impartial or independent tribunal in accordance with Article 6(4).

     B.     <u>Tembec's Facial Challenge to Article 1126 Fails</u>

Because the Consolidation Tribunal was constituted in accordance with the NAFTA's terms, Tembec's challenge to the appointment process on public policy grounds amounts to a facial challenge to Article 1126 itself.  The NAFTA was signed by President George H.W. Bush on December 17, 1992.  The House of Representatives and the Senate both approved the Treaty in 1993, and President Clinton signed it into legislation on December 8th of that year.  Tembec suggests that, in entering into the NAFTA, and adopting Article 1126, the executive and legislature violated a fundamental public policy, and that any action taken pursuant to the consolidation provision must be disregarded by a court of law.  See Pet. Mem. at 25-28.

However, even if the Consolidation Order were subject to judicial scrutiny, Tembec cannot show

any unfairness arising from the Article 1126 appointment process, let alone meet the

insurmountable burden of demonstrating that a provision of the NAFTA violates a fundamental

public policy and is invalid.

The relevant public policy for purposes of Tembec's motion is not some general notion of

fairness; rather, it is the United States' policy of "favoring arbitration" and "rigorously

enforc[ing] agreements to arbitrate," and therefore avoiding unnecessary judicial involvement in

that process. Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 226 (1987) (quoting

Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983) & Dean Witter

Reynolds Inc. v. Byrd, 470 U.S. 213, 221 (1985)); see also Buckeye Check Cashing, Inc. v.

Cardegna, 126 S.Ct. 1204, 1207-08 (2005). Courts accord a high degree of deference to arbitral

decisions, and must not "indulge the presumption" that arbitral bodies are "unable or unwilling to

retain competent, conscientious and impartial arbitrators." Gilmer v. Interstate/Johnson Lane

Corp., 500 U.S. 20, 30 (1991) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,

Inc., 473 U.S. 614, 634 (1985)) (rejecting the claim that arbitrators appointed by the New York

Stock Exchange (NYSE) would be biased against securities representative asserting employment

discrimination claim and noting that NYSE arbitration rules protected against arbitrator bias)).

In any event, the grounds for vacating an arbitral award on the basis of public policy are

exceedingly narrow. See American Postal Workers Union, AFL-CIO v. USPS, 789 F.2d 1, 8

(D.C. Cir. 1986) (holding that grounds for vacating arbitration awards are "extremely narrow,"

"so as to limit potentially intrusive judicial review of arbitration awards under the guise of

'public policy.'") (emphasis in original); Payne v. Giant Food, Inc., 346 F.Supp.2d 15, 23

(D.D.C. 2004) (Huvelle, J.); see also Northwest Airlines, Inc. v. Air Line Pilots Assoc. Int'l, 808

31

F.2d 76, 83 (D.C. Cir. 1987).  The Supreme Court has instructed lower courts to proceed "with

particular caution" when considering requests to invoke this ground for vacatur in cases "where

two political branches have created a detailed regulatory regime in a specific field" and thus

clearly articulated public policy in that area.  <u>Eastern Assoc. Coal Corp. v. United Mine Worker</u>

<u>of Am., Dist. 17</u>, 531 U.S. 57, 63 (2000).  The D.C. Circuit has likewise explained that this

ground for vacatur is "not available for every party who manages to find some generally accepted

principle which is transgressed by the award."  <u>Revere Copper and Brass Inc. v. OPIC</u>, 628 F.2d

81, 83 (D.C. Cir. 1980) (citations omitted) (declining to vacate an arbitration award on the

grounds that it did not reflect the rule of contra proferentem, <u>i.e.</u>, that ambiguities in an insurance

contract should be construed against the insurer).  Rather, an award may only be vacated on this

ground if it "'compels the violation of law or conduct contrary to accepted public policy.'" <u>Id.</u>

 The cases on which Tembec relies, none of which is controlling on this Court, are

inapposite to the case at bar.  Not only do they concern arbitral awards – not procedural orders –

they involve one of two situations that do not apply here.  First, Tembec cites cases, <u>see</u> Pet.

