**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| In the Matter of the Arbitration between<br><br>TEMBEC INC., TEMBEC INVESTMENTS INC., TEMBEC INDUSTRIES INC.<br><br>Petitioners,<br>and<br><br>THE UNITED STATES OF AMERICA,<br><br>Respondent. | ) | Case No. 05-2345 (RMC) |

**PETITIONERS' REPLY MEMORANDUM**
**IN SUPPORT OF MOTION TO VACATE ARBITRATION AWARD**

Petitioners Tembec Inc., Tembec Investments Inc., and Tembec Industries Inc. ("Tembec") submit this reply memorandum in support of their motion to vacate the September 7, 2005 Order of the Consolidation Tribunal *In the Matter of Canfor Corp. v. United States, Tembec et al v. United States, Terminal Forest Products Inc. v. United States*.

## I. INTRODUCTION

The United States recites in its opening brief a distorted history of this case, designed to divert attention from the issues before the Court. The only issues before this Court are whether Tembec's challenge to the appointment of presidential cousin Davis Robinson was justifiable, and whether the actions of the arbitral tribunal on which Mr. Robinson now has served were *ultra vires*, one or the other, or both, together constituting sufficient grounds under the Federal Arbitration Act ("FAA") to vacate the Consolidation Tribunal's September 7, 2005 Order ("Award").

The United States has fought strenuously, and so far successfully, to replace a consensually appointed arbitration tribunal with one chosen by ICSID, including President Bush's relative, to adjudicate Tembec's arbitration claims.[1] The arbitration is part of a major international dispute in which President Bush continues actively to participate. With the mandate to appoint an American citizen, ICSID chose to appoint a relative of the President with numerous other disqualifying credentials. Mr. Robinson is a member of the Bush family, a political appointee, a campaign contributor, and the former head of the very office defending the United States in the arbitration. He also was named to the ICSID Panel of Arbitrators by President Bush, giving the United States effectively a loyal party-appointed arbitrator and Tembec none. The appointment cannot stand if NAFTA investor-state arbitration is to have any credibility.

The Consolidation Tribunal acted prematurely, during Tembec's period to challenge Mr. Robinson, and while that challenge was pending, to grab jurisdiction from two consensual tribunals that were ready to rule on jurisdiction of the NAFTA Chapter 11 claims. This conduct was in direct violation of the UNCITRAL Rules, according to a prominent ICSID arbitrator and expert, Ronald Cass, former Dean of the Boston University Law School, whose opinion is not opposed by a United States expert. The Consolidation Tribunal's acts, thereafter, including its order to consolidate, are void and the Tribunal should be disqualified.

[1] The United States waged a similarly vigorous fight over the appointment of Professor Christopher Greenwood to be the independent chairperson of the Consolidation Tribunal. It urged ICSID to continue with the appointment (*see* Letter from Andrea J. Menaker to Gonzalo Flores (Apr. 4, 2005), attached as Ex. A), notwithstanding objections raised by the three Claimants that he was an expert witness paid by the United States to testify in another NAFTA Chapter 11 proceeding that the United States' scope of liability under Article 1105 was not as broad as the claimants in that case had argued. Article 1105 was one of the United States' obligations at issue in the softwood lumber Chapter 11 cases. The United States neglected to report to this Court that Professor Greenwood was its own paid witness. *See* Letter from Keith Mitchell to Jose Antonio Rivas (April 7, 2005), also attached at Ex. A.

## II. THE AWARD IS "FINAL" FOR REVIEW UNDER THE FAA

### A. The United States' Arguments Regarding Finality Of Awards Are Moot: The Consolidation Tribunal Terminated Arbitration Proceedings As To Tembec

The United States contends that the Court cannot review the Award because it is not "final." But the Court need not wait for a future "final award" to review Tembec's motion to vacate because the Consolidation Tribunal no longer is deciding any issues regarding Tembec's NAFTA Chapter 11 claims. The Consolidation Tribunal terminated arbitration proceedings as to Tembec on January 10, 2006 at Tembec's request. The United States' arguments that the Award is not final for review are moot, and there is no reason why the Court cannot proceed with Tembec's motion.

### B. The Award Satisfies FAA Law On Finality

Even were the Court to ignore the Consolidation Tribunal's January 10 termination order, the Award constitutes a final "award " under 9 U.S.C. §10 appropriate for judicial review.

#### 1. An Award Need Not Dispose Of All Substantive Issues To Be Reviewable

An arbitral decision need not resolve every issue between the parties to be considered a final award for review under the FAA. Courts will review a final interim order that is independent of and unrelated to the merits of a continuing arbitration, particularly where an interim award is necessary to prevent the final award from becoming meaningless.[2] The D.C. Circuit has followed the trend in other circuits

[2] *See Publicis Commc'n v. True North Commc'n,* 206 F.3d 725 (7th Cir. 2000); *Yasuda Fire & Marine Ins. Co. of Europe, Ltd. v. Cont'l Cas. Co.*, 37 F.3d 345 (7th Cir. 1994); *Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.* , 935 F.2d 1019 (9th Cir. 1991); *Metallgesellschaft A.G. v. M/V Capitan Constante*, 790 F.2d 280 (2d Cir. 1986); *see also Hart Surgical, Inc. v. Ultracision, Inc.,* 244 F.3d 231, 233 (1st Cir. 2001) (holding that an award on liability was final for review under 9 U.S.C. §10, even though there was (continue)

recognizing that an award need not dispose of all issues on the merits to be subject to judicial review under the FAA. The D.C. Circuit in *Ace/Clear Defense Inc. v. Clear Defense Inc.*, 47 Fed. Appx. 582; 2002 U.S. App. LEXIS 19670 (D.C. Cir. 2002), relied on both *Yasuda Fire & Marine Insurance* and *Pacific Reinsurance* in upholding a District Court decision confirming an interim arbitration award.[3]

The United States acknowledges that interim orders are reviewable, but claims that there are only two closed categories of such orders--"temporary equitable orders calculated to preserve assets or performance needed to make a potential final award meaningful," and decisions that conclusively resolve a discrete issue on the merits—and that the Award here supposedly fits in neither of those two categories. *See* Opp. at 17-18. That argument takes an overly narrow interpretation of the precedents.

