In the Consolidated Arbitration Pursuant to Article 1126
of the North American Free Trade Agreement (NAFTA)
and the UNCITRAL Arbitration Rules
between

# CANFOR CORPORATION
## v.
# UNITED STATES OF AMERICA

### AND

# TERMINAL FOREST PRODUCTS LTD.
## v.
# UNITED STATES OF AMERICA

# DECISION ON PRELIMINARY QUESTION

Before the Arbitral Tribunal comprised of:

Professor Armand L.C. de Mestral, Arbitrator

Davis R. Robinson, Esq., Arbitrator

Professor Albert Jan van den Berg, Presiding Arbitrator

Secretary of the Tribunal: Mr. Gonzalo Flores, ICSID

Washington, D.C., 6 June 2006

**Representing the United States**
**of America:**
Mr. Mark A. Clodfelter
   *Assistant Legal Adviser*
   *Office of the Legal Adviser*
Ms. Andrea J. Menaker
   *Chief, NAFTA Arbitration Division*
Mr. Mark S. McNeill
   *Attorney Advisor*
Office of International Claims
  and Investment Disputes
UNITED STATES DEPARTMENT OF STATE
2430 E Street, N.W.
South Building, Suite 203
Washington, DC 20037-2800
United States of America

**Representing Canfor Corporation**
   **and**
**Terminal Forests Products, Ltd.:**
Mr. P. John Landry
DAVIS & COMPANY LLP
2800-666 Burrard Street
Vancouver, British Columbia
Canada V6C 2Z7
  and
Mr. Keith E. W. Mitchell
HARRIS & COMPANY
1400 – 550 Burrard Street
Vancouver, British Columbia
Canada V6C 2B5


**Representing Tembec Inc.,**
**Tembec Investements Inc.,**
   **and**
**Tembec Industries, Inc.:**[1]
Mr. Elliot J. Feldman
Mr. Mark A. Cymrot
Mr. Michael S. Snarr
Mr. Ronald J. Baumgarten
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304
United States of America

---

[1]    *See* Chapter III *infra* (p. 10 *et seq.*).

# Table of Contents

I.     INTRODUCTION .......................................................................................................... 4

II.    PROCEDURE IN GENERAL ........................................................................................ 5

III.   PROCEDURE WITH RESPECT TO TEMBEC ............................................................. 10

IV.   FACTS ...................................................................................................................... 14

      A.     United States Antidumping and Countervailing Duty Law ................................. 14

      B.     NAFTA Chapter Nineteen Binational Panel Mechanism ................................... 17

      C.     Historical Context of the Softwood Lumber Dispute........................................... 23

      D.     Present Context of the Softwood Lumber Dispute.............................................. 29

      E.     Proceedings before NAFTA Chapter Nineteen Binational Panels...................... 33

      F.     Proceedings before WTO Panels and Appellate Body........................................ 38

      G.     Summary of Canfor's and Terminal's Contentions in Support of Their Claims in
          the Present Arbitration under Chapter Eleven of the NAFTA .............................. 47

V.    SUMMARY OF THE PARTIES' POSITIONS REGARDING ARTICLE 1901(3) ........... 49

      A.     Position of the United States............................................................................... 49

      B.     Position of Canfor and Terminal......................................................................... 57

VI.   CONSIDERATIONS OF THE TRIBUNAL .................................................................. 71

      A.     Introduction......................................................................................................... 71

      B.     Canfor and Terminal's Claims ............................................................................ 72

      C.     Approach to the Preliminary Question ................................................................ 77

      D.     Treaty Interpretation .......................................................................................... 87

      E.     Article 1901(3) of the NAFTA ............................................................................ 93

          (a)     *Interpretation*.................................................................................... *93*

          (b)     *The Byrd Amendment*....................................................................... *138*

          (c)     *Conclusion* ....................................................................................... *170*

VII.   COSTS .................................................................................................................. 171

VIII.   DECISIONS .......................................................................................................... 172

I.    **INTRODUCTION**

1.    Presently before the Tribunal is the question whether Article 1901(3) of the NAFTA ("Except for Article 2203 (Entry into Force), no provision of any other Chapter of this Agreement shall be construed as imposing obligations on a Party with respect to the Party's antidumping law or countervailing duty law") bars the submission of Claimants' claims with respect to U.S. antidumping and countervailing duty law to arbitration under Chapter Eleven of the NAFTA (the "Preliminary Question").

2.    The Tribunal decides with respect to the Preliminary Question that the Tribunal has no jurisdiction to decide on Claimants' claims to the extent that they concern United States antidumping and countervailing duty law, including conduct of Commerce, the ITC and other government entities and officials prior to, during and subsequent to the preliminary and final determinations in relation to such antidumping and countervailing duty law, but that the Tribunal does have jurisdiction to decide on Claimants' claims to the extent that they concern the Byrd Amendment, for the reasons given below and in the manner set forth in Chapter VIII of this Decision.

3.    The Tribunal wishes to make clear that it is aware of the length and complexity of this Decision, while the Preliminary Question would seemingly concern one single paragraph of an article in the NAFTA.  However, after expiry of the Softwood Lumber Agreement in 2001, the import of Canadian softwood lumber into the United States led to innumerable proceedings before NAFTA Article 1904 binational panels, WTO panels and the WTO Appellate Body, and the U.S. Court of International Trade, which all involve highly complex issues of trade law.  The present case was the result of a consolidation of three cases with numerous filings and a myriad of contentions.  The Preliminary Question involves fundamental

4

questions concerning the NAFTA that required the Tribunal to make an extensive analysis of that agreement. The NAFTA itself is an extraordinarily intricate international agreement, with little publicly available systematic negotiating history that illuminates the minds of those addressing its many chapters, articles and annexes.

## II.     PROCEDURE IN GENERAL

4.     The claims filed against the United States by Canfor Corporation ("Canfor"), Tembec Inc., Tembec Investments Inc. and Tembec Industries Inc. (collectively referred to as "Tembec"), and Terminal Forest Products Ltd. ("Terminal"), all Canadian producers of softwood lumber, concern a number of countervailing duty and antidumping measures adopted by the United States relating to Canadian softwood lumber products.

5.     After filing a Notice of Intent on 5 November 2001, Canfor, a forest-products company incorporated in British Columbia, Canada, filed on 9 July 2002 a Notice of Arbitration under Chapter Eleven of the NAFTA and the UNCITRAL Arbitration Rules against the United States. The Notice of Arbitration also served as a Statement of Claim. Canfor alleges that the United States adopted in May 2002 certain countervailing duty and antidumping measures on Canadian imports of softwood lumber to the United States, in breach of the NAFTA Articles 1102 (National Treatment), 1103 (Most-Favored-Nation Treatment), 1105 (Minimum Standard of Treatment), and 1110 (Expropriation). Canfor also claims damages for losses caused by the allegedly illegal Byrd Amendment, enacted into United States law in 2000, which provides that duties assessed pursuant to countervailing duty or antidumping orders shall be distributed annually to affected U.S. domestic producers. Canfor seeks damages of not less than US$250 million and an award of costs.

6.      Having filed a Notice of Intent on 12 June 2003, Terminal, a forest products corporation organized under the laws of British Columbia, Canada, filed on 31 March 2004 a Notice of Arbitration under Chapter Eleven of the NAFTA and the UNCITRAL Arbitration Rules against the United States on measures also challenged in the *Canfor* and *Tembec* arbitrations.[2] Terminal seeks damages of at least US$90 million. Since filing its Notice of Arbitration, Terminal has not taken further steps to prosecute its claim. Terminal's Notice of Arbitration does not serve as a Statement of Claim, considering that Terminal stated in its Notice that it "will more fully articulate its basis for the claim in its Statement of Claim when filed."[3]

7.      By letter dated 7 March 2005, the United States requested that the Secretary-General of the International Centre for the Settlement of Investment Disputes ("ICSID") establish a tribunal in accordance with Article 1126(5) of the NAFTA. Pursuant to Article 1126(5), the Secretary-General appointed Mr. Davis R. Robinson, Esq., a United States national residing in the United States, Professor Armand L.C. de Mestral, a Canadian national residing in Canada, as arbitrators, and Professor Albert Jan van den Berg, a Dutch national residing in Belgium, as presiding arbitrator. This Consolidation Tribunal was established on 6 May 2005.

8.      By Order of 7 September 2005, the Consolidation Tribunal decided:

> (1)  ASSUMES JURISDICTION over all claims in the Article 1120 arbitrations *Canfor Corporation v. United States of America*, *Tembec Inc., Tembec Investments Inc. and Tembec Industries Inc. v. The United States of America*, and *Terminal Forest Products Ltd. v. The United States of America*, within the meaning of Article 1126(2)(a) of the NAFTA;
>
> (2)  DENIES Tembec's Motion to Dismiss of 27 June 2005; and

---

[2]     As regards the *Tembec* arbitration, *see* Chapter III *infra* (p. 10 *et seq.*).

[3]     Terminal's Notice of Arbitration at ¶ 19.

(3) RESERVES the decision on the costs of the present proceedings to a subsequent order, decision or arbitral award.[4]

9.    Having consulted the parties as of 21 September 2005, the Tribunal issued Procedural Order No. 1 on 17 December 2005.[5]  In that Order, the Tribunal noted that the following issues were raised by the parties:

(J)   The fact that the United States has raised an objection on the basis of Article 1901(3) of the NAFTA with respect to the claims of Canfor and Tembec, and has stated to raise the same objection with respect to Terminal's claims;

(K)  The fact that the United States has raised an objection on the basis of Article 1101(1) of the NAFTA with respect to the claims of Canfor and Tembec and has stated to raise the same objection with respect to Terminal's claims;

(L)  The fact that the United States' objection on the basis of Article 1101(1) of the NAFTA was addressed as a preliminary question in the *Tembec* arbitration but, according to the United States, was to be treated with the merits in the *Canfor* arbitration;

(M)  The fact that the United States has raised an additional objection on the basis of Article 1121 of the NAFTA in the *Tembec* arbitration;

(N)  The assertion by Tembec that the United States has not timely raised its objections to jurisdiction pursuant to Article 21(3) of the UNCITRAL Arbitration Rules;

---

[4]    The text of the Consolidation Order is available at: http://www.state.gov/documents/organization/53113.pdf.

[5]    Available at: http://www.state.gov/documents/organization/58579.pdf.  The Preamble of the Procedural Order sets out the procedure and the circumstances as a result of which it took more than three months after release of the Consolidation Order to issue the Procedural Order.

(O) The assertion by Canfor that the United States has waived its entitlement to have heard as a preliminary matter its objections on the basis of Article 1101(1) and has waived its objections on the basis of 1121 of the NAFTA;

(P) The statement by Terminal in its letter of 11 October 2005 that Terminal does not insist upon the filing of a Statement of Claim prior to the United States advancing its objection to jurisdiction should the United States wish to proceed in this manner; the statement by Terminal in its letter of 15 November 2005 that if the Tribunal is contemplating considering objections based on Article 1101 at a preliminary stage, then it would be appropriate for Terminal to be permitted to file a Statement of Claim prior to the briefing of that jurisdictional objection;

(Q) The statement by the United States in its letter of 21 October 2005 that the "United States is prepared to rest on the submissions it made in the *Tembec* arbitration with respect to Article 1101(1) and 1121 objections, which arguments apply *mutatis mutandis* to Canfor and Terminal, as the case may be," while it does not intend to raise an objection based on Article 1121 with respect to Terminal's claim (*id.* n. 2);

10.    In Procedural Order No. 1, the Tribunal ruled with respect to the scope of the preliminary phase of the present proceedings:

2.1  The objection raised by the United States on the basis of Article 1901(3) of the NAFTA with respect to the claims filed by the Claimants, referred to in Recital (J) above, shall be addressed and decided upon in a preliminary and separate phase of the proceedings in accordance with the terms of this Order.

2.2  All other objections as to jurisdiction and admissibility by the United States and issues related thereto raised by the Claimants are joined to the merits.

2.3  The objection referred to in Sub-section 2.1 above is hereinafter referred to as the "Preliminary Question."

2.4  If and to the extent that the Arbitral Tribunal retains jurisdiction over the Claimants' claims, or part thereof, the

> Tribunal will consult the Parties about the further conduct of the proceedings. The provisions of this Order shall apply also to such a merits phase, unless the contrary is expressly stated in this Order and subject to additional consultations about the further conduct of the proceedings.

11.    Pursuant to Procedural Order No. 1, the United States filed a Memorial on the Preliminary Question, summarizing the objection with respect to the claims of Canfor and Tembec, and setting forth its objection with respect to the claims of Terminal, on 21 December 2005 ("United States Summary"). The United States Summary was accompanied by copies of all written submissions made by the United States, together with all Exhibits, filed in the Article 1120 Arbitrations in *Canfor*, *Tembec* and *Terminal*, as well as the transcript of the hearing in *Canfor* held on 7-9 December 2004 ("Canfor Hearing Tr.").[6] The United States Summary was also accompanied by Additional Legal Authorities.

12.    Pursuant to Procedural Order No. 1, Canfor and Terminal filed a Counter-Memorial on the Preliminary Question, summarizing their responses to the objection of the United States, on 6 January 2006 ("Canfor and Terminal Summary"). The Canfor and Terminal Summary was accompanied by copies of all written submissions made by each of Canfor and Terminal, together with all Exhibits, filed in the Article 1120 Arbitrations in *Canfor* and *Terminal*, respectively.

13.    On 9 January 2006, the Tribunal held a pre-hearing telephone conference with counsel for Canfor, Terminal and the United States.

14.    The disputing parties through their counsel presented oral arguments and responded to the Tribunal's inquiries at a hearing on the Preliminary Question held

---

[6]    Available at: http://www.state.gov/s/l/c7424.htm. The transcripts of the various hearings are identified in this Decision by the month of the relevant hearing followed by the abbreviation "Tr."

at the seat of ICSID in Washington, D.C., the place of the arbitration as agreed by the parties, on Wednesday, 11 January and Thursday, 12 January 2006.[7]

15.    On 26 January 2006, the Government of Canada advised the Tribunal that it would not file a NAFTA Article 1128 Submission.  The Government of Mexico did not avail itself of the opportunity to make a NAFTA Article 1128 submission.[8]

16.    At the hearing, the Tribunal submitted a number of questions to the parties.  They were updated in a letter to the parties of 17 January 2006 (hereafter: "Tribunal Questions").    The parties answered those questions in their Post-Hearing Memorials of 17 February 2006 ("C-PHM" and "R-PHM," respectively). The parties thereafter submitted Reply Post-Hearing Memorials on 10 March 2006 ("C-R-PHM" and "R-R-PHM," respectively).

17.    On 7 April 2006 , Canfor, Terminal and the United States filed Cost Submissions.

18.    On 9 May 2006, the Tribunal submitted a number of additional questions regarding the Byrd Amendment to the parties.   The parties answered those questions on 19 May 2006 and replied to each other's answers on 26 May 2006.

19.    The Tribunal deliberated on various occasions.

## III.    PROCEDURE WITH RESPECT TO TEMBEC

20.    The initiation of the arbitration by Tembec and subsequent proceedings are described in the Order of the Consolidation Tribunal of 7 September 2005.[9]

---

[7]    The (uncorrected) transcript is available at http://www.state.gov/documents/organization/60209.pdf and http://www.state.gov/documents/organization/60210.pdf.

[8]    Article 1128 ("Participation by a [State] Party") provides: "On written notice to the disputing parties, a Party may make submissions to a Tribunal on a question of interpretation of this Agreement."

21.  By letter of 7 December 2005, Tembec advised that "Tembec removes its Statement of Claim from these Article 1126 arbitration proceedings, and is filing in U.S. District Court for the District of Columbia a notice of motion to vacate the Tribunal's decision and order of September 7, 2005, which terminated Tembec's Article 1120 arbitration proceedings," and requesting that "the Tribunal order its Secretary to terminate the Article 1126 proceedings as to Tembec, and make a final accounting of arbitration fees and costs up until today's date."

22.  Having been invited by the Tribunal by letter of 8 December 2005, Canfor, Terminal and the United States, by letters of 13 December 2005, commented on Tembec's letter of 7 December 2005, the letter of Canfor and Terminal having as attachments Tembec's "Petition to Vacate Arbitration Award" and "Notice of Motion to Vacate Arbitration Award," both dated 7 December 2005.[10]

23.  By a second letter of 15 December 2005, Tembec advised that: "As the only claimant seeking court review of the Tribunal's September 7 order, Tembec acted so as not to interfere with the claims of the other parties;" that: "Tembec has not withdrawn its claims against the United States under NAFTA Chapter Eleven;" that: "The United States agrees that Tembec should be dismissed, but with prejudice . . . and effectively confirms that dismissal is in order;" that: "The United States errs only with respect to prejudice;" and that: "The Tribunal should order its Secretary to terminate the Article 1126 proceedings as to Tembec."

24.  Having been directed by the Tribunal in Procedural Order No. 1 of 17 December 2005, the United States, by letter of 22 December 2005, contended that Tembec "does not have the prerogative of removing its claim from the proceedings while preserving it, and [that] the Tribunal has no authority to grant Tembec's request

---

[9]     At ¶¶ 21-23.

[10]    Available at: http://www.state.gov/s/l/c17639.htm.

that its claims be dismissed from these proceedings without prejudice." The United States requested the Tribunal to dismiss Tembec's claim with prejudice. Canfor and Terminal conveyed to the Tribunal's Secretary, by telephone on 22 December 2005, that they did not have any further observations to make on Tembec's letters, referred to in paragraphs 20 and 23 above, concerning Tembec's participation in these proceedings.

25. By letter of 27 December 2005, the Tribunal submitted a draft of an Order for the Termination of the Arbitral Proceedings with respect to Tembec *et al.* to Canfor, Tembec, Terminal and the United States for comment by 4 January 2006.

26. On 4 January 2006, comments were received from Canfor, Terminal, Tembec and the United States.

27. On 10 January 2006, the Tribunal issued the Termination Order in which it decided:

> 1.  Termination
>
> 1.1 The Tribunal hereby terminates the present proceedings with respect to Tembec, subject to the provisions of this Order, considering that Canfor, Terminal and the United States have not raised justifiable grounds for objection as provided in Article 34(2) of the UNCITRAL Arbitration Rules. The United States has not shown to the satisfaction of the Tribunal that this Tribunal has the competence referred to in Sub-section 1.3 below and, as a consequence, the United States has not raised a justifiable ground for objection.
>
> 1.2 The Tribunal rejects Tembec's request in its letter of 7 December 2005 that "the Tribunal order its Secretary to terminate the Article 1126 proceedings as to Tembec . . ." since the power to terminate pertains to the Tribunal.
>
> 1.3 The Tribunal does not declare the termination referred to in Sub-section 1.1 above either with prejudice to reinstatement or without prejudice to reinstatement of Tembec's NAFTA claims

as filed in its Notice of Arbitration and Statement of Claim on 3 December 2004, considering (i) that neither any of the provisions of Chapter 11 of the NAFTA nor Article 28(1) or Article 34(2) or any other provision of the UNCITRAL Arbitration Rules confers upon the present Tribunal competence to issue such a declaration; and (ii) that the question whether or not the termination as to Tembec is with or without prejudice to reinstatement is to be considered and decided upon by the Article 1120 tribunal, if any, to which Tembec may resubmit the afore-mentioned NAFTA claims, notwithstanding, *inter alia*, the provisions of Article 1121(1)(b) of the NAFTA, Tembec's waiver made thereunder and the provisions of Article 1126(8) of the NAFTA.

2.    Costs

2.1  The Tribunal will determine at an appropriate time whether, and if so to what extent and in which manner, Tembec is to bear the costs of arbitration referred to in Articles 38 through 40 of the UNCITRAL Arbitration Rules, considering (i) that the Tribunal reserved its decision concerning costs to a subsequent order, decision or arbitral award in Decision No. 3 of the Consolidation Order of 7 September 2005; (ii) that the United States requested in its letter of 13 December 2005 "the opportunity to make a submission detailing its costs in defending against Tembec's claim;" and (iii) that Canfor, Tembec and Terminal have not made a submission on the question of costs as to Tembec either.

2.2  For the purposes of the determination referred to in Sub-section 2.1 above, the Tribunal will invite Tembec, Canfor, Terminal and the United States to submit their views in a manner and according to a schedule to be determined by the Tribunal in consultation with Tembec, Canfor, Terminal and the United States.

2.3  Accordingly, at present, the Tribunal rejects Tembec's request in its letter of 7 December 2005 that "the Tribunal order its Secretary to . . . make a final accounting of arbitration fees and costs up until today's date" and to "provide a refund to Tembec of any remaining balance of the deposit paid."

3. Competence

3.1  The Tribunal notes the pendency of Tembec's Petition and Notice of Motion to Vacate Arbitration Award, i.e., the Tribunal's Consolidation Order of 7 September 2005, filed with the United States District Court for the District of Columbia on 7 December 2005.

3.2  In regard of Sub-section 3.1 above, the Tribunal further notes that it is unaware of any applicable existing international or national law or other governing circumstance that affects the Tribunal's competence to decide any matters before it, including but not limited to the issuance of this Order for Termination of the present proceedings with respect to Tembec.

28.    As a result, Tembec is no longer a party to the present proceedings, subject to the matter of costs.

29.    Canfor and Terminal are hereinafter referred to as the "Claimants."

## IV.    FACTS

A.    United States Antidumping and Countervailing Duty Law

30.    The antidumping and countervailing duty laws of the United States are mainly contained in:

–    Title VII of the Tariff Act of 1930, as amended, codified at 19 U.S.C. §§ 1671-1671h and 1673-1673h (the "Tariff Act");

–    the regulations of the U.S. Department of Commerce ("Commerce" or "DOC"), and, in particular, those of its arm, the International Trade Administration ("ITA"), 19 C.F.R. § 351; and

–    the regulations of the International Trade Commission (the "ITC"), 19 C.F.R. §§ 201 and 207.

31.   An antidumping duty is imposed if (i) Commerce determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and (ii) the ITC determines that an industry in the United States is materially injured, or is threatened with material injury, by reason of imports of that merchandise or by reason of sales (or the likelihood of sales) of that merchandise for importation.  The antidumping duty is in an amount equal to the amount by which the normal value exceeds the export price for the merchandise.[11]

32.   A countervailing duty is imposed if (i) Commerce determines that the government of a country, or a public entity, is providing, directly or indirectly, a countervailing subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States, and (ii) the ITC determines that an industry in the United States is materially injured, or is threatened with material injury, by reason of imports of that merchandise or by reason of sales (or the likelihood of sales) of that merchandise for importation.  The countervailing duty is equal to the amount of the net countervailable subsidy.[12]

33.   Commerce may, at the request of an interested party, initiate an antidumping or countervailing duty investigation whenever it determines, from the information available to it, that a formal investigation is warranted into the elements necessary for the imposition of the duty.[13]  Commerce investigates foreign governments and manufacturers.  It makes a determination of whether there is a reasonable basis to believe that the merchandise is being sold, or likely to be sold, at less than the fair

---

[11]   19 U.S.C. § 1673.

[12]   19 U.S.C. § 1671.  The term "subsidy" is basically defined as a financial contribution provided by a foreign government that confers benefits to its recipients.  *See* 19 U.S.C. § 1677(5).

[13]   19 U.S.C. § 1673a and § 1671a.

value (in the case of dumping)[14] or whether the petition alleges elements necessary for the imposition of a countervailing duty (in the case of subsidy).[15]

34.    With respect to antidumping duties, Commerce calculates the "dumping margin" by determining the amount by which the "normal value" exceeds the export price of the merchandise.[16]    It does so on a company-by-company basis.    Commerce may also impose, under certain conditions, an "all-others rate" to be applied to all exporters and producers.[17]

35.    With respect to countervailing duties, Commerce calculates a subsidy rate for each producer benefiting from the subsidy.    Commerce may also impose, under certain conditions, an "all others rate" or "country-wide subsidy rate" to be applied to all exporters and producers.[18]

36.    The ITC is seized at the same time with the responsibility for making the determination of material injury to United States industry.    The ITC obtains evidence on the domestic industry.    If the supporting evidence exists, its findings result in a preliminary determination of reasonable indication of injury.[19]

37.    Once Commerce and the ITC have completed their investigations and found the necessary evidence, Commerce issues an antidumping or countervailing duty order in regard of the merchandise.[20]

---

[14]    19 U.S.C. § 1673b(b)(1).

[15]    19 U.S.C. § 1671a(c).

[16]    19 U.S.C. § 1677(35)(A).

[17]    19 U.S.C. §§ 1673d(c)(5) and 1677(1)(e)(2)(B).

[18]    19 U.S.C. § 1671d(c)(5).

[19]    19 U.S.C. § 1673b and § 1671b.

[20]    19 U.S.C. § 1673d(b) and § 1671d(b), respectively.    *See also id.* §§ 1673e and 1671e, respectively.

38.     Such an order is subject to review by the U.S. Court of International Trade ("CIT").  That review is, in turn, subject to appeal to the U.S. Court of Appeals for the Federal Circuit, but, in cases falling under the NAFTA, this process is in essence replaced by the Chapter Nineteen Binational Panel mechanism as described in the next Section.

B.       NAFTA Chapter Nineteen Binational Panel Mechanism

39.     Chapter Nineteen concerns: "Review and Dispute Settlement in Antidumping and Countervailing Duty Matters."  The genesis of this Chapter is that the State Parties to the NAFTA were unable to agree on uniform standards for their antidumping and countervailing duty laws and, as compromise, agreed to have final domestic antidumping and countervailing duty determinations reviewed by a binational panel mechanism (as was also the case under the Canada – United States Free Trade Agreement of 1989).

40.     The scheme of Chapter Nineteen is set up accordingly.  Article 1902 ("Retention of Domestic Antidumping Law and Countervailing Duty Law")[21] establishes the principles that a State Party has the right to retain its antidumping and countervailing duty law, and has the right to change or modify that law, but that in the case of an amendment of an antidumping or countervailing duty statute the State Party must comply with certain conditions.  Article 1903 ("Review of Statutory Amendments")[22] provides that a State Party may have recourse to a binational panel if it believes that another State Party's amendment of an antidumping or countervailing duty statute is non-compliant.  Article 1904 ("Review of Final Antidumping and Countervailing Duty Determinations"), which will be examined in more detail below, provides for a review by a binational panel

----

[21]     Article 1902 is quoted at n. 199 *infra*.

[22]     Article 1903 is quoted at n. 200 *infra*.

17

of final antidumping and countervailing duty determinations issued by national investigating authorities.  The integrity of this domestic law panel review system is safeguarded by the provisions set forth in Article 1905 ("Safeguarding the Panel Review System").[23]  The subsequent articles of Chapter Nineteen contain certain elaborations upon the previous articles.  Articles 1902 and 1903 will be addressed in more detail later in this Decision.[24]

41.    With respect to review by a binational panel under Article 1904, this process "replace[s] judicial review of final antidumping and countervailing duty determinations."  In the case of the United States, this provision means that exclusive jurisdiction over antidumping and countervailing duty claims is transferred to a binational panels in any case where this process is invoked.[25]  With respect to the United States, a binational panel in essence sits in place of the U.S. CIT.

42.    Chapter Nineteen applies to "goods that the competent investigating authority of the importing Party, applying the importing Party's antidumping or countervailing duty law to the facts of a specific case, determines are goods of another Party."[26]

43.    The "competent investigating authority" means in the case of the United States: "(i) the International Trade Administration of the United States Department of

---

[23]    Article 1905(1) is quoted at n. 217 *infra*.

[24]    *See* Section VI.E *infra* (p. 93 *et seq.*).

[25]    Article 1904(1) ("As provided in this Article, each Party shall replace judicial review of final antidumping and countervailing duty determinations with binational panel review").  *See also* Article 1904(11) ("A final determination shall not be reviewed under any judicial review procedures of the importing Party if an involved Party requests a panel with respect to that determination within the time limits set out in this Article. . . .").  *See further* Annex 1904.15 ("The United States shall amend section 516A(g) of the *Tariff Act of 1930*, as amended, to provide, in accordance with the terms of this Chapter, for binational panel review of antidumping and countervailing duty cases involving Mexican or Canadian merchandise. Such amendment shall provide that if binational panel review is requested such review will be exclusive").

[26]    Article 1901(1), quoted at ¶ 138 *infra*.

Commerce, or its successor, or (ii) the United States International Trade Commission, or its successor."[27]

44.    A binational panel under Article 1904 consists of five members.  Each of the involved Parties appoints two panelists.  These four panelists appoint the fifth panelist, who is to chair the panel.  If the four nominated panelists are unable to agree, the involved Parties draw lots and the winning Party selects the panelist from a roster established by the NAFTA Parties (who all must be citizens of Canada, Mexico or the United States).[28]

45.    The panel is, based on the prior administrative record, to review "a final antidumping or countervailing duty determination of a competent investigating authority of an importing Party to determine whether such determination was in accordance with the antidumping or countervailing duty law of the importing Party."[29]

46.    The panel must apply the standard of review set out in Annex 1911 and "the general legal principles that a court of the importing Party otherwise would apply to a review of a determination of the competent investigating authority."[30]  Annex

---

[27]    Annex 1911.

[28]    Annex 1901.2 (Establishment of Binational Panels).

[29]    Article 1904(2) ("An involved Party may request that a panel review, based on the administrative record, a final antidumping or countervailing duty determination of a competent investigating authority of an importing Party to determine whether such determination was in accordance with the antidumping or countervailing duty law of the importing Party. For this purpose, the antidumping or countervailing duty law consists of the relevant statutes, legislative history, regulations, administrative practice and judicial precedents to the extent that a court of the importing Party would rely on such materials in reviewing a final determination of the competent investigating authority. Solely for purposes of the panel review provided for in this Article, the antidumping and countervailing duty statutes of the Parties, as those statutes may be amended from time to time, are incorporated into and made a part of this Agreement").

[30]    Article 1904(3) ("The panel shall apply the standard of review set out in Annex 1911 and the general legal principles that a court of the importing Party otherwise would apply to a review of a determination of the competent investigating authority").

1911 (Country Specific Definitions) provides that the standard of review in case of the United States is:

> (i)  the standard set out in section 516A(b)(1)(B) of the *Tariff Act of 1930*, as amended, with the exception of a determination referred to in (ii), and

> (ii)  the standard set out in section 516A(b)(1)(A) of the *Tariff Act of 1930*, as amended, with respect to a determination by the United States International Trade Commission not to initiate a review pursuant to section 751(b) of the *Tariff Act of 1930*, as amended.[31]

47.  Thus, in the case of a final determination by a United States competent authority imposing an antidumping or countervailing duty, a panel must apply United States antidumping or countervailing duty law, as specified above.

48.  A request for a panel must be made in writing to the other involved Party within 30 days following the date of publication of the final determination in question in the official journal of the importing Party.[32]   The process is intended to be completed within 315 days.[33]

---

[31]    Section 516A(b)(1) of the *Tariff Act of 1930*, as amended, provides:

"(b)    Standards of review

(1)    Remedy

The court shall hold unlawful any determination, finding, or conclusion found –

(A)    in an action brought under subparagraph (A), (B), or (C) of subsection (a)(1) of this section, to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or

(B)    (i) in an action brought under paragraph (2) of subsection (a) of this section, to be unsupported by substantial evidence on the record, or otherwise not in accordance with law, or (ii) in an action brought under paragraph (1)(D) of subsection (a) of this section, to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

[32]    Article 1904(4) ("A request for a panel shall be made in writing to the other involved Party within 30 days following the date of publication of the final determination in question in the official journal of the importing Party. In the case of final determinations that are not published in

(footnote cont'd)

49.    An involved Party may, on its own initiative, request review of a final determination by an Article 1904 panel.  Such Party shall, on request of a person who would otherwise be entitled under the law of the importing Party to commence domestic procedures for judicial review of that final determination (i.e., an affected exporter or producer), request such review.[34]

50.    The panel may uphold a final determination, or remand it for action not inconsistent with the panel's decision. Where the panel remands a final determination, the panel establishes as brief a time as is reasonable for compliance with the remand, taking into account the complexity of the factual and legal issues

---

the official journal of the importing Party, the importing Party shall immediately notify the other involved Party of such final determination where it involves goods from the other involved Party, and the other involved Party may request a panel within 30 days of receipt of such notice. Where the competent investigating authority of the importing Party has imposed provisional measures in an investigation, the other involved Party may provide notice of its intention to request a panel under this Article, and the Parties shall begin to establish a panel at that time. Failure to request a panel within the time specified in this paragraph shall preclude review by a panel").

[33]    Article 1904(6) and (14) ("6.  The panel shall conduct its review in accordance with the procedures established by the Parties pursuant to paragraph 14. Where both involved Parties request a panel to review a final determination, a single panel shall review that determination." . . . . "14.  To implement the provisions of this Article, the Parties shall adopt rules of procedure by January 1, 1994. Such rules shall be based, where appropriate, on judicial rules of appellate procedure, and shall include rules concerning: the content and service of requests for panels; a requirement that the competent investigating authority transmit to the panel the administrative record of the proceeding; the protection of business proprietary, government classified, and other privileged information (including sanctions against persons participating before panels for improper release of such information); participation by private persons; limitations on panel review to errors alleged by the Parties or private persons; filing and service; computation and extensions of time; the form and content of briefs and other papers; pre and posthearing conferences; motions; oral argument; requests for rehearing; and voluntary terminations of panel reviews. The rules shall be designed to result in final decisions within 315 days of the date on which a request for a panel is made, and shall allow: (a) 30 days for the filing of the complaint; (b) 30 days for designation or certification of the administrative record and its filing with the panel; (c) 60 days for the complainant to file its brief; (d) 60 days for the respondent to file its brief; (e) 15 days for the filing of reply briefs; (f) 15 to 30 days for the panel to convene and hear oral argument; and (g) 90 days for the panel to issue its written decision").

[34]    Article 1904(5) ("An involved Party on its own initiative may request review of a final determination by a panel and shall, on request of a person who would otherwise be entitled under the law of the importing Party to commence domestic procedures for judicial review of that final determination, request such review").

involved and the nature of the panel's decision.[35]  A panel may not award financial compensation.

51.    A panel decision is not appealable to the domestic courts.[36]

52.    Against a panel decision, an involved Party may avail itself of an extraordinary challenge procedure on the grounds that (a) (i) a member of the panel was guilty of gross misconduct, bias, or a serious conflict of interest, or otherwise materially violated the rules of conduct; (ii) the panel seriously departed from a fundamental rule of procedure, or (iii) the panel manifestly exceeded its powers, authority or jurisdiction set out in this Article, for example by failing to apply the appropriate standard of review; and (b) any of the actions set out in (a) has materially affected the panel's decision and threatens the integrity of the binational panel review process.[37]

---

[35]    Article 1904(8) ("The panel may uphold a final determination, or remand it for action not inconsistent with the panel's decision. Where the panel remands a final determination, the panel shall establish as brief a time as is reasonable for compliance with the remand, taking into account the complexity of the factual and legal issues involved and the nature of the panel's decision. In no event shall the time permitted for compliance with a remand exceed an amount of time equal to the maximum amount of time (counted from the date of the filing of a petition, complaint or application) permitted by statute for the competent investigating authority in question to make a final determination in an investigation. If review of the action taken by the competent investigating authority on remand is needed, such review shall be before the same panel, which shall normally issue a final decision within 90 days of the date on which such remand action is submitted to it").

[36]    Article 1904(11), second sentence ("No Party may provide in its domestic legislation for an appeal from a panel decision to its domestic courts").

[37]    Article 1904(13) ("Where, within a reasonable time after the panel decision is issued, an involved Party alleges that: (a)(i) a member of the panel was guilty of gross misconduct, bias, or a serious conflict of interest, or otherwise materially violated the rules of conduct, (ii) the panel seriously departed from a fundamental rule of procedure, or (iii) the panel manifestly exceeded its powers, authority or jurisdiction set out in this Article, for example by failing to apply the appropriate standard of review, and (b) any of the actions set out in subparagraph (a) has materially affected the panel's decision and threatens the integrity of the binational panel review process, that Party may avail itself of the extraordinary challenge procedure set out in Annex 1904.13"). *See also* Annex 1904.13 (Extraordinary Challenge Procedure).

