# EXHIBIT A

## SOFTWOOD LUMBER AGREEMENT

### BETWEEN

### THE GOVERNMENT OF CANADA

### AND

### THE GOVERNMENT OF THE UNITED STATES OF AMERICA

The Government of Canada ("Canada") and the Government of the United States of America ("United States")

HAVE AGREED AS FOLLOWS:

### ARTICLE I

### SCOPE OF COVERAGE

1.      This Agreement applies to trade in Softwood Lumber Products. Softwood Lumber Products are those products listed in Annex 1A. For domestic implementation and administration purposes only, Canada will rely on the Canadian Table of Concordance provided in Annex 1B.

2.      No products shall be added to, or removed from, the scope of this Agreement after April 27, 2006 without the express mutual agreement of the Parties, regardless of any decision, ruling, determination, or re-determination by a Party, the effect of which would be to:

    (a)     classify or reclassify a product as falling within or outside a tariff item set out in Annex 1A; or

    (b)     determine or rule that a product falls within or outside the description of Softwood Lumber Products set out in Annex 1A.

3.      Where a Party disagrees with a decision, ruling, determination, or re-determination with respect to a tariff classification or ruling of the other Party with respect to whether a product falls within or outside the scope of Softwood Lumber Products set out in Annex 1A, the Party shall refer the matter to the Technical Working Group established under Article XIII.

1

ERRATA

## ARTICLE XX

## TERMINATION

1.      After twenty three months after entry into force, either Party may terminate this Agreement by providing one month written notice to the other.  Upon request of the Party that receives the notice of proposed termination, the Parties shall consult on the reasons for the proposed termination.  The Parties understand that, if the United States has exercised its right to terminate under this paragraph, the companies who have filed the letters in Annex 3C shall not, for a period of twelve months after such termination, file petitions and will oppose initiation of an investigation, pursuant to Title VII of the Tariff Act of 1930, as amended, or 301-305 of the Trade Act of 1974, as amended, with respect to imports of softwood lumber from Canada.  This paragraph does not apply to terminations under any other provision of this Agreement.

2.      The United States reserves the right to terminate the Agreement if Canada is not applying the export measures under Article VII and Article VIII without resort to dispute settlement under Article XIV or any other pre-condition for termination of this Agreement.

3.      Any breach of the commitments of the United States under paragraph 1 of Article V shall give Canada the right to terminate this Agreement without resort to dispute settlement under Article XIV or any other pre-condition for termination of this Agreement.

4.      The Technical Working Group shall, within 60 days of receipt of a request from a Party under Article I.3, review and provide a non-binding recommendation to the Parties on a question of product scope arising from a disagreement on tariff classification or product description referenced in paragraph 3.

5.      If the Parties fail to reach a mutually acceptable agreement on a matter referred to the Technical Working Group, either Party may refer the matter to dispute settlement under Article XIV.

6.      If the tribunal issues an award clarifying the scope, the export measures contained in this Agreement shall cover the clarified scope.

## ARTICLE II

## ENTRY INTO FORCE

1.      This Agreement shall enter into force on a date designated by the Parties in an exchange of letters (the Effective Date).  In this exchange of letters, the Parties shall certify that the following conditions have been met:

      a.      The Termination of Litigation Agreement in Annex [10] (the "Termination Agreement") has been signed:  (i)  by counsel on behalf of all represented parties and participants to the actions listed in the Termination Agreement; and (ii) by authorized representatives of any unrepresented parties or participants to the actions listed in the Termination Agreement;

      b.      Pursuant to Article 3.6 of the *Understanding on Rules and Procedures Governing the Settlement of Disputes*, the United States and Canada have signed and filed with the WTO Dispute Settlement Body, a Notification of Mutually Agreed Solution in the form provided for in Annex [11];

      c.      The United States Court of International Trade has modified the injunctions against liquidation issued in *West Fraser v. United States* (Consol. Ct. No. 05-00079) to permit the United States to fulfill its obligations under Article III or has confirmed that fulfilling those obligations is not inconsistent with those injunctions.

      d.      Canada has certified that it can administer the Export Charge and issue Export Permits as of the Effective Date.

2

e.   Canada and the United States have confirmed that importers of record that collectively account for not less than 95 percent of total refunds of cash deposits with accrued interest have complied with all of the requirements in paragraph 1 of Annex 2A.

f.   U.S. domestic interested parties, including companies, associations and worker representatives, comprising greater than 60 percent of U.S. production of softwood lumber have filed with USDOC the irrevocable letters described in Article V, and in the form provided in Annex 3A, effective on the Effective Date, and the United States has certified that the letters from the domestic interested parties collectively account for greater than 60 percent of U.S. production of softwood lumber;

g.   USDOC has issued the finding set out in Annex 3B based on the signed letters attached in Annex 3A, effective on the Effective Date.

## ARTICLE III

## REVOCATION OF ANTIDUMPING AND COUNTERVAILING DUTY ORDERS

1.   On the Effective Date, the United States shall:

   (a)   Revoke retroactively the AD Order and the CVD Order in their entirety as of May 22, 2002 without the possibility of their reinstatement;

   (b)   Terminate all USDOC proceedings related to the AD Order and the CVD Order; and

2.   As soon as possible, but no later than three days after the Effective Date, USDOC shall instruct USCPB to:

   (a)   cease collection of cash deposits, as of the Effective Date, on imports of Softwood Lumber Products from Canada; and

   (b)   liquidate all Covered Entries made on or after May 22, 2002 without regard to anti-dumping or countervailing duties and refund all deposits collected on such entries with all accrued interest pursuant to 19 U.S.C. 1677g(b) to the Importers of Record or their designates.

3

USDOC Instructions to USCBP are attached as Annex X.

## ARTICLE IV

## REFUND OF ANTIDUMPING AND COUNTERVAILING DUTY CASH DEPOSITS

1.      Within 10 days of the Effective Date, the United States shall begin to liquidate all covered entries made on or after May 22, 2002 without regard to anti-dumping or countervailing duties, with interest according to 19 U.S.C. §1677g(b).

2.      USCBP shall complete the liquidation of covered entries and the refund of all cash deposits as soon as possible, but not later than 6 months of the publication in the *Federal Register* of the revocation referred to in Article III for all other covered entries unless the entries are subject to an extension request under 19 U.S.C. § 1504(b) and 19 C.F.R. § 159.12.

3.      USCBP shall approve an initial and any subsequent requests for an extension of time by importers of record or their designates made pursuant to 19 U.S.C. § 1504(b) and 19 C.F.R. § 159.12.

4.      Canada or its agent shall provide payments to Escrow Importers in consideration of its purchase of the cash deposits and accrued interest in accordance with Annex 2A.

## ARTICLE V

## COMMITMENTS OF THE UNITED STATES CONCERNING TRADE REMEDY INVESTIGATIONS AND ACTIONS AND OTHER LITIGATION

1.      For the duration of this Agreement, including any renewal pursuant to Article XVIII, the United States shall not:

    (a)      Self-initiate an antidumping or countervailing duty investigation under Title VII of the *Tariff Act of 1930*, as amended, or any successor law ("Title VII"), with respect to imports of softwood lumber from Canada. If a petition is filed under Title VII with respect to imports of softwood lumber from Canada, USDOC shall dismiss the petition on the basis of irrevocable letters in the form provided in Annex 3A ("no injury" letters)

4

and a Finding of Department of Commerce in the form provided in Annex 3B. These letters shall be provided by U.S. domestic interested parties comprising greater than 60 percent of U.S. production of softwood lumber. In general, industry association letters are effective with respect to the production of their members, but members with an annual production of softwood lumber of over 200 million board feet must, to be counted toward the threshold of 60 percent of U.S. production, individually provide a no injury letter. The signed "no injury" letters will be appended to the Agreement.

