UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TEMBEC INC., TEMBEC INVESTMENTS INC., TEMBEC INDUSTRIES INC., <br><br> Petitioners, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Respondent. | No. 05-CV-2345 (RMC) |

**RESPONDENT'S RESPONSE AND OPPOSITION TO PETITIONERS' NOTICE OF REINSTATEMENT OR, IN THE ALTERNATIVE, MOTION UNDER RULE 60(b)**

Respondent, the United States of America, submits this memorandum in response and opposition to the Notice of Reinstatement of Action or, in the alternative, Rule 60(b) Motion to Set Aside the Judgment ("Pet. Mot.") filed by Petitioners, Tembec Inc., Tembec Investments Inc., and Tembec Industries Inc. (collectively "Tembec"). Despite the clear terms of the Softwood Lumber Agreement 2006 ("SLA") in its final form that do not prohibit the United States from seeking costs in the Tembec NAFTA Chapter Eleven arbitration proceedings, Tembec asks this Court to reopen its final judgment because the United States has sought such costs. At bottom, Tembec points to no document signed by the United States in the final SLA that limits the United States' ability to seek costs for that arbitration, and has provided no basis to reopen this case.

Tembec principally contends that United States' request for costs contravenes the SLA and, because the stipulation of dismissal was subject to the SLA, Tembec is permitted to reinstate its claim. *See* Pet. Mot. at 6-7. The United States' request for costs, however, is fully within its

1

rights because Tembec's NAFTA Chapter Eleven claim is not covered by the SLA's express terms, and, thus, reopening the final judgment is unwarranted. Tembec also argues that the request for costs permits the Court to set aside the judgment under Federal Rule of Civil Procedure 60(b)(3), because, Tembec contends, it was misled about the terms of the SLA by the Governments of the United States and Canada. *See id.* at 7-9. This claim is equally without merit and Tembec has not met the exacting standard necessary to reopen the final judgment. The document on which Tembec relies was signed only by Tembec, whereas the controlling document is the final document signed by all the parties, including Tembec and the United States. The materials submitted by Tembec therefore provide no support for its claim of misrepresentation or other misconduct; thus, Tembec has clearly not demonstrated the clear and convincing evidence needed to reopen the final judgment under Rule 60(b)(3).

## FACTUAL BACKGROUND

This case concerned Tembec's challenge to a September 2005 Consolidation Order by a tribunal constituted under Article 1126 of the NAFTA ("Consolidation Tribunal"), which consolidated three similar arbitrations under Chapter Eleven of the NAFTA brought by three sets of Canadian softwood lumber companies against the United States.[1] On December 7, 2005, Tembec informed the Consolidation Tribunal that it "does not recognize that this Tribunal has lawfully assumed jurisdiction over Tembec's Statement of Claim," and stated that it was

---

[1] Tembec's Chapter Eleven claim sought compensation for harm alleged to have arisen from antidumping, countervailing duty and other determinations by the U.S. Department of Commerce and the International Trade Commission. Those claims were substantially identical to those of two other softwood lumber companies, Canfor Corporation and Terminal Forest Products Ltd. A more detailed factual background as to the NAFTA Chapter Eleven arbitration between the United States and Tembec and the manner in which the instant case arose is set forth in detail in the United States' Opposition to the Motion to Vacate at pages 4-15 ("Respondent's Memorandum").

