# SOFTWOOD LUMBER AGREEMENT

## BETWEEN

## THE GOVERNMENT OF THE UNITED STATES OF AMERICA

## AND

## THE GOVERNMENT OF CANADA

**THE GOVERNMENT OF THE UNITED STATES OF AMERICA ("UNITED STATES") AND THE GOVERNMENT OF CANADA ("CANADA")**

**HAVE AGREED** as follows:

### ARTICLE I

### Scope of coverage

1.      This Agreement ("SLA 2006") applies to trade in Softwood Lumber Products. Softwood Lumber Products are those products listed in Annex 1A. For domestic implementation and administration purposes only, Canada shall rely on the Canadian Table of Concordance in Annex 1B.

2.      No products shall be added to, or removed from, the scope of the SLA 2006 after April 27, 2006 without the agreement of the Parties, regardless of a decision, ruling, determination, or re-determination by a Party, the effect of which would be to:

      (a)     classify or reclassify a product within or outside a tariff item in Annex 1A; or

      (b)     determine or rule that a product is within or outside a product description in Annex 1A.

3.      If there is a dispute as to whether a product is a Softwood Lumber Product, a Party shall refer the matter to a Technical Working Group established under Article XIII(C), by providing written notice of the referral to the other Party.

4.      Within 60 days after a Party provides written notice under paragraph 3, the Technical Working Group shall review the matter and, where possible, provide a non-binding recommendation to the Parties regarding whether the product in question falls within or outside a tariff item or product description in Annex 1A.

5.      If, following the 60-day period specified in paragraph 4, the Parties fail to resolve the matter, either Party may initiate dispute settlement under Article XIV.

6.      If a tribunal established under Article XIV issues an award clarifying whether a product falls within or outside a tariff item or product description in Annex 1A, the award shall govern whether the SLA 2006 applies to the product.

## ARTICLE II

### Entry into force

1.     The SLA 2006 shall enter into force on a date designated by the Parties in an exchange of letters (the "Effective Date").  The exchange of letters shall confirm that:

(a)     the Termination of Litigation Agreement in Annex 2A has been signed:

(i)     by counsel on behalf of all represented parties and participants to the actions set out in the Termination Agreement, and

(ii)     by authorized representatives of any unrepresented parties or participants to the actions set out in the Termination Agreement;

(b)     pursuant to Article 3.6 of the *Understanding on Rules and Procedures Governing the Settlement of Disputes*, the United States and Canada have signed and filed the Notification of Mutually Agreed Solution in Annex 2B with the WTO Dispute Settlement Body;

(c)     the CIT has modified the injunctions against liquidation issued in *West Fraser v. United States* (Consol. Ct. No. 05-00079) to permit the United States to fulfill its obligations under Article III or has confirmed that fulfilling those obligations is not inconsistent with those injunctions;

(d)     Canada has certified to the United States that it can administer the Export Charge and issue Export Permits as of the Effective Date;

(e)     Canada and the United States have confirmed that Importers of Record that collectively account for not less than 95% of total cash deposits on Covered Entries and accrued interest have complied with all the requirements in paragraph 1 of Annex 2C;

(f)     U.S. domestic interested parties that are companies and associations accounting for greater than 60% of U.S. production of softwood lumber in 2005 have filed with USDOC the irrevocable letters described in Article V and attached in Annex 5A on the Effective Date, to take effect on the Effective Date, and the United States has certified that the letters collectively account for greater than 60% of U.S. production of softwood lumber in 2005;

(g)     one or more U.S. domestic interested parties that are unions have filed with USDOC the irrevocable letters described in Article V and attached in Annex 5A on the Effective Date, to take effect on the Effective Date; and

(h)     USDOC has issued the finding in Annex 5B based on the letters in Annex 5A, effective on the Effective Date.

## ARTICLE III

### Revocation of antidumping and countervailing duty orders

1.    On the Effective Date, the United States shall:

    (a)    revoke retroactively the AD Order and the CVD Order ("the Orders") in their entirety as of May 22, 2002 without the possibility of their reinstatement; and

    (b)    terminate all USDOC proceedings related to the Orders.

2.    On the Effective Date, or no later than 3 days after the Effective Date, USDOC shall instruct USCBP, as set out in Annex 3, to:

    (a)    cease collecting cash deposits, as of the Effective Date, on imports of Softwood Lumber Products from Canada; and

    (b)    liquidate all Covered Entries made on or after May 22, 2002 without regard to antidumping or countervailing duties and refund all deposits collected on such entries with all accrued interest pursuant to 19 U.S.C. § 1677g(b) to the Importers of Record or their designates.

## ARTICLE IV

### Refund of antidumping and countervailing duty cash deposits

1.    Within 10 days after the Effective Date, the United States shall begin to liquidate all Covered Entries made on or after May 22, 2002 without regard to antidumping or countervailing duties, and with interest pursuant to 19 U.S.C. § 1677g(b).

2.    The United States shall complete the liquidation of Covered Entries and the refund of all cash deposits as soon as possible, but not later than 6 months after the publication in the *Federal Register* of the revocations referred to in Article III unless these entries are subject to an extension request under 19 U.S.C. § 1504(b) and 19 C.F.R. § 159.12.

3.    The United States shall approve all initial and subsequent requests for extensions of time that Importers of Record or their designates make under 19 U.S.C. § 1504(b) and 19 C.F.R. § 159.12.

4.    Canada or its agent shall purchase the rights to the amounts of the cash deposits for Covered Entries and accrued interest from the Escrow Importers and make disbursements in accordance with Annex 2C.

# ARTICLE V

## Commitments of the United States concerning
## trade remedy investigations and certain other actions

1.      For the duration of the SLA 2006, including any extension pursuant to Article XVIII, the United States shall not:

(a)     self-initiate an antidumping or countervailing duty investigation under Title VII of the *Tariff Act of 1930*, as amended, or any successor law ("Title VII"), with respect to imports of Softwood Lumber Products from Canada.  If a petition is filed under Title VII with respect to imports of Softwood Lumber Products from Canada, the United States shall dismiss the petition on the basis of the irrevocable letters in Annex 5A ("no injury" letters) and the USDOC finding in Annex 5B.  These letters shall be provided by U.S. domestic interested parties accounting for greater than 60% of U.S. production of softwood lumber in 2005 and by one or more unions.  Industry association letters shall be effective with respect to their members' production, but members with an annual production of softwood lumber of over 200 million board feet in 2005 must individually provide a no injury letter to be counted toward the threshold of 60% of U.S. production.  The signed no injury letters shall be appended to the SLA 2006 on the Effective Date;

(b)     take action under Sections 201 to 204, inclusive, of the *Trade Act of 1974*, as amended, or any successor law, with respect to imports of Softwood Lumber Products from Canada;

(c)     initiate an investigation or take action, including action pursuant to any prior determination, under Sections 301 to 307, inclusive, of the *Trade Act of 1974*, as amended, or any successor law, with respect to imports of Softwood Lumber Products from Canada; or

(d)     take action under Section 204 of the *Agricultural Act of 1956*, as amended, or any successor law, with respect to imports of Softwood Lumber Products from Canada.

# ARTICLE VI

## Export measures

As of the Effective Date, Canada shall apply the Export Measures[1] to exports of Softwood Lumber Products to the United States. [2]

---

[1]      If any value referred to in the SLA 2006 is converted on the Date of Shipment from U.S. dollars to Canadian dollars, the conversion shall be based on the nominal noon exchange rate quoted by the Bank of Canada for the day before the Date of Shipment.

[2]      Exports of Softwood Lumber Products from each Region that initially elects Option B (under Article VII) nevertheless shall be subject to Option A (under Article VII) from the Effective Date until December 31, 2006, by which time Canada shall have completed the arrangements necessary for the administration of Option B ("transition period").  Canada shall provide a refund of Export Charges paid during any month of the transition period to exporters in such a Region if, during that month, the Region exported no more than what the Region's volume restraint would have been had its exports been subject to Option B during the month.  The refund amount shall be the difference between what the exporter paid in Export Charges for that month, and what the exporter would have paid in Export Charges for that month had the Region's exports been subject to Option B.  Article VIII shall not apply during the transition period to a Region that elected Option B during a month in which it qualified for a refund.  In determining the volume restraint levels which would have applied to an Option B Region during the transition period, the carry-forward and carry-back rules laid out in Annex 7B shall be taken into account for all of the months of the transition period.

## ARTICLE VII

### Export charge and export charge plus volume restraint

1.      By the Effective Date, each Region shall elect to have Canada apply the measures in either Option A or Option B to exports of Softwood Lumber Products to the United States from the Region. Option A is an Export Charge collected by Canada, the rate of which varies based on the Prevailing Monthly Price, as provided in the table in paragraph 2. Option B is an Export Charge with a volume restraint, where both the rate of the Export Charge and the applicable volume restraint vary based on the Prevailing Monthly Price, also as provided in the table in paragraph 2. The Export Charge shall be levied on the Export Price. The Prevailing Monthly Price is defined in Annex 7A.

2.      Subject to paragraphs 3 through 9, the Export Measures that Canada applies under Option A and Option B shall be based on the following table:

| Prevailing Monthly Price | Option A – Export Charge (Expressed as a % of Export Price) | Option B – Export Charge (Expressed as a % of Export Price) with Volume Restraint |
|---|---|---|
| Over $US 355 | No Export Charge | No Export Charge and no volume restraint |
| $US 336-355 | 5% | 2.5% Export Charge + maximum volume that can be exported to the United States cannot exceed the Region's share of 34% of Expected U.S. Consumption for the month |
| $US 316-335 | 10% | 3% Export Charge + maximum volume that can be exported to the United States cannot exceed the Region's share of 32% of Expected U.S. Consumption for the month |
| $US 315 or under | 15% | 5% Export Charge + maximum volume that can be exported to the United States cannot exceed the Region's share of 30% of Expected U.S. Consumption for the month |

3.     Under Option A, Canada shall collect from the Region's exporters on a monthly basis a charge on each export of Softwood Lumber Products to the United States equal to the percentage of the Export Price set out in the table in paragraph 2 that corresponds to the Prevailing Monthly Price.

