UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
**TEMBEC INC., TEMBEC INVESTMENTS**  )
**INC., TEMBEC INDUSTRIES INC.,**    )
                                    )
        Petitioners,              )
                                    )
v.                                  )      No. 05-CV-2345 (RMC)
                                    )
**UNITED STATES OF AMERICA,**        )
                                    )
        Respondent.               )
_____)

**PETITIONERS' REPLY MEMORANDUM IN SUPPORT OF ITS NOTICE OF
REINSTATEMENT OR, IN THE ALTERNATIVE, MOTION UNDER RULE 60(b)**

**INTRODUCTION**

The United States' own factual explanation in its Opposition to Tembec's Notice and Rule 60(b) motion demonstrates that the United States obtained only a conditional Stipulation of Dismissal from Tembec. The dispute now is whether the dismissal was "subject to the terms and conditions of the Softwood Lumber Agreement 2006" on October 12, 2006 at 5:42 P.M., when Tembec agreed to the stipulation, or the Softwood Lumber Agreement ("SLA") thereafter amended by the United States and Canada without Tembec's knowledge or consent. After Tembec executed the stipulation, the Governments removed Tembec's Termination of Litigation Agreement ("TLA") pertaining to Tembec's NAFTA Chapter 11 claim against the United States. That TLA, which Tembec understood to be part of the SLA when Tembec signed the stipulation, specified that parties would bear their own costs. The United States, having changed the terms after Tembec signed—but without ever telling Tembec—is now

seeking attorneys' fees and costs from Tembec, and before the very Tribunal Tembec challenged in this proceeding.

The United States waited five and a half hours, until 11:17 P.M., "shortly after" the United States had amended the SLA, to file the joint stipulation with the Court, but without disclosing to Tembec that the United States made material changes to the SLA affecting the Stipulation of Dismissal.  The SLA at 5:42 P.M., when the United States and Tembec reached agreement on the Stipulation of Dismissal, was not the same SLA at 11:17 P.M. when the United States filed with the Court.

The United States knew at least six days before it filed the stipulation and changed the SLA that Tembec understood that the SLA prohibited the United States from seeking costs and legal fees with respect to Tembec's NAFTA Chapter 11 claim against the United States.[1]  Yet, the United States waited until after it filed the stipulation and changed the SLA to communicate its disagreement with Tembec's interpretation, and even then that communication was made only in the form of a letter to the Consolidation Tribunal falsely accusing Tembec of deception.

Now the United States submits to this Court, and to the Consolidation Tribunal, a Settlement of Claims Agreement ("SCA") purportedly signed by Tembec's counsel on October 11, 2006 and identified as "Annex 2A" to the SLA, yet the document that Tembec's counsel originally signed was not identified as "Annex 2A." The United States altered the document Tembec's counsel signed, without notice or consent, after Tembec's counsel signed it.

---

[1] Tembec's understanding that its NAFTA Chapter 11 claims would be settled under the SLA without any party being able to seek attorneys' fees and costs was expressed in its October 6, 2006 letter to the Consolidation Tribunal, which the United States also received, and never contradicted before October 13, on that day.

The alteration was material because Tembec executed a TLA for its NAFTA Chapter 11 claim on September 20, 2006 that was designated as Annex 2A to the SLA.  The TLA contained provisions that neither party would seek costs or attorneys' fees from the other.  Tembec never was informed that the SCA was a substitute for the TLA and that the SCA would be the only operative document as Annex 2A, thereby erasing Tembec's earlier signature on the TLA.  The United States knowingly misled Tembec.

Tembec's counsel was not given an explanation for the SCA, but instead was informed by Canada's counsel that if the SCA were not executed that night (the document for signature was presented at 6:00 P.M.), Tembec would be the cause of the failure of the SLA negotiations.  Under this duress, Tembec executed the SCA, viewing it as an addition to, rather than a substitute for, the TLAs.

