1

```
                IN THE ARBITRATION UNDER CHAPTER 11
            OF THE NORTH AMERICAN FREE TRADE AGREEMENT
              AND UNDER THE UNCITRAL ARBITRATION RULES
                            BETWEEN

- - - - - - - - - - - - - - - - - x
                                  :
CANFOR CORPORATION; TERMINAL FOREST :
PRODUCTS LTD.; TEMBEC, et al.,      :

                                    :
           Claimant/Investors,      :
                                    :
         and                        :
                                    :
UNITED STATES OF AMERICA,           :
                                    :
           Respondent/Party.        :
                                    :
- - - - - - - - - - - - - - - - - x
```

                    Wednesday, January 31, 2007

                    The World Bank
                    818 H Street, N.W.
                    Conference Room MC 4-800
                    Washington, D.C.

          The hearing in the above-entitled matter

came on, pursuant to notice, at 9:45 a.m. before:

          ALBERT JAN van den BERG, President

          ARMAND de MESTRAL, Arbitrator

          DAVIS ROBINSON, Arbitrator

2

Also Present:

    GONZALO FLORES,
    Secretary to the Tribunal

Court Reporter:

    DAVID A. KASDAN, RDR-CRR
    B&B Reporters
    529 14th Street, S.E.
    Washington, D.C.  20003
    (202) 544-1903

3

APPEARANCES:

On behalf of the Claimant:

    ELLIOT J. FELDMAN
    MARK A. CYMROT
    MICHAEL SNARR
    Baker & Hostetler, L.L.P.
    Washington Square, Suite 1100
    1050 Connecticut Avenue, N.W.
    Washington, D.C.  20036-5304
    (202) 861-1500
    efeldman@bakerlaw.com

On behalf of Tembec:

    PAUL KRABBE

4

APPEARANCES: (Continued)

On behalf of the Respondent:

    MARK A. CLODFELTER
     Assistant Legal Adviser for International
     Claims and Investment Disputes
    ANDREA J. MENAKER
      Chief, NAFTA Arbitration Division,
      Office of International Claims and
      Investment Disputes
    RENEE GARDNER
    Office of the Legal Adviser
    U.S. Department of State
    Suite 203, South Building
    2430 E Street, N.W.
    Washington, D.C.  20037-2800
    (202) 776-8443
    jtoole@state.gov

    JEFFREY WEISS
    Assistant General Counsel
    Office of the U.S. Trade Representative
    600 17th Street, N.W.
    Washington, D.C.  20508
    (202) 395-4498
    jweiss@ustr.gov

5

# C O N T E N T S

OPENING STATEMENTS                          PAGE

ON BEHALF OF THE RESPONDENT:

  By Mr. Clodfelter                          9

   By Ms. Menaker                           20

   By Mr. Clodfelter                        47

ON BEHALF OF THE CLAIMANTS:

  By Mr. Feldman                            50

REBUTTAL ARGUMENTS

ON BEHALF OF THE RESPONDENT:

  By Ms. Menaker                           172

ON BEHALF OF THE CLAIMANTS:

  By Mr. Feldman                           177

6

09:17:25 1                    P R O C E E D I N G S

2              PRESIDENT van den BERG:  I open the hearing

3       in the consideration proceedings concerning the

4       issues of costs between the United States and Tembec.

5       I welcome everybody.  I think neither side needs

6       further introductions since they all are known to

7       each other.

8              As the Secretary of the Tribunal has told

9       you by phone, the schedule of today is that each side

10      has one hour to present its case, and then it will be

11      followed by questions of the Tribunal, after which

12      there will be a possibility for both sides to rebut.

13             We hope to be able, Mr. Feldman, to finish

14      at 1:30.  I think it may be earlier, but nonetheless

15      there may be questions, especially in view of the

16      findings of last night, and that raises for me

17      another question for both sides.

18             First of all, both sides have received the

19      filings by the other side being the answers to the

20      questions?  I see Mr. Feldman nodding.  I note for

21      the record that means "yes."

22             Mr. Clodfelter and Ms. Menaker?

7

09:45:31 1          MS. MENAKER:  Yes.

2          PRESIDENT van den BERG:  Then my next

3     question is:  Have both sides had sufficient

4     opportunity to study the answers by the other side?

5     Mr. Feldman?  And by the word "sufficient," I should

6     be clear, although it means that you are capable of

7     addressing them today here at the hearing.

8          MR. FELDMAN:  We will try to do so,

9     Mr. President.  I have not been through the

10    appendices, but through the questions.  So, if by

11    "sufficient" you meant a thorough reading of these

12    documents, I have not given them a thorough reading,

13    but I am prepared to try to address them.

14          PRESIDENT van den BERG:  And your side, too?

15          MR. CLODFELTER:  We had sufficient time to

16    review the answers proposed by Tembec overnight.  I

17    would just note that we were prepared to file on

18    Friday, as the Tribunal originally requested, so if

19    there is lack of opportunity to review, it is not our

20    responsibility for that.  And certainly we would

21    oppose any further delay in these proceedings after

22    today, Mr. President.

8

09:46:26 1          Thank you.

2          PRESIDENT van den BERG:  The only point I

3    would like to make is, because I am obviously aware

4    of the requirements of due process, if there are any

5    open points at the end of today's hearing for either

6    side, please raise that point and see how we can deal

7    with it, but I expect that we can deal with all the

8    points today.

9          So, to begin to actively close these

10   proceedings, we have already had, I think, a large

11   number of exchanges on this issue, which appears not

12   an issue so much about money, but more about

13   principles, if I may say so.  Then I think that since

14   the United States is the moving party, that the

15   United States starts with the presentation of its

16   case in this respect.

17         Before doing that I inquire of both sides,

18   are there any matters of a procedural or

19   organizational nature you would like to address at

20   this point in time?  Now I see Mr. Feldman nodding

21   no--or shaking his head, actually.

22         MR. FELDMAN:  No, Mr. President.

9

09:47:29 1          PRESIDENT van den BERG:  Thank you,

        2    Mr. Feldman.

        3          Mr. Clodfelter or Ms. Menaker, please begin

        4    your presentation.

        5          OPENING STATEMENT BY THE RESPONDENT

        6          MR. CLODFELTER:  Thank you, Mr. President.

        7          And I know everybody is familiar with

        8    everybody on each side, but for the record let me

        9    introduce myself:  Mark Clodfelter from the State

        10   Department, and to my left is Andrea Menaker, Chief

        11   of the NAFTA Arbitration Division of our office.

        12   Next to her is Renee Gardner, who is with our office.

        13   And finally, next to her is Jeff Weiss with the

        14   Office of the U.S. Trade Representative.

        15         We would like to keep our presentation brief

        16   this morning and to be available to answer your

        17   questions at the end of the presentations and answer

        18   any points in rebuttal.  I will begin by making a few

        19   remarks about our request itself.

        20         PRESIDENT van den BERG:  To be clear about

        21   this, the Tribunal envisages to pose the questions

        22   after the presentation of both sides.

10

09:48:18 1          MR. CLODFELTER:  Yes.

2          PRESIDENT van den BERG:  So that there's no

3 confusion about this.

4          MR. CLODFELTER:  That's right.

5          PRESIDENT van den BERG:  Unless there is a

6 very discrete point, of course, but we will restrain

7 ourselves.

8          MR. CLODFELTER:  Feel free, but we

9 understand.

10          After my remarks, Ms. Menaker will address

11 the arguments that Tembec is apparently making, that

12 in the 2006 Softwood Lumber Agreement, the United

13 States waived its claims for costs.  Then she will

14 address points that Tembec is apparently making in

15 the way of equitable arguments based upon allegations

16 of misconduct.  Then I will close with a few

17 concluding remarks.

18          First of all, let me just clarify and

19 describe again our cost claim.  As originally put to

20 you on April 7th last year, we sought $125,000

21 incurred in the course of Tembec's Chapter--I mean,

22 Article 1120 proceeding, plus $40,000, approximately,

11

09:49:12 1    representing one-third of the costs incurred by the

2    United States in the consolidation proceeding for a

3    total of 165,000 and odd dollars as that part of the

4    claim.

5            Consequently, we received a refund from

6    ICSID with respect to Tembec's Article 1120 Tribunal

7    reducing our claim for this portion of our request to

8    $104,000, approximately.  The exact figures are in

9    our submissions, of course.

10           We also claimed in our April 7th, 2006,

11    submission an unspecified portion of the $300,000

12    deposit requested by the Tribunal in December 2005.

13    Because we understand that a position of that was

14    allocated to future costs, but a future cost was

15    allocated to outstanding costs, and to the extent of

16    those outstanding costs, we would request a portion

17    of that as well.  And we would suggest one-third of

18    the portion allocated to outstanding as opposed to

19    future costs from that deposit.  So, our total

20    request now is for $104,008.20, plus one-third of the

21    previously obligated portion of the December 2005

22    deposit.

12

09:50:29  1           Let me turn now to the question of

2  jurisdiction.  The parties are agreed on two points

3  here.  First, to the extent that the Tribunal has

4  jurisdiction over Tembec's claims, it has

5  jurisdiction under the rules to grant the United

6  States's request for cost--since the issue of your

7  jurisdiction over--

8           (Pause.)

9           MR. CLODFELTER:  The point I was making is,

10  there are a couple of points on which the parties are

11  agreed.  One is to the extent that you had

12  jurisdiction over Tembec's Chapter Eleven claim, you

13  have jurisdiction to grant the United States's

14  request for costs.  And since that issue has been

15  disposed of in your decisions, there is no doubt on

16  this point.

17           And second, both parties agree that such an

18  award of costs would be consistent with Article 40(3)

19  of the UNCITRAL Rules.  Because the January 10th,

20  2006, Termination Order terminated proceedings with

21  respect to Tembec except for the question of costs,

22  your order on costs would constitute the order

13

09:52:34 1    finally terminating the proceedings on Tembec's

2    claims for purposes of Article 40(3), and the

3    Tribunal's award of costs would be part of the text

4    of that order as required by Article 40(3).

5         But the parties disagree on a number of

6    points of jurisdiction.  First, Tembec argues that

7    the United States and Canada agreed, as part of the

8    2006 Softwood Lumber Agreement, that the United

9    States would not seek costs with respect to Tembec's

10   Chapter Eleven claim.  Now, this is not correct, and

11   Ms. Menaker will explain exactly why there was no

12   such agreement.  I limit myself here to simply

13   pointing out that such a waiver of costs would not,

14   in any event, be a question of the Tribunal's

15   jurisdiction to award costs.

16        Second, Tembec argues that because Canada

17   appears to maintain that the Softwood Lumber

18   Agreement does contain such an agreement, there is a

19   dispute with respect to that agreement that is

20   subject to the exclusive jurisdiction of the dispute

21   resolution procedures of Article 14 of the Softwood

22   Lumber Agreement.  This assertion is also incorrect.

14

09:53:53 1    Contrary to Tembec's assertion, the second paragraph

2    of Article 14 of the Softwood Lumber Agreement does

3    not create exclusive jurisdiction.  Instead, by its

4    expressed terms, it merely provides that, "Neither

5    party shall initiate any litigation or dispute

6    settlement proceedings with respect to any matter

7    arising under the SLA 2006."

8            So, even if you could construe this issue as

9    a matter arising under the SLA, which we doubt, our

10    pursuit of our cost request cannot in any way be

11    considered the initiation of litigation, since it was

12    initiated long before the Softwood Lumber Agreement,

13    and therefore is clearly outside of the provisions'

14    limitation.

15            Let me give you a moment to look at the

16    language of Article 14.

17            (Pause.)

18            PRESIDENT van den BERG:  This one has not

19    been amended?

20            MR. CLODFELTER:  It was not amended.

21            We would submit that there is no issue of

22    jurisdiction on this matter.  So, let me turn to the

15

09:55:29 1    merits of our costs' request.

2            We believe that the United States is

3    entitled to its costs on two grounds:  First, Article

4    40(1) of the UNCITRAL Rules provides that, in

5    principle, the prevailing party should be awarded its

6    costs, and the United States is clearly the

7    prevailing party with respect to Tembec in these

8    proceedings.  As a result of Tembec's precipitate

9    withdrawal from the proceedings, the United States no

10   longer faces any prospect of an award against it on

11   Tembec's claims in these proceedings.  It is

12   difficult to conceive of circumstances that more

13   clearly constitute "prevailing."  It might be

14   considered a case as between the parties.  The United

15   States is the last man standing.

16           Moreover, the United States clearly

17   prevailed on the issue of consolidation, which was

18   the main focus of the parties' efforts before

19   Tembec's withdrawal.  But moreover, the Tribunal's

20   September 7th, 2005, consolidation decision had the

21   effect of rendering the Article 1120 panel in

22   Tembec's case functus officio, thereby depriving

16

09:56:51 1    Tembec of any form before which to pursue its Chapter

2    Eleven claims.  This effect was confirmed by your

3    Procedural Order Number 2 by which you informed

4    Canfor that the consolidation decision rendered its

5    Article 1120 Tribunal functus officio.  Therefore,

6    despite the fact that the Tribunal determined that it

7    had no jurisdiction to rule that Tembec's withdrawal

8    was with prejudice, the effect of the consolidation

9    order, together with the Termination Order, was the

10    same.  Thus, the United States is clearly the

11    prevailing party with respect to Tembec.  And under

12    Article 40(1), this entitles the United States to a

13    presumption in favor of its request.

14         And we disagree with Tembec that there are

15    considerations that should cause you to disregard

16    that presumption.  For example, while the Article

17    1126 procedures are relatively untried, there is

18    nothing novel at all in the test for consolidation

19    set forth in Article 1126(2); that is, whether there

20    are questions of law or fact in common, and what is a

21    fair and efficient resolution of claims.

22         And finally on this point, while costs of

17

09:58:15  1  legal representation do not expressly benefit from

2  the presumption of Article 40(1), we agree with the

3  Tribunal in the Thunderbird case which held that the

4  considerations applicable to attorneys' fees are in

5  no material respect different, so that the

6  presumption should, in effect, apply to the U.S. cost

7  claim in its entirety.

8          However, even if the United States were not

9  to be considered the prevailing party or if costs of

10  legal representation were not to be determined by

11  which party prevails, the Tribunal should still grant

12  the U.S. request under the circumstances of this

13  case.

14          After initiating arbitration against the

15  United States under the agreed-upon procedures of

16  Chapter Eleven, and after forcing the United States

17  to expend considerable resources defending that

18  claim, Tembec chose unilaterally to abandon these

19  proceedings simply because it did not like the

20  direction they were taking.  And by doing so, Tembec

21  rendered wasted the resources we had been forced to

22  expend.  In effect, Tembec compelled the United

18

09:59:31 1    States to waste resources for no reason.  Under any

2    system of law, this would be considered an abuse of

3    process.  An award of costs would certainly be an

4    appropriate sanction for such conduct.

5            Mr. President, we contend that nothing

6    Tembec has argued affects the merits of the U.S.

7    request in any respect, and therefore I would now

8    like to turn the floor over to Ms. Menaker, who will

9    explain why that is the case.

10            PRESIDENT van den BERG:  Before you do that,

11    before the second ground you just mentioned, it's

12    abuse of process.  You invoked it as a legal

13    proposition?

14            MR. CLODFELTER:  Well, not as a legal

15    proposition because the rules don't have a provision

16    for abuse of process, but certainly in your weighing

17    of the considerations of whether or not it would be

18    appropriate to apportion all of the costs to one

19    side, it is a factor that you should definitely weigh

20    strongly.

21            PRESIDENT van den BERG:  One of the

22    questions the Tribunal has at this point--I don't

19

10:00:41 1   know whether you or Ms. Menaker will address it--is

2   what is the legal basis for awarding costs against

3   the party which withdraws unilaterally from a case.

4   You know in a number of legal systems, national legal

5   systems, you can withdraw as a party from costs at a

6   certain stage in the proceedings only if you pay the

7   costs of the other side.  That is not in all legal

8   systems, that situation, but in a number of legal

9   systems that's the situation.  Otherwise, your claim

10   will not be considered withdrawn.  I don't know what

11   the situation in Canada or the United States is.  I

12   have not investigated this because I haven't answered

13   the parties.

14          I wonder whether there is a system rule, one

15   way or the other, which might also prevail under the

16   UNCITRAL Rules.

17          MR. CLODFELTER:  Mr. President, if I might

18   ask, that is exactly the principle that I'm citing,

19   but whether it's a matter of customary international

20   law or international law itself and therefore binding

21   upon the Tribunal is another matter.

22          Give me a moment.

20

10:01:49 1          PRESIDENT van den BERG:  Sure.

2          (Pause.)

3          MR. CLODFELTER:  I would add to remind the

4    Tribunal that the withdrawal made by Tembec was over

5    our objection, and at that point we cited the travaux

6    of the UNCITRAL Rules in support of this principle.

7          So, whether is it a matter of governing law

8    mandatorily applicable by this Tribunal, we are not

9    prepared to say, but we are certainly prepared to say

10   that this principle, which is commonly recognized in

11   municipal legal systems, should be applied by the

12   Tribunal in the latitude which the rules grant it to

13   consider the circumstances of the case.

14         PRESIDENT van den BERG:  Thank you.

15         MS. MENAKER:  Mr. President, Members of the

16   Tribunal, good morning.

17         This morning, my comments will fall into two

18   categories.  First, I will demonstrate that, as a

19   legal matter, the United States Government is not

20   precluded from seeking costs against Tembec in this

21   arbitration; and second, I will discuss why Tembec's

22   arguments that the Tribunal should deny the United

21

10:03:20  1  States's costs request, as a matter of equity, should

2  be denied.

3          As the Tribunal is aware, the United States

4  and Canada entered into the Softwood Lumber

5  Agreement, and that agreement contains an annex, the

6  Settlement of Claims Agreement.  It is clear by its

7  express terms that the Settlement of Claims Agreement

8  doesn't call for the termination of Tembec's NAFTA

9  Chapter Eleven arbitration; it did for Canfor's

10  claim, but Tembec's claim was not included in that

11  document.  And, in fact, as the Tribunal knows,

12  Tembec's claim was the subject of an order of a

13  termination that was entered months earlier.

14          Now, Tembec raises, I believe, two legal

15  arguments in response to our costs' request.  The

16  first is actually an argument that was put forth, I

17  believe, for the first time in the letter that Canada

18  submitted that Tembec attached as part of its earlier

19  submission and was also raised by one of the

20  Tribunal's questions where Canada seemed to

21  argue--and it is unclear to us whether Tembec is

22  adopting this argument, but that its NAFTA Chapter

22

10:04:32 1    Eleven claim was referred to in the Settlement of

2    Claims Agreement because the Settlement of Claims

3    Agreement refers to actions, and the consolidated

4    action is an action that is referred to in the SCA,

5    and this claim is without merit.

6         It is clear from the terms of the Settlement

7    of Claims Commission that it refers to the

8    consolidated action between Canfor Corporation versus

9    the United States of America; and Terminal Forest

10   Products, Limited, versus United States of America.

11   There is absolutely no reference to the action of

12   Tembec versus United States of America; and, in fact,

13   it is inconsistent for Tembec to argue otherwise.

14        If one looks at the Termination of

15   Litigation Agreement, the agreement that never

16   entered into force, there one will see a reference to

17   Tembec's NAFTA Chapter Eleven arbitration, and there

18   is also the same reference to the consolidated

19   action.  There would have been no need to list

20   Tembec's Chapter Eleven NAFTA arbitration separately

21   in the TLA were it consumed within the reference to

22   the consolidated action of Canfor and Terminal.

23

10:05:47 1    Clearly, it is not.

2              So, it is our view that there is no doubt

3    that the Settlement of Claims Agreement simply does

4    not dispose of Tembec's NAFTA Chapter Eleven

5    arbitration, and no reference to that arbitration is

6    made in that agreement.

7              As I mentioned, there was a reference to

8    Tembec's NAFTA Chapter Eleven arbitration in the

9    earlier Termination of Litigation Agreement, and that

10   was referenced in that document in error.  The

11   Termination of Litigation Agreement never entered

12   into force.  It has no legal effect whatsoever.  Its

13   lack of legal effect is not dependent upon the

14   amendment to the Softwood Lumber Agreement,

15   specifically Amendment XI, that stated that the

16   Settlement of Claims Agreement would replace the

17   Termination of Litigation Agreement.

18             The fact that it has no legal effect is

19   quite independent of that.  If one looks at the

20   Softwood Lumber Agreement, Article 2, Entry Into

21   Force, and subparagraph one, subparagraph A, it

22   states that the Termination of Litigation Agreement

24

10:07:00 1  in Annex 2A, it would--excuse me.  Let me back up a

2  minute.  It says that the SLA shall enter into force

3  upon an exchange of letters, that the TLA has been

4  signed by counsel on behalf of all represented

5  parties and participants to the actions set out in

6  the termination agreement.

7       It is uncontested that that Termination of

8  Litigation Agreement was never signed by all of its

9  parties.

10       PRESIDENT van den BERG:  Ms. Menaker, and

11  that's one of--because we have to--each side jumps

12  back and forth to the SLA 2006 and the amendments

13  2006 because that has been amended, hasn't it, in the

14  amendment, this provision?  I don't want to interrupt

15  your flow of argument, but simply we have to be

16  careful each time when we talk about SLA 2006,

17  whether a provision has been amended or not.

18       MS. MENAKER:  Yes.  I mean, it's been

19  amended by the provision that says that the SCA has

20  been signed by counsel on behalf of all parties, but

21  to the extent that anyone is arguing, and this

22  is--well, to the extent that anyone is arguing that

25

10:08:26 1   the TLA ever had any legal effect even before these

2   amendments came into force, it is clear on the face

3   of the earlier SLA that that TLA never had any legal

4   effect, irrespective of the later amendments, because

5   even pursuant to its--the SLA as it was originally

6   signed, it stated that the TLA would have to be

7   signed by all of the parties, and it never was.

8           PRESIDENT van den BERG:  We get now legal

9   "vagua" or "vagueums" in the second degree because

10  the TLA, according to your submission, never entered

11  into force because of a provision that also never

12  entered into force.