Mem. at 26-27, 29, in which the sole arbitrator was appointed unilaterally by one party, or the

appointment process for the sole arbitrator was fundamentally biased in favor of one party, <u>see</u>,

<u>e.g.</u>, <u>Texas Eastern Transmission Corp. v. R.L. Barnard</u>, 285 F.2d 536 (6th Cir. 1960) (involving

decision by single-party appointed arbitrator); <u>Graham v. Scissor-Tail, Inc.</u>, 623 P.2d 165, 177-78

(Cal. 1990) (arbitration agreement called for appointment of sole arbitrator with longstanding

business connections to one party); <u>Harold Allen's Mobile Home Factory Outlet v. Butler</u>, 825

So.2d 779, 783-84 (Ala. 2002) (appointment process of sole arbitrator was in exclusive control of

one party).  As discussed below, the Secretary-General of ICSID, not the United States,

appointed the arbitrators to the Consolidation Tribunal in accordance with the express terms of

the NAFTA and the process did not unfairly favor the United States.

Second, Tembec cites situations, <u>see</u> Pet. Mem. at 27-28, where one party has thoroughly controlled the appointment process with respect to all three arbitrators.  <u>See</u>, <u>e.g.</u>, <u>Hooters of America, Inc. v. Phillips</u>, 173 F.3d 933, 938-40 (4th Cir. 1999) (arbitration agreement in employment contract required selection of employee's arbitrator and presiding arbitrator from "a list of arbitrators created exclusively by Hooters."); <u>Ditto v. RE/MAX Preferred Properties</u>, 861 P.2d 1000, 1003-04 (Okl. Civ. App. 1993) (arbitration agreement called for selection of all three arbitrators from a pool of defendant's agents); <u>Sehulster Tunnels/Pre-Con v. Taylor Brothers, Inc.</u>, 4 Cal.Rpt.3d 655, 666-68 (Cal. Ct. App. 2003) (all three arbitrators closely associated with, and remunerated by, one party); <u>Rosenberg v. Merrill Lynch</u>, 995 F.Supp. 190, 210 (D. Mass. 1998) (arbitration procedure thoroughly controlled by employer's trade association).  Here, the United States did not appoint any of the arbitrators to the Consolidation Tribunal, let alone control the appointment of the entire Consolidation Tribunal.

The essence of Tembec's complaint is that: (i) by choosing the arbitrators from the ICSID roster of Arbitrators, Article 1126 effectively grants respondent governments the opportunity to appoint one tribunal member, but denies that opportunity to claimants, <u>see</u> Pet. Mem. at 24, 31; and (ii) the arbitrators designated to that roster are pre-disposed towards respondent governments.  <u>Id.</u> at 28-29.  Neither argument withstands scrutiny.

First, Article 1126(5) does not grant respondent governments the right to "appoint" a tribunal member to a consolidation tribunal; rather, it requires that all appointments be made by a neutral appointing authority, ICSID's Secretary-General.  <u>See</u> NAFTA, Art. 1126(5) (stating that the "Secretary-General shall establish a Tribunal comprising three arbitrators . . . shall appoint the presiding arbitrator . . . [and] the two other members"); <u>see also</u> Consolidation Order, Exh.

BB at 34 ("[M]embers of an Article 1126 Tribunal are appointed by a neutral person, i.e., the Secretary- General of ICSID.").  Article 14 of the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States (the "ICSID Convention"), for example, provides that "Persons designated to serve on the Panels shall be persons of high moral character and recognized competence in the fields of law, commerce, industry or finance, who may be relied upon to exercise independent judgment."  And Article 6(4) of the UNCITRAL Arbitration Rules mandates that the Secretary-General make all arbitral appointments with regard to considerations of independence and impartiality.

The United States designated four arbitrators to the ICSID Roster, as contemplated by Article 13(1) of the ICSID Convention.  The United States appointed Mr. Robinson to the Roster in 2002, well before the consolidation proceeding and Tembec's claims were filed.  Contrary to Tembec's suggestion, see Pet. Mem. at 24, that designation cannot be equated with making a direct appointment to the Consolidation Tribunal for purposes of the specific dispute.