The courts have applied principled analysis, rather than rigid categorical exceptions, to determine when an arbitration tribunal's decision, order, or award is "final" for review under the FAA. The correct test is that an interim award must decide a "separate, discrete, independent, severable issue" to be ripe for review and the interim award must be necessary to prevent the final award from becoming meaningless.[4]

---

(continued)
no decision regarding damages, where the parties' had an agreement to bifurcate the liability and damages phases).

[3] This unpublished decision was issued after January 1, 2002, and may be cited in accordance with Local R. 28(1)(c) of the D.C. Circuit Rules. *See also National Railroad Passenger Corp. v. Expresstrak, L.L.C.*, 2003 U.S. Dist. LEXIS 24486 at *9 (D.D.C. May 1, 2003), *rev'd on other grounds*, 330 F.3d 523 (D.C. Cir. 2003), ("[h]aving decided that Amtrak cannot cease performance, the arbitrator's order 'finally and definitely disposes' of this distinct claim separate and apart from the underlying merits of the arbitration proceedings.").

[4] The courts in *Yasuda Fire & Marine Ins.*, 37 F.3d at 347-348, and *Pac. Reinsurance Mgmt. Corp.*, 935 F.2d at 1023, decided that certain interim orders were reviewable by applying the principle that the orders had to involve "a separate, discrete, independent, severable issue." Both courts cited *Island Creek Coal Sales Co. v. City of Gainesville*, 729 F.2d 1046, 1049 (6th Cir. 1984), and *Sperry Int'l Trade v. Israel*, 689 F.2d 301 (2d Cir. 1982) in reliance on this principle.

In *Publicis Communication*, one party argued that the tribunal's decision was an interim "order" and thus could not be a final "award." 206 F.3d at 728. The court noted that "although the Federal Arbitration Act uses the word award in conjunction with finality, courts go beyond the document's heading and delve into its substance and impact to determine whether the decision is final." *Id.* at 729. It then held that an interim order by the arbitration tribunal for one party to produce tax records to the other, an issue that was properly before the tribunal, was sufficiently final to merit confirmation even though other issues remained to be arbitrated. *See id.* at 730-31.

2. The Consolidation Tribunal's Award Is Reviewable

The Award by the Consolidation Tribunal meets the criteria articulated by the courts for a final award subject to review under the FAA. ICSID appointed the Consolidation Tribunal to decide whether to consolidate the NAFTA Chapter 11 claims, and this challenge focuses on that separate, discrete issue independent of the merits of Tembec's claims. It also would be enormously wasteful to require Tembec to litigate before the Consolidation Tribunal if the court ultimately would rule that the Tribunal was improperly constituted and acted prematurely.

The Award finally and definitively (albeit incorrectly) disposed of Tembec's right to review of its arbitration claims by a balanced arbitral tribunal appointed by the consent of both Tembec and the United States. Whether Tembec could continue to prosecute its claims before the NAFTA Article 1120 tribunal "wasn't just some procedural matter;" rather, it was "the whole ball of wax," the only issue before the Consolidation Tribunal, and the very discrete issue the United States wanted arbitrated by requesting consolidation under Article 1126. *See Publicis Commc'n*, 206 F.3d. at

729. There are no more issues concerning consolidation of claims (except distribution of costs) or the jurisdiction of the Article 1120 tribunals presently before the tribunal.

3. The United States' Argument That The Consolidation Order Is Procedural Is Irrelevant To Tembec's Motion And The Court's Authority To Review The Award

The United States argues that the Award is a decision on "a purely procedural question" and that the Court should defer to the arbitrators' decision "to the exclusion of ancillary judicial proceedings." Opp. at 20. That argument, even were it correct, has no effect on the motion before this Court. First, it assumes who the proper arbitrators are when it is for this Court to determine whether the Consolidation Tribunal was constituted properly and acted within the scope of its authority. Second, Tembec has not asked the Court to adjudicate whether its NAFTA Chapter 11 claims should be consolidated with other claims under the criteria provided in Article 1126.[5] Instead, Tembec has asked the Court, pursuant to 9 U.S.C. §10, to vacate the Award on grounds that there was evident partiality on the Consolidation Tribunal; the

[5] While not at issue in this motion, the decision to consolidate was plainly wrong under Article 1126 and irreconcilable with the only known precedent. The parties in the High Fructose Corn Syrup ("HFCS") cases recognized the infirmity of the Article 1126 structure and agreed to having one tribunal decide the question of consolidation with another tribunal to be chosen, by consent of all parties, to hear the consolidated claims should the first tribunal order consolidation. *See In the Matter of Corn Products International, Inc. v. United Mexican States* and *Archer Daniels Midland Co., et. al. v. United Mexican States*, Order of the Consolidation Tribunal, ICSID case No. ARB(AF)04/5 (May 20, 2005) ("HFCS Order") at ¶2. No such accommodations were made in Tembec's case. The HFCS consolidation tribunal denied consolidation, citing confidentiality concerns vis-a-vis competitors. The HFCS tribunal was concerned that claimants in a consolidated case would risk (1) not being able to fully present their cases out of confidentiality concerns, and (2) exposing confidential and sensitive business information with their competitor. HFCS Order at ¶¶10, 19. The Consolidation tribunal in Tembec's case ignored those serious concerns for fair and efficient arbitration, finding that "concerns over confidentiality are [] not relevant when considering a request for consolidation." Award at ¶138. Moreover, the "similarity in factual and legal issues" used to justify consolidation was created mostly by the United States' assertion of common jurisdictional objections. Claimants had different U.S. investments, business strategies, and products, all harmed by the United States in different ways and according to different theories. The limited number of possible jurisdictional objections cognizable under NAFTA make their commonality, in virtually all cases, inevitable.

Consolidation Tribunal violated the arbitration agreement and U.S. public policy; and the Consolidation Tribunal exceeded its powers. *See* Tembec Motion at 14.