53.    Canada, Mexico and the United States have the obligation, "[i]n order to achieve the objectives of this Article," to amend their antidumping and countervailing duty statutes and regulations with respect to antidumping or countervailing duty proceedings involving goods of the other Parties.[38]

C.    Historical Context of the Softwood Lumber Dispute

54.    The export of Canadian softwood lumber to the United States has been a bone of contention for a long time between the two countries, but for the purposes of this Decision, history begins as of more than two decades ago.[39]

55.    That history started when the United States Coalition for Fair Canadian Lumber Imports (the "Coalition"), an alliance of U.S. sawmills, lumber workers and

---

[38]    Article 1904(15) ("In order to achieve the objectives of this Article, the Parties shall amend their antidumping and countervailing duty statutes and regulations with respect to antidumping or countervailing duty proceedings involving goods of the other Parties, and other statutes and regulations to the extent that they apply to the operation of the antidumping and countervailing duty laws. In particular, without limiting the generality of the foregoing, each Party shall: (a) amend its statutes or regulations to ensure that existing procedures concerning the refund, with interest, of antidumping or countervailing duties operate to give effect to a final panel decision that a refund is due; (b) amend its statutes or regulations to ensure that its courts shall give full force and effect, with respect to any person within its jurisdiction, to all sanctions imposed pursuant to the laws of the other Parties to enforce provisions of any protective order or undertaking that such other Party has promulgated or accepted in order to permit access for purposes of panel review or of the extraordinary challenge procedure to confidential, personal, business proprietary or other privileged information; (c) amend its statutes or regulations to ensure that (i) domestic procedures for judicial review of a final determination may not be commenced until the time for requesting a panel under paragraph 4 has expired, and (ii) as a prerequisite to commencing domestic judicial review procedures to review a final determination, a Party or other person intending to commence such procedures shall provide notice of such intent to the Parties concerned and to other persons entitled to commence such review procedures of the same final determination no later than 10 days prior to the latest date on which a panel may be requested; and (d) make the further amendments set out in its Schedule to Annex 1904.15"). *See also* Annex 1904.15 (Amendments to Domestic Laws) under "Schedule of the United States."

[39]    *See* Canfor SoC at ¶¶ 19-65; US Objection pp. 10-11. For a historical overview of the United States countervailing duty investigation of Canadian softwood lumber imports during the period 1982 - March 2001, *see also, In the Matter of Certain Softwood Lumber Products from Canada. Final Affirmative Countervailing Duty Determination*, Decision of the Panel, 13 August 2003, Secretariat File No. USD-CDA-2002-1904-03, at ¶¶ 5-11.

woodland owners, filed, on 16 August 1982 a countervailing duty petition with the ITA of Commerce and the ITC ("1982 Petition"), alleging that certain softwood lumber products from Canada were subsidized by the Canadian federal and/or provincial governments, in particular that the stumpage charged by the provincial Governments constituted a subsidy on softwood lumber.[40] Finding that Canada was not subsidizing its softwood lumber industry, the 1982 Petition was dismissed in 1983 and the investigation was terminated.[41]

56.     On 16 May 1986, the Coalition filed another countervailing duty petition with the ITA and ITC ("1986 Petition"). Being of the view that the request constituted trade harassment, the Government of Canada requested consultations with the Government of the United States under the 1979 GATT Subsidies Code. Following the failure of those consultations, Canada requested the establishment of a review panel under the 1979 GATT Subsidies Code. Meanwhile, on 16 October 1986, the ITA issued a Preliminary Determination, finding that Canadian softwood lumber products were subsidized by Canadian Federal and/or Provincial Governments, and that the stumpage programs constituted specific subsidies.

57.     A Final Determination was scheduled for 30 December 1986, but on that date the Governments of Canada and the United States signed a Memorandum of Understanding ("MOU").[42] The MOU provided that the ITA would terminate the countervailing duty investigation in exchange for the Government of Canada imposing a 15% export tax on Canadian softwood lumber products exported to the

---

[40]     In Canada, the federal or provincial governments set so-called stumpage fees. Stumpage is a levy or tax paid by the timber harvesters for the right to cut standing timber on public lands. Stumpage takes into account a number of factors, such as labour and transportation costs and the obligation of reforestation.

[41]     *Final Negative Countervailing Duty Determinations on Certain Softwood Lumber Products from Canada*, 48 Fed. Reg. 24,159 (1983).

[42]     *Memorandum of Understanding*, United States and Canada, 30 December 1986, available at: www.heinonline.org.

United States.  As a result, the 1986 Petition was withdrawn and the resulting investigation was terminated, while the Government of Canada withdrew its GATT complaint.

58.    The MOU provided that in exchange for certain "replacement measures," requested by the Government of the United States, being imposed in Canadian provinces, in particular in the two major exporting provinces, British Columbia and Quebec, the export tax levied on Canadian softwood lumber products would gradually be reduced to zero.  The MOU also provided that either Party could terminate the MOU on 30 days notice.

59.    The status of the MOU, including the replacement measures, were monitored by the Import Administration ("IA") of Commerce, a branch specifically set up for that purpose.    The requested replacement measures were, according to Commerce,[43] successful in offsetting the alleged subsidies, and the export tax was subsequently eliminated in British Columbia and reduced to a 3.1% in Quebec.

60.    On 3 September 1991, the Government of Canada notified the Government of the United States that it would be terminating the MOU effective 4 October 1991.

61.    On the same day that the MOU terminated, i.e., on 4 October 1991, the Government of the United States imposed interim measures in the form of immediate bonding requirements on the importation of softwood lumber from Canada.[44]  The Government did so following an investigation by the Office of the United States Trade Representative ("USTR"), which concluded that the

---

[43]    Testimony by the acting Deputy Assistant Secretary for IA of Commerce, 22 February 1991, before the Congressional Sub Committee on Regulation.  *See* Congressional Record – Senate, Tuesday, September 1991, 102nd Cong. 1st Sess., 137 Cong. Rec. S 12614 p. 3.  Canfor Notice of Arbitration and Statement of Claim at ¶ 35.

[44]    On the basis of Section 302 of the United States Trade Act of 1974.

termination of the MOU was unreasonable and would have the effect of burdening or restricting United States commerce. The interim duties affected certain Canadian Provinces, but not all. Commerce in turn started, on its own motion, a countervailing duty investigation on 23 October 1991.[45] After a Preliminary Determination on 5 March 1992, Commerce issued a Final Determination on 28 May 1992, confirming a subsidies finding and determining a countervailing duty rate of 6.51%. On 15 July 1992, ITC issued a finding that certain Canadian softwood lumber imports into the United States caused material harm to United States domestic producers. As a result of the ITC ruling, Commerce issued a countervailing duty order requiring cash deposits of 6.51% to be provided with all future imports of softwood lumber from Canada, except for those from the "Maritimes."[46]

62.    On 19 February 1993, at the request of the Government of Canada, the GATT Panel found that the termination of the MOU was not a breach and that the interim bonding requirements prior to a preliminary determination of a subsidy were contrary to the Government of the United States' obligations under the 1979 GATT Subsidies Code.

63.    The Government of Canada and others also requested a review of the determination of Commerce and the ruling of the ITC under Chapter Nineteen of the Canada-United States Free Trade Agreement of 1989. Two panels were established: one dealing with the Commerce determination ("First TFA Panel") and the other with the ITC ruling ("Second TFA Panel"). That led to a flurry of decisions:

---

[45]    Citing "special circumstances" under the 1979 GATT Subsidies Code.

[46]    *I.e.*, Prince Edward Island, Nova Scotia, New Brunswick and Newfoundland, also known as "Atlantic Provinces."

(a)      6 May1993: the First FTA Panel decided unanimously that Commerce failed to act in accordance with United States law and remanded the decision back to Commerce in light of the Panel's findings.

(b)      26 July 1993: the Second FTA Panel decided unanimously that the ITC ruling was flawed both under international law and United States legal standards and remanded the ruling back to the ITC in light of the Panel's findings.

(c)      17 September 1993:  Commerce issued a revised determination, finding again that Canadian softwood lumber products were subsidized.

(d)      25 October 1993: ITC issued a revised determination, again determining that Canadian softwood lumber caused material injury to the United States softwood lumber industry.

(e)      17 December 1993: the First FTA Panel reviewed the revised Commerce determination, and issued another remand order requiring Commerce to review again its determination.

(f)      6 January 1994:  Commerce accepted the First FTA's ruling that a negative finding was in order.  The First FTA Panel acknowledged Commerce's acceptance on 23 February 1994 and issued a Notice of Final Panel Action on 7 March 1994, published on 17 March 1994.

(g)      28 January 1994: the Second FTA Panel issued a second remand for ITC to review its revised determination.

(h)      14 March 1994: ITC issued a second revised decision.

(i)    6 July 1994:  the Second FTA Panel issued a third remand to the ITC with respect to ITC's second revised decision.

(j)    3 August 1994:  the Extraordinary Challenge Committee decided on the extraordinary challenge requested by the United States on 6 April 1994 against the First FTA Panel's decisions, confirming the Panel's decisions and dismissing the United States' allegations of conflict of interest of two members of the Panel.

(k)    16 August 1994:  Commerce published a formal notice revoking the countervailing duty order and terminating the collection of any additional duties on softwood lumber from Canada.

64.    In December 1994, the United States enacted the Uruguay Round Agreements Act ("URAA") in light of the World Trade Organization Agreement on Subsidies and Countervailing Measures ("SCM Agreement").  The URAA included, according to Canfor and Terminal, more relaxed standards with respect to the determination of subsidies.  According to the Statement of Administrative Action that accompanied the bill that became the URAA, these changes were specifically intended to effectively overrule the First FTA Panel's findings mentioned above.

65.    Negotiations between Canada and the United States continued in 1995 and 1996 concerning the softwood lumber dispute.  The negotiations resulted in the Softwood Lumber Agreement ("SLA") that was signed by the Governments of Canada and the United States on 29 May 1996.[47]  According to the SLA, during a period of five years, a specific volume of softwood lumber could enter the United States duty free; thereafter, an export tax would be imposed on a sliding scale.  In

---

[47]    See *Softwood Lumber Agreement*, 29 May 1996, 35 I.L.M. 1195 (with effect from 1 April 1996).

addition, the two Governments agreed that no trade actions would be initiated with respect to softwood lumber during the term of the SLA, which expired on 1 April 2001.**[48]**

66.    On 28 October 2000, the United States enacted the Continued Dumping and Subsidy Offset Act of 2000, which amended the Tariff Act of 1930 (the "Byrd Amendment").[49]    The Byrd Amendment was to the effect that duties assessed pursuant to countervailing duty or antidumping orders were to be distributed to affected domestic producers.    The latter are producers who either filed or supported a petition concerning subsidies or dumping.    The Byrd Amendment constitutes one of the grounds on which Canfor and Terminal base their claims in the present arbitration.[50]

D.    Present Context of the Softwood Lumber Dispute

67.    One day after the SLA expired, on 2 April 2001, the Coalition and others[51] filed petitions with Commerce and ITC.    The Coalition sought the imposition of countervailing duties and antidumping duties.    It also alleged "critical circumstances."[52]

---

[48]    *Id*, Article I.

[49]    *See* n. 290 *infra*.

[50]    *See* Section VI.E(b) *infra* (p. 138 *et seq.*).

[51]    The United Brotherhood of Carpenters and Joiners, and the Paper, Allied-Industrial, Chemical and Energy Workers International Union.  On 20 April 2001, four lumber producers were added: Moose River Lumber Co., Inc.; Shearer Lumber Products; Shuquack Lumber Co.; and Tolleson Lumber co., Inc.

[52]    If "critical circumstances" are determined to be present, then, under United States countervailing and antidumping duty law, retroactive duties may be applied to softwood lumber imports that occurred up to 90 days prior to the determination.  *See* 19 U.S.C. §§ 1671b(e)(1), 1671d(a)(2), 1673b(e)(1), 1673d(a)(3), *as amended by* Uruguay Round Agreements Act, Pub. L. No. 103-465 (1994)**.**

68.    Before Commerce, the Petitioners requested initiation of a countervailing duty investigation to determine whether manufacturers, producers or exporters of certain softwood lumber products from Canada were receiving countervailable subsidies.  The petition complained that the Government of Canada and provincial governments were providing countervailable subsidies with respect to the export, manufacture and production of softwood lumber.  Commerce commenced the investigation on 30 April 2001.[53]

69.    Before Commerce, the Petitioners also filed an antidumping petition concerning Canadian softwood lumber.  On 23 April 2001, Commerce initiated an investigation to determine whether certain softwood lumber from Canada was being sold for exportation to the United States at less than fair value ("LTFV").[54]

70.    The Petitions resulted in the following determinations:

(a)    23 May 2001: the ITC issued a preliminary determination in which it concluded that the United States softwood lumber industry had not been injured by reason of these imports, but that there was a reasonable indication that the industry was threatened with material injury by reason of subject imports of Canadian softwood lumber that were subsidized by the Government of Canada and sold in the United States at LTFV.

(b)    9 August 2001: Commerce adopted a Preliminary Countervailing Duty ("CVD") Determination and Preliminary Critical Circumstances Determination with respect to certain softwood lumber imports from

---

[53]    *Notice of Intent of Countervailing Duty Investigation: Certain Softwood Lumber Products from Canada*, 66 Fed. Reg. 21332 (30 April 2001), amended on 2 August 2001 to exempt the Maritime Provinces, 66 Fed. Reg. 40228 (2 August 2001).

[54]    *Notice of Intent of Antidumping Duty Investigation: Certain Softwood Lumber Products from Canada*, 66 Fed. Reg. 21328 (30 April 2001).

Canada.[55]    Commerce preliminarily found that provincial stumpage programs and certain non-stumpage programs were countervailable subsidies, and imposed provisional measures of a CVD rate at 19.31% *ad valorem*.

(c)    30 October 2001: Commerce adopted a Preliminary Antidumping ("AD") Determination, in which Commerce preliminarily determined that Canadian softwood lumber producers were dumping softwood lumber in the United States market.    Commerce calculated specific dumping margins for the six mandatory respondents[56] (Canfor 12.98% and an "all-others" dumping margin of 12.58%, applicable to Terminal).[57]

(d)    22 March, 2002: Commerce issued the Final Countervailing Duty ("CVD") Determination.    It incorporated an "Issues and Decision Memorandum" dated 21 March 2002, setting forth the reasons for the Determination.[58]    The countervailing duty rate was set at 19.34%. Commerce concluded, *inter alia*, that the provincial stumpage programs constituted a financial contribution that conferred a benefit on a specific Canadian industry or specific Canadian enterprises.    Commerce calculated a single countrywide rate to be applied to exporters and

---

[55]    *Notice of Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination: Certain Softwood Lumber Products from Canada*, 66 Fed. Reg. 43186 (17 August 2001).

[56]    On 25 May 2001, Commerce selected as mandatory respondents the six largest Canadian producers and exporters of softwood lumber: Abitibi Consolidated Inc.; Canfor; Slocan Forest Products Ltd.; Tembec; West Fraser Mills Ltd.; and Weyerhaeuser Company.

[57]    *Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Certain Softwood Lumber from Canada*, 66 Fed. Reg. 56062 (6 November 2002).

[58]    See *Notice of Final Affirmative Countervailing Duty Determination and Notice of Countervailing Duty Order: Certain Softwood Lumber Products from Canada*, 67 Fed. Reg. 15545, 15547 (2 April 2002).

producers subject to the investigation.  Subsequently, Commerce made a final negative "critical circumstances" determination

(e)    26 March 2002: Commerce also issued the Final Antidumping ("AD") Determination, reducing the dumping margin to 5.96% for Canfor.[59]  The antidumping rate for all others was 9.67% (applicable to Terminal).  Here again, reference was made to the Issues and Decision Memorandum, which described the basis for Commerce's Final Determination in detail.

(f)    16 May 2002:  ITC confirmed its preliminary findings that imported Canadian softwood lumber products were not presently injuring United States softwood lumber industry, but that the domestic industry was threatened with material injury by reason of imports of softwood lumber from Canada.[60]

(g)    22 May 2002: Commerce published an amended countervailing duty order on softwood lumber products from Canada, which contained an amended countervailable subsidy of 18.79% *ad valorem*.[61]

71.    The final amended countervailing duty rate in 2002 was set at 18.79%.  The amended dumping margins for the six respondent companies ranged from 2.18%

---

[59]    *Notice of Final Determination of Sales Less Than Fair Value: Certain Softwood Lumber from Canada*, 67 Fed. Reg. 15539 (2 April 2002).

[60]    *Softwood Lumber from Canada*, Inv. Nos. 701-TA-414 and 731-TA-928 (Final), USITC Pub. 3509 (May 2002, 67 Fed. Reg. 36022 (22 May 2002).

[61]    *Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order and Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Certain Softwood Lumber Products from Canada*, 67 Fed. Reg. 36068-36077 (22 May 2002)**.**

to 12.44% (Canfor 5.96%) with a weighted average of 8.43% (applicable to Terminal).[62] The duties were applied cumulatively and were to be paid in cash.

72.     On 5 December 2005, Commerce released the final results in the second annual reviews of AD and CVD duty orders regarding softwood lumber imports from Canada.[63] It determined an all others cash deposit rate of 11.54%. It determined a countrywide CVD rate of 8.7% for the period covered by the review (i.e., 1 April 2003 – 31 March 2004). Commerce also determined an "all-others" AD rate of 2.11%, and company-specific rates (Canfor: 1.36%) for the period covered by the review (i.e., 1 May 2003 – 30 April 2004). At time of rendering this Decision, in June 2006, the composite duty rate remained at 10.8%.

73.     It has come to the attention of the Tribunal that, reportedly, Canada and the United States reached an agreement in principle regarding the softwood lumber dispute on 26 April 2006. However, without prejudice to the question as to whether the reported agreement applies also to parties like Claimants, none of the parties to the present case has requested a stay or suspension of the present proceedings and, therefore, the Tribunal is under a duty to continue the proceedings and to render a decision on the Preliminary Question before it.

E.      Proceedings before NAFTA Chapter Nineteen Binational Panels

74.     On 2 April 2002, the Government of Canada and other parties initiated NAFTA Chapter Nineteen proceedings to review Commerce's Final Countervailing Duty and Antidumping Determinations.

---

[62]    *Id.* at 36070.

[63]    *Certain Softwood Lumber Products: Final Results of Antidumping Duty Administrative Review*, 70 Fed. Reg. 73437 (12 December 2005); *Certain Softwood Lumber Products: Final Results of Countervailing Duty Administrative Review*, 70 Fed. Reg. 73448 (12 December 2005).

75.    On 22 May 2002, the Government of Canada and other parties further initiated a third NAFTA Chapter Nineteen proceeding, this time to review the ITC final injury determination.

76.    Canfor appeared in the first and second proceeding, but not in third proceeding. Terminal did not appear in any of the three proceedings.

77.    The above three proceedings resulted in numerous decisions made by different Binational Panels (the "NAFTA AD Panel," "NAFTA CVD Panel," and "NAFTA ITC Panel," respectively) as well as by an Extraordinary Challenge Committee("ECC"), which can be tabulated as follows (through March 2006):[64]

| Action | NAFTA Challenge of Final Determination of AD[65] | NAFTA Challenge of Final Determination of CVD[66] | NAFTA Challenge of Final Threat of Injury Determination by ITC[67] |
|---|---|---|---|
| Petition | 2 April 2002 | 2 April 2002 | 22 May 2002 |
| Final Report Issued | 17 July 2003 | 13 August 2003 | 5 September 2003 |
| First Remand Determination Issued | 15 October 2003 | 12 January 2004 | 15 December 2003 |
| First Panel Remand Decision | 5 March 2004 | 7 June 2004 | 19 April 2004 |
| Second Remand Determination Issued | 21 April 2004 | 30 July 2004 | 10 June 2004 |
| Second Panel Remand Decision | 9 June 2005 | 1 December 2004 | 31 August 2004 |
| Third Remand Determination Issued | 11 July 2005 | 24 January 2004 | 10 September 2004 |
| Third Panel Remand Decision | Still Pending | 23 May 2005 | 12 October 2004 |
| Fourth Remand Determination Issued | | 7 July 2005 | |
| Fourth Panel Remand Decision | | 5 October 2005 | |
| Fifth Remand | | 28 October 2005 | |

---

[64]    The Reports and Decisions are available at various websites, including: http://www.nafta-sec-alena.org/DefaultSite/index_e.aspx?DetailID=380.

[65]    NAFTA Secretariat File No. USA-CDA-2002-1904-02.

[66]    NAFTA Secretariat File No. USA-CDA-2002-1904 03.

[67]    NAFTA Secretariat File No. USA-CDA-2002-1904-07.

| Action | NAFTA Challenge of Final Determination of AD[65] | NAFTA Challenge of Final Determination of CVD[66] | NAFTA Challenge of Final Threat of Injury Determination by ITC[67] |
|---|---|---|---|
| Determination Issued | | | |
| ECC Decision | | | 10 August 2005 |
| Fifth Panel Remand Decision | | 17 March 2006 | |

78.    Chapter Nineteen litigation dealing with softwood lumber is undoubtedly the most complex in the history of this Chapter.  As previously noted, it began in 2002 and continues to this day.  It involves challenges to Commerce's final determinations of antidumping and countervailing duties and to the ITC final determination of a threat of injury.

79.    The proceedings concerning antidumping duties arose out of the challenge by the Canadian Government and Canadian softwood lumber companies to the Final Determination of Commerce that certain softwood lumber had been exported from Canada to the United States at prices less than fair market value during the period 1 April 2000 to 31 March 2001.[68] This Final Determination gave rise to remands by three binational panels between 2003 and 2005,[69] and Commerce's determination pursuant to the third remand is still pending.

80.    The proceedings concerning countervailing duties arose out of a challenge by the Canadian Government and Canadian softwood lumber companies to the Final Determination of Commerce which concluded that provincial stumpage programmes, under which Canadian Provinces confer rights to harvest standing timber on government owned forest lands, constituted subsidies to producers of

---

[68]    *See* n. 58 *supra.*

[69]    USA-CDA-2002-1904-02 (Active), *Certain Softwood Lumber Products from Canada* (Department of Commerce Final Determination of Sales at Less Than Fair Value) First Remand Decision, 17 July 2003; Second Remand Decision, 5 March 2004; Third Remand Decision, 9 June 2005.

softwood lumber which were countervailable under U.S. law.[70]  This Final Determination gave rise to no less than five remands by binational panels constituted under Article 1904 of the NAFTA.[71]

81.    The proceedings concerning threat of material injury from dumped and subsidized imports of softwood lumber from Canada gave rise to a determination by the ITC that softwood lumber imports did indeed pose a threat of material injury to the production of like goods in the United States.[72] The challenge to this Final Determination of the ITC by the Canadian Government and Canadian softwood lumber companies gave rise to three remands.[73] The Third Remand Decision, requiring the ITC to find that there was no threat of material injury, was subject to a procedure by the Government of the United States before an Extraordinary Challenge Committee under Article 1904(13) of the NAFTA.[74] The Extraordinary Challenge Committee upheld the findings and the conclusions of the Third Remand Decision.

82.    In 2005, six other proceedings were taken by the Government of Canada and various Canadian softwood lumber companies in respect of various aspects of the

---

[70]    *See* n. 59 *supra.*

[71]    USA-CDA-2002-1904-03 (Active), *Certain Softwood Lumber Products From Canada* (Department of Commerce Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination). First Remand, 13 August 2003; Second Remand, 7 June 2004; Third Remand, 1 December 2004; Fourth Remand, 23 May 2005; Fifth Remand, 5 October 2005; Sixth Remand, 17 March 2006.

[72]    *See* n. 60 *supra.*

[73]    USA-CDA-2002-1904-07, *Certain Softwood Lumber Products From Canada* (USITC Final Injury Determination).  First Remand Decision, 5 September 2003; Second Remand Decision, 19 April 2004; Third Remand Decision, 31 August 2004.

[74]    *See* ¶ 52 *supra.*

treatment of softwood lumber exports from Canada to the United States. All of these proceedings are pending.[75]

83.    The result of these numerous proceedings was a gradual, but partial, reduction in the composite antidumping and countervailing duty rate paid upon the importation of softwood lumber from Canada.

(1)    With respect to the antidumping rate, Commerce issued on 11 July 2005 a determination on second remand by a binational panel that used the transaction-to-transaction method of price comparison. In doing so, Commerce applied the zeroing method of price comparison under this method and reached an average rate of antidumping duty of 10.06%.

(2)    With respect to the countervailing duty rate, as a result of a series remands by binational panels, Commerce issued a determination on 22 November 2005, lowering the rate to 0.80%, a *de minimis* rate that does not permit the imposition of countervailing duties. This determination was upheld by a binational panel on 17 March 2006.

---

[75]    USA-CDA-2005-1904-01 (Active), *Certain Softwood Lumber Products From Canada* (Department of Commerce Final Results of Countervailing Duty Administrative Review and Rescission of Certain Company-Specific Reviews); USA-CDA-2005-1904-02 (Terminated - No Decision Issued), *Certain Softwood Lumber Products From Canada* (Department of Commerce Notice of Implementation under Section 129 of the Uruguay Round Agreements Act – Countervailing Duty); USA-CDA-2005-1904-03 (Active), *Certain Softwood Lumber Products From Canada* (USITC Implementation of the new determination under Section 129(a)(4) of the Uruguay Round Agreements Act ); USA-CDA-2005-1904-04 (Active), *Certain Softwood Lumber Products From Canada* (Department of Commerce antidumping duty determination under Section 129 of the Uruguay Round Agreements Act); USA-CDA-2006-1904-01 (Active), *Certain Softwood Lumber Products From Canada* (Department of Commerce Final Results of Antidumping Duty Administrative Review); USA-CDA-2006-1904-02 (Active), *Certain Softwood Lumber Products From Canada* (Department of Commerce Final Results of Countervailing Duty Administrative Review).

(3)     With respect to the final injury determination, a binational panel decision of 22 October 2004 ordered the ITC to find no threat of injury. Following the binational panel's decision, the ITC eventually concluded on third remand that Canadian softwood lumber exports do not threaten injury to the U.S. industry. This decision was taken before an Extraordinary Challenge Committee which affirmed the binational panel ruling on 10 August 2005. However, as it will be seen in the next Section of this Decision, on 13 April 2006, the Appellate Body of the WTO, in a proceeding under the WTO DSU which also focused upon the determination of the threat of injury from the importation of softwood lumber from Canada, reversed, in part, the WTO Panel's findings. The Appellate Body upheld the exercise of discretion by the ITC in its affirmative finding of threat of injury resulting from the importation of softwood lumber from Canada.[76]

84.     Therefore, at time of rendering this Decision, the composite duty rate remained at approximately 10%. The Government of Canada has called upon the United States to reduce all duties to "0," while the Government of the United States maintains its right to impose a composite duty of over 10%, invoking the most recent WTO Appellate Body decision expressing deference to the exercise of discretion by the ITC.

F.     Proceedings before WTO Panels and Appellate Body

85.     The softwood lumber dispute between Canada and the United States did not only keep NAFTA Panels busy. WTO Panels and its Appellate Body had similarly to

---

[76]     *United States – Investigation of the International Trade Commission in Softwood Lumber from Canada – Recourse to Article 21.5 of the DSU by Canada*, WT/DS277/AB/RW, 13 April 2006.

issue numerous reports and rulings.[77]  The Panels and Appellate Body apply WTO

---

[77]     For dispute settlement at the WTO, *see* http://www.wto.org/english/docs_e/legal_e/ ursum_e.htm#Understanding; *see also* http://www.wto.org/english/thewto_e/whatis_e/tif_e/ disp1_e.htm.  Dispute settlement at WTO takes place on the basis of Annex 2 to Agreement Establishing the World Trade Organization of 1994 ("Understanding on Rules and Procedures Governing the Settlement of Disputes" – "DSU"), available at: http://www.wto.org/english/ docs_e/legal_e/28-dsu.doc.  The following description is reproduced from WTO's website.

The DSU emphasizes the importance of consultations in securing dispute resolution, requiring a Member to enter into consultations within 30 days of a request for consultations from another Member. If after 60 days from the request for consultations there is no settlement, the complaining party may request the establishment of a panel. Where consultations are denied, the complaining party may move directly to request a panel. The parties may voluntarily agree to follow alternative means of dispute settlement, including good offices, conciliation, mediation and arbitration.

Where a dispute is not settled through consultations, the DSU requires the establishment of a panel, at the latest, at the meeting of the Dispute Settlement Body ("DSB"), which consists of all WTO Members, following that at which a request is made, unless the DSB decides by consensus against establishment. The DSU also sets out specific rules and deadlines for deciding the terms of reference and composition of panels. Standard terms of reference will apply unless the parties agree to special terms within 20 days of the panel's establishment. And where the parties do not agree on the composition of the panel within the same 20 days, this can be decided by the Director-General. Panels normally consist of three persons of appropriate background and experience from countries not party to the dispute. The Secretariat will maintain a list of experts satisfying the criteria.

Panel procedures are set out in detail in the DSU. It is envisaged that a panel will normally complete its work within six months or, in cases of urgency, within three months. Panel reports may be considered by the DSB for adoption 20 days after they are issued to Members. Within 60 days of their issuance, they will be adopted, unless the DSB decides by consensus not to adopt the report or one of the parties notifies the DSB of its intention to appeal.

The concept of appellate review is an important new feature of the DSU. An Appellate Body will be established, composed of seven members, three of whom will serve on any one case. An appeal will be limited to issues of law covered in the panel report and legal interpretations developed by the panel. Appellate proceedings shall not exceed 60 days from the date a party formally notifies its decision to appeal. The resulting report shall be adopted by the DSB and unconditionally accepted by the parties within 30 days following its issuance to Members, unless the DSB decides by consensus against its adoption.

Once the panel report or the Appellate Body report is adopted, the party concerned will have to notify its intentions with respect to implementation of adopted recommendations. If it is impracticable to comply immediately, the party concerned shall be given a reasonable period of time, the latter to be decided either by agreement of the parties and approval by the DSB within 45 days of adoption of the report or through arbitration within 90 days of adoption. In any event, the DSB will keep the implementation under regular surveillance until the issue is resolved.

Further provisions set out rules for compensation or the suspension of concessions in the event of non-implementation. Within a specified time-frame, parties can enter into negotiations to agree on mutually acceptable compensation. Where this has not been agreed, a party to the dispute may request authorization of the DSB to suspend concessions or other obligations to the other party concerned. The DSB will grant such authorization within 30 days of the expiry of the agreed time-

(footnote cont'd)

agreements, contained in "The Final Act Embodying the Results of the Uruguay Round of Multilateral Trade Negotiations."  They include: the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade (the "GATT") (the "AD Agreement"), and the Agreement on Subsidies and Countervailing Measures ("SCM Agreement") that builds on the 1979 Agreement on Interpretation and Application of Articles VI, XVI and XXIII of the GATT (the "Subsidies Code"). An overview as provided in Appendix A to Claimants' PHM and derived from WTO's website is the following (through April 2006):[78]

(a)    DS221    *Section 129(c)(1) of the Uruguay Round Agreements Act* ["URAA"] (Complainant: Canada).[79]

–    Request for Consultations received: 17 January 2001;

–    Panel Report circulated: 15 July 2002.

In this case the Panel rejected the allegations of Canada that Section 129(c) (1) of the *Uruguay Round Agreements Act* inhibited the United States from respecting WTO dispute settlement decisions adopted by the WTO Dispute Settlement Body (DSB)

(b)    DS234    *Continued Dumping and Subsidy Offset Act of 2000* [Byrd Amendment] (Complainants: Canada, Mexico, and other countries).[80]

---

frame for implementation. Disagreements over the proposed level of suspension may be referred to arbitration. In principle, concessions should be suspended in the same sector as that in issue in the panel case. If this is not practicable or effective, the suspension can be made in a different sector of the same agreement. In turn, if this is not effective or practicable and if the circumstances are serious enough, the suspension of concessions may be made under another agreement.

One of the central provisions of the DSU reaffirms that Members shall not themselves make determinations of violations or suspend concessions, but shall make use of the dispute settlement rules and procedures of the DSU.

[78]    Available   at:   http://www.wto.org/english/tratop_e/dispu_e/dispu_subjects_index_e.htm#lumber.

[79]    Available at: http://www.wto.org/english/tratop_e/dispu_e/cases_e/ds221_e.htm.

–   Request for Consultations received: 21 May 2001;

–   Panel Report circulated: 16 September 2002;

–   Appellate Body Report circulated: 16 January 2003;

–   Article 21.3(c) Arbitration Report circulated: 13 June 2003;

–   Recourse to Article 22.6 Arbitration Report circulated: 31 August 2004.

In this case the Appellate Body upheld a complaint, made by Canada and ten other WTO Members, that the *Continued Dumping and Subsidy Offset Act of 2000* ("CDSOA" or "Byrd Amendment") constituted a specific measure against dumping and subsidies not contemplated by either the WTO AD or the SCM Agreements. In doing so, it rejected arguments of the United States that the measure was merely a "payment program." However, the Appellate Body overturned the findings of the Panel that the CODSA would result in more antidumping and countervailing duty petitions having the required level of support and that hence the United States should be regarded as not having acted in good faith in respect of the disciplines of the AD and SCM Agreements concerning the determination of support from domestic producers. Subsequent to the failure of the United States to repeal the Byrd Amendment within the required time, Canada and other WTO Members were authorised to levy retaliatory duties reflecting the "trade effect" of the CDSOA.

(c)   DS236   *Preliminary Determinations with Respect to Certain Softwood Lumber from Canada* (Complainant: Canada).[81]

–   Request for Consultations received: 21 August 2001;

–   Panel Report circulated: 27 September 2002.

---

[80]   Available at: http://www.wto.org/english/tratop_e/dispu_e/cases_e/ds234_e.htm.

[81]   Also known as "Softwood Lumber III." Available at: http://www.wto.org/english/tratop_e/dispu_e/cases_e/ds236_e.htm.

In this case, Canada challenged various aspects of preliminary countervailing duty determinations[82] and critical circumstances determinations respecting softwood lumber exported to the United States as well as various company specific expedited reviews and administrative reviews.

The Panel upheld the arguments of the United States that the provision of stumpage constituted a financial contribution, in the form of the provision of a good or service as envisaged by Article 1.1(a) of the SCM Agreement. However, the Panel declared the measures not to be in conformity with the SCM Agreement as the benefit was not calculated as a function of prevailing market conditions in Canada and also because Commerce had failed to examine whether a benefit was passed through by the unrelated upstream producers of log inputs to the downstream producers of processed softwood lumber. The Panel further concluded that the retroactive imposition of a provisional measure in the circumstances was inconsistent with the SCM Agreement.

The United States responded to the adoption of this report by indicating to the DSB that the measures at issue were no longer in force and that the provisional cash deposits had been refunded.

(d)    DS247    *Provisional Anti-Dumping Measure on Imports of Certain Softwood Lumber from Canada* (Complainant: Canada).[83]

–    Request for Consultations received: 6 March 2002.

Canada requested consultations respecting antidumping preliminary determinations[84] and the application of the "zeroing" methodology to determination value but did not pursue this complaint.

---

[82]    *Notice of Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination: Certain Softwood Lumber Products from Canada*, 66 Fed. Reg. 43186 (17 August 2001).

[83]    Available at: http://www.wto.org/english/tratop_e/dispu_e/cases_e/ds247_e.htm.

[84]    *Preliminary Determination of Sales at Less than fair market Value and Postponement of Final determination: Certain Softwood Lumber from Canada*, 66 Fed. Reg. 56062 (6 November 2001).

(e)     DS257     *Final Countervailing Duty Determination with respect to certain Softwood Lumber from Canada* (Complainant: Canada).[85]

–     Request for Consultations received: 3 May 2002;

–     Panel Report circulated: 29 August 2003;

–     Appellate Body Report circulated: 19 January 2004;

–     Article 21.5 Panel Report circulated: 1 August 2005;

–     Article 21.5 Appellate Body Report circulated: 5 December 2005.