(b)   Take action under sections 201 to 204, inclusive, of the *Trade Act of 1974*, as amended, or any successor law ("section 201"), with respect to imports of softwood lumber from Canada;

(c)   Initiate an investigation or take action, including action pursuant to any prior determination, under sections 301 to 307, inclusive, of the *Trade Act of 1974*, as amended, or any successor law, with respect to imports of softwood lumber from Canada; or

(d)   Take action under section 204 of the *Agricultural Act of 1956*, as amended, or any successor law, with respect to imports of softwood lumber from Canada.

2.     Any breach of the commitments of the United States under paragraph 1 of this Article shall give Canada the right to terminate this Agreement without resort to dispute settlement under Article XV or any other pre-condition for termination of this Agreement.

## ARTICLE VI

## CANADIAN EXPORT MEASURES

On entry into force of this Agreement, Canada shall implement the export measures in Articles VII to X with respect to exports of Softwood Lumber Products listed in Annex 1A.

## ARTICLE VII

## EXPORT CHARGE AND EXPORT CHARGE PLUS VOLUME RESTRAINT

1.     By entry into force of this Agreement, each Region shall have selected either Option A or Option B. Option A is an export charge collected by Canada, with the charge varying as provided in the table below based on the Prevailing Monthly Price.

5

Option B is an export charge with a volume restraint, where both the rate of the export charge and the volume restraint vary as provided in the table below based on the Prevailing Monthly Price as defined in Annex 4.[1]

2.      Each Region may, effective the first day of January following the third and sixth anniversaries of the Effective Date, elect to be governed by the Option other than the one it previously selected.  Canada will provide the United States thirty (30) days notice that a Region has elected to be governed by a different Option.  Regions will continue to be governed by the same Option as in the previous period if no notice is given.

3.      Option A and Option B export measures shall be calculated as follows:

| Prevailing Monthly Price | Option A – Export Charge (%) | Option B – Export Charge (%) with Volume Restraint |
|---|---|---|
| Over $US 355 | No export charge | No export charge and no volume restraint |
| $US 336-355 | 5 | 2.5% export charge + maximum volume that can be shipped cannot exceed a Region's share of 34% of expected U.S. Consumption |
| $US 316-335 | 10 | 3% export charge + maximum volume that can be shipped cannot exceed the Region's share of 32% of expected U.S. Consumption |
| $US 315 or under | 15 | 5% export charge + maximum volume that can be shipped cannot exceed the Region's share of 30% of expected U.S. Consumption |

---

[1]      Each Region that initially selects Option B nevertheless shall be governed by Option A from the Effective Date until such time as Canada has completed the arrangements necessary for the administration of Option B ("transition period"). Companies in such a Region shall receive a refund of export charges paid if, in any month during the transition period, the Region exports no more than what its volume restraint would have been had it been governed by Option B.  The refund amount will be the difference between what the company paid in export charges for that month, and what it would have paid for that month had the Region been governed by Option B.  With respect to such a Region, Article VIII shall not apply in the transition period ending December 31, 2006.

6

4.      Under Option A, Canada shall on a monthly basis collect a charge on a Region's exports of Softwood Lumber Products (Annex 1A) calculated according to the center column of the chart above that corresponds to the Prevailing Monthly Price.

5.      Under Option B, Canada shall, on a monthly basis:

      (a)      Collect a charge on a Region's exports of Softwood Lumber Products (Annex 1A) calculated according to the last column of the chart above that that corresponds to the Prevailing Monthly Price, and

      (b)      Limit the volume of a Region's exports during the month to the limit established in accordance with Annex 5.

6.      The month in which an export occurs shall be based on the month in which the Date of Shipment occurs.

7.      The export charge shall be levied on the Export Price.

8.      The export charge on Softwood Lumber Products with an Export Price of more than $US 500 per MBF shall be charged as if their Export Price were $US 500 per MBF.

9.      The export charge on remanufactured Softwood Lumber Products shall be assessed in accordance with Annex 6.

10.      All Softwood Lumber Products exported from Canada to the United States shall require an Export Permit.

## ARTICLE VIII

### SURGE MECHANISM

11.      The following provisions shall apply whenever the volume of exports in any month from a Region that has selected Option A under Article VII exceeds the Region's Trigger Volume as set out in paragraph 2:

      (a)      If the volume of exports from a Region exceeds the Region's Trigger Volume by one percent or less in any month, the applicable Trigger

Volume for that Region during the following month shall be reduced by the total MBF amount of overage (i.e., the amount by which actual exports exceeded the Trigger Volume).

(b)    If the volume of exports from a Region exceeds the Region's Trigger Volume by more than one percent in any month, Canada shall apply retroactively to all exports to the United States from the Region during that month an export charge in the amount of 150 percent of the applicable export charge for that month (as specified in the middle column of the chart at Article VII).

12.    For the surge mechanism, a Region's monthly Trigger Volume shall be calculated in accordance with Annex 7.

## ARTICLE IX

### THIRD COUNTRY ADJUSTMENT

13.    Irrespective of whether a Region is governed by Option A or Option B, Canada shall refund export charges in accordance with paragraph 2 if each of the following have occurred in each of any two consecutive calendar quarters when compared with the same two consecutive quarters from the previous year[2]:

(a)    The share of actual U.S. lumber consumption accounted for by non-Canadian imports ("third country market share") is at least twenty (20) percent greater; and

(b)    Canadian market share of actual U.S. consumption decreases; and

(c)    U.S. domestic producers' market share of actual U.S. consumption increases.

14.    Where the conditions in paragraph 1 are satisfied:

---

[2]    For the purposes of this provision, each individual quarter that constitutes "consecutive quarters" is to be compared only with the same respective quarter from the previous year). For example, the second quarter of 2007 would be compared to the second quarter of 2006 and the first quarter of 2007 would be compared to the first quarter of 2006 in order to determine if the conditions in paragraph 1 are applicable.

8

(a)    If a Region is governed by Option A, then exporters in that Region will be retroactively refunded the amount they paid, up to the equivalent of a five (5) percent export charge on their exports in the consecutive quarters identified in paragraph 1.

(b)    If a Region is governed by Option B, then exporters in that Region will be retroactively refunded the full export charge they paid in the consecutive quarters identified in paragraph 1.

15.    Paragraph 2 of this Article does not apply to exports from any Region that triggered the Surge Mechanism in Article VIII.1(b) in either of the two consecutive quarters in which the conditions in paragraph 1 of this Article were met.

16.    For the purposes of this Article, U.S. lumber consumption, Canadian market share, third country market share and U.S. producers' market share are established according to Annex 8.