2

"remov[ing] its Statement of Claim" from the consolidation proceedings. *See* Letter from Elliot J. Feldman to the Consolidation Tribunal (Dec. 7, 2005), Respondent's Memorandum, Exh. EE. Tembec filed its petition with this Court seeking to vacate the Consolidation Order on that same day. In response to Tembec's December 7 filing, the Consolidation Tribunal terminated the arbitral proceedings with respect to Tembec and allowed them to withdraw on January 10, 2006. The Consolidation Tribunal, however, retained jurisdiction on the issue of the final apportionment of costs of the arbitration. *See* Order for the Termination of the Arbitral Proceedings with respect to Tembec (Jan. 10, 2006) at ¶¶ 2.1-2.3, Respondent's Memorandum, Exh. GG. At the conclusion of the hearing on jurisdiction on January 12, 2006, which addressed the United States' jurisdictional objection to Canfor's and Terminal's claims which remained before the Consolidation Tribunal, the Tribunal invited the parties to make submissions on costs. *See* Transcript of Hearing, *available at* http://www.state.gov/documents/organization/60210.pdf, Vol. 2 at 278:16-280:12. On April 7, 2006, the United States filed its submission seeking costs against Tembec, Canfor, and Terminal. *See* U.S. Submission on Costs (Apr. 7, 2006), attached hereto as Exh. A.

On September 12, 2006, the United States and Canada signed the Softwood Lumber Agreement ("SLA"), and set a target date of October 1, 2006 for bringing the Agreement into force. *See* SLA, attached hereto as Exh. B. Pursuant to Article II of the SLA, the agreement would not enter into force until the two governments confirmed that certain conditions precedent had been met. *See* Exh. B, Art. II. One of the conditions precedent was that a "Termination of Litigation Agreement" ("TLA") would be signed by counsel or representatives of all parties and participants to the "Covered Actions" set out in the TLA. *See* Exh. B, Art. II(1)(a). The TLA was set forth in Annex 2A of the SLA. The actions set forth in Annex 2A comprised a

comprehensive list of all actions in the softwood lumber dispute (with the exception of WTO cases) that were arguably still active.[2] *See* TLA at Annex 2A of Exh. B. Pursuant to the TLA, the listed actions were to be terminated on the entry into force date of the SLA. The TLA was a single, integrated document. *See id.* Thus, the September 12, 2006 SLA refers only to a single "Termination of Litigation Agreement," and nowhere refers to the possibility of multiple "Agreements." Article II, Paragraph 1 to the September 12, 2006 SLA, for example, provides that the SLA would enter into force upon the exchange of letters confirming, *inter alia*, that "the Termination of Litigation Agreement in Annex 2A has been signed." *See* Exh. B, Art. II, ¶ 1. Paragraph 3 to the TLA itself likewise states that "[t]his Termination Agreement and a letter from the United States certifying the full satisfaction of preconditions for termination . . . shall constitute proof of unanimous consent to the termination of the Covered Actions." *See* Exh. B, TLA ¶ 3. The TLA was to be executed in counterparts by all of the parties, with all of the countersigned documents together "constitut[ing] one and the same Termination Agreement." *See id.* ¶ 12.

On September 8, 2006, a copy of the TLA was jointly sent by Canada and the United States to all of the parties and participants with a request that they return signed signature pages to Canada and the United States by September 20, 2006. *See* Letter of Sept. 8, 2006, from Jim Mendenhall, General Counsel to the United States Trade Representative ("USTR"), & Meg Kinnear, General Counsel to the Canadian Trade Law Bureau to the Participants in Softwood

---

[2] Included in that list of twenty Covered Actions were: (1) *Tembec et al. v. United States* (No. 05-cv-2345 (D.D.C.)); (2) the NAFTA Chapter 11 claim of *Tembec v. United States of America*; and (3) The Consolidated Arbitration Pursuant to Article 1126 of the NAFTA and the UNCITRAL Arbitration Rules between *Canfor Corporation v. United States of America* and *Terminal Forest Products Ltd. v. United States of America*.

Lumber Litigation, attached hereto as Exh. C. Many parties and participants signed the TLA and returned the signature pages to USTR and the Trade Law Bureau.