4.     Under Option B, Canada shall, on a monthly basis:

    (a)     collect from the Region's exporters a charge on each export of Softwood Lumber Products to the United States equal to the percentage of the Export Price set out in the table in paragraph 2 that corresponds to the Prevailing Monthly Price; and

    (b)     limit the Region's exports of those products during the month to the volume determined in accordance with Annex 7B.

5.     An export of Softwood Lumber Products shall be deemed to occur in the same month as the Date of Shipment for that export.

6.     For the purposes of calculating Export Charges, a Softwood Lumber Product that has an Export Price of $US 500 per MBF or more shall be deemed to have an Export Price of $US 500 per MBF.

7.     The Export Charge on exports from Independent Manufacturers of Remanufactured Softwood Lumber Products that have been certified pursuant to Annex 7C shall be assessed on the basis of the definition of Export Price in Article XXI(25)(b) or (d).

8.     Canada shall notify the United States of each Region's original Option election no later than 10 days after the Effective Date.

9.     After the Effective Date, each Region shall have 2 opportunities to change the Option it has elected to apply to its exports of Softwood Lumber Products to the United States:

    (a)     the first opportunity to change Options shall be effective on the 1st day of January following the 3rd anniversary of the Effective Date; and

    (b)     the second opportunity to change Options shall be effective on the 1st day of January following the 6th anniversary of the Effective Date.

Canada shall provide written notice to the United States that a Region has elected to change its Option at least 30 days in advance of the January date referred to in subparagraphs (a) and (b).  Softwood Lumber Products from a Region shall continue to be subject to the same Option as in the preceding period if Canada does not provide timely notice.

10.     Canada shall require an Export Permit on each entry of Softwood Lumber Products exported to the United States.

## ARTICLE VIII

### Surge mechanism

1.    This Article shall apply when the volume of exports of Softwood Lumber Products to the United States in any month from a Region that has elected Option A under Article VII exceeds the Region's Trigger Volume:

      (a)    if the volume of exports from the Region exceeds the Region's Trigger Volume by 1% or less in a month, Canada shall reduce the applicable Trigger Volume for that Region during the following month by the total MBF amount of the overage (*i.e.*, the amount by which actual exports exceeded the Trigger Volume);

      (b)    if the volume of exports from the Region exceeds the Region's Trigger Volume by more than 1% in a month, Canada shall apply retroactively to all exports to the United States from the Region during that month an additional Export Charge equal to 50% of the applicable Export Charge determined under Article VII(3) for that month.

2.    For the purposes of this Article, a Regional Trigger Volume shall be calculated in accordance with Annex 8.

## ARTICLE IX

### Third country adjustment

1.    Under either Option A or Option B, Canada shall refund to exporters in a Region in the amounts specified in paragraph 2, Export Charges they have paid during any 2 consecutive Quarters if all of the following circumstances have occurred in each such Quarter when compared with the same 2 consecutive Quarters from the preceding Year:[3]

      (a)    the share of U.S. Consumption attributable to non-Canadian imports ("third country market share") has increased by at least 20%;

      (b)    Canadian market share of U.S. Consumption has decreased; and

      (c)    U.S. domestic producers' market share of U.S. Consumption has increased.

2.    Where the conditions in paragraph 1 are satisfied:

      (a)    if a Region has elected Option A, Canada shall refund to exporters in that Region the amount they paid, up to the equivalent of a 5% Export Charge on their exports in the 2 consecutive Quarters identified on the basis of paragraph 1;

---

[3]    For the purposes of Article IX, each individual Quarter included in 2 "consecutive Quarters" is to be compared only with the same Quarter from the preceding year. For example, the 2nd Quarter of 2007 would be compared to the 2nd Quarter of 2006 and the 1st Quarter of 2007 would be compared to the 1st Quarter of 2006 in order to determine if the conditions in paragraph 1 are satisfied.

    (b)    if a Region has elected Option B, Canada shall refund to exporters in that Region the full Export Charge they paid in the 2 consecutive Quarters identified on the basis of paragraph 1.

3.    Canada shall not pay refunds to exporters from a Region if exports from that Region triggered the surge mechanism in Article VIII(1)(b) in either of the 2 consecutive Quarters in which the conditions identified in paragraph 1 were satisfied.

4.    For purposes of this Article, U.S. Consumption, Canadian market share, third country market share and U.S. producers' market share shall be established in accordance with Annex 7D.

## ARTICLE X

### Exclusions from export measures

1.    The Export Measures shall not apply to the following products:

    (a)    Softwood Lumber Products first produced in the Maritimes from logs originating in the Maritimes or Maine, that are:

        (i)    exported directly to the United States from a Maritime province, or

        (ii)    shipped to a province that is not a Maritime province, and reloaded or further processed and subsequently exported to the United States,

        provided that the products are accompanied by an original Certificate of Origin issued by the Maritime Lumber Bureau. An original Certificate of Origin issued by the Maritime Lumber Bureau shall be a required entry summary document by USCBP. The Certificate must specifically state that the corresponding customs entries are for Softwood Lumber Products first produced in the Maritimes from logs originating in the Maritimes or Maine;

    (b)    Softwood Lumber Products first produced in the Yukon, Northwest Territories or Nunavut from logs originating in the Yukon, Northwest Territories or Nunavut; and

    (c)    Softwood Lumber Products produced by the companies listed in Annex 10.

2.    Continued eligibility for exclusion of Softwood Lumber Products produced by the companies listed in Annex 10 shall be contingent on the following provisions:

    (a)    a base average monthly production shall be established for each company equivalent to its total production of Softwood Lumber Products for 2004 and 2005, divided by 24;

(b)    subject to clauses (f) through (i), each company's annual export limit shall be that company's base average monthly production multiplied by the number of months in that Year that the Prevailing Monthly Price was not more than $US 355/MBF;

(c)    for purposes of this subparagraph, a company's actual exports shall be determined at the end of the Year by summing the company's actual exports during the months when the Prevailing Monthly Price was not more than $US 355/MBF;

(d)    if, in any Year, a company's actual exports do not exceed its annual export limit, the company shall not be subject to a volume reduction penalty in the following Year;

(e)    if, in any Year, a company's actual exports exceed its annual export limit by 0.5% or less, the company shall not be subject to a volume reduction penalty in the following Year, and such exports shall be disregarded in determining whether the company has exceeded its annual export limit under clauses (f) through (i);

(f)    if, in any Year, a company's actual exports exceed its annual export limit, its limit for the following Year shall be reduced by the amount of the excess;

(g)    if, in any subsequent Year (whether or not consecutive), the company again exceeds its annual export limit, its limit for the following Year shall be reduced by twice the amount of the excess;

(h)    if, in any subsequent Year (whether or not consecutive), the company again exceeds its annual export limit, its limit for the following Year shall be reduced by 3 times the amount of the excess; and

(i)    if, in any subsequent Year (whether or not consecutive), the company again exceeds its annual export limit, the Softwood Lumber Products that company produces shall no longer be excluded from the Export Measures.

3.    With respect to each company listed in Annex 10, the province in which the company is located shall provide Canada before the Effective Date with a certified statement attesting to the company's total production of Softwood Lumber Products for 2004 and 2005. Canada shall provide these statements to the United States within 10 days of receipt. This information shall not be treated as confidential under Article XVI. If exclusion of a company is limited to one or more mills, "company" in this Article shall be limited to those one or more mills. The Parties shall cooperate with respect to monitoring and enforcement, as contemplated in Article XV, in respect of claims of exclusion under this Article.

4.    The Parties may agree to additional exclusions from the SLA 2006 for Softwood Lumber Products produced from U.S.-origin logs or logs originating on private land in Canada.

## ARTICLE XI

### General provisions

1.    The SLA 2006 is without prejudice to the position of either Party as to:

(a)    the validity of the AD Order or the CVD Order or any determinations underlying those Orders;

(b)    the merits of, and any possible remedies arising from, any litigation related to those Orders; and

(c)    the legal effect of any decision of any court or other dispute settlement body regarding those Orders.

2.    The operation and application of Section B of Chapter Eleven of the NAFTA is hereby suspended with respect to any matter arising under the SLA 2006 and any measure taken by a Party that is necessary to give effect to or implement the SLA 2006.  Consequently, no claim under Section B of Chapter Eleven of the NAFTA may be made against a Party by investors of the United States or Canada in respect of any such matter or measure.  The Parties shall inform each national Section of the NAFTA Secretariat of this provision.

3.    The Annexes are an integral part of the SLA 2006.  No Person may assert any rights under the SLA 2006.

## ARTICLE XII

### Regional exemptions from export measures

1.    Within 3 months after the Effective Date, the Parties shall establish a Working Group on Regional Exemptions.  The Working Group shall develop substantive criteria and procedures for establishing if and when a Region uses market-determined timber pricing and forest management systems and therefore that its exports of Softwood Lumber Products to the United States qualify for exemption from the Export Measures in Articles VII through IX and Article X(2).  The Parties shall make best efforts to incorporate the results of the Working Group's work into an addendum to the SLA 2006 within 18 months after the Effective Date.  The mandate and procedures for the Working Group are set out in Annex 12.