Even were the United States' conduct not to rise to the level of fraud or misrepresentation, it is at minimum misconduct and grounds for relief from the dismissal in this case.  The United States chose not to tell Tembec that it had a different interpretation of the SLA until after the Stipulation of Dismissal was filed.  It chose not to tell Tembec that the TLAs were, in the United States' view, invalid, and that the United States was minutes away from replacing them with the SCA, which would serve as the exclusive document with respect to any of the "Covered Actions" under the SLA.  It chose not to share with Tembec the amendments it had made to the SLA before filing the Stipulation of Dismissal that was subject to the SLA.  And it materially altered, without notice or consent, a legal document signed by Tembec's legal counsel.

Whether the United States' misrepresentations and material omissions were intentional is irrelevant. *See Canady v. Erbe Elektromedizin* GMBH, 99 F.Supp.2d 37, 49 n. 26 (D.D.C. 2000)(misconduct need not be intentional). Intentionally or not, the United States misled Tembec into executing a Stipulation of Dismissal. The Court should recognize Tembec's exercise of the condition in the Stipulation that the case was not dismissed pursuant to the terms of the SLA, or alternatively, should grant Tembec's Rule 60(b) motion and reinstate this case.

## **ARGUMENT**

### I. THE UNITED STATES ENGAGED IN MISCONDUCT TO OBTAIN A STIPULATED DISMISSAL

The United States' conduct gives the appearance of a deliberate strategy to force Tembec to withdraw its challenge to the Consolidation Tribunal and then force Tembec to litigate both attorneys' fees and costs and the merits of its Chapter 11 claim before the very Tribunal whose *bona fides* Tembec had challenged. The United States materially altered the SCA after it was executed and obtained Tembec's signature through material misrepresentations and omissions. Seeking attorneys' fees and costs in the context of settling a hard fought international trade dispute, with many issues of first impression, is vindictive. Forcing Tembec to arbitrate its investment dispute claim before a Tribunal it has challenged, after material decisions were made in Tembec's absence, is unconscionable. This Court should re-institute this lawsuit to afford Tembec due process with respect to its claims.

Whether the United States' misconduct was intentional is legally irrelevant. Tembec reserved the right to re-institute this proceeding in the Stipulation of Dismissal

and, in any event, the United States' misconduct satisfies the criteria under Rule 60(b) for relief from the dismissal.

> A. The United States Solicited Tembec's Stipulation To Dismissal Without Disclosing That It Disputed Tembec's Understanding Of The SLA

The United States withheld the fact that it would seek costs and attorneys' fees in Tembec's NAFTA Chapter 11 case, notwithstanding the SLA settlement, until after it obtained Tembec's stipulation to dismiss this action and amended the SLA, even though it knew that Tembec understood the SLA settlement to mean that no party would seek costs and fees from the other. The United States set its own terms for settlement of Tembec's NAFTA Chapter 11 claim and this action on September 12, 2006 when it executed the SLA with Canada. Those terms required Tembec to give up its NAFTA Chapter 11 claim and the litigation in this case, and provided that no party should seek costs or fees against the other in those actions.[2] Both federal governments considered the SLA "final" when it was signed on September 12.[3]

The United States received Tembec's signed TLAs on September 20, 2006. They were identical as to the terms for settling the NAFTA Chapter 11 claim and this action, and were identical in almost every other respect to the TLA terms in the SLA.[4] The United States never objected to Tembec's TLAs to say that they were

---

[2] *See* Softwood Lumber Agreement of 2006, Annex 2A (Exh. A to Tembec Notice of Reinstatement).

[3] *See* "Minister Emerson and U.S. Trade Representative Schwab Sign Softwood Lumber Agreement," Sept. 12, 2006; Foreign Affairs and International Trade Canada, Press Release, available at http://w01.international.gc.ca/minpub/Publication.aspx?isRedirect=True&publication_id=384359&language=E&docnumber=99, last visited December 4, 2006.