13          MS. MENAKER:  Yes, but the end result--and

14  the only reason we are, I guess, even getting into

15  this argument--is to respond to some arguments which

16  we think don't have any legal foundation whatsoever.

17  But I think quite apart from this Article in the SLA,

18  if one just looks at the TLA itself, it is clear that

19  that document is a document that has no legal import

20  whatsoever, and never had any legal import,

21  irrespective of the later-enacted SLA amendments

22  because that document, the TLA, was never executed by

26

10:09:42 1  all parties.  The United States never signed the TLA.

2          And Tembec never signed the TLA.  As you

3  will see in the September 20th letter that Tembec

4  sent to the United States and to Canada, it stated,

5  "We are not prepared to sign the TLA.  Some of our

6  clients are unwilling to sign on to the terms of the

7  agreement.  Other clients have agreed to sign on, but

8  they want to change some of the conditions and some

9  of the terms."  And so, what Mr. Feldman did is he

10  created other documents, different documents, for not

11  even each of his clients, for some of his clients,

12  and in those documents he changed some of the terms.

13  He added conditions to some of those documents, and

14  he signed them, and he sent them to the United

15  States.  At best, that could be considered a

16  counteroffer, a counteroffer that was never accepted

17  because the United States never signed any of those

18  documents.

19          So, there is no document that has any legal

20  force which states that Tembec's NAFTA Chapter Eleven

21  claim is being terminated pursuant to an agreement by

22  the parties, and that in exchange for that

27

10:10:54 1    termination, the parties have agreed to forego

2    seeking costs against one another.  There is simply

3    no document, no agreement, between the parties to

4    that effect.

5            So, in sum, there is no legal impediment to

6    the United States seeking costs in this arbitration,

7    as we have not waived our right to do so.  The

8    remainder of Tembec's arguments are all equitable

9    arguments, reasons why it believes this Tribunal,

10   notwithstanding the fact that there is no legal

11   impediment to our seeking costs, why the Tribunal

12   should nevertheless deny our request.

13           Tembec's arguments for the main part rest on

14   a charge that it was somehow misled into executing

15   the Settlement of Claims Agreement.  As an initial

16   matter, Tembec has made this charge before a U.S.

17   District Court in seeking relief from the Stipulation

18   of Dismissal that it entered into agreeing to

19   terminate the proceedings to set aside this

20   Tribunal's consolidation order.  In the unlikely

21   event that it succeeds in its arguments before the

22   U.S. District Court, it will be granted relief by

28

10:12:13 1   that court in the form of having its case reinstated;

2   that is, it will be let out of the commitments it

3   entered into in the SCA, which included the

4   commitment to terminate that District Court

5   proceeding.  But, in our view, that should not affect

6   our submission for costs, that issue, whether it was

7   misled into signing the SCA as before the court, but

8   that is an issue that we don't believe the Tribunal

9   here needs to decide.

10           But in any event, Tembec's allegations that

11   it was misled into signing the SCA or that that

12   somehow provides the reason for this Tribunal's

13   denying our request are without any merit whatsoever.

14           Put simply, it appears that Tembec may have

15   made a mistake.  It appears that Tembec, at least now

16   it is saying that it wanted the United States to

17   waive its right to seek costs in this arbitration,

18   and it wanted that to be part of the Softwood Lumber

19   Agreement, but there is simply no provision in the

20   Softwood Lumber Agreement or in the Settlement of

21   Claims Agreement to that effect.  We don't know why

22   Tembec made that mistake to the extent it did.  They

29

10:13:34 1  were involved in multiple lawsuits, different claims.

2  There were many different claims being settled in the

3  Softwood Lumber Agreement.  Maybe it was an

4  oversight.  We don't know.  We don't need to

5  speculate on that.  Perhaps it was, as they contend,

6  that they were not given enough time by the

7  Government of Canada to review the agreement, but

8  again, we weren't privy to those negotiations, so we

9  don't know.

10         But let me just make one thing clear.  And

11  this is, despite what you may have heard from Tembec,

12  it was not the United States's intention to hide

13  anything from Tembec.  The reference to Tembec's

14  NAFTA Chapter Eleven claim that appeared in the

15  Termination of Litigation Agreement was removed and

16  does not appear in the Settlement of Claims

17  Agreement, but it was plainly not there.  It wasn't

18  carried over, just as obligations of other parties to

19  terminate litigation was not carried over from one

20  agreement to the other agreement.  It, quite frankly,

21  never occurred to the United States that its absence

22  would not be noticed.  There was no trickery here.

30

10:14:40 1  It was not hidden.  It was plainly not among the

2  actions that were listed.

3       Tembec now seeks to rewrite the agreement,

4  but it has gained the benefits of the bargain that it

5  has struck.  It signed on to the Softwood Lumber

6  Agreement.  It signed on to the Settlement of Claims

7  Agreement.  Pursuant to those agreements, the

8  Department of Commerce revoked the duty orders and

9  instructed the United States Customs and Border

10  Protection to liquidate the entries of the duties

11  that it had collected.  As we saw in Tembec's

12  submission, Canada repaid Tembec right away.  In

13  fact, Tembec says it got repaid before many or maybe

14  all of the other importers.

15       And Tembec also gained the benefit of the

16  Settlement of Claims Agreement.  It, in fact,

17  benefited from the changes that were made between the

18  Termination of Litigation Agreement to the Settlement

19  of Claims Agreement.  Under the TLA, many more

20  actions would have been terminated.  Under the SCA,

21  those same actions either were not terminated at all

22  or were only made subject to an agreement among

31

10:15:50 1  Canada and the United States to jointly seek

2  dismissal of the actions, but that did not prevent

3  any private parties, including Tembec, from opposing

4  the dismissal of those actions, and Tembec, indeed,

5  took advantage of that change in the provision.

6           With respect to the CIT action, the action

7  pending before the Court of International Trade,

8  under the TLA, that action would have been

9  terminated.  Under the SCA, that action was just the

10  subject of a Joint Motion to Dismiss, and when the

11  United States moved to dismiss that action, Tembec

12  opposed that.  Tembec never went before that court

13  and said, "Wait, there is this Termination of

14  Litigation Agreement.  In fact, we signed on to that.

15  I created these other documents.  I believe they are

16  in force, and this has to be terminated."  No, it

17  took advantage of the new provisions in the

18  Settlement of Claims Agreement.  Now it wants the

19  benefits of the Softwood Lumber Agreement, it wants

20  the benefits of the Settlement of Claims Agreement,

21  and it wants to add a new provision to the Settlement

22  of Claims Agreement to which the United States never

32

10:17:01 1   agreed.

2         Now, Tembec essentially argues two things.

3   It argues first that even if legally it were not the

4   case, it believed that the Settlement of Claims

5   Agreement supplemented the Termination of Litigation

6   Agreement and did not merely replace the Termination

7   of Litigation Agreement; and second, it argues that

8   it signed the SCA under some sort of duress and,

9   thus, shouldn't be held by its terms.

10        As I mentioned before, there can be no doubt

11  that the TLA had no legal effect because it was never

12  executed, but Tembec's arguments rest on its supposed

13  misunderstanding that somehow the TLA had some sort

14  of legal effect, despite its never having been

15  executed, and despite Tembec's counsel's statement

16  that even some of his own clients weren't ready to

17  sign on to the TLA, but they say they still thought

18  that it had some legal effect, and they blame the

19  United States for not dispelling Tembec of that

20  notion.

21        But first and foremost, as we mentioned in

22  our submission, it was not the United States

10:18:27 1    Government's rule to explain the terms of the

2    agreement to Tembec.  The Softwood Lumber Agreement

3    is an agreement between two State parties.  It was

4    negotiated between the United States and Canada.  The

5    United States quite properly was looking out for the

6    interests of its constituents.  It was looking out

7    for its governmental interests and for the interests

8    of the U.S. industry.  Canada quite properly was

9    doing the same.  It was looking out for its

10    governmental interests and for the interests of the

11    Canadian Softwood Lumber industry.  The United States

12    was not negotiating with the Canadian companies and

13    vice versa.  Canada was not negotiating directly with

14    the United States industry.  It was not the United

15    States's role to explain the terms of the agreement

16    to Tembec or to any other Canadian private party.  If

17    there is any fault to be placed here, it clearly lies

18    with Tembec for not inquiring and discovering what

19    the terms of the agreement that it was signing were.

20          Now, the evidence shows that Tembec did in

21    fact discuss the Settlement of Claims Agreement with

22    Canada.  In its October 11th letter, Tembec cites two

34

10:19:46 1    reasons given by the government for rejecting its

2    request to make what it calls a very, very minor edit

3    to the Settlement of Claims Agreement.  In our view,

4    it's simply not credible to suggest that there were

5    detailed discussions concerning the wording of the

6    Settlement of Claims Agreement, and yet Canada,

7    Tembec's government, somehow concealed the very

8    purpose of the document from Tembec.

9           There were also E-mails between Tembec and

10   counsel for the Canadian Government, and you will see

11   last night in Tembec's submission there is an Exhibit

12   C, which is an exchange of E-mails between Jeanne

13   Anderson of Weil Gotschal, who is representing the

14   Canadian Government or Canada in the negotiations,

15   and Tembec, where she is sending Tembec the SCA for

16   its signature.  She repeatedly has an offer in there

17   saying, "Please call me if you have any questions

18   about this document," but there is no indication in

19   the record whether Tembec ever called and said,

20   "Well, what is this document?  What's the effect of

21   this document?  Remember the TLA that we talked about

22   months ago that I never signed but I actually created

35

10:21:04 1    other documents?  How do these work together?"  The

2    offer was there if he had questions.  No evidence

3    that he asked the right questions.

4         But we do know that Tembec knew that the SLA

5    was being amended, and this is in the E-mail exchange

6    between Alex Haas, who is U.S. Counsel at the

7    Department of Justice in the set-aside proceeding,

8    and Tembec when they negotiated the Stipulation of

9    Dismissal of that claim.

10        Now, in the E-mail, Mr. Feldman notes that

11   he knows that the Softwood Lumber Agreement is being

12   amended, but he doesn't know how.  Now, Mr. Feldman

13   is agreeing to terminate claims because of the

14   anticipated benefits that he and his clients--excuse

15   me--are going to receive pursuant to the Softwood

16   Lumber Agreement.  If the agreement itself is being

17   amended, it's, of course, in his interest to be sure

18   that the benefits that he is counting on are going to

19   still be in place.  So, again, it's not reasonable to

20   assume that the Canadian parties did not know the

21   nature of the amendments that were being made to the

22   agreement or that they did not inquire as to the

36

10:22:13 1    nature of those amendments.

2         And in fact yesterday, in yesterday's

3    submission, Tembec revealed for the first time that

4    he had some discussions with the Canadian so-called

5    "confidential source" who told him that it's possible

6    that the Settlement of Claims Agreement might replace

7    the TLA.  Now, even if we were inclined to give any

8    weight to this statement, there is no indication in

9    the record that Tembec then asked anyone, Canada or

10    the United States, for confirmation.  He states that

11    this Canadian source was unable to offer any

12    confirmation.

13         But there, if he had simply just asked

14    anybody, he would have been told that the SCA, of

15    course, was a replacement for the TLA.  This was not

16    a secret.  It was everybody's working assumption, and

17    there is no indication that he followed up, even when

18    given notice.

19         And if you're looking for the--

20         PRESIDENT van den BERG:  I'm looking for

21    something.  You mentioned, Ms. Menaker, that

22    yesterday for the first time this was revealed, but I

37

10:23:25 1  thought it was also revealed in a footnote in one of

2  the findings before the District Court.

3          MS. MENAKER:  We received that just about an

4  hour before the filing that was made to this

5  Tribunal.

6          PRESIDENT van den BERG:  So, it all happened

7  last night?

8          MS. MENAKER:  It all happened last night,

9  yes.

10          There is further evidence in the record that

11  shows that it would have been unreasonable for

12  anybody to believe that the SCA supplemented rather

13  than replaced the TLA.

14          First, apparently no one else was under this

15  misimpression.  Canada certainly was not under any

16  illusion that the TLA has any force or effect and

17  that the SCA wasn't a replacement for it.  Canfor had

18  no trouble in this regard, and we haven't heard from

19  any other party that had this misunderstanding.

20          PRESIDENT van den BERG:  To be more

21  specific, that's a question also I have, then, for

22  Mr. Feldman later.  In the letter of Canada of 14

38

10:24:32 1    December, in the last paragraph I think, Canada, at

2    least Ms. Lyon, uses the words "In short, the

3    replacement of the TLA with the SCA," so she uses the

4    words replacement, so perhaps you could address that

5    as well, whether that is also your position,

6    Mr. Feldman.

7         But I think that's what you were alluding to

8    when you were stating, well, that Canada had no

9    misunderstanding about this?

10        MS. MENAKER:  Yes.

11        PRESIDENT van den BERG:  Okay.

12        Please proceed.

13        MS. MENAKER:  And quite apart from the fact

14   that no other party was under this supposed

15   misimpression, the terms of the two documents are

16   utterly irreconcilable.  As I mentioned, under the

17   Termination of Litigation Agreement, all of the cases

18   that were referenced therein were to be terminated.

19   Under the Settlement of Claims Agreement, by

20   contrast, only a few of those same cases were to be

21   terminated.  Others were subject to a Joint Motion to

22   Dismiss by requests for dismissal by the United

39

10:25:32  1   States and Canada, and others were not to be

2   terminated at all.  They were treated differently.

3          So, how could one document supplement the

4   other when the same cases are treated differently

5   under the two documents?  Why would Canfor's case be

6   mentioned twice?  Canfor's case was mentioned in the

7   termination of litigation agreement.  It's also

8   mentioned in the SCA.  If the documents supplemented

9   one another, there would be no need to mention the

10  same cases twice.

11         And that's the case for Tembec's District

12  Court case, as well.  Tembec has put before this

13  Tribunal two of the documents which it created

14  fashioned on the TLA, one pertaining to their Chapter

15  Eleven claim, and the other pertaining to the

16  District Court claim, both of which it signed, and it

17  says that it somehow believed that those documents

18  had force and effect notwithstanding that the United

19  States hasn't countersigned them, but if it really

20  thought that, then why didn't it question the

21  inclusion of its District Court case in the SCA?

22  That would have been superfluous.  It would have

40

10:26:45 1    already been terminated pursuant to the TLA document

2    which Mr. Feldman created and signed.

3         And as we mentioned in our written

4    submission, the treatment of the liquidation of the

5    entries were treated differently because of the

6    injunction that was in place.  So, under both the TLA

7    and the SCA, that was a different provision which was

8    quite important.

9         There is also, as I mentioned earlier,

10   Tembec's statements before the Court of International

11   Trade.  As we mentioned in our written submission, on

12   October 5th, Tembec filed an opposition to our

13   request for a stay of those proceedings, noting that

14   the settlement, any settlement, was not imminent.  It

15   did not provide the CIT with copies of its TLA

16   document that purported to dismiss that case or to

17   terminate that action.  The next day it wrote to this

18   Tribunal, submitting its TLA document claiming that

19   the parties had agreed to terminate this action,

20   relying on that same set of documents.

21        Now, in its latest submission, Tembec tries

22   to explain away its October 5th action by stating

41

10:28:04 1    events had occurred between October 5th and 6th which

2    gave it a different sense of the imminency of the

3    Softwood Lumber Agreement.  Even if that were the

4    case, however, Tembec never sought to dispel the

5    notion that it set before the CIT.  It never then

6    went back to the CIT and said, although yesterday we

7    thought a settlement wasn't imminent, today it looks

8    imminent, and let my give you this document that we

9    signed terminating this action.

10           And it had an opportunity to do that because

11    the day after the Softwood Lumber Agreement actually

12    did come into effect so there was no doubt in

13    anybody's mind that the settlement--it was not only

14    imminent, it had happened.  The CIT issued a

15    judgment, and the United States sought to vacate that

16    judgment on the grounds of mootness, arguing that the

17    Softwood Lumber Agreement should have disposed of the

18    case.

19           On November 21st, Tembec filed an opposition

20    to the United States's motion again, never mentioning

21    the TLA document that it had signed that, in its

22    view, purportedly terminated that action.

42

10:29:16  1          And finally, in its October 11th letter,

2  when it returned to the signed SCA, it complained

3  about an inconsistency between a paragraph in the SCA

4  and a paragraph in the earlier TLA that had covered

5  the same matter.  It argued that it preferred the

6  language that had appeared in the TLA and that the

7  SCA should have been modified to read the same way.

8  If, indeed, the documents supplemented one another,

9  Tembec would not have been making this argument.  In

10  fact, it would have led to quite an interpretive

11  difficulty had the same matter been treated

12  differently under the two documents, but this was

13  never noted by Tembec.  It's clear, in our view, from

14  that communication that Tembec knew that the SCA was

15  going to replace the TLA.

16          In sum, no reasonable person would have

17  thought that the SCA was supplemental to the TLA.  No

18  sophisticated counsel certainly would have thought

19  so.  Tembec had plenty of opportunities to ask the

20  simple question, what is this document you are asking

21  me to sign?  How does this interact with the TLA?  It

22  appears that it was actually on express notice that

43

10:30:28 1   the SCA might replace the TLA, according to this

2   confidential source, but we have no indication that

3   Tembec ever asked that express question.

4           Certainly, blame for that cannot be placed

5   at the United States's feet.  The United States, once

6   again, did not negotiate this agreement with Tembec,

7   and had no obligation to ensure that Tembec

8   understood the agreement and all of its terms.

9           Now, let me briefly just respond to Tembec's

10   arguments regarding duress.

11           Tembec seems to suggest that it wasn't given

12   enough time to review the documents, and so therefore

13   it signed the SCA under duress.  And it stated in

14   yesterday's submission that perhaps if it had had

15   more time to review, it would have come to the same

16   conclusion regarding the interpretation of the

17   documents.  But again, who gave Tembec the documents

18   to sign?  It was Canada.  It was Canada's counsel.

19   The E-mails show this.

20           So, in essence, Tembec is arguing that

21   Canada coerced it into signing the SCA, that it

22   signed under duress, duress that was imposed by

44

10:31:41  1  Canada.

2          Now, Tembec is using Canada's letter before

3  this Tribunal, but before the District Court it

4  alleges that the United States and Canada both misled

5  it into signing the SCA, and it alleges that both

6  governments pulled a bait and switch.  Yet now it

7  blames the United States and wants to rewrite the

8  agreement vis-à-vis the United States.  But this is

9  simply not a case of duress.  This was a case, again,

10  of highly sophisticated parties negotiating and

11  signing on to a complex agreement with billions of

12  dollars at stake.  If Tembec did not want the benefit

13  of the agreement, it didn't have to sign it.

14  Terminal Forest Products didn't sign it.  Domtar

15  didn't sign it.  There wasn't any duress here.  They

16  received the benefit of the agreement, and the United

17  States should not be forced, and now they basically

18  want the benefit of an agreement which wasn't struck,

19  which should not be imposed on the United States.

20          Finally, let me close by just responding to

21  one issue that was raised in the letter submitted by

22  Canada, or one of Canada's negotiators, I should say.

45

10:33:01  1    And I want to respond to an argument that seems

2    present throughout the letter, which is that our

3    request for costs somehow goes against the nature or

4    the very spirit of the agreement, which was to put an

5    end to all of this litigation concerning the Softwood

6    Lumber matters.

7            Unfortunately, the agreement did not do

8    that.  What we all would have liked it to do that, it

9    simply didn't, and Canada knows as well as the United

10   States that the Softwood Lumber Agreement didn't put

11   an end to all of the litigation.  It was really the

12   very reason why the Termination of Litigation

13   Agreement never came into force because Canada

14   couldn't get the Canadian private parties to agree to

15   terminate all of the litigation.  The United States

16   is still litigating many of the cases concerning the

17   Softwood Lumber dispute.

18           We have sought to dismiss various suits on

19   the grounds of mootness, and we have been challenged

20   by Canadian private parties when we have done so.  It

21   is also wrong to say that the agreement put an end to

22   all Chapter Eleven litigation and arbitration.  As

46

10:34:11 1  this Tribunal knows with respect to the Chapter

2  Eleven claims, the Settlement of Claims Agreement

3  applied only to Canfor's claim.  Pursuant to the

4  Softwood Lumber Agreement, Terminal's suit would have

5  continued.  But for recent events, Terminal Forest

6  Products's arbitration would have been before this

7  Tribunal, and it did not address Tembec's claim at

8  all.  Nor did it address other Softwood Lumber

9  companies, and I mentioned one, Domtar, that chose

10  not to sign on to the agreement.

11         Domtar, as we've mentioned, filed a Notice

12  of Intent to initiate a Chapter Eleven claim against

13  the United States based upon the same exact actions

14  that are the subject of Canfor's terminals and

15  Tembec's claims.  They filed this the day before the

16  Softwood Lumber Agreement went into effect.  So, it

17  is clear that there is, unfortunately, no larger

18  mutual understanding that there is to be no more

19  Softwood Lumber litigation or arbitration.  The only

20  understanding is that which is contained in the

21  agreement itself, and as I've stated, there are no

22  legal grounds precluding us from pursuing costs in

47

10:35:16 1   this proceeding, nor any equitable grounds to do so.

2           Thank you.

3           PRESIDENT van den BERG:  Mr. Clodfelter?

4           MR. CLODFELTER:  Mr. President, I will make

5   some brief closing remarks.

6           Now, Tembec alleges that the United States

7   is pursuing its cost request as retribution for its

8   efforts to challenge your consolidation decision.

9   First, of course, our motivation in doing so is not

10  relevant to the issue before you, but we cannot allow

11  such an allegation go unanswered.

12          Tembec is incorrect.  No one would be

13  happier than us to see these proceedings end once and

14  for all.  From the very beginning of Tembec's claim,

15  we have witnessed one accusation of personal

16  misconduct after another.  Indeed, it appears that

17  Tembec's automatic response to every setback it

18  encounters is to blame it on the unethical conduct of

19  others.  Our only consolation is that these reckless

20  accusations have been made not only against us, but

21  against our colleagues in the Justice Department and

22  the Office of the U.S. Trade Representative, against

48

10:36:30   1   the ICSID Secretariat, against a member of this

2   Tribunal, indeed, the Tribunal as a whole, and most

3   recently against the Government of Canada.