Tembec's suggestion that the process was unfair because Tembec did not get to propose or chose arbitrators or that the Secretary-General did not appoint an American nominated to the ICSID Roster by an ICSID member other than the United States, see Pet. Mem. at 28-29, 31, reads nonexistent terms into the NAFTA's text.  Article 1126(5), by its express terms, rests the appointment power exclusively in the Secretary-General.  Had the NAFTA Parties wanted to impose additional limitations on the Secretary-General's selection of arbitrators, they could have done so when drafting Article 1126(5).  They did not.  Tembec's proposal that the process is unfair because Tembec chose no arbitrators therefore contemplates a deviation from the text of the NAFTA, which itself would be in excess of ICSID's authority.  Moreover, Tembec's proposal would introduce a systemic advantage in favor of claimants by allowing claimants to

appoint candidates known to have expressed positions on particular issues at stake in the specific proceeding.

In this instance, ICSID accorded Tembec every measure of accommodation with respect to the appointment of arbitrators. For example, although it was not required to do so under the NAFTA or the UNCITRAL Arbitration Rules, ICSID provided the parties the chance to comment on ICSID's initial list of proposed arbitrators. See Letters from the Parties to ICSID, at Exhs. F-I (regarding the first set of proposed arbitrators). ICSID also accommodated claimants' objection to all three proposed arbitrators by selecting an entirely new slate of arbitrators. See Letter from Gonzalo Flores to the parties (Apr. 19, 2005), Exh. J. at 1 (appointing three new arbitrators). And, in response to Tembec's questions regarding one of those arbitrators, ICSID made clear to Tembec that "the appointments are entirely without the prejudice to the right of the parties to avail themselves of the challenge provisions of the UNCITRAL Arbitration Rules." See Letter from Antonio R. Parra, Deputy Secretary-General, ICSID to Elliot J. Feldman (May 13, 2005), Exh. T. Tembec, in fact, did challenge Mr. Robinson. And in response to Tembec's request, the Secretary-General provided a reasoned decision rejecting the challenge to Mr. Robinson, instead of simply upholding or denying the challenge, as is its usual practice. See Letter from Roberto Dañino to the parties (June 15, 2005), Exh. Y. Tembec thus has no basis for claiming any supposed procedural unfairness, either on the face of Article 1126, or by virtue of the Secretary-General's conduct pursuant to that Article.

Second, Tembec's theory that arbitrators on the ICSID Roster, including Mr. Robinson and Professor van den Berg, are predisposed to rule in favor of respondent governments, see Pet. Mem. at 28-29, is unfounded. Tembec's theory relies on the fact that governments are only respondents, but not claimants, in treaty-based investor-State arbitrations. Id. The fallacy in

35

Tembec's argument is apparent: ICSID Members appoint panelists not only with defensive risks in mind, but with regard to the protection of the foreign investment of their own nationals abroad.[5]

Tembec's argument is particularly nonsensical in the context of the NAFTA. The NAFTA's predecessor agreement, the Canada-U.S. Free Trade Agreement, did not include an investor-State arbitration mechanism. That mechanism was added when the Treaty was expanded on a trilateral basis to include Mexico, the purpose of which was to add protections for foreign investments. It makes no sense that the United States would have imported into that mechanism an arbitral appointment process that is skewed in favor of respondent governments, and against its own investors, as Tembec contends.

Finally, Tembec's reliance on the High Fructose Corn Syrup ("HFCS") consolidation proceeding, see Pet. Mem. at 30, 32, is misplaced. Tembec speculates that Mexico agreed to contract around the Article 1126 procedure in that proceeding because the parties believed that Article 1126(5)'s procedures were unlikely to produce a fair and impartial consolidation tribunal. See Pet. Mem. at 30. But Tembec advances no evidence to support its speculation.

In sum, Tembec has failed to establish any violation of the NAFTA or public policy, and its motion should therefore be denied.

---

[5]  For example, as one of the world's largest capital exporting countries, the United States has entered into dozens of investment treaties for the protection of U.S.-owned investments abroad. See Website of the United States Department of State (last visited Mar. 22, 2006), http://www.state.gov/e/eb/rls/fs/2006/22422.htm (listing bilateral investment treaties entered into by the United States). At the time of Mr. Robinson's appointment to the ICSID roster in 2002, United States investors had been involved in numerous treaty-based investment arbitrations against foreign governments, whereas the United States had been a respondent in only a handful of such claims, all under the NAFTA. It is unfounded to suggest that these governments sought to empanel individuals predisposed to rule against private investors, to the detriment of their own nationals.