The statute prohibits the argument that a procedural decision is *per se* immune from any of the bases for *vacatur* under 9 U.S.C. §10, (*i.e.*, that no matter how biased a tribunal may be against one of the parties and notwithstanding how blatantly *ultra vires* its actions, a procedural decision of that tribunal must be upheld). Subsection (a)(3) provides that the Court may order *vacatur* "[w]here the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. §10(a)(3). Refusal to postpone a hearing and refusal to hear evidence are procedural decisions and the FAA identifies them in a non-exhaustive list of grounds for *vacatur*. Although Tembec disagrees with the United States that what it refers to as "a well-reasoned 84-page decision carefully considering the parties' arguments and the applicable law" was a "purely procedural question,"[6] Opp. at 20-21, each of the grounds for *vacatur* asserted by Tembec nonetheless is reviewable under the FAA.

The United States' argument otherwise is misplaced because the cases it cites address only the question of what matters must be submitted to arbitration and what matters must be decided in the courts. *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444 (2003), *Shaw's Supermarkets, Inc. v. United Food and Commercial Workers Union*, 321 F.3d 251 (1st Cir. 2003), and *Blimpie International, Inc. v. Blimpie of the Keys*, 371 F. Supp. 2d 469 (S.D.N.Y. 2005) all concerned whether the possibility of a

[6] Determinations as to who will arbitrate, and whether the arbitrators have been selected according to governing rules and law, are not "merely procedural."

class action or consolidation in arbitration should be determined in the first instance by the courts or by arbitrators, a question not at issue here. None of the cases cited by the United States involved the authority of the courts to review final arbitral awards to determine whether *vacatur* under Section 10 of the FAA was appropriate.

## III. MR. ROBINSON'S RELATIONSHIP TO THE UNITED STATES DEMONSTRATES EVIDENT PARTIALITY

The United States addresses Mr. Robinson's various connections to the United States *ad seriatim* and in isolation, arguing that any one of them by itself is insufficient to satisfy the evident partiality standard. Tembec submits that Mr. Robinson's relationship to the United States is the sum of all of these connections, and the Court must consider them taken as a whole. Any reasonable person would conclude that the ties between Mr. Robinson and the United States in the NAFTA Chapter 11 arbitration must be considered together, and are sufficient to raise "justifiable doubts" about his ability to remain independent and impartial in the adjudication of Tembec's NAFTA Chapter 11 claims.[7]

The United States is illogical in its characterizations of Mr. Robinson's connections to the United States as "remote" and "attenuated." For example, the United States defends Mr. Robinson as being related to the President only "by law and not blood." Opp. at 23. Whether the relationship is by law or by blood is irrelevant to the question of evident partiality. Marriage is a relationship by law, not blood, yet it still would be a valid basis for claiming bias. "Life partner" is a relationship defined neither

[7] Article 10(1) of the UNCITRAL Rules explains that, "Any arbitrator may be challenged if circumstances exist that give rise to justifiable doubts as to the arbitrator's impartiality or independence."

by law nor blood, but the United States acknowledges that such a relationship would demonstrate evident partiality. *See* Opp. at 24 quoting the IBA Guidelines on Conflicts.

The United States' defense relies on a quotation from Mr. Robinson's exculpatory May 6, 2005 letter that "his wife is 'one of twenty or more' persons who [are cousins of the President] due to the large size of the President's extended family." Opp. at 24. To suggest that the size of the President's family is relevant is to suggest that partiality should not be presumed in a father-son relationship except as a function of the number of children that the father had: presumably there would be no bias if the son were "one of twenty or more" persons who fit that description. Mr. Robinson is close enough to the Bush family to have received more than one political appointment , including the roster appointment that precipitated the dispute here.

The United States points to Mr. Robinson's statement that he had no contact or substantive conversations with President Bush since he took office. Opp. at 24. The number of conversations does not define family loyalties. The fact is that President Bush found a family member with a history of loyalty and generosity to appoint as one of four arbitrators representing the United States on the ICSID Roster of Arbitrators.[8] Tembec had no similar opportunity for appointment of an arbitrator loyal to Tembec, or even from a pool of arbitrators acceptable to Tembec.

The United States argues that Mr. Robinson's relationship is with President Bush, not the United States. Opp. at 24. By that logic, there never would be a conflict in arbitration cases where the party to the arbitration was a corporate or political entity instead of a human—there would be no conflict where the arbitrator was

[8] *See Public Papers of the Presidents,* Digest of Other White House Announcements (May 27, 2002) at Tembec Appendix Tab GG.

related to the CEO or any officer with a controlling influence of a company defending against an arbitration claim. The father in *Morelite Construction Co. v. New York City District Council Carpenters Benefit Fund*, 748 F.2d 79, 82 (2d Cir. 1984), was not a party to the arbitration, but he was the vice-president of an international union, and it was the local District Union that appeared in arbitration before his son, the arbitrator. That relationship between arbitrator and party was found to be partial. *Id.* at 84.

The United States seeks to further distance President Bush from the United States as Respondent to Tembec's claims by arguing that it "strains credulity" to believe that President Bush had responsibility for the decisions at issue in the *Softwood Lumber* dispute. Opp. at 24.[9] The President, however, has been directly engaged in the lumber dispute since the beginning of his presidency.[10] As recently as April 25, 2006, the White House Press Secretary confirmed the President's personal phone call to the Prime Minister of Canada seeking resolution of the softwood lumber dispute.[11]

---

[9] The United States gives surprisingly little credence to the documented testimony of three of its own U.S. Senators—two Republicans and one Democrat—each of whom asserted on the Senate floor that they supported the position taken by President Bush and his administration in maintaining duties on Canadian softwood lumber until there would be a negotiated settlement between the United States and Canada, notwithstanding the results of any independent binational panel reviews under NAFTA. *See* Tembec Motion at 7, citing 151 Cong. Rec. S136-7 (daily ed. Jan. 24, 2005) (statements of Senators Crapo (R-ID), Craig (R-ID) and Baucus (D-MT)). Senator Craig himself stated: "President Bush was well prepared to answer the Canadian Prime Minister when they last met. The President told the Prime Minister that the problem of subsidies and dumping is caused by Canada, and the solution lies with Canada, unless Canada wants the solution to be permanent duties to offset the subsidies and the dumping."). *Id.* In addition, fourteen U.S. senators wrote to Secretary of Commerce, Donald Evans, on November 23, 2004 encouraging the agency to increase countervailing duty margins in order to "provid[e] the President with needed negotiating leverage." Letter from Larry E. Craig et al to Donald Evans (Nov. 23, 2004), attached as Ex. B.