In this case Canada challenged the final affirmative countervailing duty determination by Commerce[86] respecting certain softwood lumber from Canada. The measures challenged included the conduct of the investigation, the final determination, the expedited reviews and other matters.

The Panel found violations by the United States of SCM Agreement Article 10, respecting the conduct of the investigation; of Articles 14 and 14(d) in connection with the U.S. findings concerning the use of a benchmark other than private prices in the country of provision (i.e., Canada); and of Article 32.1.

The Appellate Body upheld and reversed certain findings of the Panel. In particular the Appellate Body upheld the finding that Canada had conferred a benefit upon softwood lumber producers. Respecting Article 14(d), the Appellate Body partially reversed the Panel's findings and held that an investigating authority may use a benchmark other than private prices in the country of provision, provided that it has established that private prices of the goods in question in the country of provision are distorted, because of the predominant role of the government in the market as a provider of the same or similar goods and provided that it

---

[85]     Also known as "Softwood Lumber IV." Available at: http://www.wto.org/english/tratop_e/dispu_e/cases_e/ds257_e.htm.

[86]     *Notice of Final Affirmative Countervailing Duty Determination and Final negative Critical Circumstances Determination: Certain Softwood Lumber Products from Canada*, 67 Fed. Reg. 15545 (2 April 2002).

ensures that the alternative benchmark relates or refers to, or is connected with, prevailing market conditions in the country of provision (including price, quality, availability, marketability, transportation and other conditions of purchase or sale).

The United States proceeded to adopt measures to comply with the Appellate Body ruling. However Canada, considering that the United States had failed to comply with the Appellate Body ruling, challenged these measures.

Both the Panel appointed under DSU Article 22.5 and the Appellate Body upheld Canada's challenge to the measures adopted by the United States in order to implement the Appellate Body's decision.

(f)    DS264    *Final Dumping Determination on Softwood Lumber from Canada* (Complainant: Canada).[87]

–    Request for Consultations received: 13 September 2002;

–    Panel Report circulated: 13 April 2004;

–    Appellate Body Report circulated: 11 August 2004;

–    Article 21.3(c) Arbitration Report circulated: 13 December 2004;

–    Article 22.6 arbitration established on 31 May, 2005, but later suspended in light of DSB decision of the same day authorising Article 21.5 proceedings (still pending).

In this case, Canada challenged the conformity of the final affirmative determination of dumping in respect of certain softwood lumber from Canada published in the Federal Register on 2 April 2002, and amended on 22 May 2002.[88] The measures included (i) the initiation and the conduct of the investigation, particularly in adopting the "zeroing"

---

[87]    Also known as "Softwood Lumber V." Available at: http://www.wto.org/english/ tratop_e/dispu_e/cases_e/ds264_e.htm.

[88]    *Notice of Amended Final Affirmative Countervailing Duty Determination and Notice of Countervailing Duty Order: Certain Softwood Lumber Products from Canada*, 67 Fed. Reg. 3670 (22 May 2002).

method of calculating margins of dumping and decisions respecting several specific companies, and (ii) the Final Determination of dumping.

The Panel, with a dissenting opinion, upheld the challenge to the zeroing methodology of calculating the normal value (where a value of "zero" was attributed to those product comparisons where the weighted average export price was greater than the weighted average normal value.) Other claims by Canada were rejected.

The Appellate Body upheld the Panel's findings with respect to zeroing since it failed to consider all prices, and partially reversed the Panel's finding with respect to one company.

The United States indicated its intention to implement the Appellate Body decision pursuant to Section 129 of the URAA. A time was determined for implementation of the decision, but Canada challenged these implementing measures. The Panel decision was rendered on 3 April 2006.[89] The panel held that the zeroing methodology of calculating normal value of dumped or subsidised goods could be used in association with the transaction-to-transaction method of assessing values of goods (as opposed to situations where the weighted average-to-weighted-average method was employed).

(g)    DS277    *Investigation of the International Trade Commission in Softwood Lumber from Canada* (Complainant: Canada).[90]

–    Request for Consultations received: 20 December 2002;

–    Panel Report circulated: 22 March 2004;

–    Article 21.5 Panel Report circulated: 15 November 2005.

In this case, Canada challenged the legality under the AD and SCM Agreements and the GATT 1994 of the ITC final threat of injury

---

[89]    *United-States – Final Dumping Determination on Softwood Lumber from Canada – Recourse to Article 21.5 of the DSU by Canada,* WT/DS264/RW, 3 April 2006.

[90]    Also known as "Softwood Lumber VI." Available at: http://www.wto.org/english/tratop_e/dispu_e/cases_e/ds277_e.htm.

determination of 22 May 2002 and of the ITC investigation pursuant to its final determination that an industry in the United States is threatened with material injury as a result of the dumping and subsidisation of softwood lumber in Canada. [91]

The Panel upheld Canada's arguments against the ITC's finding of a likely imminent substantial increase in exports and a causal link between imports and the threat of injury to the domestic industry.

The DSB adopted this ruling and the United States indicated its intention to implement the Panel's findings. A time was agreed for the implementation of the ruling and, in January 2005, the United States indicated that suitable amendments had been made to the final antidumping and countervailing duty orders pursuant to Section 129 of the URAA. Canada challenged these implementing measures and initiated proceedings under Article 21.5.

In November 2005, the Panel issued its report, finding that the revised ITC determination of threat of injury from the importation of dumped and subsidised softwood lumber from Canada was not inconsistent with the obligations of the United States under the AD and SCM Agreements.

Canada appealed this decision to the WTO Appellate Body. A decision was rendered on 13 April 2006, upholding and reversing certain aspects of the panel report relating to threat of injury, on the grounds that the panel had applied too high a standard of deference to a determination issued under Section 129 of the Tariff Act as it related to the issue of a threat of injury. [92]

(h)     DS311        *Reviews of Countervailing Duty on Softwood Lumber from Canada* (Complainant: Canada). [93]

– Request for Consultations received: 14 April 2004.

---

[91]     *Softwood Lumber from Canada*, Inv. Nos. 701-TA-414 and 731-TA-928 (Final), USITC Pub. 3509, 67 Fed. Reg. 36022 (22 May 2002).

[92]     *See* n. 76 *supra.*

[93]     Available at: http://www.wto.org/english/tratop_e/dispu_e/cases_e/ds311_e.htm.

In this complaint, Canada requested consultations with the United States concerning the failure of Commerce to complete expedited reviews of the countervailing duty order[94] against several Canadian softwood lumber companies and the refusal of Commerce to conduct company-specific administrative reviews of the same countervailing duty order at issue in Case WT DS/257. Canada has not requested the formation of a Panel, nor has it indicated a settlement.

G.     Summary of Canfor's and Terminal's Contentions in Support of Their Claims in the Present Arbitration under Chapter Eleven of the NAFTA

86.    As mentioned, Canfor and Terminal allege, *inter alia*, that the United States adopted certain countervailing duty and antidumping measures on Canadian imports of softwood lumber to the United States, in breach of NAFTA Articles 1102 (National Treatment), 1103 (Most-Favored-Nation Treatment), 1105 (Minimum Standard of Treatment), and 1110 (Expropriation).  The measures as alleged by Canfor and Terminal can be summarized as follows.

87.    *Subsidy Determinations.* Canfor and Terminal allege that Commerce's preliminary and final determinations that there was a subsidy in Canada favouring softwood lumber producers were unlawful determinations.  The United States allegedly evaluated the provincial stumpage program in Canada and determined that it constituted a subsidy.  Canfor and Terminal attack the methods employed by the United States in making its determination, including the use of cross-border benchmarks, and allege that Commerce made its determination under pressure to achieve a certain political result.

88.    *Duty Determination.*  Having determined that a subsidy existed, the United States then imposed a duty on Canadian softwood lumber producers' exports to the United States.  Canfor alleges that the United States ignored their requests for a

---

[94]     *See* n. 86 *supra.*

47

company-specific duty and imposed a country-wide rate that caused further harm to Claimants.

89.   *Critical Circumstances Determination.*   Canfor and Terminal allege that the United States made a determination that "critical circumstances" existed with respect to the alleged Canadian softwood lumber subsidies and dumping activities. As mentioned, if critical circumstances are determined to be present, then, under United States countervailing and antidumping duty law, retroactive duties may be applied to softwood lumber imports that occurred up to 90 days prior to the determination.   To make such a determination, Commerce was required to find that a relevant and applicable export subsidy actually existed, and that there were massive imports over a relatively short period of time.

90.   Claimants dispute that the export subsidy that Commerce identified in its analysis, a subsidy program employed by the Province of Quebec for its producers, was an export subsidy.   They also dispute the method employed by Commerce to calculate the amount of exports of softwood lumber that it deemed qualified as "massive exports" over a "relatively short time."

91.   *Antidumping Determinations.*   Canfor and Terminal contend that the United States made Preliminary and Final Determinations that Canadian softwood lumber producers were dumping softwood lumber in the United States market in an unlawful manner.   They attack the methodologies employed by Commerce to determine that dumping existed and the manner in which Commerce calculated company-specific weighted average dumping margins, including use of unfair price comparisons and of the technique called "zeroing" (i.e., excluding negative dumping margins from the margin calculation).

92.   *The ITC Determinations.*   As mentioned, the ITC made Preliminary and Final Determinations relating to whether there was a reasonable indication that the domestic industry producing the competing product had been materially injured or

threatened with material injury by reason of unfairly traded imports of the subject merchandise. In both its Preliminary and Final Determinations, the ITC concluded that, with the expiration of the SLA between the United States and Canada, Canadian softwood lumber exports to the United States would surge, constituting a threat of material injury. Here again, Canfor and Terminal objected to the ITC determinations.

93.    *Byrd Amendment.*  As mentioned, the Byrd Amendment, passed in 2000, provides that duties assessed pursuant to countervailing duty or antidumping orders shall be distributed annually to affected United States' domestic producers. Canfor and Terminal also assert claims in relation to the Byrd Amendment in the present arbitration.[95]

94.    *Conduct.*  Canfor and Terminal point out that their claims do not concern the substance and enactment of antidumping or countervailing duty laws in the United States, but rather the conduct of Commerce, the ITC and other government entities and officials. That matter will be addressed in more detail in Section VI.B below (page 72 *et seq.*).

## V.    SUMMARY OF THE PARTIES' POSITIONS REGARDING ARTICLE 1901(3)

### A.    Position of the United States

95.    The United States objects to the jurisdiction of the Tribunal in the claims of Canfor and Terminal on the basis that NAFTA Article 1901(3) expressly bars the submission of claims with respect to antidumping and countervailing duty law to

---

[95]    *See* Section VI.E(b) *infra* (p. 138 *et seq.*).

arbitration under Chapter Eleven of the NAFTA.  In support of its position, the United States makes the following four submissions.[96]

96.    (A)    The ordinary meaning of Article 1901(3) of the NAFTA establishes that the United States did not consent to arbitrate the claims of Canfor and Terminal under Chapter Eleven.

97.    The United States argues that the "ordinary meaning" and effect of this provision are clear: the United States has no obligations under the NAFTA with respect to its antidumping and countervailing duty laws except those specified in Chapter Nineteen and Article 2203.[97] According to the United States, Chapter Nineteen sets forth a unique, self-contained mechanism for dealing with sensitive and complex antidumping and countervailing duty claims.  The Parties to NAFTA intended for matters arising under a Party's antidumping and countervailing duty laws to be addressed exclusively under Chapter Nineteen.

98.    The United States contends that the claims of Canfor and Terminal are based entirely on obligations found in Chapter Eleven.  The claims, however, are based on obligations "with respect to [U.S.] antidumping and countervailing duty law." Their allegations are based on Commerce's and the ITC's interpretation of U.S. antidumping and countervailing duty laws and regulations, and in particular on the methodologies and procedures that Commerce used in calculating the duties at issue.  In the view of the United States, these are precisely the type of claims that

---

[96]    United States Objection to Jurisdiction (16 October 2003) pp. 21-32.  United States Statement of Defense on Jurisdiction (27 February 2004) at ¶ 1. *See also* United States Summary (21 December 2005).  The position of the United States as articulated at the January 2006 Hearing and in its Post-Hearing Memorial and Reply Post-Hearing Memorial is further reviewed in the considerations of the Tribunal in Chapter VI *infra* (p. 71 *et seq.*).

[97]    Article 2203 ("Entry into Force") provides: "This Agreement shall enter into force on January 1, 1994, on an exchange of written notifications certifying the completion of necessary legal procedures."

are – and in fact were – submitted to, and decided by, binational panels constituted under Chapter Nineteen.

99.     The United States argues that it has no substantive obligations under the provisions alleged to have been breached upon which a claim here could be based. And the provisions of Chapter Eleven relied upon by Canfor and Terminal to invoke jurisdiction of this Tribunal impose, in its opinion, no obligation on the United States.

100.    (B)   The context of Article 1901(3) confirms that the United States did not consent to investor-State arbitration of the claims of Canfor and Terminal.

101.    *First*, although the NAFTA establishes in Chapter Twenty a State-to-State dispute resolution mechanism for controversies concerning the Agreement, even that mechanism does not apply to antidumping or countervailing duty matters.  While Chapter Twenty has an unusually broad reach, it excludes expressly one category of disputes: those "matters covered in Chapter Nineteen (Review and Dispute Settlement in Antidumping and Countervailing Duty Matters)."[98] It would make no sense for the NAFTA to prohibit the NAFTA Parties themselves from pursuing State-to-State dispute resolution pertaining to a Party's antidumping and countervailing duty laws outside Chapter Nineteen, but accord private claimants the privilege of doing so under Chapter Eleven.

---

[98]    Article 2004 ("Except for the matters covered in Chapter Nineteen (Review and Dispute Settlement in Antidumping and Countervailing Duty Matters) and as otherwise provided in this Agreement, the dispute settlement provisions of this Chapter shall apply with respect to the avoidance or settlement of all disputes between the Parties regarding the interpretation or application of this Agreement or wherever a Party considers that an actual or proposed measure of another Party is or would be inconsistent with the obligations of this Agreement or cause nullification or impairment in the sense of Annex 2004").

102.  *Second*, this conclusion is reinforced by Article 1112(1),[99] which subordinates Chapter Eleven to all other chapters of he NAFTA.

103.  Moreover, the apparent position of Canfor and Terminal – that private claimants may pursue remedies under both Chapters Nineteen and Eleven with respect to antidumping and countervailing duty laws – would give rise to critical inconsistencies that would, under Article 1112(1), be resolved in favour of Chapter Nineteen.  The NAFTA Parties did not craft a treaty with two irreconcilably different methods of dispute resolution for the same matter, but if they had, Article 1112(1) would compel the same result as that provided in Article 1901(3).

104.  *Third*, Chapter Eleven itself indicates that, although the drafters expressly envisioned a certain overlap in competence between the investor-State arbitration mechanism established in Section B and the State-to-State mechanism in Chapter Twenty, they envisioned no such overlap for antidumping and countervailing duty matters in Chapter Nineteen.  Article 1115 (Purpose) provides:

> *Without prejudice to the rights and obligations of the Parties under Chapter Twenty* (Institutional Arrangements and Dispute Settlement Procedures), this Section establishes a mechanism for the settlement of investment disputes that assures both equal treatment among investors of the Parties in accordance with the principle of international reciprocity and due process before an impartial tribunal. (emphasis added by the United States)

Had the Parties contemplated that the same measure could be the subject of proceedings under both Chapter Eleven and Nineteen, a reader would expect there to be some mention of Chapter Nineteen in Article 1115.

---

[99]  Article 1112(1) provides: "In the event of any inconsistency between this Chapter and another Chapter, the other Chapter shall prevail to the extent of the inconsistency."

105.    *Finally*, the fact that the NAFTA expressly required amendments to domestic law to permit the use of business proprietary information in Chapter Nineteen proceedings – but contemplated no such amendments for Chapter Eleven – further confirms that the Parties did not envisage that antidumping and countervailing duty matters could be submitted to Chapter Eleven arbitration.[100]

106.    (C)    The NAFTA's object and purpose confirm that the United States did not consent to arbitrate the claims of Canfor and Terminal.

107.    The United States relies on Article 102(1)(e):

> 1.    The objectives of this Agreement, as elaborated more specifically through its principles and rules, including national treatment, most-favored-nation treatment and transparency, are to
>
> (. . . .)
>
> (e) create *effective* procedures for the implementation and application of this Agreement, for its joint administration and for the resolution of disputes; . . . .  (emphasis added by the United States)

108.    A review of the NAFTA's various rules for dispute resolution reveals an overriding concern with promoting effective dispute resolution procedures, and avoiding the inefficacies that result from redundant proceedings between the same parties before the different dispute resolution panels.  Thus, Article 1121 provides that, as a condition precedent to submitting a claim under Chapter Eleven, an investor must waive its rights, if any, "to initiate or continue before any

---

[100]    The United States relies on NAFTA Annex 1904.15(12) ("The United States shall amend section 777 of the *Tariff Act of 1930*, as amended, to provide for the disclosure to authorized persons under protective order of proprietary information in the administrative record, if binational panel review of a final determination regarding Mexican or Canadian merchandise is requested"), codified at 19 U.S.C. § 1677f.

administrative tribunal or court under the law of any Party, or other dispute settlement procedures, any proceedings with respect to the measure of the disputing Party that is alleged to be a breach referred to in Article 1116." The United States also points to Article 1120(1)[101] in conjunction with Annex 1120.1.[102] Likewise, Chapter Fourteen's several dispute resolution procedures apply exclusively to the "financial services" matters encompassed by that Chapter, with no possibility of overlap with other NAFTA dispute resolution mechanisms.[103]

109.     Re-litigating the binational panel's relevant factual and legal findings would give rise to the possibility of conflicting judgments and would be burdensome, unfair to the United States and wasteful of resources. The United States cites as examples the question whether stumpage constituted a "financial contribution," whether Commerce lawfully used "zeroing" to calculate the dumping margin and whether Canfor was entitled to a company-specific countervailing duty rate.

110.     (D)   The circumstances of conclusion of the NAFTA also confirm that no jurisdiction under Chapter Eleven exists for antidumping and countervailing duty matters.

---

[101]     Article 1120(1) ("Submission of a Claim to Arbitration") provides: "Except as provided in Annex 1120.1, and provided that six months have elapsed since the events giving rise to a claim, a disputing investor may submit the claim to arbitration under: . . . ."

[102]     Annex 1120.1 provides with regard to Mexico: "With respect to the submission of a claim to arbitration: (a) an investor of another Party may not allege that Mexico has breached an obligation under:  (i) Section A . . . both in an arbitration under this Section and in proceedings before a Mexican court or administrative tribunal."

[103]     The United States refers to Article 1101(3) (Chapter Eleven does not apply to measures covered by Chapter Fourteen); to Article 1401(2) (incorporating investor-State resolution solely for breaches of provisions as incorporated into Chapter Fourteen); Article 1414 (providing for a modified version of State-to-State dispute resolution for breaches of Chapter Fourteen); and Article 1415 (providing for a special, exclusive dispute resolution role for the Financial Services Committee where the prudential measures exception of Article 1410 is at issue in an investor-State arbitration).

111.    The circumstances of conclusion of the NAFTA and its predecessor agreement, the Canada-United States Free Trade Agreement of 1989 (the "FTA"), as reflected in the text of Chapter Nineteen, demonstrate that the NAFTA Parties could not agree on substantive international rules to govern antidumping and countervailing duty matters.  Accepting the hypothesis of Canfor and Terminal – that the substantive rules of Chapter Eleven do apply to such matters – would impose on the NAFTA Parties an agreement that they could not, and did not, reach.

112.    Chapter Nineteen of the NAFTA adopts, with a few modifications, the procedural solution reached by the United States and Canada in the FTA. During the negotiations of the FTA, Canada and the United States tried, but failed, to reach agreement on a common set of antidumping and countervailing duty rules.  In order to break the impasse, the parties agreed on a procedural, rather than a substantive, solution: a unique form of international dispute resolution that substituted binational panels applying domestic law for domestic courts.  Chapter Nineteen of the NAFTA reflects such a procedural solution: it sets forth no substantive international rules for antidumping and countervailing duty matters, but relies entirely on the procedural mechanism of binational panels to review the determinations of the Parties in such matters.  Chapter Eleven, by contrast, prescribes substantive standards incorporating rules of international law.  Canfor and Terminal read the NAFTA to impose a solution that the NAFTA Parties could not, and did not, agree upon.

113.    In its Reply, the United States asserts the following:

        (1)     The ordinary meaning of Article 1901(3) establishes that the United States did not consent to arbitrate Claimants' claims under Chapter Eleven:  (a) Article 1901(3) provides an exception to the jurisdiction of Chapter Eleven tribunals; (b) Claimants seek to impose obligations on the United States with respect to its antidumping and countervailing duty law,

considering that (i) the measures Claimants allege are with respect to U.S. antidumping and countervailing duty law; (ii) Claimants' interpretation of "with respect to" is unsupportable; (iii) Claimants' distinction between a challenge to the substance of a law and to its application is baseless; and (iv) Article 1901(3) precludes challenges under Chapter Eleven to antidumping and countervailing duty determinations.

(2)     The context of Article 1901(3) confirms that the United States did not consent to investor-State arbitration of Claimants' claims because: (a) Claimants err in their interpretation of Article 2004; and (b) Claimants' argument with respect to business proprietary information is baseless.

(3)     The NAFTA object and purpose confirm that the United States did not consent to arbitrate Claimants' claims under the Investment Chapter because: (a) the NAFTA general objectives referred to by Claimants do not override its specific provisions; (b) there is no presumption of parallel proceedings under the NAFTA and actually there is a presumption against parallel proceedings; (c) there is no presumption of parallel proceedings under international law; and (d) Claimants misconstrue the NAFTA objective of creating effective dispute resolution procedures.

(4)     The circumstances of conclusion of the NAFTA confirm that there is no jurisdiction under Chapter Eleven for antidumping and countervailing duty matters.

114.     Contending that "[i]n sum, the straightforward application of Article 1901(3) bars claimants' claims," the United States submits the following request for relief:

> [R]equests that the Tribunal render an award in favor of the United States and against claimants, dismissing their claims in their entirety and with prejudice [and] further request that,

> pursuant to Article 40 of the Uncitral Arbitration Rules, claimants be required to bear all costs of the arbitration, including costs and expenses of counsel.[104]

B.    Position of Canfor and Terminal

115.    Canfor and Terminal contend:[105] (a) that Article 1901(3) is not in the nature of a jurisdictional clause, but instead is an interpretive clause that directs the parties to "construe" the "obligations" in the NAFTA Chapters other than Chapter Nineteen in a certain way; and (b) that the ordinary meaning of Article 1901(3) and the relevant provisions of Chapter Eleven that establish the jurisdiction of this Tribunal do not impose State responsibility with respect to the content of municipal antidumping or countervailing duty law, and therefore do not create any bar to the claims of the Investors (i.e., Canfor and Terminal).[106]

116.    The claims of Canfor and Terminal are not premised on State responsibility for antidumping and countervailing duty laws, but rather on the conduct of officials charged with administering those laws.  That conduct was not mandated by law, they say, but rather was discretionary, arbitrary, and cavalier, and entitles Canfor and Terminal to advance their claims.[107]

117.    With respect to the "approach to jurisdictional questions," Canfor and Terminal argue that the United States has consented to arbitration in agreeing to Article

---

[104]    United States Summary of 21 December 2005 p. 3.

[105]    Canfor Reply to the United States' Objection to Jurisdiction (14 May 2004), hereinafter "Canfor Reply."  *See also* Canfor and Terminal Summary (6 January 2006).  The position of Canfor and Terminal as articulated at the January 2006 Hearing and in their Post-Hearing Memorial and Reply Post-Hearing Memorial is further considered in the considerations of the Tribunal in Chapter VI *infra* (p. 71 *et seq.*).  According to the Summary of 6 January 2006, Terminal adopted the memorials of 14 May 2004 and 24 September 2004 submitted on behalf of Canfor.

[106]    Canfor Reply at ¶ 6.

[107]    Canfor Reply at ¶ 7.

1122 of the NAFTA; that for the purposes of the present phase of the arbitration, the Tribunal must accept the facts set out in the Notice of Arbitration and Statement of Claim; and that the United States is required to demonstrate that Article 1901(3) is a jurisdictional provision and that each individual claim is beyond the Tribunal's jurisdiction.[108]

118.    With respect to general principles of treaty interpretation,[109] Canfor and Terminal refer to the Vienna Convention of 1969; the importance of the object and purpose of NAFTA, with reference to the Preamble,[110] Article 102(1)[111] and Article 1902(2(d)(ii);[112] the manner in which NAFTA directs how it shall be interpreted,

---

[108]    Canfor Reply at ¶¶ 12-36.

[109]    Canfor Reply at ¶¶ 37-57.

[110]    Claimants rely in particular on: "ESTABLISH clear and mutually advantageous rules governing their trade;" "ENSURE a predictable commercial framework for business planning and investment;" "BUILD on their respective rights and obligations under the General Agreement on Tariffs and Trade and other multilateral and bilateral instruments of cooperation;" and "ENHANCE the competitiveness of their firms in global markets."

[111]    Article 102(1) provides:

"The objectives of this Agreement, as elaborated more specifically through its principles and rules, including national treatment, most-favored-nation treatment and transparency, are to:

(a) eliminate barriers to trade in, and facilitate the cross-border movement of, goods and services between the territories of the Parties;

(b) promote conditions of fair competition in the free trade area;

(c) increase substantially investment opportunities in the territories of the Parties;

(d) provide adequate and effective protection and enforcement of intellectual property rights in each Party's territory;

(e) create effective procedures for the implementation and application of this Agreement, for its joint administration and for the resolution of disputes; and

(f) establish a framework for further trilateral, regional and multilateral cooperation to expand and enhance the benefits of this Agreement."

[112]    Article 1902(2)(d)(ii) provides:

"2.  Each Party reserves the right to change or modify its antidumping law or countervailing duty law, provided that in the case of an amendment to a Party's antidumping or countervailing duty statute: . . .

(d)        such amendment, as applicable to that other Party, is not inconsistent with . . .

(footnote cont'd)

58

with reference to Article 102(2);[113] the principle of good faith, which is a relevant rule of international law that the Tribunal is mandated to take into account; and the circumstance that the United States' interpretation is not in keeping with the object and purpose of the NAFTA, in particular as the United States ignores the progressive widening of State responsibility that the NAFTA Parties have expressly agreed to throughout the NAFTA, including in relation to the protections given to investors under Chapter Eleven.

119.    With respect to Article 1901(3), Canfor and Terminal argue that it does not preclude a claim in respect of a violation of Chapter Eleven obligations.[114]   The United States' submission is based on a fundamental misconception of the architecture of the NAFTA and the roles of Chapter Eleven and Chapter Nineteen within the context of the bargain struck between the NAFTA Parties.  Properly understood, these two Chapters deal with fundamentally different legal regimes. Any conduct being scrutinized under those regimes is reviewed using different norms and different standards of review, and give rise to different types of relief. There is nothing in the treaty text, including in NAFTA Chapter Nineteen generally or Article 1901(3) specifically, that says that conduct, which may give rise to a judicial review under domestic law under the binational panel process contemplated under Article 1904, cannot also give rise to a claim that the United States has violated its international treaty obligations under Chapter Eleven.

---

(ii)    the object and purpose of this Agreement and this Chapter, which is to establish fair and predictable conditions for the progressive liberalization of trade between the Parties to this Agreement while maintaining effective and fair disciplines on unfair trade practices, such object and purpose to be ascertained from the provisions of this Agreement, its preamble and objectives, and the practices of the Parties."

[113]    Article 102(2) provides: "The Parties shall interpret and apply the provisions of this Agreement in the light of its objectives set out in paragraph 1 and in accordance with applicable rules of international law."

[114]    Canfor Reply at ¶¶ 58-124.

Article 1901(3) does not, on its terms, refer to jurisdiction at all. Rather, it simply provides how specific obligations in Chapters other than Chapter Nineteen should be construed.

120.    Section A of Chapter Eleven, in addition to its substantive international law obligations, also specifically identifies those matters which are beyond its scope and coverage.[115] As regards Article 1112(1),[116] it provides that in the event of an "inconsistency" between NAFTA Chapter Eleven and another Chapter of the NAFTA, the other Chapter shall prevail, but in that event it shall do so "only to the extent of the inconsistency."[117]

121.    With regard to Chapter B of Chapter Eleven, there is no suggestion for the purposes of the United States' objection that the procedural or jurisdictional prerequisites have not been satisfied by Claimants. Article 1121 does not prevent a claimant from pursuing proceedings in relation to conduct of a State Party that is alleged to be in breach of Chapter Eleven that might otherwise be pursued before the courts or administrative tribunals of a State Party, for "injunctive, declaratory or other extraordinary relief, not involving the payment of damages" before such a

---

[115]    Claimants refer, by way of example, to Article 1101(3) ("This Chapter does not apply to measures adopted or maintained by a Party to the extent that they are covered by Chapter Fourteen (Financial Services)"); and Article 1108(3) ("Articles 1102, 1103, 1106 and 1107 do not apply to any measure that a Party adopts or maintains with respect to sectors, subsectors or activities, as set out in its Schedule to Annex II").

[116]    Article 1112 provides:

"1.    In the event of any inconsistency between this Chapter and another Chapter, the other Chapter shall prevail to the extent of the inconsistency.

2.    A requirement by a Party that a service provider of another Party post a bond or other form of financial security as a condition of providing a service into its territory does not of itself make this Chapter applicable to the provision of that cross border service. This Chapter applies to that Party's treatment of the posted bond or financial security."

[117]    Canfor Reply at ¶¶ 60-64.

court or tribunal.[118]   Article 1135[119] limits the Tribunal's remedial powers at the conclusion of proceedings.  A Chapter Eleven tribunal may not direct or require a Party to change, alter, amend or repeal any measure which it found to have violated the obligations under Section A.[120]

122.    Article 1901(3) can be properly understood only within the context of the structure of Chapter Nineteen as a whole.  Chapter Nineteen does not specifically refer to Chapter Eleven, nor does Chapter Eleven specifically refer to Chapter Nineteen. Article 1902 (Retention of Domestic Antidumping Law and Countervailing Duty

---

[118]    Canfor and Terminal refer to Article 1121(1)(b) which provides:

"1.    A disputing investor may submit a claim under Article 1116 to arbitration only if: . . . .

(b)    the investor and, where the claim is for loss or damage to an interest in an enterprise of another Party that is a juridical person that the investor owns or controls directly or indirectly, the enterprise, waive their right to initiate or continue before any administrative tribunal or court under the law of any Party, or other dispute settlement procedures, any proceedings with respect to the measure of the disputing Party that is alleged to be a breach referred to in Article 1116, except for proceedings for injunctive, declaratory or other extraordinary relief, not involving the payment of damages, before an administrative tribunal or court under the law of the disputing Party."

[119]    Article 1135 provides:

"1.    Where a Tribunal makes a final award against a Party, the Tribunal may award, separately or in combination, only:

(a)    monetary damages and any applicable interest;

(b)    restitution of property, in which case the award shall provide that the disputing Party may pay monetary damages and any applicable interest in lieu of restitution. A tribunal may also award costs in accordance with the applicable arbitration rules.

2.    Subject to paragraph 1, where a claim is made under Article 1117(1):

(a)    an award of restitution of property shall provide that restitution be made to the enterprise;

(b)    an award of monetary damages and any applicable interest shall provide that the sum be paid to the enterprise; and

(c)    the award shall provide that it is made without prejudice to any right that any person may have in the relief under applicable domestic law.

3.    A Tribunal may not order a Party to pay punitive damages."

[120]    Canfor Reply at ¶¶ 65-70.

Law) reserves to the NAFTA Parties the right to retain and apply their municipal antidumping law, but imposes a constraint upon a State Party wishing to change or modify such law.  Under Article 1903 (Review of Statutory Amendments), a State Party may challenge an amendment before a binational panel on ground of inconsistency with the GATT, the Antidumping Code or the Subsidies Code, or inconsistency with the object and purpose of the NAFTA, and the panel can issue a declaratory opinion.  Article 1904 (Review of Final Antidumping and Countervailing Duty Determinations) replaces municipal judicial review of final antidumping and countervailing duty determinations with a process of binational panel review.  A panel applies only the municipal law of the State Party as if it were a municipal court reviewing the determination.  It does not change that law. The remedial jurisdiction is limited by Article 1904(8),[121] such that the panel may only uphold a determination or remand it for action not inconsistent with its decision.  There is no jurisdiction to award damages.[122]

123.    Article 1901 (General Provisions) deals with three separate matters.[123]  Article 1901(1) provides that the binational panel review process applies only to goods

---

[121]    Article 1904(8) provides: "The panel may uphold a final determination, or remand it for action not inconsistent with the panel's decision. Where the panel remands a final determination, the panel shall establish as brief a time as is reasonable for compliance with the remand, taking into account the complexity of the factual and legal issues involved and the nature of the panel's decision. In no event shall the time permitted for compliance with a remand exceed an amount of time equal to the maximum amount of time (counted from the date of the filing of a petition, complaint or application) permitted by statute for the competent investigating authority in question to make a final determination in an investigation. If review of the action taken by the competent investigating authority on remand is needed, such review shall be before the same panel, which shall normally issue a final decision within 90 days of the date on which such remand action is submitted to it."

[122]    Canfor Reply at ¶¶ 72-77.

[123]    Article 1901 provides:

"1.    Article 1904 applies only with respect to goods that the competent investigating authority of the importing Party, applying the importing Party's antidumping or countervailing duty law to the facts of a specific case, determines are goods of another Party.

(footnote cont'd)

that the investigating authority determines are goods of another State Party. Article 1901(2) relates to the process for appointing binational panels. Article 1901(3) is considered further below.[124]

124.   With respect to the interrelationship between Chapter Eleven and Chapter Nineteen, the proposition of the United States that NAFTA is made up of watertight compartments finds no support in the decided cases, is unnecessary in light of the objectives of the NAFTA, and is inconsistent with its fundamental architecture which contemplates that the same facts can give rise to obligations not only under multiple Chapters, but also in different fora. According to decided cases,[125] a matter can relate to multiple Chapters of NAFTA.[126]

125.   The interrelationship between Chapter Eleven and Chapter Nineteen is that they are complementary. Chapter Eleven provides protection to individuals who have made a financial commitment to the territory of another State from arbitrary, inequitable or confiscatory treatment. Chapter Eleven is very limited in what remedies it makes available to investors. An investor is not allowed to seek relief that mandates a change in the municipal law of a State Party. Chapter Nineteen, by contrast, substitutes binational judicial review under Chapter Nineteen for municipal judicial review, based on municipal legal standards. The two

---

2.   For purposes of Articles 1903 and 1904, panels shall be established in accordance with the provisions of Annex 1901.2.

3.   Except for Article 2203 (Entry into Force), no provision of any other Chapter of this Agreement shall be construed as imposing obligations on a Party with respect to the Party's antidumping law or countervailing duty law."

[124]   Canfor Reply at ¶ 78.

[125]   Canfor and Terminal refer to *Pope & Talbot, Inc. v. Canada*, Award, 26 January 2000, NAFTA (Uncitral), at ¶¶ 16-26, available at: http://www.dfait-maeci.gc.ca/tna-nac/documents/pubdoc6.pdf, and to *S.D. Myers, Inc. v. Canada*, Partial Award, 13 November 2000, NAFTA (Uncitral), at ¶¶ 289-300, available at: http://ita.law.uvic.ca/documents/SDMeyers-1stPartialAward.pdf.