## ARTICLE X

## EXCLUSIONS FROM THE EXPORT MEASURES

17.    The following are excluded from the export measures in Articles VII to IX:

(a)    Softwood Lumber Products first produced in the Maritimes from logs harvested in the Maritimes or the State of Maine, that is

(i)    exported directly to the United States from a Maritime province , or

(ii)    shipped to a province,  other than a Maritime province, and reloaded or further processed and subsequently exported to the United States

provided that the lumber is accompanied by an original Certificate of Origin issued by the Maritime Lumber Bureau.  An original Certificate of Origin issued by the Maritime Lumber Bureau shall be a required document.  The Certificate shall specifically state that the corresponding customs entries cover Softwood Lumber Products first produced in the Maritimes from logs originating in the Maritimes or Maine.

(b)    Softwood Lumber Products first produced in the Yukon, Northwest Territories or Nunavut from logs harvested in the Yukon, Northwest Territories or Nunavut; and

9

(c)     Softwood Lumber Products manufactured by the companies listed in
Annex 9.  Continued eligibility for exclusion of Softwood Lumber
Products manufactured by such companies will be contingent on the
following:

(i)     An average monthly production volume will be established for
each company as the annual average of its production during 2004
and 2005, divided by twelve.

(ii)    Each company's annual export limit will be the company's average
monthly production volume multiplied by the number of months in
a year that the Prevailing Monthly Price was less than
$US356/MBF.

(iii)   At the end of the year the company's actual exports during months
when the Prevailing Monthly Price was less than $US356/MBF
will be summed and the total exports must be less than or equal to
the annual export limit established in (ii).  Actual exports that
exceed the company's annual export limit by less than or equal to
0.5 percent will be considered de minimis.

(iv)    If the company's actual exports exceed the annual export limit by
more than 0.5 percent then the annual export limit for the company
in the following year will be reduced by the exports in excess of
the current year's limit.

(v)     If the company again exceeds the annual export limit in any
subsequent year then the export limit for the next year will be
reduced by twice that excess.  If in any subsequent year the
company again exceeds its annual export limit then the export limit
for the following year will be reduced by three times the excess
volume of the that year.  However, if the company does not exceed
its annual export limit in any year then the volume reduction
penalty will be removed and the annual export limit will return to
the original amount; and

(vi)    Exclusion of a company shall terminate if it exceeds its export
limit, adjusted as described above, a fourth time.

The Government of the province in which the company is located will submit to
the Government of Canada a certified statement attesting to the production in 2004
and 2005 for each company listed in Annex 9.  Canada shall disclose what it
understands to be each company's 2004 and 2005 production to the United States.
This information will not be treated as being confidential.  If exclusion of a
company is limited to one or more mills, "company" in the foregoing shall be

10

limited to those one or more mills. Canada and the United States shall cooperate with respect to monitoring and enforcement regarding this paragraph as contemplated by Article XV. The list of excluded companies in Annex 9 will include all legal names and addresses.

18.     Canada and the United States may agree to additional exclusions from this Agreement for lumber produced from U.S. origin logs or for lumber produced from logs originating from private land in Canada.

## ARTICLE XI

## GENERAL PROVISIONS

1.     This Agreement is without prejudice to the position of either Party as to the validity of the AD Order or the CVD Order or any of the determinations underlying them, the merits of, and any possible remedies arising from, any litigation related to the AD Order or the CVD Order, or the legal effect of prior decisions of any court or other dispute settlement body.

2.     The operation and application of Section B of Chapter Eleven of the NAFTA is hereby suspended with respect to any matter covered by this Agreement and any measure taken by a Party that is necessary to give effect to or implement this Agreement. Consequently, no claim under Section B of Chapter Eleven of the NAFTA may be made against Canada or the United States by investors of the United States or Canada in respect of this Agreement or any such measures. The Parties shall inform each national Section of the NAFTA Secretariat of this provision.

3.     If any value referred to in this Agreement is converted on the date of shipment from U.S. dollars to Canadian dollars, Canada shall make the conversion based on the nominal noon exchange rate quoted by the Bank of Canada for the date of shipment.

4.     The Annexes are integral parts of this Agreement. However, other than the Parties, no party to the agreement contained in Annex 10 is a party to this Agreement nor may any such party assert any rights under this Agreement.

## ARTICLE XII

## REGIONAL EXEMPTION FROM EXPORT MEASURES

11

1.    The Parties shall, within 3 months of the Effective Date, establish a Working Group on regional exclusion from the export measures to develop substantive criteria and procedures for establishing if and when a Region utilizes market-determined timber pricing and management systems and therefore qualifies for exemption from the export measures in Articles VII to IX. The Parties will make best efforts to incorporate the results of the Working Group's work into an Addendum to this Agreement within 18 months. The agreed mandate and procedures for the working group is set out in Annex 10.

2.    If a Region is exempted from border measures by meeting the terms of the Addendum references in paragraph 1, then:

(a)    the following shall be prohibited with respect to that Region:

(i)    Any modification of a provincial timber pricing or forest management system as it existed as of the date of the exemption -- or any change in its administration -- that decreases the extent to which the system is market-determined. A provincial timber pricing or forest management system shall include, without limitation, the data, variables and procedures that it employs.

(ii)    Grants or other benefits that offset, in whole or in part, the policy reform. A grant or benefit shall be considered to offset, in whole or in part, the policy reform if it is provided de facto or de jure to entities manufacturing, producing or exporting Canadian Softwood Lumber Products. This subparagraph shall not apply to grants or benefits that meet criteria listed in Article XVII.2 (a), (b), (c), (d), or (e) (Anti-circumvention). For the purposes of determining whether a grant or benefit meet the criteria of Article XVII.2(a), a measure shall not be considered to offset the policy reform if it existed on the date on which the Region was exempted from the border measures pursuant to paragraph 1.

(b)    As to each exempted province or region, Canada shall continue to provide the United States, to the extent possible and within 6 months after the end of each quarter, with quarterly Region-by-Region aggregations of harvest volumes and revenues collected with respect to Crown timber used to produce Softwood Lumber Products. Quarterly reports shall also disclose changes to such systems. As to the MPS, Canada shall provide the complete Softwood Sawtimber auction results datasets used to derive the market modeling regressions and coefficients and spreadsheets used for the calculation of the Average Market Price and all information needed to monitor updates or modifications under this Article __, paragraph 1(b).

12

(c)    In respect of exports from an exempted province or region:

    (i)    If exports from that province or region to the U.S. in any quarter exceed 100% of the softwood lumber production plus the inventory of lumber products produced from logs originating in the province or region, then Canada shall retroactively impose on the entities responsible for any excess shipments from the province or region a charge equal to C$X, where X is determined according to the following formula:

$$X = (C\$200 * \text{MBF export volume in excess of total production and inventory volume during the quarter at issue})$$

    (ii)    The relevant province shall collect and submit data within 60 days after the end of each quarter to the governments of Canada and the United States on (1) production and inventory of lumber produced in the exempted province or region, and (2) excluded lumber product exports from the province or region.

    (iii)    If any excess exports are identified by any of the Parties, the governments of Canada and the U.S. and the relevant province will consult and exchange information regarding the excess shipments.

(d)    Either Party has the right to consult with the other Party if it believes that the other Party has substantially failed to enforce legal requirements in a manner that has a material impact on the price or cost of harvesting Softwood Sawtimber in a Region that has been exempted from the border measures.

(e)    This paragraph applies to action by any public authority of Canada with respect to Regions exempted from the border measures.