However, on September 20, 2006, counsel for Tembec (and other parties) responded by letter stating that some of his clients were not ready to sign the TLA, others would only sign with conditions, and others would not sign the TLA because they did not agree with all of its terms. *See* Letter from Elliot J. Feldman to Jim Mendenhall & Meg Kinnear (Sept. 20, 2006), attached hereto as Exh. D. Furthermore, rather than submitting a signed TLA signature page, Tembec's counsel created eleven individual TLAs with respect to each of the Covered Actions to which Tembec was a party and submitted signed copies of each. *See id.* (documents following Sept. 20 Letter). The submitted documents differed in certain key respects from the documents agreed to by Canada and the United States and submitted for signature to the parties. One of the documents provided only for the settlement of a single action, listed as the "NAHA [sic] Chapter 11 claim," and another document provided for the settlement of Tembec's action before this Court. *See id.* at pp. 21-24 of Exh. D. Contrary to the September 12, 2006 TLA, the documents contemplated multiple "Termination Agreements" and multiple documents captioned "Annex 2A." For example, paragraph 3 of the TLAs created by Tembec's counsel had been modified to read: "This Termination Agreement, along with the termination agreements covering all other parties to the Covered Action, and a letter from the United States certifying the full satisfaction of preconditions for termination . . . shall constitute proof of unanimous consent to the termination of the Covered Actions." *Compare* TLA ¶ 3, *with* Exh. D, documents following Sept. 20 Letter at ¶ 3.

The documents submitted by Tembec also contained an additional paragraph 2(d), *see* Exh. D, documents following Sept. 20 Letter at ¶ 2(d), not present in the TLA which stated that:

> The Government of Canada irrevocably commits to pay Tembec Inc., no later than 60 days after the date that the SLA 2006 enters into force, at least 90 percent of the amount to be paid to Tembec Inc. and its subsidiaries, including, but not limited to, Tembec Industries Inc., Excel Forest Products Inc., Marks Lumber Ltd. And Spruce Falls Inc., pursuant to the Agreement of Purchase and Sale described in Annex 2C of SLA 2006.

Not only was this subparagraph not contained in the TLA, but it is unclear how this provision could have been binding on the Government of Canada, because counsel for Canada was not listed in the signature blocks of any of the eleven individual TLAs created by Tembec's counsel.

By late September 2006, Canada and the United States had recognized that it would not be possible to satisfy all the criteria in Article II and bring the SLA into force in a timely manner unless some of those conditions were modified. Thus, they decided to extend the projected entry into force date to "no later than November 1." *See* Press Release, *Canada and the United States Agree to Extend Implementation Date of the Softwood Lumber Agreement*, available at http://w01.international.gc.ca/minpub/Publication.aspx?isRedirect=True&publication_id=384419&language=E&docnumber=112 (last visited Nov. 21, 2006). In the meantime, the two governments worked to amend the agreement, modifying some of the conditions precedent in order to allow the SLA to enter into force by the new target date. With respect to Annex 2A, the previous TLA was replaced with a more limited "Settlement of Claims Agreement" ("SCA"). A copy of the SCA – contained on pages 7-11 of the attached Agreement Between the Government of the United States of America and the Government of Canada Amending the Softwood Lumber Agreement Between the Government of the United States of America and the Government of Canada Done at Ottawa on 12 September 2006 (Oct. 12, 2006)) – as well as the executed signature pages of the counsel, is attached hereto as Exh. E.

Further, in contrast to the TLA, which contemplated the termination of twenty actions,

the SCA contemplated the termination of only four actions, including Canfor's NAFTA Chapter Eleven claim and the action before this Court. *Compare* SCA ¶¶ 1, *with* TLA ¶ 1. Paragraphs 2 and 5 of the SCA set forth five actions that the two governments would merely seek to dismiss. *See* SCA, ¶¶ 2, 5. Finally, Tembec's NAFTA Chapter Eleven claim, along with many of the other actions that had been covered by the TLA, was not listed in the SCA, either under paragraph 1 as an action to be terminated by the parties, or under paragraphs 2 or 5 as an action with respect to which the governments would seek dismissal.[3] The two governments obtained the necessary signatures from all of the parties and participants for the SCA and, as a consequence, the SLA entered into force on October 12, 2006. *See* Exh. E.