2.    If a Region satisfies the substantive criteria and procedures for exemption developed and set forth in an addendum referred to in paragraph 1, Softwood Lumber Products from that Region shall be exempted from the Export Measures in Articles VII through IX and Article X(2) and thereafter subparagraphs (a) and (b) shall apply with respect to that Region.

(a)    No public authority of Canada shall:

(i)    modify the provincial timber pricing or forest management system as it existed on the date of the exemption, or change its administration in a manner that decreases the extent to which the system is market-determined. For purposes of this Article, a provincial timber pricing or forest management system includes, without limitation, the data, variables, and procedures that it employs, or

(ii)    provide any grants or other benefits that offset, in whole or in part, the basis for the exemption under an addendum pursuant to paragraph 1. A grant or benefit shall be considered to offset, in whole or in part, the basis for the exemption, if it is provided, *de facto* or *de jure*, to producers or exporters of Softwood Lumber Products in the Region. This clause shall not apply to grants or benefits that satisfy the criteria in Article XVII(2)(a), (b), (c), (d), or (e). For purposes of determining whether a grant or benefit meets the criteria of Article XVII(2)(a), a measure shall not be considered to offset the basis for the exemption if it existed on the date on which the Region was exempted from the Export Measures pursuant to paragraph 1;

(b)

(i)    If, in any Quarter, exports of Softwood Lumber Products from the Region to the United States exceed the sum of: (1) the total Regional production of those products during the Quarter; and (2) the total Regional inventory of those products during the Quarter, Canada shall impose retroactively on the exporters responsible for any such excess a charge equal to $C X, where X is determined according to the following formula:

X = ($C 200 multiplied by MBF export volume in excess of the sum of the exporter's total Regional production during the Quarter and the exporter's total Regional inventory during the Quarter),

(ii)    Canada shall provide to the United States within 75 days after the end of each Quarter data on: (1) the total Regional production of Softwood Lumber Products during the Quarter; (2) the total Regional inventory of Softwood Lumber Products produced from timber originating in the Region during the Quarter; and (3) the volume of Softwood Lumber Products exported from the Region to the United States during the Quarter, and

(iii)    if either Party identifies any excess exports described in clause (i), the Parties and the province concerned shall consult and exchange pertinent data concerning such excess exports.

## ARTICLE XIII

### Institutional arrangements

**A.    Private Initiatives**

1.    The Parties shall encourage interested Persons in Canada and the United States to create the binational industry council described in Annex 13.

2.    By the Effective Date, the United States, in consultation with Canada, shall identify meritorious initiatives to receive the funds that are to be set aside for that purpose under Annex 2C.  The funds shall support meritorious initiatives in the United States related to:

(a)    educational and charitable causes in timber-reliant communities;

(b)    low-income housing and disaster relief; and

(c)    educational and public-interest projects addressing:

(i)    forest management issues that affect timber-reliant communities, or

(ii)    the sustainability of forests as sources of building materials, wildlife habitat, bio-energy, recreation, and other values.

**B.    Softwood Lumber Committee**

1.    The Parties shall establish a Softwood Lumber Committee, comprising an equal number of representatives of the Parties or their designees.

2.    The Committee shall:

(a)    supervise the implementation of the SLA 2006;

(b)    oversee its further elaboration;

(c)    supervise the Working Groups established under the SLA 2006; and

(d)    consider any other matter that may affect the operation of the SLA 2006.

3.    In exercising its functions, the Committee may:

(a)    establish and delegate responsibilities to Working Groups or expert groups;

(b)    seek the advice of Persons or non-governmental groups; and

(c)    take such other action in the exercise of its functions as the Parties may agree.

4.    The Committee shall establish its rules and procedures.  All decisions of the Committee shall be taken by consensus, except as the Committee may otherwise agree.

5.    The Committee shall convene at least once a Year in regular session and at such other times as the Committee may agree.  Regular sessions shall be chaired successively by each Party.

## C.    Technical Working Groups

1.    The Parties shall establish Technical Working Groups to meet upon the request of either Party.  The Working Groups shall comprise an equal number of representatives of each Party with expertise in matters relating to the implementation and operation of the SLA 2006, including customs, tariff classification under the Harmonized Commodity Description and Coding System, softwood lumber markets and data sources and the technical specifications of Softwood Lumber Products.

2.    Through the Working Groups, the Parties shall:

    (a)    ensure the effective implementation and application of the Export Charge in respect of Canadian exports of Softwood Lumber Products to the United States;

    (b)    ensure the effective administration of the customs-related aspects of the SLA 2006, including Export Permits, volume restraints, data collection, and exchange of information; and

    (c)    review and provide recommendations on issues including:

        (i)    matters referred to a Working Group pursuant to paragraph 3 of Article I;

        (ii)    the methodology established to calculate the Prevailing Monthly Price referred to in Annex 7A;

        (iii)    the methodology established to determine U.S. Consumption as set forth in Annex 7D; and

        (iv)    any other issues the Parties may jointly identify with respect to the operation of Annexes 7A through 7D and Annex 8, including, if required, the development of an alternative verification process to replace that provided under Article XV(19).

### ARTICLE XIV

### Dispute settlement

1.    Either Party may initiate dispute settlement under this Article regarding any matter arising under the SLA 2006 or with respect to the implementation of Regional exemptions from Export Measures agreed upon by the Parties pursuant to Article XII.

2.      Except as provided for in this Article, for the duration of the SLA 2006, including any extension pursuant to Article XVIII, neither Party shall initiate any litigation or dispute settlement proceedings with respect to any matter arising under the SLA 2006, including proceedings pursuant to the Marrakesh Agreement Establishing the World Trade Organization or Chapter Twenty of the NAFTA.  For purposes of this paragraph, "litigation or dispute settlement proceedings" does not include actions related to alleged civil or criminal violations, including USICE/USCBP investigations or administrative penalty actions, or any proceedings related to such investigations or penalty actions.

3.      Dispute settlement under this Article shall be conducted as expeditiously as possible.

4.      A Party may initiate dispute settlement under this Article by requesting in writing consultations with the other Party regarding a matter arising under the SLA 2006.  Unless the Parties agree otherwise, the Parties shall consult within 20 days of delivery of the request.  The Parties shall make every attempt to arrive at a satisfactory resolution of the matter through consultations and shall exchange sufficient information to enable a full examination of the matter.

5.      The Parties also may agree to submit the matter to non-binding mediation by a neutral third party in addition to, or in lieu of, the arbitration procedures set out in this Article.

6.      If the Parties do not resolve the matter within 40 days of delivery of the request for consultations, either Party may refer the matter to arbitration by delivering a written Request for Arbitration to the Registrar of the LCIA Court.  The arbitration shall be conducted under the LCIA Arbitration Rules in effect on the date the SLA 2006 was signed, irrespective of any subsequent amendments, as modified by the SLA 2006 or as the Parties may agree, except that Article 21 of the LCIA Rules shall not apply.

7.      An arbitral tribunal shall comprise 3 arbitrators.

8.      No citizen or resident of a Party shall be appointed to the tribunal.

9.      Each Party shall nominate one arbitrator within 30 days after the date the arbitration commences pursuant to LCIA Article 1.2.  Unless the Parties otherwise agree, if a Party fails to nominate an arbitrator within 30 days, the LCIA Court shall nominate that arbitrator.

10.     The 2 nominated arbitrators shall jointly nominate the Chair of the tribunal within 10 days after the date on which the second arbitrator is nominated.  The nominated arbitrators may consult with the Parties in selecting the Chair.  If the nominated arbitrators fail to nominate a Chair within 10 days, the LCIA Court shall endeavour to nominate the Chair within 20 days thereafter.

11.     The LCIA Court shall endeavour to appoint the 3 arbitrators thus nominated within 5 business days after the date on which the Chair is nominated.

12.     Arbitrators shall be remunerated and their expenses paid in accordance with LCIA rates.  Arbitrators shall keep a record and render a final account of their time and expenses, and the Chair of the tribunal shall keep a record and render a final account of all general tribunal expenses.

13.     The legal place of arbitration shall be London, United Kingdom.  All hearings shall be conducted in the United States or Canada as the tribunal may decide in its discretion.

14.    The International Bar Association Rules on the Taking of Evidence in International Commercial Arbitration as adopted in 1999, as modified by the SLA 2006, shall apply in the arbitrations held under the SLA 2006, except that Article 6 of those Rules shall not apply.

15.    If a Party wishes to designate information to be used in the arbitration as confidential, the tribunal shall establish, in consultation with the Parties, procedures for the designation and protection of confidential information. The procedures shall provide, as appropriate, for sharing confidential information for purposes of the arbitration with counsel to softwood lumber industry representatives or with provincial or state government officials.

16.    Each Party shall promptly make the following documents available to the public, subject to Article XVI and any procedures established under paragraph 15:

(a)    the Request for Arbitration;

(b)    pleadings, memorials, briefs, and any accompanying exhibits;

(c)    minutes or transcripts of hearings of the tribunal, where available; and

(d)    orders, awards, and decisions of the tribunal.

17.    Hearings of the tribunal shall be open to the public. The tribunal shall determine, in consultation with the Parties, appropriate arrangements for open hearings, including the protection of confidential information.

18.    The tribunal shall give sympathetic consideration to domestic laws that:

(a)    preclude a Party from disclosing information, when the tribunal determines whether that information is privileged from disclosure and whether to draw inferences from the Party's failure to disclose such information; or

(b)    require a Party to disclose information subject to confidentiality procedures under paragraph 15.

19.    The tribunal shall endeavour to issue an award not later than 180 days after the LCIA Court appoints the tribunal.

20.    The tribunal's award shall be final and binding and shall not be subject to any appeal or other review. An award may be enforced solely as provided in this Article.