[4] *See* Part III. C. *infra.*

deficient or unacceptable in any respect, and Tembec expected that the documents were counter-signed by the United States.[5]

The United States received Tembec's letter to the Consolidation Tribunal on October 6, 2006, which explained that, pursuant to the terms of the SLA, Tembec had agreed with the United States (a) that Tembec was terminating its NAFTA Chapter 11 claim and the related lawsuit before this Court seeking to vacate the Consolidation Tribunal's decision that it had jurisdiction over that claim; and (b) neither Tembec nor the United States would seek costs or fees against each other for those actions.[6]

Even on October 11, 2006, the United States knew that, notwithstanding the SCA, Tembec was still operating under the understanding that the TLAs of the SLA were in effect. In negotiating the terms of the Stipulation of Dismissal with Mr. Alexander Haas, counsel to the United States, Mr. Feldman, counsel to Tembec, wrote:

> Alexander –
>
> I have just been authorized to sign a stipulation as attached. **It adds a sentence taken directly from the Termination of Litigation Agreements fashioned by the two federal governments and already signed by Tembec, and then clarifies the question of fees.** Please confirm that you agree to this version of the stipulation.
>
> Thanks.[7]

---

[5] Tembec's expectation that the United States counter-signed the TLAs is memorialized in its October 6, 2006 letter to the Consolidation Tribunal before there was any indication from the United States that there may be a dispute about the terms of settlement or the efforts to recover fees.

[6] The Consolidation Tribunal never invited Tembec to make a submission on costs until September 22, 2006, when the Consolidation Tribunal apparently discovered that agreements had been reached with respect to the SLA.

[7] *See* E-mail from Elliot J. Feldman to Alexander Haas, (Oct. 11, 2006 5:18 P.M.) at Exhibit F of Tembec's Notice of Reinstatement (emphasis added).

The next day Mr. Feldman explained in another e-mail to Mr. Haas that "Our original suggestion [with the sentence taken directly from the Termination of Litigation Agreements] incorporates appropriate language from the Agreement without having to guess where in the Agreement it may be …."[8]

Counsel for the United States never responded that the United States had declined to sign the TLAs, that the TLAs were irrelevant, or that the TLAs were about to be eliminated via SLA amendments.  In fact, the United States never contradicted Tembec's understanding of its obligations in connection with the SLA settlement until *after* it had obtained Tembec's signature on the SCA on October 11; obtained Tembec's Stipulation to Dismissal of this case at 5:42 P.M. on October 12; amended the SLA to eliminate reference to the TLAs at 11:00 P.M. later that night; and filed the Stipulation of Dismissal at 11:17 P.M., which provided that dismissal was "subject to the Softwood Lumber Agreement of 2006."  Only on the next day, October 13, did the United States first express any disagreement with Tembec's understanding of the terms of settlement pursuant to the SLA.  The United States wrote to the Consolidation Tribunal arguing that Tembec had misled the Tribunal with respect to unseen SLA amendments reached between Canada and the United States just hours before the United States' October 13 letter to the Tribunal was filed. [9]

---

[8] *See* E-mail from Elliot J. Feldman to Alexander Haas, (Oct. 12, 2006 1:22 P.M.) at Exhibit F of Tembec's Notice of Reinstatement.

[9] The United States did not simply "inform[] the Consolidation Tribunal that the United States and Tembec had not agreed to forgo [*sic*] seeking costs against each other…." U.S. Opp. at 9.  It accused Tembec of attempting to mislead the Consolidation Tribunal with respect to whether there was an agreement to terminate the NAFTA Chapter 11 claim pursuant to the SLA, even though it is only the United States, and not Tembec, who could be responsible for including Tembec's NAFTA Chapter 11 claim as one of the "Covered Actions" in Annex 2A of the SLA.  *See* Letter from Andrea J. Menaker to Albert Jan van den Berg, *et al.*, (Oct. 13, 2006) ('Tembec's attempt to mislead the Tribunal by asserting that its claim was terminated pursuant to the Softwood Lumber Agreement, when that same claim was terminated nine

(continue)

The United States contends that Tembec's counsel signed the SCA knowing that the new document contradicted and replaced the TLAs Tembec's counsel previously had signed. According to the United States, because Tembec's counsel somehow must have had this knowledge, the United States did not need to disclose its intention to pursue costs and fees. The Government, thus, would have the Court believe that, notwithstanding what Tembec wrote to the Consolidation Tribunal on October 6, Tembec changed its mind five days later—for no additional consideration and without any explanation—and decided to withdraw its motion to vacate from this Court while knowingly exposing itself to a claim for costs and fees before the very Consolidation Tribunal that Tembec had alleged was biased and overreaching.