4            So, we are in good company, but it doesn't

5   make this any more pleasant.  We do not seek to

6   prolong this unpleasantness.  We are pursuing our

7   costs request because it is our responsibility to do

8   so.  We don't have authority to unilaterally

9   relinquish meritorious claims of the United States

10   Government as a matter of grace or as a gesture.  We

11   cannot do so without appropriate consideration in the

12   contract sense.

13            We dropped our cost claim against Canfor

14   because the Canadian Government provided that

15   consideration in arranging for Canfor's agreement to

16   permanently drop its Chapter Eleven claim against us

17   in the Settlement of Claims Agreement as part of the

18   TLA.

19            We dropped our cost claim against Terminal

20   Forest Products because that consideration was

21   provided by Terminal Forest in its agreement apart

22   from the TLA to permanently drop its Chapter Eleven

49

10:37:34 1   claim against us.  And, indeed, we waived any cost

2   claim we might have against Tembec in the District

3   Court case seeking to set aside the consolidation

4   decision because, as part of the SLA, Canada arranged

5   for Tembec to agree to drop that case.

6         Such consideration is absent here, and we

7   therefore have no choice but to continue our request

8   for costs from this Tribunal.  That said, let me

9   offer one last point.  It may well be that we will

10   confront similar behavior that we have experienced

11   here in the future.  In the course of executing your

12   more immediate duty of resolving the specific claims

13   before you, it would certainly not be remiss to also

14   carry out a more general duty of arbitral tribunals:

15   to protect the institution of arbitration itself.  We

16   submit that an award of costs in this case may well

17   serve that purpose as well.

18         And that's the end of our opening

19   presentation, Mr. President.

20         PRESIDENT van den BERG:  I suggest we break

21   for personal care, and also I think the Court

22   Reporter needs one.

50

10:39:01 1          (Brief recess.)

2          PRESIDENT van den BERG:  Mr. Feldman, please

3   proceed with your opening.

4      OPENING STATEMENT BY COUNSEL FOR CLAIMANTS

5          MR. FELDMAN:  Thank you, Mr. President,

6   Members of the Tribunal.

7          For the record, I'm Elliott Feldman of Baker

8   & Hostetler.  I'm counsel for Tembec, and I'm

9   accompanied from my office by Mark Cymrot, to my

10  right, Mike Snarr, and Paul Krabbe from Tembec.

11         There seems to have been no ambiguity that

12  Canada and the United States intended in the Softwood

13  Lumber Agreement to bring about the termination of

14  all litigation.  That is clear in the April 26 basic

15  terms, and it's clear through all the documents that

16  surfaced in the course of the negotiations, and that

17  a condition applicable to every case named by the two

18  governments, including Tembec's Chapter Eleven claim,

19  was for each case to be terminated with parties

20  bearing their own costs and fees.  There was never

21  any ambiguity about this intention of the two

22  parties.

51

10:51:03 1   The outstanding Chapter Eleven claims of

2 Canfor, Terminal, and Tembec presented a particular

3 problem for the governments because none would be

4 rendered moot by revocation of the antidumping and

5 countervailing duty orders.  Consequently they got

6 special attention to be terminated.

7   It is very important to remember that

8 Chapter Eleven claims and Tembec's action in U.S.

9 District Court, which, it is essential to understand,

10 expressly was preserving Tembec's Chapter Eleven

11 claim.  It cannot be distinguished from it.  The

12 Chapter Eleven claim exists only in the context of

13 the U.S. District Court action, and the U.S. District

14 Court action, which Mr. Clodfelter hardly ever

15 mentioned, and we wondered whether it was ever going

16 to be mentioned at all, is, indeed, a fundamental

17 subject of the SCA, and it is Tembec's Chapter Eleven

18 claim.  But the Chapter Eleven claims and that U.S.

19 District Court action had nothing to do with

20 countervailing duty and antidumping orders and

21 presented no obstacle of any kind to their

22 revocation.

52

10:52:05 1          The perceived necessity to terminate them

2    could be nothing more than a demand of the United

3    States.  They were not an obstacle to revocation of

4    the orders; and, indeed, revocation of the orders

5    would lawfully permit them to survive, unless some

6    other arrangements were made to extinguish them.

7          The United States's answer to the Tribunal's

8    question 13(b) is thus, at best, disingenuous.  The

9    United States says it selected those claims for the

10   SCA because, "The two governments generally sought to

11   remove cases from Annex 2A that did not need to be

12   terminated in order to bring the SLA into force."

13          If you want to find it, or shall I go on?

14          PRESIDENT van den BERG:  Continue.

15          MR. FELDMAN:  Okay.

16          Of all the cases not needed to be terminated

17   in order to bring the SLA into force, except for

18   whatever reasons the United States may have had apart

19   from revocation of the orders, the leading cases

20   referred to Chapter Eleven claims.  They turned out

21   to be the only ones requiring new signatures in the

22   SCA.  None of the Chapter Eleven petitioners--Canfor,

53

10:53:19 1    Terminal, or Tembec--would have considered abandoning

2    their claims without assurance that they would not be

3    pursued after termination for costs and fees.

4    Termination of litigation was, at least in the minds

5    of the Canadian and U.S. negotiators as articulated

6    in numerous public statements, meant to be

7    termination.  Cases were to end.

8         Now, Ms. Menaker has emphasized that the

9    cases didn't end, and there is litigation continuing.

10    It is also useful to remember that the reason cases

11    are continuing is because the United States is

12    seeking to vacate adverse decisions in the U.S.

13    courts or to terminate in such a way as to erase

14    adverse decisions that occurred in NAFTA panels.

15    Otherwise, the litigation would be over.  The

16    continuation of these cases is a U.S. effort to erase

17    the legal record prior to the agreement in the SLA.

18         The United States and Canada found, when

19    they sought to terminate under the terms of the

20    Termination of Litigation Agreement, that they could

21    not force all private parties to give up all claims.

22    Now, this was presented to you this morning as

54

10:54:23  1    exclusively a Canadian problem, but the most

2    prominent case was the United States Coalition for

3    Fair Lumber Imports that had brought an institutional

4    challenge against Chapter 19 of NAFTA, and the

5    Coalition said it would not give up its case, and it

6    didn't, and it pursued the case after the SLA was

7    signed.

8            But the governments mutually pledged to seek

9    definitive termination in all instances, and so the

10   SCA says we will seek dismissals.  All the Canadian

11   companies pursuing Chapter Eleven claims, including

12   Tembec, had received assurance that termination would

13   mean the end of all proceedings.  Yet, here we are,

14   the United States having prolonged proceedings

15   against Tembec already for months.

16           The United States contends here that in

17   effect it successfully tricked Tembec into abandoning

18   its claim while leaving Tembec fully exposed to

19   further proceedings.  And the explanation offered

20   this morning is that we are unsophisticated counsel,

21   and I'm perfectly prepared to accept that suggestion,

22   but it won't explain, in fact, what happened.

55

10:55:33  1          PRESIDENT van den BERG:  But in other

           2  instances you were referred to, as other counsel were

           3  referred, as highly sophisticated counsel, so I think

           4  that cancels each other out, so you remain

           5  sophisticated counsel.

           6          MR. FELDMAN:  Okay.  Thank you,

           7  Mr. President.

           8          To further proceedings in which only the

           9  United States could win because it would be seeking

          10  costs and fees from Tembec.  The Government of

          11  Canada, however, says it was never its understanding

          12  and never its intent that October 12 amendments to

          13  the SLA of September 12 meant that Tembec would be

          14  singled out, the only company in all of Canada, of

          15  the hundreds involved in litigation, that would be

          16  pursued after terminating its claims for costs and

          17  for fees.  There was obviously, given the Canadian

          18  explanation and the U.S. position articulated today

          19  and in submitted papers, no meeting of the minds in

          20  this regard.  Should this Tribunal elect to arbitrate

          21  that disagreement, it could be arbitrating the

          22  validity of the SLA.

56

10:56:32 1          The Government of Canada has provided both

2    its understanding of the SLA negotiations and its

3    interpretation of the SLA itself.  Article 14(2)

4    mentioned by Mr. Clodfelter of the SLA assigns

5    exclusively to the SLA's own internal dispute

6    resolution mechanism authority to address

7    disagreements between parties over matters arising

8    from the SLA.  And Mr. Clodfelter's argument is that

9    the word "initiate" somehow insulates this

10    proceeding, but we would then be engaged in a

11    considerable debate about the meaning and

12    applicability of the word "initiate."  When was the

13    cost-and-fee question initiated?  In the course of

14    the negotiations to settle?  By the September 22nd

15    order of this Tribunal requesting a submission by

16    Tembec, which was after signature by the two

17    sovereigns?  When would it be initiated?

18          The interpretation of the agreement is

19    otherwise exclusively in the hands of the parties in

20    the agreement within the terms of the agreement

21    itself.  This matter, whether United States can claim

22    costs and fees from Tembec, arises from the SLA,

57

10:57:40 1  specifically the Settlement of Claims Agreement that

2  amended the SLA, and the intent of the parties

3  clearly expressed in the Termination of Litigation

4  Agreement.

5          Consequently, this Tribunal has no

6  jurisdiction to settle this question.  The United

7  States must, if it chooses, take its theory that it

8  retained the right to seek costs and fees from

9  Tembec, exclusively Tembec, of all companies in

10  Canada to SLA dispute resolution.  It's in the wrong

11  forum here.

12          The SLA was signed as a final and

13  unchangeable document as declared by the parties on

14  September 12.  The parties said nothing in the

15  document could be changed.  On September 20,

16  conforming with the provisions of the SLA and with

17  the instructions and deadlines of the parties, Tembec

18  signed documents promising upon entry into force of

19  the SLA to give up its Chapter Eleven claims.

20          Now, the United States now says that was an

21  error, that it never should have been there, but they

22  never said it was an error until the last few days.

58

10:58:39 1    It wasn't an error when Tembec provided the United

2    States with its signature on September 20th.

3         The United States insisted it never talked

4    to Tembec--that's true--but it's not as if Tembec

5    were absent from the proceedings.  They required, the

6    United States required, Tembec's signatures.  They

7    required Tembec to submit documents to the United

8    States, not just to Canada.  Tembec submitted its

9    Termination of Litigation Agreement, which would

10   terminate its Chapter Eleven claim upon entry into

11   force of the SLA, to the United States on the 20th of

12   September, and the United States received Tembec's

13   pleading on October 6 to this Tribunal stating its

14   understanding, the understanding, the only possible

15   understanding, the only document that existed was the

16   Termination of Litigation Agreement on the 6th of

17   October, and that's what was presented to this

18   Tribunal.

19        On the 13th of October, the United States

20   turned around and said we had misled you, we'd made a

21   misrepresentation, we'd given you the wrong document;

22   that somehow we should have given you on the 6th of

59

10:59:41 1    October a document that wasn't created until the

2    12th.

3            And we gave you the documents on the express

4    understanding of the governments that they were the

5    final documents, that we were addressing the final

6    agreement as signed by the parties on the 12th of

7    September.  If there was some objection or question

8    about the amendment that was immaterial for the

9    United States on the Tembec submission as to Chapter

10    Eleven, why did the United States not say so?  It

11    collected signatures from everyone, and never said

12    who sent them in and who didn't.

13            A question has been raised:  Why was Canfor

14    expressly addressed in its Chapter Eleven claim the

15    SCA and not Tembec?  Well, first, we think that

16    Tembec's Chapter Eleven claim was expressly addressed

17    in the SCA because it's expressly addressed in the

18    District Court case.

19            But why is Canfor addressed otherwise?  It

20    is now our understanding that Canfor never submitted,

21    never signed a Termination of Litigation Agreement.

22            And why would we think that that was

60

11:00:42 1   pertinent or had some effect?  Because on

2   October 10th, when counsel for the United States did

3   contact Tembec seeking a Joint Stipulation of

4   Dismissal of the District Court case, Mr. Haas

5   approached us saying, we understand that your client

6   is prepared to dismiss this case.  The only document

7   we know of that indicated that was the signed

8   Termination of Litigation Agreement signed by Tembec

9   and delivered to the United States on the 20th of

10  September.  On the 10th of October, there was no

11  Settlement of Claims Agreement.

12          So, when Mr. Haas approached us on behalf of

13  the United States, he did so relying on, as far as we

14  understood, the Termination of Litigation Agreement.

15  Maybe it never had a final effect, but it certainly

16  seemed to be the expression of the intent of the

17  parties at the time, enough for counsel for the

18  United States approaching Tembec to rely on it.

19          A specific condition of the documents that

20  were in play at that time was that each party would

21  bear its own costs and fees.  Those documents were

22  part of an international agreement reached between

61

11:01:48 1    two sovereigns.

2              Now, we don't know why the Tribunal elected

3    on the 22nd of September to become involved with that

4    international agreement, to interpret it in some way,

5    potentially to interfere with it.

6              PRESIDENT van den BERG:  If I may get the

7    record straight on that point, Mr. Feldman, the

8    intent of the Tribunal to take action on the question

9    of cost was raised much earlier; only there was a

10    problem, a letter that had been sent out but had not

11    reached you because of a technical mishap already in

12    the beginning of September, so I would like to get

13    the record straight on that one.  The 22nd of

14    September turned out to be the date that Mr. Flores,

15    Secretary of the Tribunal, returned from his

16    holidays, and then discovered that for miracle of

17    miracle, your side was the only one who hadn't

18    received it.  I will not repeat here the language

19    that Mr. Flores has used to which the person was

20    responsible for sending, but it was absolutely a

21    wholly innocent, technical mishap at that point in

22    time, which I directed, as President of the Tribunal,

62

11:02:51   1   to rectify immediately, but it was much earlier

2   already to be sent the letter.  And I think the

3   United States can testify that they received earlier

4   a letter to that effect which we had simply to resend

5   to all of them again.

6       So, it might, in your view, create some

7   coincidences, but the coincidences are completely on

8   another level.

9       MR. FELDMAN:  We very much appreciate the

10   clarification, Mr. President.  As I do recall, your

11   letter did make reference to the international

12   agreement, and that it was on the 22nd of September,

13   and that you were making the solicitation of Tembec's

14   view in light of the international agreement.

15       PRESIDENT van den BERG:  That's correct, but

16   we have referred to the press reports.  We did not

17   make a reference to the 12 September because the

18   first September was prior to the 12th of September

19   when apparently that this SLA was being signed.  So,

20   it was something, and really you can take that as a

21   representation, if I may make a representation at

22   this point, and that it was before that, and we based

63

11:03:53  1   that on the press reports.

2          MR. FELDMAN:  Thank you, Mr. President.

3          PRESIDENT van den BERG:  And we simply

4   wanted to wrap up the case.

5          MR. FELDMAN:  The international agreement,

6   however, concerns the settlement of disputes,

7   including effectively this one between Tembec and the

8   United States, and consequently it's now beyond the

9   Tribunal's jurisdiction.

10          The U.S. premise for pursuing costs and fees

11   is that the United States asserts it is the

12   prevailing party in these proceedings.  But what did

13   the United States win against Tembec?  It won only a

14   decision, still contested, to form this Tribunal and

15   substitute it for two other Tribunals that were

16   formed incontestably.  Whether this Tribunal has

17   convened legitimately at all remains contested in

18   U.S. court.  Tembec was prepared to give up that

19   contest for the sake of the SLA.  Indeed, it made

20   that commitment.  It made that commitment in the TLA,

21   it made that commitment in the SCA, and the

22   withdrawal, therefore, of the Chapter Eleven claim

64

11:04:53 1    embedded in the U.S. District Court action.

2        But the United States preferred asserting a

3    still further claim against Tembec.  But for the U.S.

4    action, the challenge to the legitimacy and authority

5    of this Tribunal would now be over because the

6    challenge in the U.S. District Court would have

7    dissolved.

8        After the contested consolidation, the

9    United States really has nothing.  It didn't prevail

10    over Tembec on jurisdiction, nor on the merits of

11    Tembec's claim.  Indeed, to the contrary, the United

12    States, as it has stated here, vigorously opposed

13    Tembec's request to be dismissed from the proceedings

14    before this Tribunal, a contest the United States

15    lost.  The United States demanded that the dismissal

16    be with prejudice but was unable to cite any

17    authority, and the United States lost again.

18        So, how could the United States be awarded

19    costs and fees as a prevailing party?  Should this

20    Tribunal err again and decide to allocate costs and

21    fees, it should award costs and fees to Tembec.  The

22    United States, unlike Tembec, does recognize the

65

11:05:54  1  authority of the Tribunal fully for this purpose.

 2  Therefore, it should accept the Tribunal's decision

 3  to award costs and fees to Tembec for the proceedings

 4  that began with this Tribunal's September 22nd

 5  notice.  It was the United States that wanted that

 6  issue pursued.  It was the United States that

 7  rejected Tembec's simple response on October 6, but

 8  not until after it had amended the agreement so that

 9  it let the time pass from October 6 to October 13th,

10  and leaving Tembec to believe, as it had believed all

11  along, that it had signed a commitment which would

12  have terminated this proceeding and the District

13  Court proceeding.

14        Tembec signed that and delivered that to the

15  United States.  Ms. Menaker has insisted upon that

16  commitment having no force and effect and that only

17  Tembec seems to have had any view of a value or

18  meaning to the TLA, but the Government of Canada

19  tells us that the intent of the parties was expressed

20  in the TLA and preserved.  We were told that the SCA

21  was meant to track the TLA, but to reduce the number

22  of cases to just those that were essential to enter

66

11:07:01 1  the SLA into force.  Without any other renegotiation

2  what effectively we have heard here and we have seen

3  now in the U.S. papers is that the United States

4  believed it was renegotiating the understanding of

5  the parties in the SCA, while Canada tells us that

6  was not the intent at all.  It was simply to reduce

7  the scope so that it would be possible to enter the

8  agreement into force in the absence of signatures.

9         And counsel has attempted to suggest that

10  only Tembec or Tembec's counsel or Baker & Hostetler

11  representing other parties were the only ones who

12  didn't sign the TLA or didn't sign it properly.  Of

13  course, no one knows for sure because they collected

14  the signatures and kept them.  No one knew what they

15  would do with the signatures.  No one knew if they

16  would bring them out and say you can't now oppose

17  dismissal because you promised upon entry into force

18  of the agreement, and we have your promise here.  No

19  one ever knew or imagined that they didn't sign the

20  agreements.  All that was kept secret.

21         What has emerged is that we were among many

22  who had clients who couldn't sign or couldn't sign or

67

11:08:05 1    had other proceedings.  The whole delay and entry

2    into force from the 1st of October to the 1st of

3    November was the consequence of the British Columbia

4    Lumber Trade Council representing the substantial

5    portion of the exports to the United States saying,

6    as an association, we don't know how to sign this

7    Termination of Litigation Agreement, and we have a

8    procedures and bylaws that prevent us from getting

9    this done.  And on its request, the entry into force

10    of the agreement was postponed.

11         So, many parties never provided signature,

12    but who and how many, nobody knew, and nobody knew

13    what the consequence or implication was if you did

14    sign, if you had signed.  Would it be used as a

15    promissory note when the United States and Canada

16    then moved to dismiss the cases?  Would they bring

17    this out and say you can't object?

18         The notion that the Termination of

19    Litigation Agreement would, in fact, have no force

20    and effect emerged over the following days, and not

21    at the time that any of this took place on the 11th

22    and 12th of October, nor was Tembec informed, and I

68

11:09:08 1    will come back to that momentarily.

2          Since September 22nd, then, Tembec has had

3    to make a series of filings before this Tribunal, had

4    to return to U.S. court, all because the United

5    States has pursued a claim in the wrong forum on a

6    wrong premise, thinking it had outwitted or tricked

7    Tembec and its lawyers.  It has pursued its claim not

8    for money, as you suggested was probably the case,

9    Mr. President.  There was much more at stake with

10   Canfor and Terminal--

11         PRESIDENT van den BERG:  I stated in the

12   beginning it seems to the Tribunal that it was not so

13   much a question about money, but rather about

14   principles.

15         MR. FELDMAN:  Yes, and that's my

16   understanding that I'm suggesting.

17         PRESIDENT van den BERG:  Okay.  I'm sorry I

18   misunderstood you.

19         MR. FELDMAN:  And it's not to vindicate this

20   Tribunal.  It has invited the Tribunal, in our view,

21   to err again by asserting jurisdiction where we don't

22   think there is jurisdiction because of the SLA.

69

11:10:00  1    Apparently it has pursued this matter because it

2    didn't prevail in Chapter Eleven over Tembec,

3    believes an allocation of costs and fees would

4    register a victory, would establish it as a

5    prevailing party.

6         So, instead, the United States should now

7    get what it deserves, in our view, from these

8    proceedings, which is a bill to pay Tembec for its

9    costs and fees since September 22nd.

10        Now, I want to emphasize that in the notion

11   that there is no legal document suggesting that the

12   Chapter Eleven claims were being extinguished, there

13   is a legal document, and that is in the Joint

14   Dismissal, the stipulation to dismiss the case in the

15   District Court, because that embodies the Chapter

16   Eleven claim.  Everyone has always understood that if

17   the District Court were to rule not to vacate the

18   decision of this Tribunal, that the Chapter Eleven

19   claim would be effectively extinguished.

20        So, the pursuit of a Joint Stipulation of

21   Dismissal was to that end and understood by Tembec to

22   that end.  What Tembec did not understand was that

11:11:07 1    the intent of the parties was being changed, that the

2    SCA was necessarily replacing entirely the TLA, and

3    that, indeed, the parties, Canada and the United

4    States, had no intention to do anything with, what we

5    considered in effect, a promissory note with respect

6    to litigation.