IV.    THE CONSOLIDATION TRIBUNAL DID NOT EXCEED ITS AUTHORITY UNDER
       THE NAFTA OR THE GOVERNING ARBITRATION RULES

Tembec also argues that the Consolidation Tribunal exceeded its powers by acting while

"potential" challenges were pending.  Pet. Mem. at 32.  This contention is baseless.  Even if the

Consolidation Order were subject to judicial scrutiny – which it is not, see supra Part I – Tembec

cannot demonstrate that the Consolidation Tribunal exceeded the authority granted to it under the

NAFTA or the UNCITRAL Arbitration Rules.

    A.    The Consolidation Tribunal Did Not Exceed Its Authority By Staying the Article
          1120 Arbitrations or Issuing Procedural Orders

Tembec fails to demonstrate that the Consolidation Tribunal exceeded its authority by

temporarily staying the Article 1120 arbitrations pending its decision on consolidation, or by

issuing a scheduling order.  The excess of authority provision in section 10 of the FAA is

accorded the "'the narrowest of readings.'"  Kanuth v. Prescott, Ball & Turben, Inc., 949 F.2d

1175, 1180 (D.C. Cir. 1991) (noting that the excess of authority provision does not "'confer on

courts a general equitable power to substitute a judicial resolution of a dispute for an arbitral

one.'") (quoting Davis v. Chevy Chase Fin. Ltd., 667 F.2d 160, 165 (D.C. Cir. 1981)).  See e.g.,

Banco de Seguros del Estado v. Mutual Marine Office, Inc., 344 F.3d 255, 262 (2d Cir. 2003)

(noting that the Second Circuit also accords the "narrowest of readings" to the FAA's

authorization to vacate arbitral awards on the excess of powers ground).  As the D.C. Circuit has

explained, vacatur is limited to situations where an arbitral award is made "regarding a matter not

within the scope of the governing arbitration clause . . . ."  Davis, 667 F.2d at 165.

     The authorities on which Tembec relies, see Pet. Mem. at 33-34, generally involve the

refusal to enforce an arbitral award on the ground that the tribunal was not constituted in

accordance with the agreed upon procedures in the arbitration agreement.  See Encyclopaedia

37

Universalis S.A. v. Encyclopaedia Britannica, Inc., 403 F.3d 85, 91 (2d Cir. 2005) ("Article V(1)(d) of the New York Convention itself suggests the importance of arbitral composition, as failure to comport with an agreement's requirements for how arbitrators are selected is one of only seven grounds for refusing to enforce an arbitral award"); Cargill Rice, Inc. v. Empresa Nicaraguense Dealimentos Basicos, 25 F.3d 223, 226 (4th Cir. 1994) ("Arbitration awards made by arbitrators not appointed under the method provided in the parties' contract must be vacated"); Bear Stearns & Co. v. N.H. Karol & Assoc., Ltd., 728 F.Supp. 499, 501-02 (N.D. Ill. 1989) ("the failure to adhere to the forum selection clause of an arbitration agreement is such a failure" to arbitrate according to the agreement); Avis Rent-A-Car System, Inc. v. Garage Employees Union, Local 272, 791 F.2d 22, 25 (2d Cir. 1986) ("Courts generally enforce such clauses strictly, vacating awards entered by arbitrators whose qualifications or method of appointment fail to conform to arbitration clauses.").  These authorities are inapposite, as the Consolidation Tribunal was constituted in accordance with the NAFTA's express terms and this Court should therefore enforce that arbitration selection process "strictly" by denying Tembec's challenge.  See Avis Rent-A-Car System, 791 F.2d at 25.

Indeed, Tembec cannot demonstrate that the Consolidation Tribunal took any action in excess of the authority granted to it under the NAFTA.  The Consolidation Tribunal temporarily stayed the Article 1120 proceedings pending its consolidation decision.  It did so pursuant to the NAFTA's express terms, which state that a consolidation tribunal "may order that the proceedings of a Tribunal established under Article 1120 be stayed, unless the latter Tribunal has already adjourned its proceedings."  NAFTA, Art. 1126(9).  Article 1126(9) contains no time limitations or other restrictions upon a consolidation tribunal for staying Article 1120 proceedings, apart from the fact that it may only issue a stay order upon request of a party.  That