[10] *See Bush, Chretien Discuss Fast Track, Bilateral Trade Irritants*, Inside U.S. Trade, February 9, 2001 ("The two leaders also discussed such irritants as the softwood lumber agreement and its pending expiration."); *see also Zoellick Hints at Lumber Tax, Warns Canada Against Surges*, Inside U.S. Trade, March 2, 2001 ("Since Bush was sworn in as president, he has heard repeated calls from individual senators to engage Canada in talks over the lumber dispute.").

[11] *See* Press Briefing by Scott McClellan at www.whitehouse.gov/news/releases/2006/04/print/20060425-4.html, last visited April 25, 2006, attached at Ex. C. ("The President had a good conversation with Prime Minister Harper. … One of the issues that was discussed was the softwood lumber issue. The President

(continue)

During the original investigations, the Secretary of Commerce, as the chief administrator of the International Trade Administration, regularly briefed the President on the status of those investigations, the duties that would be imposed, and the negotiations with Canada.[12] President Bush stated publicly that "our negotiators, as a result of the (Canadian) prime minister's insistence and *my assistance* are working overtime to achieve an agreement" by the date the Department of Commerce was scheduled to issue final antidumping and countervailing duty determinations. Rossella Brevetti and Chris Rugaber, *Following Meeting with Chretien, Bush Expects Lumber Deal by March 21*, BNA International Trade Daily, March 15, 2002 (emphasis added). The President has continued the push to negotiate with Canada long-term trade restrictions on softwood lumber in exchange for ending the imposition of duties during both his terms in office.[13] Moreover, the President is the Chief Executive of the United States and, like

(continued)
would like to see this resolved. I know that the Prime Minister would like to see it resolved. And both leaders reiterated their commitment to resolving the matter. We remain in discussions with Canadian officials about how to move forward and get this resolved.")

[12] *See* Memorandum for the President from the Hon. Donald L. Evans, Secretary of Commerce, *Preliminary Determination in the Countervailing Duty Investigation on Softwood Lumber from Canada* (Aug. 9, 2001) ("Canada has recently expressed some interest in finding an 'alternative solution' to this dispute."); Memorandum for the President from the Hon. Donald L. Evans, Secretary of Commerce, *Preliminary Determination in the Antidumping Investigation on Softwood Lumber from Canada* (Oct. 30, 2001) ("The discussions thus far have been productive, but no settlement is immediately at hand."), attached as Ex. D.

[13] *See* Beth Gorham, *Martin Seeks Quick End to Ban on Beef; PM Satisfied Bush 'Genuine' About Opening Border*, The Toronto Sun, June 9, 2004 at 53 ("We'll continue to work on a softwood lumber agreement.") (quoting Pres. George W. Bush); Peter O'Neil, *Softwood talks convince Bush to study NAFTA dispute system: 'Progress' won't help those suffering from tariffs now, B.C. lumberman says*, The Vancouver Sun, December 1, 2004 at D3 (Canadian officials reporting "[t]he president … certainly acknowledged that this is a dispute that has tremendously complex legal components …."); Edwin Chen, *Bush, Martin Spar on Lumber Tariffs; the Canadian leader says the U.S. is violating NAFTA and promises to sue the government*, Los Angeles Times, October 15, 2005 at pt. A pg. 3 ("President Bush and Canadian Prime Minister Paul Martin clashed over U.S. [lumber] tariffs … in a 20-minute telephone conversation…."); Press Release, White House Office of the Press Secretary (Mar. 30, 2006)("The Prime Minister … made an emphatic case for softwood lumber …. [a]nd I assured him that our intention is to negotiate in good faith, in a timely fashion to resolve this issue.").

the CEO of a private entity, has a controlling influence over the United States Government, particularly with respect to Executive Branch offices and agencies executing his trade objectives. There is no dispute that the policies carried out by Executive Branch officials under President Bush's leadership are directly at issue in Tembec's claims.

The United States' selection of arbitrators to NAFTA Chapter 11 tribunals contradicts the argument that prior service in the U.S. government is an irrelevant consideration as to the views of the arbitrator. Opp. at 26. In every one of the eight cases in which the United States has been a defendant and appointed a tribunal member, the United States has appointed someone with prior U.S. governmental service and those individuals typically have served in the Office of the Legal Adviser.[14] The United States has never lost a NAFTA Chapter 11 dispute.

In addition, each of the four persons appointed by the President as U.S. arbitrators on the ICSID Roster has prior high-level government service for the Executive Branch of the United States.[15] Thus, even in the Article 1126 consolidation proceeding, ICSID appointed Davis Robinson, former Legal Adviser and relative to the President of the United States, with the approval of the United States and despite the objections of the three Canadian parties to the proceedings.[16] A reasonable person

[14] *See* Ex. E, "United States' Arbitrators In NAFTA Chapter 11 Cases Where The United States Is The Defendant/Respondent." The only time the United States did not appoint an individual with prior government experience was after the former Secretary of State, Warren Christopher, resigned midway through the *Methanex* proceedings following conflict of interest allegations.

[15] *See* Ex. F, United States' Appointees To The ICSID Panel of Arbitrators.

[16] Davis Robinson's appointment followed the naming of O. Thomas Johnson, Jr., Former Special Assistant to the Legal Adviser, United States Department of State. The United States objected to the appointment of J. William Rowley and Yves Fortier, both of Canada, on the basis that their law firms were involved with litigation of the softwood lumber dispute. Even though Mr. Johnson's firm and Mr. Johnson personally had been involved with the softwood lumber litigation, the United States did not object to Mr.