[126]   Canfor Reply at ¶¶ 80-85.

mechanisms are so dramatically different that they are complementary: they apply different laws (international versus municipal) and they provide different remedies. Nothing the United States has identified establishes any conflict between them, demonstrates irreconcilability between the two dispute resolution mechanisms, or would give rise to any critical inconsistencies so as to preclude a Chapter Eleven claim being advanced. Contrary to the United States' assertion, Article 1112(1),[127] which relates to inconsistencies between Chapters of the NAFTA, is not engaged by the claims made in this proceeding. There is no inconsistency, and there is therefore nothing to be resolved "in favour of Chapter 19." [128]

126. With respect to the United States' argument that Chapter Eleven proceedings would be redundant, based on concerns over the proliferation of international tribunals in recent decades and the risk of inconsistent decisions, Canfor and Terminal respond that Chapter Eleven and Nineteen proceedings result in effective dispute settlement because: (i) international law generally permits proceedings arising out of the same or related facts, and (ii) Chapter Eleven and Chapter Nineteen are not the same as they occur before different tribunals that apply different laws and award remedies that are completely different.[129]

127. In connection with (i), Canfor and Terminal criticize the United States' reliance on the *Bluefin Tuna* case.[130] They also point out that the United States itself is currently defending against multiple cases brought by Canada before the WTO, where the United States has not argued that they should be stayed pending

---

[127]    Article 1112(1) is quoted at n. 116 *supra*.

[128]    Canfor Reply at ¶¶ 86-95.

[129]    Canfor Reply at ¶¶ 96-98.

[130]    *Southern Bluefin Tuna Case – Australia and New Zealand v. Japan*, Award on Jurisdiction and Admissibility, 4 August 2000, 39 I.L.M. 1359 (UNCLOS Arb. Trib. 2000).

resolution of the NAFTA Chapter Nineteen binational panel proceedings, much less dismissed because of redundancy. [131]

128.    Canfor and Terminal submit that NAFTA expressly contemplates simultaneous proceedings under a State Party's municipal law and under the legal regime established under Chapter Eleven.  This is confirmed by Article 1121, which provides that, while a party must waive the right to advance proceedings before a court or an administrative tribunal seeking the same relief (i.e., the payment of damages), they are expressly not required to do so where they seek "injunctive, declaratory or other extraordinary relief not involving the payment of damages." The proceedings before the Chapter Nineteen binational panel do not involve a claim for damages; the relief is, in essence, declaratory.  If the United States did not want to defend itself against concurrent proceedings under two different legal regimes arising out of Chapters Eleven and Nineteen, it should have demanded an explicit exemption in the negotiations,  There is no evidence in the record that such a demand was ever made.[132]

129.    In conclusion, permitting simultaneous proceedings under Chapter Eleven and Chapter Nineteen will not result in the prospect of conflicting decisions (as the two proceedings apply different laws); finality will not be undermined (as each proceeding has different procedures for review); double recovery cannot occur (as only the Chapter Eleven panel can award damages); it is not unfair or burdensome to the United States; it does not represent a poor use of resources; and, given the objective articulated in the NAFTA, trade liberalization and international dispute

---

[131]    Canfor Reply at ¶¶ 99-102.

[132]    Canfor Reply at ¶¶ 103-108.

resolution are both enhanced, not undermined, by imposing obligations on a State Party to treat investors fairly.[133]

130.    With respect to the United States' argument based on Chapter Twenty, it is founded on the mistaken premise that the Investor's Chapter Eleven claim somehow seeks to challenge the substance of the United States' antidumping and countervailing duty laws. The existence of a specific jurisdictional clause in Article 2004 precluding Chapter Twenty dispute settlement in Chapter Nineteen matters actually demonstrates that the NAFTA Parties could draft such exclusions explicitly if they intended them to exist.[134]

131.    With respect to the United States' argument based on Article 1115, that Article preserves the rights of the State Parties to take Chapter Twenty proceedings in relation to matters covered under Chapter Eleven and, therefore, both Chapter Twenty and Chapter Eleven proceedings are contemplated in respect of the same matter. As Chapter Nineteen proceedings apply a different set of legal obligations than those that are contained in Chapter Eleven, there would not be any confusion over the impact of the Chapter Eleven dispute.[135]

132.    Finally, Canfor and Terminal contend that the United States has provided no evidence to support its interpretation of Article 1901(3).[136] The evidence does nothing more than support the proposition that the State Parties could not agree on an international antidumping and countervailing duty law and, as a result, the State Parties agreed instead to retain the existing national antidumping and countervailing duty laws and procedures. The United States Statement of

---

[133]    Canfor Reply at ¶ 109.

[134]    Canfor Reply at ¶¶ 111-115.

[135]    Canfor Reply at ¶¶ 116-119.

[136]    Canfor Reply at ¶¶ 120-123.

Administrative Action ("SAA") says nothing to support the United States' current interpretation of Article 1901(3).  It only states that "Articles 1901 and 1902 make clear that each country retains its domestic antidumping and countervailing duty laws and can amend them." [137]  By contrast, it contains an expansive view of the scope of application of Chapter Eleven, stating: "The chapter applies to *all* governmental measures relating to investment, with the exception of measures governing financial service, which are treated in Chapter Fourteen"  (emphasis added by Canfor and Terminal)."[138] No mention is made about the application of antidumping or countervailing duty law also being preemptively excluded from coverage under Chapter Eleven.  The effect of the United States' assertion is "that the NAFTA Parties agreed that conduct (which is discretionary and not required by or attributable to the law itself) that was in any way connected to 'antidumping and countervailing duty matters' could be considered a 'safe harbour' for their officials to accord arbitrary and discriminatory treatment to investors . . ."  It is simply not plausible that the NAFTA Parties could have intended to leave a gaping hole in the protection afforded by NAFTA Chapter Eleven.

133.    According to Canfor and Terminal, the proper interpretation of Article 1901(3) is that it ensures that no other provision of the NAFTA will result in a requirement to change or modify municipal law.[139]  It was necessary to ensure that no other provision of the NAFTA, including the process contemplated in Chapter Twenty, would apply so as to impose an obligation to enact changes to a State Party's municipal antidumping and countervailing duty law.  The wording of Article 1901(3) supports the interpretation of Canfor and Terminal.  The relationship

---

[137]    NORTH AMERICAN FREE TRADE AGREEMENT, IMPLEMENTATION ACT, STATEMENT OF ADMINISTRATIVE ACTION, H.R. Doc. No. 103-159, Vol. I, 103d Cong., 1st Sess. at 194 (1993).

[138]    *Id.* at 589.

[139]    Canfor Reply at ¶¶125-148.

between the exclusion in Article 1901(3) ("no provision of any other Chapter of [the NAFTA] shall be construed as imposing obligations on a Party") and the measures to which it applies ("the Party's antidumping law and countervailing duty law" as they are defined in Article 1902(1)) is governed by the phrasal preposition "with respect to."  Other international tribunals have found that the words "with respect to" limit its objects to those to which the subject of the sentence applies, and that only those things identified in the provisions apply to it.[140] In this case, the conduct of the United States which violates the obligations accorded to investors under Chapter Eleven at most "arises out of," in some way, the application of "antidumping law and countervailing duty law."  As the case law makes clear, this is not an obligation on the United States "with respect to" such laws.  This proposition is supported by the actual definition of antidumping and countervailing laws in Article 1902(1).[141] In other words, it describes the State Party's antidumping and countervailing duty law to be applied by an agency disposing of the matter, but does not stipulate the agency's conduct in the course of applying the law in an individual case.

134.   Canfor and Terminal add that when NAFTA Parties intended to limit the scope and application of certain provisions of the NAFA, the NAFTA text says so clearly.  Thus, Article 1101 explicitly sets out what is and what is not covered.  Article 1108 provides a lengthy set of reservations and exceptions.  When the NAFTA Parties wanted to make clear that certain measures were not affected by

---

[140]     Canfor and Terminal refer to the dissenting opinion by arbitrator Highet in *Waste Management Inc. v. Mexico*, Arbitral Award, 2 June 2002, Case No. ARB(AF)/98/2, http://ita.law.uvic.ca/documents/WastMgmt-Jurisdiction-Sp.pdf, at ¶¶ 25-26, and to the ICJ, *Fisheries Jurisdiction* Case, 1998 ICJ Reports p. 96 at ¶ 62;  *Aegean Sea Continental Shelf* Case, 1976-1978 ICJ Reports pp. 34-36 at ¶¶ 81-88.

[141]     Article 1902(1) provides: "Each Party reserves the right to apply its antidumping law and countervailing duty law to goods imported from the territory of any other Party. Antidumping law and countervailing duty law include, as appropriate for each Party, relevant statutes, legislative history, regulations, administrative practice and judicial precedents."

the Treaty, a clear and specific formulation was used. An example is Article 2103.[142] To highlight the point that the NAFTA Parties used explicit and precise language to exclude the application of certain NAFTA dispute resolution mechanisms, examples are: Article 1501 (Competition Law);[143] and Article 1138 (Exclusions).[144]

135.  Canfor and Terminal conclude that Article 1901(3) is not designed to prevent the application of Section B of Chapter Eleven, but rather to prevent the United States

---

[142]  Article 2103 provides in part: "1. Except as set out in this Article, nothing in this Agreement shall apply to taxation measures. 2. Nothing in this Agreement shall affect the rights and obligations of any Party under any tax convention. In the event of any inconsistency between this Agreement and any such convention, that convention shall prevail to the extent of the inconsistency. . . . 4. Subject to paragraph 2: (a) Article 1202 (Cross-Border Trade in Services - National Treatment) and Article 1405 (Financial Services - National Treatment) shall apply to taxation measures on income, capital gains or on the taxable capital of corporations, and to those taxes listed in paragraph 1 of Annex 2103.4, that relate to the purchase or consumption of particular services, and (b) Articles 1102 and 1103 (Investment - National Treatment and Most-Favored Nation Treatment), Articles 1202 and 1203 (Cross-Border Trade in Services - National Treatment and Most-Favored Nation Treatment) and Articles 1405 and 1406 (Financial Services - National Treatment and Most-Favored Nation Treatment) shall apply to all taxation measures, other than those on income, capital gains or on the taxable capital of corporations, taxes on estates, inheritances, gifts and generation-skipping transfers and those taxes listed in paragraph 1 of Annex 2103.4, except that nothing in those Articles shall apply . . . ."

[143]  Article 1501 provides: "1. Each Party shall adopt or maintain measures to proscribe anticompetitive business conduct and take appropriate action with respect thereto, recognizing that such measures will enhance the fulfillment of the objectives of this Agreement. To this end the Parties shall consult from time to time about the effectiveness of measures undertaken by each Party. 2. Each Party recognizes the importance of cooperation and coordination among their authorities to further effective competition law enforcement in the free trade area. The Parties shall cooperate on issues of competition law enforcement policy, including mutual legal assistance, notification, consultation and exchange of information relating to the enforcement of competition laws and policies in the free trade area. 3. No Party may have recourse to dispute settlement under this Agreement for any matter arising under this Article."

[144]  Article 1138 provides: "1. Without prejudice to the applicability or non-applicability of the dispute settlement provisions of this Section or of Chapter Twenty (Institutional Arrangements and Dispute Settlement Procedures) to other actions taken by a Party pursuant to Article 2102 (National Security), a decision by a Party to prohibit or restrict the acquisition of an investment in its territory by an investor of another Party, or its investment, pursuant to that Article shall not be subject to such provisions. 2. The dispute settlement provisions of this Section and of Chapter Twenty shall not apply to the matters referred to in Annex 1138.2."

from being obliged to change its municipal antidumping and countervailing duty laws.

136.     In the Rejoinder,[145] Claimants assert that the United States misinterprets Articles 1607 and 2103 and misstates the function of Article 1901(3) because: Articles 1607 and 2103 use the terms "measures" not "law;" the structure of the Articles is different; and there are differences in terminology between Articles 1607 and 2103 and Article 1901(3).  Claimants further assert that: the United States never defines the obligations that it says Claimants seek to impose; the United States misstates Claimants' submission concerning "with respect to;" the NAFTA distinguishes between the law and the application of the law; the context of Article 1901(3) does not support the United States' submission; all NAFTA objectives are relevant; the United States relies on an erroneous reading of the *Bluefin Tuna* case; and the circumstances of the conclusion of the NAFTA do not support the United States' submission.

137.     Canfor and Terminal seek the following relief:

> [T]hat the objection to jurisdiction raised by the United States in its Objection of October 16, 2003 be dismissed in its entirety, and that the Tribunal order the United States to pay all of the Investor's costs incurred in respect of answering this preliminary question.[146]

---

[145]     Canfor Rejoinder on Jurisdiction (24 September 2004), hereinafter "Canfor Rejoinder."

[146]     Canfor Reply at ¶ 152; Rejoinder at ¶ 68. According to the Summary of 6 January 2006, Terminal adopted the memorials of 14 May 2004 and 24 September 2004 submitted on behalf of Canfor.

## VI.    CONSIDERATIONS OF THE TRIBUNAL

### A.    Introduction

138.    The question before this Tribunal is whether Article 1901(3) of the NAFTA bars it from considering Canfor's and Terminal's Chapter Eleven claims. Article 1901 ("Review and Dispute Settlement in Antidumping and Countervailing Duty Matters") of the NAFTA provides:

> 1.    Article 1904 applies only with respect to goods that the competent investigating authority of the importing Party, applying the importing Party's antidumping or countervailing duty law to the facts of a specific case, determines are goods of another Party.

> 2.    For purposes of Articles 1903 [Review of Statutory Amendments] and 1904 [Review of Final Antidumping and Countervailing Duty Determinations],[147] panels shall be established in accordance with the provisions of Annex 1901.2.[148]

> 3.    Except for Article 2203 (Entry into Force),[149] no provision of any other Chapter of this Agreement shall be construed as imposing obligations on a Party with respect to the Party's antidumping law or countervailing duty law.

139.    The provisions of Article 1901(3) of the NAFTA pose a number of questions, which require analysis in order to determine the objection of the United States.

140.    In the analysis below, the Tribunal has not only considered the positions of the parties as summarized in the preceding Chapter but also their numerous detailed

---

[147]    For a description of Article 1904, *see* Section IV.B *supra* (p. 17 *et seq.*).

[148]    Annex 1901.2 contains provisions concerning the establishment of binational panels.

[149]    Article 2203 provides: "This Agreement shall enter into force on January 1, 1994, on an exchange of written notifications certifying the completion but necessary legal procedures."

arguments in support of those positions as well as the arguments made at the hearing, in their Post-Hearing Memorials and Replies, and in their Responses to the Additional Questions of the Tribunal Regarding the Byrd Amendment and their Replies thereto.  To the extent that these arguments are not referred to expressly, they must be deemed to be subsumed in the analysis.

B.      Canfor and Terminal's Claims

141.    At the outset, it must be determined to what Canfor's and Terminal's claims actually relate.

142.    As mentioned, Canfor and Terminal allege that the United States has imposed certain countervailing duty and antidumping measures on Canadian imports of softwood lumber to the United States, in breach of the NAFTA Articles 1102 (National Treatment), 1103 (Most-Favored-Nation Treatment), 1105 (Minimum Standard of Treatment), and 1110 (Expropriation).  The allegations in support of Canfor's and Terminal's claims are summarized in Section IV.G above (page 47 *et seq.*).

143.    On the basis of the responses to a series of questions by the Tribunal to the parties concerning Canfor's and Terminal's claims,[150] their claims appear to be delineated for the present Preliminary Question as follows.

144.    *First*, Canfor's and Terminal's claims concern the conduct of Commerce, the ITC and other government entities and officials, and not the substance or enactment of

---

[150]    Tribunal Questions Nos. 1-5, *see* ¶ 16 (p. 10) *supra.*

antidumping or countervailing duty law.[151]  That is acknowledged by the United States (without admitting its substance).[152]

145.    *Second*, according to Canfor and Terminal,[153] each of (a) the preliminary determinations, (b) the final determinations, (c) the interpretation and application by investigating authorities, and (d) the process leading to the determinations, constitute conduct which is the subject of the claims.  Equally, the failure to implement all of those determinations, the flouting of them, the political interference that colours them, the bias of the decision makers making them, the results-driven nature of them, and the rendering of any remedy ineffective are all aspects of State conduct that are the subject of these claims.

146.    While disputing its substance,[154] the United States understands that the process leading to the determinations is challenged by Canfor and Terminal to the extent that their allegations are based on Commerce's and the ITC's interpretation and application of U.S. trade remedy law.  Canfor and Terminal respond that the United States too narrowly characterizes the claims, which concern more than simply the interpretation or application of United States' law, but rather the treatment received by them at the hands of United States' officials.

147.    As Canfor and Terminal have the right to formulate their claims, the Tribunal takes note of their position and deems the restrictive interpretation made by the United States not controlling for purposes of deciding the Preliminary Question.

---

[151]    C-PHM at ¶ 1; C-R-PHM at ¶ 1.

[152]    R-PHM at 1.

[153]    C-PHM at ¶ 2.

[154]    R-PHM at ¶ 2.

148.    The United States further contends that in order for "conduct" to be the subject of a Chapter Eleven claim, that conduct must amount to a measure within the meaning of NAFTA Article 201, which defines "measure" as: "includes any law, regulation, procedure, requirement or practice," and that Claimants have not specified what particular conduct they challenge and have not explained how that conduct constitutes a "measure" that may be challenged under Chapter Eleven.[155] Claimants respond that the issue before the Tribunal does not concern what is or is not a measure, but that the broad and non-exhaustive definition of a "measure" in NAFTA Article 201 encompasses all conduct for which the United States has State responsibility under international law, including the actions leading up to, including and following the determinations and the requirement that deposits be posted on imported softwood lumber.[156]

149.    The Tribunal agrees with Claimants that the issue before it does not concern what or what is not a "measure." To the extent that the definition is relevant to the issue before it, the Tribunal finds, without prejudice to the merits (if any), that the definition of "measure" in Article 201 of the NAFTA is broad. The Tribunal further finds that, for the purposes of the present Preliminary Question, Claimants have sufficiently particularized and explained which conduct is to be considered to fall under measures that are within the scope and coverage of Chapter Eleven.[157]

150.    Canfor and Terminal also explain the use of the terms "conduct" and "treatment":[158] "Conduct" is what officials do; "treatment" is the manner in which the officials direct conduct to a specific investor or claimant. Relevant conduct includes the actions of the United States, its agents or officials, in misapplying its

---

[155]    R-PHM pp. 2-3.

[156]    C-R-PHM at ¶ 2.

[157]    *See* ¶¶ 257-258 *infra.*

[158]    C-PHM at ¶ 3(c).

law, in abusing its discretion, in using its processes to harm Canfor and Terminal, in having biased decision makers, and in not abiding by the outcome of the review of its processes. For the purposes of the Preliminary Question before it, the Tribunal takes note of that explanation.

151.    In this connection, Canfor and Terminal identify five examples of allegedly politically motivated abuses of process for which, individually or collectively, the United States is responsible.[159] The United States responds that Claimants identify only a single action that is arguably within the four corners of their pleadings (i.e., Commerce's preliminary critical circumstances determination of 17 August 2001[160]), but that the remaining examples of alleged abuse by the United States fall outside of their Notices of Arbitration since they concern events that post-date the Notices of Arbitration and are substantially different from the claims in the pleadings. In any event, according to the United States, the examples given by Claimants do not evidence "abuse of process" by the United States.[161] In the Tribunal's view, the United States' responses are irrelevant for the Preliminary Question that is presently before it. The issue whether events that post-date a Notice of Arbitration can be taken into account for deciding on claims under Chapter Eleven is to be determined in a next phase of the arbitration (if any). Without deciding this issue at present, the Tribunal notes that various tribunals have held that such events can be taken into account in the same proceedings.[162] Moreover, the United States recognizes that at least one of the examples is within the Claimants' (initial) pleadings.

---

[159]    C-PHM at ¶ 4.

[160]    *See* n. 55 *supra.*

[161]    R-R-PHM pp. 7-10.

[162]    *See, e.g.*, *Ethyl Corporation v. Canada*, Award on Jurisdiction, 24 June 1998, NAFTA (UNCITRAL), at ¶¶ 93-95, available at: http://ita.law.uvic.ca/documents/Ethyl-Award.pdf.

152.  *Third*, Canfor and Terminal's claims do not subject conduct to scrutiny under municipal law (i.e., United States law) but to scrutiny under international law, in particular the obligations undertaken by the United States in Chapter Eleven of the NAFTA.[163]

153.  *Fourth*, the antidumping and countervailing duty determinations by the United States authorities are not reviewable under Chapter Eleven, but rather by Article 1904 binational panels under Chapter Nineteen applying the municipal law governing the agency that has made the determination (i.e., United States antidumping and countervailing duty law).  According to Canfor and Terminal, for the determinations to be reviewable under Chapter Eleven, there has to be misconduct involved in the errors in question, "not just honest errors by conscientious officials doing their jobs as usual."[164]

154.  Both the third and the fourth point are acknowledged by the United States (without admitting their substance), which contends, however, that Claimants do not explain how an antidumping and countervailing duty claim reviewable under Chapter Nineteen becomes reviewable under Chapter Eleven as well, simply by virtue of allegations that Commerce and the ITC did not merely err, but engaged in abuse.[165]  The Tribunal takes note of the rival positions of the parties but need not decide thereon within the confines of the Preliminary Question because those issues are related to the merits phase (if any).

155.  *Fifth*, Canfor and Terminal do not complain about the conduct of the Article 1904 binational panels, but rather, to the extent relevant, about the conduct of the United States' officials before, or in response to, the decisions of the Article 1904

---

[163]    C-PHM at ¶ 3(a).

[164]    C-PHM at ¶ 3(a)-(b).

[165]    R-R-PHM pp. 3-4 and 7.

Panels.[166]   Again, this position is noted by the Tribunal in connection with its consideration of the present Preliminary Question.

156.   *Sixth*, according to Canfor and Terminal, if the various determinations and decisions made by Commerce and the ITC are to be considered to be part of antidumping and countervailing duty law, the arguments of Canfor and Terminal alleging violations of Chapter Eleven due to abuse of process still stand, because the United States cannot escape liability from internationally wrongful aberrant conduct merely by labeling the determinations that result from that conduct as "law."  The Tribunal is of the view that Canfor and Terminal are, in turn, labeling their claims.  The question in the present phase of the arbitration is whether the claims of Canfor and Terminal are barred by Article 1901(3).   Canfor and Terminal cannot escape the dictates of Article 1901(3), as interpreted, by presenting claims in a fashion that circumvents those dictates.

C.       Approach to the Preliminary Question

157.   The Tribunal will first summarize the parties' positions with respect to the approach to the Preliminary Question.

158.   In their Reply,[167] Canfor and Terminal submit that they have *prima facie* established the jurisdiction of the Tribunal as consent has been demonstrated. They assert that for the purposes of the United States' motion, the Tribunal must accept their version of the facts as true and assume that Canfor and Terminal have been subject to arbitrary, discriminatory and otherwise abusive treatment that falls under Articles 1102, 1103, 1105 and 1110.  Canfor and Terminal contend that, given that their facts must be assumed to be true, the sole question before the

---

[166]     C-PHM at ¶ 3(b).

[167]     Canfor Reply ¶¶ 24-36.

Tribunal is whether a claim in respect of otherwise objectionable treatment (i.e., conduct that, but for the United States' interpretation of Article 1901(3) of the NAFTA, would allegedly give rise to a successful Chapter Eleven claim) is precluded by virtue of Article 1901(3). Canfor and Terminal further assert that the United States is required to demonstrate that Article 1901(3) is a jurisdictional provision and that each individual claim is beyond the Tribunal's jurisdiction.

159.    In its Reply, the United States asserts that it is the Tribunal's role to decide whether Canfor's and Terminal's claims seek to impose obligations "with respect to [U.S.] antidumping law or countervailing duty law" and are, therefore, outside its jurisdiction.[168]

160.    At the hearing, Canfor and Terminal suggested that the Tribunal defer to the merits phase the question whether some aspects of their claims fall under Article 1901(3).[169]

161.    In their Post-Hearing Memorial,[170] Canfor and Terminal contend that Article 1901(3) is fundamentally not a jurisdictional provision since the United States' motion is not an objection to jurisdiction *ratione materiae*, *ratione temporis* or *ratione personae*. According to Canfor and Terminal, therefore, the legal standards for determining jurisdiction that have been addressed in such arbitrations as *Methanex*,[171] *UPS*[172] and the *Oil Platforms Case*[173] are not directly applicable to

---

[168]    United States Reply p. 7.

[169]    January 2006 Hearing Tr. Vol. 2 at 78:19-79:3.

[170]    C-PHM at ¶ 6-10.

[171]    *Methanex Corporation v. United States of America*, Preliminary Award on Jurisdiction and Admissibility, 7 August 2002, NAFTA (UNCITRAL), available at:  http://ita.law.uvic.ca/documents/Methanex-1stPartial.pdf.

[172]    *United Parcel Service Inc. v. Canada*, Award on Jurisdiction, 22 November 2002, NAFTA (UNCITRAL), available at: http://ita.law.uvic.ca/documents/UPS-Jurisdiction.pdf.

the task before the Tribunal.  If it were a jurisdictional objection, the proper approach, they contend, is as set out in Canfor and Terminal's Reply (summarized in paragraph 157 above).  Canfor and Terminal propose that the proper question for the Tribunal is described in their Reply at paragraph 11 as follows:

> Where a claimant alleges that the United States has violated the international law obligations assumed under NAFTA Articles 1102, 1103, 1105 and 1110, does NAFTA Article 1901(3) provide a complete defence to the claimant's otherwise properly brought claim by virtue of only the fact that the claim has some connection to the municipal antidumping or countervailing duty laws of the United States or their application to the claimant?

162.   In its Post-Hearing Memorial,[174] the United States proposes that in establishing whether the necessary consensual basis for its jurisdiction is present, the Tribunal's task is to make a definitive interpretation of the relevant jurisdictional provisions and then to consider whether the claims, as credibly alleged, fall within the Tribunal's jurisdiction.  The United States opposes Claimants' suggestion to defer interpreting Article 1901(3) to the merits.  The United States deems the test enunciated by Judge Koroma in his separate opinion in the *Fisheries Jurisdiction Case* particularly relevant:

> [T]he question whether the Court is entitled to exercise its jurisdiction must depend on the subject-matter and not on the applicable law, or the rules purported to have been violated.  In other words, once it is established that the dispute relates to the subject-matter defined or excluded in the reservation, then the dispute is precluded from the jurisdiction of the Court, whatever the scope of the rules which have been purportedly violated.[175]

---

[173]   *Case Concerning Oil Platforms (Islamic Republic of Iran v. United States of America)*, Judgment on Preliminary Objection, 12 December 1996, 1996 I.C.J. Reports (II), 803 at 810.

[174]   R-PHM at ¶¶ 6-10.

[175]   ICJ, Judgment, 4 December 1998, *Spain v. Canada*, 1998 I.C.J. Reports 432, 487 at ¶ 4.

163.    The United States agrees with the general tests in *UPS* and the *Oil Platforms* cases, but believes that the above test of Judge Koroma is particularly relevant for the present case.  According to the United States, if the Tribunal determines that Claimants' claims impose any obligation on the United States with respect to antidumping and countervailing duty laws, it must dismiss the claims for lack of jurisdiction.  The United States argues that as its objection is based on an exclusionary provision, this Tribunal must reach a definitive conclusion as to the scope and effect of that provision, and determine whether Claimants' claims are precluded thereby.

164.    In their Reply Post-Hearing Memorial,[176] Claimants repeat their submission that Article 1901(3) is not a jurisdictional provision in the sense as to whether the test as proffered by the United States might be applicable.  Claimants also state that, even if the provision were a "jurisdictional provision," their submission in respect of deferral to the merits is with respect to any matters upon which the Tribunal may need to make factual findings.  Claimants further argue that the provision interpreted by the International Court of Justice in the *Fisheries Jurisdiction Case* is not analogous to the matter before this Tribunal, as the International Court of Justice case concerned a specific reservation with respect to "disputes arising out of or concerning conservation and management measures," while Article 1901(3) does not contain language analogous to that reservation.

165.    In its Reply Post-Hearing Memorial,[177] the United States opposes again the deferral of the question to until the merits as suggested by the Claimants.  The United States also takes issue with Claimants in that, according to the United States, the *UPS* tribunal confirmed that the claimants there had no right to submit a

---

[176]    C-R-PHM at ¶ 6.

[177]    R-R-PHM pp. 10-11.

claim under Chapter Eleven with respect to a taxation matter by virtue of the jurisdictional exclusion in Article 2103.[178]

166.    Having summarized the parties' positions with respect to the approach to the Preliminary Question, the Tribunal will now make the analysis with respect to that approach.

167.    At the outset, assuming without deciding that the Preliminary Question is a jurisdictional question, the Tribunal recalls the approach to such questions in the *Oil Platforms*, *Methanex*, and *UPS* cases:

168.    In the *Oil Platforms Case*,[179] the International Court of Justice observed in relevant part:

> 15.    The Court points out, to begin with, that the Parties do not contest that the Treaty of 1955 was in force at the date of the filing of the Application of Iran and is moreover still in force. The Court recalls that it had decided in 1980 that the Treaty of 1955 was applicable at that time (*United States Diplomatic and Consular Staff in Tehran, Judgment*, *I.C.J. Reports 1980*, p. 28, para. 54); none of the circumstances brought to its knowledge in the present case would cause it now to depart from that view.
>
> By the terms of Article XXI, paragraph 2, of that Treaty:

---

[178]    Article 2103 provides in relevant parts: "1.  Except as set out in this Article, nothing in this Agreement shall apply to taxation measures." . . . .  "6. Article 1110 (Expropriation and Compensation) shall apply to taxation measures except that no investor may invoke that Article as the basis for a claim under Article 1116 (Claim by an Investor of a Party on its Own Behalf) or 1117 (Claim by an Investor of a Party on Behalf of an Enterprise), where it has been determined pursuant to this paragraph that the measure is not an expropriation. The investor shall refer the issue of whether the measure is not an expropriation for a determination to the appropriate competent authorities set out in Annex 2103.6 at the time that it gives notice under Article 1119 (Notice of Intent to Submit a Claim to Arbitration). If the competent authorities do not agree to consider the issue or, having agreed to consider it, fail to agree that the measure is not an expropriation within a period of six months of such referral, the investor may submit its claim to arbitration under Article 1120 (Submission of a Claim to Arbitration)."  *See* ¶¶ 253-260 *infra*.

[179]    *See* n. 173 *supra*.

"Any dispute between the High Contracting Parties as to the interpretation or application of the present Treaty, not satisfactorily adjusted by diplomacy, shall be submitted to the International Court of Justice, unless the High Contracting Parties agree to settlement by some other pacific means."

16. It is not contested that several of the conditions laid down by this text have been met in the present case: a dispute has arisen between Iran and the United States; it has not been possible to adjust that dispute by diplomacy and the two States have not agreed "to settlement by some other pacific means" as contemplated by Article XXI. On the other hand, the Parties differ on the question whether the dispute between the two States with respect to the lawfulness of the actions carried out by the United States against the Iranian oil platforms is a dispute "as to the interpretation or application" of the Treaty of 1955. In order to answer that question, the Court cannot limit itself to noting that one of the Parties maintains that such a dispute exists, and the other denies it. It must ascertain whether the violations of the Treaty of 1955 pleaded by Iran do or do not fall within the provisions of the Treaty and whether, as a consequence, the dispute is one which the Court has jurisdiction *ratione materiae* to entertain, pursuant to Article XXI, paragraph 2.[180]

169.    In *Methanex*,[181] the tribunal observed in relevant part:

119. The decision in the *Oil Platforms* case was reached in the context of an inter-state dispute subject to settlement pursuant to the Statute and Rules of Procedure of the International Court of Justice. The question whether the parties had there consented to

---

[180]    Judge Higgins observes in her separate opinion at ¶ 32: "The only way in which, in the present case, it can be determined whether the claims of Iran are sufficiently plausibly based upon the 1955 Treaty is to accept *pro tem* the facts as alleged by Iran to be true and in that light to interpret Articles I, IV and X for jurisdictional purposes, that is to say, to see if on the basis of Iran's claims of fact there could occur a violation of one or more of them." At ¶ 33 she explains the use of the word "could": "Only at the merits, after deployment of evidence, and possible defences, may 'could' be converted to 'would'. The Court should thus see if, on the facts as alleged by Iran, the US actions complained of might violate the Treaty articles."

[181]    *See* n. 171 *supra*.

the Court's jurisdiction could not be answered by accepting that the claimant's interpretation of the treaty's provisions was merely "arguable". It could only be answered in the affirmative if the claimant could show (i) that the legality of the parties' actions fell within the treaty (containing a clause conferring compulsory jurisdiction on the Court) and (ii) that the requirements of that clause were definitively met. As quoted above, the Court expressly rejected Iran's argument that there was inevitably a dispute within the jurisdiction clause once Iran contended that the treaty applied or that its provisions had certain meanings and the USA contended the opposite. Under the treaty, the answer to issue (i) required the interpretation of the substantive provisions of the treaty invoked by the claimant to determine if the alleged facts could amount to a breach of the treaty before the treaty (with its jurisdiction clause) could apply at all.

120. This Tribunal is faced with the same issue of whether the necessary consensual base for its jurisdiction is present. However, as appears from the scheme of NAFTA Chapter 11 outlined above, the jurisdictional requirements of Chapter 11 are (of course) different from the requirements of the 1955 Treaty. In order to establish the necessary consent to arbitration, it is sufficient to show (i) that Chapter 11 applies in the first place, i.e. that the requirements of Article 1101 are met, and (ii) that a claim has been brought by a claimant investor in accordance with Article 1116 or 1117 (and that all pre-conditions and formalities under Article 1118-1121 are satisfied). Where these requirements are met by a claimant, Article 1122 is satisfied; and the NAFTA Party's consent to arbitration is established.

121. Accordingly, there is no necessity at the jurisdictional stage for a definitive interpretation of the substantive provisions relied upon by a claimant: the jurisdiction of the arbitration tribunal is established without the need for such interpretation. Indeed a final award on the merits where a NAFTA tribunal determines that the claimant has failed to prove its case within these substantive provisions cannot signify that the tribunal lacked jurisdiction to make that award. On the other hand, in order to establish its jurisdiction, a tribunal must be satisfied that Chapter 11 does indeed apply and that a claim has been brought within its procedural provisions. This means that it must interpret, definitively, Article 1101(1) and decide whether, on the facts

alleged by the claimant, Chapter 11 applies. Similarly, insofar as the point is in issue, the tribunal must establish that the requirements of Articles 1116-1121 have been met by a claimant, which will similarly require a definitive interpretation of those provisions (as we have decided, in Chapter H above, in regard to Article 1116).

170.     In *UPS*, [182] the tribunal observed in relevant part:

> 33. In the course of their written argument the parties formulated the test the Tribunal is to apply in determining jurisdictional disputes in various ways. They made extensive references to decisions of the International Court of Justice and of NAFTA tribunals, as well as of other tribunals. The differences between their positions appeared to narrow through that written process and, at the oral hearing, counsel for UPS accepted the test stated by Canada in its Reply Memorial:
>
> > [The Tribunal] must conduct a *prima facie* analysis of the NAFTA obligations, which UPS seeks to invoke, and determine whether the facts alleged are *capable of constituting a violation* of these obligations. (original emphasis)
>
> 34. That formulation rightly makes plain that a claimant party's mere assertion that a dispute is within the Tribunal's jurisdiction is not conclusive. It is the Tribunal that must decide. The formulation also importantly recognizes that the Tribunal must address itself to the particular jurisdictional provisions invoked. There is a contrast, for instance, between a relatively general grant of jurisdiction over "investment disputes" and the more particularized grant in article 1116 which is to be read with the provisions to which it refers and which are invoked by UPS. Those provisions impose "obligations", as the test proposed by Canada and accepted by UPS indicates.
>
> 35. (. . . . [quoting the *Oil Platforms* case])

---

[182]     *See* n. 172 *supra.*

36. The reference to the facts alleged being "capable" of constituting a violation of the invoked obligations, as opposed to "falling within" the provisions, may be of little or no consequence. The test is of course provisional in the sense that the facts alleged have still to be established at the merits stage. But any ruling about the legal meaning of the jurisdictional provision, for instance about its outer limits, is binding on the parties.