## ARTICLE XIII

## INSTITUTIONAL ARRANGEMENTS


**A.    Private Initiatives**


13

1.    Canada and the United States encourage the creation of a binational industry council as described in Annex 12.

2.    By September 1, 2006 the United States shall identify in consultation with Canada meritorious initiatives to receive the funds identified in Annex 2A. Such meritorious initiatives shall support, in the United States:

- Educational and charitable causes in timber-reliant communities;
- Initiatives related to low-income housing and disaster relief; and
- Educational and public-interest projects addressing forest management issues that affect timber-reliant communities and the sustainability of forests as sources of building materials, wildlife habitat, bio-energy, recreation, and other values.

## B.    Softwood Lumber Committee

1.    The Parties hereby establish the Softwood Lumber Committee, comprising representatives of the Parties or their designees.

2.    The Softwood Lumber Committee shall:

    (a)    supervise the implementation of this Agreement;

    (b)    oversee its further elaboration; and

    (c)    supervise the work of all working groups established under this Agreement; and

    (d)    consider any other matter that may affect the operation of this Agreement.

3.    In exercising its functions, the Softwood Lumber Committee may:

    (a)    establish and delegate responsibilities to working groups or expert groups;

    (b)    seek the advice of non-governmental persons or groups; and

    (c)    take such other action in the exercise of its functions as the Parties may agree.

4.    The Softwood Lumber Committee shall establish its rules and procedures. All decisions of the Committee shall be taken by consensus, except as the Committee may agree otherwise.

5.    The Softwood Lumber Committee shall convene at least once a year in regular session. Regular Sessions of the Committee shall be chaired successively by each Party.

14

### C.    Technical Working Groups

1.    The Parties shall establish Technical Working Groups that shall meet at the request of either Party comprising representatives of each Party knowledgeable in matters relating to the implementation of this Agreement, including customs, tariff classification under the Harmonized Commodity Description and Coding System, softwood lumber markets and data sources and of the technical specifications of softwood lumber products referred to in Annex 1A, to ensure:

    (a)    the effective implementation and application of a softwood lumber charge in respect of Canadian exports of softwood lumber products to the United States; and

    (b)    the effective administration of the customs related aspects of the Agreement, including export permit/quota administration, data collection and exchange of information.

And, to review and provide recommendations on:

    (c)    the methodology established to calculate prevailing monthly prices referred to in Annex 4;

    (d)    the methodology established to determine US softwood lumber consumption referred to in Annex 8; and

    (e)    to address any other issues as may be agreed by the Parties with respect to the operation of Annexes 4 and 8, including, if required, the development of an alternative verification process referred to in Article XV, paragraph 15.

## ARTICLE XIV

## DISPUTE SETTLEMENT

1.    Either Party may initiate dispute settlement under this Article on any matter arising out of this Agreement or with respect to the implementation of agreed upon regional exemptions from export measures pursuant to Article XII.

2.    Except as provided in this Article, for the duration of this Agreement, including any renewal pursuant to Article XVIII, neither Party shall initiate any litigation or dispute settlement with respect to Softwood Lumber Products or any matter arising out of this Agreement, including proceedings pursuant to the Marrakesh Agreement Establishing the World Trade Organization or Chapter Twenty of the NAFTA. For purposes of this paragraph, "litigation or dispute settlement" does not include actions related to alleged

civil or criminal violations, including ICE/CBP investigations or administrative penalty actions, as well as any litigation related to such investigations or penalty actions.

3.    Dispute settlement under this Agreement shall be conducted as expeditiously as possible.

4.    To initiate dispute settlement, a Party shall request in writing consultations with the other Party regarding a matter. Unless the Parties agree otherwise, consultations shall be held within 20 days of delivery of the request for consultations. The Parties shall make every attempt to arrive at a satisfactory resolution of the matter through consultations. The Parties shall exchange sufficient information to enable a full examination of the matter.

5.    The Parties also may agree to have the matter resolved through non-binding mediation by a neutral third party.

6.    If the Parties do not resolve the matter within 40 days of delivery of the request for consultations, either Party may refer the matter to arbitration by sending a written Request for Arbitration to the Registrar of the LCIA Court. The arbitration shall be conducted under the LCIA Arbitration Rules , with the exception of Article 21, that are in effect on the date this Agreement was signed, as modified by this Agreement or by consent of the Parties.

7.    An arbitral tribunal shall comprise three arbitrators.

8.    Citizens or residents of the United States or Canada are not eligible for appointment to the tribunal.

9.    Each Party shall nominate one arbitrator within 30 days following the date the arbitration commences pursuant to LCIA Article 1.2. Unless the Parties otherwise agree, if a Party fails to nominate an arbitrator within 30 days, the LCIA Court shall nominate that arbitrator.

10.    The two nominated arbitrators shall jointly nominate the Chair of the tribunal within 10 days following the nomination of the second arbitrator. In doing so, the nominated arbitrators may consult with the Parties. If the nominated arbitrators fail to nominate a Chair within 10 days, the LCIA Court shall nominate the Chair within 20 days thereafter.

11.    The LCIA Court shall endeavour to appoint the three arbitrators thus nominated within 5 business days following the nomination of the Chair.

12.    Arbitrators shall be remunerated and their expenses paid in accordance with the rates established by the LCIA.  Arbitrators shall keep a record and render a final account of their time and expenses, and the Chair of the panel shall keep a record and render a final account of all general tribunal expenses

13.    The legal place of arbitration shall be London, United Kingdom.  All hearings shall be conducted in the United States or Canada as the tribunal may decide in its discretion.

14.    The International Bar Association Rules on the Taking of Evidence in International Commercial Arbitration as adopted in 1999, except Article 6 of the International Bar Association Rules, and to the extent modified by this Agreement,  shall apply in the arbitrations held under this Agreement.

15.    If a Party wishes to designate information to be used in the arbitration as confidential, the tribunal shall establish, in consultation with the Parties, procedures for the designation and protection of confidential information.  Such procedures shall provide, as appropriate, for the sharing of confidential information for purposes of the arbitration with counsel to softwood lumber industry representatives or with provincial or state government officials.

16.    Each Party shall promptly make the following documents available to the public, subject to Article XVI and the procedures established under paragraph 15:

   (f)    the request for arbitration;

   (g)    pleadings, memorials, briefs, and any accompanying exhibits;

   (h)    minutes or transcripts of hearings of the tribunal, where available; and

   (i)    orders, awards, and decisions of the tribunal.

17.    Hearings of the tribunal shall be open to the public.  The tribunal shall determine, in consultation with the Parties, the appropriate arrangements for open hearings, including the protection of confidential information.

17

18.     A tribunal shall give sympathetic consideration to domestic laws:

     (j)     precluding disclosure by a Party of information in determining whether that information is privileged from disclosure and whether to draw inferences from a Party's failure to disclose such information; or

     (k)     requiring disclosure by a Party of information subject to confidentiality procedures under paragraph 15.

19.     The tribunal shall endeavour to issue an award not later than 180 days after the LCIA Court has appointed the tribunal.

20.     A tribunal award is final and binding. There shall be no appeal or any other review of a decision of the tribunal, and no enforcement of awards other than in accordance with this Agreement.

21.     The tribunal may not award costs. US$ 10 million shall be earmarked from the funds allocated to the binational industry council as described in Article XIII to cover the costs of the arbitration, including the costs of arbitrators, hearing facilities, transcripts, assistants to the tribunal and costs of the LCIA. However, each Party shall bear its own costs, including the costs of legal representation, experts, witnesses and travel.