On September 22, 2006, the Consolidation Tribunal sent a letter to the United States, Tembec, Canfor, and Terminal stating that it intended to render a decision on the costs of the proceedings. *See* Pet Mot. at Exh. C. Because Tembec was the only party that had not made a submission on costs, the Consolidation Tribunal invited it to do so on or before October 6, 2006. *Id.* On October 6, Tembec wrote the Consolidation Tribunal contending that Tembec and the United States had reached an "agreement" with respect to costs. *See* Pet. Mot. at Exh. D. The letter attached the two purported agreements with respect to the NAFTA Chapter Eleven arbitration and this action that counsel for Tembec had sent to the Governments of Canada and the United States on September 20, 2006. *See id.* Neither of those documents had been countersigned by the United States.

On October 10, 2006, undersigned counsel sent an email to Tembec's counsel inquiring whether Tembec had agreed to the dismissal of the instant action, and attached a draft stipulation

---

[3] As noted above, the Consolidation Tribunal had terminated the NAFTA Chapter Eleven arbitral proceedings with respect to Tembec nine months earlier.

7

of dismissal for Tembec's approval. *See* Pet. Mot., Exh. F at 3. Tembec's counsel initially advised on the morning of October 11, 2006, that Tembec had provided no instructions on the stipulation of dismissal. *See* October 11, 2006 11:07 email from Elliot Feldman to Alexander Haas, attached hereto at Exh. F. But later on October, 11, 2006, Tembec signed a copy of the document captioned "Settlement of Claims Agreement," *see* Pet. Mot. at Exh. E (attachment to Oct. 11, 2006 Letter). The SCA that Tembec signed did not include Tembec's NAFTA Chapter Eleven claim. *See id.* Tembec's October 11, 2006 Letter attaching the signed SCA raised what Tembec described as several minor errors that Tembec wished could have been fixed had it been given more time to review the SCA. *Id.* Tembec, for example, "proposed that paragraph 6 be modified, very very modestly" to clarify that the agreement was without prejudice to the position of each party to the agreement. *See id.* Tembec offered that the sentence would have been clearer had it stated that the SCA was "without prejudice to the position of *that* Party." *Id.* (emphasis added). Notably, Tembec's October 11 Letter did not raise any question as to why its NAFTA Chapter Eleven claim was not included in the list of actions set forth in the SCA it *signed. Id.*

Beginning in the evening of October 11, 2006 and continuing on October 12, 2006, undersigned counsel and Tembec's counsel continued to negotiate the terms of the stipulation of dismissal of this action. *See* Pet. Mot. at Exh. F. Tembec's counsel initially objected to a proposed stipulation and suggested proposed revisions, including the removal of the reference to specific paragraph numbers of the SLA, because Tembec was aware that the SLA had been amended, but asserted they "[did]n't know how." *Id.* At 4:54 pm on October 12, 2006, undersigned counsel sent an email explaining certain revisions, and confirming that the "stipulation was pursuant to the entire [Softwood Lumber] [A]greement and all the terms and

conditions in its final form." *Id.* After a further exchange of emails, counsel arrived at a mutually acceptable text for the stipulation, which was made subject to the terms and conditions of the SLA in its final form. *Id.* The stipulation was filed with the Court on October 12, 2006, shortly after the SLA came into force. Article XI of Amendment to the SLA substitutes the SCA for the TLA at Annex 2A. *See* Exh. E, Art. XI; *see also* Exh. E, Art. I.