21.    The tribunal may not award costs. $US 10 million shall be allotted from the funds allocated to the binational industry council described in Annex 13 to pay the costs of arbitrations under this Article, including the costs of arbitrators, hearing facilities, transcripts, assistants to the tribunal, and costs of the LCIA. Each Party shall bear its own costs, including costs of legal representation, experts, witnesses and travel.

22.    If the tribunal finds that a Party has breached an obligation under the SLA 2006, the tribunal shall:

    (a)    identify a reasonable period of time for that Party to cure the breach, which shall be the shortest reasonable period of time feasible and, in any event, not longer than 30 days from the date the tribunal issues the award; and

    (b)    determine appropriate adjustments to the Export Measures to compensate for the breach if that Party fails to cure the breach within the reasonable period of time.

23.    The compensatory adjustments that the tribunal determines under paragraph 22(b) shall consist of:

    (a)    in the case of a breach by Canada, an increase in the Export Charge and/or a reduction in the export volumes permitted under a volume restraint that Canada is then applying or, if no Export Charge and/or volume restraint is being applied, the imposition of such Export Charge and/or volume restraint as appropriate; and

    (b)    in the case of a breach by the United States, a decrease in the Export Charge and/or an increase in the export volumes permitted under a volume restraint that Canada is then applying.

Such adjustments shall be in an amount that remedies the breach.

24.    Such adjustments may be applied from the end of the reasonable period of time until the Party Complained Against cures the breach.

25.    In the case of a breach by Canada attributable to a particular Region, the tribunal shall determine the compensatory adjustment applicable to that Region.

26.    If Canada considers that the United States has failed to cure a breach by the end of the reasonable period of time, Canada may make the compensatory adjustments that the tribunal has determined under paragraph 22(b).

27.    If the United States considers that Canada has failed to cure a breach and has not made the compensatory adjustments that the tribunal has determined under paragraph 22(b) by the end of the reasonable period of time, the United States may impose compensatory measures in the form of volume restraints and/or customs duties on imports of Softwood Lumber Products from Canada, as follows:

    (a)    the amount of the volume restraints shall not exceed the adjustment to the volume restraints that the tribunal has determined; and

    (b)    the customs duties shall not exceed the adjustment to the Export Charges that the tribunal has determined.

28.    Measures taken in accordance with paragraph 27 shall not be considered a breach of Article V.  For greater certainty, the United States may initiate an investigation or take action with respect to Softwood Lumber Products under Sections 301 to 307 of the *Trade Act of 1974*, solely for the purpose of paragraph 27.

29.    If, after the expiry of the reasonable period of time:

    (a)    the United States considers that the compensatory adjustments that Canada is applying reduce Export Charges or allow for export volumes beyond those that the tribunal has determined under paragraph 22(b);

    (b)    Canada considers that the compensatory measures the United States is applying exceed the levels authorized for those measures under paragraph 27; or

    (c)    the Party Complained Against considers that it has cured the breach, in whole or in part, such that the compensatory adjustments or measures should be modified or terminated, and the Complaining Party does not agree,

the Party may commence a new arbitration to address the matter, by delivering a written Request for Arbitration to the Registrar of the LCIA Court.

30.    In any arbitration initiated under paragraph 29, the LCIA shall appoint to the tribunal the arbitrators comprising the original tribunal, to the extent they are available, within 10 days after the Request for Arbitration is delivered. Any member of the original tribunal who is no longer available shall be replaced in accordance with Article 11 of the LCIA Rules and paragraph 8. The tribunal shall endeavour to issue its award within 60 days after delivery of the Request for Arbitration referred to in paragraph 29.

31.    If in its award in an arbitration initiated under paragraph 29, the tribunal finds that the compensatory adjustments or measures that are the subject of the arbitration are inconsistent with the award in the original arbitration or that the breach has been cured in whole or in part, the tribunal shall determine the extent to which the compensatory adjustments or measures should be modified or whether they should be terminated.

32.    An award under paragraph 31 shall be effective as of the date that the compensatory adjustments or measures were imposed and, accordingly, shall provide that:

    (a)    Canada shall collect any Export Charge that the tribunal finds it should have imposed and the United States shall refund any customs duties that the tribunal finds it should not have collected, retroactive to that date; and

    (b)    Canada shall impose additional export volume restraints to compensate for any excess export volumes that the tribunal finds that Canada has allowed and Canada may increase the export volumes permitted under the export restraints to compensate for any excess import restraints the tribunal finds that the United States has imposed since that date, with these adjustments to be applied to exports from the pertinent Region or Regions in equal monthly amounts during a period following the award as determined by the tribunal.

## ARTICLE XV

### Information collection and exchange

**A.    Information Collection**

1.    Canada shall place Softwood Lumber Products on the Export Control List under the *Export and Import Permits Act*, as amended, or any successor law, require an Export Permit for each exportation to the United States of Softwood Lumber Products, and require any Person to which such a permit is issued to keep records relating to its issuance for 60 months after the issuance of the permit.

2.    In connection with the issuance of an Export Permit under the *Export and Import Permits Act*, as amended, or any successor law, Canada shall require each exporter to the United States of Softwood Lumber Products to furnish to it the:

    (a)    Exporter's Business Number;

    (b)    name of exporter;

    (c)    Region of Origin;

    (d)    Customs Tariff (Canada) classification and product description;

    (e)    quantity in board feet, cubic meters, or square meters in nominal terms;

    (f)    Export Price;

    (g)    U.S. port of entry;

    (h)    anticipated U.S. entry date;

    (i)    name of importer or consignee;

    (j)    mode of transportation;

    (k)    Export Permit number;

    (l)    Canadian Date of Shipment; and

    (m)    Maritime Lumber Bureau Certificate of Origin number, if applicable.

3.    In addition to the entry and entry summary information otherwise required for importation into the United States, the United States shall require importers of Softwood Lumber Products, under Section 484 of the *Tariff Act of 1930*, as amended, or any successor law, to furnish to it the Export Permit number and if applicable the original Maritime Lumber Bureau Certificate of Origin for each USCBP entry and may request additional information as provided under U.S. law.

4.     Canada shall ensure that each Export Permit includes an Export Permit number that meets the format requirement of USCBP Form 7501. USCBP shall provide instructions on the required format for the Export Permit number on USCBP Form 7501. USCBP shall require transmission of the Export Permit number electronically to USCBP with the USCBP Form 7501 data elements. USCBP shall also require the submission of an Export Permit number for merchandise referred to in Article X. USCBP shall request the Export Permit, as needed, from the importer.

## B.     Information Exchange

5.     The United States shall provide to Canada on a monthly basis, the data elements listed below for each entry summary of Canadian Softwood Lumber Products filed during the preceding month:

   (a)     Manufacturer Identification Number;

   (b)     Province;[4]

   (c)     10-digit HTSUS Code and description as provided on USCBP Form 7501;

   (d)     quantity in board feet, cubic meters, or square meters in nominal terms, as required by the HTSUS;

   (e)     Appraised Value ($US) as defined by USCBP;

   (f)     U.S. port of entry;

   (g)     USCBP entry number;

   (h)     U.S. entry date;

   (i)     name of importer or consignee;

   (j)     mode of transportation; and

   (k)     Export Permit number.

6.     No later than 20 days after the end of each month, the Parties shall exchange on a monthly basis aggregated Region-specific data collected pursuant to paragraphs 2 and 5, for the purpose of reconciling their data covering the preceding calendar month and the Year-to-date. Reconciliation shall be quarterly and shall be completed within 4 months after the end of the Quarter covered by the reconciliation. The aggregated Region-specific data collected under subparagraphs 2(c) through (g) shall not be treated as confidential under Article XVI.

---

[4] After the date of signature of the SLA 2006, the United States shall initiate a process to designate B.C. Coast and B.C. Interior as separate Regions for purposes of the SLA 2006. USCBP shall also provide guidance to importers on how to report the Region of first manufacture or first mill manufacture.

7.      Canada shall provide to the United States on a monthly basis data on the total charges it assessed on exports of Softwood Lumber Products from each Region pursuant to the SLA 2006 covering the preceding calendar month and the Year-to-date, broken out by type of charge or refund, including any revisions. This information shall not be treated as confidential under Article XVI.

8.      If the Parties cannot reconcile their Region-specific aggregated data, they shall exchange information regarding exports by specific exporters, importers, or manufacturers, and if necessary, regarding specific exports and imports, in order to achieve complete reconciliation within 9 months after the end of the pertinent Quarter.

9.      The Parties shall cooperate to detect and prevent false designations of Region of Origin and false statements of export quantities. If necessary, USCBP may submit a request to the Bureau to visit the premises of the manufacturer(s) of the goods at issue, in order to ensure compliance with the *Export and Import Permits Act*, as amended, or any successor law. The Bureau shall conduct the visit following consultations between the Parties to define the nature of the problem and to agree on the information required by USCBP. The Bureau shall share information obtained relating to any such visit with USCBP.

10.     The United States shall notify and consult with Canada on any:

    (a)     importation of Softwood Lumber Products from Canada that USCBP views as requiring an Export Permit but for which an Export Permit number has not been provided on USCBP Form 7501; and

    (b)     customs investigation that USICE initiates on or after the Effective Date regarding the importation of Softwood Lumber Products.[5]

11.     Nothing in the SLA 2006 shall prevent a Party from imposing criminal, civil, or administrative penalties for violations of its laws and regulations relating to the matters governed by this Article.

12.     Within 90 days after the Effective Date, Canada shall provide to the United States a list of the companies it has certified as Independent Manufacturers of Remanufactured Softwood Lumber Products pursuant to Annex 7C. Canada shall notify the United States in writing of any change in this list within 30 days after the change.