> B. The United States Withheld From Tembec That It Was Amending
> The SLA To Affect Materially Tembec's Termination Of Litigation

The United States expressly acknowledges that Tembec told U.S. counsel during negotiations of the Stipulation of Dismissal that Tembec did not know how the SLA might be amended. *See* U.S. Opp. at 8. The United States does not say in its Opposition that U.S. counsel responded by explaining how the SLA would be amended with respect to Tembec's commitments to terminate litigation, because the United States never offered any explanation. And the document given to Tembec to sign was labeled "Settlement of Claims Agreement," but nowhere indicated anything about "Annex 2A." At a minimum, the United States should have shared with Tembec that it was mere hours away from adopting the following SLA amendment:

---

(continued)
months earlier, should not be countenanced and, indeed, reinforces the United States' entitlement to costs.")

- 8 -

> **ARTICLE XI**
> Annex 2A of the SLA 2006 shall be deleted and replaced by the attached Annex 2A.

As stated in the U.S. Opposition, "Article XI of Amendment to the SLA substitutes the SCA for the TLA at Annex 2A." Opp. at 9. Yet, nowhere in its Opposition does the United States claim that it provided Tembec with copies of or any explanation of Article XI or any of the SLA Amendments it was negotiating with Canada that day. Tembec had no knowledge of Article XI, the United States knew Tembec had no knowledge of it, and the United States still withheld Article XI from Tembec. Now the United States relies on that amendment as the explanation for why the original SLA terms prohibiting recovery of costs and fees in Tembec's NAFTA Chapter 11 claim were not implemented.

The United States defends itself by saying that Mr. Haas did respond to Mr. Feldman, providing his view "that the 'stipulation was pursuant to the entire [Softwood Lumber] [A]greement and all the terms and conditions in its final form,'" and from this statement, the United States asserts that the Stipulation "was made subject to the terms and conditions of the SLA in its final form." Opp. at 8-9. The United States' Opposition refers to "final form," language that does not appear in the language of the Stipulation, to suggest that the Stipulation of Dismissal is subject to the terms of the SLA as it may be amended from time to time without Tembec's knowledge or consent.

Beyond its obvious unfairness to Tembec, there are problems with the U.S. interpretation of the Stipulation's terms. First, the SLA already was "final" when it was signed by the two governments on September 12, 2006. *See* "Backgrounder: The

Softwood Lumber Agreement Process," attached to News Release, September 12, 2006 (3:35 p.m. EDT) "Minister Emerson and U.S. Trade Representative Schwab Sign Softwood Lumber Agreement," ("Signature indicates that the two Parties have agreed to a final legal text of the Agreement.").[10]  On that day, at the ceremonial signing, U.S. Trade Representative Susan Schwab thanked Canadian Minister of International Trade David Emerson and Ambassador Michael Wilson "for their tremendous efforts in concluding this agreement."[11]  Thus, Tembec's agreement was subject to a final, concluded international agreement in existence at the time the Stipulation was executed.  The Stipulation makes no reference to any change in that agreement. The SLA to which the Stipulation of Dismissal refers is the final agreement of September 12, the only agreement of which both parties to the Stipulation were aware.

Another problem with the United States' construction is that the Stipulation of Dismissal never could be effective while it was subject to the "final" SLA because the SLA would be subject to future amendments as long as it was in existence.[12]  Thus, the reference to "final form" in Mr. Haas' e-mail cannot exonerate the United States for withholding Article XI from Tembec when the change it purportedly implemented materially altered the terms according to which Tembec believed it was signing the Stipulation of Dismissal.