7        There was a colloquy earlier as to

8    withdrawal with no costs and what's permitted in

9    different jurisdictions.  As one example, in Virginia

10   in the middle of a trial, you can nonsuit without a

11   penalty, so it depends on the jurisdiction and on the

12   context.  We were dismissed through a voluntary

13   dismissal.  There is nothing in the UNCITRAL Rules

14   that then says that there should be an allocation of

15   costs and fees under those circumstances, and none

16   has been cited as specific authority for that

17   purpose.

18       We stated in our understanding on October 6

19   with the documents that existed on October 6, we have

20   held that the United States responded in bad faith by

21   saying on October 13 that we misrepresented something

22   to this Tribunal on October 6 because of a document

11:12:20 1    that was invented on October 11 and 12.  And we have

2    tracked for you the history by the time elements that

3    occurred on October 11 and 12, conspicuously the

4    United States withholding the submission to the court

5    of the Joint Stipulation for Dismissal until after

6    the agreement was amended, but nowhere in the

7    agreement does it refer to the SLA as amended.

8    Nowhere did anyone indicate to Tembec that there was

9    an amendment that would materially change Tembec's

10    position and, indeed, the Government of Canada has

11    provided a letter that says it was not its

12    understanding that there had been any material

13    change.

14           U.S. counsel, Mr. Haas, never said a word on

15    October 10 that there was some change coming, and he

16    had to have been relying on the TLA, as I said

17    moments ago.

18           The United States had submissions from

19    Tembec.  It required Tembec's signature.  It elected

20    not to communicate or to explain its position.  We

21    believe that since Tembec was a required party to

22    make the SLA take place, fair dealing would have

72

11:13:37 1  required some explanation; and as to the events of

2  October 11 and the time allowed, Ms. Menaker says

3  there were E-mails with Ms. Anderson saying, why

4  don't you call me?  Well, we did.  And our call

5  wasn't returned very promptly, and so Ms. Menaker

6  then doesn't mention to you that in the E-mails that

7  have also been provided to you is an inquiry to

8  Ms. Anderson, would you please walk us through this

9  document.  We don't understand it.  And that's in

10  writing, and there is no reply to that E-mail,

11  because there was no replay to that E-mail.

12          And when we did finally reach Ms. Anderson

13  later in the evening and asked certain questions, her

14  response was, "I don't know.  I would have to call

15  Ottawa, and it's rather late."

16          So, to the notion of did we inquire, we

17  received the document by E-mail at about 6:20, and I

18  wasn't sitting at my screen staring to see the

19  arrival of a document, and we were told it had to be

20  signed that night after close of business, clients

21  difficult to reach, and no one available to provide

22  an adequate explanation.  If that's not duress, I

73

11:14:46 1   don't know what would be because what we were also

2   told, that if we didn't sign, there would be no

3   Softwood Lumber Agreement.  It wasn't just that there

4   would be no SCA or that we wasn't making those

5   commitments.  We were told that Tembec would be

6   responsible for preventing this long and hard

7   negotiated agreement from coming into effect.

8          PRESIDENT van den BERG:  Who told you that?

9          MR. FELDMAN:  Counsel for Canada.

10          PRESIDENT van den BERG:  Ms. Anderson?

11          MR. FELDMAN:  Yes.

12          PRESIDENT van den BERG:  Was that in the

13   evening?

14          MR. FELDMAN:  In the evening, about eight or

15   nine o'clock.  Well, it's a phone conversation.

16          PRESIDENT van den BERG:  11 October?

17          MR. FELDMAN:  11 October.

18          PRESIDENT van den BERG:  Okay.

19          Now, there is also evidence in the E-mail--

20          ARBITRATOR ROBINSON:  Pardon me.  I would

21   like to ask, if I might, since we are in this, one of

22   the E-mails in your Exhibit C is a 6:16 p.m. E-mail

74

11:15:46 1    from Jeanne Anderson, saying that a red lined is

2    attached so that you can see the changes.  Would you

3    have a copy of that red lined that you would submit?

4            MR. FELDMAN:  It was in the E-mail.  Do we

5    have it here?

6            ARBITRATOR ROBINSON:  And does it indicate

7    the red lines?

8            MR. FELDMAN:  Yes.  We received--the

9    sequence if you go back through, although for some

10   reason the E-mail trail, if I recall, cut off the

11   times.  At some point in the late afternoon, and

12   three, 4:00, something like that, I was on a

13   conference call and didn't see the E-mail come in,

14   there was an E-mail from her saying, you are getting

15   a document.  And very soon thereafter there was a

16   subsequent E-mail that said, never mind; you're

17   getting a revision.  I never opened the first one.

18           ARBITRATOR ROBINSON:  But you did actually

19   earlier receive an earlier version that was not the

20   red lined version?

21           MR. FELDMAN:  Exactly.

22           ARBITRATOR ROBINSON:  So, you obtained not

75

11:16:46 1  only the red lined version, but also an earlier

2  version?

3          MR. FELDMAN:  We received a first version

4  that I never opened because before I ever got to open

5  it, I got a subsequent message that said, don't deal

6  with that one.  So I waited for the document that I

7  was supposed to deal with.  When that came, it came

8  with a second document which was the red lined of the

9  original document, I guess for those people who had

10  already endeavored to go into the first document to

11  see what had been changed.

12          ARBITRATOR ROBINSON:  Well, I think it would

13  be helpful if we could see those two documents.

14          The other question that I wanted to raise

15  while we are on this October 11--

16          MR. FELDMAN:  Excuse me, Mr. Robinson,

17  Mr. Snarr tells me that you do have it.

18          MR. SNARR:  It should be in that same

19  collection of E-mails, so Exhibit C, and it should be

20  10 pages or so into that Exhibit C.

21          ARBITRATOR ROBINSON:  Oh, I see.  All right.

22  Thank you.  My mistake.  Thank you so much.

76

11:17:43 1          The other item that I just wanted to raise

2    while we are at the evening of October 11 is, and I

3    find this a little hard to follow, there is an E-mail

4    from you, Mr. Feldman, at 6:09 p.m., to which is

5    attached an E-mail from Jeanne Anderson, dated

6    3:42 p.m., to which is attached something from Hugh

7    Cheetham and Jeff Weiss that says--this is

8    3:42 p.m.--"All, attached the Settlement of Claims

9    Agreement that must be signed," so on and so on.

10          And then it says, "As you undoubtedly know

11    from your clients, in conversations with

12    International Trade Canada, your clients have

13    indicated their willingness to have this document

14    signed on their behalf."

15          Would you please explain that and what the

16    background is to that statement.

17          MR. FELDMAN:  As best I can because I'm

18    obviously not the author of it.

19          Again, the tracking of the time, and you

20    will also see if we are looking on the same page,

21    there is a message at 3:42 that says, "All, please

22    hold off on sending signatures as well as we will

77

11:19:02 1  be"--there is a typographical error here,

2  obviously--"we'll be circulating a corrected version

3  of the agreement shortly."  And that's the first

4  message I, in fact, read, and I simply used that

5  trail to reply, so my reply of 6:10, or whenever it

6  was, 6:09--here it is, at 6:09--I simply used her

7  message to reply, but I hadn't, in fact, opened the

8  document yet.

9        PRESIDENT van den BERG:  If you see the

10  trail on that day, I think it starts actually with an

11  E-mail from Colin Byrd, which has been filed by U.S.

12  yesterday, also on 11 October, at 12 noon.

13        MR. FELDMAN:  I didn't receive that.

14        PRESIDENT van den BERG:  You didn't see that

15  because perhaps you will read it because

16  there--perhaps that is Colin Byrd from Canadian

17  Government, sends it to his outside counsel, Jeanne

18  Anderson, at 12:00 and says--perhaps you will take it

19  in front of you.  Perhaps it can be shown to you.

20        MR. SNARR:  Which tab is it?

21        ARBITRATOR ROBINSON:  Tab B.

22        PRESIDENT van den BERG:  For us it's Tab B.

78

11:20:40 1   MR. FELDMAN:  Could I just borrow yours?

2   THE SECRETARY:  Yes.

3   MR. FELDMAN:  As you can see, this wasn't

4 sent to us.

5   PRESIDENT van den BERG:  I understand, but

6 simply to now put the story together, what happened

7 apparently was during the day.  And please help me if

8 I'm wrong, is that at noon action was taken by the

9 Canadian Government?

10   MR. FELDMAN:  It would appear.

11   PRESIDENT van den BERG:  They told the

12 outside counsel you are going to distribute this to

13 the various counsels.

14   MR. FELDMAN:  Right.

15   PRESIDENT van den BERG:  And in that E-mail

16 he writes, "Please circulate the attached document,

17 all counsel for Canada.  You can indicate that

18 International Trade Canada has been in contact with

19 their clients who have indicated a willingness to

20 sign this document."

21   Here it already states that Colin Byrd

22 writes to Jeanne Anderson, look, already the

79

11:21:44 1    clients--at least what he thinks--have agreed.

2         And then the E-mail goes on, "You can also

3    indicate that they will need to return signed copies

4    of their signature pages today," all in capitals, "to

5    Hugh and Jeff, and Hugh Cheetham and Jeff Weiss, as

6    per the instructions in the original instruction

7    letter for the original TLA."

8         Now, what you see then is that Ms. Anderson

9    takes action apparently--now I have to be careful

10   what time--at 3:42 p.m. because then she says on--and

11   you have one of the--

12        ARBITRATOR ROBINSON:  Then he uses the same

13   language.

14        PRESIDENT van den BERG:  She repeats

15   dutifully what her client tells her, tell them, the

16   client, your clients, have agreed.  So, that's what

17   you have got at 3:42.

18        And then there comes a message after that

19   at--have to be careful where it is--hold off signing

20   signature because something else is coming, and then

21   the 3:42 is the hold off mail, and then the

22   date--sorry--the timing of the please sign mail

11:23:31 1  before that is not clear here.

2        Anyway, that must be between the 12:00 mail

3  from Colin Reid and the hold off E-mail from Jeanne

4  Anderson of 3:42.

5        And then you sent a letter--an E-mail at

6  6:09 p.m., "Jeannie," and then you say, "We are a bit

7  puzzled."

8        And she responds then almost within minutes,

9  at 6:16, isn't it, or are we in a time zone

10  difference?  Because I have always to be careful

11  about that.

12        MR. FELDMAN:  We're in the same time zone.

13        PRESIDENT van den BERG:  Okay, right.

14        Attached is the final settlement agreement

15  and red line is attached to it, you can see.

16        MR. FELDMAN:  And that is the first document

17  I in fact then undertook to read.

18        PRESIDENT van den BERG:  Then the next, see

19  whether there is any subsequent E-mail during that

20  evening.

21        ARBITRATOR ROBINSON:  There is one I would

22  like to ask about.

81

11:24:35 1          PRESIDENT van den BERG:  One second, simply

2    to get the trail and then you get the questions.

3          Because we have then at 6:46--6:20, all

4    right.  We have the first one at 6:20, where you

5    write, Mr. Feldman.  We will look at that document

6    now, but perhaps you could send us an E-mail with a

7    more detailed response to our queries.

8          MR. FELDMAN:  And the query is referring to

9    my message of 6:09.

10          PRESIDENT van den BERG:  Yes.  That is

11    your--we have the puzzled E-mail.

12          MR. FELDMAN:  Right.  And there was no

13    answer to that E-mail.

14          PRESIDENT van den BERG:  That's 6:20, but at

15    6:42, you sent another mail to her, that says, well,

16    look--apparently you had read it in the meantime?

17          MR. FELDMAN:  Probably, but I have lost the

18    trail.

19          PRESIDENT van den BERG:  That's the reason

20    why I tried to put all these E-mails in time, one

21    behind the other.  6:46.

22          MR. FELDMAN:  Yes, I have got it.  Thank

82

11:25:32 1  you.

2          PRESIDENT van den BERG:  And then you have

3  the E-mail, you talk about without prejudice clause

4  and what happened thereafter.  I think we don't have

5  further E-mails on that subject.

6          MR. FELDMAN:  Is that the last one?

7          MR. SNARR:  Yes.

8          PRESIDENT van den BERG:  The next thing is

9  what you told us, that you finally could get hold of

10 her by telephone, Ms. Anderson.

11         MR. FELDMAN:  And I believe that the

12 interval was that she was on the phone with the folks

13 in Vancouver.

14         PRESIDENT van den BERG:  And you probably

15 have contacted your clients to find out--

16         MR. FELDMAN:  I tried--

17         PRESIDENT van den BERG:  You get all kinds

18 of messages that they have agreed to something, and

19 of course you would like to figure out where your

20 client--the details or something.

21         MR. FELDMAN:  Yes, indeed, and I did not

22 find them right away.  I don't remember exactly when

83

11:26:27 1    I did, but it was in the evening.  It was not during

2    the day.

3              PRESIDENT van den BERG:  And then you sent

4    the SCA signed back by fax, I think it is, e-mailed

5    PDF?

6              MR. FELDMAN:  We had to discuss, and there

7    was a back and forth with Mrs. Anderson as to how we

8    were to execute the document and deliver it given

9    that we were told it had to be done, as I think one

10   of these E-mails indicate "by close of business," and

11   we were already long past close of business, and we

12   were instructed to do it by facsimile.

13             PRESIDENT van den BERG:  And that was at

14   9:52 in the evening.

15             MR. FELDMAN:  I think one was earlier, a

16   little earlier.

17             PRESIDENT van den BERG:  9:22.

18             MR. FELDMAN:  And I think I signed them, but

19   I'm uncertain, sometime around nine, and then we went

20   through whatever bureaucratic process in the office

21   was required to get them faxed.

22             PRESIDENT van den BERG:  Because the fax

84

11:27:22 1  transaction reports--I have this one that says 2139,

2  and--sorry, there is another one.

3          MR. FELDMAN:  It was within that hour

4  interval.

5          PRESIDENT van den BERG:  And the other one

6  was on 2152.

7          MR. FELDMAN:  Right.

8          PRESIDENT van den BERG:  Okay.  So, now we

9  have established what happened.

10          MR. FELDMAN:  I think we did.

11          PRESIDENT van den BERG:  Thank you.

12          Please proceed.

13          MR. FELDMAN:  Mr. Robinson had a question.

14          ARBITRATOR ROBINSON:  Well, I was just going

15  to ask, while we were on the E-mails, in the E-mail

16  of 6:46 p.m., Mr. Feldman, there is some fairly

17  detailed references to a portion of the draft SCA,

18  but I don't notice in that E-mail any mention of the

19  lack of the reference to the Tembec NAFTA claim; is

20  that right?

21          MR. FELDMAN:  That's correct, Mr. Robinson,

22  for two reasons.  One is this particular clause had

85

11:28:18 1    been a concern of ours throughout the negotiations of

2    the SLA, and so we fastened on it and raised it

3    because what we were understanding was that we were

4    somehow--I think one of the messages here indicates

5    that somehow we were being asked to be responsible

6    for the whole country, and we didn't understand why.

7    Here was a document that came to us with no

8    explanation, and it said our clients agreed to have

9    us sign it, it but our clients had never seen it,

10   which imposed a serious problem for counsel as well.

11   In effect, counsel had talked to the government--the

12   clients had talked to the government and said, well,

13   sure, we will sign, but it's presented to counsel to

14   sign, and we don't know what it says, and they had

15   never seen it either.

16        So, we are trying to understand what the

17   document is, and as you can see, we didn't understand

18   what the document was; that's put in writing, and it

19   appeared that we were responsible for the whole

20   document.

21        So, we did fasten on a clause that had been

22   a concern to us throughout the negotiations.

86

11:29:18 1         And as to the question of why didn't we

2  address this particular issue, because we were being

3  asked to enter into a Joint Stipulation of Dismissal

4  of the District Court action which contains the

5  Chapter Eleven claim, first reason; second reason,

6  that we understood that there were to be--our client

7  apparently had understood there were--that these were

8  additional documents to be signed.  We did not

9  understand that, therefore, this substituted entirely

10  for the TLA, and we had signed in effect, what I've

11  called here a promissory note for extinguishing the

12  Chapter Eleven claim.  And we understood the absence

13  of Canfor and Terminal because Terminal had publicly

14  stated it would not withdraw its Chapter Eleven

15  claims, so there would have been no utility in

16  including it in a document.  They were on the public

17  record saying they would not withdraw.

18         As for Canfor, we came to understand, in the

19  course of exchanges with Canfor's counsel, that

20  Canfor perhaps had never pledged to withdraw

21  formally.  It had made public indications that it

22  supported the Softwood Lumber Agreement, but, in

87

11:30:36  1  fact, as far as we know, it had not done what Tembec

2  had done.  It had not, promised, in fact, in writing

3  to extinguish its claim, so it became necessary in

4  our view, as we interpreted the document, uninformed,

5  but as best as we could do that evening that there

6  would be no reason to refer to Tembec's claim again

7  both because it was in the TLA and because it's in

8  the Joint Stipulation of Dismissal, but there would

9  be reason to have to deal with Canfor, and there

10  would be no reason to mention Terminal because

11  Terminal had already pledged that it would not

12  withdraw its claim, but publicly had said so.

13        So, that was our interpretation of the

14  document that evening, and we had, as we have now

15  disclosed, and which an issue--it seemed like

16  Ms. Menaker wanted to make an issue of what we just

17  disclosed it, and it's true we just disclosed it

18  because I didn't go back to all these E-mails from

19  October 11 and 12 until we had to make our way

20  through your questions and found confidential

21  exchanges with respect to the conversation I did have

22  that evening, indicating the SCA might substitute for

88

1   the TLA, but we couldn't confirm that, and we

2   certainly couldn't confirm it in the time involved,

3   and it didn't become indicated until we got the

4   amendments the next night.  So, I couldn't rely on

5   it, but we felt it was important to disclose that we

6   discovered I did have such a conversation.

7          But otherwise, this was the best we could do

8   with the document that evening under very direct

9   pressure that we stood in the way of the SLA itself

10  going into effect, and Tembec, it was widely and

11  commonly known, needed money, and therefore was

12  committed to putting this into effect and not

13  blocking it.  And Mr. Krabbe has passed me a note

14  here saying the other parties may be concerned here

15  about principles, but Tembec is here about money.

16         So, Tembec's primary motivation at the time

17  that the SLA was put on the table--and now they were

18  being told if you don't sign it, there will be no

19  agreement--was that the Government of Canada had

20  withdrawn all other indications of any support to the

21  industry unless it entered the SLA and got its money

22  back from the cash deposits.

89

11:32:53 1        So, Tembec, therefore, was under severe

2   pressure and from all those other companies that

3   perceived that Tembec was--had the agreement in its

4   hands and had to sign it.

5        ARBITRATOR ROBINSON:  Well, if I could just

6   ask, then, if I understand, then, what you're saying,

7   Mr. Feldman, in the statement both in the exhibit,

8   Exhibit B E-mail at noon on the 11th and then in the

9   E-mail from Hugh Cheetham and Jeff Weiss where it

10   says, "As you undoubtedly know from your clients, in

11   conversations with international trade Canada, your

12   clients have indicated their willingness to have this

13   document signed on their behalf."

14        Now, if I understood what you said, you were

15   saying that they in fact had not received the

16   document.

17        MR. FELDMAN:  Yes.

18        ARBITRATOR ROBINSON:  So they were simply

19   saying that we will sign even though we haven't seen

20   the document?

21        MR. FELDMAN:  Well, you're asking me to

22   interpret something that is hard to interpret because

90

11:34:00 1    I'm not the author.

2                ARBITRATOR ROBINSON:  Right.

3                MR. FELDMAN:  But I think that the term

4    "willingness" also is a deliberately chosen term.

5    "Willingness" suggests upon inspection and review.  I

6    called the clients when I received the document,

7    which was the first I was hearing about it.  I was

8    not informed by my clients between noon, when this

9    message apparently went out to counsel for Canada,

10   and the time we received these messages and the trail

11   that the President has now reviewed.  I had no

12   contact from my client that there was an agreement to

13   sign--that there was an agreement to sign an

14   agreement and that there was a document coming that I

15   was expected to sign.  I had no such knowledge.

16               ARBITRATOR ROBINSON:  I will ask one last

17   item and then I will be quiet, which is, from that

18   sentence it leads me to believe that you were not the

19   only person in contact with the Government of Canada

20   on behalf of Tembec through their lawyer Jeanne

21   Anderson.  Were there other contacts that Tembec had

22   with the Government of Canada, separate from you, and

91

11:35:03 1   were they by the company, or were they by the counsel

2   of Tembec up in Canada?  What other interaction was

3   there with the Government of Canada by Tembec other

4   than you and through Ms. Anderson, please?

5           MR. FELDMAN:  With counsel, I'm not aware of

6   any communications.  That is, I'm not aware that

7   Tembec communicated ever with counsel for Canada.

8   All those communications were with me.

9           I am aware, but cannot detail or even

10  identify necessarily who.  I'm aware that there were

11  communications among officials of Tembec.  I don't

12  believe it was Tembec's in-house counsel and the

13  government at all levels because it was publicly

14  known and published in the press that government

15  officials, cabinet level, and the Prime Minister,

16  were periodically contacting CEOs to press them to

17  agree to the Softwood Lumber Agreement, so there were

18  such contacts, but I wasn't privy to any of them, I

19  wasn't briefed on them, so therefore the

20  communication to which Mr. Byrd refers, I have never

21  been told who exactly talked to whom.  What I was

22  told was, we need this agreement; we are going to

92

11:36:31 1   sign.

2        But it was also left to me as counsel to

3   understand the document as best I could, which is why

4   when we sent the SCA in that night, it was

5   accompanied by a letter from me saying, we haven't

6   had time to really review this document.  We don't

7   really understand it.  And I put that in writing

8   because that was the circumstance.  I hadn't seen it

9   before, as you can see, after 6:00.  I signed it by

10   nine under instruction by the client, and the client

11   had presumably made some kind of promise as to the

12   willingness to sign with the government, but exactly

13   who at Tembec spoke with whom in the government, I

14   don't know.

15        PRESIDENT van den BERG:  In that connection,

16   the document you sent back on the 20th of September,

17   which you state, would you say, is it TLA--actually

18   you sent back a number of them.  As far as Tembec was

19   concerned, there was a provision added to the effect

20   that payment should be made within 30 days, I think,

21   isn't it?