is what occurred here.  The Consolidation Tribunal stayed the Article 1120 arbitrations in response to the United States' request on May 19, 2005.  <u>See</u> Letter from Gonzalo Flores to the parties (May 19, 2005), Exh. U.  Although a pending challenge would not have limited the Tribunal's authority to issue a stay, no challenge to any arbitrators was pending as of that date. The only other action taken by the Consolidation Tribunal prior to the Consolidation Order was to issue a scheduling order, which again was issued on May 19, 2005, before any challenge was made.  Issuing such orders was clearly within the Consolidation Tribunal's inherent authority to conduct the arbitral proceedings.  <u>See</u> UNCITRAL Arbitration Rule 15(1).  The Consolidation Tribunal's revision to that schedule on June 2, 2005, was made in Tembec's favor in response to Tembec's concerns about timing.  <u>See</u> Exh. Z (Tembec Letter) & AA (modification to schedule).

Tembec relies on the UNCITRAL Arbitration Rules for its theory that a tribunal is not authorized to act, either during the first fifteen days after its constitution, or after a party has alerted the tribunal to a "potential" challenge.  Pet. Mem. at 35-36.  This reliance is misplaced. Article 11(1) of the UNCITRAL Arbitration Rules merely sets a fifteen-day time limit for a party to challenge an arbitrator from the time it receives notice of the arbitrator's appointment, or from the time it learns of circumstances likely to give rise to justifiable doubts as to the arbitrator's impartiality or independence.  The Rules do not prevent a tribunal from acting while any <u>actual</u> challenge is pending, let alone, as in this case, <u>before</u> any such challenge has been made.

Notably, neither Tembec, nor its expert, Ronald Cass, point to any provision of the UNCITRAL Arbitration Rules that support Tembec's interpretation.  Mr. Cass merely offers his "common sense" understanding of the section of the UNCITRAL Rules pertaining to arbitral challenges.  <u>See</u> Declaration of Ronald A. Cass ¶ 10.  And Tembec also seeks to rely on the Rules' negotiating history and the IBA Guidelines on Conflicts of Interest, neither of which

39

offers any support to Tembec's interpretation.  See Pet. Mem. at 36.  The UNCITRAL

negotiating history relied on by Tembec merely notes that a challenge to an arbitrator,

particularly a successful challenge, will naturally cause some "interruption" of the arbitral

proceedings.  Id.  That passage does not in any way suggest a limitation on a tribunal's authority,

either while a challenge is pending, or, as in the case here, before any challenge has been

brought.  And as Tembec acknowledges, if the Consolidation Tribunal had not issued a stay of

the Article 1120 proceedings, the delay may have largely mooted the United States' application

for consolidation.  See Pet. Mem. at 39 ("Had the Consolidation Tribunal waited for Tembec's

challenge to be resolved before deciding to suspend Tembec's Article 1120 proceedings, Tembec

likely would have been able to complete a hearing on jurisdiction before a consensually-formed

Article 1120 tribunal, or alternatively received a decision from the Article 1120 tribunal on the

United States' objection to jurisdiction of Tembec's NAFTA Chapter 11 claims").

      Tembec's reliance on the IBA Guidelines is similarly unavailing.  The IBA Guidelines, of

course, do not interpret the UNCITRAL Arbitration Rules.  Even so, the portion of the

Guidelines that Tembec buries in an ellipsis, see Pet. Mem. at 37, reveals the fallacy in Tembec's

argument:  it provides that an arbitrator "can also act if there is no timely objection by the

parties."  IBA Guidelines, Part II ¶ 4, p. 18.  Thus, even under the authority on which Tembec

relies, the Consolidation Tribunal could act because no objection had been asserted as of May 19,

2005, when the Tribunal issued its stay and scheduling orders.

      In any event, Tembec's claim that by entering a stay the Consolidation Tribunal

"'irremediably spoiled the arbitration process'" rings hollow.  See Pet. Mem. at 38 (quoting

Encyclopaedia Universalis, 403 F.3d at 92).  By temporarily staying the Article 1120 proceeding

pending its decision on consolidation, the Consolidation Tribunal merely preserved the status

quo ante. Such a procedural order, which merely ensured that the Consolidation Tribunal could carefully consider the issue of consolidation, in no way irremediably altered the parties' rights.