(continue)

would interpret the United States' strong predilection for former government officials as evidence shaping the arbitrator's views in determining the outcome.

Tembec does not claim that prior government service alone would be enough to demonstrate evident partiality. Tembec had no objection to the appointment of Professor Kenneth Dam, former U.S. Undersecretary of Treasury, to Tembec's Article 1120 tribunal. Professor Dam's government service was unrelated to the U.S. office acting as legal counsel in Tembec's Article 1120 arbitration or the government agencies and offices (U.S. Department of Commerce, U.S. International Trade Commission, Office of the United States Trade Representative) responsible for the unlawful implementation of the *Softwood Lumber* duties.[17] Nor did Professor Dam have familial relations with the President of the United States. But a reasonable person would conclude that the United States' own pattern of selecting arbitrators reflects a perception by the United States that prior government service is a contributing factor toward an outcome in its favor.[18]

---

(continued)
Johnson's appointment until after the issue was raised first by the Canadian parties. *See* Letter from Andrea J. Menaker to Gonzalo Flores (Apr. 1, 2005); Letter from Elliot J. Feldman to Jose Antonio Rivas (Apr. 1, 2005) both attached as Ex. G.

[17] In any event, Tembec had its own party-appointed arbitrator to counterbalance the United States' party-appointment of Professor Dam to the Article 1120 tribunal. ICSID's selection of Mr. Robinson from the United States' list of four pre-approved arbitrators is equivalent to a party appointment to the tribunal, and Tembec was given no similar opportunity.

[18] The United States claims "[i]t is unfounded to suggest that … governments sought to empanel individuals predisposed to rule against private investors, to the detriment of their own nationals." Opp. at 36, n.5. Yet, the United States also claims that the "very purpose of consolidation is to prevent harassment and harm to the respondent government," Opp. at 42, and that the governments intended Article 1126 "to relieve a State Party from the hardship of having to defend multiple claims arising from the same measure . . . ." Opp. at 13, *citing* Henri C. Alvarez, who was counsel to the Government of Mexico in challenging a NAFTA Chapter 11 award. The United States expended significant energy arguing to the Consolidation Tribunal that Article 1126 was designed to protect government Respondents, and not to assist Claimants, *see In the Matter of Canfor Corp v. United States, Tembec et al v. United States, Terminal Forest Products Ltd. v. United States*, Reply Submission of the Respondent United
(continue)

As the United States points out, Tembec did not immediately object to Mr. Robinson on the basis of his prior government service. Opp. at 25. But when Tembec discovered information that the President of the United States was related to one Davis Robinson, it asked Mr. Robinson to explain (because Mr. Robinson had not disclosed) whether he had a relationship to President Bush and the nature of that relationship.[19] Had Mr. Robinson been able to say truthfully that it was not he, but some other Davis Robinson who was related to the President, Tembec would not have challenged Mr. Robinson's appointment. Failure to disclose such relationships, as in the case of Mr. Robinson here, has been held by courts to be relevant evidence of bias.[20]

The United States argues that Mr. Robinson's prior service is *per se* irrelevant under the IBA Guidelines because it occurred more than three years ago. Opp. at 25. The IBA Guidelines do not say, as the United States contends, that "'previous services for one of the parties more than three year[s] prior to an arbitration gives rise to *no appearance of, and no actual, conflict of interest.*" Opp. at 25. The IBA Guidelines set a three-year benchmark, but also state that the three-year period "may be too long in certain circumstances and too short in others, but the Working Group believes that the period is an appropriate general criterion, *subject to the special circumstances of any case*." *See* IBA Guidelines at 19 (emphasis added). The special

(continued)
States of America In Support Of Request For Consolidation (Aug. 12, 2005) at 2-3, which the tribunal accepted unequivocally. *See* Award at 27.

[19] *See* Letter from Elliot J. Feldman to Jose Antonio Rivas (May 2, 2005), Tembec Motion Appendix at Tab O.

[20] *See, e.g., Delta Mine Holding Co. v. AFC Coal Props., Inc.*, 280 F.3d 815, 821-822 (8th Cir. 2002) ("When a neutral arbitrator fails to disclose a relationship with one party that casts significant doubt on the arbitrator's impartiality, as in *Commonwealth Coatings*, it is appropriate to assume that the concealed partiality prejudicially tainted the award.").

circumstances in this case include that Mr. Robinson received the political appointment to Legal Adviser while his wife's cousin was the Vice-President of the United States. That political appointment is a career-defining opportunity for a lifetime. Over the decades, Mr. Robinson has made what appear to be the maximum contributions under law to the Bush family presidential campaigns, and the gestures were reciprocated, for example, when Mr. and Mrs. Robinson were invited as part of the President's personal and official delegation to Poland to attend with Pope John Paul II, and Polish President Lech Walesa, the dedication of a new wing of a Polish-American Children's Hospital.[21] The current President appointed Mr. Robinson on behalf of the United States to the ICSID Panel of Arbitrators to adjudicate (and to be paid for adjudicating) arbitration disputes where appointments are made from that roster. A reasonable person, evaluating Mr. Robinson's potential partiality, could not overlook the role of Mr. Robinson's government service as it relates to Mr. Robinson's relationship, through his wife, to the current and former Presidents of the United States.

The United States surely would have sought recusal were the facts reversed,[22] and a reasonable person would agree with the U.S. challenge under the same set of reversed facts:

- the NAFTA Chapter 11 arbitrator is married to the cousin of Tembec's past and present CEOs (*compare* Tembec Motion at 20);

[21] *See* Christopher Connell, *Bush Makes Global Relations a Family Affair: Having a Relative in the White House has its Privileges*, Associated Press, Dec. 1, 1991) in Tembec Motion Appendix at Tab II.