37. Accordingly, the Tribunal's task is to discover the meaning and particularly the scope of the provisions which UPS invokes as conferring jurisdiction. Do the facts alleged by UPS fall within those provisions; are the facts capable, once proved, of constituting breaches of the obligations they state? It may be that those formulations would differ in their effect in some circumstances but in the present case that appears not to be so.

171. The above decisions make clear four points that a Chapter Eleven tribunal needs to address if and to the extent that a respondent State Party raises an objection to jurisdiction under the NAFTA:

– First, a mere assertion by a claimant that a tribunal has jurisdiction does not in and of itself establish jurisdiction. It is the tribunal that must decide whether the requirements for jurisdiction are met.

– Second, in making that determination, the tribunal is required to interpret and apply the jurisdictional provisions, including procedural provisions of the NAFTA relating thereto, i.e., whether the requirements of Article 1101 are met; whether a claim has been brought by a claimant investor in accordance with Article 1116 or 1117; and whether all pre-conditions and formalities under Articles 1118-1121 are satisfied.

– Third, the facts as alleged by a claimant must be accepted as true *pro tempore* for purposes of determining jurisdiction.

–       Fourth, the tribunal must determine whether the facts as alleged by the claimant, if eventually proven, are *prima facie* capable of constituting a violation of the relevant substantive obligations of the respondent State Party under the NAFTA.

172.    It is also clear that, in determining jurisdiction by applying the above test, a NAFTA tribunal is not in any way prejudging the merits of the case.

173.    It should be added that it is not required that these jurisdictional issues must be addressed by a tribunal in a separate, preliminary phase prior to consideration of the merits.  A tribunal is entitled to join them, or one or more of them, to the merits.[183] In accordance with this principle, the Tribunal has joined to the merits a number of the United States' objections and related issues (*see* Procedural Order No. 1, quoted at paragraph 10 above).

174.    Considering the above scheme, the question arises how the United States' invocation of Article 1901(3) of the NAFTA fits within it, if at all.  Claimants believe that Article 1901(3) is an interpretative provision that does not concern jurisdiction, for which reason they are of the opinion that the test set forth in *Oil Platforms*, *UPS* and *Methanex* need not be applied.  In contrast, the United States is of the view that it is a jurisdictional provision, but proposes a test different from the one in *Oil Platforms*, *UPS* and *Methanex* (i.e., the test enunciated in the separate opinion of Judge Koroma in the *Fisheries Jurisdiction Case*).

175.    The rival positions of the parties on this issue appear to stem from their differing positions as to how Article 1901(3) is to be interpreted.  That is the very object of the Preliminary Question.  The Tribunal, therefore, will first interpret Article

---

[183]    *See*, *e.g.*, UNCITRAL Arbitration Rules, Article 21(4):  "In general, the arbitral tribunal should rule on a plea concerning its jurisdiction as a preliminary question. However, the arbitral tribunal may proceed with the arbitration and rule on such a plea in their final award."

1901(3), and, depending on the outcome of that interpretation, examine whether the objection raised by the United States, which is presented as a jurisdictional objection, passes the test summarized in paragraph 171 above. In any event, since the Preliminary Question has been fully pleaded by the parties, the Tribunal declines to grant Claimants' request to defer to the merits whether some aspects of their claims fall under Article 1901(3) to the extent that those aspects are covered by the Preliminary Question.

176.  Finally, with respect to the burden of proof, a claimant must satisfy the Tribunal that the requirements of Article 1101 are fulfilled, that a claim has been brought by a claimant investor in accordance with Article 1116 or 1117, and that all pre-conditions and formalities under Articles 1118-1121 are fulfilled (*see* second point at paragraph 171 above). However, where a respondent State invokes a provision in the NAFTA which, according to the respondent, bars the tribunal from deciding on the merits of the claims, the respondent has the burden of proof that the provision has the effect which it alleges.[184] That means in the present case that the United States has the burden of proof that Article 1901(3) bars the submission of claims with respect to antidumping and countervailing duty law to arbitration under Chapter Eleven of the NAFTA.

D.    Treaty Interpretation

177.  As required by Article 1131(1) of the NAFTA, the Tribunal shall apply "this Agreement [the NAFTA] and the applicable rules of international law." Accordingly, the Tribunal will also apply the rules of interpretation of treaties as

---

[184]    *See, e.g., Canada - Import Restrictions on Ice Cream and Yoghurt*, Report of the Panel adopted at the Forty-Fifth Session of the Contracting Parties on 5 December 1989 (L/6568 - 36S/68), 27 September 1989, at ¶ 59: "The Panel recalled that it had previously been concluded that a contracting party invoking an exception to the General Agreement bore the burden of proving that it had met all of the conditions of that exception."

set forth in Articles 31 and 32 of the Vienna Convention on the Law of Treaties of 1969.[185]   While the 1969 Vienna Convention is not in force among the three NAFTA State Parties (the United States has never ratified it), Articles 31 and 32 are regarded as reflective of established customary international law.[186]   The rules of customary international law apply as between States and claimants in the present case on the basis of the provisions of Article 1131(1) of the NAFTA.

---

[185]   "Article 31 – General rule of interpretation

1.     A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

2.     The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

(a)     any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty;

(b)     any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

3.     There shall be taken into account, together with the context:

(a)     any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

(b)     any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

(c)     any relevant rules of international law applicable in the relations between the parties.

4.     A special meaning shall be given to a term if it is established that the parties so intended.

Article 32 – Supplementary means of interpretation

Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:

(a)     leaves the meaning ambiguous or obscure; or

(b)     leads to a result which is manifestly absurd or unreasonable."

[186]   *See, e.g.,* ICJ, Judgment, 13 December 1999, *Kasikili/Sedudu Island (Botswana v. Namibia)*, 1999 I.C.J. Reports (II) 1045,¶ 18 at 1059.

178.    Accordingly, the Tribunal shall interpret the provisions of the NAFTA, and in particular Article 1901(3), in accordance with their ordinary meaning.  The Tribunal cannot do so in the abstract, but must give the provisions their meaning in their context and in the light of their object and purpose.

179.    The objectives of the NAFTA may cast light on a specific interpretive issue but cannot override and supersede a particular provision.[187]  The Tribunal finds the following passage in the award in *ADF Group Inc. v. United States of America* persuasive:

> NAFTA's objectives, together with the statements set out in the Preamble of NAFTA, are necessarily cast in terms of a high level of generality and abstraction.  In contrast, interpretive issues commonly arise in respect of detailed provisions embedded in the extraordinarily complex architecture of the treaty.  We understand the rules of interpretation found in customary international law to enjoin us to focus first on the actual language of the provision being construed. The object and purpose of the parties to a treaty in agreeing upon any particular paragraph of that treaty are to be found, in the first instance, in the words in fact used by the parties in that paragraph [footnote omitted].  This is the line with Article 102(1) which states *NAFTA's objectives are "elaborated more specifically through* its principles and *rules*" such as "national treatment, most-favored-nation treatment and transparency."   The provision under examination must of course be scrutinized in context; but that context is constituted chiefly by the other relevant provisions of NAFTA.   We do not suggest that the general objectives of NAFTA are not useful or relevant.  Far from it.  Those general objectives may be conceived of as partaking of the nature of *lex generalis* while a particular detailed provision set in a particular context in the rest of a Chapter or Part of NAFTA functions as *lex specialis*.  The former may frequently cast light on a specific

---

[187]    *See also Tariffs Applied by Canada to Certain U.S.-Origin Agricultural Products*, CDA-95-2008-01, 2 December 1996, at ¶ 122: "Any interpretation adopted by the Panel must, therefore, promote rather than inhibit the NAFTA's objectives," available at: http://www.nafta-sec-alena.org/app/DocRepository/1/Dispute/english/NAFTA_Chapter_20/Canada/cb95010e.pdf.

interpretive issue; but it is not to be regarded as overriding and superseding the latter.[188]  (italics as in original text)

180.    The parties do not disagree on the aforementioned principles, but rather which of the objectives are the relevant ones.[189]   The Tribunal will address that issue later.[190]

181.    Article 102(2) of the NAFTA directs State Parties to the NAFTA to "interpret and apply the provisions of this Agreement in the light of its objectives set out in paragraph 1 and in accordance with applicable rules of international law."  The United States contends that Article 102(2) does not apply to an arbitral tribunal constituted under Chapter Eleven as it is addressed to State Parties.[191]   That contention does not seem relevant in light of Article 1131(1) which requires a Chapter Eleven tribunal to "decide the issues in dispute in accordance with *this Agreement* and applicable rules of international law." (emphasis added)

182.    The parties have debated at some length about the relevance of good faith in the present case.[192]   Good faith is a basic principle for interpretation of a treaty.  It is stated in so many words in Article 31(1) of the Vienna Convention ("A treaty shall be interpreted in good faith . . .").   Good faith is also a basic principle in the performance of a treaty by States.  Article 26 of the Vienna Convention provides: "Every treaty in force is binding on the parties to it and must be performed by them in good faith."  In the words of the ICJ: "The principle of good faith is, as the Court has observed, one of the basic principles governing the creation and

---

[188]    Award, 9 January 2003, ICSID Case No. ARB(AF)/00/1, at ¶ 147, available at: http://www.investmentclaims.com/decisions/ADF-US-Award-9Jan2003.pdf.

[189]    United States Reply pp. 22-23; Canfor Rejoinder p. 24; C-PHM at ¶ 16.

[190]    *See* ¶¶ 232-243 *infra*.

[191]    R-PHM at ¶ 11.

[192]    Canfor Reply at ¶¶ 49-51; United States Reply at n. 93; C-PHM at ¶ 13; R-PHM at ¶ 13.

performance of legal obligations . . . it is not in itself a source of obligation where none would otherwise exist."[193]

183.　With respect to the interpretation of the NAFTA, it can be interpreted as a series of special agreements, each one made in a separate negotiation by a separate negotiating committee.  But this would fail to capture a significant part of the reality of the NAFTA, since general principles are to be found in the NAFTA. These include: (1) the elimination of customs duties; (2) no new tariffs; (3) no quotas; (4) compatibility of NAFTA with GATT/WTO law; and (5) the priority of NAFTA over the GATT/WTO in case of direct conflict, to name but five. However, the existence of general principles does not exclude the existence of significant and sometimes highly specific exceptions. These exceptions are found throughout the text; in definitional sections in each Chapter; in Annexes to Chapters or articles which entail exceptions, and most important of all, in the five Schedules containing grandfathered laws or programmes, which take up as many pages as the text of the 22 Chapters of NAFTA.

184.　Another important general principle for the interpretation of the NAFTA is the requirement of the availability of compulsory dispute settlement for all parts of the text.  There is a default procedure in Chapter Twenty (State-to-State arbitration),[194] which in principle covers disputes under any Chapter of NAFTA (except Chapter Nineteen).  But there are other procedures in the form of a number of special dispute settlement procedures such as Chapters Eleven, Fourteen and Nineteen. Reference can also made to the 1989 Canada-United States Free Trade Agreement and the GATT/WTO dispute settlement procedures, as well as to arbitration and

---

[193]　ICJ, Judgment, 20 December 1988, *Border and Transborder Armed Actions (Nicaragua* v. *Honduras)*, 1988 I.C.J. Reports 69, 105 at ¶ 94.

[194]　*See* Article 2004 ("Recourse to Dispute Settlement Procedures") quoted at n. 234 *infra.*

domestic law procedures.[195]  There also are exceptions in the form of exclusions from dispute settlement mechanisms on a very restricted number of issues (such as competition law, temporary entry of an individual service provider, taxation, etc.). Finally, there are restrictions upon the application of certain dispute settlement procedures to other parts of NAFTA.[196]

185.    Finally, two rules of interpretation may be relevant for the Preliminary Question.

186.    The first concerns the jurisdiction of a Chapter Eleven arbitral tribunal.  The present Tribunal endorses the view expressed by the tribunal in *Fireman's Fund Insurance Company v. Mexico* that: ". . . the Tribunal does not believe that under contemporary international law a foreign investor is entitled to the benefit of the doubt with respect to the existence and scope of an arbitration agreement."[197]

187.    The second concerns the manner in which exceptions in international instruments are to be interpreted.  The present Tribunal subscribes to the view expressed by the GATT Panel in *Canada - Import Restrictions on Ice Cream and Yoghurt*: "The Panel . . . . noted, as had previous panels, that exceptions were to be interpreted narrowly and considered that this argued against flexible interpretation of Article XI:2(c)(i)."[198]

---

[195]    *See* Annex 702.1 ("Incorporation of Trade Provisions"); Article 2005 ("GATT Dispute Settlement");  Section C ("Domestic and Private Commercial Dispute Settlement") of Chapter Twenty (Articles 2020 through 2022).

[196]    *See* overview at ¶ 249 *infra.*

[197]    Decision on the Preliminary Question, 17 July 2003, ICSID Case No. ARB(AF)/02/01, at ¶ 64, available at: http://ita.law.uvic.ca/documents/FiremansAward.pdf.

[198]    *Canada - Import Restrictions on Ice Cream and Yoghurt*, Report of the Panel adopted at the Forty-fifth Session of the Contracting Parties on 5 December 1989 (L/6568 - 36S/68), 27 September 1989, at ¶ 59.  *See also Tariffs Applied by Canada to Certain U.S.-Origin Agricultural Products*, CDA-95-2008-01, 2 December 1996, at ¶ 122: "Exceptions to obligations to trade liberalization must perforce be viewed with caution."

E.      Article 1901(3) of the NAFTA

(a)   Interpretation

188.    At the outset, it may be recalled that  Chapter Nineteen concerns: "Review and Dispute Settlement in Antidumping and Countervailing Duty Matters," and that the genesis of this Chapter is that the State Parties to the NAFTA were unable to agree on uniform standards for their antidumping and countervailing duty laws and, as compromise, agreed to have final domestic antidumping and countervailing duty determinations reviewed by a binational panel mechanism (as was the case under the Canada – United States Free Trade Agreement of 1989).  It may also be recalled that the scheme of Chapter Nineteen is set up accordingly.  Article 1902[199]

---

[199]    Article 1902 ("Retention of Domestic Antidumping Law and Countervailing Duty Law") provides:

"1.     Each Party reserves the right to apply its antidumping law and countervailing duty law to goods imported from the territory of any other Party. Antidumping law and countervailing duty law include, as appropriate for each Party, relevant statutes, legislative history, regulations, administrative practice and judicial precedents.

2.      Each Party reserves the right to change or modify its antidumping law or countervailing duty law, provided that in the case of an amendment to a Party's antidumping or countervailing duty statute:

(a)      such amendment shall apply to goods from another Party only if the amending statute specifies that it applies to goods from that Party or from the Parties to this Agreement;

(b)      the amending Party notifies in writing the Parties to which the amendment applies of the amending statute as far in advance as possible of the date of enactment of such statute;

(c)      following notification, the amending Party, on request of any Party to which the amendment applies, consults with that Party prior to the enactment of the amending statute; and

(d)      such amendment, as applicable to that other Party, is not inconsistent with

(i) the *General Agreement on Tariffs and Trade* (GATT), the *Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade* (the Antidumping Code) or the *Agreement on the Interpretation and Application of Articles VI, XVI and XXIII of the General Agreement on Tariffs and Trade* (the

(footnote cont'd)

establishes the principles that a State Party has the right to retain its antidumping and countervailing duty law, has the right to change or modify that law, but that in the case of an amendment of an antidumping or countervailing duty statute it has to comply with certain conditions, including notification of such amendment to the other State Parties prior to enactment.  Article 1903 provides that a State Party may have recourse to a binational panel if it believes that another State Party's amendment of an antidumping or countervailing duty statute is non-compliant. [200]

---

Subsidies Code), or any successor agreement to which all the original signatories to this Agreement are party, or

(ii) the object and purpose of this Agreement and this Chapter, which is to establish fair and predictable conditions for the progressive liberalization of trade between the Parties to this Agreement while maintaining effective and fair disciplines on unfair trade practices, such object and purpose to be ascertained from the provisions of this Agreement, its preamble and objectives, and the practices of the Parties.."

[200]     Article 1903 ("Review of Statutory Amendments") provides:

"1.     A Party to which an amendment of another Party's antidumping or countervailing duty statute applies may request in writing that such amendment be referred to a binational panel for a declaratory opinion as to whether:

(a)     the amendment does not conform to the provisions of Article 1902(2)(d)(i) or (ii); or

(b)     such amendment has the function and effect of overturning a prior decision of a panel made pursuant to Article 1904 and does not conform to the provisions of Article 1902(2)(d)(i) or (ii).

Such declaratory opinion shall have force or effect only as provided in this Article.

2.     The panel shall conduct its review in accordance with the procedures of Annex 1903.2.

3.     In the event that the panel recommends modifications to the amending statute to remedy a non-conformity that it has identified in its opinion:

(a)     the two Parties shall immediately begin consultations and shall seek to achieve a mutually satisfactory solution to the matter within 90 days of the issuance of the panel's final declaratory opinion. Such solution may include seeking corrective legislation with respect to the statute of the amending Party;

(b)     if corrective legislation is not enacted within nine months from the end of the 90-day consultation period referred to in subparagraph (a) and no other mutually satisfactory solution has been reached, the Party that requested the panel may

(i)     take comparable legislative or equivalent executive action, or

(footnote cont'd)

Article 1904 provides for a review by a binational panel of final antidumping and countervailing duty determinations by national investigating authorities.[201]  The possible impact of this domestic law panel review system is safeguarded by the provisions set forth in Article 1905.  The subsequent articles of Chapter Nineteen contain certain elaborations upon the previous articles.

189.    The first article of Chapter Nineteen is captioned: "General Provisions." Article 1901(1) sets forth the field of application of Chapter Nineteen.[202] Article 1901(2) provides that Annex 1901.2 governs the establishment of the panels referred to in Articles 1903 and 1904.[203] Article 1901(3) then states:

> Except for Article 2203 (Entry into Force),[204] no provision of any other Chapter of this Agreement shall be construed as imposing obligations on a Party with respect to the Party's antidumping law or countervailing duty law.

190.    Considering this framework of Chapter Nineteen, the question is how the provisions of Article 1901(3) fit within it.

191.    The United States basically takes the position that the ordinary meaning and effect of Article 1901(3) of the NAFTA are that the United States has no obligations under the NAFTA with respect to its antidumping and countervailing duty laws

---

(ii)        terminate this Agreement with regard to the amending Party on 60-day written notice to that Party."

[201]    For a description of the binational review panel mechanism under Article 1904, *see* Section IV.B *supra* (p. 17 *et seq.*).

[202]    Article 1901(1) provides: "Article 1904 applies only with respect to goods that the competent investigating authority of the importing Party, applying the importing Party's antidumping or countervailing duty law to the facts of a specific case, determines are goods of another Party."

[203]    Article 1901(2) provides: "For purposes of Articles 1903 and 1904, panels shall be established in accordance with the provisions of Annex 1901.2."

[204]    Article 2203 provides: "This Agreement shall enter into force on January 1, 1994, on an exchange of written notifications certifying the completion of necessary legal procedures."

except those specified in Chapter Nineteen and Article 2203. Canfor and Terminal basically take the position that Article 1901(3) is an interpretive clause that directs the parties to "construe" the "obligations" in the NAFTA Chapters other than Chapter Nineteen in a certain way.

192.    As mentioned, the text of Article 1901(3) is to be interpreted in accordance with the ordinary meaning to be given to its terms in its context and in the light of its object and purpose.

193.    The starting point in the analysis is the phrase: ". . . no provision of any other Chapter of this Agreement . . ." An isolated reading would refer to potentially all of the provisions set forth in the NAFTA. In particular, the words "any other Chapter" would appear of necessity to include Chapter Eleven, in particular in light of the word "any."

194.    Next are the words: "shall be construed as." Their ordinary meaning is the manner in which the other provisions are to be interpreted. As we will see later, in conjunction with a negative, such as the words "no provision" in Article 1901(3), the drafters of the NAFTA used this expression interchangeably with the expression "shall not apply to" in connection with restrictions and exclusions set forth in other provisions of the NAFTA (*see* paragraph 256 below).

195.    The words "imposing obligations on a Party" refer to the provisions of the NAFTA that impose an obligation on a State Party to the Treaty. Canfor and Terminal deny that an arbitration agreement under Section B of Chapter Eleven constitutes an "obligation" within the meaning of Article 1901(3) because Claimants' are not challenging the validity of antidumping or countervailing duty law itself, and thus Claimants' claims do not imply an obligation on the part of the United States to submit its antidumping or countervailing duty law to Chapter Eleven dispute settlement in this case. The position of Canfor and Terminal is premised on the argument that Article 1901(3) is simply an interpretative

provision that gives guidance to tribunals that, except for Article 2203 ("Entry into Force"), no provision of any other Chapter of the NAFTA gives rise to an obligation to amend those laws.[205]

196.    Insofar as the term "obligation" in the NAFTA is concerned, the Tribunal agrees with the United States that Claimants' interpretation is incorrect.  An arbitration agreement does create obligations for both parties to it, hence also for a State Party.  Canfor and Terminal concede that: "the term 'obligation' is used elsewhere [in the NAFTA] as a descriptive term to reference substantive or procedural requirements of the Agreement itself [footnote omitted]."[206]  Therefore, the term "obligations" in Article 1901(3) *prima facie* includes the obligation to arbitrate under Section B of Chapter Eleven.  The question is rather whether that obligation is "with respect to the Party's antidumping law or countervailing duty law."

197.    The phrasal preposition "with respect to" has given rise to some debate between the parties.

198.    Canfor and Terminal argue that tribunals have found that the words "with respect to" limit the objects to which the subject of the sentence applies, so that only those things identified in the provision are covered by it.[207]  According to Canfor and Terminal, the strict definition of "with respect to" is to be contrasted with the broad definition given to "arising out of" by the ICJ in the *Fisheries Jurisdiction*

---

[205]    Canfor Reply ¶¶ 125-128; C-PHM at ¶ 20; C-R-PHM at ¶ 20.

[206]    C-PHM at ¶ 36(b).

[207]    Canfor Reply ¶¶ 129-134.  Canfor and Terminal rely on the dissenting opinion by arbitrator Highet in *Waste Management, Inc. v. Mexico*, Arbitral Award, 2 June 2002, Case No. ARB(AF)/98/2, at ¶¶ 25-26, available at: http://ita.law.uvic.ca/documents/WasteMgmt-Jurisdiction-dissent.pdf. The text of the majority of the tribunal is available at: http://ita.law.uvic.ca/documents/WasteMgmt-Jurisdiction.pdf.

*Case*.[208]  Canfor and Terminal argue that conduct of the United States that violates the obligations vis-à-vis investors under Chapter Eleven at most "arises out of," in some way, the application of antidumping and countervailing duty laws, but is not an obligation of the United States "with respect to" such laws.  Therefore, Canfor and Terminal assert, the question whether conduct, which may include the way in which United States' agencies act in connection with its laws, violates the international obligations undertaken by a State Party remains a separate issue.

199.    The United States responds[209] that the arguments of Canfor and Terminal are baseless because: (1) the *Waste Management* tribunal construed the phrase "with respect to" broadly, not narrowly;[210] (2) the NAFTA uses the phrase "with respect to" interchangeably with "concerning" (e.g., Article 603(1) and 1607));[211] and (3) Article 1121(1)(b) requires investors to "waive their right to initiate or continue . . . any proceedings *with respect to* the measure." (emphasis added by the United States)

200.    In the Rejoinder, however, Canfor and Terminal state that they do "not assert that 'with respect to' is being used as a term of art or in some out of the ordinary sense in Article 1901(3), but rather that the particular context, the surrounding language

---

[208]    ICJ, *Fisheries Jurisdiction* Case, 1998 ICJ Reports p. 96 at ¶ 62;  *Aegean Sea Continental Shelf* Case, 1976-1978 ICJ Reports, pp. 34-36 at ¶¶ 81-88.

[209]    United States Reply pp. 10-12.

[210]    *See* n. 207 *supra.*

[211]    Article 603(1) provides: "Subject to the further rights and obligations of this Agreement, the Parties incorporate the provisions of the *General Agreement on Tariffs and Trade* (GATT), *with respect to* prohibitions or restrictions on trade in energy and basic petrochemical goods. The Parties agree that this language does not incorporate their respective protocols of provisional application to the GATT." (emphasis added)  Article 1607 ("Relation to Other Chapters") provides: "Except for this Chapter, Chapters One (Objectives), Two (General Definitions), Twenty (Institutional Arrangements and Dispute Settlement Procedures) and Twenty-Two (Final Provisions) and Articles 1801 (Contacts Points), 1802 (Publication), 1803 (Notification and Provision of Information) and 1804 (Administrative Proceedings), no provision of this Agreement shall impose any obligation on a Party *regarding* its immigration measures." (emphasis added)

in Article 1901(3), as well as the context and purpose of Chapter 19 as a whole, make it clear that 'with respect to' means that the obligations referred to in Chapter 1901(3) would purport to address themselves to a Party's *laws*, requiring some action on those *laws*" (emphasis added by Canfor and Terminal).[212]

201.    The Tribunal, therefore, notes that while the parties disagree on the meaning of the words "with respect to," it is the meaning of the word "law" on which their disagreement is fundamental to the Preliminary Question.  To the extent that Canfor and Terminal have maintained their distinction between "with respect to" and other phrasal prepositions, the Tribunal is of the view that the words "with respect to" are to be interpreted broadly.[213]  The drafters used phrasal prepositions interchangeably in a number of cases.  For example, Article 1607 provides: ". . . no provision of this Agreement shall impose any obligation on a Party *regarding* its immigration measures."[214]  Moreover, the majority of the tribunal in *Waste Management* did not give a narrow interpretation of the words "with respect to."[215]

---

[212]    Canfor and Terminal Rejoinder at ¶¶ 30-34.

[213]    The equally authentic French and Spanish texts of Article 1901(3) read:

"Exception faite de l'article 2203 (Entrée en vigueur), aucune disposition de l'un quelconque des autres chapitres du présent accord ne sera interprétée comme imposant des obligations à une Partie *relativement à* sa législation sur les droits antidumping ou sur les droits compensateurs," and

"A excepción del Artículo 2203, 'Entrada en vigor', ninguna disposición de otro capítulo de este Tratado se interpretará en el sentido de imponer obligaciones a las Partes *con respecto* a sus disposiciones jurídicas sobre cuotas antidumping y compensatorias." (emphasis added)

[214]    The equally authentic French and Spanish texts of Article 1607 read:

"Sauf pour ce qui est du présent chapitre, des chapitres 1 (Objectifs), 2 (Définitions générales), 20 (Dispositions institutionnelles et procédures de règlement des différends) et 22 (Dispositions finales), et des articles 1801 (Points de contact), 1802 (Publication), 1803 (Notification et information) et 1804 (Procédures administratives), aucune disposition du présent accord n'imposera d'obligations à une Partie *concernant* ses mesures d'immigration," and

"Salvo lo dispuesto en este capítulo y en los Capítulos I, "Objetivos", II, "Definiciones generales", XX, "Disposiciones institucionales y procedimientos para la solución de controversias", y XXII, "Disposiciones finales" y los Artículos 1801, "Puntos de enlace", 1802, "Publicación", 1803, "Notificación y suministro de información", y 1804, "Procedimientos administrativos", ninguna

(footnote cont'd)

202.    The foregoing brings the analysis to the phrase "the Party's antidumping law or countervailing duty law."  It is in respect of those words, and in particular the word "law," that the parties, as noted, have displayed fundamental disagreement.

203.    The first issue regarding the phrase "the Party's antidumping law or countervailing duty law" is what definition the Tribunal must or should follow.  Chapter Nineteen has as its basic premise that each State Party retains its domestic antidumping and countervailing duty law instead of providing for international rules governing antidumping and countervailing duty matters (although statutory amendments to the domestic law may not be inconsistent with the WTO agreements and the object and purpose of the NAFTA and Chapter Nineteen).[216]  That basic premise is set forth in Article 1902 concerning the "Retention of Domestic Antidumping Law and Countervailing Duty Law."  The first paragraph of that Article reserves for each State Party "the right to apply its antidumping law and countervailing duty

---

disposición de este Tratado impondrá obligación alguna a las Partes *respecto a* sus medidas migratorias." (emphasis added)  Article 603(1) employs in the French text the words "*en ce qui concerne*" and in the Spanish text the words "*relativas a.*"

[215]    *See* n. 207 *supra.*

[216]    *See* Article 1902(2)(d), which provides:

"2.    Each Party reserves the right to change or modify its antidumping law or countervailing duty law, provided that in the case of an amendment to a Party's antidumping or countervailing duty statute: . . .

    (d)    such amendment, as applicable to that other Party, is not inconsistent with

        (i)    the *General Agreement on Tariffs and Trade* (GATT), the *Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade* (the Antidumping Code) or the *Agreement on the Interpretation and Application of Articles VI, XVI and XXIII of the General Agreement on Tariffs and Trade* (the Subsidies Code), or any successor agreement to which all the original signatories to this Agreement are party, or

        (ii)    the object and purpose of this Agreement and this Chapter, which is to establish fair and predictable conditions for the progressive liberalization of trade between the Parties to this Agreement while maintaining effective and fair disciplines on unfair trade practices, such object and purpose to be ascertained from the provisions of this Agreement, its preamble and objectives, and the practices of the Parties."

law to goods imported from the territory of any other Party."  Article 1902(2) then gives the following definition:

> Antidumping law and countervailing duty law include, as appropriate for each Party, relevant statutes, legislative history, regulations, administrative practice and judicial precedents.

204.    The ordinary meaning to be given to the phrase "the Party's antidumping law or countervailing duty law" appearing in Article 1901(3) in its context, and in light of the object and purpose of the NAFTA in general and Chapter Nineteen in particular, is that its interpretation is governed by the definition in Article 1902(1) quoted above.  As noted, the basic premise, described above, of Chapter Nineteen is the retention of domestic antidumping law and countervailing duty law, with an opportunity for amendment but only under the terms and conditions of Article 1902(2) and subject to review under Article 1903. Article 1901(3) is set forth in the "General Provisions" first article of Chapter Nineteen.  The definition that appears in the subsequent Article 1902(1) is without any express limitation and thus presumptively governs the meaning of the same term in another Article of the same Chapter Nineteen in the absence of any express indication to the contrary. Such identity of meaning is in keeping with the construct of Chapter Nineteen because Article 1902 particularizes this basic premise by stating the right to apply, and the conditions under which a State Party may "enact" statutory amendments to, that Party's "antidumping law or countervailing duty law."

205.    One could also refer to Article 1904, which requires a binational review panel  to determine whether a final antidumping or countervailing duty determination of a competent investigating authority of an importing Party was "in accordance with the antidumping or countervailing duty law of the importing Party" (Article 1904(2)).  That provision adds:

> For this purpose, the antidumping or countervailing duty law consists of the relevant statutes, legislative history, regulations,

> administrative practice and judicial precedents to the extent that a court of the importing Party would rely on such materials in reviewing a final determination of the competent investigating authority.

206. By comparison to the unexcepted definition found in Article 1902(1), the definition in Article 1904(2) of "antidumping or countervailing duty law" is specifically prefaced, and consequently limited in its coverage, by the words "For this purpose". Consequently, the Tribunal is of the view that the meaning of the phrase "the Party's antidumping law or countervailing duty law" as appearing in Article 1901(3) is not governed by the definition in Article 1904(2). While that definition is quite similar to the one in Article 1902(1), the former is restricted in its application while the latter is not (barring an express exception found elsewhere in Chapter Nineteen).

207. For completeness sake, it may be mentioned that Chapter Nineteen also contains yet another definition of "law." Article 1911 ("Definitions") provides:

> **domestic law** for purposes of Article 1905(1) means a Party's constitution, statutes, regulations and judicial decisions to the extent they are relevant to the antidumping and countervailing duty laws.

208. That definition is broader than those in Article 1902(1) and Article 1904(2) in that Article 1911 adds the "constitution" of a Party. At the same time, Article 1911's definition is more restrictive in that it omits "legislative history" and "administrative practice," words which appear in both Article 1902(1) and Article 1904(2). However, as is the case with Article 1904(2), the Tribunal does not believe that the definition appearing in Article 1911 applies to the words "antidumping law or countervailing duty law" in Article 1901(3) since the definition of "domestic law" in Article 1911 is restricted in its scope because of

the inclusion of the words "for purposes of Article 1905(1)."[217]  Thus, similarly to the definition contained in Article 1904(2), that set forth in Article 1911 is of limited application, whereas the definition of "antidumping law and countervailing duty law" set forth in Article 1902(1) is of general application within Chapter Nineteen, in the absence of an express exception thereto.

209.    Having determined that the definition of the phrase "the Party's antidumping law or countervailing duty law" for the purposes of Article 1901(3) is governed by Article 1902(1), the Tribunal, as a second issue, must decide whether Article 1901(3) includes the *application* of "antidumping law and countervailing duty law," application being a term not expressly referenced within that definition.

210.    Canfor and Terminal argue that Article 1901(3) does not comprise an application of antidumping and countervailing duty law since the drafters of Chapter Nineteen distinguished between law and its application in the first and second sentence of

---

[217]    Article 1905(1) provides:

"1.    Where a Party alleges that the application of another Party's domestic law:

(a)    has prevented the establishment of a panel requested by the complaining Party;

(b)    has prevented a panel requested by the complaining Party from rendering a final decision;

(c)    has prevented the implementation of the decision of a panel requested by the complaining Party or denied it binding force and effect with respect to the particular matter that was before the panel; or

(d)    has resulted in a failure to provide opportunity for review of a final determination by a panel or court of competent jurisdiction that is independent of the competent investigating authorities, that examines the basis for the competent investigating authority's determination and whether the competent investigating authority properly applied domestic antidumping and countervailing duty law in reaching the challenged determination, and that employs the relevant standard of review identified in Article 1911, the Party may request in writing consultations with the other Party regarding the allegations. The consultations shall begin within 15 days of the date of the request."

Article 1902(1).[218]  The United States disagrees, arguing that in this context there is no distinction between a law and the law's application.[219]

211.    In the Tribunal's judgment, the phrase "with respect to the Party's antidumping law or countervailing duty law" in Article 1901(3) must be deemed to include the application of that law.  The distinction that Canfor and Terminal draw between the first sentence of Article 1902(1) and its second sentence, which contains the definition of antidumping and countervailing duty law, is unavailing.  The first sentence makes clear that application of that law is expressly envisaged by the drafters of the NAFTA, which is one of the subject matters of Chapter Nineteen.  The scope of Article 1901(3) concerns Chapter Nineteen as a whole and that provision constitutes a restriction or exception regarding the subject matters of Chapter Nineteen.  Furthermore, Article 1904 contemplates review by binational panels of final antidumping and countervailing duty determinations.  Such determinations are certainly an application of the law, whether they are correct or erroneous.

212.    The foregoing is not altered by the fact that Article 1905(1) refers explicitly to "the application of another Party's domestic law."[220]  Here, the word "application" is used in a different setting, i.e., the safeguarding of the panel review system.  Article 1905 is to the effect that the application of a Party's domestic law should not frustrate the panel review system.  Moreover, as previously mentioned,[221] the

---

[218]    C-PHM at ¶¶ 26-27; C-R-PHM at ¶¶ 26-27.  The first and second sentence in Article 1902(1) read: "Each Party reserves the right to apply its antidumping law and countervailing duty law to goods imported from the territory of any other Party. Antidumping law and countervailing duty law include, as appropriate for each Party, relevant statutes, legislative history, regulations, administrative practice and judicial precedents."

[219]    R-PHM at ¶¶ 26-27; R-R-PHM p. 16.

[220]    Article 1905(1) is quoted at n. 217 *supra.*

[221]    *See* ¶ 208 *supra.*

definition of "domestic law" referred to in Article 1905(1) is not the one which is to be retained for defining the words "the Party's antidumping law or countervailing duty law" in Article 1901(3).