22.     If the tribunal finds that a Party has breached an obligation under this Agreement, the tribunal shall:

     (l)     identify a reasonable period of time for that Party to cure the breach, which shall be the shortest reasonable time period feasible and in any event, not longer than 30 days from the issuance of the award; and

     (m)    determine appropriate adjustments to the Canadian export measures to compensate for the breach if that Party fails to cure the breach within the reasonable period of time.

23.     The compensatory adjustments determined by the tribunal under paragraph 22(b) shall consist of increases or reductions to the export charge and/or the volume restraint applied, or if no border measure is being applied under Article VII, the imposition of

such measures as appropriate. Such adjustments shall be in an amount that remedies the breach.

24.     Such adjustments may be imposed from the end of the reasonable period of time until the breach is cured.

25.     In the case of a breach by Canada attributable to a particular region, the tribunal shall determine the compensatory adjustment applicable to that region.

26.     If Canada considers that the United States has failed to cure a breach by the end of the reasonable period of time, Canada may make the compensatory adjustments to the Canadian export measures in the amount determined by the tribunal.

27.     If the United States considers that Canada has failed to cure a breach and failed to make the compensatory adjustments determined by the tribunal by the end of the reasonable period of time, the United States may impose compensatory measures in the form of volume restraints and/or customs duties on imports to the United States of Softwood Lumber Products from Canada. Any volume restraint under the compensatory measures shall not be greater than the adjustment to the volume restraint determined by the tribunal. Any customs duties under the compensatory measures shall not exceed the adjustment to the export charge determined by the tribunal. Such measures shall not be considered to be a breach of Article V.

28.     If, after the expiry of the reasonable period of time, the Party complained against considers that:

    (n)     the compensatory adjustments being applied by the other Party are inconsistent with the award;

    (o)     the compensatory measures being applied by the other Party do not meet the conditions in paragraph 27; and/or

    (p)     the breach has been eliminated, in whole or in part, such that the compensatory adjustments or measures should be modified or terminated, and the complaining Party does not agree, the Party complained against may commence a new arbitration under this Article for the purpose of addressing these issues.

29.    The matter in paragraph 28 shall be referred to a tribunal identical in composition to the tribunal that considered the original dispute, to the extent the arbitrators are still available. The Parties shall ask the LCIA within 10 days of commencement of the new arbitration to appoint the arbitrators comprising the original tribunal to the extent they are available. Any member of the original tribunal who is no longer available shall be replaced in accordance with Article 11 of the LCIA Rules. The LCIA Court shall endeavour to appoint the three arbitrators thus nominated within 5 business days following the request of the Parties to appoint the original arbitrators, or if one or more arbitrators is unavailable, within 5 business days following the replacement of the unavailable arbitrator(s). The tribunal shall endeavour to issue its award within 60 days of the request for arbitration in paragraph 28.

30.    In its award in an arbitration pursuant to paragraph 29, the tribunal may affirm the compensatory adjustments or measures being applied by the complaining Party or find that the compensatory adjustments or measures should be applied, modified or terminated

31.    An award under paragraph 29 shall apply as of the date that the compensatory adjustments or compensatory measures were imposed such that: (a) any export charge due is collected or any customs duties owing is refunded, retroactive to that date; and (b) any revision to the volume restraint applied is calculated retroactive to that date and the quota volume for the affected region or regions is increased or reduced accordingly in equal monthly amounts in the quarter following the award.

32.    If the United States imposes compensatory measures pursuant to paragraph 27 or Canada imposes compensatory adjustments pursuant to paragraph 26, the other Party may request consultations to discuss the status of the Agreement. Such consultations shall be held within 10 days from the date the request is received. Following the consultations, either Party may terminate the Agreement.

## ARTICLE XV

## INFORMATION COLLECTION AND EXCHANGE

### A.    Information Collection

1.    Canada shall place Softwood Lumber Products on the Export Control List under the *Export and Import Permits Act*, as amended, require a federal Export Permit for each exportation to the United States of Softwood Lumber Products, and require any person to which such a permit is issued to keep records relating to its issuance for sixty (60) months after the date of issuance of the permit.

20

2.     In connection with the issuance of an Export Permit under the Export and Import Permits Act, as amended, or any successor law, Canada shall require exporters to the United States of Softwood Lumber Products to furnish to it the:

  (a)     manufacturer identification number;

  (b)     name of exporter;

  (c)     Region of origin;

  (d)     Customs Tariff (Canada) classification and product description;

  (e)     quantity in board feet, cubic meters, or square meters in nominal terms;

  (f)     the Export Price;

  (g)     U.S. port of entry;

  (h)     Anticipated U.S. entry date;

  (i)     name of importer;

  (j)     mode of transportation;

  (k)     Export Permit number;

  (l)     Canadian shipment date; and

  (m)     Maritime Lumber Bureau Certificate of Origin number if applicable.

3.     In addition to the entry and entry summary information currently required for importation into the United States, the United States shall require importers of such merchandise, under section 484 of the Tariff Act of 1930, as amended, or any successor law, to furnish to it the Export Permit Number and if applicable the Maritime Lumber Bureau Certificate of Origin number.

4.     Each Export Permit will have a permit number that meets the format requirement for the CBP Form 7501, and the permit number will be electronically transmitted to USCBP with the CBP Form 7501 data elements. USCBP will also require the submission of a permit number for merchandise referred to in Article X. USCBP will request the Export Permit, as needed, from the importer.

**B.     Information Exchange**

5.     USCBP will provide to Canada on a monthly basis, the following information on U.S. imports of Canadian Softwood Lumber Products, by shipment:

  (a)     manufacturer identification number;

21

    (b)       Province (Region of first manufacture or first mill manufacture);3

    (c)       10-digit HTSUS Code and product description;

    (d)       quantity in board feet, cubic meters, or square meters in nominal terms, as required by the HTSUS;

    (e)       Appraised Value (USD) as defined by USCBP;

    (f)       U.S. port of entry;

    (g)       U.S. CBP entry number;

    (h)       U.S. entry date;

    (i)       name of importer;

    (j)       mode of transportation; and

    (k)       Export Permit number.

6.      The Parties shall exchange on a monthly basis aggregated Region-specific data collected pursuant to paragraph 2, for the purpose of reconciling their data covering the preceding calendar month and the year to date. Reconciliation shall be quarterly and shall be completed within four months of the end of the quarter covered by the reconciliation.

7.      Canada shall provide to the United States, on a monthly basis, data on the total charges assessed pursuant to this Agreement covering the preceding calendar month and the year to date, broken down both by Region and by type of charge (export charges, surge penalty charges, and refunded charges), including any revisions.

8.      If the Parties cannot reconcile their Region-specific aggregated data, they shall exchange information regarding exports by specific exporters, importers, or manufacturers, and if necessary, regarding specific exports and imports in order to achieve complete reconciliation within nine months of the end of any quarter.