On October 13, 2006, the United States wrote a letter to the Consolidation Tribunal in response to Tembec's October 6 Letter. *See* Letter from Andrea J. Menaker to the Softwood Lumber Tribunal (Oct. 13, 2006), attached hereto as Exh. G. The United States informed the Consolidation Tribunal that the United States and Tembec had not agreed to forgo seeking costs against each other, and that the documents attached to Tembec's October 6 letter, which were signed only by Tembec and not the United States, were not true and correct copies of the SCA. *See id.* On November 9, 2006, the Consolidation Tribunal invited Tembec to respond. *See* Letter from Gonzalo Flores to the Parties (Nov. 9, 2006), attached hereto as Exh. H. On November 16, 2006, Tembec sent a letter to the Tribunal setting forth additional arguments on costs. *See* Letter from Elliot J. Feldman to the Tribunal (Nov. 16, 2006), attached hereto as Exh. I. On November 20, 2006, the United States wrote to the Tribunal requesting an opportunity to respond to Tembec's November 16 letter. *See* Letter from Andrea J. Menaker to the Tribunal (Nov. 20, 2006), attached hereto as Exh. J. The issue of costs remains pending before the Consolidation Tribunal.

## ARGUMENT

### I. NO BASIS EXISTS TO REOPEN THE JUDGMENT.

In asking this Court to reopen its final judgment, Tembec principally relies upon the stipulation of dismissal itself, which states that it is "with prejudice, subject to the terms and

conditions of the Softwood Lumber Agreement 2006." *See* Stipulation of Dismissal With Prejudice, Docket Entry 25 (Oct. 12, 2006). Tembec contends that the United States' request for costs in the NAFTA Chapter Eleven arbitration is contrary to the SLA, and for this reason it is entitled to withdraw from the stipulation. *See* Pet. Mot. at 6. This argument amounts to nothing more than a classic case of buyer's remorse.

The SLA that entered into force does not preclude the United States from seeking costs in the NAFTA Chapter Eleven arbitration between Tembec and the United States. The provision of the SLA limiting the ability to seek costs is found in Annex 2A of the SLA, as amended. That document, the SCA, provides that "[n]o party to this Claims Settlement Agreement shall seek to hold any other party liable to pay its costs and expenses of litigation relating to *any action referenced in this Claims Settlement Agreement*." *See* Exh. E, SCA, ¶ 8 (emphasis added). The Tembec NAFTA Chapter Eleven arbitration, as well as many other cases that are part of the softwood lumber dispute, are not listed or "referenced" in the SCA and therefore are not subject to the paragraph 8 limitation on requests for costs. At bottom, because the arbitration is not an "action referenced in this Claims Settlement Agreement," the United States was fully within its rights to seek costs arising out of the Tembec NAFTA Chapter Eleven arbitration. Thus, the United States is not precluded by the SLA from seeking such costs, and there is no violation of the SLA that Tembec can point to and no basis under the stipulation for Tembec to seek to reinstate this case.

As Tembec itself acknowledges, *see* Pet. Mot. at 3, it executed the "Settlement of Claims Agreement" on October 11, 2006, that became part of, and replaced, the original TLA, which had been labeled "Annex 2A." *See* Exh. E, Art. XI. Indeed, Tembec clearly reviewed the document, *see* Pet. Mot. at 3 & Exh. E thereto, and signed it, presumably to obtain the benefits that would

accrue to Tembec under the entirety of the SLA. In addition, the stipulation ending this case was finally negotiated after Tembec executed the SCA, and that stipulation was filed with the Court after the Governments of Canada and the United States signed the final version of the SLA, which incorporated the SCA.