13.     Canada shall notify the United States of any new or amended federal or provincial law, regulation, order-in-council, or other measure governing timber pricing or forest management systems related to Softwood Lumber Products, within 45 days after the measure is adopted or amended, as the case may be.[6] This information shall not be treated as confidential under Article XVI. Each Party shall respond to requests from the other for information relevant to the operation of the SLA 2006.

---

[5] For purposes of this subparagraph, any communication between the Parties shall be conducted between the relevant agencies of the Parties.

[6] This obligation shall not apply with respect to the Maritimes, Nunavut, Yukon, or the Northwest Territories.

14.    Canada shall notify the United States of any change to a timber pricing or forest management system Canada maintains is covered by paragraphs 2(a), 2(c), 2(d), or 4 of Article XVII, together with an explanation of why it is covered, including any evidence showing that such a change improves the statistical accuracy and reliability of a timber pricing or forest management system or maintains or improves the extent to which stumpage charges reflect market conditions, including prices and costs.

15.    Based on sufficient information that it obtains, Canada shall certify to the United States each Quarter that, to the best of its knowledge and ability, it has no basis to believe that:

     (a)     the timber pricing and forest management systems of the provinces have been modified other than as notified in paragraph 14; and

     (b)     the provinces are collecting revenues at levels lower than required under those systems.

The sufficiency of the information that Canada obtains under this paragraph shall not be subject to arbitration pursuant to Article XIV.

16.    The United States shall not use a request for information concerning the operation of the SLA 2006 to obtain information concerning the basis upon which Canada has made a certification under paragraph 15.

17.    Within 6 months after the end of each Quarter, to the extent possible, Canada shall provide the United States with the total harvest volume of, and total revenues collected for Crown Softwood Sawtimber within each Region during the Quarter.  If a Region is subject to the MPS, Canada shall provide in such reports the complete auction results datasets used to derive the market modeling regressions and coefficients and spreadsheets used for the calculation of the Average Market Price, if any, and all information needed to monitor any updates or modifications.

18.    The United States shall certify to Canada each month that, to the best of its knowledge and ability, the following is correct:

     (a)     the U.S. softwood lumber shipment data published by the Western Wood Products Association (WWPA) is an unbiased estimate of actual shipments used in determining U.S. Consumption; and

     (b)     the FLC price published by Random Lengths Publishing Incorporated is an unbiased estimate.

19.    With respect to a data source referred to in paragraph 18:

     (a)     either Party may, with the consent of a data source identified in paragraph 18, require that an agreed-upon third-party professional accounting firm conduct an independent audit of that data source, including verification of the compilation of the data and the accuracy of the input source data;

     (b)     alternatively, the Parties may request a Technical Working Group established under Article XIII(C) to verify the data; and

(c)     if a data source identified in paragraph 18 refuses to consent to an audit under this paragraph, or if the Parties agree on the basis of an audit or otherwise that such source is an unreliable measure of shipments, exports or imports:

      (i)     the Parties shall select an alternative data source, and

      (ii)    to the extent that historical data is shown to be biased or unreliable and materially affected the Export Measures that were applied in a previous period and in respect to which exporters within a Region relied in good faith to their detriment, the Export Measures shall be re-adjusted on a retroactive basis to take this into account.

## ARTICLE XVI

### Confidentiality

1.      Each Party shall treat as confidential, in accordance with its laws, information provided to it under the SLA 2006, that is not otherwise publicly available.  Nothing in this Article shall be construed to limit a Party's authority under its domestic law to exempt information from disclosure.

2.      A Party shall refuse to disclose information obtained in confidence from the other Party or an institution thereof under the SLA 2006, unless the Party providing the information consents to the disclosure or the information is otherwise publicly available.

3.      The information referred to in paragraphs 1 and 2:

(a)     may be used by and disclosed to government officials solely in connection with the implementation or operation of the SLA 2006 and subject to the disclosure requirements of the receiving Party's law; and

(b)     shall not be used or disclosed in any trade action or investigation of the type referred to in Article V except with the written permission of the Party or Person providing the information.

4.      Each Party shall handle information referred to in paragraphs 1 and 2 so as to prevent unauthorized disclosure.  However, the Parties may transmit the information through e-mail or by fax, may process the information on unclassified computer systems and may store the information in locked filing cabinets or offices.

5.      For greater certainty, the Parties affirm that the following information shall be treated as non-confidential, to the extent permissible under a Party's domestic law and except insofar as it discloses business confidential information:

(a)     reports and recommendations of committees and working groups established under the SLA 2006;

(b)     information provided under sub-paragraph 2(b)(ii) of Article XII;

(c)     information provided under paragraphs 12, 14 (excluding any notification, explanation or evidence relating to Article XVII(2)(d)), and 17 of Article XV; and

(d)     information provided under sub-paragraph 5(b) of Article XVII.

## ARTICLE XVII

### Anti-circumvention

1.     Neither Party, including any public authority of a Party, shall take action to circumvent or offset the commitments under the SLA 2006, including any action having the effect of reducing or offsetting the Export Measures or undermining the commitments set forth in Article V.

2.     Grants or other benefits that a Party, including any public authority of a Party, provides shall be considered to reduce or offset the Export Measures if they are provided on a *de jure* or *de facto* basis to producers or exporters of Canadian Softwood Lumber Products.  Notwithstanding the foregoing, measures that shall not be considered to reduce or offset the Export Measures in the SLA 2006 include, without limitation:

      (a)     provincial timber pricing or forest management systems as they existed on July 1, 2006, including any modifications or updates that maintain or improve the extent to which stumpage charges reflect market conditions, including prices and costs.[7]  Fluctuations in stumpage charges that result from such modifications or updates, including fluctuations resulting from changes in market conditions or other factors affecting the value of the province's timber, such as transportation costs, exchange rates, and timber quality and natural harvesting conditions, do not constitute circumvention.  A provincial timber pricing or forest management system includes, without limitation, the data, variables, and procedures it employs;

      (b)     other government programs that provide benefits on a non-discretionary basis in the form and the total aggregate amount in which they existed and were administered on July 1, 2006;

      (c)     actions or programs undertaken by a Party, including any public authority of a Party, for the purpose of forest or environmental management, protection, or conservation, including, without limitation, actions or programs to reduce wildfire risk; protect watersheds; protect, restore, or enhance forest ecosystems; or to facilitate public access to and use of non-timber forest resources, provided that such actions or programs do not involve grants or other benefits that have the effect of undermining or counteracting movement toward the market pricing of timber;

      (d)     payments or other compensation to First Nations to address or settle claims; and

---

[7] MPS Updates shall not be considered "modifications or updates" for purposes of this subparagraph.

(e)     measures that are not specific to the forest products industry.

3.     Either Party may consult with the other if it believes the other Party has substantially failed to enforce its legal requirements in a manner that has a material impact on the price or cost of harvesting Softwood Sawtimber.

4.     In respect of British Columbia:

(a)     the MPS shall be considered a provincial timber pricing or forest management system that existed on July 1, 2006.  Any action that conflicts with measures in the documents listed in Article XXI(35) may constitute circumvention;

(b)     Canada warrants that a central purpose of the MPS is to implement a system that is more sensitive to market forces than pre-existing systems.  The MPS and fluctuations in stumpage charges that result from the operation of the MPS, including fluctuations resulting from changes in market conditions or other factors, such as transportation costs, exchange rates, timber quality, and natural harvesting conditions, shall not constitute circumvention of the SLA 2006 or offset its commitments;

(c)     modifications to the MPS that improve the statistical accuracy and reliability of the MPS regression equations (that relate winning bids on, or the number of bidders participating in, timber auctions to explanatory variables) shall not constitute circumvention of the SLA 2006 or offset its commitments; and

(d)     compensation that the Government of British Columbia is legally obliged to pay for tenure rights taken back by the Province and determined by binding arbitration or negotiated settlements of legal claims approved by the Province's Minister of Finance and that have been certified by the Province's Attorney General as being in the public interest, shall not constitute circumvention of the SLA 2006 or offset its commitments.

5.     In respect of exports of Softwood Lumber Products from the Maritimes to the United States covered by an original Maritime Lumber Bureau Certificate of Origin and that otherwise satisfy the requirements of Article X(1)(a):

(a)     if, in any Quarter, the volume of exports exceeds the sum of the total production and total inventory of Softwood Lumber Products first produced from logs originating in the Maritimes or Maine in that Quarter, Canada shall retroactively collect a charge from the exporters responsible for the excess shipments.  This charge shall equal $C X, where X is determined according to the following formula:

X = ($C 200 multiplied by the MBF export volume in excess of the sum of the exporter's total production and total inventory of Softwood Lumber Products produced from logs originating in the Maritimes or Maine during the Quarter)

(b)    within 60 days after the end of each Quarter, the Maritime Lumber Bureau shall collect and submit to the Parties data on:

    (i)    total production and total inventory of Softwood Lumber Products first produced from logs originating in the Maritimes or Maine in the Quarter, and

    (ii)    exports of Softwood Lumber Products from the Maritimes excluded from the Export Measures under Article X(1)(a) that have been certified under the Maritime Lumber Bureau Certificate of Origin Program; and

(c)    the Parties shall consult with the Maritime Lumber Bureau and shall exchange information regarding any excess exports that either Party identifies.

6.    Transfers of quota allocation between Persons in a particular Region shall not constitute circumvention of the SLA 2006.