---

[10] Available at: http://w01.international.gc.ca/minpub/Publication.aspx?isRedirect=True&publication_id=384359&language=E&docnumber=99, last visited December 1, 2006.

[11] See Remarks by U.S. Trade Representative Susan C. Schwab at the Signing of U.S.-Canada Agreement on Softwood Lumber Trade (Sept. 12, 2006), at http://www.ustr.gov/Document_Library/Transcripts/2006/September/Remarks_by_US_Trade_Representative_Susan_C_Schwab_at_the_Signing_of_US-Canada_Agreement_on_Softwood_Lumber_Trade.html, last visited December 1, 2006.  See also "U.S., Canada Agree On Changes To Final Lumber Deal Before Signing," *Inside U.S. Trade* (Sept. 15, 2006).

[12] See Article XIX of the SLA 2006 (Sept. 12, 2006) available at http://www.dfait-maeci.gc.ca/eicb/softwood/pdfs/SLA-en.pdf, last visited December 4, 2006.

Compounding the United States' material omission is the fact that the SCA that Tembec was given to sign was not labeled "Annex 2A." But, the SCA that the United States offered to the Consolidation Tribunal and to this Court as the true and correct copy is labeled "Annex 2A." *Compare* Exh. E of Tembec's Notice of Reinstatement with Exh. G of the U.S. Opposition, page 5. The document presented by the United States as the authentic SCA is different from the document actually signed by Tembec's counsel, and different in a material way that might have suggested at the time of signature that the SCA was intended to replace, not supplement, the TLAs signed by Tembec. This misrepresentation furthered the United States' efforts to withhold from Tembec until (i) after the stipulation language was obtained, (ii) the SLA was amended, and (iii) the stipulation was filed, the fact that the United States would not recognize the TLAs and its obligation not to seek costs and fees.

### C. The United States Waited To File The Stipulation Of Dismissal Until After The SLA Was Amended, Without Tembec's Knowledge Or Consent

The United States does not refute that it amended the SLA at approximately 11:00 P.M., hours after Tembec and the United States agreed to the terms of the Stipulation of Dismissal at 5:42 P.M., nor does it claim to have shared with Tembec in advance what those changes would be. By the United States' own factual account, the United States filed the stipulation "with the Court on October 12, 2006, shortly after the SLA came into force." Opp. at 9. According to the United States, the SLA Amendments were necessary for the SLA to enter into force. *See* Opp. at 6. The United States filed the joint Stipulation of Dismissal not at 6:00 P.M., "shortly after" it agreed to language with Tembec, but at 11:17 P.M., "shortly after" it amended the

SLA.[13]  Counsel for the United States waited five and a half hours to file a one-paragraph Stipulation of Dismissal, without attachments, so that the terms of the SLA could be changed, and the United States could construe "subject to the terms and conditions of the Softwood Lumber Agreement 2006" as applying to the new SLA Amendments that Tembec had never seen.

The United States gives no explanation for why it waited until October 13, 2006 to respond to Tembec's October 6, 2006 letter; why it declined to inform Tembec that the amendments it was considering with Canada were material to the meaning of the documents Tembec was asked to sign; or why the United States would treat Tembec differently from Canfor with respect to costs and fees (the third "consolidated" claimant, Terminal Forest Products, had made it known publicly that it was not withdrawing its Chapter 11 claims, which presumably contributed to the Parties' need to amend the conditions precedent for entry into force of the Softwood Lumber Agreement so that all litigation need not be terminated).  The facts suggest that the United States waited to respond because there was no colorable basis for the United States to seek costs and fees until it could claim that the TLAs had been supplanted, and because the United States knew it would not have obtained Tembec's agreement to the Stipulation of Dismissal or the SCA had Tembec known the United States' true intentions.[14]

---

[13] *See* Docket Entry #25, Notice of Electronic Filing ("The following transaction was received from Haas, Alexander entered on 10/12/2006 at 11:17 PM and filed on 10/12/2006").