22        MR. FELDMAN:  I think that's right, 60 days.

93

11:37:50 1          PRESIDENT van den BERG:  Sixty days.

2          As a matter of fact, Tembec has been paid,

3  according to your submission of last night, within

4  eight days.

5          MR. FELDMAN:  Eighteen days.

6          PRESIDENT van den BERG:  Eighteen days.

7  It's much quicker.

8          How much money was at stake?

9          MR. FELDMAN:  Well, there was a 20 percent

10  haircut, so I don't know how much, in fact, was

11  returned.

12          MR. KRABBE:  $242 million.

13          MR. FELDMAN:  $242 million was returned, and

14  20 percent of the sum had been left behind.

15          PRESIDENT van den BERG:  During the evening

16  when you received the document to be signed--

17          MR. FELDMAN:  Which?

18          PRESIDENT van den BERG:  Sorry, I should be

19  more precise.  On the 11th of October, when you

20  received the SCA from Ms. Anderson, did you negotiate

21  with her payment terms?

22          MR. FELDMAN:  No.  In fact--

94

11:38:48 1          PRESIDENT van den BERG:  Some negotiation to

2    the effect, well, look, I don't know whether I'm

3    going to sign this, and then going back and forth,

4    well, if you pay me a little bit earlier than the

5    whole rest, we would be willing to sign it.

6          MR. FELDMAN:  That had been consecrated, we

7    thought--let me back up on to how that came about.

8          PRESIDENT van den BERG:  All right.

9          MR. FELDMAN:  Tembec did have discussions

10   with the government at all levels, and I believe

11   there were discussions directly between the Prime

12   Minister and the Chief Executive Officer of Tembec at

13   various times, and Tembec understood there was a

14   pledge from the Government of Canada that it would be

15   paid within those 60 days, and we were asked to

16   memorialize that which we did on the TLA on

17   September 20, with the approval of the client.

18          Now, this question of we created another

19   document and so on, we memorialized what we

20   understood to be a pledge from the Government of

21   Canada to Tembec and in which, indeed, was fulfilled,

22   materially had no effect on the United States, and we

95

11:39:53 1    were presented in the formal TLA with a document that

2    asked us to act unethically.  There was no way we

3    could sign a signature block on behalf of all clients

4    and all matters when they didn't all agree on all

5    matters.  We did the best we could to resolve that

6    problem, and you will see in the papers that we

7    submitted to last night that I had a phone call from

8    Hugh Cheetham, whose name you see here because he was

9    responsible in the Government of Canada for managing

10   this process, or at least the papers, in which

11   because we had already indicated to Canada, I think

12   orally, although I don't remember exactly, that we

13   had an immediate dilemma in the signature block.  We

14   were being asked to sign for the dismissal of all of

15   the--termination of all the litigation on behalf of

16   the Canadian-American Business Council for whom we he

17   filed an amicus brief in one of the cases, and

18   obviously the Canadian-American Business Council

19   could not therefore sign with respect to terminating

20   litigation.  It had no authority to do so and no

21   capacity to do so as a party, as an amicus, and you

22   said, why can't you just wipe them out and initial

96

11:41:01 1    it?  I said, well, that's not the only problem.  I

2    have got associations that are unsure about their

3    bylaws.  They're not sure what they can sign with

4    respect to all their members, so we will do the best

5    we can, but I'm going to have to disaggregate this

6    for the purpose of addressing responsibly and

7    fulfilling my fiduciary duties what the interest of

8    each client is in each matter, and that's what we

9    did.

10           So, everyone was on notice.  No one said you

11    can't do it.  No one said don't do it.  No one

12    answered us after the 20th of September.  And we

13    believe, just to close the loop on your question and

14    try to make sure that I have answered it, therefore,

15    on the 11th of October, when I was talking to

16    Ms. Anderson, there was no reason to renegotiate

17    anything.  Tembec had agreed to dismiss all of its

18    litigation.  It had done so with Canada.  It signed

19    Termination of Litigation Agreements in all of its

20    cases, which was not true of every company, but it

21    was true of Tembec.  They signed them all.  No one

22    ever said these are ineffective or irrelevant, and

11:42:10  1  therefore I didn't need to renegotiate this question

2  of don't pay us first.  It was all understood.  We

3  had already signed it.  It never was suggested and it

4  never appeared to us that our promissory notes in

5  this regard had no effect, nor did we ever imagine

6  that someone hadn't signed.

7          PRESIDENT van den BERG:  What was then the

8  reason that Tembec got privileged treatment as far as

9  payout is concerned?

10          MR. FELDMAN:  First, I can't know that it

11  was the only one promised privileged treatment.  I

12  have no idea what went on in those discussions with

13  the Government of Canada and different companies.

14  So, maybe a lot of such promises were made.  We know

15  that that promise was made to Tembec.

16          As to why there would be an interest in

17  making any kind of promise to Tembec, there may be a

18  connection to the Chapter Eleven claim, which I

19  indicated earlier there was an issue there.  The

20  governments couldn't look to those as being

21  extinguished through mootness after revocation of the

22  orders because the revocation of the orders wouldn't

98

11:43:18 1  affect them.

2           PRESIDENT van den BERG:  Before I forget,

3  when was that promise made, because we have two

4  promises.  One promise is to pay within--was it 60

5  days that you memorialized in the documents,

6  according to your statement?

7           MR. FELDMAN:  Right.

8           PRESIDENT van den BERG:  But the next is we

9  have a payment within 18 days.

10          MR. FELDMAN:  No.  It wasn't a promise.  It

11  just happened.

12          PRESIDENT van den BERG:  It simply happened?

13          MR. FELDMAN:  Exactly.

14          And we can speculate, if you are interested

15  in speculation, as to how that happened, but--

16          PRESIDENT van den BERG:  We're not

17  interested in speculation, no.

18          MR. FELDMAN:  So, the promise was made

19  obviously prior to our signing the documents on the

20  20th of September.

21          Now, the Chapter Eleven claim presented this

22  problem.  They were not material to entering the SLA

99

11:43:59 1    into force for the reasons I have indicated; that is,

2    they're not an obstacle to revocation of the orders,

3    but the United States apparently was very committed,

4    very determined to having all of the Chapter Eleven

5    claims extinguished.  That meant, perhaps, and again

6    this is speculation because this is why or how Tembec

7    had some ability to extract a promise from the

8    Government of Canada.  I don't know, but certainly

9    there were discussions related to making sure that

10   all of Tembec's claims were extinguished and Tembec

11   had more claims in part because of this one than most

12   other companies.

13          ARBITRATOR ROBINSON:  I--

14          MR. FELDMAN:  Excuse me, just to amend,

15   Mr. Robinson.  I'm sorry, I'm trying to give a

16   complete answer to the President's question.

17          Tembec had, as an objective in the course of

18   the Softwood Lumber proceedings, to be present in all

19   matters and to maintain as much leverage as it could.

20   It was a strategic choice.  And you will find lots of

21   cases, including the one that the United States very

22   anxiously wants to vacate now that is at the CIT, and

100

11:45:15 1   they have appealed to the Court of Appeals for the

2   Federal Circuit, the July 21 and October 13 decisions

3   of the CIT, which is called Tembec versus the United

4   States.

5          So, Tembec was throughout the proceedings a

6   very visible, important litigator with respect to the

7   disputes, and that may also have been a reason why

8   Canada was keen to get a commitment from Tembec to

9   terminate all of its litigation.

10          ARBITRATOR ROBINSON:  You referred,

11   Mr. Feldman, to the form that you received on

12   September 8th of the TLA and the difficulties that

13   you had because of the difference in the positions of

14   your clients.  What I'm having difficulty with is

15   that I read the letter to the participants in the

16   Softwood Lumber litigation that was dated September 8

17   as fundamentally a take-it-or-leave-it letter.  You

18   were sent two copies of the agreement, as I

19   understand it, in the verbatim text as to which it

20   was attached as Annex 2A to the September 12 Softwood

21   Lumber Agreement, and then you were asked to sign and

22   date and return your signature pages.  It didn't ask

11:46:58 1 you to return anything other than your signature

2 pages, and the Annex 2A, the TLA, as I call it,

3 allowed for signature in counterparts; so that if I

4 understand it, once the parties received all of the

5 signature parties from all of the private parties,

6 then there would be one single integrated TLA.

7         Now, where I'm having difficulty is, as I

8 understand it, for whatever reason, Tembec made the

9 decision to not send the signature pages as it was

10 asked to do, but to amend the TLA as set forth as an

11 Annex to the Softwood Lumber Agreement that had been

12 agreed to between the two sovereign governments.  And

13 I don't understand where you think you had the

14 authority or the consent--at least from my reading, I

15 have not seen any evidence that you received any

16 consent from either government to making the

17 revisions such as paragraph 2(d) that was added.

18         Now, if, in fact, you did not receive any

19 approval or any consent, then what was the duty of

20 the United States or Canada to inform you that they

21 did not accept a change for which you had not

22 received their approval or their consent?  So, wasn't

102

11:48:51 1  the duty upon you to obtain the approval and the

2  consent of the two sovereign governments to a change

3  that you were making in the underlying agreement?

4  When you were asked only to send in signature pages,

5  why is the duty upon the United States?  If, in fact,

6  they failed to say anything between September the

7  20th, when you submitted your amended form, and

8  October the 11th, why was the duty upon them to do

9  anything?

10          MR. FELDMAN:  Unfortunately, Mr. Robinson,

11  there were several factual problems in leading up to

12  your question.  Tembec did not receive a form.  There

13  was no form for Tembec.  Tembec could not sign a form

14  and send it back.  The form was for counsel, and the

15  form had all of my clients listed for all of the

16  matters of which they were concerned asking for one

17  signature.  As an ethical matter, I could not do

18  that.  I could not sign saying all litigation is

19  terminated for Tembec.  I had no such form.  So,

20  Tembec said we will terminate our litigation.  What

21  do we do?

22          And there were conversations about that, as

11:50:07 1    indicated in the record we have given you.  My

2    conversation on the 18th of September with Hugh

3    Cheetham of Canada.  He didn't say, no, you can't do

4    that.  He didn't say unacceptable.

5         The simple answer to your question is good

6    faith.  We signed the documents in good faith.  We

7    supplied a letter explaining why we had to do it this

8    way.  The entire proceeding, the entry into force of

9    the agreement was suspended initially for a month

10   because associations couldn't sign the document

11   because counsel couldn't resolve problems among

12   clients.

13        The impression perhaps has been given this

14   morning that the negotiation of this agreement and

15   the substitutions and amendments were all very

16   orderly and planned.  This was a chaotic process.  We

17   were frequently being told by counsel for Canada that

18   documents were defective or there were drafting

19   errors, nothing could be done.  On the evening of

20   October 11, when I received the document, and we went

21   back through it, I tried to amend it, and I couldn't.

22   And I called counsel for Canada and said, I can't

104

11:51:20 1    seem to change this.  She said that was deliberate.

2    I was given an unalterable PDF file.  It couldn't be

3    changed, not one word.

4           But notwithstanding that these were

5    imperfect documents.  If anyone doubts they're

6    imperfect documents, there are lawsuits now going on

7    in Canada, with which we have nothing to do, of

8    various companies suing the Government of Canada over

9    problems with this agreement already.

10          So, here we are dealing with a fairly

11   chaotic process, imperfect documents, that TLA was

12   one of those.

13          Now, when you asked, so why did I do this?

14   The Government of Canada made a number of public

15   statements in that period saying, well, we don't need

16   everybody.  Maybe it said that, but that's changing.

17   We don't need everybody.  And different phrases were

18   used:  "Substantial majority," "clear majority" and

19   so on.

20          It was our understanding, Tembec's

21   understanding, and plainly the understanding of

22   others, that those companies, those parties who

11:52:26  1  wanted the SLA to be approved, would do whatever they

2  could for that purpose.

3        Now, all Tembec could do for that purpose

4  was to pledge that it would terminate its litigation

5  upon entry into force of the agreement.  That's all

6  it could do because the form we were given we

7  couldn't sign, and Tembec didn't disagree.  There was

8  no way I could sign that document on behalf of the

9  other clients who said no, you can't sign it.  It was

10  an imperfect document, and I was being asked to do

11  so.  That would have breached my fiduciary duty to my

12  clients and been unethical.

13        The insistence that that's what should have

14  been signed and that's what we should have submitted

15  is an insistence that we should have acted

16  unethically, which I find astounding.

17        So we did the best we could.  We informed,

18  we wrote a letter.  We sent it to the Government of

19  the United States.  In good faith would have said no,

20  we won't accept it.  There would have been a

21  communication.

22        And on October 6th, when we submitted to

11:53:19  1   this Tribunal, this is what we have done, these are

2   the documents, good faith would have said, United

3   States would have stepped forward and said no, no,

4   no, no, no.  We don't accept that.  Not wait until

5   the agreement was amended, not slip in a document.

6   When we said bait and switch, we meant it.  We signed

7   a document that was not labeled Annex 2A.  The

8   labeling Annex 2A was applied after we signed and

9   submitted the document.  So, what was submitted to

10  you is this is the authentic document they signed was

11  not the authentic document we signed.  We signed a

12  document not labeled Annex 2A.

13          And later that night, when it gets its

14  relabeling and only after that does the United States

15  come to this Tribunal and say, aha, there is another

16  document that negates that document they gave you on

17  October 6.  Where was the good faith any of these

18  dealings?  We did the best we could under the

19  circumstances of an imperfect document on behalf of

20  clients, respecting our ethical obligations and our

21  fiduciary duties.

22          ARBITRATOR ROBINSON:  Well, if I could just

107

11:54:23  1  ask on that.

2          MR. CLODFELTER:  This is Mr. Feldman's time,

3  and the Tribunal is getting ahead of its questions,

4  but we would ask that if you are going to pose

5  questions now, we also be given a chance to respond.

6          PRESIDENT van den BERG:  I was assuming,

7  Mr. Clodfelter, that you and Ms. Menaker were noting

8  the questions and the answers.  Admittedly, if you

9  have not noted my answers, it might be somewhat

10  difficult.

11          MR. CLODFELTER:  It would be preferable to

12  answer in proximity to the question and answer that

13  we are responding to.

14          PRESIDENT van den BERG:  That is what I

15  envision doing is simply going question by question

16  and giving each side a chance to respond.

17          I think, Mr. Feldman, could you please,

18  then, finish your presentation?

19          MR. FELDMAN:  If I could take just a moment?

20          (Pause.)

21          PRESIDENT van den BERG:  By all means.

22          (Brief recess.)

108

11:55:33 1          PRESIDENT van den BERG:  I simply wanted to

2    use the time to tell the United States that there

3    will be opportunity first to answer, to make

4    observation on the answers, the questions posed by

5    the Tribunal and the answers given by your side.

6          MR. FELDMAN:  I have just one short point.

7          PRESIDENT van den BERG:  Please.

8          MR. FELDMAN:  Ms. Menaker argued that the

9    action of this Tribunal--and I think I'm

10   quoting--"deprived Tembec of any form for its Chapter

11   Eleven claim."  If that were true, why was it

12   necessary to dismiss the case in the U.S. District

13   Court?  There was a forum.  It embodied the Chapter

14   Eleven claim.  That's what in the SCA Tembec agreed

15   to extinguish.  That is what would have extinguished

16   the Tembec Chapter Eleven claim in the SCA.  Its

17   claim otherwise was obviously not extinguished, and,

18   indeed, this Tribunal said that it was not

19   extinguishing the claim.  It was dismissing Tembec

20   from the Tribunal's proceedings.

21          PRESIDENT van den BERG:  To be correct, we

22   said it either way:  Didn't say yes, we didn't say

109

11:56:43 1    no.

2              MR. FELDMAN:  That's right, but therefore

3    didn't say yes.

4              PRESIDENT van den BERG:  Okay.  But we

5    didn't say no, either.

6              MR. FELDMAN:  Because you left it as an

7    incomplete proposition and in the hands of the U.S.

8    District Court.

9              PRESIDENT van den BERG:  With all due

10   respect, I think the order said for the Tribunal it

11   would be brought.

12             MR. FELDMAN:  I think that's right, but we

13   had gone to another forum in the process, and

14   obviously there was a forum.  There is a forum.

15             Also, Ms. Menaker said that 11:26--and I

16   think this is her wording, maybe it's Mr. Clodfelter,

17   and excuse me if I got things wrong--was relatively

18   untried as to the question of going to the novelty of

19   the situation.  And "relatively untried" is an

20   interesting term for something that had been done

21   once and come out the other way, so I don't want to

22   go back; I don't want to relitigate the consolidation

110

11:57:36 1   decision which appears to be part of the agenda here,

2   at least, and I guess my notes indicate that this was

3   Mr. Clodfelter--I'm sorry, I don't think there is

4   utility in that--and our papers make clear that as to

5   the equitable questions, these proceedings are

6   effectively unprecedented.  And I will stop there.

7          Thank you.

8          PRESIDENT van den BERG:  Before breaking, I

9   would like to give the United States an opportunity

10  to make observations on the questions and answers,

11  and then I would suggest we break for five minutes.

12         MR. CLODFELTER:  I suggest, Mr. President,

13  we break now and come back for those, if you don't

14  mind, because so many questions have been posed and

15  we want to organize our thoughts on that.

16         PRESIDENT van den BERG:  That would be fair

17  enough.  Let's break then for five minutes.

18         (Brief recess.)

19         PRESIDENT van den BERG:  Whenever you are

20  ready, Mr. Clodfelter.

21         MR. CLODFELTER:  I think we will take

22  advantage of this moment just to respond to the last

12:08:36 1   question posed by Mr. Robinson and then answer the

2   other questions, as pertinent, in our rebuttal or in

3   response to further questions from the Tribunal.

4        I just want to note that the so-called TLAs

5   provided by Tembec are completely without fact.

6   There was no need to tell that to Tembec because that

7   was obvious from the terms of the SLA itself.  The

8   SLA Article 2(1) makes clear that the entire

9   agreement is subject to confirmation that the

10  attached Annex 2A was signed.  There was no room for

11  alterations or different versions of the TLA, and

12  that was absolutely clear on the face of the SLA, and

13  the notion that somehow there was some good-faith

14  duty to tell them what was obvious is absurd, and we

15  reject any notion that we were acting in bad faith

16  for failing to do so.

17       I think Mr. Feldman is a sophisticated

18  lawyer.  Sophisticated lawyers have to be responsible

19  for understanding the documents they deal with.

20  There was no need to be told that his proposed

21  counteroffer would not have satisfied the terms of

22  the SLA, even if we had signed them, which we never

112

12:09:41 1  did.

2          So, I just wanted to clarify that point.

3  That is why the so-called TLAs which Tembec provided

4  had nothing to do with the SLA.

5          MR. FELDMAN:  Mr. President, if I may

6  respond just briefly.

7          PRESIDENT van den BERG:  Sure.

8          MR. FELDMAN:  Thank you.

9          We received the communication from counsel

10  for the United States on October 10, prior to any

11  knowledge of any existence of any other document than

12  the TLA, saying that it was his understanding that

13  Tembec had agreed to dismiss the case in District

14  Court.  The only document that said that was the

15  signed TLA, and it would be reasonable to interpret

16  that communication from the United States if we were

17  to use the legal terms invoked earlier by Ms. Menaker

18  as an acceptance of an "offer," if that's the term.

19  This was counsel communicating with us that it now

20  wanted to complete the terms of the commitment of

21  Tembec to terminate that claim in which the only

22  document that said so was the signed TLA.

113

12:10:58 1              MS. MENAKER:  Mr. President, if I may very

2      briefly respond to that.

3              PRESIDENT van den BERG:  Yes.

4              MS. MENAKER:  Mr. Feldman's comments are

5      based on a mistaken premise, and that is that the

6      SCA, even in draft form, was nowhere to be found on

7      October 10th, and that's simply not the case.

8              It became clear to both the Government of

9      Canada and the Government of the United States that,

10     either before September 20th or definitely by

11     September 20th, that the TLA was not going to come

12     into effect because there simply was not enough

13     support for that document.  We had not received the

14     signatures.  At that point in time, no later than

15     September 20th and probably it was earlier than

16     September 20th, the governments knew that they were

17     going to have to move via a different route.

18             When Mr. Haas contacted Mr. Feldman and

19     said, "We understand that your clients have agreed to

20     move forward and terminate the District Court case,"

21     first, we were clearly working off of a draft of the

22     SCA.  Whether Mr. Feldman and his clients had that,

114

12:12:00  1   we did not know, but clearly we certainly had a draft

2   of the SCA at that point in time.  The SCA was not

3   drafted overnight.  It was not drafted in the morning

4   of the 11th.  We had a draft of that on October 10th

5   and well before that time.

6          Now, Mr. Feldman has told you that he and

7   his client were in constant contact with the

8   Government of Canada at very high levels discussing

9   these matters, so certainly the fact that we had

10   heard that his client was willing to terminate the

11   case as part of a Softwood Lumber Agreement was no

12   surprise that those contacts had been ongoing and

13   there was no reason to assume that our understanding

14   stemmed in all from the TLAs.

15          And I'm trying to be careful because I don't

16   want to turn myself into a fact witness in this case,

17   but the notion that we had those September 20th TLAs

18   and that we were just working off of them is just a

19   false motion.  I could tell you that neither the

20   State Department or the Justice Department ever saw

21   those documents before the time that Mr. Feldman put

22   them before this Tribunal.

115

12:13:11 1        MR. FELDMAN:  If I may.

2        PRESIDENT van den BERG:  Yes, the last word

3  on this point.

4        MR. FELDMAN:  Thank you.  This is a little

5  colloquy.

6        Just two points.  If there was an SCA in the

7  works and it was going to require our signature, then

8  surely we could have been included in some respect if

9  there was good faith at work as to what this document

10  said and what to sign.  Surely, we should have known

11  about it and seen it before after close of business

12  on the day the signature was demanded, but that was,

13  in fact, what happened.