B.      The Consolidation Tribunal Did Not Exceed Its Authority By Consolidating the Softwood Lumber Claims

Tembec's contention that the Consolidation Tribunal exceeded its authority by consolidating the Article 1120 claims also lacks merit. Tembec asserts that "Article 1126 confers authority only over claims, not jurisdictional objections, which are not claims." Pet. Mem. at 43.[6] But the Consolidation Tribunal expressly "assume[d] jurisdiction over all <u>claims</u> in the Article 1120 arbitration," not merely jurisdiction issues. Consolidation Order, Exh. BB at 84 (emphasis added). The Tribunal merely noted that the commonality between the jurisdictional objections the United States intended to make with respect to each of those claims was one of several common questions of fact and law that militated in favor of consolidation. <u>Id.</u> at 68; <u>see also id.</u> at 41 (explaining the difference between claims and jurisdictional objections in the context of Article 1126).

Tembec likewise seeks to rehash its argument that the Consolidation Tribunal was not empowered to assume jurisdiction over the claims pending before the Article 1120 tribunals, because the United States disputed the validity of those claims in its jurisdictional objections, and the Article 1120 tribunals were therefore required to resolve whether there existed any valid claims in the first instance that were capable of Consolidation. <u>See, e.g.</u>, Tembec's Post-Hearing Rebuttal Brief in Opposition to Consolidation (Aug. 12, 2005) at 6-7, <u>available at</u>

_____

[6] This assertion contradicts Tembec's own suggestion in its May 27, 2005 Letter that the tribunal bifurcate the question of whether to consolidate issues of jurisdiction from the question of whether to consolidate the claims on the merits, and address the former issue separately. <u>See</u> Exh. Z at 4.

http://www.state.gov/documents/organization/52525.pdf (last visited Mar. 28, 2006) ("When

there are no claims to consolidate, there is no reason for Article 1126 proceedings."). The

Consolidation Tribunal, however, squarely rejected that argument, noting that Article 21(1) of

the UNCITRAL Arbitration Rules makes clear that a tribunal has jurisdiction before it rules on

an objection to its jurisdiction. See Consolidation Order, Exh. BB at 38-39. No basis exists to

second-guess the Consolidation Tribunal. Indeed, it is clearly without merit to suggest that one

could only consolidate claims after jurisdictional objections have been resolved. The very

purpose of consolidation is to prevent harassment and harm to the respondent government. See

id. at 27-28. That purpose would be rendered a nullity if the respondent government would be

forced to contest jurisdiction for multiple identical claims in multiple arbitral fora.

Under the express terms of Article 1126(2), the Consolidation Tribunal's clear mandate is

to consolidate claims, or parts of claims, that have "a question of law or fact in common," and

where consolidation would serve "the interests of fair and efficient resolution of the claims." See

NAFTA, Art. 1126(2). A consolidation tribunal therefore has broad discretion under Article

1126 in balancing the interests of the parties and the interest of procedural economy. Here, the

Consolidation Tribunal issued a well-reasoned 84-page Order explaining in detail all of the

factors that contributed to its decision to consolidate the claims. Given the overwhelming

similarity in factual and legal issues between the claims, the Tribunal's decision was not

surprising. Even if the procedural order were subject to vacatur – which, again, it is not –

Tembec has failed to demonstrate the Tribunal abused its discretion or exceeded its authority in

consolidating the Article 1120 claims. The Court should therefore reject Tembec's motion on

this excess of authority ground as well.

CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny

Tembec's Motion to Vacate.

Dated: March 28, 2006                          Respectfully submitted,

                                               PETER D. KEISLER
Of Counsel:                                    Assistant Attorney General

MARK A. CLODFELTER                             KENNETH WAINSTEIN
*Assistant Legal Adviser*                      United States Attorney

ANDREA J. MENAKER                              VINCENT M. GARVEY
*Chief, NAFTA Arbitration Division*            Deputy Branch Director
MARK S. MCNEILL
JENNIFER THORNTON                                  */s/ Alexander K. Haas*
*Attorney-Advisers*                            ALEXANDER K. HAAS (CA 220932)
*Office of International Claims and*            Trial Attorney
  *Investment Disputes*                        U.S. Department of Justice, Civil Division
                                               Federal Programs Branch
United States Department of State              Post Office Box 883, Room 1030
Washington, D.C. 20520                         Washington, D.C.  20044
Office of the Legal Adviser                    Tel: (202) 307-3937  Fax:  (202) 616-8460
2201 C. Street, N.W.                           *Attorneys for the United States*
Suite 5519