[22] The United States seemed momentarily to consider making a challenge based on a "familial relationship … of some distance" upon learning that Canfor's party-appointed arbitrator in the Article 1120 proceedings shared the same last name as one of the legal consultants to Canfor's counsel. *See In the Matter of Canfor Corp. v. United States*, Hearing Transcript, vol. 3 (Dec. 9, 2004) (Statements of Mark A. Clodfelter) Tembec Motion Appendix Tab T. Had the names revealed a family connection, any family connection and nothing more, the United States apparently perceived a conflict.

- the United States' claims against Tembec were based on the actions taken and policies directed by Tembec's CEO (*compare* Tembec Motion at 22);

- the arbitrator had been employed by Tembec as the head of in-house legal counsel for several years, and Tembec's in-house legal counsel would be representing Tembec before the arbitrator in opposing the United States' arguments (*compare* Tembec Motion at 21);

- the arbitrator made efforts to help his wife's cousin rise to the office of CEO within Tembec (*compare* Tembec Motion at 21);

- the arbitrator was appointed to the tribunal from a list of arbitrators appointed by Tembec's CEO, but the United States would have had no comparable appointee on the tribunal (*compare* Tembec Motion at 24-30);

- the United States questioned the arbitrator about his relationship to Tembec's CEO, and in response, the arbitrator would have described the relationship as minimal but would not have disclosed either that he had been appointed by the CEO to the list of arbitrators, or that he had actively helped his wife's cousin to obtain the CEO position within Tembec (*compare* Tembec Motion at 21, 23-24);

- the United States and all other parties challenged the appointment of the arbitrator while Tembec alone urged the arbitrator to remain, and the arbitrator refused to withdraw (*compare* Tembec Motion at 13).

The D.C. Circuit has not adopted the factors cited by the Fourth Circuit (and by the United States in its Opposition) in *Consolidation Coal Co. v. Local 1643, United Mine Workers of Am.*, 48 F.3d 125 (4th Cir. 1995), in place of the "reasonable person" standard, but Mr. Robinson's relationships are evidently partial under those criteria, too: (1) Mr. Robinson's personal interest in Tembec's claims is his loyalty to the United States based on his personal and professional relationships with the current and former Presidents of the United States; (2) Mr. Robinson, through his wife, is directly related to the Chief Executive of the United States, a party to the arbitration, and formerly served as the head of the legal office advocating the United States' case before him; (3) there is a connection between the relationship and the arbitration because President Bush's trade policies and involvement in the *Softwood Lumber*

dispute are squarely at issue in Tembec's claims; (4) there is temporal proximity to the relationship because President Bush remains in office now, and Mr. Robinson's relationship to him has existed at all relevant times of the claims raised by Tembec.

## IV. THE CONSOLIDATION TRIBUNAL'S FORMATION AND CONSTITUTION VIOLATED PUBLIC POLICY

The United States claims that its arbitration agreement with Tembec was followed precisely, and that Tembec's complaint that the constitution of the Consolidation Tribunal violated public policy amounts to a facial challenge to NAFTA Article 1126. Opp. at 30. Even if the agreement were followed precisely, which Tembec disputes, it would still be voided here on public policy grounds. *See* Tembec Motion at 25-30.

Tembec's challenge of the appointment process should not be considered a facial challenge to an international agreement, because the Consolidation Tribunal was not constituted in accordance with the agreement. Article 1126(1) requires the UNCITRAL Arbitration Rules to apply to the establishment and conduct of the Consolidation Tribunal, and the UNCITRAL Rules require that an independent and impartial tribunal be appointed. The United States concedes that Article 6(4) should apply to the appointment of Article 1126 tribunals. *See* Opp. at 34 ("And Article 6(4) of the UNCITRAL Arbitration Rules mandates that the Secretary-General make all arbitral appointments with regard to considerations of independence and impartiality.").

ICSID chose an American from the list of the United States' own pre-selected arbitrators, instead of an arbitrator from another country's list as Article 1126 allowed. Article 1126 states that ICSID's Secretary-General "shall appoint the two other

members from the roster referred to in Article 1124(4),[23] and to the extent not available from that roster, from the ICSID Panel of Arbitrators, and to the extent not available from that Panel, in the discretion of the Secretary-General. One member shall be a national of the disputing Party and one member shall be a national of a Party of the disputing investors." The obligation to appoint an American to the Consolidation Tribunal did not require naming an appointee from the list of four arbitrators provided by the United States Government. In fact, there are more Americans on the ICSID Panel of Arbitrators who were not appointed by the United States Government (at least eight), than those who were (four).

ICSID could have appointed one of the eight Americans from the Panel of Arbitrators who had not been appointed by the President of the United States.[24] Such an appointment would have been consistent with Article 1126, and the obligation under UNCITRAL Rule 6(4) to "have regard to such considerations as are likely to secure the appointment of an independent and impartial arbitrator…." Rule 6(4) is not a modification of NAFTA as the United States claims, Opp. at 30, but an extension of NAFTA based on the plain text of Article 1126(1). The United States has not shown how the obligation to appoint an independent and impartial arbitrator under the UNCITRAL Rules is inconsistent with the mandate in Article 1126(1), which requires the UNCITRAL rules to be respected, nor how the obligation is inconsistent with any of the other terms of NAFTA Chapter 11.

---

[23] This roster does not exist. *See* Opp. at 29.

[24] *See* List of American Arbitrators From ICSID Panel of Arbitrators Not Appointed By the United States Government, attached as Ex. H.

The naming of an arbitrator from among the four U.S. government appointees, without affording Claimants an equal right to control the named arbitrators on the tribunal, presents an unfair advantage to the United States in the formation of the tribunal, and violates public policy concerning fairness in the adjudication of disputes. That unfair advantage is exacerbated here by Mr. Robinson's connections to President Bush and the United States Government: (a) the Consolidation Tribunal consisted of one of four persons nominated (and pre-screened) by the United States to resolve investor-state disputes, while it did not consist of any arbitrator nominated or pre-screened by Tembec; (b) that same arbitrator would be more sympathetic to the arguments of counsel from the legal office over which he once presided representing the same client, whereas none of the other arbitrators has similar affiliations with Tembec; (c) that same arbitrator was related to the President of the United States and tangibly supported the President's election to that office, but Tembec has no comparable representative with any relation to Tembec's President or any of its officers.