213.    Related to the second issue, the third issue is: what is to be understood by "administrative practice" in the definition of Article 1902(1).    Canfor and Terminal contend that an administrative practice is part of the law that Commerce and the ITC apply, not its application in any particular case, and that it means a written policy guidance of general application.[222]   In contrast, the United States argues that determinations by Commerce and the ITC are examples of administrative practice.[223]

214.    The Tribunal is of the view that "administrative practice," which is not defined in the NAFTA, consists of written policy guidance of general application that exists prior to its application in a given case.   It cannot be assumed that an individual determination, in one single matter, creates "administrative practice" in and of itself.   This is also the way in which it was understood by a Chapter Nineteen Panel, albeit in the context of the Uruguay Round Agreement Act of 1994 ("URAA").[224]

215.    The United States relies by way of analogy on Article 1706 of the Canada-United States Free Trade Agreement of 1989.   That article appears in the Financial Services Chapter and contains the definition of administrative practice: "All actions, practices, and procedures by any federal agency having regulatory responsibility over the activities of financial institutions, including, but not limited

---

[222]    C-PHM at ¶¶ 22-25A; C-R-PHM at 22-25A.

[223]    R-PHM at ¶¶ 22-25A; R-R-PHM pp. 15-16.

[224]    *In the Matter of Certain Softwood Lumber Products from Canada: Final Affirmative Antidumping Determination*, Decision of the Panel, 9 June 2005, Secretariat File No. USA-CDA-2002-1904-02, p. 38.

to, rules, orders, directives, and approvals."[225]   As is correctly pointed out by Canfor and Terminal,[226] the definition of "administrative practice" in Article 1706 of the Canada-United States Free Trade Agreement is limited to usage in Article 1702(3) of that Agreement (i.e., with respect to "resulting amendments to regulation and administrative practices").   Such usage makes clear that it can only be referring to normative rules and not to the outcome in a particular case.

216.   The interpretation of "administrative practice," however, is not particularly relevant for the Preliminary Question since it was determined under the second issue above that Article 1901(3) includes the application of antidumping and countervailing duty law.    Thus, while "administrative practice" does not necessarily include an individual determination in one single matter with respect to antidumping and countervailing duty law, the reference to that law in Article 1901(3) includes such a determination because it comprises a sort of application of that law.

217.   The fourth issue is whether the French and Spanish texts shed any light on the interpretation of the words "the Party's antidumping law or countervailing duty law" in Article 1901(3).[227] Those texts are equally authentic.[228] The interpretation of treaties authenticated in two or more languages is governed by Article 33 of the Vienna Convention on the Law of Treaties of 1969.[229]   The French text of the

---

[225]    R-PHM at ¶ 25A.

[226]    C-R-PHM at ¶ 25A.

[227]    The French and Spanish texts of Article 1901(3) are reproduced in n. 213 *supra.*

[228]    Article 2206 provides: "The English, French and Spanish texts of this Agreement are equally authentic."

[229]    Article 33 of the Vienna Convention provides:

"1.    When a treaty has been authenticated in two or more languages, the text is equally authoritative in each language, unless the treaty provides or the parties agree that, in case of divergence, a particular text shall prevail.

(footnote cont'd)

word "law" in Article 1901(3) is "*législation sur les droits.*"   The Spanish text reads: "*disposiciones jurídicas.*"

218.    Canfor and Terminal contend that the French text supports their case as Article 1901(3) does not disclose a different meaning than that which they have argued attaches to the English text.[230]  They also contend that the French text is clearer than the English in suggesting that by what is meant by "law" is a body of rules or norms to be applied to particular cases, and not to those individual applications. The United States argues that the French and Spanish texts support its position that the term "law" does not mean "statute."[231]

219.    The Tribunal does not believe that there are relevant differences between the English, French and Spanish texts on this point because what is "law," "*législation sur les droits*," and "*disposiciones jurídicas*" in Article 1901(3) is defined in the equally authenticated texts of Article 1902(1).[232]  Those definitions do not show

---

2.     A version of the treaty in a language other than one of those in which the text was authenticated shall be considered an authentic text only if the treaty so provides or the parties so agree.

3.     The terms of the treaty are presumed to have the same meaning in each authentic text.

4.     Except where a particular text prevails in accordance with paragraph 1, when a comparison of the authentic texts discloses a difference of meaning which the application of articles 31 and 32 does not remove, the meaning which best reconciles the texts, having regard to the object and purpose of the treaty, shall be adopted."

[230]    C-PHM at ¶ 35E.

[231]    R-PHM at ¶ 35E.

[232]    The French text of Article 1902(1) reads: "Chacune des Parties se réserve le droit d'appliquer sa législation sur les droits antidumping et sur les droits compensateurs aux produits importés du territoire de toute autre Partie. Selon qu'il y a lieu pour chacune des Parties, ladite législation est réputée comprendre les lois, le contexte législatif, les règlements, la pratique administrative et la jurisprudence pertinents."

The Spanish text of Article 1902(1) reads: "Cada una de las Partes se reserva el derecho de aplicar sus disposiciones jurídicas en materia de cuotas antidumping y compensatorias a los bienes que se importen de territorio de cualquiera de las otras Partes. Se consideran disposiciones jurídicas en materia de cuotas antidumping y compensatorias, según corresponda en cada Parte, las leyes

(footnote cont'd)

107

differences in language that display any material distinction.  In any event, the United States is correct when it points out that the English word "law" in Article 1901(3) is not the equivalent of "statute."  That distinction is also shown by the French and Spanish versions of Article 1902(1), in which the term "statutes" reads "*les lois*" and "*las leyes*," while the term "law" in both Article 1901(3) and Article 1902(1) reads "*législation sur les droits,*" and "*disposiciones jurídicas*," in the French and Spanish texts, respectively.

220.    In conclusion, the phrase "the Party's antidumping law or countervailing duty law," in Article 1901(3), in the Tribunal's judgment, encompasses a very broad spectrum of matters, a conclusion that is particularly justified by the use of the phrasal preposition "with respect to" in Article 1901(3) and of the non-exhaustive verb "include" in the Article 1902(1) definition that the Tribunal has previously determined to apply to the meaning of that phrase in Article 1901(3).

221.    The Tribunal may now turn to the four arguments of the United States with respect to context[233] and to the position of Canfor and Terminal in that regard.

222.    The United States' first argument is that, in Chapter Twenty, Article 2004 excludes "matters covered in Chapter Nineteen (Review and Dispute Settlement in Antidumping and Countervailing Duty Matters) from State-to-State dispute settlement."[234]

---

pertinentes, los antecedentes legislativos, los reglamentos, la práctica administrativa y los precedentes judiciales."

[233]    *See* ¶¶ 100-105 *supra.*

[234]    Article 2004 provides: "Except for the matters covered in Chapter Nineteen (Review and Dispute Settlement in Antidumping and Countervailing Duty Matters) and as otherwise provided in this Agreement, the dispute settlement provisions of this Chapter shall apply with respect to the avoidance or settlement of all disputes between the Parties regarding the interpretation or application of this Agreement or wherever a Party considers that an actual or proposed measure of

(footnote cont'd)

223.   In the Tribunal's view, there is some force in the argument that it would make no sense for the NAFTA to prohibit the NAFTA Parties themselves from pursuing State-to-State dispute resolution pertaining to a Party's antidumping and countervailing duty laws outside Chapter Nineteen, but accord private claimants the privilege of doing so under Chapter Eleven.  However, while the State Parties were specific with the exclusion with respect to State-to-State dispute settlement, Chapter Eleven does not have a corresponding express exclusion pertaining to Chapter Nineteen matters.   Articles 1108 and 1138 set forth a number of exceptions and exclusions, but Chapter Nineteen is conspicuously absent from that list.

224.   The Tribunal, therefore, does not regard the United States' first argument as convincing to the extent that it is based on Article 2004 alone.[235]   On the other hand, as will be seen later,[236] all restrictions and exceptions with respect to Chapter Eleven are indeed not solely set forth in Chapter Eleven but are to be found in other Chapters of the NAFTA.

225.   The United States' second argument is based upon Article 1112(1), which Article 1112 is headed "Relation to Other Chapters":

> In the event of any inconsistency between this Chapter and another Chapter, the other Chapter shall prevail to the extent of the inconsistency.

226.   According to the United States, Article 1112(1) subordinates Chapter Eleven to all other Chapters of the NAFTA.   The United States adds that, if Claimants'

---

another Party is or would be inconsistent with the obligations of this Agreement or cause nullification or impairment in the sense of Annex 2004."

[235]   *See also* ¶¶ 263-264 *infra.*

[236]   *See* ¶ 248 *et seq.*

argument were accepted, private claimants could then pursue remedies under both Chapter Eleven and Chapter Nineteen with respect to antidumping and countervailing duty laws, which would give rise to "critical inconsistencies."[237] This argument is rejected by Canfor and Terminal on various grounds, which are considered below.

227.    Article 1112(1) appears to constitute a form of an "underride clause."  It seems that the drafters of the NAFTA wished to have a safety-valve for overreaching interpretations of other Chapters of the NAFTA in relation to the investment provisions in Chapter Eleven.[238]  In that respect, Article 1112(1) is an important guidance in interpretation of the NAFTA.

228.    The language of Article 1112(1), however, is limited to "any inconsistencies." That limitation appears to be confined to differences in text, possibly as interpreted, and not to decisions resulting from dispute resolution mechanisms contemplated by those texts.  This limitation is also, at least partially, recognized by the United States when it states: "As the United States has noted at the hearing, the United States does not raise the potential for inconsistent decisions as a basis for declining jurisdiction.  Rather, the United States contends that the Parties would not have wanted to – and did not – create an Agreement in which parallel proceedings could give rise to such potentially conflicting findings of fact and law."[239]

---

[237]    United States Objection to Jurisdiction p. 24.

[238]    *See also* Department of External Affairs, *North American Free Trade Agreement: Canadian Statement of Implementation*, *in* Canada Gazette 68 (1 January 1994), p. 152: "[Article 1112] ensures that the specific provisions of other chapters are not superseded by the general provisions of this [the investment] chapter."

[239]    R-PHM at ¶ 45 *in fine. See also* Consolidation Hearing, 11 June 2005, at 16:20-17:1.

229.    The United States' third argument is that Chapter Eleven itself would indicate that, although the drafters expressly envisioned a certain overlap in competence between the investor-State arbitration mechanism established in Section B and the State-to-State mechanism in Chapter Twenty, they envisioned no such overlap for antidumping and countervailing duty matters in Chapter Nineteen.  This result, the United States contends, is derived from Article 1115, entitled "Purpose".[240]  According to the United States, had the Parties contemplated that the same measure could be the subject of proceedings under both Chapter Eleven and Chapter Nineteen, a reader would expect there to be some mention of Chapter Nineteen in Article 1115.

230.    In the Tribunal's view, that argument carries the possibility of taking inferences too far.  Because Article 1115 explicitly contemplates some overlap with State-to-State arbitration, in the absence of anything to the contrary, it must be inferred, the United States argues, that no such overlap is intended with respect to Chapter Nineteen.  However, just the opposite could also be argued:  since Article 1115 is silent with respect to Chapter Nineteen, it could be inferred that Article 1115 contemplates some overlap with Chapter Nineteen.

231.    The Tribunal can be brief with respect to the United States' fourth argument concerning the requirement of Chapter Nineteen to make amendments to domestic law to permit the use of business proprietary information, which requirement is absent in Chapter Eleven.[241]  The issue of confidential information was addressed

---

[240]    Article 1115 (Purpose) provides: "*Without prejudice to the rights and obligations of the Parties under Chapter Twenty* (Institutional Arrangements and Dispute Settlement Procedures), this Section establishes a mechanism for the settlement of investment disputes that assures both equal treatment among investors of the Parties in accordance with the principle of international reciprocity and due process before an impartial tribunal." (emphasis added by the United States)

[241]    *See* n. 100 *supra.*

at length in the Consolidation Order of this Tribunal.[242]  At that time the United States argued that confidentiality would not be a bar to consolidation, and the present Tribunal agreed with the United States' position.[243]  The United States cannot now successfully make similar arguments in the reverse.  In any event, the present Tribunal has indicated that it is prepared to adequately deal with issues relating to confidentiality, including business proprietary information.

232.  Do the objectives of the NAFTA shed light on the Preliminary Question?  Canfor and Terminal rely on Article 102(1)(c) ("increase substantially investment opportunities in the territories of the Parties"), while the United States relies on Article 102(1)(e) ("create effective procedures for the implementation and application of this Agreement, for its joint administration and for the resolution of disputes").

233.  As a preliminary point, the Tribunal recalls its finding that the objectives of the NAFTA may cast a light on a specific interpretive issue but cannot override and supersede a particular provision.[244]

234.  With respect to Canfor and Terminal's reliance on Article 102(1)(c),[245] the NAFTA establishes a free trade area among Canada, Mexico and the United States.  The Tribunal does not doubt that a free trade agreement will be enhanced if investment opportunities are increased.  The architects of the NAFTA appear to have been aware of the advantages of such an integrated approach as evidenced by the Preamble[246] and by including a Chapter Eleven concerning investments,

---

[242]    Consolidation Order, n. 4 *supra*, at ¶¶ 138-147.

[243]    Consolidation Order, n. 4 *supra*, at ¶¶ 218-219.

[244]    *See* ¶ 179 *supra.*

[245]    *See also* C-PHM at ¶ 60 and R-PHM at ¶ 60.

[246]    *See* n. 110 *supra.*

although they did so with some hesitation by inserting Article 1112(1) relating to inconsistencies.[247]  In that respect, the NAFTA constituted a step forward in comparison with the Canada-United States Free Trade Agreement of 1989, which did not contain an investment disputes chapter.

235.  On the other hand, reliance by Canfor and Terminal on the objective stated in Article 102(1)(c) does not advance their case since the objective of Article 102(1)(e), discussed below, takes precedence in the present case as it is more specific with respect to dispute settlement.

236.  The reliance by the United States on the objective stated in Article 102(2)(e) forms part of a wider debate between the parties to the present case as to whether the NAFTA, and international law in general, contain a presumption against (as contended by the United States), or in favour of (as contended by Canfor and Terminal), concurrent or parallel proceedings.

237.  On the basis of its review, the Tribunal believes that the drafters of the NAFTA sought to avoid concurrent or parallel proceedings.  For example, Article 1121(1)(b) and Article 1121(2)(b) require an investor to waive its "right to initiate or continue before any administrative tribunal or court under the law of any Party, or other dispute settlement procedures, any proceedings with respect to the measure of the disputing Party that is alleged to be a breach [of Section A of Chapter Eleven]."  As is observed in *International Thunderbird Gaming Corp. v. Mexico*:

> In construing Article 1121 of the NAFTA, one must also take into account the rationale and purpose of that article. The consent and waiver requirements set forth in Article 1121 serve a specific purpose, namely to prevent a party from pursuing concurrent

---

[247]    *See* ¶¶ 225-228 *supra.*

domestic and international remedies, which could either give rise to conflicting outcomes (and thus legal uncertainty) or lead to double redress for the same conduct or measure.[248]

238.  Canfor and Terminal contend that Article 1121 does not prevent a claimant from pursuing proceedings in relation to conduct of a State Party that is alleged to be in breach of Chapter Eleven that might otherwise be pursued before the courts or administrative tribunals of a State Party for "injunctive, declaratory or other extraordinary relief, not involving the payment of damages."[249]  However, this is an express exception to the ordinary relief exclusively available from a Chapter Eleven tribunal under Article 1135 (i.e., damages and restitution).[250]  Article 1121, therefore, does not show a presumption for concurrent and parallel proceedings.

239.  Likewise, the drafters of the NAFTA were careful in providing for specific dispute settlement procedures with respect to financial services in Chapter Fourteen, without an overlap with Chapter Eleven dispute resolution mechanisms.[251]

240.  On the other hand, the NAFTA, in certain instances, also offers the possibility of the same measure being considered by two different fora.  Thus, the subject matter of a claim in investor-State arbitration under Chapter Eleven can also be submitted

---

[248]    Final Award, 26 January 2006, NAFTA (UNCITRAL), at ¶ 118, available at: http://www.investmentclaims.com/decisions/Thunderbird-Mexico-Award.pdf.    *See also Waste Management, Inc. v. Mexico*, Arbitral Award, 26 June 2002, Case No. ARB(AF)/00/3, http://ita.law.uvic.ca/documents/WastMgmt2-Jurisdiction.pdf, at ¶ 27: "No doubt the concern of the NAFTA [P]arties in inserting Article 1121 was to achieve finality of decision and to avoid multiplicity of proceedings."

[249]    Canfor Reply at ¶ 66.  Article 1121(1)(b) is quoted at n. 118 *supra.  See also* C-PHM at ¶¶ 49-52; C-R-PHM at ¶¶ 49-52; R-PHM at ¶¶ 49-52.

[250]    Article 1135 is quoted at n. 119 *supra.*

[251]    *See, e.g., Fireman's Fund Insurance Company v. Mexico*, Decision on the Preliminary Question, 17 July 2003, ICSID Case No. ARB(AF)/02/01, available at: http://ita.law.uvic.ca/documents/FiremansAward.pdf.

to State-to-State arbitration under Chapter Twenty.[252]   As the United States correctly points out, where the NAFTA Parties contemplated concurrent proceedings under different NAFTA dispute resolution procedures, they were explicit in providing such a possibility.[253]

241.  The tribunal in *Pope & Talbot* answered the question in the affirmative whether different Chapters of the NAFTA can overlap and that the rights it provides can be cumulative, except in cases of conflict.[254]   The tribunal in *S.D. Myers* concurred with that reasoning as being "sound and compelling."[255]   In the present Tribunal's view, that conclusion may be correct insofar as substantive rights are concerned and, indeed, the Chapters of the NAFTA are part of a single international agreement (and not of watertight, separated compartments as the United States seems to imply).   Nonetheless, when it comes to NAFTA's mechanisms for dispute settlement, it cannot be presumed that the drafters intended to create an open-ended, multiple fora system.

242.  Viewed in light of the foregoing, the objective stated in Article 102(1)(e) concerning effective proceedings is an important guiding principle in assessing any assertion that a provision of the NAFTA that is silent in this regard should nonetheless be interpreted as permitting concurrent or parallel proceedings.   In the Tribunal's opinion, the presumption of the NAFTA is that, in the absence of an express provision to the contrary, concurrent or parallel proceedings are to be avoided.

---

[252]   *See* Article 1115, quoted at n. 240 *supra.*

[253]   R-PHM at n. 135.

[254]   *Pope & Talbot, Inc. v. Canada*, Award, 26 January 2000, NAFTA (UNCITRAL), at ¶¶ 16-26, available at: http://www.dfait-maeci.gc.ca/tna-nac/documents/pubdoc6.pdf.

[255]   *S.D. Myers, Inc. v. Canada*, Partial Award, 13 November 2000, NAFTA (UNCITRAL), at ¶¶ 289-300, available at:  http://ita.law.uvic.ca/documents/SDMeyers-1stPartialAward.pdf.

243.    It is, therefore, not necessary for the Tribunal to address the question whether international law posits a presumption against, or in favour of, concurrent or parallel proceedings.  The Tribunal notes *obiter dictum* that, in its view, there is no presumption in favour of concurrent or parallel proceedings under international law, but that it is an open question whether there is a presumption against such proceedings.[256]  The expression of the will of States in consenting, or not consenting, to compulsory dispute settlement remains the central operative principle.

244.    That brings the analysis to the question whether a Chapter Nineteen binational panel review, under Article 1904, would, under the NAFTA presumption set forth in paragraph 242 above, be concurrent with, or parallel to, the consideration of a claim by a Chapter Eleven tribunal insofar as any antidumping and countervailing duty matters are involved.

245.    Proceedings pursuant to Chapter Nineteen (and in particular under Article 1904) have indeed a different object than those pursuant to Chapter Eleven.  Chapter Eleven is concerned with claims that a State Party has breached an obligation under Section A of that Chapter (and with some other matters that are not relevant here).  The United States itself concedes, as it must, that "Chapter Nineteen binational panels apply domestic law and Chapter Eleven tribunals apply international law."[257]  Moreover, the standard of review in the two Chapters is not the same.  A Chapter Eleven tribunal is to determine whether a respondent State has breached its obligations under Section A of Chapter Eleven.  In contrast, an Article 1904 binational panel is to review "a final antidumping or countervailing duty determination of a competent investigating authority of an importing Party to

---

[256]    *See Bluefin Tuna Case*, n. 130 *supra*.

[257]    R-PHM at ¶ 45.

determine whether such determination was in accordance with the antidumping or countervailing duty law of the importing Party" (Article 1904(2)).  According to Section 516A of the Tariff Act, which an Article 1904 binational panel is to apply when reviewing a final determination, such panel "shall hold unlawful any determination, finding or conclusion, found . . . to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with the law."[258]  In addition, an Article 1904 binational panel, on the one hand, cannot award monetary damages,[259] while the remedies before a Chapter Eleven tribunal, on the other hand, are limited to restitution and damages (Article 1135(1)).[260]

246.     While the differences between proceedings under Chapters Eleven and Nineteen are noticeable, it must be borne in mind that Canfor's and Terminal's claims concern the conduct of Commerce, the ITC and other government officials prior to, during and subsequent to preliminary and final antidumping and countervailing duty determinations, including review by Article 1904 binational panels.[261]  To a

---

[258]     *See* Annex 1911. The standard of review in the United States is set forth at n. 31 *supra*.  *See also* C-PHM at ¶ 34; R-PHM at ¶ 34.  Canfor and Terminal distinguish conduct that can be considered arbitrary under the standards of the municipal regime and in the international sense (C-PHM at ¶ 33).

[259]     Nor can a claim for damages against the United States be submitted before a United States court with respect to the application of its antidumping and countervailing duty law.  *See* C-PHM at ¶ 53; R-PHM at ¶ 53.  *See also* 19 U.S.C. § 516a(g)(7)(A), which provides: "If a determination is referred to a binational panel or extraordinary challenge committee under the NAFTA or the Agreement and the panel or committee makes a decision remanding the determination to the administering authority [i.e., Commerce] or the Commission [i.e., the ITC], the administering authority or the Commission shall, within the period specified by the panel or committee, take action not inconsistent with the decision of the panel or the committee.  Any action taken by the administering authority or the Commission under this paragraph shall not be subject to judicial review, and no court of the United States shall have the power or jurisdiction to review such action on any question of law or fact by an action in the nature of mandamus or otherwise."

[260]     Article 1135 is quoted at n. 119 *supra*.

[261]     *See* Section VI.B *supra* (p. 72 *et seq.*).

large extent, it appears that the claims of Canfor and Terminal in the present case are based on the same factual matrix as the various Article 1904 binational panel review proceedings, in which they are permitted to participate,[262] albeit that these claims are presented in the present proceedings from the angle of allegedly reprehensible conduct rather than of allegedly deficient preliminary or final determinations.  Viewed from that perspective, the Article 1904 proceedings and the present Chapter Eleven proceedings are concurrent or parallel (with the attendant problems that this creates), even though the applicable law and available remedies differ.[263]

247.    With respect to the NAFTA's objectives, Canfor and Terminal point generally also to the progressive widening of State responsibility that the NAFTA Parties have expressly agreed to throughout the NAFTA, including in relation to the protections given to investors under Chapter Eleven.[264]  As a general proposition, that is certainly correct.  However, the NAFTA was the subject of intensive negotiations between the State Parties, and was carefully drafted by them.  The investors' rights and the corresponding obligations of the State Parties to the NAFTA are circumscribed in detail in the NAFTA.  The general proposition cited by Canfor and Terminal, therefore, cannot expand, let alone override, the text of the NAFTA.

248.    An analysis of the Preliminary Question also requires the Tribunal to examine the manner in which the NAFTA drafters expressed restrictions and exclusions in provisions in addition to Article 1901(3).  Such a comparison is justified even if one follows the characterization by Canfor and Terminal of Article 1901(3) as an "interpretive" provision.  It cannot be denied that, whatever characterization is

---

[262]    Canfor did indeed participate in a number of them, *see* ¶ 76 *supra.*

[263]    These observations also relate to the answers given by the parties in C-PHM at ¶¶ 44-48 and 53-57; C-R-PHM at ¶¶ 44-48 and 53-57; R-PHM at ¶¶ 44-48 and 53-57; R-R-PHM pp. 17-18.

[264]    Canfor Reply at ¶ 54.

followed, the language of Article 1901(3) plainly contains some form of restriction or exclusion with respect to provisions in any Chapter of the NAFTA other than Chapter Nineteen (except for Article 2203 ("Entry into Force")).

249.    The following non-exhaustive list provides a wide variety of the manner in which restrictions and exclusions are expressed in the NAFTA:

### Article 309: Import and Export Restrictions

3.    In the event that a Party adopts or maintains a prohibition or restriction on the importation from or exportation to a non-Party of a good, nothing in this Agreement shall be construed to prevent the Party from:

(a)    limiting or prohibiting the importation from the territory of another Party of such good of that non-Party; or

(b)    requiring as a condition of export of such good of the Party to the territory of another Party, that the good not be re-exported to the non-Party, directly or indirectly, without being consumed in the territory of the other Party.

### Article 603: Import and Export Restrictions

3.    In circumstances where a Party adopts or maintains a restriction on importation from or exportation to a non-Party of an energy or basic petrochemical good, nothing in this Agreement shall be construed to prevent the Party from:

(a)    limiting or prohibiting the importation from the territory of any Party of such energy or basic petrochemical good of the non Party; or

(b)    requiring as a condition of export of such energy or basic petrochemical good of the Party to the territory of any other Party that the good be consumed within the territory of the other Party.

### Article 804: Dispute Settlement in Emergency Action Matters

No Party may request the establishment of an arbitral panel under Article 2008 (Request for an Arbitral Panel) regarding any proposed emergency action.

### Article 1101: Scope and Coverage

3.   This Chapter does not apply to measures adopted or maintained by a Party to the extent that they are covered by Chapter Fourteen (Financial Services).

### Article 1108: Reservations and Exceptions

1.   Articles 1102, 1103, 1106 and 1107 do not apply to:

    (a)   any existing non-conforming measure that is maintained by

        (i)   a Party at the federal level, as set out in its Schedule to Annex I or III,

        (ii)   a state or province, for two years after the date of entry into force of this Agreement, and thereafter as set out by a Party in its Schedule to Annex I in accordance with paragraph 2, or

        (iii)   a local government;

    (b)   the continuation or prompt renewal of any non-conforming measure referred to in subparagraph (a); or

    (c)   an amendment to any non-conforming measure referred to in subparagraph (a) to the extent that the amendment does not decrease the conformity of the measure, as it existed immediately before the amendment, with Articles 1102, 1103, 1106 and 1107.

2.    Each Party may set out in its Schedule to Annex I, within two years of the date of entry into force of this Agreement, any existing nonconforming measure maintained by a state or province, not including a local government.

3.    Articles 1102, 1103, 1106 and 1107 do not apply to any measure that a Party adopts or maintains with respect to sectors, subsectors or activities, as set out in its Schedule to Annex II.

4.    No Party may, under any measure adopted after the date of entry into force of this Agreement and covered by its Schedule to Annex II, require an investor of another Party, by reason of its nationality, to sell or otherwise dispose of an investment existing at the time the measure becomes effective.

5.    Articles 1102 and 1103 do not apply to any measure that is an exception to, or derogation from, the obligations under Article 1703 (Intellectual Property National Treatment) as specifically provided for in that Article.

6.    Article 1103 does not apply to treatment accorded by a Party pursuant to agreements, or with respect to sectors, set out in its Schedule to Annex IV.

7.    Articles 1102, 1103 and 1107 do not apply to:

(a)     procurement by a Party or a state enterprise; or

(b)     subsidies or grants provided by a Party or a state enterprise, including government supported loans, guarantees and insurance.

8.    The provisions of:

(a)     Article 1106(1)(a), (b) and (c), and (3)(a) and (b) do not apply to qualification requirements for goods or services with respect to export promotion and foreign aid programs;

(b)     Article 1106(1)(b), (c), (f) and (g), and (3)(a) and (b) do not apply to procurement by a Party or a state enterprise; and

(c)    Article 1106(3)(a) and (b) do not apply to requirements imposed by an importing Party relating to the content of goods necessary to qualify for preferential tariffs or preferential quotas.

## Article 1138: Exclusions

1.    Without prejudice to the applicability or non-applicability of the dispute settlement provisions of this Section or of Chapter Twenty (Institutional Arrangements and Dispute Settlement Procedures) to other actions taken by a Party pursuant to Article 2102 (National Security), a decision by a Party to prohibit or restrict the acquisition of an investment in its territory by an investor of another Party, or its investment, pursuant to that Article shall not be subject to such provisions.

2.    The dispute settlement provisions of this Section and of Chapter Twenty shall not apply to the matters referred to in Annex 1138.2.

## Annex 1138.2: Exclusions from Dispute Settlement

### Canada

A decision by Canada following a review under the *Investment Canada Act*, with respect to whether or not to permit an acquisition that is subject to review, shall not be subject to the dispute settlement provisions of Section B or of Chapter Twenty (Institutional Arrangements and Dispute Settlement Procedures).

### Mexico

A decision by the National Commission on Foreign Investment ("Comisión Nacional de Inversiones Extranjeras") following a review pursuant to Annex I, page IM4, with respect to whether or not to permit an acquisition that is subject to review, shall not be subject to the dispute settlement provisions of Section B or of Chapter Twenty (Institutional Arrangements and Dispute Settlement Procedures).

**Article 1201: Scope and Coverage**

2.    This Chapter does not apply to:

(a)    financial services, as defined in Chapter Fourteen (Financial Services);

(b)    air services, including domestic and international air transportation services, whether scheduled or non-scheduled, and related services in support of air services, other than

(i)    aircraft repair and maintenance services during which an aircraft is withdrawn from service, and

(ii)    specialty air services;

(c)    procurement by a Party or a state enterprise; or

(d)    subsidies or grants provided by a Party or a state enterprise, including government-supported loans, guarantees and insurance.

3.    Nothing in this Chapter shall be construed to:

(a)    impose any obligation on a Party with respect to a national of another Party seeking access to its employment market, or employed on a permanent basis in its territory, or to confer any right on that national with respect to that access or employment; or

(b)    prevent a Party from providing a service or performing a function such as law enforcement, correctional services, income security or insurance, social security or insurance, social welfare, public education, public training, health, and child care, in a manner that is not inconsistent with this Chapter.

**Article 1301: Scope and Coverage**

2.    Except to ensure that persons operating broadcast stations and cable systems have continued access to and use of public telecommunications transport networks and services, this Chapter does not apply to any measure adopted or maintained by a Party relating to cable or broadcast distribution of radio or television programming.

**Article 1401: Scope and Coverage**

2.    Articles 1109 through 1111, 1113, 1114 and 1211 are hereby incorporated into and made a part of this Chapter. Articles 1115 through 1138 are hereby incorporated into and made a part of this Chapter solely for breaches by a Party of Articles 1109 through 1111, 1113 and 1114, as incorporated into this Chapter.

**Article 1410: Exceptions**

1.    Nothing in this Part shall be construed to prevent a Party from adopting or maintaining reasonable measures for prudential reasons, such as: . . . .

**Article 1501: Competition Law**

3.    No Party may have recourse to dispute settlement under this Agreement for any matter arising under this Article.[265]

---

[265]    Note 43 to the NAFTA provides: "Article 1501 (Competition Law): no investor may have recourse to investor-state arbitration under the Investment Chapter for any matter arising under this Article."  *See United Parcel Service of America, Inc. v. Canada*, Award on Jurisdiction, 22 November 2002, NAFTA (UNCITRAL), available at: http://www.investmentclaims.com/decisions/UPS-Canada-Jurisdiction-22Nov2002.pdf, at ¶ 61: "Note 43 evidences the drafters' caution . . . . and added a note to make plain that investor-State arbitration also cannot be used to enforce [Article 1501]."

**Article 1503: State Enterprises**

1.   Nothing in this Agreement shall be construed to prevent a Party from maintaining or establishing a state enterprise.

**Article 1606: Dispute Settlement**

1.   A Party may not initiate proceedings under Article 2007 (Commission Good Offices, Conciliation and Mediation) regarding a refusal to grant temporary entry under this Chapter or a particular case arising under Article 1602(1) unless:

      (a)     the matter involves a pattern of practice; and

      (b)     the business person has exhausted the available administrative remedies regarding the particular matter.

**Article 1607: Relation to Other Chapters**

Except for this Chapter, Chapters One (Objectives), Two (General Definitions), Twenty (Institutional Arrangements and Dispute Settlement Procedures) and Twenty Two (Final Provisions) and Articles 1801 (Contacts Points), 1802 (Publication), 1803 (Notification and Provision of Information) and 1804 (Administrative Proceedings), no provision of this Agreement shall impose any obligation on a Party regarding its immigration measures.

**Article 2004: Recourse to Dispute Settlement Procedures**

Except for the matters covered in Chapter Nineteen (Review and Dispute Settlement in Antidumping and Countervailing Duty Matters) and as otherwise provided in this Agreement, the dispute settlement provisions of this Chapter shall apply with respect to the avoidance or settlement of all disputes between the Parties regarding the interpretation or application of this Agreement or wherever a Party considers that an actual or proposed measure of another Party is or would be inconsistent with the obligations of this Agreement or cause nullification or impairment in the sense of Annex 2004.

**Article 2103: Taxation**

1.    Except as set out in this Article, nothing in this Agreement shall apply to taxation measures.

2.    Nothing in this Agreement shall affect the rights and obligations of any Party under any tax convention. In the event of any inconsistency between this Agreement and any such convention, that convention shall prevail to the extent of the inconsistency.

3.    Notwithstanding paragraph 2:

(a)    Article 301 (Market Access - National Treatment) and such other provisions of this Agreement as are necessary to give effect to that Article shall apply to taxation measures to the same extent as does Article III of the GATT; and

(b)    Article 314 (Market Access - Export Taxes) and Article 604 (Energy Export Taxes) shall apply to taxation measures.

4.    Subject to paragraph 2:

(a)    Article 1202 (Cross-Border Trade in Services - National Treatment) and Article 1405 (Financial Services - National Treatment) shall apply to taxation measures on income, capital gains or on the taxable capital of corporations, and to those taxes listed in paragraph 1 of Annex 2103.4, that relate to the purchase or consumption of particular services, and

(b)    Articles 1102 and 1103 (Investment - National Treatment and Most-Favored Nation Treatment), Articles 1202 and 1203 (Cross-Border Trade in Services - National Treatment and Most-Favored Nation Treatment) and Articles 1405 and 1406 (Financial Services - National Treatment and Most-Favored Nation Treatment) shall apply to all taxation measures, other than those on income, capital gains or on the taxable capital of corporations, taxes on

estates, inheritances, gifts and generation-skipping transfers and those taxes listed in paragraph 1 of Annex 2103.4,

except that nothing in those Articles shall apply

> (c)    any most-favored-nation obligation with respect to an advantage accorded by a Party pursuant to a tax convention,

> (d)    to a non-conforming provision of any existing taxation measure,

> (e)    to the continuation or prompt renewal of a non-conforming provision of any existing taxation measure,

> (f)    to an amendment to a non-conforming provision of any existing taxation measure to the extent that the amendment does not decrease its conformity, at the time of the amendment, with any of those Articles,

> (g)    to any new taxation measure aimed at ensuring the equitable and effective imposition or collection of taxes and that does not arbitrarily discriminate between persons, goods or services of the Parties or arbitrarily nullify or impair benefits accorded under those Articles, in the sense of Annex 2004, or

> (h)    to the measures listed in paragraph 2 of Annex 2103.4.

5.    Subject to paragraph 2 and without prejudice to the rights and obligations of the Parties under paragraph 3, Article 1106(3), (4) and (5) (Investment - Performance Requirements) shall apply to taxation measures.

6.    Article 1110 (Expropriation and Compensation) shall apply to taxation measures except that no investor may invoke that Article as the basis for a claim under Article 1116 (Claim by an Investor of a Party on its Own Behalf) or 1117 (Claim by an Investor of a Party on Behalf of an Enterprise), where it has been determined pursuant to this paragraph that the measure is not an

expropriation. The investor shall refer the issue of whether the measure is not an expropriation for a determination to the appropriate competent authorities set out in Annex 2103.6 at the time that it gives notice under Article 1119 (Notice of Intent to Submit a Claim to Arbitration). If the competent authorities do not agree to consider the issue or, having agreed to consider it, fail to agree that the measure is not an expropriation within a period of six months of such referral, the investor may submit its claim to arbitration under Article 1120 (Submission of a Claim to Arbitration).