9.      The Parties shall cooperate for purposes of detection and prevention of false designations of Region of first manufacture and quantities exported. Where USCBP has reason to believe that an exporter has failed to obtain an Export Permit as required or has made a false declaration with respect to any of the information requirements of paragraph 2, USCBP shall request additional information from the importer to support the claim. If necessary, USCBP may submit a request to the Bureau to visit the premises of the manufacturer(s) of the goods at issue, in order to ensure compliance with the Export and Import Permits Act, as amended, or any successor law. The Bureau shall conduct the

---

[3] CBP will initiate a process to designate BC Coast and BC Interior as separate Regions for purposes of this Agreement.

visit following consultations between the Parties to define the nature of the problem and to agree on the information required. The Bureau shall share information relating to any such visit with USCBP.

10.    The United States shall notify and consult with Canada on any

    (a)    importation of softwood lumber products that USCBP views as requiring an export permit but for which an export permit number has not been provided on CBP form 7501; and

    (b)    customs investigation that ICE initiates on or after the date the Agreement enters into force.

11.    Nothing in this Agreement shall be construed to prevent a Party from imposing criminal, civil, or administrative penalties for violations of its laws and regulations relating to the implementation of this Article.

12.    Notwithstanding Article XVI, the aggregated Region-specific data collected under subparagraphs 2(c) through (g), and the aggregated Region-specific data pertaining to charges collected and remitted pursuant to this Article, need not be treated as confidential.

13.    Within 90 days of the entry into force of this Agreement, Canada shall provide to the United States a list of the companies that have qualified under the process described in Annex 6 as independent re-manufacturers. Canada shall notify the United States in writing of any change to the list within 15 days of the change.

14.    Canada shall provide the United States notice of any new, or any amendment to a, federal, provincial, or territory law, regulation, order-in-council, or other measure governing stumpage charges or forest management systems related to Softwood Lumber Products, within 45 days after such measure is adopted. This information shall not be treated as being confidential under Article XVI. Each Party shall respond to requests from the other for information that is relevant to the operation of this Agreement. This paragraph does not apply with respect to the Maritimes, Nunavut, Yukon and the Northwest Territories.

15.    Canada shall disclose to the United States any changes to its systems or other actions that it maintains are covered by Paragraphs 2(a), 2(c), 2(d), or 4 of Article XVII, together with an explanation of why they are covered, including any evidence showing that such changes improve the statistical accuracy and reliability of a system or pricing. As to the MPS, Canada shall provide the complete Softwood Sawtimber auction results datasets used to derive the market modeling regressions and coefficients and spreadsheets

used for the calculation of the Average Market Price and all information needed to monitor updates or modifications under this Article __, paragraph 1(b).

16.    Canada shall, based on sufficient information that it obtains, certify to the United States each quarter that it has no basis to believe that:

    (c)    the timber pricing and forest management systems of the provinces and territories have been modified other than as notified in paragraph 4; and

    (d)    the provinces and territories are collecting revenues at levels lower than called for under those systems.

The sufficiency of the information that Canada obtains shall not be subject to dispute resolution.

Requests for information concerning the operation of this Agreement shall not be used to obtain information concerning the basis upon which Canada certifies the information under this paragraph.

17.    Within 6 months after the end of each quarter, Canada shall, to the extent possible, provide the United States with quarterly Region-by-Region aggregations of harvest volumes and revenues collected with respect to Crown timber used to produce Softwood Lumber Products.

18.    The United States shall, to the best of its knowledge and ability certify each month:

    (e)    that the US softwood lumber shipment data published by the Western Wood Products Association (WWPA) is an unbiased estimate of actual shipments used in the determination of US consumption, and

    (f)    that the framing lumber composite price published by Random Lengths Publishing Publications Incorporated is unbiased.

19.    Either Party, may, with the consent of a data source referred to in paragraph 15, require that a third-party, professional accounting firm as may be mutually agreed upon by the Parties, conduct an independent audit of that data source, including verification of the compilation of the data as well as the accuracy of the input source data.

20.    The Parties may agree to an alternative verification process to that provided in paragraph 16, as established by a Technical Working Group established under Part C of Article XIII (Institutional Arrangements).

21.    If a data source fails to consent to a third party audit, or is shown as a result of an audit or any other basis to be a biased or otherwise unreliable measure of shipments, exports or imports, the Parties shall select an alternative data source that is mutually agreeable. To the extent that historical data is shown to be biased or unreliable and materially affects the export measures that were applied in a previous period and in respect to which exporters within a region relied upon in good faith to their detriment, the export measures shall be re-adjusted on a retroactive basis.

## ARTICLE XVI

## CONFIDENTIALITY

1.    Subject to paragraphs 12 and 14 of Article XV and paragraphs 4 and 15 - 18 of Article XIV, each Party shall treat as confidential, in accordance with its laws, information provided to it under this Agreement that is not otherwise publicly available.

2.    For greater certainty, each Party shall refuse to disclose information obtained in confidence from the other Party or an institution thereof, unless that Party consents to the disclosure or makes the information public.

3.    Information referred to in paragraph 1:

    (a)    may be used and disclosed to government officials solely in connection with the implementation or operation of this Agreement and subject to the disclosure requirements of the receiving Party's law; and

    (b)    shall not be used or disclosed in any trade action or investigation of the type referred to in Article V except with the written permission of the Party or person providing the information.

4.    Each Party shall handle information provided to it under this Agreement so as to prevent unauthorized disclosure. However, the Parties may transmit the information through e-mail or by fax, may process the information on unclassified computer systems or store the information in locked filing cabinets or offices.

25

## ARTICLE XVII

### ANTI-CIRCUMVENTION

1.    No Party or any public authority of a Party shall take action to circumvent or offset the commitments set out in this Agreement, including action having the effect of reducing or offsetting the border measures provided for in Article ___ or undermining the commitments set forth in Article ___.

2.    Grants or other benefits provided by a Party or any public authority of a Party shall be considered to offset the border measures if they are provided on a de jure or de facto basis to entities manufacturing, producing or exporting Canadian Softwood Lumber Products. Notwithstanding the foregoing, measures that shall not be considered to offset the border measures set out in the Agreement include, without limitation:

   (c)    provincial timber pricing or forest management systems as they existed as of July 1, 2006, including any modifications or updates that maintain or improve the extent to which stumpage charges reflect market conditions, including prices and costs. Fluctuations in stumpage charges that result from such modifications or updates, including fluctuations resulting from changes in market conditions or other factors that affect the value of the province's timber, such as transportation costs, exchange rates and timber quality and natural harvesting conditions, do not constitute circumvention. A provincial timber pricing or forest management system includes the data, variables and procedures it employs;

   (d)    other government programs that provide benefits on a non-discretionary basis in the form and the total aggregate amount in which they existed and were administered as of July 1, 2006;

   (e)    actions or programs undertaken by a Party or any public authority of a Party for the purpose of forest or environmental management, protection, or conservation, including, without limitation, actions or programs to reduce wildfire risk, protect watersheds, protect, restore or enhance forest ecosystems; or facilitate public access to and use of non-timber forest resources, provided that such actions or programs do not involve grants or other benefits that have the effect of undermining or countering movement toward market pricing of timber;

   (f)    payments or other compensation to First Nations for purposes of addressing or settling claims; and

   (g)    measures that are not specific to the forest products industry.

26

3.    Either Party has the right to consult with the other Party if it believes that the other Party has substantially failed to enforce legal requirements in a manner that has a material impact on the price or cost of harvesting Softwood Sawtimber.