Nevertheless, Tembec maintains that the stipulation provides an opportunity to reinstate this case. In so doing, Tembec seeks to read in an additional condition to the stipulation, contending that the "stipulation of dismissal of this case was conditional, subject to the terms of the SLA *as known to Tembec when it signed.*" Pet. Mot. at 6 (emphasis added). The stipulation's plain language clearly does not include Tembec's newly claimed condition. It speaks only to the stipulation being "with prejudice, subject to the terms and conditions of the Softwood Lumber Agreement 2006." *See WMATA v. Mergentime Corp.*, 626 F.2d 959, 961 (D.C. Cir. 1980) (the plain meaning of a contract is determined by "the language used by the parties to express their agreement."); *see also Mittal Steel USA ISG, Inc. v. Bodman*, 435 F. Supp. 2d 106, 108-09 (D.D.C. 2006). Indeed, agreeing to such a condition in a stipulation of dismissal would render the stipulation subject to the unilateral interpretation of one of the parties, thereby injecting ambiguity into an otherwise unambiguous stipulation. That is not what the stipulation provides. The Court should therefore interpret the stipulation according to its plain terms as a matter of law, *see America First Inv. Corp. v. Goland*, 925 F.2d 1518, 1520 (D.C. Cir. 1991), and deny the requested relief given that the SLA does not preclude the United States from seeking costs for the Tembec NAFTA Chapter Eleven arbitration.

Moreover, the very set of emails Tembec relies upon to demonstrate that the stipulation of dismissal with prejudice is "subject to" the SLA, *see* Pet. Mot. at 4 & n.8, do not support Tembec's contention here. *See Consol. Gas Transmission Corp. v. FERC*, 771 F.2d 1536, 1546

11

(D.C. Cir. 1985) (discussing the consideration of extrinsic evidence). The emails show that Tembec was fully aware of the fact that the Governments of Canada and the United States were amending the SLA. For example, Tembec objected to proposed language in a draft of the stipulation referencing particular paragraphs of the SLA. *See* Pet. Mot., Exh. F at p. 3 (Oct. 12, 2006, 1:22 p.m. email). Tembec acknowledged that "[m]oreover, we understand the Agreement has been amended, but we don't know how, and therefore we also don't know whether there has been any renumbering of paragraphs." *See id.* To respond and clarify, the United States suggested additional language making clear that the "stipulation is pursuant to the entire agreement and all the terms and conditions in its final form." *See id.* at 2 (Oct. 12, 2006, 4:54 p.m. email). As both its brief and the emails make clear, Tembec did not disagree with this clarification, but was concerned about clarifying that the dismissal with prejudice was "subject to" the SLA. *Compare* Pet. Mot. at 4, *with* Pet. Mot., Exh. F at 1 (Oct. 12, 2006, 5:05 p.m. email).

The evidence therefore simply does not support the contention either that Tembec was unaware of the amendment process between the Governments of Canada and the United States, or that the stipulation was subject to the terms "as known to Tembec when it signed." Rather, the evidence demonstrates that Tembec, a major corporation, is represented by sophisticated counsel that reviewed the SCA, which did not list the Tembec NAFTA Chapter Eleven claim, but signed it anyway, and carefully negotiated a four-line stipulation of dismissal of this action. Tembec understood that the SLA was being amended and signed the SCA and the stipulation of dismissal subject to the SLA in its final form. The SLA governs Tembec's ability to reinstate its claim, and the SCA, which Tembec executed, does not preclude the United States from seeking costs for the Tembec Chapter Eleven arbitration. The stipulation therefore provides no basis to reopen this

judgment.

Finally, even if the SLA did preclude the United States from seeking costs in the arbitration – which it does not – the United States' request for costs in that arbitration would not provide any legal basis for reopening the final judgment in this case. Rather, Tembec's remedy would be before the Consolidation Tribunal. Indeed, Tembec has already sought such a remedy from the Tribunal. *See* Exh. I, Letter from Elliot J. Feldman to the Tribunal (Nov. 16, 2006).

## II.   RULE 60(b)(3) PROVIDES NO BASIS TO REOPEN THE JUDGMENT.

Tembec also argues that this Court should reinstate the case pursuant to Federal Rule of Civil Procedure 60(b)(3), which permits a Court to reopen a judgment for "fraud . . . misrepresentation, or other misconduct of an adverse party." *See* Fed. R. Civ. P. 60(b)(3). This argument should also be rejected.