## ARTICLE XVIII

### Duration

The SLA 2006 shall remain in force for 7 years after the Effective Date and may be extended by agreement of the Parties for an additional 2 years. The domestic interested parties that have filed the letters in Annex 18, which shall be appended to Annex 18 on the Effective Date, shall not file petitions, and shall oppose initiation of an investigation, pursuant to Title VII of the *Tariff Act of 1930*, as amended, or Sections 301 to 305 of the *Trade Act of 1974*, as amended, with respect to imports of Softwood Lumber Products from Canada during the 12-month period after the expiration of the SLA 2006 under this paragraph. In addition, the United States shall not self-initiate such actions during that period. This paragraph shall not apply to a termination under any other provision of the SLA 2006, including Article XX.

## ARTICLE XIX

### Amendment

The SLA 2006 may be amended at any time by the Parties in writing.

## ARTICLE XX

### Termination

1.      At any time after the SLA 2006 has been in force for 18 months, either Party may terminate the SLA 2006 by providing 6-month written notice of the intent to terminate to the other Party.  On request of the Party receiving the notice, the Parties shall consult on the reasons for the termination.  If the United States terminates the SLA 2006 under this paragraph, the domestic interested parties that have filed the letters in Annex 18, which shall be appended to Annex 18 on the Effective Date, shall not file petitions, and shall oppose initiation of an investigation, pursuant to Title VII of the *Tariff Act of 1930*, as amended, or Sections 301 to 305 of the *Trade Act of 1974*, as amended, with respect to imports of Softwood Lumber Products from Canada during the 12-month period after the SLA 2006 terminates.  In addition, the United States shall not self-initiate such actions during that period.  This paragraph shall not apply to a termination under any other provision of the SLA 2006, including paragraphs 2 through 4 of this Article or a termination by operation of Article XVIII.

2.      If, pursuant to Article XIV:

     (a)     Canada imposes compensatory adjustments under paragraph 26 of Article XIV, or

     (b)     the United States imposes compensatory measures under paragraph 27 of Article XIV,

the other Party may request in writing consultations to discuss the status of the SLA 2006.  The consultations shall be held within 10 days after the date on which the request is delivered.  Following the consultations, either Party may terminate the SLA 2006 by providing 1-month written notice of the intent to terminate to the other Party.

3.      The United States shall have the immediate and unconditional right to terminate the SLA 2006 if Canada fails to apply the Export Measures.

4.      Canada shall have the immediate and unconditional right to terminate the SLA 2006 if the United States breaches its commitments in Article V.

## ARTICLE XXI

### Definitions

For purposes of the SLA 2006:

1.      "ACH" or Automated Clearing House means a funds transfer system governed by the ACH Rules, as defined in 31 CFR § 210.2, which provides for the interbank clearing of electronic entries for participating financial institutions;

2.      "AD Order" means the Antidumping Duty Order regarding Certain Softwood Lumber from Canada, 67 Fed. Reg. 36,068 (May 22, 2002), as amended;

3.      "Appraised Value" means the value of imported merchandise determined in accordance with 19 U.S.C. § 1401a or any successor statute;

4.    "Associated Persons" means:

    (a)    Persons related to each other in that:

        (i)    they are individuals connected by blood relationship, marriage, common-law partnership, or adoption within the meaning of subsection 251(6) of the *Income Tax Act*,

        (ii)    one is an officer or director of the other,

        (iii)    each such Person is an officer or director of the same 2 corporations, associations, partnerships, or other organizations,

        (iv)    they are partners,

        (v)    one is the employer of the other,

        (vi)    they directly or indirectly control or are controlled by the same Person,

        (vii)    one directly or indirectly controls or is controlled by the other,

        (viii)    any other Person directly or indirectly owns, holds or controls 5% or more of the outstanding voting stock or shares of each such Person, or

        (ix)    one directly or indirectly owns, holds or controls 5% or more of the outstanding voting stock or shares of the other;

        or

    (b)    Persons not related to each other, but not dealing with each other at arm's-length.  It is a question of fact whether Persons not related to each other were at a particular time dealing with each other at arm's-length;

5.    "B.C. Coast" means the Coastal Forest Regions as defined by the existing *Forest Regions and Districts Regulation*, B.C. Reg. 123/2003;

6.    "B.C. Interior" means the Northern Interior Forest Region and the Southern Interior Forest Region as defined by the existing *Forest Regions and Districts Regulation*, B.C. Reg. 123/2003;

7.    "Board foot" or "BF" means the lumber volume equal to a one-inch board that is 12 inches in width and one foot in length.  When calculating board feet, nominal sizes are assumed;

8.    "British Columbia" means the B.C. Coast and the B.C. Interior;

9.    "Bureau" means the Export and Import Controls Bureau of the Department of Foreign Affairs and International Trade;

10.     "Canada" means, for purposes of the application of Export Measures, the territory to which Canadian customs laws apply, including any areas beyond the territorial seas of Canada within which, in accordance with international law and its domestic law, the Government of Canada may exercise rights with respect to the seabed and subsoil and their natural resources;

11.     "CIT" means the U.S. Court of International Trade;

12.     "Complaining Party" refers to the Party filing a Request for Arbitration;

13.     "Covered Entries" means unliquidated entries that were subject to the AD Order and/or the CVD Order;

14.     "CRA" means Canada Revenue Agency;

15.     "CVD Order" means the Countervailing Duty Order regarding Certain Softwood Lumber from Canada, 67 Fed. Reg. 36,070 (May 22, 2002), as amended;

16.     "Date of Shipment" means:

        (a)     in the case of products exported by rail, the date when the railcar that contains the products is assembled to form part of a train for export; and

        (b)     in any other case, the date when the products are loaded aboard a conveyance for export.

        If a shipment is transshipped through a Canadian reload or other inventory location, then the Date of Shipment shall be the date on which the merchandise leaves the reload or other inventory location for final shipment to the United States;

17.     "Day" means a calendar day;

18.     "Effective Date" means the date of entry into force of the SLA 2006 pursuant to Article II(1);

19.     "Escrow Importer" means an Importer of Record that has fulfilled all of the requirements set forth in paragraph 1 of Annex 2C;

20.     "Existing" means existing on the Effective Date of the SLA 2006;

21.     "Expected U.S. Consumption" means the expected level of U.S. Consumption defined and calculated in accordance with paragraphs 12 through 14 of Annex 7D;

22.     "Export Charge" means the charge levied by Canada on the Export Price of Softwood Lumber Products exported to the United States at the rates specified in Articles VII through IX;

23.     "Export Measures" means the measures in Articles VII through IX, Article X(2), Article XII(2)(b)(i), and Article XVII(5)(a);

24.   "Export Permit" means authority to export goods on the Export Control List (ECL), pursuant to the *Export and Import Permits Act*, as amended, or any successor law;

25.   "Export Price" means:

    (a)   if the product has undergone only primary processing, the value that would be determined FOB at the facility where the product underwent its last primary processing before export;

    (b)   if the product was last remanufactured before export by an Independent Manufacturer of Remanufactured Softwood Lumber Products, the value that would be determined FOB at the facility where the softwood lumber used to make the remanufactured product underwent its last primary processing;

    (c)   if the product was last remanufactured before export by a remanufacturer that is not an Independent Manufacturer of Remanufactured Softwood Lumber Products, the value that would be determined FOB at the facility where the product underwent its last processing before export; or,

    (d)   for a product described in paragraphs (a), (b) or (c) in respect of which an FOB value cannot be determined, the market price for identical products sold in Canada at approximately the same time and in an arm's-length transaction, determined in one of the following 3 ways, listed in order of preference:

        (i)   at substantially the same trade level but in different quantities;

        (ii)   at a different trade level but in similar quantities; or

        (iii)   at a different trade level and in different quantities;

26.   "Exporter's Business Number" means the identifier assigned by the CRA to a registered exporter of Softwood Lumber Products;

27.   "FOB" means a value consisting of all charges payable by a purchaser including those incurred in the placement on board of the conveyance for shipment, but not including the actual shipping charges or charges levied pursuant to the SLA 2006;

28.   "Household and Personal Effects" means merchandise classifiable under Chapter 98, Subchapters IV, V, & VI of the HTSUS;

29.   "HTSUS" means the Harmonized Tariff Schedule of the United States;

30.   "Importers of Record" means corporations, sole proprietorships, partnerships or U.S. residents that are importers of record for the purposes of U.S. law that imported Softwood Lumber Products from Canada from May 22, 2002 to the Effective Date;

31.  "Independent Manufacturer of Remanufactured Softwood Lumber Products" means a Canadian manufacturer of Remanufactured Softwood Lumber Products that does not hold Crown tenure rights and, after the Effective Date, has not acquired standing timber directly from the Crown, and is not an Associated Person with respect to a Tenure Holder or any Person that has acquired standing timber directly from the Crown;

32.  "LCIA" means the London Court of International Arbitration;

33.  "Manufacturer Identification Number" means the identifying code for a manufacturer or shipper derived from its name and address as defined in 19 C.F.R. Part 102;

34.  "Maritimes" means New Brunswick, Nova Scotia, Prince Edward Island, and Newfoundland and Labrador;

35.  "Market Pricing System" or "MPS" means:

(a)  in the case of the B.C. Coast, the timber pricing policies and procedures in the Coast Appraisal Manual in effect on July 1, 2006; and the description of the system in the paper Market Pricing System – Coast (January 16, 2004); and

(b)  in the case of the B.C. Interior, the timber pricing policies and procedures in the Interior Appraisal Manual in effect on July 1, 2006; its accompanying papers Specifications: Calculation of the Interior Average Market Price; Specifications: Calculation of Interior Stumpage Rates (both dated July 1, 2006); and the description of the MPS in the papers Interior Market Pricing System (June 1, 2006), Interior Market Pricing System Average Market Price (June 5, 2006), Interior Market Pricing System Tenure Obligation Adjustments (June 5, 2006), and Interior Market Pricing System Specified Operations (June 5, 2006);

For greater certainty, the B.C. Coast and B.C. Interior Appraisal Manuals in effect on July 1, 2006 are:

(a)  in the case of the B.C. Coast, the manual dated February 29, 2004 and including all amendments through July 1, 2006; and

(b)  in the case of the B.C. Interior, the manual dated November 1, 2004 and including all amendments through July 1, 2006.