[14]  Paragraph 5 of the SLA's original Annex 2A, which provided that "No Party to this Termination Agreement shall seek to hold any other party liable to pay its costs and expenses of litigation relating to the Covered Actions," applied to all twenty of the "Covered Actions" without distinction.  Thus, there was every reason for Tembec to believe that the "no costs" provision applicable to Canfor or anyone else settling their claims against the United States applied also to Tembec and its NAFTA Chapter 11 claim.

## II. THE UNITED STATES' MISCONDUCT WARRANTS RELIEF FROM THE STIPULATION OF DISMISSAL

The stipulation provides for dismissal "subject to the terms and conditions of the Softwood Lumber Agreement 2006." At 5:42 P.M. on October 12, when Tembec consented to this language in the stipulation, the Softwood Lumber Agreement 2006 was the *unamended final* SLA dated September 12, 2006. The United States' subsequent actions are inconsistent with the SLA as it existed at that time, justifying Tembec's Notice of Reinstatement on November 9, 2006. The Court should recognize that Notice and allow this case to proceed on the merits.

Should the Court determine that a formal Rule 60(b) ruling is necessary, the United States' misconduct satisfies the standard to grant Tembec relief from dismissal of this case. The evidence of the United States' misconduct is not only clear and convincing, *see Shepherd v. American Broadcasting Cos.,* 62 F.3d 1469, 1477 (D.C. Cir. 1995), it is largely unrebutted. The United States withheld information material to Tembec's consent to the joint Stipulation of Dismissal and manipulated the timing of filing the stipulation so the terms would be altered in a material, substantive way. The United States' misrepresentations and omissions are analogous to an adverse party's failure to disclose materials in discovery, which has been held to constitute "misconduct" under Rule 60(b)(3). *See Summers v. Howard University*, 374 F.3d 1188, 1193 (D.C. Cir. 2004) and cases cited therein.

Tembec has been prejudiced by the United States' misconduct. *See id.* (requiring demonstration of prejudice). Tembec could be exposed to a decision awarding to the United States costs and attorneys' fees by a tribunal that Tembec publicly has alleged was biased against it in favor of the United States. Moreover, it has

incurred the expenses and burden of defending against the United States' efforts to recover costs by having to file submissions to the Consolidation Tribunal and to this Court that never should have been necessary.

It was apparent from the United States' August 7, 2006 "Factual Notice" and its "Response to Petitioners' August 8, 2006 Submission" that the United States did not want this case to go forward on the merits. The United States has again, in its Opposition, misinterpreted the SLA's conditions for the termination of litigation, this time in an effort to ensure the finality of the dismissal in this case. The interests of finality in judgments are important, but in this case they are outweighed by the unseemly manner in which Tembec's Stipulation of Dismissal was obtained. The Court should not reward the United States for seeking finality through deceptive (or at minimum, recklessly unclear) communications used to obtain stipulated settlements.

### III.  THE UNITED STATES' OTHER DEFENSES OF ITS MISCONDUCT ARE "WITHOUT MERIT"

#### A.  Tembec Did Not Forfeit Its NAFTA Chapter 11 Claims Independently Of The SLA

The United States portrays Tembec's NAFTA Chapter 11 claim as forfeited when the Consolidation Tribunal terminated the arbitration proceedings with respect to Tembec, but that characterization is inaccurate. Tembec contested the authority of the Consolidation Tribunal from the moment it was constituted, and never forfeited its claim against the United States. Tembec considered the Consolidation Tribunal as lacking proper authority to decide Tembec's claim and brought this action asking the Court to affirm Tembec's position by vacating the Consolidation Tribunal's

September 7, 2005 order.[15]  Tembec asked the Consolidation Tribunal to terminate the proceedings with respect to Tembec, but expressly preserved its Chapter 11 claim. The United States opposed Tembec and expressly asked the Consolidation Tribunal either to deny Tembec's request for termination, or alternatively, to dismiss Tembec's NAFTA Chapter 11 claim with prejudice.  The Consolidation Tribunal denied the United States' request.  Thus, it cannot be said that Tembec's claim against the United States ceased to exist, let alone that Tembec relinquished that claim, when Tembec took the proper steps to vacate the Consolidation Tribunal's decision assuming consolidated jurisdiction.[16]