14        And secondly, they may have been working off

15  some SCA, but Mr. Haas didn't communicate that to us.

16  We knew of no SCA.  We only knew of the TLA on the

17  10th of October.  We knew of no alternative

18  agreement, and Mr. Haas didn't suggest there was any

19  alternative.  And in any case, what effect would the

20  SCA have had?  If it had been drafted, we didn't sign

21  it.  What we had signed was the TLA.

22        ARBITRATOR ROBINSON:  Well, if I might ask

116

12:14:07 1  on that, even if you, as the counsel for Tembec, and

2  the United States had not any forwarning of the SCA,

3  can you affirm for the Tribunal that Tembec itself

4  had no forewarning of the SCA?

5          MR. FELDMAN:  When I advised Tembec of a new

6  document and its content on the 11th of October,

7  Tembec confirmed that it was the first they knew of

8  this document, so that some amendments were in the

9  works had been reported in the press; that the two

10  governments could not enter into force with the

11  conditions precedent, is what we had told the Court

12  of International Trade; that there were problems with

13  the conditions precedent.  But what was being done to

14  the conditions precedent, what amendments were taking

15  place, that there were new documents to be signed, we

16  didn't know that.  Tembec did not know that.

17          MS. MENAKER:  Mr. President, may I have just

18  one brief response?

19          PRESIDENT van den BERG:  Yes.

20          MS. MENAKER:  Thank you.

21          I just want to note two things.  First, I

22  wanted to point the Tribunal's attention to the

12:15:24 1    E-mail that you looked at earlier, which is the

2    E-mail that Mr. Feldman sent to Jeanne Anderson at

3    6:09 on October 11th, and even in that E-mail he

4    references, he says, "In view of the statements from

5    the government beginning last Friday that Termination

6    of Litigation Agreements no longer would be

7    applicable to entry into force, recognizing that many

8    had not been submitted and now may not be required

9    pursuant to new but undisclosed amendments."

10          So, that is yet another example among the

11    others that I cited earlier this morning that shows

12    that Mr. Feldman was on notice that the TLA had never

13    entered into force and that not everyone had signed

14    the TLA.  But again, I just note that in response to

15    Mr. Feldman's response to my earlier comment, when he

16    was speaking with Mr. Haas, again, we were working

17    under the assumption he had agreed.  How he had

18    agreed, like he had mentioned both Tembec and he had

19    been in constant contact with the Government of

20    Canada, and there was no reason at all to assume that

21    our knowledge that he had agreed to terminate the

22    District Court case had anything to do whatsoever

118

12:16:38 1    with his TLA document, and certainly our

2    understanding does not in any way acknowledge an

3    acceptance of that offer that he made in that

4    document.  And if he's complaining now that someone

5    should have advised him of the SCA, again that is a

6    complaint that he has with his own government, the

7    Government of Canada, with whom he was speaking about

8    these issues.

9              MR. FELDMAN:  Mr. President, you had

10   promised me the last word on this in this colloquy.

11             PRESIDENT van den BERG:  Please.

12             MR. FELDMAN:  Thank you.

13             I never said I was in constant contact with

14   the Government of Canada, and I wasn't in constant

15   contact with the Government of Canada.

16             PRESIDENT van den BERG:  But the point was

17   that your client was.

18             MR. FELDMAN:  Yes.  And as to the dialogue

19   with my client, my understanding is that the client

20   promised the Government of Canada that it would

21   dismiss and terminate all of its litigation and that

22   it would moreover participate in a second facility

119

12:17:36 1    that is not of concern here, the Export Development

2    Corporation facility, which would have enabled the

3    Government of Canada to garnish 20 percent of the

4    refunds, to turn over to the United States $1 billion

5    and Tembec pledged to do that, as well.

6         We understand that even Canfor did not sign

7    that document, did not make that pledge, but Tembec

8    did.  In other words, Tembec did everything that the

9    Government of Canada asked of it and understood that,

10   in exchange, it was finished, including with this

11   Tribunal in the exchange, and that was the

12   understanding.

13        And the only other understanding, to my

14   knowledge, that Tembec pursued with the Government of

15   Canada was the early payment that Mr. Robinson was

16   asking about.  Otherwise, the details, the legal

17   documents and so on were not presented to my client,

18   and nor should they have been or would they have

19   been.  The conversations taking place between the

20   Government of Canada and the Tembec officials was at

21   an entirely different level.  So, the notion that

22   through constant communications these things were

12:18:34   1   known to us--they weren't known to me, I didn't have

2   those constant communications--and the nature of the

3   communications between Tembec and the Government of

4   Canada were of a different kind and level, and

5   really, were simple:  Tembec agreed to dismiss all of

6   its cases, terminate all of its litigation, face no

7   more litigation such as this proceeding, but instead

8   be done, and would agree to give up 20 percent of the

9   money it was due back in exchange for the completion

10   of the SLA.

11           ARBITRATOR ROBINSON:  I would like to ask

12   both Tembec and the U.S., when the revised TLA was

13   received on September 20th with the add-on of the

14   paragraph D, did you ever hear from the Government of

15   Canada with respect to the fact that you had not

16   submitted the TLA in the form set forth as an annex

17   to the SLA?  And then if you did not, I would like to

18   ask the U.S., did you ever speak with anybody from

19   the Government of Canada about the fact that this TLA

20   submitted by Tembec was not in the form as set forth

21   in the Annex 2A?

22           MR. FELDMAN:  I was surprised--we had a

121

12:20:04  1    number of surprises when we went back to records

2    because the intensity of events in that period was so

3    great that memory didn't always serve.

4            I had thought that I had spoken to Hugh

5    Cheetham on or after the 20th of September and found

6    in my records that it was the 18th.  So, if you were

7    asking me just from memory, I would have thought I

8    had the conversation subsequent to the submission,

9    but my records say otherwise.

10           That conversation took place prior, but it

11    took place with the full knowledge of the problem.

12    If memory serves, it was triggered initially by my

13    concern of what I was to do about the

14    Canadian-American Business Council on the signature

15    block, and then I started returning into the problems

16    with the other clients.

17           But therefore, as best my records now

18    indicate, I had no subsequent conversation with the

19    Government of Canada.  And as the United States has

20    said repeatedly, we never heard from the United

21    States until and except this communication from

22    Mr. Haas on the 10th of October, where the only

122

12:21:10 1    extant document of a promise of dismissal, to our

2    knowledge, was the TLA.

3              ARBITRATOR ROBINSON:  Well, what I'm

4    struggling with is whether there was any duty of

5    either the Government of Canada or the United States

6    Government to come forward to comment so you would be

7    aware of the fact there was no acceptance of the

8    changes you had made, and I guess what I'm struggling

9    with is, as a Canadian company, if there were such

10   notification of a difficulty, would you not have

11   expected that to have come from the Government of

12   Canada and not from the Government of the United

13   States?

14             MR. FELDMAN:  I think there were two

15   questions there, if I caught them.  I think the first

16   question is was there a communication, until the

17   communication from Mr. Haas on the 10th of October.

18   Would I have expected the Government of Canada to

19   tell me?  It's not apparent to me that the Government

20   of Canada had a problem with what we did in that the

21   Government of Canada was trying to collect as much

22   support for the agreement as it could.  It was making

123

12:22:25 1    public statements that we had a majority or

2    substantial majority and so on, and it was based on

3    documents coming in, both with respect to the Export

4    Development Corporation facility and with respect to

5    the termination of litigation.

6            So, we had no reason to think since what we

7    had put in the amendment in that paragraph only

8    affected the Government of Canada as to its

9    commitment to pay Tembec, so we had no reason to

10   expect that the Government of Canada would have had

11   to contact us, unless, indeed, it disagreed, and

12   there is no indication that it did.  I had that

13   conversation with Mr. Cheetham on the 18th in which

14   he did acknowledge that I was making his life

15   difficult because there was an awful lot of paper

16   coming in, but he also understood that we had not

17   been given the choice given the way that the thing

18   had been written.

19           Now, the governments were getting together

20   and changing it or changing--they might have--there

21   were all kinds of ways in which they might have done

22   this.  SCA was one invention, and another invention

124

12:23:29 1  would have been the "converter," amended in some way

2  to make it a document that lawyers could sign, and

3  that, frankly, is what I was anticipating that week.

4  I was not anticipating a completely different

5  document with shrunk-down cases and signatures from

6  only two companies.  I was expecting something that

7  would mirror the TLA but come within the framework of

8  what already had been done that would preserve the

9  signatures or be able to reproduce them in some

10  fashion, given that we were doing all that we could

11  on behalf of Tembec to secure the SLA.

12        MR. CYMROT:  Could I have a minute?

13        (Pause.)

14        MR. FELDMAN:  My partner has asked me to

15  point out as well that when Mr. Haas contacted us on

16  October 10, he created the legal duty to tell me

17  because he said you committed to dismiss, and

18  Ms. Menaker said, "Well, there were other

19  conversations and we had another basis for saying

20  this" and so on.  Well, he didn't disclose any basis,

21  and the document that was extant was the signed TLA.

22  That was the only written document that said we are

125

12:24:50 1    prepared to dismiss this case.  And that goes beyond

2    good faith to a legal duty.  If he had something else

3    in mind or he was rejecting that written document, he

4    needed to say so.

5            PRESIDENT van den BERG:  United States

6    wishes to react to the statement by Tembec?

7            MS. MENAKER:  Yes.  Thank you.

8            First, I just note, which I'm sure the

9    Tribunal is aware, that neither I nor the agency,

10    which I represent, the State Department, represented

11    the United States in the Softwood Lumber

12    negotiations.  It was the U.S. Trade Representative's

13    office that did.  To the best of our knowledge, after

14    consulting with the USTR and the people that involved

15    in those negotiations, we did not know of any

16    discussions that ensued with the Government of Canada

17    on the point of Tembec's documents that were

18    submitted on September 20th.  So, to the best of our

19    knowledge, there were no discussions with Canada

20    about those documents.

21            As I mentioned earlier, and I just confirmed

22    that by September 20th it was clear to both the U.S.

126

12:25:54  1    and Canada that the TLA would never be signed, and

2    that the governments needed to essentially go back to

3    the drafting board and figure out another way to

4    accommodate the concerns that the TLA was supposed to

5    address, and they needed to do that through a

6    different means, and that became the SCA.

7         The other thing I want to note is that, here

8    Tembec again is placing a lot of emphasis on these

9    documents that it submitted, but we can't forget that

10    that document was never countersigned by the United

11    States.  So, they keep talking about whether--or they

12    noticed that we didn't accept it.  They had no

13    affirmative notice that we had accepted it.  We never

14    signed it.  And it is quite odd that of all the

15    issues that have been before this Tribunal, before

16    the District Court, the only issue on which he wants

17    to grant the United States the benefit of the doubt

18    is that we actually signed a document that he sent us

19    that differed in material respects from the document

20    that we asked him to sign, that we looked at his

21    counteroffer and we just signed it, and he's willing

22    to accept that we probably countersigned it, and I

127

12:27:10 1    submit that no sophisticated counsel would just

2    merely accept or just conclude that someone had

3    countersigned a document of such importance like that

4    without asking, without inquiring, without demanding

5    to see the countersigned document, so in your files

6    you had a fully executed document.

7         Under general principles of contract law,

8    that document is of no legal effect.  It contains two

9    signature blocks.  Only one of those signature blocks

10   was ever executed.  It was never executed by the

11   other party.

12        And again, to go back to the discussions

13   regarding Mr. Haas, Mr. Haas never had any legal duty

14   to discuss with Mr. Feldman the so-called "TLAs."  As

15   I have just said, Mr. Haas--I mean, he's not here to

16   testify, but there is no reason to believe that

17   Mr. Haas even ever knew about the TLAs.  All he said

18   is, "I understand your clients are willing to

19   terminate the District Court litigation."  It's

20   perfectly reasonable.

21        As of October 11, the day before the

22   Softwood Lumber Agreement was to come into effect,

128

12:28:20  1   Mr. Feldman said his client had already been talking

       2   to the Government of Canada, had expressed its

       3   agreement to terminate certain litigation.  So, the

       4   fact that the United States Government knew this and

       5   was going to work towards putting that into effect is

       6   not at all surprising.  Certainly, you can't impose a

       7   duty on Mr. Haas to discuss something of which he was

       8   probably unaware, and where is Mr. Feldman saying,

       9   "Okay, have you looked at our TLA that we signed?  Do

      10   you countersign it?  Is that the document we are

      11   working from?"  No, he never said any of those

      12   things.

      13          MR. FELDMAN:  Actually, our E-mail to

      14   Mr. Haas does ask about tracking the language of the

      15   TLA, and it's quite apparent that Mr. Haas understood

      16   that the District Court dismissal was effectively the

      17   dismissal of the Chapter Eleven claim, which is the

      18   question here, and, indeed, that's in the SCA.

      19          MR. CLODFELTER:  I really have to object to

      20   that.  I don't see any basis for that conclusion of

      21   fact.

      22          PRESIDENT van den BERG:  It would be helpful

129

12:29:23 1    if you could simply take the E-mail exchange in front

2    of us, and the E-mail exchange is Exhibit C to the

3    letter of the United States of 4 December 2006.

4         Now, if both sides have it in front of them,

5    if you look to the E-mail of Mr. Feldman of 11

6    October at 5:18, do you see that?

7         ARBITRATOR ROBINSON:  5:18?

8         PRESIDENT van den BERG:  It's p.m.

9         You see there is the language, Mr. Feldman

10   writing to Mr. Haas, "I have just been authorized to

11   sign this stipulation as attached.  It adds a

12   sentence taken directly from the Termination of

13   Litigation Agreements," in plural, "fashioned by the

14   two Federal Governments and already signed by Tembec,

15   and then clarifies the question of fees.  Please

16   confirm that you agree to this version of the

17   stipulation."  So, here is a reference to the TLAs.

18        Could you please explain how we should then

19   view the ignorance, as claimed by you, of Mr. Haas of

20   the TLAs?

21        MS. MENAKER:  First, I don't think you can

22   read anything into the fact that that is in plural

130

12:31:35  1    and conclude from that that Mr. Haas somehow knew

2    that, back on September 20th, Mr. Feldman had signed

3    multiple copies of a document that he created, that

4    he termed the "TLAs."  All Mr. Haas's sole role in

5    this entire Softwood Lumber Agreement was just to

6    file the Stipulation of Dismissal in District Court;

7    that was his sole role.  He was not involved in the

8    Softwood Lumber Agreement or any other aspect of

9    that.

10          So, here Mr. Feldman is simply going forward

11    and negotiating the terminology and Stipulation of

12    Dismissal and he's saying, "Look, let's take some

13    language from some other document," which Mr. Haas

14    isn't involved in negotiating.  He doesn't care where

15    the language comes from.  He wants to look at that

16    language and see if it makes sense to put that

17    language in the Stipulation of Dismissal.  And I

18    don't think we could read anything at all into that

19    language as to Mr. Haas's knowledge of the fact that

20    Tembec had supplied these other documents, and

21    certainly we can't read anything to assume that

22    somehow we had accepted a counteroffer made in those

12:33:03 1  documents through the fact that Mr. Haas did not

2  respond by saying, "What are you talking about?  What

3  document are you referring to?  I don't know about

4  this document.  I have looked into it and found that

5  the United States never countersigned it."  They're

6  only talking about the language that is to go in the

7  Stipulation of Dismissal.

8        I would just also note that in the

9  subsequent E-mail sent by Mr. Haas at 11:53, when he

10  quotes, I suggest--

11        PRESIDENT van den BERG:  To be very precise

12  on this sequence, that's the next morning.

13        MS. MENAKER:  Yes.

14        PRESIDENT van den BERG:  12th of October,

15  11:50 a.m.

16        MS. MENAKER:  That's correct.

17        He says, "I suggest that instead of a

18  sentence 'This termination agreement is without

19  prejudice to the position of any party on any issue

20  in the Covered Actions,' we simply cite the agreement

21  itself."  There he is quoting from the TLA that was

22  attached as Annex 2A to the original SLA which was

132

12:34:06 1    never executed by any party, including by Tembec,

2    because it refers to the Covered Actions in the

3    plural.  He is clearly there not citing from the

4    documents that Tembec created and sent back to the

5    United States and Canada on September 20th.

6         PRESIDENT van den BERG:  Mr. Feldman, you

7    wish--

8         MR. FELDMAN:  I think this confirms that

9    Mr. Haas is sophisticated counsel and he knew about

10    the Termination of Litigation Agreements, and if he

11    needed to know more, then perhaps he should have

12    asked.

13         MR. CLODFELTER:  It just shows he knew about

14    the attachment to the SLA that the parties agreed was

15    the termination of the litigation agreement.  It

16    doesn't show anything about the pieces of paper that

17    Mr. Feldman concocted and also labeled "Termination

18    of Litigation Agreements."

19         PRESIDENT van den BERG:  I would like to

20    change the subject because actually we are most of

21    the time spending on the question whether or not

22    there was an agreement between the parties about the

133

12:35:23 1    costs, but there are a number of other issues,

2    obviously, without prejudice to all these questions.

3         First, a question to Mr. Feldman:  In your

4    submission of 15 December 2006, at page 8, you say in

5    the penultimate paragraph at page 8--the last

6    paragraph of page 8, but the ultimate paragraph of

7    your letter--perhaps Mr. Snarr can help you in

8    finding it.

9         You see there you say--

10    MR. FELDMAN:  "While it appeared

11    previously"?

12         PRESIDENT van den BERG:  Where it starts,

13    "In the conclusion," and then the second paragraph of

14    the conclusion is this, starts with Tembec's letter

15    of October 6, and then goes on, you write, "The

16    Tribunal should not only reject the United States's

17    request for costs and fees."

18         Do you see that sentence?

19    MR. FELDMAN:  We are still on this page?

20         We have got it.

21         PRESIDENT van den BERG:  You go on, "It

22    should award Tembec's costs and fees with respect to

134

12:36:48 1   the United States's request.

2          Are you referring to dealing with this issue

3   of costs?

4          MR. FELDMAN:  Yes.

5          PRESIDENT van den BERG:  Cost-of-costs

6   issue?

7          MR. FELDMAN:  Yes, the cost of costs.

8          PRESIDENT van den BERG:  And are you

9   actually claiming those costs?

10          MR. FELDMAN:  We would if the Tribunal would

11   entertain them.  Tembec believes that it had an

12   agreement and clear understanding that all parties

13   would bear their own costs and fees and now has been

14   put to very substantial expense about that agreement,

15   and there is a jurisdictional question here, as well.

16   So, if there were jurisdiction, then there would be

17   such a claim.

18          PRESIDENT van den BERG:  I'm a little bit

19   puzzled.  Are you claiming them or are you not

20   claiming them, or are you claiming them subject to

21   whether you have jurisdiction in respect of them?

22          MR. FELDMAN:  Yes.

135

12:37:42 1          We are contesting jurisdiction, but if you

2    were to find that you had jurisdiction, then Tembec

3    would submit for a claim for cost of the costs, as

4    you put it.

5          PRESIDENT van den BERG:  So, what you're

6    asking us is rule first on jurisdiction, and then--

7          MR. FELDMAN:  Yes.

8          PRESIDENT van den BERG:  --once you have

9    done that, come back to us, and perhaps we have a

10   claim for the costs of these proceedings?

11         MR. FELDMAN:  Yes, and I think we put in one

12   of these letters to you that we would request an

13   opportunity to submit costs, if that were--if that

14   were the situation.

15         PRESIDENT van den BERG:  Back to the United

16   States, because you do not claim, you do not put

17   forward a claim like Tembec is putting forward what I

18   understand will be on a provisional basis.

19         MS. MENAKER:  We have always requested costs

20   for the proceedings, which would be costs for the

21   proceedings to the day that the proceedings end.  So,

22   yes, our costs' submission as of the last time we put

12:38:44  1    in our costs' submission was as stated, but yes, we

2    would keep open the possibility of seeking costs for

3    all of the costs that we have incurred in these

4    proceedings which include up until today, hopefully

5    the end of today.

6         I would note with respect to Tembec's

7    request that the Tribunal did not retain jurisdiction

8    over a claim for costs from Tembec against the United

9    States.  In its Termination Order, it says that "the

10   Tribunal hereby terminates the present proceedings

11   with respect to Tembec subject to the provisions of

12   this order."  And then it adds that "the Tribunal

13   will determine at an appropriate time whether and, if

14   so, to what extent in which manner Tembec is to bear

15   the costs of arbitration referred to in Articles 38

16   through 40 of the UNCITRAL Arbitration Rules, and

17   then it notes that we had previously made such a

18   request and that you are retaining jurisdiction over

19   that portion of the proceedings.  It says nothing

20   about retaining jurisdiction over a claim for costs

21   for Tembec against the United States.

22        PRESIDENT van den BERG:  On the question of

137

12:40:00 1    quantification of costs, without expressing any view

2    which way this Tribunal would go, the Tribunal has

3    two questions, actually.  One is, Ms. Menaker,

4    whether you had an office on the sidewalk.  The

5    reason is that you are purely claiming legal fees and

6    no overhead.

7            MS. MENAKER:  I feel like I often do have an

8    office on the sidewalk, and when this is all over, I

9    can invite you all there to see it.

10           But as we mentioned in our submission, in

11   our first cost submission.  Our cost requests are

12   extremely conservative.  We are not like a law firm

13   that bills out to clients, where we charge for

14   overhead.  As you say, we do not have a system that

15   unless we have a very large submission that we

16   outsource for copying.  We do our copying in-house,

17   and we don't have a system like law firms have that

18   tally up the copies that you're making and bill it to

19   a certain client.  We don't have that system for

20   faxes.  We don't allocate our secretaries' time or

21   any of that, so our costs are very understated.

22           And we have also been very conservative in

138

12:41:21 1     that we have estimated the time that we have spent on

2     the matter, but we have not allocated a market rate

3     to that time, but rather have just taken a portion of

4     our annual salary, because we are government salaried

5     that is well below market rate, so yes, it is akin to

6     having an office on the sidewalk.