The United States argues that fairness is not a relevant public policy with respect to arbitration awards, Opp. at 31, which must be disconcerting to U.S. investors. Independent and impartial adjudication, besides being part of the UNCITRAL Rules that must be applied under NAFTA Article 1126, have been critical elements of arbitration, and the bases for judicial deference. *See* Tembec Motion at 25-26. The United States' comparison of a failure to provide impartial adjudication to a tribunal's failure to account for "the rule of *contra proferentem*," Opp. at 32, is inapt. Impartial adjudication is not merely a pedagogical tool of contractual interpretation that might be overlooked when

omitted from the analysis of an arbitration tribunal. It is one of the pillars of judicial respect for arbitration awards.

The United States could have remedied the unfair composition of the Consolidation Tribunal when Tembec asked the United States to agree to a substitute in accordance with Article 11(3) of the UNCITRAL Rules.[25] But the United States chose instead to stick with Mr. Robinson and defend his appointment.

ICSID could have appointed an American in the same way it appointed a Canadian. Canada makes no appointments to the ICSID list because it is not a signatory to the ICSID Convention (at least one Canadian has been appointed by another government). ICSID exercised its discretion under Article 1126(5) to name a Canadian lawyer, originally Yves Fortier, and then Professor de Mestral. Mr. Fortier only became "unable to serve" because the United States challenged his appointment by asserting a conflict arising from his law firm's involvement with the *softwood lumber* disputes, even though the lawyers who had been responsible for advising on softwood lumber matters (not Mr. Fortier, who apparently had no connection to the matters at all) already had left Mr. Fortier's firm and taken their business with them. Tembec respected the United States' challenge in the spirit of arbitration, as did Mr. Fortier, despite the "tenuous" and "remote" connection asserted. Neither the United States nor Mr. Robinson showed the same respect for Tembec's challenge or the principles of international arbitration.[26]

---

[25] *See* Letter from Elliot J. Feldman to Gonzalo Flores (May 20, 1995), Tembec Motion Appendix at Tab W.

[26] The United States offered no rebuttal to the statement of Tembec's expert that, in his experience, "arbitrators withdraw in situations where a challenge is at most colorable," as in this case. *See* Cass Aff. ¶7. Mr. Fortier withdrew from consideration following this standard in international arbitration. Other

(continue)

The "reasoned decision" that the United States claims ICSID issued in response to the challenge of Mr. Robinson was one short paragraph in which nearly all of the sentences were conclusory. Tembec challenged Mr. Robinson's appointment on May 20, 2005, and pleaded with the office of ICSID's Secretary-General for an early decision. The Secretary-General's decision, however, did not issue until June 15, 2005. Whether the Secretary-General had consultations with Mr. Robinson during that time to persuade him to withdraw of his own accord is unknown, but already by the time the decision was made, (i) the parties, at the request of the tribunal, had exchanged correspondence with the Consolidation Tribunal on procedural issues regarding the June 16 hearing on consolidation; (ii) the parties, per order of the tribunal, had submitted substantial pre-hearing briefs for and against consolidation; (iii) counsel for Canfor and Terminal had arrived in Washington D.C. from Vancouver, Canada in preparation for the next day's hearing; (iv) and Professors van den Berg and de Mestral had arrived from the Netherlands and Canada, respectively, for the hearing. Therefore, ICSID's last-minute decision, which Tembec only received the next day on the morning of the hearing, likely was the product of a perceived expediency rather than reason.

## V. THE CONSOLIDATION TRIBUNAL EXCEEDED ITS AUTHORITY UNDER THE AGREEMENT

Mr. Robinson's relationship to the President was disclosed only upon Tembec's inquiry, and only on May 6, 2005 with ICSID's declaration that the

---

(continued)
NAFTA Chapter 11 arbitrators, even those with former U.S. government service, have followed this standard. *See In the Matter of Methanex Corp. v. United States*, Response of Arbitrator Warren Christopher to Notice of Challenge (Sept. 20, 2002), *and* e-mail from Conrad Harper to Emmanuel Gaillard *et. al.* (Mar. 2, 2005) (indicating that Mr. Harper would withdraw as an arbitrator immediately "[i]n accordance with the request of Canfor Corporation"), both attached as Ex. I. Mr. Robinson's conduct would appear to be unique, at least in the experience of NAFTA's Chapter 11.

Consolidation Tribunal was established. Tembec's challenge to Mr. Robinson was made on May 20, 2005, within fifteen days of both the establishment of the tribunal and the day when Mr. Robinson disclosed that he was related to the President of the United States. *See* UNCITRAL Rules Article 11(1). The Consolidation Tribunal nevertheless acted to stay Tembec's Article 1120 proceedings during the initial fifteen days, and continued to press forward, ordering briefs and hearing preparations, while Tembec's challenge was pending.[27]

The United States has had to take positions logically unsustainable to defend the Consolidation Tribunal to which Mr. Robinson belongs. The government posits that, once an arbitration tribunal is established under the UNCITRAL Rules, it may act immediately to one party's detriment even before that party has been allowed time under the rules to challenge an arbitrator's appointment on grounds of bias; and furthermore, a tribunal with one or more biased arbitrators would be free to rule against a party even while that party's challenge had yet to be resolved. Opp at 39. ("The Rules do not prevent a tribunal from acting while any *actual* challenge is pending … [or] *before* any such challenge has been made.") Consequently, when Tembec's expert, Dean Ronald Cass, stated that the evident intent of the UNCITRAL Rules is that a