## Article 2104: Balance of Payments

1.    Nothing in this Agreement shall be construed to prevent a Party from adopting or maintaining measures that restrict transfers where the Party experiences serious balance of payments difficulties, or the threat thereof, and such restrictions are consistent with paragraphs 2 through 4 and are:

> (a)    consistent with paragraph 5 to the extent they are imposed on transfers other than Cross-Border trade in financial services; or

> (b)    consistent with paragraphs 6 and 7 to the extent they are imposed on Cross-Border trade in financial services.

## Article 2105: Disclosure of Information

Nothing in this Agreement shall be construed to require a Party to furnish or allow access to information the disclosure of which would impede law enforcement or would be contrary to the Party's law protecting personal privacy or the financial affairs and accounts of individual customers of financial institutions.

## Article 2106: Cultural Industries

Annex 2106 applies to the Parties specified in that Annex with respect to cultural industries.

128

**Annex 2106: Cultural Industries**

Notwithstanding any other provision of this Agreement, as between Canada and the United States, any measure adopted or maintained with respect to cultural industries, except as specifically provided in Article 302 (Market Access - Tariff Elimination), and any measure of equivalent commercial effect taken in response, shall be governed under this Agreement exclusively in accordance with the provisions of the *Canada - United States Free Trade Agreement*. The rights and obligations between Canada and any other Party with respect to such measures shall be identical to those applying between Canada and the United States.

250. The above survey shows a number of things.

251. First, if the NAFTA drafters wanted to achieve a restriction or exclusion of substantive matters, they did so by employing language of "shall not apply to" or "shall [not] be construed." *See* Articles 309(3); 603(3); 1101(3); 1108; 1138; 1201(2) and (3); 1301(2); 1401(2); 1410; 1503(1); 2104(1); 2105; and 2106.

252. Second, if the drafters wanted to restrict or exclude dispute settlement provisions to certain subject matters, they did so explicitly in a number of cases. *See* Articles 804; 1501(3); 1606(1); and 2004.

253. Third, two provisions would *prima facie* appear to be comparable to Article 1901(3): Articles 1607 and 2103(1), which also do not explicitly refer to any NAFTA dispute settlement provisions. The former Article has not been the subject of arbitral review, whereas the latter has been to a certain extent. In *UPS*, the tribunal stated in this regard:

116. The ASC [Amended Statement of Claim] contains allegations relating to goods and services tax. They appear in parts of the Claim relating both to national treatment (article 1102) and minimum standard (article 1105). The allegation relating to article 1105 was challenged by Canada, in its Memorial, as being outside the Tribunal's jurisdiction. Counsel

for the Investor stated at the hearing that it abandoned that particular claim and as a consequence para 33(a) of the ASC. It did however maintain the Claim relating to the tax so far as article 1102 was concerned. As a result of that statement, counsel for Canada did not at the hearing pursue its challenge in relation to taxation.

117. The Tribunal records those clarifications which have the consequence that no Canadian challenge remains under this heading. We simply note that while article 2103 provides that nothing in the Agreement applies to taxation measures, one of the limits to that exception is that article 1102 (but not article 1105) does apply to taxation measures (with exceptions that are not relevant). Accordingly the position taken by the two parties appears to conform exactly with the Agreement.[266]

254.    The tribunal in *UPS* apparently considered that the text of Article 2103(1) excludes claims based on Section A of Chapter Eleven as being outside the jurisdiction of an arbitral tribunal constituted under Section B of Chapter Eleven, unless the exceptions to the exception set forth in Article 2103(3)-(6) (quoted in the preceding paragraph, which, in turn, have "exceptions to the exceptions to the exception") apply. While the present Tribunal wonders whether the drafters could not have utilized more comprehensible wording for the average reader (and also for the informed reader for that matter) by avoiding triple layered exceptions, the message, as interpreted by the *UPS* tribunal, is clear: the limitation as set forth in Article 2103(1) precludes a Chapter Eleven tribunal from considering NAFTA taxation claims under Section A of Chapter Eleven.

255.    Here, four observations are in order.

---

[266]    *United Parcel Service of America, Inc. v. Canada*, Award on Jurisdiction, 22 November 2002, NAFTA (UNCITRAL), available at: http://www.investmentclaims.com/decisions/UPS-Canada-Jurisdiction-22Nov2002.pdf.

256.    In the first place, unlike Article 1901(3), which uses the words "shall [not] be construed as," Article 2103(1) uses the words "shall not apply to." The present Tribunal does not attach any relevance to the wording differences in these two phrases as, linguistically, they appear to carry the same meaning in the context of the NAFTA provisions relating to restrictions and exclusions as previously recited.[267]

257.    In the second place, Article 2103(1) refers to "measures," while Article 1901(3) refers to "law." Canfor and Terminal argue that by the use of the more precise, defined phrase "antidumping law or countervailing duty law," as opposed to the broader phrase "antidumping measure or countervailing duty measure," the State Parties intended to signal a distinction in the scope or ambit of Article 1901(3) as compared to Article 2103(1) (and Article 1607).[268] Canfor and Terminal further argue that "measure" is "clearly broader than 'law' and broader than 'application of the law'."[269] The United States contends that "Claimants' claims challenging the application of U.S. antidumping and countervailing duty law are claims that impose obligations on the United States with respect to its antidumping and countervailing duty law."[270]

258.    Within the terminology used in the NAFTA, "measure" is indeed broader than "law."[271] "Measure" is defined in Article 201 as: "includes any law, regulation, procedure, requirement or practice." However, the Tribunal doubts that the

---

[267]    *See also* ¶ 194 *supra.*

[268]    Canfor and Terminal Rejoinder at ¶¶ 13-19.

[269]    C-PHM at ¶¶ 29, 35B and 36(a).

[270]    R-PHM at ¶¶ 29 and 35B; R-R-PHM p. 16.

[271]    *Ethyl Corporation v. Canada*, Award on Jurisdiction, 24 June 1998, NAFTA (UNCITRAL), at ¶ 66, available at: http://ita.law.uvic.ca/documents/Ethyl-Award.pdf; *Loewen Group, Inc. and Raymond R. Loewen v. United States*, Award on Jurisdiction, 5 January 2001, ICSID Case No. ARB(AF)/98/3 (NAFTA), at ¶ 11, available at: http://ita.law.uvic.ca/documents/Loewen-Jurisdiction-2.pdf.

difference in terminology used in the present context signals a material distinction. Article 1901(3) employs the broad language of "with respect to the Party's antidumping law or countervailing duty law." The Tribunal found earlier that that phrase includes the application of the law.[272] Such application comprises the conduct complained of by Canfor and Terminal as being measures under Chapter Eleven.[273] Consequently, the difference between "measures" under Article 2103(1) (and under Article 1607) and "law" under Article 1901(3) is of no assistance for deciding the present Preliminary Question. The same analysis applies to the use of the word "matters" in the caption of Chapter Nineteen.[274]

259. In the third place, Article 2103(3)-(6) is very detailed with respect to which substantive provisions of Section A of Chapter Eleven do or do not apply to "taxation measures." In contrast, Article 1901(3) is silent on the provisions of Section A of Chapter Eleven. However, if the drafters considered an across-the-board exclusion for antidumping and countervailing duty law appropriate under Chapter Eleven (without exceptions to the exceptions to the exception), the insertion into Chapter Nineteen of a provision comparable to Article 2103(1) would have sufficed.

260. In the fourth place, Article 2103 concerning taxation measures appears in a separate NAFTA Chapter that is devoted to "Exceptions," and yet no provision in Chapter Twenty One relates to antidumping and countervailing duty law. The present Tribunal does not attach any importance to the omission of antidumping and countervailing duty law from the exceptions set forth in Chapter Twenty One,

---

[272] *See* ¶¶ 209-212 *supra.*

[273] *See* ¶ 149 *supra.* According to Article 1101, Chapter Eleven applies to "measures adopted or maintained by a Party relating to: (a) investors of another Party; (b) investments of investors of another Party in the territory of the Party; and (c) with respect to Articles 1106 and 1114, all investments in the territory of the Party."

[274] For the word "matters" in Article 2004, *see* ¶¶ 263-264 *infra.*

since, as demonstrated by the above selective overview, the NAFTA contains numerous restrictions and exceptions that do not appear in Chapter Twenty One. Moreover, the NAFTA does not, in distinction from antidumping and countervailing duty law, contain a separate Chapter that is concerned with taxation and, therefore, it is understandable that taxation exceptions are dealt with in Chapter Twenty One.

261.    As previously mentioned, Article 1607 is also comparable to Article 1901(3) insofar as silence regarding Chapter Eleven is concerned. Actually, Article 1607 is, in its drafting, a close approximation to Article 1901(3). Article 1607 contains the words "no provision of this Agreement shall impose any obligation . . .," while Article 1901(3) contains the words "no provision of any other Chapter of this Agreement shall be construed as imposing obligations . . ." In the Tribunal's view, those differing formulations are conveying the same result. There is a further difference in that Article 1901(3) refers to "law" while Article 1607 refers to "measures."[275] Whereas Article 2103 contains restrictions related to taxation measures, Article 1607 contains restrictions related to immigration measures. Other than with regard to these differences in verbiage, Article 1901(3) and Article 1607 are analogous. Furthermore, in this latter regard, not even Canfor and Terminal have suggested that immigration measures can be the subject of Chapter Eleven Claims.

262.    Articles 1607 and 2103(1) show that, in these cases, the drafters of the NAFTA achieved a restriction to, or exclusion of, dispute settlement provisions without express reference to those provisions. This was accomplished by the use in both cases of broadly exclusionary language, with the accompanying recitation of express exceptions. The Tribunal believes that Article 1901(3) is similar in that it

---

[275]    *See* ¶¶ 257-258 *supra.*

sets forth a broad exclusion that in turn is subject to the one express exception for Article 2203 ("Entry into Force").

263. With respect to Article 2004,[276] which explicitly excludes "matters" covered in Chapter Nineteen, Canfor and Terminal argue that the provisions in that article and in Article 1901(3) perform different functions.[277]   According to Canfor and Terminal, the use of the word "law" in Article 1901(3) reflects the fact that no provision of another Chapter is to be interpreted so as to require another State Party to do something to their antidumping or countervailing duty law, while Article 2004 excludes the use of the dispute settlement provisions of Chapter Twenty in any case where the dispute settlement provisions of Chapter Nineteen apply.  The United States contends that there is no practical significance to the difference in wording.[278]

264. The Tribunal is of the view that the wording of Article 2004 is of no assistance in interpreting Article 1901(3).  As is correctly pointed out by the United States,[279] the perspectives of Articles 2004 and 1901(3) are different.   Article 2004 introduces a set of rules that apply generally to the subject matter of the NAFTA except as expressly excluded.  By contrast, Article 1901(3) does not introduce a set of rules, but, rather, identifies a subject matter – the Party's antidumping law and countervailing duty law – and provides that rules set forth elsewhere in the

---

[276]     Article 2004 provides: "Except for the *matters* covered in Chapter Nineteen (Review and Dispute Settlement in Antidumping and Countervailing Duty Matters) and as otherwise provided in this Agreement, the dispute settlement provisions of this Chapter shall apply with respect to the avoidance or settlement of all disputes between the Parties regarding the interpretation or application of this Agreement or wherever a Party considers that an actual or proposed measure of another Party is or would be inconsistent with the obligations of this Agreement or cause nullification or impairment in the sense of Annex 2004." (emphasis added)

[277]     C-PHM at ¶ 41.

[278]     R-PHM at ¶ 41.

[279]     *Id.*

NAFTA are not to be construed as imposing obligations on a Party with respect to that subject matter.

265.    The Tribunal now turns to the circumstances of conclusion of Article 1901(3), which topic is a supplementary means of interpreting a treaty, although the foregoing analysis does not require resort to that means of interpretation in order to support its conclusion.  The Tribunal notes in this regard that, even if resort to supplementary means was justified under the Vienna Convention on the Law of Treaties, the available legislative history of NAFTA does not assist in the interpretation of Article 1901(3), simply because there is none available that is relevant, except that this history shows that the State Parties were unable to agree on substantive international rules to govern antidumping and countervailing duty matters.[280]

266.    In construing the reach of Article 1901(3), Canfor and Terminal rely on the list of "Provisions to be placed outside of the Investment Chapter,"[281] which does not refer to Chapter Nineteen, but the United States has convincingly shown that that list is not exhaustive.[282]

267.    Canfor and Terminal also rely on the following passage in the United States' Statement of Administrative Action ("SAA") as reflecting the United States' contemporaneous understanding:

> Articles 1901 and 1902 make clear that each country retains its domestic antidumping and countervailing duty laws and can amend them . . . . These provisions are identical to Articles 1901

---

[280]    United States Objection to Jurisdiction pp. 30-32; Canfor Reply at ¶¶ 120-123; United States Reply p. 30; Canfor and Terminal Rejoinder at ¶¶ 62-67; C-PHM at ¶¶ 62-64; R-PHM at ¶¶ 62-64; C-R-PHM at ¶¶ 62-64.

[281]    C-PHM at ¶ 64.

[282]    R-PHM at ¶ 64.

> through 1903 of the CFTA [Canada-United States Free Trade Agreement of 1989], except for technical changes necessary to accommodate the addition of a third country[283]

268. That statement is indeed puzzling.  The "third country" must be deemed to refer to Mexico.  However, the Tribunal agrees with Canfor and Terminal when they state that they "would be speculating what the drafters thought was necessary to facilitate the addition of Mexico to the treaty."[284]

269. Actually, none of the parties to the present case has provided a satisfactory explanation why Article 1901(3) was inserted, while the predecessor treaty – the Canada-United States Free Trade Agreement of 1989 – did not contain a similar provision.  The FTA contained counterparts to Article 1901(1) and (2) but not Article 1901(3).  And, as previously described, there is no available negotiating history whatsoever that sheds a light on the derivation of Article 1901(3).  Canfor and Terminal hypothesize that the purpose of Article 1901(3) was to make clear that no provision of any other Chapter imposed an obligation on a State Party to amend their antidumping or countervailing duty laws beyond those amendments set out in Chapter Nineteen itself.[285]   The United States theorizes that the introduction of investor-State arbitration under the NAFTA (not available under the Canada-United States FTA) may have, in part, prompted the inclusion of the clarification found in Article 1901(3) and that, additionally, a degree of political sensitivity in the United States over subjecting antidumping and countervailing duty matters to international dispute resolution was even greater in 1992 than it was in 1986 and 1987, Chapter Nineteen of the Canada-United States FTA having

---

[283]    NORTH AMERICAN FREE TRADE AGREEMENT, IMPLEMENTATION ACT, STATEMENT OF ADMINISTRATIVE ACTION, H.R. Doc. No. 103-159, Vol. I, 103d Cong., 1st Sess. at 194 (1993).

[284]    C-PHM at ¶ 63.

[285]    C-PHM at ¶ 62.

become a target of significant criticism in the United States.[286]   These speculations, however interesting they may be, cannot form a sound basis for relying on the circumstances of the conclusion of Article 1901(3) as a supplementary means of interpreting this provision of the NAFTA.

270.   The other passage in the SAA relied upon by Canfor and Terminal reads:

> The chapter [Eleven] applies to *all* government measures relating to investments, with the exception of measures governing financial services, which are treated in Chapter Fourteen.[287] (emphasis added by Canfor and Terminal)

271.   Indeed, an explicit reference to Chapter Nineteen is lacking in this passage in the SAA.   However, as is the case for the "Provisions to be placed outside of the Investment Chapter" referred to above, the lack of mention of certain measures does not mean that those that are not mentioned must be deemed to be included. By way of example, immigration measures are not mentioned in the passage of the SAA, but there is no-one who has argued that they fall within the reach of Chapter Eleven.

272.   Finally, Canfor and Terminal contend that it is not plausible that the NAFTA Parties could have intended to leave a "gaping hole in the protection afforded by NAFTA Chapter 11 such that conduct connected in any way to municipal antidumping and countervailing duty law would become the tool of choice for mistreatment of investors and their investments."[288]   In light of the exceptions and restrictions reviewed above, the protection afforded by Chapter Eleven is, as one might expect, not complete.   That is the reality of treaty negotiation between States

---

[286]     R-PHM at ¶ 62.

[287]     NORTH AMERICAN FREE TRADE AGREEMENT, IMPLEMENTATION ACT, STATEMENT OF ADMINISTRATIVE ACTION, H.R. Doc. No. 103-159, Vol. I, 103d Cong., 1st Sess. at 194 (1993).

[288]     Canfor Reply at ¶ 123.

with which investors have to live, even though investor-State arbitration as offered by Chapter Eleven already constitutes a great step forward in investor protection.

273. In conclusion, (i) having regard to all the foregoing considerations, (ii) in light of the objective of efficient proceedings as set forth in Article 102(1)(e), and (iii) notwithstanding the principle that exclusion clauses are to be interpreted narrowly, the text of Article 1901(3) does not, in the judgment of the Tribunal, leave room for any other interpretation than that the entire Chapter Eleven does not apply with respect to the antidumping law and countervailing duty law of a State Party to the NAFTA. As previously quoted, that text specifically stipulates: ". . . no provision of *any* other Chapter of *this Agreement* shall be construed as imposing *obligations* . . ." (emphasis added). Based on the foregoing analysis, the inescapable conclusion must be that the exclusionary language of Article 1901(3), in the absence of an express exception to the contrary, encompasses all obligations stemming from Chapter Eleven, including those related to dispute settlement. That preclusion necessarily encompasses all claims related to conduct of Commerce, the ITC and other government entities and officials prior to, during and subsequent to preliminary and final determinations in relation to United States antidumping and countervailing duty laws.

### (b) The Byrd Amendment

274. As mentioned,[289] on 28 October 2000, the United States enacted the Continued Dumping and Subsidy Offset Act of 2000, which amended Title VII of the Tariff Act of 1930 by inserting a new Section 754 ("CDSOA" or "Byrd Amendment").[290]

---

[289]    *See* ¶¶ 66 and 93 *supra.*

[290]    Act Oct. 28, 2000, P.L. 106-387, Title X, § 1002, 114 Stat. 1549, 1549A-72 (2000), codified at 19 U.S.C. § 1675c (2000), corresponding to § 754 of the Tariff Act, repealed by Act Feb. 8, 2006, P.L. 109-171, Title VII, Subtitle F, § 7601(a), *see* ¶ 288 *infra.*

275.    The Findings of Congress concerning the Byrd Amendment were as follows:

(1)  Consistent with the rights of the United States under the World Trade Organization, injurious dumping is to be condemned and actionable subsidies which cause injury to domestic industries must be effectively neutralized.

(2)  United States unfair trade laws have as their purpose the restoration of fair trade so that jobs and investment that should be in the United States are not lost through the false market signals.

(3)  The continued dumping or subsidization of imported products after the issuance of antidumping orders or findings or countervailing duty orders can frustrate the remedial purpose of the laws by preventing market prices from returning to fair levels.

(4)  Where dumping or subsidization continues, domestic producers will be reluctant to reinvest or rehire and may be unable to maintain pension and health care benefits that conditions of fair trade would permit.  Similarly, small businesses and American farmers and ranchers may be unable to pay down accumulated debt, to obtain working capital, or to otherwise remain viable.

(5)  United States trade laws should be strengthened to see that the remedial purpose of those laws is achieved.[291]

276.    The operative provision of the Byrd Amendment reads:

Duties assessed pursuant to a countervailing duty order, an antidumping duty order, or a finding under the Antidumping Act of 1921 shall be distributed on an annual basis under this section [i.e., § 1675c] to the affected domestic producers for qualifying

---

[291]    *Id.* § 1002.

> expenditures.    Such distribution shall be known as the
> "continued dumping and subsidy offset".[292]

277.    The term "affected domestic producers" is defined as:

> [A]ny manufacturer, producer, farmer, rancher, or worker
> representative (including associations of such persons) that–
>
> (A)  was a petitioner or interested party in support of the petition
> with respect to which an antidumping duty order, a finding under
> the Antidumping Act of 1921, or a countervailing duty order has
> been entered, and
>
> (B)  remains in operation.
>
> (. . . .)[293]

278.    The term "Qualifying Expenditure" for purposes of the Byrd Amendment means
an expenditure incurred after the issuance of the antidumping duty finding or order
or countervailing duty order in a wide variety of categories of expenditures.[294]

279.    With respect to the persons eligible for distribution of the antidumping and
countervailing duties assessed, the U.S. International Trade Commission ("ITC")
is to draw up (i) a list of petitioners and persons with respect to each order and
finding and (ii) a list of persons who indicate support of the petition by letter or
through questionnaire response within 60 days after the date of the issuance of an
antidumping or countervailing duty order and finding.[295]  Pursuant to the Byrd
Amendment, the Commissioner of Customs shall distribute, on an annual basis, all
funds from the assessed duties received in a preceding fiscal year to the affected

---

[292]    19 U.S.C. § 1675c(a).

[293]    19 U.S.C. § 1675c(b).

[294]    19 U.S.C. § 1675c(c).

[295]    19 U.S.C. § 1675c(d).

domestic producers, provided that certain requirements for certification of those producers have been satisfied.

280.    All antidumping or countervailing duties that are assessed after the effective date of the Byrd Amendment (i.e., 1 January 1999) are deposited by the Commissioner of Customs in special accounts established in the Treasury of the United States with respect to each order or finding.[296]

281.    The United States, in its Reply Post-Hearing Memorial, notes "the rather unusual circumstances leading to the enactment of the Byrd Amendment."[297]  Although the Byrd Amendment amended the Tariff Act of 1930, the vehicle through which it became law was a bill consisting of almost 100 pages and thirteen separate titles, whose primary focus involved appropriations for agricultural programs for the upcoming fiscal year (i.e., the Agriculture, Rural Development, Food and Drug Administration and Related Agencies Appropriations Act, 2001).  The Byrd Amendment appeared neither in the House nor the Senate version of this "omnibus" appropriations bill.  Rather, it was inserted in a bill (as part of what is known as a "Conference Report") that emanated on 6 October 2000 from a House-Senate conference that reconciled the differences between the two earlier versions of the bill.  The House of Representatives then approved the Conference Report on 11 October 2000, and the Senate approved it on 18 October 2000.  As the final step in the enactment of the Byrd Amendment, the President signed the bill into law on 28 October 2000.

282.    The United States expressly admits that it did not notify the Byrd Amendment to Canada "prior to enactment" as was required under Article 1902(2)(b) of the

---

[296]    19 U.S.C. § 1675c(e).

[297]    R-PHM at n. 167.  The United States also states that, as far as it is aware, there is no legislative history of the Byrd Amendment (Canfor December 2004 Hearing Tr. 703-705).

NAFTA (assuming, as later described, that the Byrd Amendment constituted an "amending statute" thereunder).[298]

283.    It is widely reported that, as of the end of 2005, Customs had collected approximately US$5 billion in duties in connection with softwood lumber imports from Canada.  By that time, an amount of approximately US$ 5 million had, reportedly, been disbursed under the CDSOA to a number of U.S. softwood lumber companies.

284.    In 2001, Canada and Mexico (as well as Australia, Brazil, Chile, the European Communities, India, Indonesia, Japan, Korea, and Thailand) brought a complaint against the United States before the WTO,[299] asserting that the Byrd Amendment (i.e., the CDSOA) constituted a specific measure against dumping and subsidies not contemplated by either the WTO AD Agreement or the WTO SCM Agreement.[300]   On 27 January 2003, the Dispute Settlement Body ("DSB") adopted the report of the Panel, as modified by the report of the Appellate Body, to the effect that the CDSOA: (a) is a non-permissible specific action against dumping or a subsidy, contrary to Articles VI:2 and VI:3 of the GATT 1994, Article 18.1 of the AD Agreement and Article 32.1 of the SCM Agreement; (b) is inconsistent with certain provisions of the AD Agreement and the SCM Agreement, with the result that the United States failed to comply with Article 18.4 of the AD Agreement, Article 32.5 of the SCM Agreement and Article XVI:4

---

[298]    Canfor December 2004 Hearing Tr. 654-656; January 2006 Hearing Tr. 144-145.  R-AAQ *passim*; R-RAQ at p. 6 ("The United States did not notify Canada in writing of this amendment prior to its enactment").  Article 1902(2)(b) provides: "2. Each Party reserves the right to change or modify its antidumping law or countervailing duty law, provided that in the case of an amendment to a Party's antidumping or countervailing duty statute: . . . (b) the amending Party notifies in writing the Parties to which the amendment applies of the amending statute as far in advance as possible of the date of enactment of such statute."

[299]    For the WTO dispute settlement mechanism, *see* n. 77 *supra*.

[300]    *See* ¶ 85 at (b) *supra*.

of the WTO Agreement; and (c) pursuant to Article 3.8 of the DSU, to the extent that the CDSOA is inconsistent with provisions of the AD Agreement and the SCM Agreement, nullifies or impairs benefits accruing to the complaining parties under those Agreements.

285.    Subsequent to the failure of the United States to repeal the Byrd Amendment within the required time, Canada and other WTO Members were authorized by the WTO DSB to levy retaliatory duties reflecting the "trade effect" of the CDSOA.

286.    Neither Canada nor Mexico requested a review of the Byrd Amendment in binational panel review proceedings under Article 1903 of the NAFTA.[301]  The Tribunal has no information as to why this is so.

287.    In 2005, the Government of Canada and several Canadian trade associations and exporters filed complaints with the U.S. Court of International Trade (the "CIT") related to the Byrd Amendment.  Each plaintiff claimed that the U.S. Customs and Border Protection ("Customs") acted unlawfully when it applied the Byrd Amendment to disburse to domestic producers antidumping and countervailing duties assessed on imports of goods from Canada because, pursuant to Section 408 of the NAFTA Implementation Act,[302] the Byrd Amendment failed to so specify as

---

[301]    Article 1903 is quoted at n. 200 *supra.*

[302]    Codified at 19 U.S.C. § 3438.  Section 408 provides:

"Any amendment enacted after the Agreement [i.e., the NAFTA] enters into force with respect to the United States that is made to –

    (1)     section 303 or title VII of the Tariff Act of 1930, or any successor statute, or

    (2)     any other statute which –

        (A)     provides for judicial review of final determinations under such section, title, or successor statute, or

        (B)     indicates the standard of review to be applied,

shall apply to goods from a NAFTA country only to the extent specified in the amendment."

required thereunder.[303]  By a decision of 7 April 2006, the CIT found that the plaintiff Canadian exporters, but not the Government of Canada, were authorized to bring the action, and that Customs had violated U.S. law, specifically Section 408 of the NAFTA Implementation Act, in applying the Byrd Amendment to antidumping and countervailing duties on goods from Canada and Mexico.[304]  The CIT did not decide on the proper remedy, in respect of which the CIT ordered further briefing.

288.    Previously, on 8 February 2006, the President of the United States signed into law the Deficit Reduction Act of 2005, which includes a provision repealing the Byrd Amendment.[305]  The provision stipulates that the repeal is effective upon the date of enactment of the Act, while also providing that "all duties on entries of goods made before and filed before October 1, 2007," shall be distributed as if the Byrd Amendment had not been repealed.[306]  The transition period is reportedly the result of a compromise reached during consideration of this Act by the United States Congress.

---

[303]    R-PHM at ¶ 67.

[304]    *Canadian Lumber Trade Alliance et al. v. United States of America et al.*, Consol. Ct. No. 05-00324. 2006 Ct. Intl. Trade LEXIS 45, Annex D to R-AAQ.

[305]    Act Feb. 8, 2006, P.L. 109-171, Title VII, Subtitle F.  Section 7601 ("Repeal of Continued Dumping and Subsidy Offset") of the Deficit Reductions Act of 2005 provides:

"(a)    Repeal - Effective upon the date of enactment of this Act, section 754 of the Tariff Act of 1930 (19 U.S.C. 1675c), and the item relating to section 754 in the table of contents of title VII of that Act, are repealed.

(b)    Distributions on Certain Entries - All duties on entries of goods made and filed before October 1, 2007, that would, but for subsection (a) of this section, be distributed under section 754 of the Tariff Act of 1930, shall be distributed as if section 754 of the Tariff Act of 1930 had not been repealed by subsection (a)."

[306]    R-PHM at ¶ 67. *Accord* C-R-PHM at ¶ 67.

289.    In Canfor's Notice of Arbitration and Statement of Claim of 9 July 2002 and Terminal's Notice of Arbitration of 30 March 2004,[307] Claimants asserted that the Byrd Amendment falls below the standard required of the United States under Article 1102 (National Treatment), 1103 (Most-Favored-Nation Treatment), and 1105 (Minimum Standard of Treatment), in that, in particular, it:

> (1)    creates a financial incentive for the domestic industry to initiate and support frivolous and vexatious anti-dumping and countervailing duty petitions, irrespective of their merit, by promising to distribute any duties ultimately collected by those members and only those members of the domestic industry that supported a petition, and not to any other members of the industry that did not;

> (2)    creates an affirmative incentive to ensure such petitions are not resolved other than by the imposition of final duties;

> (3)    discourages the use of undertakings as a resolution of anti-dumping and countervailing duty complaints, as domestic industry is financially encouraged to support only the imposition of duties;

> (4)    artificially distorts the support for any particular petition by, in effect, paying the domestic industry to support it, (in the present case to the potential level of several hundred millions of dollars per year);

> (5)    ensures that any anti-dumping or countervailing duties imposed to remedy any proven dumping or to neutralize the impact of countervailable subsidies is over-remedied, in that the redistribution of such duties distorts the United States market place in favour of the domestic United States industry at the expense of Canfor and its investments and those in its positions; and

---

[307]    Canfor Notice of Arbitration and Statement of Claim at ¶ 144; Terminal Notice of Arbitration at ¶ 45.

(6)   creates a systemic bias in favour of a petition meeting the standing requirements of United States antidumping and countervailing duty law. If a member of the domestic industry does not support a petition that is ultimately successful, then that member of the industry would see its competitors gain an immediate financial advantage over it, and accordingly is induced to support such a petition.

290.   Claimants' position regarding the Byrd Amendment is summarized by them as follows in their Post-Hearing Memorial: [308]

The Byrd Amendment may be "law," but the Claimants' position is that it is not, in the sense intended in Chapter 19, "antidumping or countervailing duty law" as it is antithetical to what is properly understood by those terms and as the United States has not complied with the requirements of Article 1902.[309]

The Claimants challenge the conduct of the United States. That conduct can include certain legislative acts; however, there will only be a violation of Chapter 11 if the conduct falls below the standard of treatment to which the investor is entitled. In order to understand the fundamental unfairness or injustice to the investor that is produced by the Byrd Amendment it is necessary to consider both its effect on decisions to initiate investigations, as well as the financial benefits it confers on United States investors or investments in competition with the Claimant Canadian investors. Moreover, these effects must be viewed in light of the overall pattern of conduct described in Claimants' pleadings. [310]

Canfor and Terminal challenge the effect of the Byrd Amendment, but say that it is not part of AD or countervailing duty law as those terms are expressed in Article 1901(3). The

---

[308]   *See also* Canfor Notice of Arbitration and Statement of Claim at ¶¶ 141-147; Terminal Notice of Arbitration at ¶¶ 41-49; Canfor Reply at n. 11 and 67; United States Reply p. 9 and n. 22; Canfor Rejoinder at n. 17 and 34; January 2006 Hearing: Tr. 100-102; 184:16; 247:13; 394-395; 660; and 662-663.

[309]   C-PHM at ¶ 65.

[310]   C-PHM at ¶ 65A.

> Byrd Amendment is not AD or CVD law within the meaning of those terms in Chapter 19, but yet it has effects on the application of AD or CVD law that contribute to the denial of justice complained of by the Claimants; indeed the offering of what amount to bounties to private actors to pursue unmeritorious claims against an investor is itself a denial of justice. [311]

291. The United States argues that Claimants' position concerning the Byrd Amendment is "with respect to the Party's antidumping law or countervailing duty law" within the meaning of Article 1901(3) and that, therefore, Claimants' claims in relation to the Byrd Amendment are barred by Article 1901(3). [312]

292. At the outset, the Tribunal notes that, contrary to the assertion by the United States, [313] Canfor and Terminal have not conceded that the Byrd Amendment is antidumping and countervailing duty law, at least not within the meaning of "the Party's antidumping law or countervailing duty law" as appearing in Article 1901(3). [314]

293. A first question to be considered by the Tribunal is whether the Byrd Amendment is "antidumping law or countervailing duty law" within the meaning of Article 1901(3).

294. Canfor and Terminal argued that the United States cannot take benefit from the provisions of Chapter Nineteen in respect of statutory amendments to its antidumping and countervailing duty law that have not been notified in accordance

---

[311]    C-PHM at ¶ 65B.

[312]    *See* references in n. 308 *supra.*  *See also* C-R-PHM at ¶¶ 65A and 65C; R-R-PHM pp. 18-19.

[313]    R-PHM at ¶ 71.

[314]    C-R-PHM at ¶ 72.  Nor can Claimants' claims in relation to the Byrd Amendment be reduced to the summary given by the United States in its R-AAQ p. 2.  *See* references in n. 308 *supra.*

with the provisions of Article 1902(2).[315]  That argument gave rise to a number of additional questions from the Tribunal which it submitted to the parties for their comment.[316]  After having taken into account the answers to those questions and the replies thereto, the Tribunal agrees with Canfor and Terminal that the Byrd Amendment does not fall with the definition of that phrase as set forth in Article 1902, and, consequently, the Byrd Amendment is not subject to the terms of Article 1901(3), for the reasons set forth below.

295.    In this regard, the Tribunal has already determined that the definition of "antidumping law or countervailing duty law" set forth in Article 1901(3) is given in Article 1902(1).[317]  Part of that definition is the term "statutes."  Article 1902(2) then provides with respect to statutory amendments:

> 2.    Each Party reserves the right to change or modify its antidumping law or countervailing duty law, provided that in the case of an amendment to a Party's antidumping or countervailing duty statute:

> (a)   such amendment shall apply to goods from another Party only if the amending statute specifies that it applies to goods from that Party or from the Parties to this Agreement;

---

[315]    Canfor December 2004 Hearing Tr. 627-628;  January 2006 Hearing Tr. 100-102; 241-242; 269;  C-PHM at ¶¶ 65C and 65D(a); R-PHM at ¶ 65D(a).

[316]    *See* ¶ 18 *supra.* Response of Canfor Corporation and Terminal Forest Products Ltd. to Additional Questions by the Tribunal Regarding the Byrd Amendment of 19 May 2006 ("C-AAQ");  Response of Respondent United States of America to the Tribunal's Additional Questions Regarding the Continued Dumping and Subsidy Offset Act of 2000 of 19 May 2006 ("R-AAQ"); Claimants' Reply to United States' Answers to the Tribunal's Additional Questions in Relation to the Byrd Amendment of 26 May 2006 ("C-RAQ";  Reply of Respondent United States of America to Claimants' Response to the Tribunal's Additional Questions Regarding the Continued Dumping and Subsidy Offset Act of 2000 of 26 May 2006 ("R-RAQ").

[317]    *See* ¶ 202 *et seq. supra.*

(b)  the amending Party notifies in writing the Parties to which the amendment applies of the amending statute as far in advance as possible of the date of enactment of such statute;

(c)  following notification, the amending Party, on request of any Party to which the amendment applies, consults with that Party prior to the enactment of the amending statute; and

(d)  such amendment, as applicable to that other Party, is not inconsistent with

(i) the *General Agreement on Tariffs and Trade* (GATT), the *Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade* (the Antidumping Code) or the *Agreement on the Interpretation and Application of Articles VI, XVI and XXIII of the General Agreement on Tariffs and Trade* (the Subsidies Code), or any successor agreement to which all the original signatories to this Agreement are party, or

(ii)    the object and purpose of this Agreement and this Chapter, which is to establish fair and predictable conditions for the progressive liberalization of trade between the Parties to this Agreement while maintaining effective and fair disciplines on unfair trade practices, such object and purpose to be ascertained from the provisions of this Agreement, its preamble and objectives, and the practices of the Parties.