4.    In respect of British Columbia:

   (h)    The MPS shall be considered a provincial timber pricing or forest management system that existed as of July 1, 2006. Action that conflicts with the June 6, 2006 documents as disclosed to the U.S. can constitute circumvention.

   (i)    Canada warrants that a central purpose of the MPS is to put into place a system that is more sensitive to market forces than pre-existing systems. The MPS and any fluctuations in stumpage charges that result from the operation of this system, including fluctuations resulting from changes in market conditions or other factors, such as transportation costs, exchange rates and timber quality and natural harvesting conditions, do not constitute circumvention of this Agreement or offset its commitments.

   (j)    Modifications to the MPS that improve the statistical accuracy and reliability of the MPS regression equations (that relate winning bids on, or the number of bidders participating in, timber auctions to explanatory variables) do not constitute circumvention of this Agreement or offset its commitments.

   (k)    Payments in accordance with legal obligations of British Columbia to pay compensation for tenure rights taken back by the Province consisting of binding arbitration awards or negotiated settlements of legal claims that have been approved by the Province's Minister of Finance and that have been certified by the Province's Attorney General as being in the public interest, do not constitute circumvention of this Agreement or offset its commitments.

5.    In respect of exports from the Maritimes:

   (a)    If exports from the Maritimes to the U.S., covered by an original Maritime Lumber Bureau Certificate of Origin, in any quarter exceed 100% of the softwood lumber production plus the inventory of lumber products produced from logs originating in the Maritimes and Maine, then Canada shall retroactively impose on the entity or entities responsible for any excess shipments from the Maritimes, a charge equal to C$X, where X is determined according to the following formula:

X = (C$200 * MBF export volume in excess of total production and inventory volume during the quarter at issue).

27

(b)     The Maritime Lumber Bureau shall collect and submit data within 60 days after the end of each quarter to the governments of Canada and the United States on (1) production and inventory of lumber produced in the Maritimes and (2) excluded lumber product exports from the Maritimes as certified under the Maritime Lumber Bureau Certificate of Origin Program.

(c)     If any excess exports are identified by any of the Parties, the governments of Canada and the U.S. and the Maritime Lumber Bureau will consult and exchange information regarding the excess shipments.

6.     Transfers of quota allocation between companies within a particular Region will not constitute circumvention under this Agreement.

## ARTICLE XVIII

## DURATION

The Agreement will remain in place for seven years from the Effective Date and may be renewed by agreement of both Parties for an additional two years.

## ARTICLE XIX

## AMENDMENT

This Agreement may be amended at any time by the agreement in writing of the Parties.

## ARTICLE XX

## TERMINATION

33.     After two years after entry into force, either Party may terminate this Agreement by providing 3 months written notice to the other. Upon request of the Party that receives the notice of proposed termination, the Parties shall consult on the reasons for the proposed termination. The Parties understand that, if the United States has exercised its right to terminate under this paragraph, the companies who have filed the letters in Annex 3C shall not, for a period of 3 months after such termination, file petitions and will oppose initiation of an investigation, pursuant to Title VII of the Tariff Act of 1930, as amended, or 301-305 of the Trade Act of 1974, as amended, with respect to imports of softwood lumber from Canada.

34.     The United States reserves the right to terminate the Agreement if Canada is not applying the export measures under Article VII and Article VIII without resort to dispute

28

settlement under Article XIV or any other pre-condition for termination of this Agreement.

35.     Any breach of the commitments of the United States under paragraph 1 of Article V shall give Canada the right to terminate this Agreement without resort to dispute settlement under Article XIV or any other pre-condition for termination of this Agreement.

## ARTICLE XXI

## DEFINITIONS

For purposes of this Agreement:

1.     "ACH" or Automated Clearing House means a funds transfer system governed by the ACH Rules, as defined in 31 CFR § 210.2, which provides for the interbank clearing of electronic entries for participating financial institutions.

2.     "AD Order" means the Antidumping Duty Order regarding Certain Softwood Lumber from Canada, 67 Fed. Reg. 36,068 (May 22, 2002), as amended.

3.     "Associated persons" means:

   (a)     persons related to each other in that:

      (i)     they are individuals connected by blood relationship, marriage, common-law partnership, or adoption within the meaning of subsection 251(6) of the Income Tax Act

      (ii)     one is an officer or director of the other;

      (iii)     each such person is an officer or director of the same two corporations, associations, partnerships, or other organizations;

      (iv)     they are partners;

      (v)     one is the employer of the other;

      (vi)     they directly or indirectly control or are controlled by the same person

      (vii)     one directly or indirectly controls or is controlled by the other

      (viii)     any other person directly or indirectly owns, holds or controls five percent or more of the outstanding voting stock or shares of each such person

      (ix)     one directly or indirectly owns, holds or controls five percent or more of the outstanding voting stock or shares of the other

   or

29

(b)    persons not related to each other, but not dealing with each other at arms length. It is a question of fact whether persons not related to each other were at a particular time dealing with each other at arm's length.

4.    "BC Coast" means the Coastal Forest Regions as defined, as of the Effective Date, by British Columbia's Forest Regions and Districts Regulation.

5.    "BC Interior" means the Northern Interior Forest Region and the Southern Interior Forest Region as defined, as of the Effective Date, by British Columbia's Forest Regions and Districts Regulation.

6.    "British Columbia" means the BC Coast and the BC Interior.

7.    "Board foot" means the lumber volume equal to a one-inch board 12 inches in width and one foot in length. When calculating board feet nominal sizes are assumed.

8.    "Bureau" means the Export and Controls Bureau of the Department of Foreign Affairs and International Trade.

9.    "CIT" means the United States Court of International Trade.

10.    "Complaining Party" refers to the Party filing a request for arbitration;

11.    "Conversion factor" means the factors used to convert lumber volumes measures in square and cubic metres to board feet. The conversion factors that will be used in this agreement are specified in Annex 8.

12.    "covered entries" means unliquidated entries of softwood lumber that were subject to the AD Order and/or CVD Order.

13.    "CVD Order" means the Countervailing Duty Order regarding Certain Softwood Lumber from Canada, 67 Fed. Reg. 36,070 (May 22, 2002), as amended.

14.    "Date of shipment" means (a) in the case of products exported by rail, the date when the railcar which contains the products is assembled to form part of a train for export; and (b) in any other case, the date when the products are loaded aboard a conveyance for export.

15.    "Day" means a calendar day.

16.    "Effective Date" means the date designated by the Parties as the entry into force date through the exchange of letters pursuant to Article II(1).

17.    "Appraised Value" means the value of imported merchandise as determined in accordance with 19 U.S.C. § 1401a or any successor statute.

18.    "Escrow Accounts" means

19.    "Escrow Agent" means

20.    "Escrow Agreement" means

21.    "Existing" means existing on the Effective Date of this Agreement.

22.    "Escrow Importers" means

23. "Export Permit" means authority to export goods included on the Export Control List (ECL), pursuant to the Export and Import Permits Act, as amended.