To prevail under Rule 60(b)(3) requires meeting an "exacting" standard. *Johnson v. Holway*, 2006 WL 3201877, *1 (D.D.C. Nov. 6, 2006). Thus, Tembec must establish "'by clear and convincing evidence some sort of fraud, misrepresentation or other misconduct'" and show "'actual prejudice' resulting from the fraud, misrepresentation or other misconduct." *Id.* (quoting *Martin v. Howard Univ.*, 2006 WL 2850656, at *3 (D.D.C. Oct. 4, 2006) & *Summers v. Howard Univ.*, 374 F.3d 1188, 1193 (D.C. Cir. 2004)). The standard under Rule 60(b)(3) is high because of the strong interest in protecting the finality of judgments. *See Summers*, 374 F.3d at 1193. The United States did not mislead Tembec into either signing the SCA or the stipulation of dismissal in this case, and Tembec certainly has not adduced "clear and convincing evidence" to demonstrate misrepresentation or other misconduct.

Tembec's complaint is that the United States is seeking costs for the Tembec NAFTA Chapter Eleven claim, even though Tembec was allegedly led to believe that piece of litigation

would be terminated pursuant to the SLA and, thus, there would not be a basis for a request for reimbursement of costs. *See* Pet. Mot. at 8. Tembec, however, establishes no misrepresentation or other misconduct. The SCA – a document which does not contain any reference to Tembec's NAFTA Chapter Eleven claim and therefore does not preclude the request for costs – was given to Tembec. Tembec voluntarily signed that document. *See* Exh. E to Pet. Mot. The terms of the SCA were therefore fully disclosed. As the SCA's express terms did not list Tembec's NAFTA Chapter Eleven claim as one of the cases subject to dismissal or other action and the provision of the SCA limiting requests for costs, there was nothing precluding the United States from seeking costs from Tembec in the Chapter Eleven arbitration.[4] Moreover, as already discussed above, *see supra* at 11-12, Tembec was clearly aware that the Governments of Canada and the United States were amending the SLA when the stipulation in this case was being negotiated, and Tembec signed onto the stipulation, presumably to obtain all the benefits that would accrue to Tembec under the SLA. Thus, while Tembec suggests that the "timing of events" show some misconduct, *see* Pet. Mot. at 8, the timing, in fact, establishes that Tembec had been given the terms of the SCA and agreed to the dismissal of the instant action.

Tembec is therefore left to argue that when it "executed [the SCA], it reasonably believed that it was supplemental to, and not in place of, the earlier Termination of Litigation Agreements." Pet. Mot. at 4. Even if true, this would not establish misrepresentation or other misconduct by clear and convincing evidence necessary to reopen the final judgment. Moreover,

---

[4] Notably, there were no substantive claims left for the SLA to terminate. Tembec purported to unilaterally remove its NAFTA Chapter Eleven claims on December 7, 2005, and the Consolidation Tribunal, on January 10, 2006, issued an order terminating the arbitral proceedings with respect to Tembec. *See* Exh. GG to Respondent's Memorandum. The Consolidation Tribunal only retained jurisdiction over the issue of whether to award costs in the arbitration.

this assertion simply does not withstand scrutiny. Tembec's claim that it did not realize that the SCA was supplemental to the Termination of Litigation Agreement is not credible for several reasons.