The MPS includes any MPS Updates;

36.  "MBF" means thousand board feet;

37.  "MPS Updates" means any periodic revision to the Market Pricing System in accordance with the methods and procedures described in the documents referenced in the definition of "Market Pricing System" in paragraph 35. The MPS Updates to the Market Pricing System in the B.C. Interior and in the B.C. Coast, as described in the documents referred to in the definition of Market Pricing System, use substantially the same methods and procedures. MPS Updates shall come into force as amendments to, or new versions of, the Coast Appraisal Manual or the Interior Appraisal Manual;

38.  "NAFTA" means the North American Free Trade Agreement;

39.  "Parties" means Canada and the United States;

40.  "Party" means Canada or the United States;

41.  "Party Complained Against" refers to the Party responding to a Request for Arbitration;

42.  "Person" means a natural person, sole proprietorship, partnership, corporation, union, or association;

43.  "Prevailing Monthly Price" means the most recent four-week average of the weekly framing lumber composite ("FLC") prices available 21 days before the beginning of the month to which the Prevailing Monthly Price shall be applied, as specified in Annex 7A;

44.  "Quarter" means, unless otherwise specified, the three-month periods commencing January 1, April 1, July 1 and October 1 of each Year;

45.  "Region" means one of the following: Alberta, the B.C. Interior, the B.C. Coast, Manitoba, Ontario, Saskatchewan, or Quebec;

46.  "Region of Origin" means the Region where the facility at which the Softwood Lumber Product was first produced into such a product is located, regardless of whether that product was further processed (for example, by planing or kiln drying) or was transformed from one Softwood Lumber Product into another such product (for example, a remanufactured product) in another Region, with the following exceptions:

    (a)  the Region of Origin of Softwood Lumber Products first produced in the Maritime Provinces from logs originating in a non-Maritime province shall be the Region where the log originated; and

    (b)  the Region of Origin of Softwood Lumber Products first produced in the Yukon, Northwest Territories or Nunavut (the "Territories") from logs originating outside the Territories shall be the Region where the log originated;

47.  "Remanufactured Softwood Lumber Products" means Softwood Lumber
Products that are produced by reprocessing lumber inputs by subjecting such
inputs to one or more of the following: a change in thickness; a change in
width; a change in length; a change in profile; a change in texture; a change in
moisture; a change in grading; joining together by finger jointing; turning; or
other processes that produce components, semi-finished and/or finished
Softwood Lumber Products;

48.  "Softwood Sawtimber" means timber used for production of Softwood Lumber
Products;

49.  "TIB" means that an entry summary supporting a temporary importation under
bond has been filed with USCBP in paper form and the entry of articles is
brought into the United States temporarily and claimed to be exempt from duty
under Chapter 98, Subchapter XIII of the HTSUS;

50.  "Tenure Holder" means a Person who holds specific rights to harvest timber in
a Crown or public forest;

51.  "USCBP" means U.S. Customs and Border Protection;

52.  "USDOC" means the U.S. Department of Commerce;

53.  "USICE" means U.S. Immigration and Customs Enforcement;

54.   "U.S. Consumption" means, in any period, (1) Canadian softwood lumber
exports to the United States, plus (2) U.S. softwood lumber imports from
countries other than Canada, plus (3) U.S. shipments of softwood lumber,
minus (4) U.S. exports of softwood lumber, as set forth in Annex 7D;

55.    "United States" means, for purposes of importation, the customs territory of the United States and the foreign trade zones located in that territory;

56.    "WTO" means the World Trade Organization; and

57.    "Year" means, unless otherwise specified, the 12-month period commencing on January 1 of any year.

**IN WITNESS WHEREOF,** the undersigned, being duly authorized by their respective Governments, have signed this Agreement.

**DONE** in duplicate at Ottawa, this 12th day of September 2006, in the English and French languages, each version being equally authentic.

**FOR THE
GOVERNMENT OF THE UNITED STATES
OF AMERICA**

**FOR THE
GOVERNMENT OF CANADA**

## ANNEXES

ANNEX 1A          Softwood Lumber Products

ANNEX 1B          Canadian Table of Concordance – Harmonized Tariff Schedule of
                  the United States (2006) with Canadian Tariff Equivalent

ANNEX 2A          Termination of Litigation Agreement

ANNEX 2B          Notification of Mutually Agreed Solution

ANNEX 2C          Assignment of Cash Deposits and Disbursement of Payments

ANNEX 3           USDOC Liquidation Instructions to USCBP

ANNEX 5A          Template for "No Injury" Letters from the U.S. Domestic
                  Interested Parties

ANNEX 5B          Finding of the U.S. Department of Commerce

ANNEX 7A          Prevailing Monthly Price

ANNEX 7B          Calculation of Quota Volumes for Option B

ANNEX 7C          Procedure for Certifying Independent Remanufacturers

ANNEX 7D          Calculation of U.S. Consumption and Market Shares

ANNEX 8           Calculation of Regional Trigger Volumes

ANNEX 10          Excluded Companies

ANNEX 12          Working Group on Regional Exemptions

ANNEX 13          The North American Initiative on Lumber

ANNEX 18          Template for Supplemental Letters from the Members of the
                  U.S. Industry Which Have Filed Letters as Described in Annex
                  5A

**ANNEX 1A**

**Softwood Lumber Products**

1.    The products covered by the SLA 2006 are softwood lumber, flooring and siding ("Softwood Lumber Products").  Softwood Lumber Products include all products classified under subheadings 4407.1000, 4409.1010, 4409.1020, and 4409.1090, respectively, of the HTSUS, and any softwood lumber, flooring, and siding described below.  These Softwood Lumber Products include:

    (a)    coniferous wood, sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or finger-jointed, of a thickness exceeding 6 millimeters;

    (b)    coniferous wood siding (including strips and friezes for parquet flooring, not assembled) continuously shaped (tongued, grooved, rabbeted, chamfered, v-jointed, beaded, molded, rounded, or the like) along any of its edges or faces, whether or not planed, sanded, or finger-jointed;

    (c)    other coniferous wood (including strips and friezes for parquet flooring, not assembled) continuously shaped (tongued, grooved, rabbeted, chamfered, v-jointed, beaded, molded, rounded, or the like) along any of its edges or faces (other than wood moldings and wood dowel rods) whether or not planed, sanded, or finger-jointed;

    (d)    coniferous wood flooring (including strips and friezes for parquet flooring, not assembled) continuously shaped (tongued, grooved, rabbeted, chamfered, v-jointed, beaded, molded, rounded, or the like) along any of its edges or faces, whether or not planed, sanded, or finger-jointed; and

    (e)    coniferous drilled and notched lumber and angle cut lumber.

Other merchandise that shall be included in the definition of Softwood Lumber Products are:

    (f)    any product entering under HTSUS 4409.10.05 which is continually shaped along its end and/or side edges which otherwise conforms to the written definition of the scope; and

    (g)    lumber products that USCBP may classify as stringers, radius cut box-spring-frame components, and fence pickets, not conforming to the criteria listed in paragraph 4 below, as well as truss components, pallet components, and door and window frame parts, which may be classified under HTSUS subheadings 4418.90.45.90, 4421.90.70.40, and 4421.90.97.40.

2.    Although the HTSUS subheadings are provided for convenience and USCBP purposes, the written description of the merchandise subject to the SLA 2006 is dispositive.

3.    The following Softwood Lumber Products are excluded from the scope of the SLA 2006:

    (a)    trusses and truss kits, properly classified under HTSUS 4418.90;

    (b)    I-Joist beams;

(c)    assembled box spring frames;

(d)    pallets and pallet kits, properly classified under HTSUS 4415.20;

(e)    garage doors;

(f)    edge-glued wood, properly classified under HTSUS 4421.90.97.40;

(g)    properly classified complete door frames;

(h)    properly classified complete window frames;

(i)    properly classified furniture;

(j)    articles brought into the United States temporarily and claimed to be exempt from duty under Chapter 98, Subchapter XIII, of the HTSUS (TIB); and

(k)    household and personal effects.

4.    The following Softwood Lumber Products are excluded from the scope of the SLA 2006 provided that they meet the specified requirements detailed below:

(a)    stringers (pallet components used for runners); if they have at least two notches on the side, positioned at equal distance from the center, to properly accommodate forklift blades, properly classified under HTSUS 4421.90.97.40;

(b)    box-spring frame kits, if they contain the following wooden pieces – two side rails; two end (or top) rails; and varying numbers of slats. The side rails and the end rails should be radius-cut at both ends. The kits should be individually packaged, and should contain the exact number of wooden components needed to make a particular box spring frame, with no further processing required. None of the components exceeds 1 inch in actual thickness or 83 inches in length;

(c)    radius-cut box-spring-frame components, not exceeding 1 inch in actual thickness or 83 inches in length, ready for assembly without further processing. The radius cuts must be present on both ends of the boards and must be substantial cuts so as to completely round one corner;

(d)    fence pickets requiring no further processing and properly classified under HTSUS 4421.90.70, 1 inch or less in actual thickness, up to 8 inches wide, and 6 feet or less in length, and having finials or decorative cuttings that clearly identify them as fence pickets. In the case of dog-eared fence pickets, the corners of the boards should be cut off so as to remove pieces of wood in the shape of isosceles right angle triangles with sides measuring 3/4 of an inch or more;

(e)     U.S.-origin lumber shipped to Canada for minor processing and imported into the United States, is excluded from the scope of the SLA 2006 if the following conditions are met: (1) if the processing occurring in Canada is limited to kiln drying, planing to create smooth-to-size board, and sanding, and (2) if the importer establishes to the satisfaction of USCBP that the lumber is of U.S. origin; and

(f)     in addition, all Softwood Lumber Products entered claiming non-subject status based on U.S. country of origin shall be treated as excluded under the SLA 2006, provided that these Softwood Lumber Products meet the following condition: upon entry, the importer, exporter, Canadian processor and/or original U.S. producer establish to USCBP's satisfaction that the softwood lumber entered and documented as U.S.-origin softwood lumber was first produced in the United States as a lumber product satisfying the physical parameters of the softwood lumber scope.