### B.  Tembec's SCA Signature Was Demanded Under Duress

Even were it possible for Tembec to intuit that the United States had not signed Tembec's TLAs and had rejected certain terms upon which it insisted in those documents; that the SLA would be amended to eliminate the TLAs; that the United States would rather continue the NAFTA Chapter 11 litigation to pursue costs and fees against Tembec but not any other party who settled its NAFTA Chapter 11 litigation; that the United States would contend both that Tembec's Chapter 11 claim was extinguished when its proceedings before the Consolidation Tribunal were terminated, but not extinguished for purposes of trying to allocate costs and fees; that the SCA would become Annex 2A of an amended SLA; and that the SCA was exhaustive with respect

---

[15] The United States characterized the NAFTA Chapter 11 claims of Tembec as "substantially identical" to the claims brought against it by Canfor and Terminal, but that conclusion was reached by a tribunal that Tembec has challenged here as biased in favor of the United States and improperly constituted. It is not for this Court to decide, but Tembec vigorously contests the characterization that the claims are "substantially identical" or even similar enough to warrant, on the merits, consolidation.

[16] State Department lawyers for the NAFTA Chapter 11 claims are co-counsel with the U.S. Attorney's Office. Their input would not be needed if the NAFTA Chapter 11 claims were extinguished as and when the United States contends.

- 15 -

to all of the "Covered Actions" in the SLA notwithstanding that the document presented to Tembec for signature was not so marked; Tembec was not given fair opportunity to reach all of those conclusions. The governments gave Tembec just a few hours (and entirely after close of business) to sign the SCA, and told Tembec's counsel that not a word in the document could be changed. Knowing that Tembec had endorsed the Softwood Lumber Agreement, the Government of Canada advised that the agreement would not go forward without counsel's immediate signature.

The United States downplays Tembec's letter accompanying the signed SCA by saying that it raised only "minor errors" and that it "did not raise any question as to why [Tembec's] NAFTA Chapter 11 claim was not included in the list of actions set forth in the SCA it *signed*." Opp. at 8 (emphasis in original). The point is that Tembec sent a letter saying that:

> [T]his document was presented to us in final form for signature today around 6:00 P.M. We have had virtually no time to study it, and do not understand why we were given no notice that it was being prepared and were not consulted at all about its contents.[17]

The SCA was signed under duress. Moreover, there was no apparent reason to think that Tembec's NAFTA Chapter 11 claims were still at issue because Tembec had received no objection to the TLAs that it signed and submitted some twenty-three days earlier.

The United States claims that the two governments agreed to amend the SLA, "modifying some of the conditions precedent in order to allow the SLA to enter into force by the new target date," and explains these apparently necessary amendments as the reason why "the previous TLA was replaced with a more limited 'Settlement of

---

[17] Exh. E of Tembec's Notice of Reinstatement.

Claims Agreement' ('SCA')." U.S. Opp. at 6. But these reasons, not previously disclosed, nor failure to mention that "the new target date" was November 1 and therefore still not justifying the rush and pressure on October 12, do not support any explanation for why Canada and the United States would change positions on whether costs and attorneys' fees could be sought in the NAFTA Chapter 11 arbitration, why Canfor and Tembec would be treated differently, or why such modifications had to be taken without Tembec's knowledge or consent even as they pertained to Tembec's legal rights. Had the two governments decided that the SLA's entry into force would be possible only if the termination of litigation were limited to a handful of cases, the United States should have conferred with the relevant parties to each of those cases about the terms of settlement.