7          PRESIDENT van den BERG:  The other question

8     is, the salaries which are put forward in the 7th

9     April 2006 submission, are they with or without tax,

10     or before tax or after tax?

11          MS. MENAKER:  They're gross, before tax.

12          PRESIDENT van den BERG:  Now, assuming

13     another hypothetical thing, that the Tribunal would

14     award those costs, are we not actually awarding

15     double payment because tax is already taken back by

16     the United States over your salary?  Isn't it,

17     Ms. Menaker?  So, in other words, should we not award

18     the net costs?

19          MR. CLODFELTER:  I would hate to foist upon

20     you the calculation burden that we propose.  We don't

21     think so, Mr. President.  An award of costs to

22     private parties, tax is also paid on the income

139

12:42:46  1   represented in those awards of costs, and there is no

2   reduction for taxes, so we would suggest not.  And

3   even though the parties are the same here, we don't

4   see any rationale for doing that.

5        PRESIDENT van den BERG:  The Tribunal may

6   not see that, but a private party cannot put the tax

7   in its own pockets, although some private parties

8   would like to do that.  But in this case, a party is

9   claiming costs, being a government, and then says,

10   well, look, we are claiming the gross salaries, but

11   part of those gross salaries we have already been

12   paid in a form of tax.

13        MR. CLODFELTER:  I don't think I have a

14   better answer for you, Mr. President, except to say

15   it's our understanding that in practice there is no

16   deduction for awards of costs to governments.  We

17   have enjoyed one award of costs in the past, and no

18   such deduction was made.

19        ARBITRATOR ROBINSON:  If I might turn to the

20   letter from the Government of Canada to the CEO of

21   Tembec, if I can find it here in my pile, it's

22   probably right in front of me, might I ask,

12:44:47 1    Mr. Feldman, who is the author of this letter?  Do

2    you know?

3            MR. FELDMAN:  It's signed by Andrea Lyon,

4    and it identifies her as the Chief Trade Negotiator

5    of North America for the Department of Foreign and

6    International Affairs Trade Canada.

7            ARBITRATOR ROBINSON:  And did Tembec have

8    any input into this draft letter?

9            MR. FELDMAN:  None whatsoever.

10           ARBITRATOR ROBINSON:  Do you know whether

11   this letter was approved by the other people in the

12   Canadian Government who were involved with the

13   Softwood Lumber Agreement?  As I understand it, and I

14   must say I can only assume that the Canadian

15   Government is--what shall I say--functionally as

16   organized as the U.S. Government, is this a letter

17   that was approved by Meg Kinnear, for example, who I

18   gather is the lead negotiator for the Government of

19   Canada?

20           MR. FELDMAN:  It's my understanding, but I

21   have no firsthand knowledge that this request was

22   made at a senior level of the government--that is,

141

12:46:10 1    Mr. Lopez, the Chief Executive Officer of Tembec, at

2    a senior level of government asked for the view of

3    the Government of Canada on this matter, and the

4    letter then came from Ms. Lyon.

5         So, I would draw the inference that it

6    having been brought about at a senior level--and by

7    "senior level" I mean a cabinet level--that it would

8    have had to have been approved in the office to be

9    sent out.

10        ARBITRATOR ROBINSON:  I would like to ask

11   the U.S. for its views with respect to what effect we

12   should give to this letter.  I believe that was one

13   of the questions that we asked, but since I read the

14   answers in the wee hours, I cannot recall.  But since

15   we do not have the Government of Canada here for

16   whatever reason, not that they would answer anything

17   even if they were here, I have been struggling with

18   what are we to make of this letter from the

19   Government of Canada in our own deliberations.

20        MS. MENAKER:  The United States submits that

21   the Tribunal ought to give no weight whatsoever to

22   this letter.  You will recall that in Tembec's prior

12:47:39 1    submission it stated that if the Tribunal would like,

2    it could have the Government of Canada submit a

3    letter regarding what Canada's intentions were, and

4    we objected to that.  We said that that is not an

5    issue, that a submission that could be made pursuant

6    to Article 1128 of the NAFTA for instance, where that

7    Article prevents a nondisputing party or nondisputing

8    state to make submissions on issues of treaty

9    interpretation of the NAFTA, this doesn't concern

10    that.  This is essentially factual evidence, and we

11    objected on the grounds that factual evidence ought

12    not to be introduced, especially if we would not have

13    a chance to subject the evidence to

14    cross-examination, and we have not had that

15    opportunity.

16        Ms. Lyon isn't here today, nor has she been

17    asked to come today, and we have had no opportunity

18    to cross-examine her.  We don't know.  She says here

19    she was the chief negotiator.  We know from the USTR

20    that to the best of or knowledge, they never dealt

21    with her on any of these issues, so we don't know

22    what role she actually played, what her understanding

143

12:48:47 1    was at the time that the SCA was being negotiated.

2         We don't know where she gained her

3    understanding of Tembec's Chapter XI claim in the

4    District Court proceedings.  Now, Mr. Feldman has

5    just said Tembec had no hand in drafting this, but

6    surely the chief negotiator for North America, I

7    don't think she keeps up with the procedural history

8    of all of these cases, especially the procedural

9    history insofar as it's taking place in a U.S. court.

10        So, we don't know where she gained that

11   information.  We have not been able to make much

12   sense of it, but had no opportunity to question her

13   on that.

14        She also expresses the view that she doesn't

15   understand why--it was her understanding that Canfor

16   and Tembec would be treated equally.  Well, certainly

17   that, to the best of our knowledge, wasn't discussed

18   at the negotiations.  If it had been, we could have

19   quite easily explained how those companies and their

20   claims were dissimilarly situated.  One had an

21   arbitration that was proceeding before this panel.

22   The others' claim had been terminated subject to the

144

12:49:47 1    qualifications of that order.

2            So, there are many things in here which we

3    think go unanswered, and given the fact that we

4    haven't had any opportunity for cross-examination, we

5    don't think that it should be given any credence.

6            MR. CLODFELTER:  I would just add, if I

7    might, Mr. President, first of all, the letter does

8    not support Mr. Feldman's theory that his draft TLAs

9    represented anything effective with respect to this

10   agreement.  They don't cite them.  They don't rely

11   upon them at all from Canada's point of view.

12   Secondly, they provide no support for the theory that

13   we've heard all for the first time today, the

14   dismissal of the District Court action embodied the

15   Chapter Eleven action, and therefore reference to the

16   District Court action was sufficient to trigger the

17   no claims per cost language with respect to the

18   Chapter Eleven action.  There is no support for that

19   in Canada's understanding whatsoever in this letter.

20           Beyond that, the letter represents the

21   claimed understandings of a single party to a

22   negotiation, and as we stated in answers to your

145

12:50:44  1    questions, these understandings were never

2    communicated to our negotiators.  Therefore, it

3    doesn't have any value as evidence, we believe.

4         PRESIDENT van den BERG:  Mr. Feldman, you

5    would like to respond?

6         MR. FELDMAN:  Yes, just a small note.  Thank

7    you, Mr. President.

8         I'm not aware that any evidence of any kind

9    has been presented that the inclusion of the Chapter

10   Eleven claim in the Termination of Litigation

11   Agreement was a mistake, and I'm not aware that the

12   Government of Canada was ever informed that it was a

13   mistake or was being deliberately excluded from the

14   SCA because it was a mistake.  It was there.  It was

15   there for a very long time without anyone saying, oh,

16   we have a mistake here.  It was deliberately

17   included.  It was a document that they obviously

18   spent quite a lot of time on.  They have been

19   emphasizing the time they have spent on it.

20        Nor am I aware that there was ever any

21   suggestion that any companies during the negotiations

22   were to be treated differently from other companies,

146

12:51:45  1   and it is clear that the Government of Canada thought

2   all companies were being treated the same.

3          Now, this once again goes, I regret to say,

4   to the question of jurisdiction.  This appears to be

5   a disagreement of interpretation of the Softwood

6   Lumber Agreement and its amendments between the two

7   governments for them to sort out.  But as to the

8   testimony that it appeared as a mistake and it was

9   deliberately removed because it was a mistake, this

10  is a version with no evidence, no support, and to the

11  best of our knowledge, the Government of Canada

12  certainly was never aware of that thinking in the

13  United States, that this was a matter that was to be

14  removed because it was a mistake.

15         MR. CLODFELTER:  Mr. President, we have to

16  answer this jurisdictional point because we haven't

17  had a chance to do so.  Mr. Feldman has not shown

18  how, even if his interpretation of Article 14 of the

19  SLA is accurate, it would affect this Tribunal's

20  jurisdiction at all.  In fact, it simply prohibits

21  the initiation of litigation by the parties.

22         We would suggest that its only application

147

12:52:46  1  would come if and when Canada thought our pursuit of

2  these costs were somehow in violation, and it would

3  be up to them to exercise their right to initiate

4  dispute resolution proceedings under paragraph one of

5  Article 14.  No showing has been made how it

6  restricts your authority whatsoever.

7         PRESIDENT van den BERG:  Firstly,

8  Mr. Mestral's questions.

9         ARBITRATOR MESTRAL:  One very general

10  question for both sides.  Setting aside the

11  jurisdictional question, we do decide on this, the

12  UNCITRAL Rules give us very broad discretion.  And I

13  was struck by this morning that throughout all this,

14  first of all, there has been very a complex political

15  process, apparently going to very highest levels of

16  government, several not many voices at higher levels

17  of government.  Many departments involved, many

18  people in departments, and one wonders in the end

19  whether this multiplicity of voices doesn't become

20  something of a cacophony.  In that case, my question

21  is then to both sides, well, how should that

22  appreciation affect the exercise of our discretion?

148

12:54:32 1          MR. FELDMAN:  Would you like us to answer

2  first?

3          ARBITRATOR MESTRAL:  Yes, sure.

4          MR. FELDMAN:  I believe that this is why we

5  invoked our--earlier the basic terms of April 26th

6  and suggested that one give consideration to the

7  intent of the parties, and to the reflection of the

8  intent of the parties, and why I began my remarks,

9  therefore, this morning saying that there was never

10  any ambiguity.

11          Indeed, in the basic terms and in the first

12  draft of an agreement that was circulated, in, I

13  believe, May, the front end of the agreement only

14  dealt with the termination of litigation.  That was

15  the initial purpose of the agreement was to terminate

16  litigation, and terminate meaning in its complete way

17  with all sides and all parties bearing their own

18  costs and fees.  That was always the understanding of

19  everyone in these negotiations except apparently this

20  team of lawyers from the Department of State because

21  this notion that Tembec was to be singled out in some

22  way has been news to the Government of Canada, as

149

12:55:41 1    indicated in this letter from Ms. Lyon, the

2    communications certainly between the Government of

3    Canada and Tembec were always that there was to be no

4    distinction as to how the companies and parties were

5    to be treated.

6        So, the course and intent of the parties

7    from the beginning was to put the litigation behind

8    everyone without allocating costs and fees to

9    anybody, and that was always the intent, and that's

10    the intent reflected in the termination litigation

11    agreement in which the Government of Canada says in

12    this letter there was no understanding that the

13    Settlement of Claims Agreement was to change in some

14    way those terms or intent.  That wasn't the purpose

15    of the Settlement of Claims Agreement.

16        What you have heard today is that there was

17    a deliberate intent on the part of the United States

18    to eliminate from the Settlement of Claims Agreement

19    the Tembec Chapter Eleven claim so that they could

20    pursue costs and fees.  This has been news to

21    everyone.

22        MR. CLODFELTER:  Let me just begin our

12:56:41  1    answer by noting that this arrangement is not unique

2    in its complexity or the number of people involved.

3    Complex corporate transactions frequently involve

4    many, many parties and many actors on behalf of those

5    parties.  Yet there is no possible suggestion that

6    the parties can somehow avoid the terms of their

7    agreement because there were a lot of people

8    involved.

9         What we do have here when you work beyond

10    the cacophony is the written text of the agreement of

11    the parties.  That is what reflects their intent, not

12    the unilateral statements of one party about what it

13    understood.

14         The fact of the matter is Tembec's Chapter

15    Eleven claim was no longer listed as an action to be

16    dropped, and therefore did not enjoy the benefit of

17    the reference to the claims for costs in that

18    agreement.

19         MS. MENAKER:  And let me just add here about

20    insofar as the complications are concerned, some of

21    the complication arises, quite frankly, from Tembec's

22    submissions in this regard.  We have heard a

151

12:57:42 1    multitude of different arguments as to why we should

2    not be able to pursue our cost claim.

3          First, they argued that the TLA supplemented

4    the SCA, that the SCA didn't replace it.  Then a

5    while after that, they argued that the reference to

6    the consolidated action, that that incorporated their

7    Chapter Eleven claim.

8          Today for the first time we heard that the

9    dismissal of the District Court claim was--somehow

10    encompassed our claim for costs in this arbitration,

11    and we have also heard argument today for the first

12    time about their--the TLA document that they signed

13    being some sort of promissory note, and I suggest all

14    of this is unnecessarily added to the complexity of

15    this issue when really what we are dealing with here

16    is an agreement that is clear on its face.  There is

17    only one signed executed agreement.

18          I also just wanted to note that the last

19    thing that Mr. Feldman said is that the reference to

20    Tembec's NAFTA Chapter Eleven claim was intentionally

21    removed so that we could pursue costs in this

22    proceeding, and that's simply not true, and there is

152

12:58:53 1   no evidence to suggest that.  Yes, it was

2   intentionally removed.  It was intentionally removed

3   because it was placed in error in the earlier

4   agreement.

5          Now, he has cast doubt on that, but the

6   truth of the matter is that there were several things

7   in the SLA which were just--which had to be corrected

8   in the SCA.  Mr. Feldman himself pointed out one of

9   those things earlier.  He said that he was asked to

10   sign to terminate a case when the client, on behalf

11   of who he was asked to terminate was an amici in that

12   case, an amicus, and didn't have standing to

13   terminate that case.  That obviously was an error,

14   and that had to be corrected in the SCA.

15          Similarly, we heard before Tembec surmising

16   that perhaps Canfor's Chapter Eleven claim was

17   included in the SCA and Canfor signed the SCA because

18   perhaps it had not signed the TLA.  Well, I have just

19   discovered because I asked someone to look into it,

20   that, indeed, Tembec--Canfor, excuse me, Canfor's

21   counsel did return a signature page for the SCA.

22   What is interesting about that signature page--TLA.

153

13:00:07 1    Excuse me.  What's interesting about that signature

2    page, however, is the fact that the counsel who is

3    listed as Canfor's counsel is Mr. Thomas Peel of

4    Baker & McKenzie, and he is listed as counsel for a

5    number of different companies, including Canfor.

6          Now, I don't know if he represents Canfor in

7    some other proceedings or not, but there is no

8    signature block in the TLA for either Mr. John Landry

9    or Mr. Keith Mitchell, who, as you know, are the

10    counsel for Canfor in its NAFTA Chapter Eleven claim.

11    That seems to have been in error that was corrected

12    in the SCA.

13          So, as Mr. Feldman noted, these negotiations

14    were done on a very fast time schedule.  It was a

15    very complex negotiation.  Not everybody who needed

16    to be involved was involved in the negotiations from

17    the beginning, and it became very clear very early

18    that the TLA had problems with it, that it was never

19    going to become into force, that the governments had

20    to try, go back to the drafting board and redraft it,

21    which is what they did, and certain of those

22    litigations were dropped for various reasons.  Some

154

13:01:15 1    were included by error.  Some were simply unnecessary

2    to include in order for the SLA to come into force.

3         But again, it was not the burden of the

4    United States to tell Tembec or to tell the

5    Government of Canada, look, we are going to drop this

6    one litigation.  Let me explain to you why.  It was

7    clear it was being dropped.  If the Government of

8    Canada or anybody else had a question about it, it

9    would have been discussed, but just the same reason

10   why we didn't necessarily discuss every other

11   litigation that was listed and why that was

12   being--the treatment was being changed among the two

13   different agreements.  There is no reason to put

14   any--to find any sort of bad faith or to find that

15   the United States had a burden which it did not have

16   just because it did not initiate discussions on these

17   points with the Government of Canada.

18        ARBITRATOR ROBINSON:  I would like to ask

19   with regard to the Vienna Convention on the Law of

20   Treaties, Article 32, which is on the subject of

21   supplementary means of interpretation.

22        As I understand it, the Vienna Convention is

13:02:36  1  regarded as stating customary international law in

2  this regard, and it bears on whether in interpreting

3  the SCA itself, the SCA, in effect, can stand on its

4  own two feet, or whether we have to have recourse to

5  supplementary means of interpretation, such as the

6  letter from the Canadian Government or such as the

7  provisions in the TLA.

8         And Article 32 states that recourse may be

9  had to supplementary means of interpretation when the

10  interpretation leaves the meaning ambiguous or

11  obscure or leads to a result which is manifestly

12  absurd or unreasonable.

13         I would ask both of the parties whether in

14  their opinion Article 32 applies or whether we do not

15  have to have any recourse to supplementary means of

16  interpretation for the purpose of interpreting the

17  SCA.

18         PRESIDENT van den BERG:  Mr. Clodfelter,

19  Ms. Menaker.

20         MS. MENAKER:  I mean, in our view, Article

21  32 is inapplicable for several reasons.

22         First, I believe that Article 32 talks in

13:04:15  1    terms of the travaux, the preparatory work for a

2    treaty in interpreting a treaty.  Here, this letter

3    is not travaux.  It didn't precede the negotiation of

4    the conclusion of the Treaty.  Rather, it's a

5    post hoc explanation.  So, in that one respect, we

6    would submit that resort ought not to be made to the

7    letter in terms of interpreting the SCA under the

8    Vienna Convention.

9          Moreover, in interpreting the SCA in

10   accordance with its terms would not lead to any

11   absurd or unreasonable result, and there is not any

12   inherent ambiguity in its terms.  Under Article 31 of

13   the Vienna Convention, the Tribunal ought to

14   interpret the Treaty--in this case the SCA--in

15   accordance with the ordinary meaning of its text read

16   in context and in light of the object and purpose of

17   the Treaty.

18          The text of the SCA is clear.  Tembec's

19   NAFTA Chapter Eleven claim is not mentioned in the

20   SCA.  If you look even at the broader context and you

21   look at the TLA, you will see that it is explicitly

22   mentioned there.  That agreement never entered into

157

13:05:33 1   force.  That only bolsters the argument that it would

2   need to be mentioned in the SCA for it to be covered.

3   If it needed to be mentioned in the TLA, why wasn't

4   it mentioned in the SCA?

5        And again, there is nothing in reading the

6   agreement in accordance with its terms, in its

7   context and in light of its object and purpose, which

8   is clear on its face leads to, in our view, the

9   inescapable conclusion that there was no agreement to

10  terminate these proceedings insofar as the Tribunal

11  retained jurisdiction over our request for costs and

12  through--by means of the SCA.

13       PRESIDENT van den BERG:  I will give you an

14  opportunity, Mr. Feldman, but just one question here.

15  Obviously the SLA is in Treaty because it's between

16  two states.  The SCA is between a state or two states

17  and private parties.  Is that an international

18  treaty?

19       MS. MENAKER:  In Article 11, general

20  provisions, subparagraph three, it says, "The Annexes

21  are an integral part of the SLA 2006."

22       PRESIDENT van den BERG:  Thank you.

158

13:07:07 1          Mr. Feldman.

2          MR. FELDMAN:  Thank you, Mr. President.

3          We believe that the SCA does address the

4  Chapter Eleven claim, as I said several times.  The

5  District Court case contains the Chapter Eleven

6  claim.  There is no ambiguity that the dismissal of

7  that case means the dismissal of the Chapter Eleven

8  claim; that the Chapter Eleven claim was in that

9  forum, and only in that forum as the Chapter Eleven

10  claim.

11          It is an absurd result if you ask one

12  company out of hundreds in settling an international

13  dispute to pay costs and fees for all of the

14  litigation that was involved.  That does, indeed,

15  produce an absurd result.

16          And to my question, where is the evidence

17  that there was an error here that the Government of

18  the United States was deliberately correcting, we

19  have been given no evidence.  What we have been given

20  is once again the United States didn't seem to want

21  to tell anybody.  It didn't tell the Government of

22  Canada we are leaving that out.  We are making that

159

13:08:17 1    correction.

2         We have no knowledge of how long the SCA was

3    in the works or how quickly it was prepared or what

4    attention it was given.  All we know is we didn't

5    even know it existed until the 11th of October when

6    we were presented it for signature, which does raise,

7    since it required our signature, a serious question

8    of good faith.

9         But, in the haste of the preparation of some

10   of these documents and the cacophony that Professor

11   de Mestral invoked, they were undoubtedly errors, but

12   this was no mere error.  This was a change of real

13   substance and real consequence, and the Government of

14   Canada has indicated to you that it was a change that

15   the Government of Canada did not understand was

16   taking place, and that it changed materially the

17   intent of the parties as inscribed in the Termination

18   of Litigation Agreement, which was part of the

19   definitive signed agreement between the parties on

20   the 8th of September, and the only document to the

21   knowledge of Tembec, as of the 6th of October, and,

22   indeed, until the evening of the 11th of October.

160

13:09:26  1          So, if all of that still leaves an

2  ambiguity, then, indeed, Article 32 of the Vienna

3  Convention may apply, but I note that Ms. Menaker was

4  reading it as referring to the travaux preparatoires,

5  but it says including the preparatory work of the

6  treaty.  It otherwise says to supplementary means of

7  interpretation, which would be such as the letter

8  that has been provided from the Government of Canada.

9          So, we think that the agreements signed

10  clearly involved the dismissal of the Tembec's

11  Chapter Eleven claim.  That was Tembec's intent in

12  signing the SCA, and the intent of that party also

13  should be taken into consideration, but if that's not

14  sufficient, and it's perceived that nevertheless

15  there is some other latent claim not embodied there

16  that the United States deliberately excluded for

17  whatever reason, then Article 32 would seem to us

18  would apply.

19          MR. CLODFELTER:  Mr. President, it's hard to

20  understand how Mr. Feldman can say that the U.S.