[27] Although the United States seeks to characterize Tembec as non-responsive and responsible for certain failures of the Consolidation Tribunal, Opp. at 13, n.3, the tribunal's own erratic and hasty demands for comments on procedure, without coordinating among the parties, and breakdowns with the tribunal's Secretary at ICSID, impacted everyone. For example, counsel for Canfor and Terminal "received no response to [his procedural proposal] from the United States prior to the time limited by the Tribunal" and without any given explanation, although he recognized that Tembec could not respond "due to Mr. Cymrot's absence from the country and Dr. Feldman's involvement in the filings due this week in other proceedings in the softwood lumber dispute, and due to the late receipt by Tembec of your letter of November 23 setting out the time limits for response." *See* Letter from P. John Landry to the Consolidation Tribunal (Dec. 2, 2005), attached at Ex. J. *See also* Letter from Gonzalo Flores to the parties (Dec. 5, 2005), attached at Ex. K (admitting failure to serve Consolidation Tribunal's request on Tembec "due to consecutive clerical mistakes," followed by "another clerical oversight" and "apologiz[ing] for these clerical mistakes which were not known to the Tribunal until receipt of the letter of Tembec et al. of December 1, 2005.").

tribunal should not act during the 15-day window provided by Articles 10 and 11 of the UNCITRAL Rules (Cass Aff. at ¶10), nor during the time when the challenge of an arbitrator is pending (Cass Aff. at ¶11), the United States offered no substantive rebuttal. (*See* Opp. at 39, "Mr. Cass merely offers his 'common sense' understanding of the section of the UNCITRAL Rules pertaining to arbitral challenges."[28])

The United States cannot diminish the Consolidation Tribunal's obligation to comply with the UNCITRAL Rules as NAFTA Article 1126(1) requires. The United States has no logical justification for why the Consolidation Tribunal should be empowered to act (staying Tembec's Article 1120 proceedings and requiring participation in consolidation proceedings) during the fifteen days allowed for an arbitrator challenge under UNCITRAL Rule 11(1), or while an arbitrator challenge is pending. The United States claims that the "interruption" in arbitral proceedings caused by an arbitrator challenge, as identified by the UNCITRAL negotiating history, "does not in any way suggest a limitation on a tribunal's authority" such that the tribunal should stop (or interrupt) its actions until that challenge is resolved. Opp. at 40. It also claims that Tembec's arbitrator challenge, made within fifteen days of Mr. Robinson's appointment and his revelation that he was related to the President, was untimely because the Consolidation Tribunal acted to stay Tembec's Article 1120 tribunal on May 19, 2005--two days before the fifteen-day period to bring the challenge had expired.[29]

---

[28] Nor did the United States contradict Dean Cass' assertions that arbitrators typically withdraw when facing a colorable challenge, and that a colorable challenge is presented when the arbitrator is related to one of the parties, or previously headed the counsel office advocating on behalf of one of the parties.

[29] It goes without saying "that an arbitrator 'can also act if there is no timely objection by the parties'" as stated in the IBA Guidelines, Opp. at 40, but there can be no dispute that Tembec made an arbitrator challenge on May 20, 2005 and that the challenge was made within fifteen days of the establishment of the Consolidation Tribunal and Mr. Robinson's revelation of his relationship to President Bush, which occurred simultaneously on May 6, 2005.

The UNCITRAL Rules' arbitrator challenge process protects parties from the legal effects of actions taken by partial tribunals, but the United States' position renders that process a nullity. In the United States' view, a biased arbitrator, if quick enough, could take action in favor of the preferred party and any challenge that followed would be too late, notwithstanding the provisions in the rules. That scenario plainly "contravenes the evident intent of the UNCITRAL Rules." Cass. Aff. at ¶12.

ICSID's Deputy Secretary-General was incorrect when he stated that the appointment of the Consolidation Tribunal members was "entirely without the prejudice to the right of the parties to avail themselves of the challenge provisions of the UNCITRAL Arbitration Rules." The jurisdictional hearing before Tembec's Article 1120 tribunal was canceled before the time had expired for Tembec to challenge Mr. Robinson, and once the challenge was made, Tembec's counsel learned that the challenge had been denied only moments before walking out the door to the Consolidation Tribunal's hearing. The Consolidation Tribunal's actions were prejudicial and unauthorized under the arbitration agreement, including the UNCITRAL Rules.

The Consolidation Tribunal also exceeded its authority by seizing from the Article 1120 tribunals authority to decide jurisdictional challenges, the outcome of which would determine whether there were any common "claims" within the Consolidation Tribunal's authority to consolidate under Article 1126. Had an Article 1120 tribunal found no jurisdiction, there would have been no claims to consolidate. Predictably, the partial tribunal disagreed with Tembec's position on the scope of the tribunal's jurisdiction. The United States' defense of the Consolidation Tribunal's claim of authority in excess of the arbitration agreement relies principally on the Consolidation Tribunal's own decision.

The Consolidation Tribunal's decision to stay Tembec's Article 1120 tribunal did not, as the United States argues, "preserv[e] the status quo." Opp. at 10. The *status quo* was that Tembec's Article 1120 tribunal had authority to decide the United States' objection to jurisdiction on the merits of Tembec's and the United States' written submissions, or to continue toward conducting an oral hearing on jurisdiction as had been scheduled for over six months. Tembec's Article 1120 tribunal had denied the United States' motion for a stay and could have decided the jurisdictional issues before the Consolidation Tribunal was constituted. The United States waited for more than a year to file its consolidation motion, during which time it repeatedly disclaimed any intent to consolidate. The motion was untimely under Article 21(3) of the UNCITRAL Rules, and the orders of the Article 1120 tribunals. The United States' motion was strategic to avoid a decision on jurisdiction by two consensually appointed tribunals. It cannot rely upon its own delay to support the improper conduct of the Consolidation Tribunal.

## VI. CONCLUSION

The Court should grant Tembec's Motion to Vacate for the reasons provided here and in Tembec's motion.

Respectfully submitted,

/s/

Elliot J. Feldman (Bar No. 418501)
Mark A. Cymrot (Bar No. 164673)
Michael S. Snarr (Bar No. 474719)
BAKER & HOSTETLER LLP
1050 Connecticut Ave., NW, Suite 1100
Washington, DC 20036-5304
Tel: (202) 861-1500
Fax: (202) 861-1783