296.    As is correctly described by the United States, sub-paragraphs (a) through (c) of Article 1902(2) concern procedural requirements, while sub-paragraph (d) concerns substantive requirements.[318]  Article 1902(2)(a) requires specification by the amending Party in the amending statute.  Article 1902(2)(b) and (c) require prior notification to the affected NAFTA Party or Parties and consultation on request.    Article 1902(2)(d) requires that any amendment conform to the

---

[318]    R-AAQ p. 12.  *Accord* C-AAQ at ¶ 5.

GATT/WTO Agreements and the object and purpose of the NAFTA and Chapter Nineteen.

297.    Viewed within the context as well as the object and purpose of Chapter Nineteen in general, and of Article 1902 in particular, non-compliance with the specific requirements set forth in sub-paragraphs (a) through (d) of Article 1902(2) cannot be considered a "futility" or a "harmless omission," as the United States asserts in connection with the lack of notification of a statutory amendment prior to enactment.[319]   Canfor and Terminal correctly state that the negotiations with respect to Chapter Nineteen of the NAFTA resulted in a compromise which allowed the NAFTA Parties the right to retain their existing antidumping and countervailing duty law, but that that right was circumscribed by the accompanying express requirement that any such amendments must conform to the conditions set forth in Article 1902(2)(a)-(d).[320]   Given these basic considerations, the Tribunal is of the opinion that the United States' interpretation of Article 1902(2) would undermine the purpose and object of Chapter Nineteen, and in particular the delicate and sensitive balance of rights and obligations agreed to under that Chapter.

298.    Assuming that the Byrd Amendment amounts to an antidumping and countervailing duty statute, it amended the law that was in place at the time the NAFTA was concluded.  In order for the Byrd Amendment to be protected by the provisions of Chapter Nineteen as a qualifying subsequent "amending statute," the United States, in enacting the Byrd Amendment, was obligated to meet the explicit conditions set out in Article 1902(2).

---

[319]    R-AAQ p. 1 ("perceived futility given Canada's knowledge and actions"); p. 3 ("Such result . . . . would also be inequitable, based on such a harmless omission . . .")

[320]    C-AAQ at ¶¶ 6-10.

299.    The United States argues that it was clear that the Byrd Amendment pertained to U.S. antidumping and countervailing duty law.  The United States refers to the title of the amendment ("Continued Dumping and Subsidy Offset Act of 2000"), to the Findings of Congress,[321] to the fact that it formed part of an amendment to the Tariff Act of 1930, and to the characterization of the Byrd Amendment by the CIT.[322]  Leaving aside for the moment whether that argument can be reconciled with the United States' contemporaneous conduct, which will be reviewed below, the issue is whether the Byrd Amendment falls under the phrase a "Party's antidumping law or countervailing duty law" set forth in Article 1901(3) of the NAFTA.  As previously mentioned, the structure and purpose of Article 1902 make clear that, in order to become part of a "Party's antidumping law or countervailing duty law," a statutory amendment must meet a number of conditions.  If it were otherwise, Article 1901(3) would be akin to a self-judging treaty provision, which might arguably occur in certain instances such as where provisions relating to essential national security interests are involved.  It has never been suggested that Article 1901(3) falls within such a category.

300.    Moreover, for a tribunal to determine what pertains to a "Party's antidumping law or countervailing duty law" under the exception of Article 1901(3), a degree of certainty is required as to what does and does not fall within that phrase.  In this case, Article 1902 performs that task.  The position of the United States that its future "antidumping law or countervailing duty law" comprises for NAFTA purposes whatever the United States says that it comprises, without having observed the requirements of Article 1902(2), would render Article 1901(3) a great unknown.  As Canfor and Terminal aptly put it: ". . . the United States begs the

---

[321]    Quoted at ¶ 275 *supra.*

[322]    R-AAQ pp. 17-18.

question of where else but Chapter 19 itself this Tribunal should be seeking to find a definition of antidumping and countervailing duty law."[323]

301.    At this juncture, the Tribunal would like to emphasize that it is not acting outside its authority, as it is alleged by the United States.[324]  The role of the Tribunal with respect to the first question is to interpret the phrase "the Party's antidumping law or countervailing duty law" in Article 1901(3).  Thus, the Tribunal's charter in the present phase of the case does not include deciding on a remedy for non-compliance with the conditions set forth in Article 1902(2)(d) as a binational panel under Article 1903(3) would have the power to do so in the form of recommendations.[325]  In arriving at the proper interpretation in the case before it, the Tribunal has to determine whether the effect of non-compliance with one or more of the conditions set forth in Article 1902(2) does or does not permit the amending State Party to rely on the exception contained in Article 1901(3).  Once the Tribunal previously determined that the cited phrase in Article 1901(3) is defined in Article 1902, it is then bound to reach a decision as to whether a particular statute that is alleged to pertain to a "Party's antidumping law or countervailing duty law" appropriately falls, in Tribunal's judgment, within that definition.

302.    In the same vein, the United States' argument that the conditions of Article 1902(2) are directed to State Parties to the NAFTA and not to private claimants[326] is, in the Tribunal's opinion, based on a mistaken assessment of the Tribunal's mission in the present phase of this case.  It is correct that the conditions set forth in Article 1902(2) are to be fulfilled by a State Party to the NAFTA and, as such,

---

[323]    C-AAQ at ¶ 27.

[324]    R-AAQ pp. 3-4; 6-7.

[325]    The text of Article 1903(3) is quoted at n. 200 *supra*.

[326]    R-AAQ p. 16; R-RAQ pp. 2-3.

are obligations owed to other State Parties to the NAFTA.  However, when a State Party invokes the exception of Article 1901(3) against a private party claimant, the Tribunal must determine, by way of interpretation, what the phrase "the Party's antidumping law or countervailing duty law" means in the case before it.  Due to the need to interpret Article 1901(3) in such a case, the fulfillment of the conditions set forth in Article 1902(2) necessarily come into play once the Tribunal has found that Article 1902 defines that Article 1901(3) phrase.

303.  Returning to the issue of notification under Article 1902(2)(b), as previously mentioned, the United States expressly admits that it has not notified the Byrd Amendment to Canada (and to Mexico, assuming that the latter would also be a Party to which the amendment was intended to apply).[327]  The United States explains the lack of notification by reference to the "short timeframe and the unusual circumstances of this substantive amendment of the *Tariff Act* being adopted as part of an appropriations bill."[328]  That explanation might suffice as far as a notification in advance of the hurried Congressional vote following the issuance of the Conference Report.  But the United States, contrary to its treaty commitment to do so, continued thereafter also not to notify the other NAFTA Parties prior to the enactment of the statute.  The United States was obligated to assure an opportunity for notification.  In failing to do so, the United States did not fulfill the precondition of Article 1902(2)(b).

304.  A good faith interpretation and application of the notification requirement of Article 1902(2)(b) within the context of NAFTA Chapter Nineteen require that if a State Party is prevented for some reason to make the notification "as far in advance as possible of the date of enactment of such statute," it must then

---

[327]  *See* n. 298 *supra.*

[328]  R-PHM at n. 167. *See also* ¶ 281 *supra.*

postpone the final step in enactment (i.e., signature into law by the President in the case of the United States), until not only satisfaction of the express requirements of Article 1902(2)(b) but also allowance for the opportunity for consultation "prior to the enactment of the amending statute" as required by Article 1902(2)(c).  If it were otherwise, a State Party to the NAFTA could simply ignore the notification obligation of Article 1902(2)(b) and, by enacting an amending antidumping or countervailing duty statute without notifying it to the other State Parties, undermine the carefully crafted system of checks and balances as contemplated by Chapter Nineteen.

305.    The United States has taken the position that "there is no ongoing duty, pursuant to Article 1902(2)(b), to notify once that amendment becomes law."[329]  The Tribunal shares this view but does so on the basis that the duty to notify is in advance of the final step in any "enactment," failing which the terms of Article 1902(2)(b) are neither satisfied nor capable of becoming satisfied at some future date.

306.    The United States further contends: "There is no evidence to suggest that the President [of the United States] was aware of Article 1902(2)(b)'s requirement, and yet decided not to postpone enacting the bill in order to comply with that requirement,"[330] and: "[I]t is quite possible that the relevant officials were focused on the substance of the bill and not on the notification requirement in NAFTA Article 1902(2)."[331]  The Tribunal does not call into question the good faith application of treaty obligations by the President of the United States and the relevant officials.  However, it is a generally accepted principle of international

---

[329]    R-PHM at ¶ 69; at the January 2006 Hearing, the United States stated that the lack of notification "could have been just an oversight" (Tr. 262-266).

[330]    R-AAQ p. 7.  The Tribunal assumes that there is a typographical error in the last part of the quoted sentence and that it should read: ". . . in order *not* to comply with that requirement." (emphasis added)

[331]    R-AAQ p. 19.

law that, subject to exceptions that do not apply here, ignorance of treaty obligations is no defence.

307.    How each State Party assures that the mandates of Article 1902(2) are respected may depend on its domestic law, but it is also well-established as a principle of international law that particular provisions of a State Party's domestic legal system cannot be invoked to avoid that State's responsibility to fulfill its binding international obligations.[332]

308.    One of the specified purposes of the required notification is to enable the other State Parties to request consultations prior to the enactment of the proposed statutory amendment.    Such consultations could, for example, result in an agreement that the proposed statutory amendment is inconsistent with the provisions of Article 1902(2)(d), thereby bringing about appropriate revision or other reconsideration by the "amending Party."    In other words, the fulfillment of the notification and consultation provisions of Article 1902(2)(b) and of Article 1902(2)(c) may prevent harm in the eyes of the other State Parties before it is inflicted.

309.    Furthermore, the required notification does not merely serve the function of putting a State Party on notice that another State Party is proposing some statute that may affect the first State Party's interests, but also provides fair warning that the legislating Party is *characterizing* the statute in question as an amendment to its antidumping or countervailing duty law for the purpose of Chapter Nineteen.[333]

---

[332]    *See also* Article 27 of the Vienna Convention on the Law of Treaties of 1969, reading: "A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty . . ." For the applicability of the Vienna Convention in the present case, *see* ¶ 177 *supra*.

[333]    C-RAQ at ¶ 13.

310.    The Tribunal does not accept the United States' argument that it effectively met the provisions of Article 1902(2)(b) because of the alleged widespread press reports that, according to the United States, provided the other State Parties with "actual notice" of the Byrd Amendment.[334]   Pursuant to the NAFTA, it is incumbent on the amending Party to notify the affected State Party or Parties in advance of enactment; because of the carefully constructed process of Article 1902(2), an amending Party cannot dispense with notification on the basis of an assumption that the other affected State Party or Parties would be aware of it anyway.

311.    In this connection, the United States also relies on a letter of 25 October 2000 from the Ambassadors to the United States of Canada, the European Commission, and Japan to President Clinton, stating in relevant part:

> As we have each separately indicated to the United States Trade Representative and Congressional leadership, we view this section of the bill [i.e., the Byrd Amendment] as a serious violation of US obligations under the anti-dumping and countervailing duties codes of the WTO. We therefore strongly urge you to veto this measure, thereby avoiding the gratuitous creation of another serious trade problem with your WTO partners.[335]

The United States argues that the letter shows that Canada did in fact have "actual notice" of the Byrd Amendment prior to its enactment, had the opportunity to request consultation, and went so far as to make the United States aware of Canada's views regarding the proposed legislation.[336]

---

[334]    Canfor December 2004 Hearing Tr. 654-656.  R-AAQ p. 5 and Annex A.

[335]    Annex B to R-AAQ.  The unsigned copy of the letter was issued by the White House in the from of a press release.

[336]    R-AAQ pp. 5-6.

312.    The Tribunal notes that the letter cited by the United States is by its terms concerned with the anti-dumping and countervailing duties agreements of the WTO, and not with Chapter Nineteen of the NAFTA.  The concerns expressed by, *inter alia*, Canada should, in the Tribunal's judgment, have brought to the attention of the U.S. administration, by way of reminder or otherwise, that the Byrd Amendment might implicate United States' obligations under other international treaties, including NAFTA.  Furthermore, Canada's awareness of the Byrd Amendment did not satisfy the plain terms of Article 1902(2)(b), which are a precondition to satisfaction of Article 1902(2)(c) dealing with a pre-enactment opportunity for consultation.  The introductory words of that latter provision are: "Following notification . . . ."

313.    Also, Mexico, another State Party to the NAFTA which objected to the Byrd Amendment before the WTO,[337] is omitted from the United States' analysis concerning alleged "actual notice."[338]  Moreover, the United States' speculation that the lack of written notification may have been the result of an "oversight," or that notification was "pointless" when it was clear that Canada was aware of the Byrd Amendment, is irrelevant in the Tribunal's view due to the presence of such a clear treaty provision.[339]

314.    Consequently, the Tribunal believes that the United States is in no position successfully to argue that "the purpose of the notification provision was fully satisfied."[340]

---

[337]    *See* ¶ 284 *supra.*

[338]    Mexico is only mentioned once in R-AAQ and R-RAQ.  In R-AAQ at p. 16 the United States refers to Mexico in the context of its argument that it owed a procedural obligation to Canada and Mexico and not to Claimants under Article 1902(2)(b).

[339]    R-AAQ p. 6.

[340]    R-AAQ p. 6.

315.  This lack of timely notification as required by Article 1902(2)(b) has, in the Tribunal's view, the consequence that an "amending statute," which purportedly pertains to antidumping or countervailing duty law, cannot be regarded as having become part of that "law" for purposes of the definition contained in Article 1902(1).[341]  When Canada, Mexico and the United States signed the NAFTA in 1992, what constituted a State Party's antidumping and countervailing duty "statute" was well circumscribed.  Article 1911 ("Definitions") provides:

> **antidumping statute** as referred to in Articles 1902 and 1903 means "antidumping statute" of a Party as defined in Annex 1911;
>
> **countervailing duty statute** as referred to in Articles 1902 and 1903 means "countervailing duty statute" of a Party as defined in Annex 1911.

This Annex 1911 ("Country Specific Definitions") in turn provides with respect to the United States:

> For purposes of this Chapter:
>
> **antidumping statute** means: . . .
>
> (b)  in the case of the United States, the relevant provisions of Title VII of the *Tariff Act of 1930*,[342] as amended, and any successor statutes;
>
> **countervailing duty statute** means: . . .
>
> (b)  in the case of the United States, section 303 and the relevant provisions of Title VII of the *Tariff Act of 1930*, as amended, and any successor statutes.

---

[341]    C-PHM at ¶¶ 65D(a), 69 and 76; C-R-PHM at ¶ 65D(a).

[342]    Codified at 19 U.S.C. § 1671 *et seq.*

316.    While the extent of the antidumping and countervailing duty statutes then in force in the three State Parties was therefore clearly defined for purposes of the NAFTA,[343] each State Party retained the right to amend its statutes in the future. However, as mentioned, this right of amendment was subjected to the requirements of Article 1902(2), including pre-enactment notification to the other State Parties pursuant to Article 1902(2)(b). If a State Party were to fail to comply, it thereby would fail to bring a particular statutory amendment within the definition of antidumping or countervailing duty statute of Article 1911 and Annex 1911. The consequence of such a failure would be that the new statutory amendment in question would not become part of the definition of antidumping and countervailing duty "law" under Article 1902(1). That result in turn would have the further consequence that that statutory amendment would not become part of antidumping and countervailing duty "law" within the meaning of Article 1901(3). This sequence, in the Tribunal's view, is the price that the Parties set under Chapter Nineteen for failing to comply with the carefully delineated requirements set forth in Article 1902(2).

317.    In the judgment of the Tribunal, the argument of the United States that the "Byrd Amendment is an amendment of the *Tariff Act* and thus, presumptively, is part of the antidumping and countervailing duty law, within the meaning of the terms as used in Article 1901(3),"[344] does not withstand scrutiny. Adding a new amendment to the Tariff Act does not mean that the addition falls automatically within the definition of antidumping and countervailing duty "law" of Article 1902(1) and, hence, within Article 1901(3). This is so because fulfilling the

---

[343]    To which may be added that the NAFTA Parties were very precise as to which statutes had to be amended for purposes of Article 1904(15) regarding antidumping and countervailing duty proceedings, *see* Annex 1904.15.

[344]    R-PHM at ¶ 71.

dictates of Article 1902(2), including notification and, if requested, consultation, is a precondition to that result.

318.    In this connection, the United States contends that Article 1911 and Annex 1911, apparently automatically, include any further amendment to a Party's antidumping or countervailing duty law within the definition of "antidumping statute" and "countervailing duty statute."[345]    According to the United States, that definition does not include the additional words "that have been notified in accordance with Article 1902(2)," and thus Article 1911 and Annex 1911 do not make compliance with the notification and consultation provisions set forth in Article 1902(2) a condition precedent to the amendment forming part of the United States' antidumping and countervailing duty statute for purposes of Chapter Nineteen.

319.    The Tribunal cannot agree with that contention of the United States.  Interpretation of Article 1911 and Annex 1911 requires that the Tribunal ascertain their ordinary meaning in their context and in the light of the NAFTA's object and purpose.[346]  Both definitions contain the words "the relevant provisions of Title VII of the *Tariff Act of 1930*, as amended, and any successor statutes" (antidumping) and "section 303 and the relevant provisions of Title VII of the *Tariff Act of 1930*, as amended, and any successor statutes" (countervailing duty) and both reference the words "as amended."  Those two words must, in the Tribunal's view, refer to an amendment of an antidumping statute or of a countervailing duty statute, respectively.   As previously emphasized, Article 1902(2) subjects any such proposed amendment to specific treaty rules.   Interpretation of the words "as amended" in context then requires that Article 1911 and Annex 1911 be read in conjunction with the commands of Article 1902(2).   As Canfor and Terminal

---

[345]    R-AAQ pp. 10-11; R-RAQ pp. 3-4.

[346]    Article 31(1) of the Vienna Convention on the Law of Treaties, Article 31(1), quoted at n. 185 *supra.*

correctly point out, the opposite interpretation would render the procedures and rules of Article 1902(2) meaningless, leaving the State Parties free to ignore them.[347]

320.    The United States further contends that the context of Article 1902(2) demonstrates that the State Parties did not intend compliance with the conditions set forth therein as a prerequisite to bringing an amendment within the definition of "antidumping statute" or "countervailing duty statute" in Article 1911 and Annex 1911.[348]    The United States also argues that non-compliance with sub-paragraph (a) results in a forfeiture of the amending Party's right to apply that legislation to the goods of the affected Party, and that non-compliance with sub-paragraph (d) results in the consequences contemplated by Article 1903.[349]    The United States further asserts that no remedy is provided for non-compliance with sub-paragraphs (b) and (c) (i.e., notification and consultation).    According to the United States, these consequences show that, notwithstanding non-compliance with the requirements of Article 1902(2), the presumed statutory amendment remains somehow within the definition of an "antidumping statute" and "countervailing duty statute" in Annex 1911.

321.    The short answer to these contentions, in the Tribunal's view, is that sub-paragraphs (a)-(d) of Article 1902(2) are prefaced by the language: "Each Party reserves the right to change or modify its antidumping law or countervailing duty law, *provided that* in the case of an amendment to a Party's antidumping or countervailing duty statute . . ." (emphasis added).    This provision could not be more plain in its language.    Accordingly, the consequence of a failure to comply

---

[347]    C-AAQ at ¶ 22.

[348]    R-AAQ pp. 12-13; R-RAQ pp. 4-5.

[349]    Article 1903 is quoted at n. 200 *supra*.

with the requirements of Article 1902(2) is that a tribunal is unable to take into account that statutory amendment for purposes of Article 1901(3).

322.    The United States also asserts that removing an amendment from the definition of "antidumping statute" or "countervailing duty statute" due to non-compliance with Article 1902(2) would lead to absurd results.[350]  According to the United States, a State Party to the NAFTA could "shield" amendments to its antidumping and countervailing duty law from obligations under Chapter Nineteen simply by failing to notify the amendment, contrary to Article 1902(2)(b), or by intentionally enacting legislation that subverts the object and purpose of the NAFTA itself, contrary to Article 1902(2)(d).

323.    The Tribunal disagrees with the position of the United States because it is, in the Tribunal's view, a fundamental principle of international law that States Party to a treaty must perform treaty obligations in good faith and, therefore, would not intentionally take steps that would undermine performance of those obligations.[351]  Moreover, an affected State Party could cite an alleged lack of compliance with Article 1902(2)(d) of the NAFTA before an Article 1903 binational panel. Recourse to Article 1903 is, according to the NAFTA's provisions, not made dependent on a prior notification and consultation upon request under Article 1902(2)(b) and (c), although lack of observance may impact such recourse since a possibly affected State Party will not know whether the legislating Party regards the statutory amendment in question as an integral part of its antidumping or countervailing duty law.

324.    As a final point, the Tribunal wishes to emphasize that, under well-known principles of international law, every provision of an international agreement must

---

[350]    R-AAQ p. 14; R-RAQ p. 5.

[351]    *See* ¶ 182 *supra.*

have meaning, because it is presumed that the State Parties that negotiated and concluded that agreement intended each of its provisions to have an effect. Accordingly, because the language of Article 1902(2)(b) and Article 1902(2)(c) is so plain that, for interpretive purposes, there is no occasion for recourse to supplementary sources of evidence under the terms of the Vienna Convention on the Law of Treaties,[352] the Tribunal must perforce give effect to those two sub-paragraphs. To do otherwise would be to deny fundamental tenets of international law, which, pursuant to Article 1131(1) of the NAFTA, are governing in this case. Consequently, the Tribunal has no choice but to follow strictly the clear demands of Articles 1902(2)(b) and 1902(2)(c). Furthermore, the conduct of the United States that was contemporaneous with, or proximate to, enactment of the Byrd Amendment is supportive of this conclusion, because it leads to the presumption that apparently the United States did not itself consider the Byrd Amendment to constitute a part of its antidumping or countervailing duty law. That observation brings the Tribunal to examine Claimants' contentions regarding relevant United States' conduct.

325. First, the Claimants cite the lack of notification by the United States of the Byrd Amendment pursuant to Article 1902(2)(b) as evidentiary support for the proposition that, at the time of Presidential signature, the United States did not consider the Byrd Amendment as antidumping or countervailing duty "law" under the definition of Article 1902.[353] That inferred view of the United States at the time of enactment is, in the Tribunal's judgment, confirmed by the position that it took not long thereafter in the previously described WTO proceedings. Before the WTO panel, the United States asserted that: "The CDSOA [i.e., the Byrd Amendment] is a government payment programme," and that: "The CDSOA has

---

[352]    Article 32, quoted at n. 185 *supra.*

[353]    C-AAQ at ¶ 3.

nothing to do with the administration of the anti-dumping and countervailing duty *laws*" (emphasis added).[354]  While the United States made those assertions in the context of its WTO obligations, they also support Claimants' proposition that, for NAFTA purposes, the United States did not consider the Byrd Amendment to be part of its antidumping or countervailing duty *law* at the time of its enactment. Moreover, in the present arbitration, the United States admits that: "Before the WTO, the United States argued that the Byrd Amendment was not a specific action against dumping or subsidization."[355]

326.    The United States points out that the WTO Panel and Appellate Body disagreed with the United States' characterization of the Byrd Amendment and that the United States has not only accepted the findings of the WTO but has also signed into law legislation (the Deficit Reduction Act of 2005) repealing the Byrd Amendment in order to comply with those findings.[356] However, the present Tribunal's charter is to determine whether the Byrd Amendment is antidumping or countervailing duty law for purposes of Article 1901(3) and not for purposes of the separate WTO agreements in respect of which the WTO Panel and Appellate Body made their findings.  What matters here in terms of timing is the position that the United States took at the time of enactment and contemporaneously or proximately therewith.  In this connection, the Tribunal believes that it is irrelevant what Canada argued before the WTO[357] because, again, it is the United States' conduct at the time that constitutes the relevant best evidence of its position.

---

[354]    *United States – Continued Dumping and Subsidy Offset Act of 2000*, Report of the Panel, WT/DS217/R and WT/DS234/R, 16 September 2002, at ¶¶ 4.501 and 4.502, available at: http://www.wto.org/english/tratop_e/dispu_e/cases_e/ds234_e.htm.

[355]    R-PHM at ¶ 65D(b).

[356]    R-PHM at ¶ 65D(b).

[357]    R-RAQ p. 6.

327.    While the conduct of the United States before the WTO and the findings of WTO Panels and its Appellate Body have no binding effect upon this Tribunal, they constitute relevant factual evidence which the Tribunal can and should appropriately take into account, especially in the case of positions advocated by the United States before the WTO that amount to admissions against interest for purposes of this NAFTA case.

328.    The United States' conduct at the time of enactment and before the WTO, therefore, leads the Tribunal to conclude that the Byrd Amendment does not come within the purview of the words "with respect to a Party's antidumping law or countervailing duty law" under Article 1901(3).  The presumption of good faith under international law as far as compliance with treaty obligations is concerned is supportive of this conclusion.

329.    As a result of the above findings, the Tribunal need not respond to all the other detailed arguments of the parties regarding the Byrd Amendment.

330.    The Tribunal is aware of the Claimants' contention that the Byrd Amendment is "antithetical to what is properly understood by those terms [i.e., antidumping or countervailing duty law]."[358]  In light of the foregoing analysis and conclusion, the Tribunal need not decide on that contention.  The Tribunal notes *obiter dictum* that the Byrd Amendment would appear conceptually not to come within what has commonly been understood as antidumping and countervailing duty law in many countries and internationally.

331.    The Tribunal also wishes to note that the U.S. Court of International Trade (the "CIT") recently found that the Byrd Amendment failed to specify its application to

---

[358]    C-PHM at ¶ 65.

goods from a NAFTA country.[359] That finding, in turn, would indicate that the United States did not comply with the requirements of sub-paragraph (a) of Article 1902(2) (". . . such amendment shall apply to goods from another Party only if the amending statute specifies that it applies to goods from that Party or from the Parties to this Agreement").

332.    In this connection, the following observations of the CIT (Judge Pogue) may be quoted:

> By requiring that amendments apply to goods from Canada and Mexico "only to the extent specified in the amendment," Congress, through Section 408,[360] imposed a "magic words" [footnote omitted] rule of interpretation on amendments to U.S. trade laws, *i.e.*, that any amendment to title VII of the Tariff Act of 1930 must contain certain "magic words" for Congress to indicate that it intends to alter antidumping and countervailing duty laws with respect to NAFTA parties. SAA, reprinted in H.R. Doc. No. 103-159, p. 203 (1993) ("Section 408 of the bill implements the requirement of Article 1902 that amendments to the AD and CVD laws shall apply to a NAFTA country only if the amendment so states explicitly.").

> In so doing, Section 408 insulates NAFTA parties, including their exporters, from some changes to the antidumping and countervailing duty laws unless Congress has explicitly stated otherwise. Such an exercise of self-restraint was intended to ensure that future Congresses, agencies, and courts did not inadvertently abrogate the rights NAFTA parties negotiated, or, alternatively, to require future Congresses to give due consideration to the United States' NAFTA obligations before they amend the antidumping and countervailing duty laws.[361]

---

[359]    *See* ¶ 287 *supra.*

[360]    Quoted at n. 302 *supra.*

[361]    *See* n. 304 *supra*, pp. 21-22.

333.    The Tribunal further points out that the WTO considered the Byrd Amendment, to a large extent, non-compliant with the WTO AD Agreement and SCM Agreement.[362] That WTO position, in turn, calls into question whether the United States complied with the requirements of sub-paragraph (d)(i) of Article 1902(2).[363]

334.    For all these reasons, the Tribunal concludes with respect to the first question that the Byrd Amendment is not antidumping or countervailing duty law within the meaning of that term under Article 1901(3) of the NAFTA, because (i) assuming that it pertains to U.S. antidumping and countervailing duty law, the United States failed to bring that subsequent statutory amendment into the definition of "antidumping law and countervailing duty law" of Article 1902(1), and (ii) the contemporaneous and proximate conduct of the United States indicates that it did not consider the Byrd Amendment to pertain to its antidumping and countervailing duty law.  As previously noted, the Tribunal is of the view that such a conclusion is reinforced by the general rule of interpretation of treaties that restrictions and exceptions are construed narrowly.[364]

335.    The second question is whether Claimants' claims concerning the Byrd Amendment do or do not fall within Chapter Eleven for purposes of the Tribunal's jurisdiction.

336.    Applying the test that the Tribunal has set forth in paragraph 171 above, the Tribunal concludes that it does have jurisdiction over Claimants' claims concerning the Byrd Amendment, subject to resolution of the issues identified in

---

[362]    *See* ¶ 284 *supra.*

[363]    Quoted at ¶ 295 *supra*.

[364]    *See* ¶ 187 *supra*.

Procedural Order No. 1, quoted in paragraphs 9-10 above, which issues were joined to the merits.

337.    The first point of the test needs to be recalled only: that is, the mere assertion by the Claimants that the Tribunal has jurisdiction does not in and of itself establish jurisdiction. Rather, it is the Tribunal that must decide whether the requirements for jurisdiction are met.

338.    The second point of the test requires that, in making the determination, the Tribunal interpret and apply the relevant jurisdictional provisions of the NAFTA, including procedural provisions relating thereto, i.e., whether the requirements of Article 1101 are met; whether a claim has been brought by a claimant investor in accordance with Article 1116 or 1117; and whether all pre-conditions and formalities under Articles 1118-1121 are satisfied. The Tribunal notes that no objections have been raised by the United States with respect to those NAFTA provisions, except again for those set out in Procedural Order No. 1. In other respects, the Tribunal is satisfied that the requirements of the second point of the test are met.

339.    The third point of the test, similarly with the first point, is self-explanatory and dictates that the facts as alleged by the Claimants must be accepted as true *pro tempore* for purposes of determining jurisdiction.

340.    The fourth point of the test is that the Tribunal must determine whether the facts as alleged by the Claimants, if eventually proven, are *prima facie* capable of constituting a violation of the relevant substantive obligations of the United States under the NAFTA. The Tribunal is satisfied that that outcome is justified in this case. Specifically, the facts as set forth in the Notices of Arbitration and Statement of Claim, quoted in paragraph 289 above, and Claimants' position with respect thereto, summarized in paragraph 290 above, are, in the Tribunal's view, if eventually proven, *prima facie* capable of constituting a violation of the

substantive obligations of the United States under Section A of Chapter Eleven of the NAFTA.

341.    In particular, in the Tribunal's judgment, the Claimants have made a *prima facie* showing that, while not constituting antidumping or countervailing duty law within the meaning of Article 1901(3), the Byrd Amendment may ultimately be proven to have conferred financial benefits on United States investors or investments in competition with the claimant Canadian investors that are demonstrably contrary to the national treatment provisions of Article 1102.

342.    Whether, and, if so, to what extent, Claimants' claims concerning the Byrd Amendment would rely on alleged speculative future losses[365] is a question to be addressed during the merits phase of the present proceedings.

343.    In sum, the Claimants must still make their case on the merits, but the Tribunal believes that they have made an adequate initial offering for jurisdictional purposes.   In this connection, the Tribunal emphasizes that, in rendering this decision as to its jurisdiction, it does so at this stage of the proceedings without in any way judging the merits of Claimants' claims concerning the Byrd Amendment.

344.    Two further observations are in order.

345.    First, the Tribunal believes that it is irrelevant for the present Preliminary Question that the Byrd Amendment is in the process of being repealed.[366] Claimants' claims concern the period during which the Byrd Amendment's distribution system has been in effect.   Moreover, the repeal of the Byrd Amendment appears to be prospective only in this respect because the recent United States legislation

---

[365]    R-AAQ p. 3.

[366]    C-PHM at ¶ 68; C-RAQ at ¶ 24.

169

provides for a transitional period. As noted in paragraph 288 above, the Deficit Reduction Act of 2005 provides that "all duties on entries of goods made before and filed before October 1, 2007" shall be distributed as if the Byrd Amendment had not been repealed.

346.    Second, for the same reasons, the Tribunal believes that it is irrelevant for the present Preliminary Question that the duties assessed pursuant to antidumping and countervailing duty orders on imports of products of Canfor and Terminal into the United States have not been distributed to allegedly affected producers out of the accounts established under the Byrd Amendment.[367]

### (c)    Conclusion

347.    The United States has met its burden of proof that Article 1901(3) bars the submission of Claimants' claims with respect to antidumping and countervailing duty law to arbitration under Chapter Eleven of the NAFTA, but not that the Byrd Amendment falls within that Article.

348.    The Tribunal therefore concludes that Article 1901(3) establishes that the United States did not consent to arbitrate the claims of Canfor and Terminal filed in the Article 1120 arbitrations, as consolidated in the present proceedings, except to the extent that they concern the Byrd Amendment since the Byrd Amendment does not form part of "the Party's antidumping law or countervailing duty law" within the meaning of Article 1901(3) of the NAFTA.

349.    The consequence of the Tribunal's decision is that it lacks jurisdiction over the claims of Canfor and Terminal filed in the Article 1120 proceedings, as consolidated in the present proceedings, within the meaning of Article 21 of the

---

[367]    C-PHM at ¶ 77; C-RAQ at ¶ 24.

UNCITRAL Arbitration Rules,[368] except to the extent that they concern the Byrd Amendment.

350.    The next step in the proceedings will be for the Tribunal to consult with the parties about the further conduct and sequence of the proceedings.

## VII.    COSTS

351.    Canfor, Terminal and the United States filed cost submissions on 7 April 2006. The Tribunal reserves the decision on the award of costs of the present proceedings as referred to in Articles 38-40 of the UNCITRAL Arbitration Rules to a subsequent order, decision or arbitral award, having regard to the fact that this decision will depend on the next phase or phases of the proceedings as to which of the parties is to bear the costs or whether costs should be apportioned between the parties. Moreover, costs related to Tembec need to be addressed by affording Tembec an opportunity to present its case regarding costs.[369]

---

[368]    Article 21 of the UNCITRAL Arbitration Rules provides:

"1.    The arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause or of the separate arbitration agreement.

2.    The arbitral tribunal shall have the power to determine the existence or the validity of the contract of which an arbitration clause forms a part. For the purposes of article 21, an arbitration clause which forms part of a contract and which provides for arbitration under these Rules shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitral tribunal that the contract is null and void shall not entail *ipso jure* the invalidity of the arbitration clause.

3.    A plea that the arbitral tribunal does not have jurisdiction shall be raised not later than in the statement of defence or, with respect to a counter-claim, in the reply to the counter-claim.

4.    In general, the arbitral tribunal should rule on a plea concerning its jurisdiction as a preliminary question. However, the arbitral tribunal may proceed with the arbitration and rule on such a plea in their final award."

[369]    *See* Termination Order of 10 January 2006, ¶ 27 *supra*, at ¶ 2.

**VIII.**    <u>DECISIONS</u>

352.    For the foregoing reasons, the Tribunal renders the following decisions:

(1)    DETERMINES that Article 1901(3) of the NAFTA establishes that the United States did not consent to arbitrate under Chapter Eleven the claims of Canfor and Terminal filed in *Canfor Corporation v. United States of America* and in *Terminal Forest Products Ltd. v. The United States of America*, respectively, except to the extent that they concern the Byrd Amendment;

(2)    DECLARES to lack jurisdiction over the claims of Canfor and Terminal filed in *Canfor Corporation v. United States of America* and in *Terminal Forest Products Ltd. v. The United States of America*, respectively, except to the extent that they concern the Byrd Amendment; and

(3)    RESERVES the decision on the costs of the present phase of the proceedings to a subsequent order, decision or arbitral award.

Made in Washington, D.C., this __6TH__ day of June 2006,

THE TRIBUNAL:

_____
Professor Armand L.C. de Mestral
Arbitrator

_____
Davis R. Robinson, Esq.
Arbitrator

_____
Professor Albert Jan van den Berg
Presiding Arbitrator