24. Export Price means:

    (a)    a) if the product has undergone only primary processing, the value that would be determined FOB at the facility where the product underwent its last primary processing before exportation;

    (b)    b) if the product was last remanufactured before exportation by an Independent Re-manufacturer, the value that would be determined FOB at the facility where the softwood lumber used to make the re-manufactured product underwent its last primary processing;

    (c)    c) if the product was last remanufactured before exportation by a re-manufacturer that is not an independent re-manufacturer, the value that would be determined FOB at the facility where the product underwent its last processing before exportation; or,

    (d)    d) for a product described in paragraph (a), (b) or (c) in respect of which an FOB value cannot be determined, market price for identical products sold in Canada at approximately the same time and in an arm's length transaction, determined in one of the following three ways, listed in order of preference: (i) at substantially the same trade level but in different quantities; (ii) at a different trade level but in similar quantities; or, (iii) at a different trade level and in different quantities.

25. FOB means: A value consisting of all charges payable by a purchaser including those incurred in the placement on board the conveyance for shipment, but not including the actual shipping charges.

26. "Liquidated as entered" means liquidation of the entry at the rate of duty, value, quantity, and the amount of duties asserted by the importer of record.

27. "Expected U.S. Consumption" means the level of U.S. Consumption forecasted in accordance with the formula{e} contained in Annex 8.

28. "Formal Entry" means an entry made to obtain a release of merchandise under 19 CFR § 141.

29. "Household and Personal Effects" means merchandise classifiable under Chapter 98, Subchapters IV, V, & VI, HTSUS.

30. "HTSUS" means the Harmonized Tariff Schedule of the United States.

31. "ICE" means U.S. Immigration and Customs Enforcement.

32. "importers of record" are importers of record for the purpose of U.S. law that are corporations, partnerships or residents of the United States that have imported Canadian softwood lumber products between May 22, 2002 and the entry into force of this Agreement.

31

33. "Independent Manufacturer of Remanufactured Softwood Lumber" means a Canadian manufacturer of Remanufactured Softwood Lumber that does not hold Crown tenure rights and, after entry into force of the Agreement, has not acquired standing timber directly from the Crown, and is not an "associated person" with respect to a tenure holder or any entity that has acquired standing timber directly from the Crown.

34. "Informal Entry" means an entry made to obtain a release of merchandise eligible for informal entry as defined in 19 CFR Part 143.21.

35. "LCIA" means the London Court of International Arbitration.

36. "Market Pricing System" or MPS means (1) in the case of the B.C. Coast, the timber pricing policies and procedures in the Coast Appraisal Manual in effect on the coming into force of this Agreement; and the description of the system in the paper Market Pricing System – Coast (January 16, 2004); and (2) in the case of the B.C. Interior, the timber pricing policies and procedures in the Interior Appraisal Manual in effect on the coming into force of this Agreement; its accompanying papers Specifications: Calculation of the Interior Average Market Price and Specifications: Calculation of Interior Stumpage Rates (both dated July 1, 2006); and the description of the system in the papers Market Pricing System – Interior (June 1, 2006), Interior Market Pricing System – Average Market Price (June 5, 2006), Interior Market Pricing System – Tenure Obligation Adjustments (June 5, 2006), Interior Market Pricing System – Specified Operations (June 5, 2006). For greater clarity, the Coast and Interior appraisal manuals in effect on July 1, 2006 are: (1) in the case of the B.C. Coast, the manual dated February 29, 2004 and including all subsequent amendments up to and including July 1, 2006; and (2) in the case of the B.C. Interior, the manual dated November 1, 2004 and including all subsequent amendments up to and including July 1, 2006. The MPS includes any MPS Updates.

37. "Manufacturer identification number" means the identifying code for a manufacturer or shipper derived from its name and address as defined in 19 C.F.R. §102.

38. "Maritimes" means New Brunswick, Nova Scotia, Prince Edward Island, and Newfoundland and Labrador.

39. "MBF" means thousand board feet.

40. "MPS Updates" means any periodic revision to the Market Pricing System in accordance with the methods and procedures described in the documents referenced in the definition of "Market Pricing System." The MPS Updates to the Market Pricing System in the B.C. Interior and in the B.C. Coast, as described in the documents referenced in the definition of "Market Pricing System" in paragraph 2 above, use substantially the same methods and procedures. MPS Updates will come into force as amendments to, or new versions, of the Coast Appraisal Manual or the Interior Appraisal Manual. MPS Updates shall not be

32

considered "modifications or updates" as set forth in Article XVII, paragraph 2(a), of this Agreement.

41.    "NAFTA" means the North American Free Trade Agreement.

"Party Complained Against" refers to the Party responding to a request for arbitration;

"Party" means Canada or the United States;

"Parties" means Canada and the United States;

42.    "Person" means a natural person, sole proprietorship, partnership, corporation, or association.

43.    Prevailing Monthly Price means the framing lumber composite price specified in Annex 4.

44.    "Quarter" means, unless otherwise specified, a calendar quarter

45.    "Region" means one of the following: Alberta, the BC Interior, the BC Coast, Manitoba, Ontario, Saskatchewan, or Quebec.

46.    "Region of Origin" means: the Region where the facility, at which the Softwood Lumber Product was first manufactured into such a product, is situated, whether or not that product was further processed (for example, planing or kiln drying) or was transformed from one softwood lumber product into another such product (for example, a remanufactured product) in another Region, with the following exceptions:

   (a)    The Region of Origin of Softwood Lumber Products first manufactured in the Maritime Provinces from logs harvested in a non-Maritime Province shall be the Region where the log was harvested; and

   (b)    The Region of Origin of Softwood Lumber Products first manufactured in the Yukon, Northwest Territories or Nunavut (the "Territories") from logs harvested outside the Territories shall be the Region where the log was harvested.

47.    "Regional Share" means a Region's share of U.S. Consumption as specified in Table 1 of Annex 5 and Table 1 of Annex 7.

48.    "Re-manufactured Softwood Lumber Products" means Softwood Lumber Products that are produced by reprocessing lumber inputs by subjecting such inputs to one or more of the following: a change in thickness; width; length; profile; texture; moisture; grading'; or joining together by finger jointing, turning one or other processes that produce components, semi-finished and/or finished Softwood Lumber Products.

49.    "Softwood Sawtimber" means timber used for production of Softwood Lumber Products.

33

50. "TIB", or Temporary Importation Under Bond, means that an entry summary supporting a temporary importation under bond has been filed with USCBP in paper form and the entry of articles is brought into the United States temporarily and claimed to be exempt from duty under Chapter 98, Subchapter XIII, HTSUS.

51. "Tenure holder" means a person who holds specific rights to harvest timber in a Crown/public forest.

52. "United States" means the customs territory of the United States of America and all foreign trade zones located in the territory of the United States of America.

53. "USCBP" means United States Customs and Border Protection.

54. "USDOC" means the United States Department of Commerce.

55. "U.S. Consumption" means total U.S. shipments of softwood lumber plus total U.S. imports of softwood lumber less total U.S. exports of softwood lumber, as defined in Annex 8.

56. "USTR" means the Office of the United States Trade Representative.

57. "WTO" means the World Trade Organization.

58. "Year" means, unless otherwise specified, a calendar year.

## ARTICLE XXI

## ENTRY INTO FORCE

This Agreement comes into force on the Effective Date.

**IN WITNESS WHEREOF the undersigned, being duly authorized for this purpose by their respective governments, have signed this Agreement.**

**DONE in duplicate at [•], this [•] of 2006, in the English and French languages, each text being equally authentic.**

**FOR THE GOVERNMENT**
**OF CANADA**

**FOR THE GOVERNMENT OF**
**THE UNITED STATES OF AMERICA**