Tembec acknowledges that the "Tembec's NAFTA Chapter 11 claim" was deleted and was not listed in the SCA, *see* Pet. Mot. at 3, and Tembec clearly reviewed the contents of the SCA. Tembec's October 11, 2006 Letter attaching the signed SCA raised what Tembec described as several minor errors that Tembec wished could have been fixed had it been given more time to review the document. *See* Pet. Mot., Exh. E at 1. Tembec, for example, "proposed that paragraph 6 be modified, very very modestly" to clarify that the agreement was without prejudice to the position of each party to the agreement. *See id.* Notably, Tembec's October 11 Letter did not raise any question as to why its NAFTA Chapter Eleven claim was not included in the list of actions covered by the SCA. *Id.* In addition, Tembec, points to no attempts that it made to reach out to counsel for the United States in the Tembec NAFTA Chapter Eleven arbitration to terminate that litigation. If Tembec believed that the TLA was operative and the SCA was merely supplemental, Tembec would have attempted to effectuate the termination of that case, as it did this one. Tembec, however, has pointed to no correspondence with United States' counsel in the Office of the Legal Adviser for the Department of State indicating any such efforts, in sharp contrast to the several communications it has submitted to this Court evidencing the negotiations between Tembec's counsel and undersigned counsel in connection with the filing of the stipulation in this action. Moreover, as set forth above, *see supra* at 5-6, the September 20th documents Tembec now relies upon were executed only by Tembec and were different in key respects from the original TLA. Tembec thus relies on a TLA it altered from the version that it was sent and that is signed only by Tembec, while the United States relies on the SCA signed

15

by all parties. Finally, it cannot be overlooked that the SCA and the TLA deal with the same cases differently. For example, in the TLA, the *Coalition for Fair Lumber Imports Executive Committee* constitutional case in the D.C. Circuit is terminated, whereas under the SCA, it is not terminated, and the two governments agreed merely to seek the case's dismissal. *Compare* TLA ¶ 1, 3, *with* SCA ¶ 2. Thus, the SCA was clearly a replacement for the TLA and no reasonable person could have concluded differently.[5]

In conclusion, there was simply no misrepresentation of the facts or other misconduct committed by the United States and, consequently, Tembec has provided no evidence thereof. Tembec signed onto the SCA with full knowledge that the Tembec NAFTA Chapter Eleven arbitration was not a listed action and that, therefore, there was a risk that the United States could seek costs in that arbitration. And Tembec signed onto the stipulation after signing the SCA and with the knowledge that the Governments of Canada and the United States had amended the SLA.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court deny Tembec's motion to reopen the final judgment in this case.

---

[5] Tembec also points to the fact that the United States has agreed not to seek costs from Canfor Corp., *see* Pet. Mot. at 9. Canfor's NAFTA Chapter Eleven claim, however, *is* listed in paragraph 1 of the SCA. Tembec's Chapter Eleven claim is not listed, and was not listed when Tembec signed the SCA. These claims are therefore being treated differently, not because the United States "construed" the SLA differently, *see id.*, but because the cases are *treated* differently under the express terms of the agreement Tembec signed. Tembec's Chapter Eleven claim is not listed in the SCA – as are several other cases that were originally listed in the TLA and to which Tembec is a Plaintiff – so it is not subject to the SCA. Consequently, both the United States' request for costs in the Tembec NAFTA Chapter Eleven arbitration and the claims submitted by Terminal under NAFTA Chapter Eleven, which was not terminated pursuant to the SCA, remain pending.

| | |
|---|---|
| Dated: November 22, 2006 | Respectfully submitted, |
| | PETER D. KEISLER |
| Of Counsel: | Assistant Attorney General |
| | |
| MARK A. CLODFELTER | JEFFREY A. TAYLOR |
| *Assistant Legal Adviser* | United States Attorney |
| | |
| ANDREA J. MENAKER | VINCENT M. GARVEY |
| *Chief, NAFTA Arbitration Division* | Deputy Branch Director |
| MARK S. MCNEILL | |
| *Attorney-Adviser* |    /s/ Alexander K. Haas |
| *Office of International Claims and* | ALEXANDER K. HAAS (CA 220932) |
| *    Investment Disputes* | Trial Attorney |
| | U.S. Department of Justice, Civil Division |
| United States Department of State | Federal Programs Branch |
| Washington, D.C. 20520 | Post Office Box 883 |
| Office of the Legal Adviser | Washington, D.C.  20044 |
| 2201 C. Street, N.W. | Tel: (202) 307-3937 – Fax: (202) 616-8470 |
| Suite 5519 | *Attorneys for the United States* |