5.     Softwood Lumber Products contained in single family home packages or kits, regardless of tariff classification, are excluded from the scope of the SLA 2006 if the importer certifies to items (a), (b), (c), and (d) and requirement (e) is met:

(a)     the imported home package or kit constitutes a full package of the number of wooden pieces specified in the plan, design or blueprint necessary to produce a home of at least 700 square feet produced to a specified plan, design or blueprint;

(b)     the package or kit must contain all necessary internal and external doors and windows, nails, screws, glue, sub floor, sheathing, beams, posts, connectors, and if included in the purchase contract, decking, trim, drywall and roof shingles specified in the plan, design or blueprint;

(c)     prior to importation, the package or kit must be sold to a retailer in the United States of complete home packages or kits pursuant to a valid purchase contract referencing the particular home design plan or blueprint, and signed by a customer not affiliated with the importer;

(d)     Softwood Lumber Products entered as part of a single family home package or kit, whether in a single entry or multiple entries on multiple days, will be used solely for the construction of the single family home specified by the home design matching the USCBP import entry; and

(e)     for each entry into the United States, the following documentation must be retained by the importer and made available to USCBP upon request:

(i)     a copy of the appropriate home design plan, or blueprint matching the customs entry in the United States,

(ii)    a purchase contract from a retailer of home kits or packages signed by a customer not affiliated with the importer,

(iii)    a listing of inventory of all parts of the package or kit being entered into the United States that conforms to the home design package being imported, and

(iv)    in the case of multiple shipments on the same contract, all items listed in (iii) which are included in the shipment at issue shall be identified as well.

**ANNEX 1B**

Canadian Table of Concordance - Harmonized Tariff Schedule of the United States (2006) with Canadian tariff equivalent*[8]

These tables list classification provisions for all products under paragraphs 1(a) through 1(g), paragraphs 3(a) through 3(k), and paragraph 4 of Annex 1A. Finalization of this concordance is subject to U.S. review and consultation at any time before the Effective Date.

I.    Table relative to HTSUS references in Annex 1A (1) (a) through (g)

| Heading/Subheading HTSUS 2006 | Stat. Suffix | Article Description | Canadian Customs Tariff (CCT) |
|---|---|---|---|
| 4407.10.00 | | Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or finger-jointed, of a thickness exceeding 6mm<br>  Coniferous | 4407.10.00 |
| | 01 | Finger-jointed | 4407.10.00.11 |
| | | Other | |
| | 02 | Treated with paint, stain, creosote, or other preservative | 4407.10.00.12 |
| | | Not treated | |
| | 15 | Mixtures of spruce, pine, and fir ("S-P-F") | 4407.10.00.13 |
| | 16 | Mixtures of western hemlock and amabilis fir (hem-fir) | 4407.10.00.14 |
| | | Other: | |
| | 17 | Sitka Spruce  (Picea sitchensis)<br>  Rough | 4407.10.00.32 |
| | 18 | Other | 4407.10.00.22 |
| | 19 | Other Spruce<br>  Rough | 4407.10.00.33 |
| | 20 | Other | 4407.10.00.23 |
| | 42 | Eastern White pine (Pinus Strobus) and red pine (Pinus resinosa):<br>  Rough | 4407.10.00.52, 4407.10.00.53 |
| | 43 | Other | 4407.10.00.42, 4407.10.00.43 |
| | 44 | Lodgepole pine (Pinus contorta):<br>  Rough | 4407.10.00.54 |
| | 45 | Other | 4407.10.00.44 |

---

[8]    *Customs Tariff*, S.C. 1997, c. 36, Sch. 1.

| | | | |
|---|---|---|---|
| | 46 | Southern yellow pine (Loblolly pine (Pinus taeda)), long leaf pine (Pinus palustris), pitch pine (Pinus rigida), short leaf pine (Pinus echinata), slash pine (Pinus elliottii) and Virginia pine (Pinus virginiana)<br><br>Rough | 4407.10.00.55, 4407.10.00.56 |
| | 47 | Other | 4407.10.00.45, 4407.10.00.46 |
| | 48 | Ponderosa pine (Pinus ponderosa):<br>Rough | 4407.10.00.51 |
| | 49 | Other | 4407.10.00.41 |
| | 52 | Other pine<br>Rough | 4407.10.00.59 |
| | 53 | Other | 4407.10.00.49 |
| | 54 | Douglas-fir (Pseudotsuga menziesii)<br>Rough<br>Having a minimum dimension of less than 5.1 cm | 4407.10.00.81 |
| | 55 | Douglas-fir<br>Rough<br>Having a minimum dimension of 5.1 cm or more but less than 12.7 cm | 4407.10.00.82 |
| | 56 | Douglas-fir<br>Rough<br>Having a minimum dimension of 12.7 cm or more | 4407.10.00.83 |
| | 57 | Other  (Douglas-fir) | 4407.10.00.89 |
| | 58 | Fir (Abies spp.)<br>Rough | 4407.10.00.36 |
| | 59 | Other | 4407.10.00.26 |
| | 64 | Hemlock  (Tsuga spp.)<br>Rough | 4407.10.00.35 |
| | 65 | Other | 4407.10.00.25 |
| | 66 | Larch (Larix spp.)<br>Rough | 4407.10.00.31 |
| | 67 | Other | 4407.10.00.21 |
| | 68 | Western Red Cedar<br>Rough | 4407.10.00.71 |
| | 69 | Other | 4407.10.00.61 |
| | 74 | Yellow Cedar (Chamaecyparis nootkanensis)<br>Rough | 4407.10.00.72 |
| | 75 | Other | 4407.10.00.62 |
| | 76 | Other Cedar (Thuja spp., Juniperus spp., Chamaecyparis spp., Cupressus spp. and Libocedrus spp.)<br>Rough | 4407.10.00.79 |
| | 77 | Other | 4407.10.00.69 |
| | 82 | Redwood (Sequois sempervirens)<br>Rough | 4407.10.00.34 |
| | 83 | Other | 4407.10.00.24 |

| | | | |
|---|---|---|---|
| | | Other | 4407.10.00.92 |
| | 92 | Rough | |
| | 93 | Other | 4407.10.00.91 |
| 4409.10.10 | | Wood siding | 4409.10.00.40 |
| | | Resawn bevel siding: | |
| | 20 | Western red cedar | |
| | 40 | Other | 4409.10.00.40 |
| | 60 | Other: Western red cedar | 4409.10.00.40 |
| | 80 | Other | 4409.10.00.40 |
| 4409.10.90 | | Other Coniferous Wood | |
| | 20 | Western Red Cedar | 4409.10.00.90 |
| | 40 | Other | 4409.10.00.90 |
| 4409.10.20 | 00 | Wood flooring | 4409.10.00.20 |
| 4409.10.05 | 00 | Wood continuously shaped along any of its ends, whether or not also continuously shaped along any of its edges or faces, all the foregoing whether or not planed sanded or end-jointed | 4409.10.00.90 |
| | | Builders' joinery and carpentry of wood, including cellular wood panels and assembled parquet panels; shingles and shakes | |
| 4418.90.45 | 90 | Other, Other, Other | 4418.90.00.99 |
| | | Other Articles of Wood | |
| 4421.90.70 | | Pickets, palings, posts and rails, the foregoing which are sawn; assembled fence sections | 4421.90.90.60 |
| | 40 | Other | |
| 4421.90.97 | | Other | 4421.90.90.99 |
| | 40 | Other | |

\* 1.(e) Drilled and notched lumber and angle cut lumber – No concordance of HS numbers is possible under this provision as it applies to all Softwood Lumber Products covered under the SLA 2006, regardless of their classification.

II.   **Table relative to HTSUS references in Annex 1A (3) (a) through (k)**

| HTSUS | Excluded Product | Canadian Customs Tariff |
|---|---|---|
| | | |
| 4418.90 | (a) trusses and truss kits | 4418.90 |
| N/A | (b) I-Joist beams | 4418.90 |
| N/A | (c) Assembled box spring frames | 4421.90 |
| 4415.20 | (d) Pallets and pallet kits | 4415.20 |
| N/A | (e) Garage doors | 4418.20 |
| 4421.90.97.40 | (f) Edge-glued wood | 4421.90 |
| N/A | (g) Complete Door Frames | 4418.20 |
| N/A | (h) Complete Window frames | 4418.10 |
| N/A | (i) Furniture | Chapters 44, 94 |
| | (j) Articles brought into the United States temporarily and claimed to be exempt from duty under Chapter 98, Subchapter XIII of the HTSUS (TIB) | Chapters 98, 99 |
| N/A | (k) Household and Personal Effects | (Too broad in scope, not possible to concord) |

III.   **HTSUS references in Annex 1A (4)**

HTSUS 4421.90.97.40 (Stringers) (See above:  Table relative to HTSUS references in Annex 1A (1) (a) through (g))

HTSUS 4421.90.70 (Fence Pickets) (See above:  Table relative to HTSUS references in Annex 1A (1) (a) through (g))