### C. The United States' Criticisms Of Tembec's TLAs Do Not Justify The United States' Misconduct

The United States' critique of Tembec's TLAs, making its debut in the United States' November 22, 2006 Opposition, warrants only two points in reply. First, the United States complains that Tembec's counsel did not sign a document that, ethically, counsel could not sign. The two governments asked counsel to Tembec to sign one document on behalf of many different clients in many different actions. Although Tembec agreed to settle the "Covered Actions" identified in Annex 2A of the SLA, not all of the hundreds of Canadian companies involved with the multiple legal actions making up the *Softwood Lumber* dispute were equally prepared to have counsel sign such documents at that time, and industry associations who were asked to have TLAs signed required time to confer with members as to their positions with respect to

each separate action. Tembec's counsel ethically could not sign one document on behalf of all companies and associations in all matters.[18]

Instead, Tembec's counsel signed separate TLAs for Tembec with respect to each action in which it was involved. Tembec's counsel advised Canadian and U.S. officials of the ethical problem in writing, and received no reply.[19] Tembec's counsel proceeded to the best of its ability to satisfy ethically its fiduciary responsibilities to all clients in all matters. The United States held in its possession Tembec's TLAs beginning on September 20, and never disagreed or objected to Tembec's handling of those documents until the filing recently submitted to this Court.

Second, the "additional paragraph 2(d)" contained in Tembec's TLAs reflected an understanding between Tembec and the Government of Canada that Tembec would receive ninety percent of the funds Canada would owe Tembec (through the Export Development Canada facility) within sixty days of the SLA entering into force. Canada fulfilled that obligation by paying Tembec ahead of many other companies on the first day of refunds, October 30, 2006, just eighteen days after the SLA entered into force.[20] As that commitment did not affect the United States and was fulfilled by Canada, it cannot now be offered as justification for the United States' misconduct.

---

[18] Tembec's counsel acted *pro bono* on behalf of the Canadian-American Business Council, as an *amicus curiae,* in one of the actions. The document originally presented by Canada and the United States would have required counsel to agree to the termination of litigation, for which an *amicus curiae* has no standing. Tembec's counsel informed government authorities that it could not sign the document as written on behalf of the Canadian-American Business Council, and that consequently the document was defective. *See* Annex 2A of the SLA 2006 (Sept. 12, 2006) available at http://www.dfait-maeci.gc.ca/eicb/softwood/pdfs/SLA-en.pdf, last visited December 4, 2006.

[19] *See* Letter from Elliot J. Feldman to Meg Kinnear and James Mendenhall (Sept. 20, 2006) at U.S. Opp. at Exh. D.

[20] *See* Press Release, Tembec Inc., Tembec Receives US $242 million of its U.S. duty deposits through EDC (Oct. 30, 2006) available at http://www.tembec.com/public/Salle-de-presse/2006-10-30.html?Count=3&isRecent=true&search=all, last visited December 4, 2006.

The United States presented Tembec's counsel with a document to sign that the United States subsequently altered, and presented the altered document as "authentic" to this Court; knowingly withheld material information from Tembec's counsel, first in obtaining signature on the SCA, and then in obtaining a joint Stipulation of Dismissal; accused Tembec's counsel of misrepresentation to an international tribunal because Tembec's counsel presented the official, final documents in existence at the time of filing, and the United States subsequently replaced those documents based on amendments it entered secretly and without Tembec's knowledge or consent. Tembec dealt with the Governments of Canada and the United States transparently. The United States, for its part, treated Tembec with deception, misconduct sufficient for Rule 60(b).

## CONCLUSION

For the foregoing reasons, the Court should reinstate this case and allow Tembec's motion to vacate to proceed on the merits.

Respectfully submitted,

_____/s/_____
Elliot J. Feldman (D.C. Bar No. 418501)
Mark A. Cymrot (D.C. Bar No. 164673)
Michael S. Snarr (D.C. Bar No. 474719)
BAKER & HOSTETLER LLP
1050 Connecticut Ave. N.W.
Suite 1100
Washington D.C. 20036-5304
Tel: (202) 861-1679
Fax: (202) 861-1783
*Counsel for Petitioners*

Dated: December 4, 2006