21  excluded their claim from the text when it was an

22  agreement of both parties, and he just said it was a

161

13:10:42 1  substantive major change.  We agree with that.  It

2  was obvious on its face that the Chapter Eleven claim

3  was no longer listed, and the implications of that

4  should have been obvious to both parties.  It was

5  certainly obvious to us, and since it was a two-party

6  agreement, it had to have been obvious to the

7  Government of Canada as well.

8         If there is any complaint about bad faith,

9  we suggest that Tembec should look to its own

10  government.  We had no obligation with respect to

11  Tembec in that regard at all.

12         But I have to address as well this new

13  notion that somehow inclusion of the District Court

14  case also included Tembec's Chapter 11 claim.  Now,

15  if, in fact, that was Tembec's understanding all

16  along, it's very curious they were hearing about it

17  for the first time on the date of this hearing.  We

18  know that Canada doesn't support that interpretation.

19  Canada doesn't claim that that's what they achieved

20  in the SCA.  It's Tembec's notion that they presented

21  for the first time today.  We suggest it's absurd.

22         Because whether or not--I don't know what it

162

13:11:47 1   means to say that the District Court case included

2   their Chapter Eleven claim.  What we do know is that

3   Chapter Eleven proceedings continued with respect to

4   the cost claim arising from their Chapter Eleven

5   claim, and these proceedings clearly were not

6   included in that District Court action.  These

7   proceedings were not covered by the SCA, and

8   therefore the agreement not to seek costs with

9   respect to these proceedings was not covered by the

10   SCA.

11        MS. MENAKER:  And, indeed, I would just note

12   that even the documents that Tembec created, the TLAs

13   that it sent on September 20th, it contained one for

14   the District Court proceeding and one for the NAFTA

15   Chapter Eleven proceeding.  If the District Court

16   proceeding encompassed the NAFTA Chapter Eleven

17   claim, why was it necessary for Tembec to send back

18   two separate documents?  I submit that those

19   arguments are just simply inconsistent with one

20   another.

21        MR. FELDMAN:  Mr. President, that argument

22   is beyond the pale.  Tembec signed every document

163

13:12:49 1    requested of it to terminate all of its litigation.

2    Every document that was presented to it by the

3    Government of Canada to be signed and to be submitted

4    to the Government of the United States as well as to

5    the Government of Canada Tembec signed.

6              Now, to suggest, well, we slipped in one and

7    we slipped out another, and why didn't Tembec

8    question this one and why didn't Tembec question that

9    one with all of the litigation involved and all the

10   questions at issue, and it was a major change and

11   should have been plain on its face, but the

12   Government of Canada has told you they weren't aware

13   that this intent was changed.  The government of the

14   United States did this big thing, and we ought to

15   take recourse at the Government of Canada.

16             Our understanding is the Government of the

17   United States drafted the SCA.  Maybe that's not

18   true.  We don't know.  We weren't there.  We don't

19   know how it necessarily came about.  Maybe someone

20   else wants to say it was a mutual document.  What we

21   know is that the Government of Canada says it thought

22   that all the parties were being treated the same and

13:13:44 1  that this extinguished all of the legal cases.

2  That's what it understood.  That's what Tembec

3  understood.  Tembec signed every dismissal and

4  termination of litigation it was presented.

5        ARBITRATOR ROBINSON:  I would like to ask if

6  I'm understanding, Mr. Feldman, are you saying in any

7  way that our decision on the costs is affected by the

8  case in the District Court?  I don't know whether one

9  would call it now pending or not pending because it

10  was withdrawn and then the motion to reinstate, but

11  is there any, in your opinion, and I would like to

12  hear from the United States, are we in any way

13  circumscribed in what we do by the existence of that

14  case in whatever state it may now be?

15        MR. FELDMAN:  It's a very difficult

16  question, and I don't have a canned answer for you.

17        Tembec agreed to dismiss that case.  With

18  the dismissal of that case, the Chapter Eleven claim

19  of Tembec would have been extinguished.  That was

20  Tembec's intent and its understanding of what it was

21  doing.  So, when it signed the Settlement of Claims

22  Agreement, as it indicated, as we indicated in our

13:15:09 1  letter that night, we weren't quite sure why we were

2  signing what we were signing.  You have seen the

3  E-mail trail.  We questioned why this was being

4  presented this way, why we hadn't heard about it

5  before.  We presumed that the parties agreed that we

6  weren't to have seen it before.  We don't presume

7  that the Government of Canada was free to have shown

8  it to us sooner.

9        And so, we believed that that case being

10  extinguished ended the entire question of costs and

11  fees because that was a term of the SCA, it was a

12  term of the TLA.  It was the term of the basic terms

13  in April 26.  It was everybody's understanding from

14  the beginning.  Everyone bears their own costs and

15  fees, all litigation goes away.

16        Now that that case has been revived, and

17  that goes to your question to the reason why I don't

18  have a canned answer, Tembec sought out the

19  Department of State days ago saying it would withdraw

20  that claim and extinguish this if everyone would just

21  get back to where we were and walk away, terminate

22  all of these proceedings.  And the United States

166

13:16:28 1    declined to enter that discussion with us.

2         So--

3         PRESIDENT van den BERG:  Sorry, Mr. Feldman,

4    are you referring now to settlement discussions

5    between Tembec and the United States?

6         MR. FELDMAN:  Yes.

7         PRESIDENT van den BERG:  I take always the

8    position that parties should be free to discuss

9    settlement, and I would encourage that, but one thing

10   is I don't want to hear about it.

11        MR. FELDMAN:  That's fine, and I apologize,

12   Mr. President.  I introduced it only because I'm

13   struggling with Mr. Robinson's question; that is,

14   Tembec has only been seeking to terminate all the

15   litigation, and one way to do that would be to do it

16   voluntarily, but in the context of an understanding

17   that there was to be no allocation of costs and fees,

18   which was Tembec's understanding from the beginning.

19        So, exactly how to deal with that case and

20   how it constrains you, I don't have a simple answer

21   because it is a complexity here.

22        ARBITRATOR ROBINSON:  Thank you.

13:17:28 1            PRESIDENT van den BERG:  May I ask you also,

2    actually, the answer given to the question 21 by your

3    side--question 21 was, "What is the relevance, if

4    any, of setting aside the action before the U.S.

5    District Court for the present question of the costs

6    of arbitration?"  And you your answer is,

7    Mr. Feldman, "See the answer to the question 16 C."

8    And then you add, "What the District Court decides to

9    do with respect to Tembec's motion to set aside the

10   judgment should not affect the decision before the

11   Tribunal."

12            And basically also 16 C, you start--your

13   answer there starts with--the question there is,

14   "What is legal relevance of response to this

15   question?"  And A, the first words are, "There is

16   none," so basically what you're saying.

17            MR. FELDMAN:  Yes.  What I'm trying to do is

18   acknowledge the complexity of the question.  There is

19   an answer.  You're not constrained in simple terms,

20   but I don't see it as so simple.

21            PRESIDENT van den BERG:  Any observations

22   from the United States on this point?

168

13:18:47 1             MS. MENAKER:  As I stated earlier today, in

2      our view, many of the arguments that Tembec is making

3      here are better addressed by the District Court

4      because here the Tribunal, in our view, it's clear,

5      has jurisdiction to decide the issue of costs, and

6      there is no legal impediment to our seeking costs.

7             Now, Tembec's primary argument against

8      awarding costs is that it was somehow tricked into

9      signing the SCA, and that is the argument that they

10     are making before the District Court seeking to

11     reinstate their set aside proceeding.  Now, if they

12     should prevail there, their remedy is that that

13     proceeding will be reinstated.  They ought not

14     to--this Tribunal ought not to deny our request on

15     that basis; and then, as I stated before, I think

16     that issue is one that is before the District Court,

17     and this Tribunal need not decide that issue here.

18             I would just note that when Tembec argued

19     that it had agreed to dismiss the District Court

20     claim and therefore dismiss the Chapter Eleven claim,

21     the Chapter Eleven claim would have been

22     extinguished.  In our view, our view has always been

169

13:20:10 1    that the Chapter Eleven claim, aside from our costs

2    request, was always extinguished, that they never had

3    a right to reinstate that Chapter Eleven claim.  So,

4    in our view, that was something separate and apart

5    from their District Court challenge, and I will just

6    leave it there.

7              PRESIDENT van den BERG:  I'm mindful of

8    Mr. Feldman's imminent departure time, but

9    nonetheless, I wonder whether the parties have

10   anything for rebuttal?  But I'm also mindful about

11   our Court Reporter who at this point in time must be

12   exhausted.

13             First of all, I look to the United States.

14   Would you like to use rebuttal?

15             MR. CLODFELTER:  We do have some rebuttal,

16   and we would like a few minutes just to prepare.

17             PRESIDENT van den BERG:  Exactly.  So what I

18   suggest, Mr. Feldman, there are a few minutes on

19   rebuttal.  Perhaps you have some 15 minutes more?

20   When I make these type of applications to a Tribunal,

21   I say I'm always a bit conservative.  I built in a

22   float of 15 minutes.

170

13:21:20 1          MR. FELDMAN:  My flight's at 3:30, so we can

        2    do it.

        3          PRESIDENT van den BERG:  I would like to

        4    have five minutes break.

        5          (Brief recess.)

        6          PRESIDENT van den BERG:  Mr. Clodfelter, are

        7    you ready?

        8          MR. CLODFELTER:  We are ready.

        9          PRESIDENT van den BERG:  Before you start

       10    your rebuttals, we have to consider one aspect, being

       11    the curious matter which we think is not very

       12    precedented, is the cost of the costs issue, and the

       13    Tribunal is minded to allow both parties to make very

       14    brief costs submission on the cost-of-costs issue,

       15    since both parties actually are seeking those costs

       16    in principle, and the Tribunal has in mind a period

       17    of one week, but one wonders whether that is too

       18    short.

       19          Mr. Feldman?  You can produce these numbers

       20    immediately?

       21          MR. FELDMAN:  Not off the top of my head,

       22    but probably a computer can spit them out.

171

13:33:53 1             PRESIDENT van den BERG:  Sure could.

2             Mr. Clodfelter?

3             MR. CLODFELTER:  You're talking about a

4    further quantification?

5             PRESIDENT van den BERG:  No, I'm talking

6    about the costs--remember that these proceedings

7    involved costs for both sides, and both sides--

8             MR. CLODFELTER:  Costs sought in the

9    cost-for-cost section?

10             PRESIDENT van den BERG:  Yes.  You have not

11   yet submitted or quantified a cost-of-costs

12   submission.

13             MS. MENAKER:  That's fine.

14             PRESIDENT van den BERG:  One week,

15   wonderful.  All right, that's the point.

16             And then we can come now to the rebuttals.

17             Mr. Clodfelter, Ms. Menaker for the United

18   States.

19             MR. CLODFELTER:  Ms. Menaker will make our

20   brief closing remarks.

21      REBUTTAL ARGUMENT BY COUNSEL FOR RESPONDENT

22             MS. MENAKER:  My closing remarks will be

172

13:34:45 1    very brief.

2              As we have shown, there is no legal

3    prohibition, there is no legal rationale that would

4    preclude us from seeking costs in this arbitration.

5    Tembec's NAFTA Chapter Eleven claim was not among the

6    claims that was listed in the Settlement of Claims

7    Agreement.  The rationale for why it wasn't listed,

8    our reasons behind that, none of that is relevant.

9    Our intent for not listing it really is not relevant.

10   We have spent a long time talking about that and what

11   changed between the TLA and the SCA, but at the end

12   of the day the document is clear on its face.  It's

13   not ambiguous.  There is no uncertainty about it.

14             Mr. Feldman argued about absurd results, but

15   certainly that is not the type of absurd results that

16   the Vienna Convention is talking about when

17   interpreting a treaty provision.  There, absurd

18   results would be when the document can't be read

19   giving meaning to all of its provisions.  Here, there

20   is no such thing.  It is clear on its face that there

21   was no agreement to terminate the proceedings with

22   respect to Tembec's NAFTA Chapter Eleven claim in the

173

13:35:59  1  SCA; and, therefore, there was no agreement by the

2  parties to bear their own costs in this proceeding.

3          At bottom, Tembec's complaint is with its

4  own government.  As we have repeatedly emphasized,

5  the SLA is an agreement between the United States and

6  Canada.  We negotiated its terms and the terms of all

7  of its annexes with Canada.  In doing so, we looked

8  out for the interests of the United States, as is

9  proper.  Canada presumably looked out for the

10  interests of Canada, which is also proper.  It would

11  have, indeed, been inappropriate for us to speak

12  directly with Canadian private parties with respect

13  to the terms of the agreement.  We never did that.

14  All discussions went through Government of Canada

15  officials and/or Canada's counsel.

16          So, we had no discussions with any of the

17  Canadian Softwood Lumber companies concerning the

18  Softwood Lumber Agreement or the Settlement of Claims

19  Agreement or the earlier Termination of Litigation

20  Agreement.  Our sole communications with those

21  companies was in the very last day and the last hours

22  when we were negotiating the precise language to be

174

13:37:18 1  used in stipulations of dismissal to be filed in

2  those various cases, because then it was a

3  negotiation between counsel for the parties to that

4  particular action, and we needed to agree on the

5  precise language that could be used in the document

6  to be filed before the court or the Tribunal.

7          So, Tembec's claims all amount to a

8  dissatisfaction with the manner in which its

9  government treated it during the negotiations.  It

10  argues it wasn't given enough time to review the SCA.

11  Well, the Government of Canada was responsible for

12  giving the SCA to the Canadian companies, which it

13  did.  It argues that the counsel for the Government

14  of Canada was unresponsive to its questions regarding

15  the SCA.  What does that have to do with the United

16  States?  I mean, nothing, we submit.  The United

17  States should not be made to pay because the

18  Government of Canada's counsel was not responsive to

19  Tembec's questions concerning the terms of the

20  agreement.  We would have no reason to know that

21  Tembec had questions concerning the terms of the

22  agreement.  We would have had no reason to announce

175

13:38:25 1    our interpretation of the terms of the agreement.

2    That was all done between Government of Canada, their

3    counsel, and counsel for the private parties.

4            Mr. Feldman just reiterated that the

5    governments pulled a bait and switch, and he said,

6    "We stand by that."  And again, I remind you that in

7    the District Court he's argued that both the United

8    States and the Government of Canada pulled this

9    so-called "bait and switch."  It is clearly unhappy

10   with the manner in which its government negotiated on

11   its behalf, but that is no reason whatsoever to

12   rewrite the agreement, and to rewrite the agreement

13   at a provision that waives the United States's right

14   to seek costs in this proceeding when that provision

15   is not in the agreement itself.

16           We have also heard from Tembec that it

17   gained the benefits of the agreement.  It argues it

18   was under duress to sign, it wasn't given enough

19   time, its questions weren't answered, it was

20   pressured.  Maybe it was under some pressure.

21   Everyone is under some pressure in a negotiation, but

22   other companies chose not to sign.  As I mentioned

13:39:33 1  before, Terminal Forest Products did not sign.  They

2  were listed earlier.  They would not agree to drop

3  their case.  They did not sign.  Domtar never signed

4  on to the agreement.

5           But Tembec wanted to sign on to the

6  agreement.  We heard today that it received over

7  $240 million as a result of the Softwood Lumber

8  Agreement.  I also discussed earlier how it benefited

9  from the very terms of the Settlement of Claims

10  Agreement and how it benefited from the changes that

11  were made in that agreement as compared to the

12  earlier TLA which never entered into force.

13           So, again, just to sum up, there is no legal

14  reason that would prevent this Tribunal from granting

15  the United States's request for costs in this

16  proceeding, nor is there any equitable basis to do

17  so.

18           Thank you.

19           PRESIDENT van den BERG:  That completes

20  closing submissions by the United States?

21           MR. CLODFELTER:  It does.

22           PRESIDENT van den BERG:  Thank you.

177

13:40:35 1          Mr. Feldman?

2          REBUTTAL ARGUMENT BY COUNSEL FOR CLAIMANT

3               MR. FELDMAN:  Thank you, Mr. President.

4               The United States suggests that it had no

5     relationship to Tembec in any of these

6     proceedings--its relationship was entirely with the

7     Government of Canada--and yet it had instructed and

8     asked, required Tembec to submit documents to the

9     United States, documents on the 20th of September,

10    the proceedings here, and, indeed, the SCA.

11              So, there was a direct relationship with

12    Tembec, and there were obligations, therefore, of

13    counsel, in dealing with counsel and in dealing with

14    the parties.  The SCA was an agreement with us, with

15    Tembec, as the Tribunal itself has pointed out,

16    signed by counsel on behalf of parties.

17              The Termination of Litigation Agreement was

18    in circulation available, if memory serves, for about

19    12 days before the deadline for signature and return,

20    and we had the SCA for about two hours, and the

21    instruction was that if we didn't sign it, we would

22    be responsible for the failure of the entire

178

13:41:40 1   negotiation and all of the SLA.

2        Now, the United States said it had nothing

3   to do with those instructions, but it had its

4   dealings with the Government of Canada, and we

5   certainly believe that the Government of Canada was

6   addressing us on behalf of both governments when we

7   were presented the SCA and told we had to sign it,

8   and we made very clear that we didn't have time to

9   understand it, and we asked questions.

10       What we do now know is that the Government

11   of Canada understood the agreement--at least to the

12   extent that we did, it understood that it had not

13   changed the underlying terms of the Termination of

14   Litigation Agreement.  It did not change the

15   agreement that all parties would bear their own costs

16   and fees.

17       The position of the United States now is,

18   well, that may be true, but your case wasn't there

19   anymore, but the Government of Canada thought it was.

20   And so the United States says, "Well, the document

21   was clear on its face, and Government of Canada

22   should have noticed that it wasn't there."  We

179

13:42:39 1   deliberately took it out, although we were told that

2   it was there in the Termination of Litigation

3   Agreement as an error.  It could easily be argued

4   under those circumstances that it was in the--it was

5   absent from the SCA as an error.

6          How would one know, given one document

7   signed, and all the time that passed without any

8   correction of that supposed error, and then here we

9   are with the SCA, it appears to be absent but not

10   really, because the action that we were asked to take

11   in a Joint Stipulation of Dismissal of the case in

12   the District Court extinguished the Chapter Eleven

13   claim.  And having that effect and the terms of the

14   SCA enunciated for all parties to bear their own

15   costs and fees, there was no reason to then divine

16   that there had been this change, that the Government

17   of Canada didn't notice?  It's not just that the

18   Government of Canada didn't tell us on the night of

19   October 11.  It wan unaware, as is indicated in its

20   letter of December 14, that it still was unaware that

21   there had been this kind of change this, material

22   change, affecting Tembec and Tembec uniquely.

180

13:43:50 1          Ms. Menaker mixes up the Termination of

2    Litigation Agreement and the SCA in the proceedings.

3    She said, "Other companies chose not to sign."  Other

4    companies chose not to sign the Termination of

5    Litigation Agreement--that is certainly true--but it

6    is not true of what happened with the Settlement of

7    Claims Agreement.  These were two distinct events in

8    different time spans.  And as to the SCA, everybody

9    signed it because everybody was under the same

10   understanding and under the same obligation.

11          That somehow Tembec was fooled, and the

12   Government of Canada was fooled, into distinguishing

13   Tembec from other companies in all litigation is

14   extraordinary, and this Tribunal can easily find that

15   it's beyond extraordinary.  It's now a matter of

16   interpretation of the agreement; and, if not, and

17   were the Tribunal to conclude that it comes within

18   its own ambit of responsibility and jurisdiction that

19   the matter was settled through the extinguishing of

20   the claim in the District Court, therefore covered

21   the Chapter Eleven claim, and that the two

22   governments therefore settled, that all parties would

181

13:45:06 1    bear their own costs and fees.

2               Thank you.

3               PRESIDENT van den BERG:  Thank you,

4    Mr. Feldman.

5               I think this comes to the close of our

6    hearing.  I look to my co-arbitrators, if there is

7    nothing further.

8               Are there any matters that the parties would

9    like to raise in terms of procedure or

10   administrative?  Mr. Feldman, on your side?

11              MR. FELDMAN:  We understand that you would

12   like a cost of costs in a week.

13              PRESIDENT van den BERG:  Yes.

14              MR. FELDMAN:  Thank you.

15              MS. MENAKER:  Just one question.  We noted

16   as far as the E-mail that we received from counsel

17   last night, in response to one of the questions, you

18   had asked for all of the motions and orders and

19   everything that had been filed in the District Court

20   proceeding.

21              PRESIDENT van den BERG:  You referred to

22   your Web site?

182

13:45:55 1          MS. MENAKER:  Referred to the Web site, but

2    there are also other more minor filings that were

3    made in that proceeding that I don't think had been

4    submitted to the Tribunal.  We have those with us and

5    a copy for counsel, if the Tribunal is interested in

6    those.

7          PRESIDENT van den BERG:  Yes, please.

8          Okay.  Anything else, Mr. Clodfelter or

9    Ms. Menaker?

10          MR. CLODFELTER:  No.

11          PRESIDENT van den BERG:  I wouldn't want to

12    hold up Mr. Feldman.  You are excused.  I can

13    understand.

14          Simply to thank counsel for both sides, it

15    was very helpful for the Tribunal today, and also the

16    preparation of today.  And we would also like to

17    thank David, again, for the court reporting and our

18    Secretary of the Tribunal.

19          That being said, we close the hearing, and

20    we look forward to receiving your submissions next

21    week, and the Tribunal will endeavor to render the

22    decision as soon as possible.  We are in the process

183

13:46:51 1  already of drafting it.

2             Thank you.

3             (Whereupon, at 1:46 p.m., the hearing was

4  adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

184

CERTIFICATE OF REPORTER


I, David A. Kasdan, RDR-CRR, Court Reporter, do hereby testify that the foregoing proceedings were stenographically recorded by me and thereafter reduced to typewritten form by computer-assisted transcription under my direction and supervision; and that the foregoing transcript is a true and accurate record of the proceedings.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to this action in this proceeding, nor financially or otherwise interested in the outcome of this litigation.


_____

DAVID A. KASDAN